## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ESTATE OF TAMAR KEDEM SIMAN TOV, BY HEIR-AT-LAW GAD KEDEM, ESTATE OF O. S. T., BY HEIR-AT-LAW GAD KEDEM, GAD KEDEM, INDIVIDUALLY, REUMA KEDEM, TALIA BINER, ESTHER BINER, DITZA HEIMAN, NETA HEIMAN MINA, DAFNA SHAY HEIMAN, GIDEON HEIMAN GLATT, YASMIN BEN GIGI, MAAYAN ELIAZ, INDIVIDUALLY, ESTATE OF DIKLA ARAVA ELIAZ, BY HEIR-AT-LAWS ODIN ELIAZ AND STAV ELIAZ, ESTATE OF T.E., MINOR CHILD, BY HEIR-AT-LAW MAAYAN ELIAZ, ODIN ELIAZ, INDIVIDUALLY, STAV ARAVA ELIAZ, INDIVIDUALLY, DOV ELIAZ, YIFAT TANAMI, SAGI ARAVA, ALON ARAVA, HADAR BEN DAVID, LIAT KOPERSTEIN, YALI KOPERSTEIN, ZIV KOPERSTEIN, NAAMA KOPERSTEIN, GONI KOPERSTEIN AVNI, RAN AHARON AVNI, MAAYAN ZIN, INDIVIDUALLY, D.E., MINOR CHILD, BY LEGAL GUARDIAN MAAYAN ZIN, E.E., MINOR CHILD, BY LEGAL GUARDIAN MAAYAN ZIN, MERAV TAL (TAL ALFASI), RACHEL ALFENDRI, TOMER TAL ALFASI, ORI TAL ALFASI, KEREN BLANK, SIGALIT SHARABI, VIKTOR RAHMILOV, GALINA RAHMILOV, INDIVIDUALLY, SOFIA HODEDATOV, SIGAL BENBENISTE, NATALI RAHMILOV, E.L.R, MINOR CHILD, BY LEGAL GUARDIAN GALINA RAHMILOV, TAMIR HODEDATOV, HANANEL BENBENISTE, EFIM SOLOMONOV, ESTATE OF YUVAL BAR-ON, BY HEIRS-AT-LAW ORIT BAR-ON AND ITZHAK BAR-ON, ORIT BAR-ON, INDIVIDUALLY, ITZHAK BAR-ON, INDIVIDUALLY, ESTATE OF MOSHE SHUVA, BY HEIR-AT-LAW YOSSEF SHUVA, YOSSEF SHUVA, INDIVIDUALLY, SONIA SHUVA, MAAYAN DEVIKO, SHIMON SHUVA, ESTATE OF DROR KAPLUN, BY HEIRS-AT-LAW NOAM KAPLUN, MAAYAN KAPLUN KEIDAR, MORAN KAPLUN (TARASOV), NOAM KAPLUN, INDIVIDUALLY, MAAYAN KAPLUN KEIDAR, INDIVIDUALLY, MORAN KAPLUN (TARASOV), INDIVIDUALLY, ESTATE OF MARCEL FRAILICH, BY HEIRS-AT-LAW MOR FRIDA STRIKOVKI, ZIV FRAILICH, AMIT FRAILICH, MOR FRIDA STRIKOVSKI, INDIVIDUALLY, ZIV FRAILICH, INDIVIDUALLY, AMIT FRAILICH, INDIVIDUALLY, SHARON CASPI, AMIT CASPI, INDIVIDUALLY, NIV CASPI, MAY CASPI, S. C., MINOR CHILD, BY LEGAL GUARDIAN AMIT CASPI, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§      Civil Action No.<br>     _____<br><br><br>     **COMPLAINT WITH**<br>     **JURY DEMAND** |

| | |
|---|---|
| ESTATE OF VARDA HARAMATY, BY HEIR-AT-LAW AYELET HARAMATI MIZRAHI, AYELET HARAMATI MIZRAHI, INDIVIDUALLY, AVRAHAM MIZRAHI, ITAMAR MIZRAHI, TOMER MIZRAHI, EDITH HYAMS, ASHER SABAG, MICHAL SABAG, DOR MICHAEL SABAG, DANNY OFER VAGE, INDIVIDUALLY, GAT VAGE, H. V., MINOR CHILD, BY LEGAL GUARDIAN DANNY OFER VAGE, S. V., MINOR CHILD, BY LEGAL GUARDIAN DANNY OFER VAGE, ESTATE OF MARK SHINDEL, BY HEIR-AT-LAW JULIA SHINDEL, JULIA SHINDEL, INDIVIDUALLY, IGOR SHINDEL, GUY SHINDEL, B. S., MINOR CHILD, BY LEGAL GUARDIAN JULIA SHINDEL, ESTATE OF YUVAL SALOMON, BY HEIR-AT-LAW DORON SALOMON, DORON SALOMON, INDIVIDUALLY, ESTATE OF GAYA HALIFA, BY HEIR-AT-LAW AVRAHAM HALIFA, AVRAHAM HALIFA, INDIVIDUALLY, SIGAL HALIFA, NOGA HALIFA, IDO HALIFA, IRIT LAHAV, TAMAR LAHAV, ELIYAHU HANAN BUCH, NITZAN LAHAV-PASTER, YAARA SZATMARI, ILAN LAHAV, GALIT LAHAV, INDIVIDUALLY, GUI LAHAV, R. L., MINOR CHILD, BY LEGAL GUARDIAN GALIT LAHAV, AND OMER LAHAV. <br><br> Plaintiffs, <br> v. <br><br> UNITED NATIONS RELIEF AND WORKS AGENCY ("UNRWA"), PHILIPPE LAZZARINI, PIERRE KRÄHENBÜHL, FILIPPO GRANDI, LENI STENSETH, SANDRA MITCHELL, MARGOT ELLIS, AND GRETA GUNNARSDOTTIR, <br><br> Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § |

ii

# TABLE OF CONTENTS

**Page**

NATURE OF THIS ACTION ................................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 6

THE PLAINTIFFS AND THEIR INJURIES FROM THE OCTOBER 7 ATTACK ................... 7

    Siman Tov-Kedem Families ......................................................................................... 7

    Biner Family ................................................................................................................. 12

    Heiman-Mina-Glatt-Gigi Families ............................................................................... 18

    Eliaz-Zin-Elyakim-Arava-Tanami-Koperstein-Avni-Ben David Families ............................... 25

    Tal-Alfendri-Alfasi-Blank-Sharabi Families ................................................................... 41

    Rahmilov-Hodedatov-Benbeniste-Solomonov Families ........................................... 49

    Bar-On-Shuva-Deviko Families ................................................................................. 56

    Kaplun-Keidar-Frailich-Strikovski Families ................................................................. 61

    Caspi Family ............................................................................................................... 66

    Haramaty-Haramati-Mizrahi-Hyams Families ........................................................... 72

    Sabag-Vage Families ................................................................................................. 78

    Shindel Family ............................................................................................................ 84

    Salomon Family .......................................................................................................... 87

    Halifa Family ............................................................................................................... 90

    Lahav-Buch-Paster-Szatmari Families ...................................................................... 94

DEFENDANTS ................................................................................................................ 101

BACKGROUND ON GAZA, HAMAS AND UNRWA .......................................................... 103

    Background on Gaza and Takeover by Hamas ......................................................... 103

    Background Regarding Hamas ................................................................................... 104

    Background regarding UNRWA .................................................................................. 111

UNRWA'S SUBSTANTIAL ASSISTANCE TO HAMAS ..................................................... 113

    A.    UNRWA facilitated construction of Hamas command and control centers, attack tunnels and underground bunkers under UNRWA headquarters, UNRWA schools, medical clinics, and offices. ..................................................................................... 113

    B.    Defendants knew that UNRWA permitted constructing weapons storage and deployment centers in its headquarters, schools, medical clinics, offices, warehouses and other facilities. ............................................................................................... 116

C.    Defendants knew that UNRWA permitted installation of rocket launching platforms and terrorist firing positions within and/or adjacent to UNRWA schools, medical clinics and offices. ................................................................................................ 119

D.    UNRWA continues to provide material assistance to Hamas despite public concern and objections from within the UN system............................................................. 120

E.    UNRWA staff are and were members of Hamas and participated in the genocidal terrorist attacks on October 7, 2023. ....................................................................... 122

F.    UNRWA Staff held and tortured hostages taken in the attacks on October 7. ......... 125

G.    UNRWA knowingly and intentionally employed Hamas members as UNRWA management and staff. .............................................................................................. 126

H.    Defendants knew that senior Hamas operatives held influential positions in UNRWA.. ................................................................................................................. 129

I.    UNRWA pays its Gaza staff in a fashion calculated to further enrich Hamas. ........ 132

J.    Defendants knew Hamas controlled UNRWA's Staff Union in Gaza. .................... 134

K.    UNRWA chose to use textbooks and teaching curricula approved by Hamas which contained incitement and indoctrination of Palestinian children to support and participate in Hamas' jihadi culture, rather than using textbooks consistent with principles and requirements of the United Nations.................................................... 135

L.    The indoctrination of hatred of Jews and Israel that is taught in UNRWA's curriculum is further exacerbated by UNRWA's allowance of Hamas' student activities in its schools. ............................................................................................ 143

THE NEW YORK SITUS OF DEFENDANTS' SUBSTANTIAL ASSISTANCE TO HAMAS ................................................................................................................................ 147

THE OCTOBER 7 ATTACK AND ITS AFTERMATH ......................................................... 152

COUNT I ................................................................................................................................ 155

COUNT II ............................................................................................................................... 159

COUNT III .............................................................................................................................. 160

COUNT IV .............................................................................................................................. 161

COUNT V ............................................................................................................................... 161

The above-named plaintiffs, by their undersigned counsel, as and for their Complaint with Jury Demand against the above-named defendants, on personal knowledge as to their own actions and on information and belief as to all other matters, respectfully state as follows:

## NATURE OF THIS ACTION

1.      This is a tort action.  On October 7, 2023 (the "October 7 Attack" or "Attack"), the world was shocked by the brutal attack launched from Gaza by thousands of Hamas terrorists on innocent Israeli civilians, including the genocidal mass murder of over a thousand civilian victims, the wounding and/or attempted mass murder of many thousand more, the systematic, planned and weaponized mass rape and mutilation of numerous civilian victims, many of whom were also murdered, tortured, and the kidnapping of over two hundred civilians to be held as hostages.

2.      Hamas did not carry out these atrocities without assistance.  It was aided and abetted by, among others, the above-named defendants, who are current or former senior officials (the "Individual Defendants") of the United Nations Relief and Works Agency for Palestine Refugees in the Near East ("UNRWA"), as well as UNRWA itself, who collectively spent over a decade prior to the October 7 Attack helping Hamas build up the terror infrastructure and personnel that were necessary to carry out the October 7 Attack, including by knowingly providing Hamas with the U.S. dollars in cash that it needed to pay smugglers for weapons, explosives, and other terror materiel.  As discussed throughout, Defendants were warned repeatedly that their policies were directly providing assistance to Hamas.  In the face of those warnings, Defendants continued those very policies.

3.      Whether Defendants knew of the precise plans for the attack or its magnitude is irrelevant to their liability; they knew that Hamas openly proclaimed its goal to target and murder innocent civilians in violation of the law of nations and treaties of the United States and knew that

1

the material support they were providing would enhance Hamas' capability to do so.  The resulting atrocities were foreseeable, and the Defendants are liable for aiding and abetting Hamas' genocide, crimes against humanity, and torture.

4.    Plaintiffs are non-U.S.-citizen victims of the October 7 Attack and/or the estates and other survivors of such victims, whose individual stories and suffering are given in detail below.

5.    The atrocities committed by Hamas in the October 7 Attack were not only acts of terror, genocide, and crimes against humanity, they were torts in violation of the law of nations. Because, as detailed below, the Defendants' actions aiding and abetting those torts in violation of the law of nations, including but not limited to their funding of Hamas, occurred in significant part in the State of New York and in this federal judicial district, this Court has subject matter jurisdiction and venue over Plaintiffs' claims against these Defendants.  Many of the Plaintiffs separately have claims against Defendants for aiding and abetting Hamas' violations of the Torture Victim Protection Act of 1991 ("TVPA"), which requires no such New York nexus.

6.    Defendants' New-York-centered actions, as specified in more detail below, included:

   a.    Constant travel by the Individual Defendants to New York (other than those who were New-York-based) and other senior UNRWA personnel from the Middle East to solicit and receive approval of their budget for operations in Gaza and elsewhere and of the annual audit of their operations in Gaza and elsewhere.

   b.    Constant travel by the Individual Defendants and other senior UNRWA personnel to Manhattan to solicit, in Manhattan, the financial support from

2

donor countries necessary to fund their work, including but not limited to their material support of Hamas' terror infrastructure. Defendants obtain almost all of UNRWA's funding from donor nations, none of whom have any obligation to contribute to UNRWA. UNRWA depends on voluntary contributions which the Defendants must solicit, collect, manage, supervise and renew every year. The Defendants obtain that vital financial support via face-to-face interaction in New York, collect the funds in New York, and then disburse those funds from New York in installments as needed to fund UNRWA's operations (both legitimate and illegitimate) in accordance with the policies set by the Defendants.

c.  Oversight of UNRWA's permanent New-York based staff, who facilitate necessary ongoing support for UNRWA's work with other stakeholders and approve and implement funding disbursements from New York to UNRWA's field offices in the Middle East, including but not limited to the provision of financial and other material support to Hamas' terror infrastructure in Gaza.

d.  Sending over one billion dollars from UNRWA's New York bank account in Manhattan that Defendants then caused to be delivered to Gaza in cash U.S. dollars to benefit Hamas.

7.  UNRWA has knowingly provided material support to Hamas in Gaza by:

a.  Providing Hamas access to, and safe harbor in UNRWA owned-and-funded facilities, including (but not limited to) schools to be used for weapons storage, command and control operations, and planning/staging areas for the October 7

3

Attack, including enabling underground facilities to access electricity and other utilities from UNRWA.

b.  Providing Hamas access to, and safe harbor in UNRWA property for launching rockets directed at civilian targets in Israel, including rockets launched as part of the barrage intended as a diversion and distraction to Israeli defenses on the morning of the October 7 Attack.

c.  Despite knowing of Hamas' use of UNRWA premises, consistently taking the position with Israel that UNRWA premises were inviolate, thus making them safe havens for terrorists and their materiel and preventing Israel from disabling Hamas' terror infrastructure prior to the October 7 Attack.  Indeed, this intentionally and predictably protected Hamas terror infrastructure not literally located on UNRWA property, but deliberately installed (including rocket launchers) so close to UNRWA property that it could not be struck by Israeli forces without risk of damage to UNRWA property and harm to children and noncombatants present in UNWRA schools and other facilities.

d.   Having the schools they operate in Gaza use Hamas-approved textbooks, curriculum and teachers' guides that indoctrinate children from a young age into a death-cult ideology of hatred and genocide, predictably producing the next generation of Hamas recruits willing to commit terrorist acts;

e.  Allowing Hamas' youth wing al-Kutla direct access to UNRWA schools and students to organize in-school and after-school programs to propagandize, indoctrinate, and recruit future terrorists, with the encouragement of Hamas-affiliated teaching staff;

f.  Permitting local employees on UNRWA's payroll to simultaneously be active Hamas members, many of whom personally participated in the atrocities of the October 7 Attack;

g.  Deliberately paying its local personnel in the form of cash US dollars, requiring them to turn to Hamas-affiliated moneychangers to receive the local currency (Israeli shekels) they actually need to be able to make purchases, thus predictably generating millions of dollars per month of additional income for Hamas from the spread charged by the moneychangers – income that was not merely denominated in dollars but was in cash; and

h.  By doing so, providing Hamas with access to hard U.S currency, which Hamas desperately needed to pay its illicit weapons procurement network to smuggle into Gaza vast quantities weapons, ammunition, explosives, rockets, and other materials needed by Hamas to perpetrate the October 7 Attack as well as numerous other genocidal attacks on civilians.

8.  Plaintiffs understand that there are many politically charged controversies swirling around the October 7 Attack and its aftermath.  Plaintiffs do not come to this Court seeking a forum to air political grievances, but as ordinary tort claimants seeking monetary compensation for their injuries from parties who are liable for those injuries on traditional tort principles.  Plaintiffs' right to recover tort damages from these Defendants does not in any way depend on, for example, adjudicating any disagreements about the appropriateness or degree of the Israeli military response to the October 7 Attack or the prudence or wisdom of U.S. foreign policy either before or after the October 7 Attack, and Plaintiffs do not ask this Court to opine on such controversies.

9.     Similarly, Plaintiffs seek no injunctive or declaratory relief regarding UNRWA's future actions or policies, or regarding U.S. policy toward UNRWA.  UNRWA's past actions in the numerous areas other than Gaza where it works with Palestinian populations, such as the West Bank, Jordan, Lebanon, and Syria, are likewise not at issue.  Plaintiffs' claims are limited to the Defendants' New-York-centered actions in obtaining funding and approval for providing material support for Hamas in Gaza, and the related provision of that material support, both of which were carried out in a fashion that gives rise to aiding-and-abetting liability for the October 7 Attack under traditional tort principles.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1350 (the "ATS") without regard to the citizenship of the parties, because Plaintiffs are aliens seeking relief for torts committed in violation of the law of nations and treaties of the United States, and also in part under 28 U.S.C. § 1331 as certain Plaintiffs seek relief against certain Defendants under a federal statute, namely the TVPA.

11.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1367(a) because all of Plaintiffs' claims that may not arise under the law of nations or the TVPA arise from the same nucleus of operative facts as the ATS and/or TVPA claims and form part of the same Article III case or controversy.

12.     This Court has personal jurisdiction over all Defendants under, among other things, CPLR 302.

13.     Venue is proper in this Court under 28 U.S.C. § 1391 because, among other things, a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

14.     To the extent that relevant events or omissions giving rise to the claims occurred in buildings or other locations in this judicial district owned or controlled by the United Nations as part of its so-called "Headquarters District" in Manhattan, that does not limit or affect jurisdiction, venue, or choice of law, because, among other things, the UN's treaty with the United States regarding control over the Headquarters District provides that "except as otherwise provided … the federal, state and local law of the United States shall apply within the headquarters district."

## THE PLAINTIFFS AND THEIR INJURIES FROM THE OCTOBER 7 ATTACK

### Siman Tov-Kedem Families

15.     Plaintiff Estate of Tamar Kedem Siman Tov[1] was a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

16.     Plaintiff Estate of O.S.T., minor child, is the child of Plaintiff Estate of Tamar Kedem Siman Tov. Plaintiff Estate of O.S.T., minor child, was a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

17.     Plaintiff Gad Kedem is the parent of Plaintiff Estate of Tamar Kedem Siman Tov. Plaintiff Gad Kedem is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel. Plaintiff Gad Kedem brings this action individually and as heir-at-law, on behalf of Plaintiff Estate of Tamar Kedem Siman Tov, and on behalf of Plaintiff Estate of O.S.T., minor child.

18.     Plaintiff Reuma Kedem is the parent of Plaintiff Estate of Tamar Kedem Siman Tov. Plaintiff Reuma Kedem is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

---

[1]  For consistency, all deceased Plaintiffs are formally referred to herein as "Plaintiff Estate of _____."

19.     Plaintiffs Estate of Tamar Kedem Siman Tov, Estate of O.S.T., minor child, Gad Kedem, and Reuma Kedem are hereinafter collectively referred to as "The Siman Tov-Kedem Family."

20.     On October 7, 2023, Yahonatan Siman Tov, spouse of Plaintiff Estate of Tamar Kedem Siman Tov, and parent of Plaintiff Estate of O.S.T., minor child, and twin children, Estate of A.S.T., minor child, and Estate of S.S.T., minor child, were all at home together in Kibbutz Nir Oz, Israel, when they were ruthlessly attacked and killed by Hamas.  The parents were first shot to death, and then the terrorists lit the home on fire, causing the death of the children from smoke inhalation in the arms of their mother.

21.     On October 7, 2023, Plaintiffs Gad Kedem and Reuma Kedem were at home together in Kibbutz Ein Hashlosha, Israel when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

22.     Around 6:30 a.m. that morning, Plaintiffs Gad Kedem and Reuma Kedem were awakened by the harrowing sounds of rockets and gunfire. Plaintiff Reuma Kedem immediately called her children, Plaintiff Estate of Tamar Kedem Siman Tov, Noa, and Maya, who lived nearby, to make sure everyone was safe and had gone to hide in their saferooms. Suddenly, Plaintiffs Gad Kedem and Reuma Kedem heard gunshots and voices shouting in Arabic close by. They looked outside and saw people running, in disbelief and horror.

23.     Plaintiff Reuma Kedem received a call from a panicked and hysterical neighbor, pleading for help. After waiting for a lull in the sounds coming from outside, Plaintiff Gad Kedem ran to get the neighbor and he brought her back to their house to all be together.

24.     They were all communicating with other people from their kibbutz to share information about what was happening. Plaintiffs Gad Kedem and Reuma Kedem, and their

neighbor, learned that terrorists were near their house, so they armed themselves with knives and hammers and watched from their closed pergola, which was out of sight. They turned chairs upside down to act as obstacles at their entrance so that if the terrorists tried to come in, they had time to run to the saferoom and they keenly remained vigilant.

25.     At one point, a terrorist approached the pergola, peeked inside, looked at their Sukkah with a photo of Plaintiff Estate of Tamar Kedem Siman Tov, and then thankfully continued on his way. Almost every home in Plaintiff Gad Kedem and Reuma Kedem's row of houses had been ravaged, but not theirs. One nearby neighbor had been murdered and her home burned down. Plaintiffs Gad Kedem and Reuma Kedem thought that maybe the obstacle of chairs they created made it look like other terrorists had already been there and that saved them.

26.     Plaintiff Reuma Kedem tried to contact the Community Security Coordinator, but he did not answer his phone. They later learned that he had been the first one killed and that the terrorists had planned the attack in great detail, strategically ambushing the security coordinators right away.

27.     Around 9:00 a.m., Plaintiff Estate of Tamar Kedem Siman Tov texted Plaintiff Reuma Kedem that she and her family were gathered together in silence in their saferoom, but that the terrorists were at their door. Then Plaintiff Reuma Kedem lost contact with Plaintiff Estate of Tamar Kedem Siman Tov. She tried desperately to reach Plaintiff Estate of Tamar Kedem Siman Tov through Yahonatan Siman Tov's phone, but he also did not answer. Plaintiff Reuma Kedem was overwrought with worry for the safety of her child and family.

28.     When Plaintiff Reuma Kedem's other child, Noa, finally texted her, she was horrorstruck to learn that a terrorist tried to break down the door to Noa's saferoom and that Noa's spouse was shot trying to fend him off. Noa bravely used her skills as a veterinarian to stabilize

her spouse's wounds and save his life. Plaintiff Reuma Kedem desperately wanted to go to Kibbutz Nir Oz to save her children. She was willing to risk her life for those of her children and rummaged around for anything she could use as body armor, which included baking trays from the oven taped around her body, and a cooking pot on her head as a helmet. However, Plaintiff Gad Kedem would not let her go because it was too dangerous. Plaintiff Reuma Kedem then called one of her child's mothers-in-law at Kibbutz Nir Oz, Carol, to ask her to check on her children, but was met with an angry and hostile man's voice instead speaking in Arabic. It was a terrorist. In the little Arabic she knew, Plaintiff Reuma Kedem begged and pleaded with him for mercy, but the terrorist coldly stated that there was no one to talk to, no Carol, and no more Israel. That they eliminated them. Distraught and devastated, Plaintiff Reuma Kedem feared that worst, which was later confirmed, that Carol had been shot and killed by the terrorists.

29.     Later that evening, when it was safe to move, the families gathered at a sheltered children's house on Kibbutz Nir Oz. While searching for her family members, she received the devastating news that her sibling, Plaintiff Estate of Tamar Kedem Siman Tov, had been shot and killed by the merciless terrorists, and that Plaintiff Estate of Tamar Kedem Siman Tov's husband, Yahonatan, her 5-year-old twin daughters, and 2-year-old son-had also been murdered. Noa then had to share this shattering information with her parent, Plaintiff Reuma Kedem. Plaintiff Reuma Kedem refused to believe that her innocent child and family members were dead at the hands of evil. She could not fathom that this beautiful couple and their pure children would cease to exist.

30.     When Plaintiff Reuma Kedem was eventually able to view the remains of Plaintiff Estate of Tamar Kedem Siman Tov's house, she was further shattered and traumatized when she saw bullets leading all the way into the saferoom, which was also the children's bedroom. Plaintiff Estate of Tamar Kedem Siman Tov's body was found lying in between her children's beds, and

the carpet there was saturated in blood. Plaintiff Reuma Kedem believes that Plaintiff Estate of Tamar Kedem Siman Tov was shot and then laid down in between her children's beds, keeping a hand on them to calm them while they were under their covers as she passed. The terrorists then set the home on fire, and the three beautiful children were in the inferno next to the bodies of their murdered parents, until they themselves died of suffocation from the smoke of their own home. They lived and died as a family.

31.     Everyone loved Plaintiff Estate of Tamar Kedem Siman Tov and her spouse. The two shared a great love with perfect synergy. They adored their children and were a very loving family.

32.     In Noa's house, Plaintiffs Gad Kedem and Reuma Kedem found a plastic bag with dates and biscuits, and a receipt from Gaza dated October 4. They were horrified at the thought that the terrorists indifferently sat down and ate, after committing the Attack on the kibbutz.

33.     The Siman Tov-Kedem Family suffered immense injuries that are ongoing and permanent.

34.     As a result of the October 7 Attack, Plaintiff Estate of Tamar Kedem Siman Tov and Plaintiff Estate of O.S.T., minor child, suffered wrongful death.

35.     As a result of the October 7 Attack, and the injuries suffered, Plaintiff Estate of Tamar Kedem Siman Tov and Plaintiff Estate of O.S.T., have past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estates bring claims for wrongful death on behalf of Tamar Kedem Siman Tov and O.S.T.'s beneficiaries.

36.     As a result of the October 7 Attack, and Plaintiff Estate of Tamar Kedem Siman Tov's wrongful death, Plaintiff Gad Kedem and Plaintiff Reuma Kedem suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Estate of Tamar Kedem Siman Tov, and the subsequent loss of her life, continue to have a lasting effect on her family members.

37.     As a result of the October 7 Attack and the injuries they suffered, Plaintiffs Gad Kedem and Reuma Kedem have past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, loss of earning capacity.

38.     As a result of the October 7 Attack, Plaintiff Gad Kedem and Plaintiff Reuma Kedem suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked.

**Biner Family**

39.     Plaintiff Talia Biner is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

40.     Plaintiff Esther Biner is the mother of Talia Biner, is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

41.     On October 7, 2023, Plaintiff Esther Biner was at her home in Holon, Israel.

42.     On October 7, 2023, Plaintiff Talia Biner was at the NOVA Music Festival in Re'im, Negev, Israel when she was ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

43.     Plaintiff Talia Biner was so excited to attend the NOVA Music Festival to celebrate her 28th birthday, which was upcoming on Monday, October 8, 2023, with friends. They took the camping trailer to the festival grounds on the evening of October 5, 2023. They spent Friday,

October 6, 2023, with all the happy Festival attendees enjoying the day. Around 10:00 p.m., Plaintiff Talia Biner went to rest in the trailer before the festival began again. Around 2:00 a.m., Plaintiff Talia Biner and her friends awoke reenergized and ready to continue their carefree celebration. Everyone was relaxed and enjoying the sunrise.

44.     The peace of the early morning abruptly came to a halt when, around 6:30 am, the sounds of piercing sirens overtook the music and explosive rockets shot through the sky. Confusion quickly set in for the festival attendees. Plaintiff Talia Biner, completely unaware of the scale of the attack unfolding all around her, remained near the trailer in a parking lot and waited for the all-clear announcement that never came. Instead, the police appeared and urged everyone to evacuate. Plaintiff Talia Biner and her friends quickly ran from the open parking lot to a nearby tree, which, she thought, would serve as an acceptable shelter from the overhead dangers. She did not realize that additional dangers were approaching on the ground level as well.

45.     Plaintiff Talia Biner promptly got a text from her mother, Plaintiff Esther Biner, asking if she was safe from the overhead rockets. Since she did not want her mother to worry about her, she lied and told her that she was safe and in a bomb shelter. Plaintiff Talia Biner, however, grew increasingly worried about her family since the rockets were traveling in the direction of where they lived.

46.     Suddenly, the sound of gunfire began, and quickly got louder and closer to her. Plaintiff Talia Biner and her friends decided to rush back to their trailer to get out of the area. They swiftly reattached the trailer to their car, packed their belongings, and sped off towards the festival headquarters approximately one kilometer away to try to get additional information about what was happening.

47.     When Plaintiff Talia Biner and her friends arrived at the festival headquarters, they learned that terrorists had infiltrated Israel and many people had been shot and killed. Plaintiff Talia Biner was in disbelief. At that moment, she got a frantic message from her brother that 50 terrorists had infiltrated Sderot, and that she should escape immediately. With the sound of gunshots growing louder and coming from every direction, Plaintiff Talia Biner knew that they needed to get to safety, but since they were in an open field, their options were scarce. They had nowhere to run, so the seven of them squished into their trailer designed for four. Despite the tight confinement, they huddled together in silence, hoping and praying that they were safe. Since no one spoke a word, all they could hear was the never-ending barrage of explosions, screams for help, and chaos outside of their shelter. The ground under them was shaking from the constant pounding blasts. Plaintiff Talia Biner received a message in her reserves group chat requesting that everyone come to the base. She then knew that something immense was happening.

48.     Around approximately 9:00 am, Plaintiff Talia Biner heard voices yelling in Arabic just outside of the trailer. The terrorists were calling each other's names while indiscriminately and mercilessly executing hundreds of people with their guns. They were so close that she could hear the bullets whizzing past the trailer. She closed her eyes to try to shut it all out. She thought she was going to die.

49.     Her fears magnified in intensity when the terrorists tried to force their way into the trailer. Plaintiff Talia Biner was beside herself. The terrorists kept pulling at the door, but Plaintiff Talia Biner gathered herself and grasped the handle on the door of the trailer and, with the assistance of one of her friends, held it closed with all their strength. The terrorists thankfully gave up and left, probably thinking that the trailer had been abandoned, or that they had enough targets

with all the people running around on the festival grounds. Either way, Plaintiff Talia Biner could feel a brief wave of relief rush over her.

50.     That relief was short-lived when around 9:30 a.m., Plaintiff Talia Biner heard her friend, Dor's voice outside. The terrorists had shot him, and he was begging them to leave him alone. She listened as Dor's cries faded away. She assumed that he had been taken somewhere by the terrorists and she then started to think that she, too, would be kidnapped. She wished herself dead instead of that.

51.     Plaintiff Talia Biner continued to listen to the excruciating screams of victims outside her trailer. She was tormented by the fact that she could not do anything to help, which was against her nature and training as a nurse. At one point, she heard a young female voice pleading with the terrorists to stop and leave her alone. Her ear-piercing screams lasted about 15 minutes and were full of pain and suffering. The screams seemed to be directed at more than one person. Plaintiff Talia Biner agonized over the thought of what could be happening to this poor girl. Then she heard gunshots and the girl's voice stopped. All she could hear then was deafening silence.

52.     Then Plaintiff Talia Biner heard more bloodcurdling screams coming from a female a little farther away. She also heard a male voice futilely begging the terrorists to leave her alone. The female's screams were muffled, as if something was covering her mouth, but the screaming did not stop. Shrieks of agony came from all directions throughout the day. At least five different women were crying for help, pleas that continue to haunt Plaintiff Talia Biner today. The terrorists responded to the screams of the women by calling them horrific names and insults, then laughing at them. Then silence engulfed the area and the gunshots subsided.

53.     Plaintiff Talia Biner's momentary hope that the terrorists had left the area was shattered when the terrorists began their second attempt at breaking into the trailer. When they could not gain access to the inside, they then tried to hijack the entire trailer. They shattered the windows of the car to which the trailer was connected, but unsuccessfully tried to start the car. Plaintiff Talia Biner considered whether this time was an opportunity to jump out and escape, but then the terrorists tried to separate the car from the trailer and were, once again, unsuccessful. Determined to wreak havoc and pain on the innocent Festival attendees, the terrorists then lit the trailer on fire. The temperature in the trailer, already hot from the tight space and the large number of people inside, instantly intensified.

54.     Miraculously, the rescue forces started to arrive at that moment, and after some gunfire and battle noises, silence set in once again. Plaintiff Talia Biner and her friends, after six long and grueling hours wedged in the trailer, slowly and cautiously began to exit, but the door would not open. It was blocked by something. The terrorists had wedged the door of another car to block the trailer door to prevent them from escaping the inferno. When they squeezed their bodies through the small passageway they managed to force, Plaintiff Talia Biner devastatingly saw her friend, Dor's body immediately. He had been maliciously shot in the head. As she stepped out of the trailer, she tripped over a decapitated head on the ground, sickening her.

55.     Courageously, and despite the traumas she endured herself, Plaintiff Talia Biner asked the soldiers who rescued her if she could help anyone as she was a surgery room nurse. They told her to find and treat anyone that she could. While bravely searching the war-stricken area for survivors of the Attack, she witnessed many horrifying images that will remain forever seared in her brain. She saw countless lifeless and bloodied bodies. She found a girl tied to a tree. She saw another girl with her legs spread, no underwear and her shirt shredded. She saw one of her friends

16

murdered with his eyes gouged out. She saw a man bleeding from his anus. She saw countless dead bodies under the stage of the festival. Her shoes were saturated with blood by the time she could not take the devastation any longer and ceased her valiant efforts.

56.     Plaintiff Esther Biner endured one of the most painful and difficult days of her life as she awaited word whether her daughter was alive or dead.  As Plaintiff Esther Biner was inundated with horrific videos and images from social media, her fear and panic grew to an almost intolerable level until approximately 1:30 p.m. when she finally received word that, despite enduring unimaginably hellish harms, her daughter had survived.

57.     Plaintiff Talia Biner attended 25 funerals in one week after that fateful day. Her life completely changed. She engaged in psychological treatment but continues to suffer. She struggles to sleep and has nightmares when she does. She drives in the carpool lanes because she dreads getting stuck in traffic and feeling trapped. She fears her own shadow. Scarred by the images of the abused girls she witnessed, Plaintiff Talia Biner was unable to engage in any intimacy with her boyfriend, so she ended their relationship. She moved back into her parents' home. She only gets up and out of bed every day to honor her commitment to do anything for the hostages. She cannot start her own healing until those still suffering at the hands of the evil terrorists come home.

58.     Plaintiff Talia Biner once believed in the human spirit. As a nurse, she treated people from Gaza weekly. She knew her path in life and was paving the way. Now, she does not feel healthy enough to even take care of herself, let alone treat others.  The gruesome sexual violence with which Plaintiff Talia Biner was threatened and witnessed has caused her extreme and lasting injury.

59.     Plaintiff Talia Biner suffered immense injuries that are ongoing and permanent.

60.     As a result of the October 7 Attack and the injuries she suffered, Plaintiff Talia Biner has past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, and loss of earning capacity.

61.     As a result of the October 7 Attack, Plaintiff Esther Biner suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because of the ruthless attack on her daughter, Plaintiff Talia Biner.

### Heiman-Mina-Glatt-Gigi Families

62.     Plaintiff Ditza Heiman is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

63.     Plaintiff Neta Heiman Mina is the child of Plaintiff Ditza Heiman. Plaintiff Neta Heiman Mina is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

64.     Plaintiff Daphna Shay Heiman is the child of Plaintiff Ditza Heiman. Plaintiff Daphna Shay Heiman is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

65.     Plaintiff Gideon Heiman Glatt is the child of Plaintiff Ditza Heiman. Plaintiff Gideon Heiman Glatt is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

66.     Plaintiff Yasmin Ben Gigi is the child of Plaintiff Ditza Heiman. Plaintiff Yasmin Ben Gigi is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

67.     Plaintiffs Neta Heiman Mina, Daphna Shay Heiman, Gideon Heiman Glatt, and Yasmin Ben Gigi, are siblings.

68.     Plaintiffs Ditza Heiman, Neta Heiman Mina, Daphna Shay Heiman, Gideon Heiman Glatt, and Yasmin Ben Gigi are hereinafter collectively referred to as "The Heiman Family."

69.     On October 7, 2023, Plaintiff Ditza Heiman, age 84, was at home in Nir Oz, Israel, and present when she was ruthlessly attacked and kidnapped by Hamas with machine guns, grenades, and other weapons.

70.     At approximately 6:30 a.m., Plaintiff Ditza Heiman awoke to a frightful red alert alarm and hurried to her saferoom. She promptly called each of her children to make sure they knew what was happening and had gotten to safety. After ensuring that her children were safe, Plaintiff Ditza Heiman then started making calls to everyone in the neighborhood per protocol since she was the Civil Emergency Team's hub.

71.     Plaintiff Daphna Shay Heiman awoke around 6:30 a.m. to shrieking alarms in Rehovot, Israel. She hurried to her saferoom and anxiously started making calls to her family members to check on their status and safety. She engaged in regular check-in calls every thirty minutes. She was more scared and worried than ever before. This day seemed different.

72.     Plaintiff Yasmin Ben Gigi awoke to piercing sirens around 6:30 a.m. She lived seven kilometers away from Gaza in Moshav Zohar, Israel. As Yasmin did not have a state-provided saferoom, or one in her house, she quickly gathered her family members, and they hid in their bathroom. She did not feel safe there and was terrified. She spoke with Plaintiff Ditza Heiman and confirmed she was safe around 8:30 a.m.

73.     Plaintiff Neta Heiman Mina was at home in Haifa, Israel on October 7, 2023. When she awoke, she learned what was happening in Kibbutz Nir Oz and called Plaintiff Ditza Heiman right away, who, at that time, was safe.

19

74.     Plaintiff Gideon Heiman Glatt was at home in Kfar Warburg, Israel when he was awakened by sirens around 6:30 a.m. He and his family hurried to their saferoom, and Plaintiff Gideon Heiman Glatt called Plaintiff Ditza Heiman to see if she was aware of what was happening and that she was safe. At the time, everyone was secure and in hiding.

75.     Mid-morning, around 9:45 a.m., Plaintiff Daphna Shay Heiman spoke with Plaintiff Ditza Heiman, again, and she was thankfully still fine at that time, but that was the last time Plaintiff Daphna Shay Heiman would talk to Plaintiff Ditza Heiman for fifty-three long, gut-wrenching days.

76.     When Plaintiff Ditza Heiman did not hear any noises, except for the red alert, she did not think anything was happening and exited her saferoom. She used the washroom, changed out of her pajamas, and put her glasses on, then she went back to the saferoom and continued making calls. She was on a call when a terrorist dressed in all black with an assault rifle burst into her saferoom, grabbed her by the arm, confiscated her phone, and dragged her with him. Plaintiff Ditza Heiman was guided towards her front door, with the terrorist walking behind her. Once at the door, she turned around and the terrorist was not there anymore, so she darted outside yelling for help. The street was eerily empty, so she ran to a neighbor's house, but no one answered, so she buried herself between some bushes.

77.     Plaintiff Ditza Heiman's hiding place was discovered a few minutes later when a terrorist found her, grabbed her hand, and dragged her to a vehicle down the street. His face was covered. He put a hat and a surgical mask on her, but she could still see. He demanded that she be quiet. More terrorists were already in the car, also dressed in all black and wearing masks. They rambled around, driving in circles on the kibbutz grounds for a few minutes, and then started

driving towards Gaza. Plaintiff Ditza Heiman could see other terrorists riding bikes all around them. It looked like a mob in every direction.

78.     Plaintiff Ditza Heiman had no concept of time or how long they drove around on bumpy dirt roads, and she had no idea where she was. The terrorists moved her to different vehicles multiple times and stopped at numerous locations. In some of the locations, people were cheering outside. At one point they stopped and made her change into a Jellabiya. Two of the terrorists eventually took her to a house. All the windows were closed, but there was some light coming through. They sat her down in the living room and then talked amongst themselves, with a third man who was unmasked and appeared to be the owner of the house. They also used a radio device to communicate with others. Hamas marching music was playing, which haunts her to this day.

79.     By noon, Plaintiff Daphna Shay Heiman had learned about the massive terrorist attack on Kibbutz Nir Oz and in the moshavim near her moshav, where her child was home alone with the family dog, locked in their saferoom.

80.     Plaintiff Daphna Shay Heiman kept calling Plaintiff Ditza Heiman throughout the day, but there was no answer. At one point in the afternoon, Plaintiff Daphna Shay Heiman called Plaintiff Ditza Heiman again, but this time, a terrorist answered her phone. He told her he was Hamas. Plaintiff Daphna Shay Heiman started having trouble breathing and panicked. She called her siblings to tell them what she heard on the other end of the phone. Plaintiff Yasmin Ben Gigi's son, Saar, then called Plaintiff Ditza Heiman and a terrorist answered again, saying that there was, "No more grandma." Saar then called the army and asked them to go check on Plaintiff Ditza Heiman. When the army finally called back, they told Saar that no one was at Plaintiff Ditza Heiman's home. Plaintiff Ditza Heiman's family members were overwrought with concern, worry, and fear that something awful happened to her.

81.     Plaintiff Ditza Heiman remained at this house for about 24 hours. At one point, Plaintiff Ditza Heiman asked the homeowner if he spoke English. He knew a few words in English and then he showed Plaintiff Ditza Heiman his daughter's English workbook to show her that his children were learning English.

82.     The next day, the two masked terrorists took Plaintiff Ditza Heiman and left the house. She was again forced to dress in a Jellabiya. As they neared their destination, Plaintiff Ditza Heiman saw many cement buildings with the UNRWA logo.

83.     Plaintiff Ditza Heiman was then taken to an apartment in a building with many stairs. The owner of this apartment did not wear a mask. Plaintiff Ditza Heiman spent the next seven weeks in this apartment.

84.     While there, she noticed some notebooks on top of the refrigerator, so she asked for some paper. Plaintiff Ditza Heiman then made a calendar for three months ahead and marked family birthdays in Gematria to disguise her words. She noticed that the notebooks had the symbol of UNRWA on the cover.

85.     During her captivity there, Plaintiff Ditza Heiman communicated with the homeowner on a few occasions in Arabic, of which she had some knowledge, and using universal hand gestures that they both understood. One day, Plaintiff Ditza Heiman asked the homeowner if he was a teacher, to which he replied yes. She then asked him if he was a teacher for UNRWA given the notebooks she saw, and again, he replied yes. She asked him if he taught at the boys' school or the girls' school, and he replied that he taught boys. He was an UNRWA teacher.

86.     Plaintiff Ditza Heiman did not see the sun or moon during this time. She was only able to discern the hours of the day from the sounds of the Muezzin and roosters and the small amount of light that shone through the window blinds that were slightly open.

87.     Initially, Plaintiff Ditza Heiman was given food three times a day, but that was torturously reduced to two times a day, and eventually to once a day around 4:00 p.m. When she was not provided enough sustenance, she communicated with the homeowner to let him know that she was not a dog who only eats once a day, and that she needed food twice a day. He understood her and responded by providing her with something to eat twice a day. For food, Plaintiff Ditza Heiman was often given snacks that had the UNRWA label on the package. The packaging also said that the item was not for sale, and only for the consumption of the children of the UNRWA school.

88.     During these 53 days of captivity, Plaintiff Ditza Heiman only bathed three times in the form of a bucket of lukewarm water. In the first bathing, which was two and a half weeks into her abduction, she tried to wash her hair but did not have enough water, so the shampoo stayed in her hair until she was released as she never had enough time to wash herself completely.

89.     People were constantly peeking in at her through the door gap. Food was scarce. She was always being guarded by someone.

90.     One day, one of the daughters of the homeowner brought Plaintiff Ditza Heiman some clothing and told her that she would be in Tel Aviv by 5:00 p.m. After she put on the dress and hijab given to her, the terrorists blindfolded her and forced her into the trunk of a Club Car. She was then driven to another location and ordered to transfer into a commercial van, where she encountered two other hostages. A camera crew accosted her and filmed her outside the van against her will.

91.     Finally, after this traumatic ordeal and 53 days in captivity, the Hamas terrorists surrendered her at a hospital. There, she started to learn about what had happened in Kibbutz Nir Oz on October 7, 2023, from other people who were also held in the hospital. She had not heard

anything during her captivity, so hearing about the atrocities and the people murdered all at once was awful and shocking. Plaintiff Ditza Heiman was in disbelief.

92.     Plaintiff Ditza Heiman did not receive her daily medications for her medical issues while in captivity, so she was very concerned about her health. She is diabetic, has thyroid issues, and suffers from venous inflammation. Plaintiff Ditza Heiman was hospitalized upon her release and is still not completely stabilized to this day.

93.     For 53 days, Plaintiffs Daphna Shay Heiman, Yasmin Ben Gigi, Neta Heiman Mina, and Gideon Heiman Glatt suffered, not knowing the status or whereabouts of Plaintiff Ditza Heiman. They struggled daily trying to get updates or any information on Plaintiff Ditza Heiman's status and condition, and they worked tirelessly for her release.

94.     Plaintiff Daphna Shay Heiman sees a clinical psychologist regularly now and takes blood pressure medication that she did not need before the Attack. She cannot be in crowded places and feels detached and lonely.

95.     Plaintiff Yasmin Ben Gigi now suffers from post-traumatic stress disorder and sees a psychologist. She is anxious and noises frighten her. She struggles with sleep issues.

96.     Plaintiff Neta Heiman Mina felt terribly helpless. At one point early after her parent was taken, she saw a video posted by Hamas of Plaintiff Ditza Heiman's abduction. Plaintiff Neta Heiman Mina now receives regular treatment by a psychologist. She has difficulty sleeping, suffers frequent bouts of crying, anger, and sadness, and cannot be in crowded spaces.

97.     Plaintiff Gideon Heiman Glatt spent the day of the Attack in his saferoom desperately trying to get any information he could on his parent. He was overwrought with concern and panic. Plaintiff Gideon Heiman Glatt began receiving therapy right after his parent's abduction and continued to do so throughout her time in captivity.

98.     The Heiman Family suffered immense injuries that are ongoing and permanent.

99.     As a result of the October 7 Attack and the injuries they suffered, Plaintiff Ditza Heiman has past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, loss of earning capacity.

100.     As a result of the October 7 Attack, Plaintiffs Daphna Shay Heiman, Yasmin Ben Gigi, Neta Heiman Mina, and Gideon Heiman Glatt, each suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family member was attacked.

### Eliaz-Zin-Elyakim-Arava-Tanami-Koperstein-Avni-Ben David Families

101.     Plaintiff Maayan Eliaz is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

102.     Plaintiff Estate of Dikla Arava Eliaz was the former spouse of Plaintiff Maayan Eliaz. Plaintiff Estate of Dikla Arava Eliaz was a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

103.     Plaintiff Estate of T.E., minor child, is the child of Plaintiffs Maayan Eliaz and Estate of Dikla Arava. Plaintiff Estate of T.E., minor child, was a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

104.     Plaintiff Maayan Eliaz brings this action individually and as heir-at-law on behalf of the Estate of T.E., minor child.

105.     Plaintiff Odin Eliaz is the child of Plaintiffs Maayan Eliaz and Estate of Dikla Arava. Plaintiff Odin Eliaz is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

106.    Plaintiff Stav Arava Eliaz is the child of Plaintiffs Maayan Eliaz and Estate of Dikla Arava. Plaintiff Stav Eliaz is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

107.    Plaintiffs Odin Eliaz and Stav Eliaz bring this action individually and as heirs-at-law on behalf of the Estate of Dikla Arava.

108.    Plaintiff Dov Eliaz is the parent of Plaintiff Maayan Eliaz. Plaintiff Dov Eliaz is a citizen of Israel and at the time of the acts alleged, and at all other times thereto, was domiciled in Israel.

109.    Plaintiff Yifat Tanami is the sibling of Plaintiff Estate of Dikla Arava Eliaz. Plaintiff Yifat Tanami is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

110.    Plaintiff Sagi Arava is the sibling of Plaintiff Estate of Dikla Arava Eliaz. Plaintiff Sagi Arava is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

111.    Plaintiff Alon Arava is the sibling of Plaintiff Estate of Dikla Arava Eliaz. Plaintiff Alon Arava is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

112.    Plaintiff Hadar Ben David is the sibling of Plaintiff Estate of Dikla Arava Eliaz. Plaintiff Hadar Ben David is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

113.    Plaintiff Liat Koperstein is the domestic partner of Plaintiff Maayan Eliaz. Plaintiff Liat Koperstein is a citizen of Israel and at the time of the acts, alleged, and at all other times relevant hereto, was domiciled in Israel.

114.    Plaintiff Yali Koperstein is the child of Plaintiff Liat Koperstein. Plaintiff Yali Koperstein is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

115.    Plaintiff Ziv Koperstein is the child of Plaintiff Liat Koperstein. Plaintiff Ziv Koperstein is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

116.    Plaintiff Naama Koperstein is the child of Plaintiff Liat Koperstein. Plaintiff Naama Koperstein is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

117.    Plaintiff Goni Koperstein Avni is the child of Plaintiff Liat Koperstein. Plaintiff Goni Koperstein Avni is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

118.    Plaintiff Ran Aharon Avni is the spouse of Plaintiff Goni Koperstein Avni. Plaintiff Ran Aharon Avni is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

119.    Plaintiff Maayan Zin is the former spouse of Noam Elyakim, and the parent of Plaintiffs D.E., minor child, and E.E., minor child. Plaintiff Maayan Zin is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

120.    Plaintiff D.E., minor child, is the child of Plaintiff Maayan Zin and Noam Elyakim. Plaintiff D.E., minor child, is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

121.    Plaintiff E.E., minor child, is the child of Plaintiff Maayan Zin and Noam Elyakim. Plaintiff E.E., minor child, is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

122.    Plaintiff Maayan Zin brings this action individually and as legal guardian of D.E., minor child, and E.E., minor child.

123.    On October 7, 2023, Plaintiffs Maayan Eliaz and Liat Koperstein were in a temporary home located at Kibbutz Mefalsim, Israel, and present when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

124.    On October 7, 2023, Plaintiff Estate of T.E., minor child, was at home with his mother, Plaintiff Estate of Dikla Arava Eliaz, her domestic partner, Noam Elyakim, and Plaintiffs D.E., minor child, and E.E., minor child, in Kibbutz Nahal Oz, Israel, and present when he was ruthlessly attacked and killed by Hamas with machine guns, grenades, and other weapons.

125.    On October 7, 2023, Plaintiff Odin Eliaz was at home in her apartment in Kibbutz Nahal Oz, Israel, and present when she was ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

126.    On October 7, 2023, Plaintiff Dov Eliaz, age 88, was at home in Kibbutz Nahal Oz, Israel, and present when he was ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

127.    On October 7, 2023, Plaintiffs D.E., minor child, and E.E., minor child, were at home with their father, Noam Elyakim, his domestic partner, Plaintiff Estate of Dikla Arava Eliaz, and Plaintiff Estate of T.E., minor child, in Kibbutz Nahal Oz, Israel, and present when they were ruthlessly attacked and abducted by Hamas with machine guns, grenades, and other weapons.

128.    On October 7, 2023, Plaintiffs Ran Aharon Avni and Goni Koperstein Avni were at the home located just behind Plaintiffs Maayan Eliaz and Liat Koperstein's temporary home, with Plaintiffs Ziv Koperstein and Naama Koperstein, in Kibbutz Mefalsim, Israel, and present when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

129.    On October 7, 2023, Plaintiff Hadar Ben David was at home in Kibbutz Nahal Oz, Israel, with her spouse and children, and present when she was ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

130.    Plaintiff Maayan Eliaz and Plaintiff Liat Koperstein left their home in Kibbutz Nahal Oz earlier that week and were preparing to relocate to the United States on October 11, 2023. They had packed all their belongings and were staying in temporary housing on Kibbutz Mefalsim, Israel.

131.    Plaintiffs Maayan Eliaz and Liat Koperstein's life plans were decimated at sunrise when, early in the morning of October 7, 2023, they were awoken by the piercing sound of gunfire and threats screamed by Hamas terrorists as they invaded the sanctity of Kibbutz Mefalsim. Terrified and alone in an unfamiliar home, they struggled to determine the proper emergency measures for this kibbutz. Out their window, they could see the alarming, spine-chilling scene of Hamas terrorists driving around indiscriminately shooting assault rifles at the NPVA Music Festival attendees, many of whom were frantically running barefoot trying to escape.

132.    As the Attack progressed around them, helpless and without a weapon, Plaintiff Maayan Eliaz tore apart closets in the house in an attempt to create a hiding place for Liat. Plaintiffs Maayan Eliaz and Liat Koperstein also frantically tried to contact each of their family members.

133.    Through social media, Plaintiff Maayan Eliaz was devastated to learn that Hamas terrorists had broken into the home of Plaintiff Estate of Dikla Arava Eliaz and Noam Elyakim,

brutally assaulted and gravely wounded them. Plaintiff Maayan Eliaz watched a horrifying livestream video of the Hamas terrorists viciously demand that his youngest son, Plaintiff Estate of T.E., minor child, abandon the family and exit the saferoom. The video then showed the heartbreaking and futile pleas of Noam Elyakim begging the terrorists to take him instead. En route to their truck, the Hamas terrorists cruelly forced Plaintiff Estate of T.E., minor child, by gunpoint, to coerce his dear friends and neighbors to come out of their saferooms.

134.    The video then showed Hamas terrorists horrifyingly tear Plaintiffs D.E., minor child, and E.E., minor child, from weak and battered Plaintiff Estate of Dikla Arava Eliaz's grasp.

135.    After viewing this agonizing and life-shattering video, Plaintiff Maayan Eliaz frantically tried, but could not reach, his eldest child, Plaintiff Odin Eliaz, leaving him painfully unaware of her safety.

136.    Plaintiff Odin Eliaz had fallen asleep on her couch in the living room the night before, leaving her window open and the door unlocked, which was unusual for her. She awoke to the sounds of blaring sirens and explosive gunshots. She immediately called her mother, Plaintiff Estate of Dikla Arava Eliaz, to check on her. Plaintiff Estate of Dikla Arava Eliaz was okay at that time, and Plaintiff Odin Eliaz went to her saferoom. The window in her saferoom did not close all the way and the door did not close at all, so she was very nervous. She started receiving messages from friends, neighbors, and colleagues on the kibbutz group chats that terrorists were violently invading the area. When Plaintiff Odin Eliaz started to hear the terrorists getting closer to her, she knew that she needed to quickly hide, so she squished herself into a crack between the wall and her bed, crouched down to the floor, put a blanket over her, and prayed. The sounds were so close that she thought they were in the neighboring apartment.

137.   Because she had fallen asleep in the living room, Plaintiff Odin Eliaz had not plugged her phone in to charge, so it only had a 10% battery life. There was a power outage, so she had no ability to charge her phone. The last message she saw before her phone died was someone asking what happened to the Arava-Elyakim family. That was her family, and it was clear to her that something had happened to them. She was completely cut off and did not have contact with anyone for many hours. She was beside herself with worry and distress.

138.   Plaintiff Dov Eliaz awoke that morning to the sounds of bomb alarms and gunfire. He was in his saferoom, so he closed the door and the shutters, and went back to bed, assuming that it would be over soon. However, messages started coming in that the kibbutz was being attacked and he was told to stay in his saferoom. When his area seemed to quiet down, he left the saferoom to go to the bathroom, take his medicine, and get his phone. He also grabbed a bottle of water and a pack of waffles and then went back to the saferoom and locked the door, however the shutters would not close all the way. He began reading messages from others begging and pleading for help. Plaintiff Dov Eliaz could hear people screaming, shouting, and crying. He felt so scared and helpless.

139.   Plaintiff Dov Eliaz called each of his family members to make sure everyone was safe. At the beginning, he connected with everyone, but later, he could not reach two of his family members, Plaintiff Odin Eliaz and Plaintiff Estate of Dikla Arava Eliaz, with whom he maintained a good relationship despite the demise of her relationship with his son.

140.   Plaintiff Hadar Ben David awoke to the alarms and rushed with her family to their saferoom. She was the culture manager for the kibbutz and was planning for a holiday celebration that evening. Initially, she thought that it was a shame that the event was ruined. She realized the severity of the situation when gunfire erupted, and she started receiving messages in the kibbutz

31

group chat that terrorists were crashing into homes and breaking through windows in a nearby neighborhood. She tried to contact the head of security of Nahal Oz, but he did not answer. The standby civil squad did not appear to be activated. Israeli Defense Forces soldiers were not arriving as they typically did in these situations. Suddenly, chaos was overtaking the kibbutz. Plaintiff Hadar Ben David's son called the police, but they were frenzied with the massive attack.

141.    Plaintiff Hadar Ben David could hear battle sounds outside her home, along with shouting in Arabic. Suddenly, her back door was blown up, sending glass shards everywhere. Terrorists poured into her home, but Plaintiff Hadar Ben David and her family remained silent and hidden in their saferoom. They were terrified as their saferoom door did not lock or even close all the way. When the terrorists tried to open the door, her spouse and sons held the door closed, with knives in their other hands for defense. The terrorists kept trying to force their way into the saferoom, but they were pushing the door the wrong way and fortunately would not open. After a few minutes, she could hear them walking around the house opening doors, and then they just left.

142.    Plaintiff Hadar Ben David continued contacting family members to ensure they were safe, but Plaintiff Estate of Dikla Arava Eliaz stopped answering her phone. Plaintiff Hadar Ben David promptly went to social media when she learned videos were being posted to try to learn anything about her family members, but it was so chaotic and unclear what was happening in the videos. Nonetheless, the gravity of the situation was growing, and she realized that no one was going to be able to come to help them. They were all alone. She felt broken and collapsed.

143.    The cellular telephone network crashed, and Plaintiff Hadar Ben David then lost power and did not have contact with anyone for several hours. When the network was restored, she promptly received a photo from Plaintiff Stav Arava Eliaz of Plaintiffs D.E., minor child, and E.E., minor child, abducted to Gaza. She was confused about what she was seeing. Everything was

happening so fast. She remained in contact with her family members for the remainder of the day, trying to piece together any information, while also fighting her own fear and trying to be strong for her family and keep her special needs child at ease. They did not exit the saferoom until 5:30 p.m.

144.    Plaintiff Hadar Ben David was the last one to exit the saferoom. She took a moment for herself, then came out to 30 soldiers with their guns drawn in her once peaceful, loving home. She was given two minutes to gather some belongings and leave.

145.    They gathered at a neighbor's house, and it was chaotic there, too. Many were in denial of what was happening and planned to return to their own homes to sleep that night. Plaintiff Hadar Ben David came to the reality that the day was worse than anything she imagined. Plaintiff Hadar Ben David had no choice but to hurry to the bus to evacuate her family to safety. On the bus, she saw her niece, Plaintiff Odin Eliaz crying hysterically. She had just been told about the attack at her mother's home by someone on the bus. Plaintiff Hadar Ben David did her best to console Plaintiff Odin Eliaz.

146.    When Plaintiff Hadar Ben David realized that the bus was going to Mishmar HaEmek, she called her sister, Plaintiff Yifat Tanami, in Be'er Ganim, to send someone to come get her at the bus stop in Mishmar Hanegev. Plaintiff Odin Eliaz joined her.

147.    Plaintiff Stav Arava Eliaz, who was at his girlfriend's house in Haifa, Israel, awoke that morning around 8:00 a.m. to a phone call from a friend informing him what was happening. He immediately called and spoke with his mother, Plaintiff Estate of Dikla Arava Eliaz. Plaintiff Stav Arava Eliaz communicated with her until about 10:38 a.m., and then never spoke with her again. He did not know that would be the last time he heard her voice. He later saw a livestream video of his family being terrorized in their home. He fell, frozen and paralyzed in disbelief.

Plaintiff Stav Arava Eliaz still cannot get those images out of his head. He kept making calls to his family members and no one answered. He thought he was the only one left alive.

148.    Plaintiff Stav Arava Eliaz eventually connected with Plaintiffs Maayan Eliaz and Liat Koperstein. He shared the videos of terrorists in the home of Plaintiff Estate of Dikla Arava Eliaz and Noam Elyakim and the frightened children there, then Plaintiffs E.E., minor child, and D.E., minor child, in Gaza, and one of his siblings, Plaintiff Estate of T.E., minor child, taken by terrorists at gunpoint, being forced to go house to house to coerce the residents to come out of their saferooms. It was excruciating to see the wicked attack on their family.

149.    Throughout the day, the Community Security Coordinator and Israeli Defense Forces soldiers came to Plaintiff Odin Eliaz's house. She hysterically begged them each time to take her to Plaintiff Estate of Dikla Arava Eliaz's house, but they did not. She remained in her saferoom, terrified and alone, wedged in the crack between the wall and her bed, praying. At one point, when the terrorists came by her house and broke windows, the fear overtook her body, and she blacked out. While lying alone in her saferoom all day, Plaintiff Odin Eliaz thought she was going to die. Her life flashed before her eyes. She was completely disconnected, and so worried about her family.

150.    Around 8:00 p.m., her power came back on, and Plaintiff Odin Eliaz was able to turn on her phone. She froze while reading the barrage of messages coming through. Her cousin called at that time, and she sent her location. At 9:00 p.m. a crew of soldiers came to get her. As they headed out of the kibbutz, she could still hear gunfire erupting. First, she begged once again to go into her mother, Plaintiff Estate of Dikla Arava Eliaz's house, but upon stern refusal, she insisted there were others left behind, so they checked the homes of her friends and rescued about 40 more people.

151.    When they got to the gate of the kibbutz, without warning, someone showed Plaintiff Odin Eliaz the horrifying video from social media of her family members held at gunpoint at their home. Terror crashed over her like a tidal wave. In shock, she started to cry uncontrollably. The bus arrived and then she evacuated like a robot, in total disbelief that this massacre was destroying her family. Plaintiff Odin Eliaz's outcries grew more intense as she witnessed the dead bodies strewn everywhere and the destroyed homes of her friends and family. The horror continued as Plaintiff Odin Eliaz learned from social media, that her stepsisters, Plaintiffs E.E., minor child, and D.E., minor child, had been abducted and were forcibly kidnapped to Gaza.

152.    At 11:30 p.m. Plaintiff Dov Eliaz heard loud knocks on the door of the saferoom and a voice calling him by his nickname, "Dogel." The terrorists could not possibly know his nickname, so he opened the door and found the civil emergency squad and three armed soldiers there. They gave him ten minutes to gather a few things and evacuate the kibbutz. He organized a bag, closed all the windows, and went to his neighbor's house to help her get organized. Together, they left for the bus station.

153.    At the bus station, Plaintiff Dov Eliaz started asking if anyone had seen or heard from any of his family members. When he recognized one of Plaintiff Estate of Dikla Arava Eliaz's neighbors, he asked her about Plaintiff Estate of Dikla Arava Eliaz. The neighbor told him that she had heard gunshots and was very scared, so she went under the bed. Beyond that, she knew nothing.

154.    Someone else told Plaintiff Dov Eliaz that she saw Plaintiff Odin Eliaz with her aunt, Plaintiff Hadar Ben David, evacuating the area. When Plaintiff Dov Eliaz heard that, he knew that something had happened, otherwise she would not have gone there without the family.

155.    Shortly after his arrival at a military camp, Plaintiff Dov Eliaz received a call from his brother-in-law telling him that he would be coming to get him. When he arrived, he immediately told Plaintiff Dov Eliaz about that attack on Plaintiff Estate of Dikla Arava Eliaz, Noam Elyakim, and Plaintiff Estate of T.E., minor child, and that Plaintiffs D.E., minor child, and E.E., minor child, had been kidnapped. Two days later, Plaintiff Dov Eliaz learned about a video showing the kidnappings. He was shattered. He later learned that Plaintiff Estate of T.E., minor child, was a hero that day when he rescued a small child that had been left alone in a saferoom and returned that child to its parent.

156.    Plaintiff Maayan Zin, the former spouse of Noam Elyakim, and mother of Plaintiffs D.E., minor child, and E.E., minor child, was notified of the malevolent and wicked kidnapping of her young daughters, which pained her beyond consolation.

157.    Plaintiff Stav Arava Eliaz found his sister, Plaintiff Odin Eliaz the next day at a gathering of other extended family members in Be'er Ganim. He was so thankful to see her and know that she was alive.

158.    Plaintiffs Ran Aharon Avni, Goni Koperstein Avni, Naama Koperstein, and Ziv Koperstein, remained barricaded in their saferoom, huddled together and praying for their safety, in Mefalsim, Israel, while the tormenting sounds of the Attack persisted outside their home.

159.    Plaintiffs Sagi Arava and Alon Arava, on Kfar Maimon, and Plaintiff Yifat Tanami, at Be'er Ganim, spent the day desperately trying to get any information they could on their family members and feared for their safety. They found live-stream videos, posted by the terrorists holding their wounded and bleeding family members at gunpoint, which simultaneously devastated them and also gave them false hope their their beloveds were still alive and might survive. They worked relentlessly for a week, trying to piece together the information they

gathered, thinking their beloveds were abducted to Gaza, as they had viewed videos of the two girls in Gaza. They were distraught beyond consolation when they learned that Plaintiff Estate of Dikla Arava Eliaz, their dear sister, was brutally murdered along with her dedicated and loving partner, Noam Elyakim, and that their darling nephew, Plaintiff Estate of T.E., minor child, had been murdered. Upon hearing this news, their hearts were crushed as they were harboring hope that the terrorists would grow fond of the child, as everyone did, and would spare his life.

160.  Plaintiff Yali Koperstein was in her apartment in Herzliya, Israel, overcome with worry and concern for her mother, Plaintiff Liat Koperstein's safety, feverishly trying to stay in contact with her throughout the day, while viewing horrific videos, in real time, of the atrocities being committed by Hamas.

161.  Plaintiff Maayan Eliaz had no information regarding the whereabouts of Plaintiff Estate of Dikla Arava Eliaz and Noam Elyakim. Plaintiff Stav Arava Eliaz searched endlessly through social media outlets for any information he could find on them and about his brother, Plaintiff Estate of T.E., minor child. In the process, Plaintiff Stav Arava Eliaz reviewed countless graphic and shocking images and videos posted online.

162.  Approximately one week later, the family received the devastating news that Plaintiff Estate of Dilka Arava Eliaz had been murdered.  Plaintiff Hadar Ben David had to provide DNA samples to confirm the identity of Plaintiff Estate of Dikla Arava Eliaz's body. The next day they learned that Plaintiff Estate of T.E., had likewise been viciously murdered, shot three times in the back, destroying their hope that he had only been abducted. The videos of Plaintiff Estate of T.E., minor child, are the last haunting images his family has of him alive. Two days later, they received the news that Noam Elyakim had also been murdered.

163.     While sitting shiva, Plaintiff Hadar Ben David was diagnosed with breast cancer. Her entire family now lives in darkness and uncertainty.

164.     Plaintiffs D.E., minor child, and E.E., minor child, were held captive for 53 torturous days. On the first night of their captivity, Plaintiffs D.E., minor child, and E.E., minor child, were awoken and moved to another location because the Israeli Defense Forces had located them and the other hostages in the building. The Hamas terrorists forced them to put on hijabs for the transfer, and again, when they were transferred to a house in the daylight.

165.     During their imprisonment, they frighteningly heard bombs exploding all around them. The building in which they were being kept shook so vigorously that plaster fell from the ceiling.

166.     At one point, they were again forced to wear hijabs and move to another location that was a school purportedly controlled by UNRWA. There, Plaintiffs D.E., minor child, and E.E., minor child, slept on the cold, hard floor. They built a wall out of blankets to hide themselves from the civilians so they could remove the hijabs they were forced to wear to disguise themselves so they could breathe. They were not allowed to speak, or they would be killed. Hamas terrorists also forced them to make a propaganda video in which they begged for their lives and to be saved by whatever means necessary. The Hamas terrorists mercilessly tortured these young, harmless children.

167.     Plaintiff D.E., minor child, was afraid to sleep at night and dreaded what the next day would bring. She anticipated that the terrorists would kill her or her sibling overnight, or that the building would be bombed.

168.     Miraculously, after 53 days of captivity, Plaintiffs D.E., minor child, and E.E., minor child, were freed from Gaza. Upon returning from their harrowing nightmare, Plaintiffs

D.E., minor child, and E.E., minor child tragically learned the sickening news that their father, Noam Elyakim, and his domestic partner with whom they lived, Plaintiff Estate of Dikla Arava Eliaz, were gruesomely murdered.

169.     Plaintiff Maayan Eliaz, Plaintiff Odin Eliaz, Plaintiff Stav Arava Eliaz, and Plaintiff Liat Koperstein are each now being treated by psychologists and therapists. The entire Eliaz family is in therapy.

170.     Plaintiffs Maayan Eliaz and Liat Koperstein cancelled their plans to relocate to the United States so that they could remain present for their children and were both out of work. As a result of the Attack, they lost family and friends from Kibbutz Nahal Oz, and they have also lost their financial security. They now live in a house in Sde Warburg, with friends who are hosting them. They are unsure of what they will do next. Their suitcases are still packed and sitting in the house on Kibbutz Mefalsim as the Plaintiffs Maayan Eliaz and Liat Koperstein do not have the mental or emotional stamina to return to the house to retrieve them.

171.     Plaintiff Odin Eliaz struggles with not telling her mother that she loved her the last time they spoke. She cannot be alone and does not feel safe anywhere. She is restless and never feels at peace. She also struggles with sleep and cannot return to work.

172.     The Plaintiffs detailed herein each suffered immense injuries that are ongoing and permanent.

173.     As a result of the October 7 Attack, Plaintiff Estate of T.E., minor child, suffered wrongful death.

174.     As a result of the October 7 Attack, and the injuries T.E., minor child, suffered, Plaintiff Estate of T.E., minor child, has past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages,

including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of T.E., minor child's beneficiaries.

175.    As a result of the October 7 Attack, and Plaintiff Estate of T.E., minor child's wrongful death, Plaintiff Maayan Eliaz, Plaintiff Estate of Dikla Arava Eliaz, Plaintiff Odin Eliaz, and Plaintiff Stav Arava Eliaz suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Plaintiff Estate of T.E., minor child, and the subsequent loss of his life, continue to have a lasting effect on his family members.

176.    As a result of the October 7 Attack, Plaintiff Estate of Dikla Arava Eliaz suffered wrongful death.

177.    As a result of the October 7 Attack, and the injuries Dikla Arava suffered, Plaintiff Estate of Dikla Arava Eliaz has past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of Dikla Arava's beneficiaries.

178.    As a result of the October 7 Attack, and Plaintiff Estate of Dikla Arava Eliaz's wrongful death, Plaintiff Maayan Eliaz, Plaintiff Estate of T.E., Plaintiff Odin Eliaz, Plaintiff Stav Arava Eliaz, Plaintiff Yifat Tanami, Plaintiff Sagi Arava, Plaintiff Alon Arava, and Plaintiff Hadar Ben David, suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Plaintiff Estate of Dikla Arava Eliaz, and the subsequent loss of her life, continue to have a lasting effect on her family members.

179.    As a result of the October 7 Attack and the injuries they suffered, Plaintiffs Maayan Eliaz, Liat Koperstein, Odin Eliaz, Dov Eliaz, D.E., minor child, E.E., minor child, Ran Aharon Avni, Goni Koperstein Avni, Hadar Ben David, Naama Koperstein, and Ziv Koperstein, have past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, loss of earning capacity.

180.    As a result of the October 7 Attack, Plaintiffs Maayan Eliaz, Liat Koperstein, Odin Eliaz, Dov Eliaz, D.E., minor child, E.E., minor child, Ran Aharon Avni, Goni Koperstein Avni, Hadar Ben David, Naama Koperstein, Ziv Koperstein, Maayan Zin, Stav Arava Eliaz, Sagi Arava, Alon Arava, Yifat Tanami, and Yali Koperstein each suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked.

**Tal-Alfendri-Alfasi-Blank-Sharabi Families**

181.    Plaintiff Merav Tal (Tal Alfasi) is a citizen of Israel and at the times of the acts alleged and at all other times relevant hereto, was domiciled in the United States.

182.    Plaintiff Rachel Alfendri is the parent of Plaintiff Merav Tal (Tal Alfasi). Plaintiff Rachel Alfendri is a citizen of Israel and at the times of the acts alleged and at all other times relevant hereto, was domiciled in the United States.

183.    Plaintiff Tomer Tal Alfasi is the child of Plaintiff Merav Tal (Tal Alfasi). Plaintiff Tomer Tal Alfasi a citizen of Israel and at the times of the acts alleged and at all other times relevant hereto, was domiciled in the United States.

184.    Plaintiff Ori Tal Alfasi is the child of Plaintiff Merav Tal (Tal Alfasi). Plaintiff Ori Tal Alfasi a citizen of Israel and at the times of the acts alleged and at all other times relevant hereto, was domiciled in the United States.

185.    Plaintiff Keren Blank is the sibling of Plaintiff Merav Tal (Tal Alfasi). Plaintiff Keren Blank is a citizen of Israel and at the times of the acts alleged and at all other times relevant hereto, was domiciled in the United States.

186.    Plaintiff Sigalit Sharabi is the sibling of Plaintiff Merav Tal (Tal Alfasi). Plaintiff Sigalit Sharabi is a citizen of Israel and at the times of the acts alleged and at all other times relevant hereto, was domiciled in the United States.

187.    On October 7, 2023, Plaintiff Merav Tal (Tal Alfasi) was at home with her partner, Yair Yaakov, at Kibbutz Nir Oz, Israel, and present when she was ruthlessly attacked and abducted by Hamas with machine guns, grenades, and other weapons.

188.    Plaintiff Merav Tal (Tal Alfasi) and Yair were sleeping after celebrating Yair's birthday the night before with his children when, around 6:30 a.m., they were startled awake by ear-piercing sirens. They quickly ran to their saferoom. Since they were not in any group chats with their neighborhood, they had no communication or information about what was happening on the kibbutz.

189.    While hiding in their saferoom, Plaintiff Merav Tal (Tal Alfasi) and Yair saw on television that there was an invasion of terrorists attacking their kibbutz. Their family members were calling each other to make sure everyone was safe and in hiding. They were all terrified. Then they heard someone yelling for help outside, so Yair went to see if he could do anything. He rushed back into the house within seconds because the kibbutz was full of terrorists shooting and screaming indiscriminately. Yair instructed Plaintiff Merav Tal (Tal Alfasi) to quickly get dressed as she was still in her nightgown and secure herself in the saferoom. Plaintiff Merav Tal (Tal Alfasi) grabbed her overnight bag and a knife from the kitchen for protection. Yair was just starting

to put on his shoes when they heard Arabic voices inside their home. As soon as the terrorists found the saferoom, they started shooting.

190.     Yair pulled the door to the saferoom tightly closed, but the terrorists kept shooting. Yair suddenly yelled in agony when multiple bullets struck his body near his groin. He was bleeding profusely. Plaintiff Merav Tal (Tal Alfasi) tried to calm him by telling him not to worry, that they could take care of his injuries later, and that he would be okay.

191.     In the horror of the moment, Plaintiff Merav Tal (Tal Alfasi) frantically called her family and left a message telling them that Yair had been shot and was gravely injured, that they needed help, and to call the police quickly. Gunshots could be heard in the background.

192.     The terrorists in their home were yelling to others that they found hostages. Plaintiff Merav Tal (Tal Alfasi) went into shock. Yair, weakened by his injuries, could not hold the door any longer. Suddenly an explosion blasted them backwards and plunging them to the floor. Plaintiff Merav Tal (Tal Alfasi) was covered with shrapnel and bleeding wounds all over her legs. She felt like she was burning, but she did not move, hoping to appear dead and deter the terrorists from doing anything else to her. She whispered to Yair to do the same and added that she loved him very much.

193.     The terrorists burst into the saferoom, yelling at them in Arabic to get up or else they would shoot them. They dragged Yair out of the room. Plaintiff Merav Tal (Tal Alfasi) urged him not to fight them. Then the terrorists seized her. On their way out of their once beautiful, cherished home, they saw that the terrorists had destroyed it. The terrorists were videoing everything. Yair, while being carried out of the house by four terrorists, yelled to Plaintiff Merav Tal (Tal Alfasi) that he was going to die. Plaintiff Merav Tal (Tal Alfasi) pleaded and begged with

all her might for them not to harm them. The terrorists shot Yair in the shoulder. She did not see Yair ever again.

194.    Plaintiff Merav Tal (Tal Alfasi) was thrown onto a moped with two terrorists holding her. The one in front of her had a weapon and one behind her held a knife at her throat. They rode all the way to Gaza like that. Once they got to Khan Yunis, a terrorist smacked her hard on the head as they moved her from the moped to a car and ripped off her jewelry, most of which was profoundly sentimental to her.

195.    As the car sped away, Plaintiff Merav Tal (Tal Alfasi) could see that they were being followed by a crowd of people cheering in excitement, celebrating, and shooting bullets into the air. Plaintiff Merav Tal (Tal Alfasi) signaled to bystanders to take pictures, even though the terrorists were commanding them not to take pictures. She hoped that the pictures would help in finding her.

196.    From there, she was moved to a different car, and then another, and eventually to a small open storage room. It seemed to be a little wooden greenhouse that was part of a house. She saw a friend, Oded Lipschitz, injured and lying on the floor and then dragged away. The terrorists told her that they treated Oded, but she never heard anything about him after that. While there, many terrorists, and even some women and children, came to look at her and the other hostages.

197.    Plaintiff Merav Tal (Tal Alfasi) was in that house for two and a half days. On her last day, she was taken to a "shower," which was a room with just a sink and walls, Plaintiff Merav Tal (Tal Alfasi) was told that she would need to be searched for electronic chips. A large male terrorist with a flashlight stood at the door to the shower. She quickly realized what was going to happen next, that he was going to search her naked body, and she ran out screaming, managing to squeeze herself under his arm.

44

198.   Plaintiff Merav Tal (Tal Alfasi) called for help from someone who spoke English. Miraculously, someone came to her aid and a scary and violent argument about who should conduct the search flared between the two terrorists. Next, Plaintiff Merav Tal (Tal Alfasi) was threatened that if she did not comply she would be blindfolded, have her hands tied behind her back taken to another location to get checked. Eventually, she was checked by a female, but it was still a horrible, degrading outcome. Every single mark on her body was questioned by the woman. Plaintiff Merav Tal (Tal Alfasi) feared she would be cut open or killed with each spot checked. The terrorists threw all her clothing away and gave her one shirt, which she wore for 53 days.

199.   After the horrific shower incident, the terrorists filmed Plaintiff Merav Tal (Tal Alfasi) and the another hostage with their guns drawn. She was forced to state her personal information, that she was kidnapped, and that she missed her children. Then she was moved to another house, where she was held captive for the next 45 days. She was confined to a children's bedroom that contained metal bunk beds. The window, except for a small opening for air, was intentionally blocked with a closet by the terrorists. The terrorists sat on two small armchairs every night, all night, with their guns pointed at her. Under these frightening circumstances, Plaintiff Merav Tal (Tal Alfasi) could not sleep. When she did sleep, she had terrifying nightmares, which she still experiences today. The other hostage being held with her told her that she screamed in her sleep.

200.   Plaintiff Merav Tal (Tal Alfasi) spent each day filled with uncertainty, not knowing what to expect. She spent much of her time thinking about when she would be saved. Notwithstanding the fear and worry she felt every single day, she and the other hostages would play category games to keep their minds working and strong, and to pass the time. She would hear banging and screaming often.

201.     One day, the terrorists let her listen to the news on an old transistor radio. She was shocked and horrified at what was happening in her beloved country. The amount of people injured, kidnapped, or killed overwhelmed her.

202.     One male hostage that arrived after Plaintiff Merav Tal (Tal Alfasi) told her what he knew about and witnessed of the Attack.   The terrorists then removed him and isolated him in a different room, preventing further conversation, and it is believed subsequently murdered him.

203.     A few days into her captivity, Plaintiff Merav Tal (Tal Alfasi) noticed that one of her shrapnel wounds was infected. Pus and discharge were oozing out of it. She asked for medical treatment from the terrorists, but they told her she was fine and only gave her an ointment. The wound was burning and painful, and it was untreated until her release.

204.     Initially, Plaintiff Merav Tal (Tal Alfasi) was provided rice, chicken, and bread. She only ate half and hid the other half to eat later in the day when she got hungry. Sometimes she was given macaroni, bread, labneh, and dry tuna. She was given lentil soup once. Shortly thereafter, the terrorists stopped giving her bread and she only received spaghetti or rice. She was given a good amount of water for the first two weeks, but that quickly decreased to a small portion.

205.     She and the other hostages did not have water to shower or flush the toilet. They would use the toilet, often diarrhea, one on top of the other, without flushing. It was disgusting, degrading, and inhumane.

206.     After approximately 48 days, on a Friday morning, Plaintiff Merav Tal (Tal Alfasi) was taken out of her room by a particularly scary man. He asked her numerous personal questions and then informed her that she was going home. He allowed her to watch the news, which detailed that a ceasefire had been established. He then took Plaintiff Merav Tal (Tal Alfasi) and the hostage who had been held with her away by car, with black plastic garbage bags sealed on their heads

with masking tape. Their heads were down the entire time, and they could not see a thing, which was frightening not knowing if they were going to be released or killed. The terrorist switched cars a few times. It was a tortuous day. At one point, they were forced to stand outside a greenhouse, under armed guard for about five hours with their heads against the wall. 15 terrorists were filming them and asking political questions. Plaintiff Merav Tal (Tal Alfasi) was too scared to speak and did not know what to answer. She did not want to say the wrong thing.

207.     After many hours, the terrorists took Plaintiff Merav Tal (Tal Alfasi) and other hostages to Natzer hospital. Seven people in total were placed in a tiny room without windows for five days. When one of them needed to use the bathroom, they had to knock on the door three times and then wait for someone to come get them, which would take an hour or two before someone came. When they finished going to the bathroom, they had to knock on the door again for someone to come and let them out.

208.     Plaintiff Merav Tal (Tal Alfasi) saw one of Yair's children, screaming and crying, at the hospital. She did not know that he had been kidnapped, and she was incredibly sad to see him there. She could not help him, and she felt like dying. She had an emotional reunion with him and the chance to talk to him. He was now startlingly speaking Arabic, which he had learned while in captivity. She also learned that Yair had not survived his injuries and had died, crushing her. As far as she knows, his body is still in Gaza and has not been able to properly lay her beloved partner to rest.

209.     Plaintiffs Rachel Alfendri, Keren Blank, and Sigalit Sharabi were in Holon, Israel at the time of the Attack. Plaintiffs Tomer Tal Alfasi and Ori Tal Alfasi were in Rishon LeZion, Israel, at the time of the Attack. They each received text messages from Plaintiff Merav Tal (Tal Alfasi) early in the morning on October 7, 2023, begging and pleading for help. Their lives

collapsed at the moment. They were all in shock and chaos erupted. They called the police, but they could not help. They felt helpless and alone. When they tried to call Plaintiff Merav Tal (Tal Alfasi), and got no answer, they tried calling Yair. Again, no answer. They had learned through the news that some people had been murdered and others had been kidnapped. They did not know anything about their beloved family member for two days when they received a video telegram showing Plaintiff Merav Tal (Tal Alfasi) and Yair being hauled out of their home, and Yair gravely injured and bleeding.

210.   Plaintiff Merav Tal (Tal Alfasi)'s entire family received her in Israel upon her release. The reunion was momentous, but the damage to all was significant. Plaintiff Merav Tal (Tal Alfasi) struggles with sleep and now takes medication to help with that, and also for depression. She has recurrent and severe migraines, and now suffers from fibromyalgia. Nightmares are frequent. She sees a psychologist and a psychiatrist.

211.   For the entire time of Plaintiff Merav Tal (Tal Alfasi)'s captivity, her family members struggled with stress, anxiety, worry, and despair. Every single day, they awaited any information about their loved one that never came. They each needed to begin some form of psychological therapy to get through the dark and never-ending days of waiting.

212.   The Plaintiffs detailed herein each suffered immense injuries that are ongoing and permanent.

213.   As a result of the October 7 Attack and the injuries she suffered, Plaintiff Merav Tal (Tal Alfasi) has past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, loss of earning capacity.

214.     As a result of the October 7 Attack, Plaintiffs Rachel Alfendri, Keren Blank, Sigalit Sharabi, Tomer Tal Alfasi, and Ori Tal Alfasi, each suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked.

### Rahmilov-Hodedatov-Benbeniste-Solomonov Families

215.     Plaintiff Viktor Rahmilov is a citizen of Israel and Russia and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

216.     Plaintiff Galina Rahmilov is the spouse of Plaintiff Viktor Rahmilov. Plaintiff Galina Rahmilov is a citizen of Israel and Russia and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

217.     Plaintiff Sofia Hodedatov is the child of Plaintiff Viktor Rahmilov and Plaintiff Galina Rahmilov. Plaintiff Sofia Hodedatov is a citizen of Israel and Russia and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

218.     Plaintiff Sigal Benbeniste is the child of Plaintiff Viktor Rahmilov and Plaintiff Galina Rahmilov. Plaintiff is a citizen of Israel and Russia and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

219.     Plaintiff Natali Rahmilov is the child of Plaintiff Viktor Rahmilov and Plaintiff Galina Rahmilov. Plaintiff is a citizen of Israel and Russia and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

220.     Plaintiff E.L.R., minor child, is the child of Plaintiff Viktor Rahmilov and Plaintiff Galina Rahmilov. Plaintiff is a citizen of Israel and Russia and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel. Plaintiff Galina Rahmilov brings this action individually and as legal guardian of Plaintiff E.L.R., minor child.

221.     Plaintiff Tamir Hodedatov is the spouse of Plaintiff Sofia Hodedatov. Plaintiff is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

222.     Plaintiff Hananel Benbeniste is the spouse of Plaintiff Sigal Benbeniste. Plaintiff Hananel Benbeniste is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

223.     Plaintiff Efim Solomonov is the parent of Plaintiff Galina Rahmilov. Plaintiff Efim Solomonov is a citizen of Israel at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

224.     Plaintiffs Viktor Rahmilov, Galina Rahmilov, Sofia Hodedatov, Sigal Benbeniste, Natali Rahmilov, E.L.R., minor child, Tamir Hodedatov, Hananel Benbeniste, and Efim Solomonov are hereinafter collectively known as "The Rahmilov-Hodedatov-Benbeniste-Solomonov Family."

225.     On October 7, 2023, Plaintiffs Viktor Rahmilov, Galina Rahmilov, E.L.R., minor child, Efim Solomonov, and Natali Rahmilov were at home in Mishor Hagefen, Ofakim, Israel, and present when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

226.     On October 7, 2023, Plaintiff Sofia Hodedatov and Plaintiff Tamir Hodedatov were at home in Ofakim, Israel, with their children, and present when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

227.     On October 7, 2023, Plaintiff Sigal Benbeniste and Plaintiff Hananel Benbeniste were at home in Ofakim, Israel, with their children, and present when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

228.    At approximately 6:30 a.m., Plaintiffs Viktor Rahmilov, Galina Rahmilov, E.L.R., minor child, Efim Solomonov, and Natali Rahmilov, were startled awake by the frightening blare of sirens in their neighborhood. Still dressed in their pajamas, they quickly ran from the house to the city shelter, which was about fifty meters away. They could see rockets soaring in the sky overhead. Many neighbors were also running to the shelter, but the doors were locked, and no one could enter.

229.    Plaintiff Viktor Rahmilov directed his family to get in the car and he would take them to the house of their eldest daughter, Plaintiff Sofia Hodedatov. Plaintiff Sofia Hodedatov lived in a nearby neighborhood just a few minutes away, and she had a saferoom. Plaintiff Sofia Hodedatov had been startled awake at the same time by terrifying loud booms that shook her house. She woke her husband, Plaintiff Tamir Hodedatov, and they grabbed their kids and ran to their saferoom.

230.    Plaintiff Sigal Benbeniste and her husband, Plaintiff Hananel Benbeniste, were awakened by the pounding alarms as well. They ran with their two babies to a synagogue near their house since they did not have a saferoom. After a half hour, Plaintiff Sigal Benbeniste begged Plaintiff Hananel Benbeniste to go to her parents' house. She wanted to all be together. Since they are religious orthodox Jews that keep the Sabbath, and therefore they could not drive, they headed out on foot. Along the way, they learned from others running around that terrorists were in her parents' neighborhood. In a panic, they rushed back home.

231.    Plaintiffs Galina Rahmilov, Efim Solomonov, and E.L.R., minor child, got in the car right away, but Plaintiff Natali Rahmilov was so distraught that she froze. She eventually calmed herself enough to go, but she wanted to follow the family in her own car. Plaintiff Viktor Rahmilov started to drive off, but promptly got a call from Plaintiff Natali Rahmilov, who was

screaming and crying, terrified because terrorists were indiscriminately shooting throughout the neighborhood. Plaintiff Viktor Rahmilov could hear the barrage of gunfire over the phone and immediately realized that they were being invaded. He quickly delivered Plaintiffs Galina Rahmilov, Efim Solomonov, and E.L.R., minor child, to Plaintiff Sofia Hodedatov's house where they hid in the saferoom, and he then rushed back to rescue Plaintiff Natali Rahmilov from the deadly attack around her.

232.     Worried about her father's safety, Plaintiff Natali Rahmilov insisted that Plaintiff Viktor Rahmilov not come back to get her because it was too dangerous, but Plaintiff Viktor Rahmilov kept her on the phone to try to calm her down and instructed her to go in the house to wait for him and lock the doors.

233.     As soon as Plaintiff Viktor Rahmilov entered the neighborhood, a large group of terrorists bombarded him and opened fire. He was shot in his arm, both legs, and his chest. Despite his horrific injuries, he kept driving to get to Plaintiff Natali Rahmilov before the terrorists did. As he neared his house, he yelled for Plaintiff Natali Rahmilov to get in the car. She jumped into the backseat, and they attempted to speed away, but they could not avoid the overwhelming number of terrorists stalking and shooting at them. The terrorists pummeled the car with about 80 bullets, and the wheels were shredded from the erratic driving, rendering the car immobile. Plaintiff Viktor Rahmilov had nowhere to go and had to make an excruciating life-or-death decision for both himself, and his daughter, and he prayed that getting out of the car and running would give them a fighting chance to survive.

234.     With more terrorists approaching, Plaintiff Viktor Rahmilov told Plaintiff Natali Rahmilov to get out of the car and run between houses to escape the neighborhood. He felt like he was sending his child to her death. As soon as Plaintiff Natali Rahmilov started running, Plaintiff

Viktor Rahmilov saw a terrorist aim his gun at her. Somehow Plaintiff Viktor Rahmilov selflessly managed to insert himself in between the terrorist and Plaintiff Natali Rahmilov, to save her life. In doing so, he took four bullets to his legs, but kept his focus on getting his daughter to safety and just kept yelling at her to run.

235.    Despite the seven bullets in his body, Plaintiff Viktor Rahmilov and Plaintiff Natali Rahmilov managed to get out onto the main road and to a nearby neighborhood, Ramat Shaked. They desperately pounded on so many doors to get into a saferoom, but no one answered. They continued running until they found themselves at Plaintiff Viktor Rahmilov's nephew's home, and he answered the door for them. Both Plaintiff Viktor Rahmilov and Plaintiff Natali Rahmilov were saturated in blood.

236.    Plaintiff Natali Rahmilov hysterically called her family members to let them know what happened to them and that Plaintiff Viktor Rahmilov needed medical attention immediately. They all tried calling around to get medical assistance for Plaintiff Viktor Rahmilov, but no one could come. The medical service gave Plaintiff Natali Rahmilov and Plaintiff Viktor Rahmilov's nephew instructions over the phone to stop Plaintiff Viktor Rahmilov's bleeding. Despite their valiant efforts, Plaintiff Viktor Rahmilov laid on the floor for three hours, bleeding and on the verge of death.

237.    At this point, Plaintiff Sigal Benbeniste and her family had arrived back at their home and, although it was the Sabbath, she turned on her phone due to the severity of the situation and learned that her father had been shot and was dying. She and her family immediately got in their car and headed to her sister Plaintiff Sofia Hodedatov's house to go to her saferoom and all be together.

238.     Over the phone, the family used their connections to get Plaintiff Viktor Rahmilov medical attention from a rescue team who got him out of the house and to the hospital. At the emergency room, Plaintiff Viktor Rahmilov was the 132nd person in line to be treated, but his blood pressure and pulse were dangerously low, and his injuries were so severe that the doctors had to intervene to stop him from fatally hemorrhaging. He was eventually taken into surgery.

239.     The rest of the family members sat in Plaintiff Sofia Hodedatov's saferoom, in silence, in the dark, and in fear for their lives. At the same time, they feared for the life of Plaintiff Viktor Rahmilov, whom they knew was fighting for his life. They had lost contact with him after he was evacuated to the hospital as his phone had been left in the car, and Plaintiff Natali Rahmilov had stayed in the saferoom with Plaintiff Viktor Rahmilov's nephew and his family. To this day, she refuses any mention of the events of that day.

240.     Despite two surgeries, Plaintiff Viktor Rahmilov still suffers from many pieces of shrapnel lodged in his body that feel like knives when he walks. The bullets used by the terrorists exploded upon entry into the body. The doctors could not believe how he was able to run with those injuries.

241.     Plaintiff Viktor Rahmilov's rehabilitation continues with physiotherapy and hydrotherapy, but he can only painstakingly walk short distances. He has severe pain in his left leg that feels like electricity pulsing through. He cannot feel his right leg. He has constant pain and electricity in his arm due to shrapnel. He has lost the joy in his life. Everything annoys him and he is short-tempered. He continuously sees images of terrorists all around him.

242.     Plaintiff E.L.R., minor child, was traumatized and would not leave the saferoom at Plaintiff Sofia Hodedatov's house for two months.

243.     After a few months at Plaintiff Sofia Hodedatov's house, Plaintiffs Viktor Rahmilov and Galina Rahmilov decided it was time to return to their home in Mishor Hagefen, Ofakim. Their neighborhood looked like a haunted cemetery. It was covered with memorial candles, photos, and obituaries of the murdered, all of whom they knew. It was difficult for them to recognize what was once home. They are still struggling to adapt.

244.     Plaintiff Galina Rahmilov took care of Plaintiff Viktor Rahmilov around the clock when he was released from the hospital, cleaning his wounds, and changing his bandages. She now sees a psychologist. The stress she experienced from the Attack has resulted in chronic physical pain and stiffness. Despite her injuries, she had to return to work as she was now the only one able to support her family.

245.     The Rahmilov-Hodedatov-Benbeniste-Solomonov families suffer from anxiety, hypervigilance, sleep issues, fear of other people, fear of loud noises, and constant worry for their safety, for which they are receiving treatment from psychiatrists. Their once peaceful, joyful, and optimistic lives are now filled with feelings of loss, stress, skepticism, and tears.

246.     The Rahmilov-Hodedatov-Benbeniste-Solomonov families suffered immense injuries that are ongoing and permanent.

247.     As a result of the October 7 Attack and the injuries they suffered, Plaintiff Viktor Rahmilov, Plaintiff Galina Rahmilov, Plaintiff Sofia Hodedatov, Plaintiff Sigal Benbeniste, Plaintiff Natali Rahmilov, Plaintiff E.L.R., minor child, Plaintiff Tamir Hodedatov, Plaintiff Hananel Benbeniste, and Plaintiff Efim Solomonov have past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, and loss of earning capacity.

248.    As a result of the October 7 Attack, Plaintiff Viktor Rahmilov, Plaintiff Galina Rahmilov, Plaintiff Sofia Hodedatov, Plaintiff Sigal Benbeniste, Plaintiff Natali Rahmilov, Plaintiff E.L.R., minor child, Plaintiff Tamir Hodedatov, Plaintiff Hananel Benbeniste, and Plaintiff Efim Solomonov suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked.

**Bar-On-Shuva-Deviko Families**

249.    Plaintiff Estate of Yuval Bar-On was a citizen of Israel and at the time of the acts alleged, and at all times relevant hereto, was domiciled in Israel.

250.    Plaintiff Orit Bar-On is the parent of Plaintiff Estate of Yuval Bar-On, and the spouse of Plaintiff Itzhak Bar-On. Plaintiff Orit Bar-On is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel. Plaintiff Orit Bar-On brings this action individually and as heir-at-law on behalf of the Estate of Yuval Bar-On.

251.    Plaintiff Itzhak Bar-On is the parent of Plaintiff Estate of Yuval Bar-On. Plaintiff Itzhak Bar-On is a citizen of Israel, and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel. Plaintiff Itzhak Bar-On brings this action individually and on behalf of the Estate of his child, Yuval Bar-On.

252.    Plaintiffs Estate of Yuval Bar-On, Orit Bar-On, and Itzhak Bar-On, are hereinafter collectively referred to as "The Bar-On Family."

253.    Plaintiff Estate of Moshe Shuva was the fiancé of Plaintiff Estate of Yuval Bar-On. Plaintiff Estate of Moshe Shuva was a citizen of Israel, and at the time of the acts alleged, and at all times relevant hereto, was domiciled in Israel.

254.    Plaintiff Yossef Shuva is the parent of Plaintiff Estate of Moshe Shuva. Plaintiff Yossef Shuva is a citizen of Israel, and at the time of the acts alleged, and at all other times relevant

hereto, was domiciled in Israel. Plaintiff Yossef Shuva brings this action individually and as heir-at-law on behalf of the Estate of Moshe Shuva.

255.    Plaintiff Sonia Shuva is the parent of Plaintiff Estate of Moshe Shuva, and the spouse of Plaintiff Yossef Shuva.  Plaintiff Sonia Shuva is a citizen of Israel, and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

256.    Plaintiff Maayan Deviko is the sibling of Plaintiff Estate of Moshe Shuva, and the child of Plaintiffs Yossef Shuva and Sonia Shuva. Plaintiff Maayan Deviko is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

257.    Plaintiff Shimon Shuva is the sibling of Plaintiff Estate of Moshe Shuva, and the child of Plaintiffs Yossef Shuva and Sonia Shuva. He is also the sibling of Plaintiff Maayan Deviko. Plaintiff Shimon Shuva is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

258.    Plaintiffs Estate of Moshe Shuva, Yossef Shuva, Sonia Shuva, Maayan Deviko, and Shimon Shuva are hereinafter collectively referred to as "The Shuva Family."

259.    Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva were engaged to be married on Valentine's Day, February 14, 2024. They were all so excited and plans were well underway. A reception hall had been rented for the event. Plaintiff Estate of Yuval Bar-On had chosen her stunning wedding gown. They were deeply in love and shared many of the same passions in life. They especially loved nature.

260.    Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva were both the youngest children in their respective families. At the time, they had been happily living together in the additional living space attached to the Shuva Family's home.

261.    Late on the evening of October 6, 2023, Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva excitedly informed their families that they planned to attend the NOVA Music festival and would leave early in the morning. Plaintiff Estate of Yuval Bar-On reassured the Bar-On Family that she would let the family know when they had arrived safely at the event. Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva left for the event around 4:00 a.m., on October 7, 2023.

262.    At 5:37 a.m., Plaintiff Itzhak Bar-On received a text from Plaintiff Estate of Yuval Bar-On that they had arrived at the event safely, so Plaintiff Itzhak Bar-On and Plaintiff Orit Bar-On returned to bed. They had no idea it would be the last contact they would ever have with their beloved child.

263.    On the morning of October 7, 2023, Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva were ruthlessly attacked and killed by Hamas terrorists with machine guns, grenades, and other weapons, while trying to escape in their car from the NOVA Music Festival. Neither the Bar-On Family nor the Shuva Family would discover what happened to their children for three days, and they desperately waited for information the entire excruciating time.

264.    Plaintiff Maayan Deviko awoke from a bad dream around 3:00 a.m. on October 7, 2024, made some coffee, and watched television. She was still awake when, shortly after 6:00 a.m., she started to hear an unusually large number of alarms and sirens. Plaintiff Maayan Deviko woke her husband and told him to go buy water supplies for them and for her parents so that, if need be, they would be prepared in their shelter. She felt that this time, something was different than other times when alarms would sound.

265.    Plaintiff Orit Bar-On learned of rocket attacks and chaos occurring in the South from the news on the morning of October 7, 2023. She woke her spouse, Plaintiff Itzhak Bar-On, at approximately 8:00 a.m. to alert him as to what was happening across Israel.

266.    Around 8:30 a.m., Plaintiff Maayan Deviko received a call from a friend who asked her if she heard about the chaos transpiring in the south. She was stunned to learn of the attack as she knew that was where Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva lived. From that moment, she felt overwhelming feelings of panic and concern. She tried endlessly contacting Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva, to no avail.

267.    All attempts by the Bar-On Family to contact Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva were unsuccessful.

268.    On October 10, 2023, police informed the Bar-On family that Plaintiff Estate of Yuval Bar-On had been found brutally murdered. On October 11, 2023, Plaintiff Itzhak Bar-On went with police to identify his child's remains. It took him 30 minutes to identify her mutilated body. It was an experience that he will relive for the rest of his life.

269.    When Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva's bodies were found, they were rotten, and the family was not allowed to touch them.

270.    To spare the family distress, Plaintiff Estate of Moshe Shuva was identified by the rabbi of his community who knew him personally. Plaintiff Maayan Deviko later saw a horrific video taken by a terrorist of her beloved brother and his beautiful fiancée shot dead.

271.    As part of the mass recognition efforts following the Attack, a special unit was connecting mobile batteries to phones found in the areas attacked. Earlier that day, in a pile of cell phones found in a wooded area near Re'im, a battery was connected to a phone that showed a

screensaver image of Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva. It was Plaintiff Estate of Moshe Shuva's cell phone.

272.    Rather than uniting the families of Plaintiff Estate of Yuval Bar-On and Plaintiff Estate of Moshe Shuva through their joyful nuptials, instead the two families were united in sorrow at the cemetery for the funerals and final burials of their loved ones.

273.    Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva were a beautiful young couple. They were a perfect match who made each other and everyone around them very happy. They were so excited to be getting married soon. Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva did not have a chance to say goodbye.

274.    Plaintiff Estate of Moshe Shuva was a source of light, joy, and comfort to his whole family, especially for Plaintiff Maayan Deviko, who now must take care of her family alone. Prior to the Attack and Plaintiff Estate of Moshe Shuva's murder, Plaintiff Estate of Moshe Shuva helped Plaintiff Maayan Deviko care for her family since her husband is disabled and she worked a full-time job. Plaintiff Estate of Moshe Shuva also took care of his parents.

275.    Plaintiff Shimon Shuva has not returned to work.

276.    Plaintiff Sonia Shuva was later diagnosed with cancer.

277.    The Plaintiffs detailed herein each suffered immense injuries that are ongoing and permanent.

278.    As a result of the October 7 Attack, Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva suffered wrongful deaths.

279.    As a result of the October 7 Attack, and the injuries Yuval Bar-On suffered, Plaintiff Estate of Yuval Bar-On, has past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages,

including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of Yuval Bar-On's beneficiaries.

280.    As a result of the October 7 Attack, and the injuries Moshe Shuva suffered, Plaintiff Estate of Moshe Shuva, has past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of Moshe Shuva's beneficiaries.

281.    As a result of the October 7 Attack, and Plaintiff Estate of Yuval Bar-On's wrongful death, Plaintiff Itzhak Bar-On and Plaintiff Orit Bar-On suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Plaintiff Estate of Yuval Bar-On, and the subsequent loss of her life, continue to have a lasting effect on her family members.

282.    As a result of the October 7 Attack, and Plaintiff Estate of Moshe Shuva's wrongful death, Plaintiff Yossef Shuva, Plaintiff Simona Shuva, Plaintiff Maayan Deviko, and Plaintiff Shimon Shuva suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Estate of Moshe Shuva, and the subsequent loss of his life, continue to have a lasting effect on his family members.

**Kaplun-Keidar-Frailich-Strikovski Families**

283.    Plaintiff Estate of Dror Kaplun was a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

284.     Plaintiff Noam Kaplun is the child of Plaintiff Estate of Dror Kaplun. Plaintiff Noam Kaplun is a citizen of Israel and the United Kingdom and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

285.     Plaintiff Maayan Kaplun Keidar is the child of Plaintiff Estate of Dror Kaplun Plaintiff Maayan Kaplun Keidar is a citizen of Israel and the United Kingdom and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

286.     Plaintiff Moran Kaplun (Tarasov) is the child of Plaintiff Estate of Dror Kaplun. Plaintiff Moran Kaplun (Tarasov) is a citizen of Israel and the United Kingdom and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

287.     Plaintiffs Noam Kaplun, Maayan Kaplun Keidar, and Moran Kaplun (Tarasov) bring this action individually and as heirs-at-law on behalf of the Estate Dror Kaplun.

288.     Plaintiff Noam Kaplun, Maayan Kaplun Keidar, and Moran Kaplun (Tarasov) are siblings.

289.     Plaintiffs Estate of Dror Kaplun, Noam Kaplun, Maayan Kaplun Keidar, and Moran Kaplun (Tarasov) are hereinafter collectively referred to as "The Kaplun Family."

290.     Plaintiff Estate of Marcel Frailich is the spouse of Plaintiff Estate of Dror Kaplun. Plaintiff Estate of Marcel Frailich was a citizen of Israel and Morocco and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

291.     Plaintiff Mor Frida Strikovski is the child of Plaintiff Estate of Marcel Frailich. Plaintiff Mor Frida Strikovski is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

292.     Plaintiff Ziv Frailich is the child of Plaintiff Estate of Marcel Frailich. Plaintiff Ziv Frailich is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

293.     Plaintiff Amit Frailich is the child of Plaintiff Estate of Marcel Frailich. Plaintiff Amit Frailich is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

294.     Plaintiff Mor Frida Strikovski, Ziv Frailich, and Amit Frailich bring this action individually and as heirs-at-law on behalf of the Estate of Marcel Frailich.

295.     Plaintiffs Mor Frida Strikovski, Ziv Frailich, and Amit Frailich are siblings.

296.     Plaintiffs Estate of Marcel Frailich, Mor Frida Strikovski, Ziv Frailich, and Amit Frailich are hereinafter collectively referred to as "The Frailich Family."

297.     On October 7, 2023, Plaintiff Estate of Dror Kaplun and his spouse Plaintiff Estate of Marcel Frailich were in their home in Be'eri, Israel, and present when they were ruthlessly attacked with machine guns, grenades, and other weapons, abducted, and then murdered by Hamas, with their hands tied behind their backs.

298.     On October 7, 2023, between 10:30 a.m. and 11:00 a.m., Plaintiff Estate of Dror Kaplun and Plaintiff Estate of Marcel Frailich were mercilessly abducted from their home by Hamas terrorists, barefoot, and wearing nothing but pajamas.

299.     On October 7, 2023, Plaintiff Noam Kaplun awoke to numerous disturbing text messages announcing that terrorists had infiltrated the kibbutz and were attacking. His parent, Plaintiff Estate of Dror Kaplun, wrote reassuringly that Israeli Defense Forces had come, so the family hoped that Plaintiffs Estate of Dror Kaplun and Estate of Marcel Frailich were safe and had been rescued. Nonetheless, out of fear of risking their safety, Plaintiff Noam Kaplun did not call

them to avoid risking their safety until approximately 10:30 a.m., but he could not reach them. Distraught, Plaintiff Noam Kaplun desperately kept trying to reach Plaintiffs Estate of Dror Kaplun and Estate of Marcel Frailich, but he never spoke to either of them again.

300.    On October 10, 2023, a video was released showing Plaintiffs Estate of Dror Kaplun and Estate of Marcel Frailich being dragged through the kibbutz by armed terrorists, with their hands savagely tied behind their backs. Their families' relief at seeing them alive lasted for only two days. After that, another video was published that showed Plaintiff Estate of Marcel Frailich's lifeless and ravaged body lying on the ground.

301.    The family painstakingly waited a week for more information on Plaintiff Estate of Marcel Frailich, and then received the unwanted and shattering news that her deceased body had been found and identified.

302.    For the next two months, the families nervously waited for information on Plaintiff Estate of Dor Kaplun. The Kaplun Family fought valiantly for his release, presuming he had been taken hostage and transported to Gaza. In fact, the terrorists tried to abduct Plaintiff Estate of Dror Kaplun's body to Gaza as evidenced in a video showing his body on a bicycle with terrorists who ran into Israeli Defense Forces soldiers and then abandoned his body there. But, on December 7, 2023, Plaintiff Estate of Dror Kaplun's body was positively identified. Archaeologists from Israel's Antiquities Authority aided in locating and identifying his remains.

303.    In February and April 2024, additional body parts of Plaintiff Estate of Dror Kaplun had been found, traumatizing his family further and forcing them to endure the re-opening of his grave.

304.    The Plaintiffs detailed herein each suffered immense injuries that are ongoing and permanent.

305.     Plaintiff Estate of Dror Kaplun was a humble man who only wanted to enjoy life. He retired in 2023 and dedicated himself to spending time with his five grandchildren, volunteering at Kibbutz Be'eri's library, cooking healthy foods, practicing yoga, and listening to podcasts. He was a father of three children and the son of Holocaust survivor parents. His wife, Plaintiff Estate of Marcel Frailich, was a Doctor of Chemistry at the Weizmann Institute of Science.

306.     As a result of the October 7 Attack, Plaintiff Estate of Dror Kaplun suffered wrongful death.

307.     As a result of the October 7 Attack, and the injuries Dror Kaplun suffered, Plaintiff Estate of Dror Kaplun, has past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of Dror Kaplun's beneficiaries.

308.     As a result of the October 7 Attack, and Plaintiff Estate of Dror Kaplun's wrongful death, Plaintiff Noam Kaplun, Plaintiff Maayan Kaplun Keidar, Plaintiff Moran Kaplun (Tarasov), and Plaintiff Estate of Marcel Frailich suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Estate of Dror Kaplun, and the subsequent loss of his life, continue to have a lasting effect on his family members.

309.     As a result of the October 7 Attack, Plaintiff Estate of Marcel Frailich suffered wrongful death.

310.     As a result of the October 7 Attack, and the injuries Marcel Frailich suffered, Plaintiff Estate of Marcel Frailich, has past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages,

including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of Marcel Frailich's beneficiaries.

311.    As a result of the October 7 Attack, and Plaintiff Estate of Marcel Frailich's wrongful death, Plaintiff Estate of Dror Kaplun, Plaintiff Mor Frida Strikovski, Plaintiff Ziv Frailich, and Plaintiff Amit Frailich suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Estate of Marcel Frailich, and the subsequent loss of her life, continue to have a lasting effect on her family members.

**Caspi Family**

312.    Plaintiff Sharon Caspi is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

313.    Plaintiff Amit Caspi is the spouse of Plaintiff Sharon Caspi. Plaintiff Amit Caspi is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

314.    Plaintiff Niv Caspi is the child of Plaintiff Sharon Caspi and the child of Plaintiff Amit Caspi. Plaintiff Niv Caspi is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

315.    Plaintiff May Caspi is the child of Plaintiff Sharon Caspi and the child of Plaintiff Amit Caspi. Plaintiff May Caspi is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

316.    Plaintiff S.C., minor child, is the child of Plaintiff Sharon Caspi and the child of Plaintiff Amit Caspi. Plaintiff S.C., minor child, is a citizen of Israel and at the time of the acts

alleged, and at all other times relevant hereto, was domiciled in Israel. Plaintiff Amit Caspi brings this action individually and as legal guardian of Plaintiff, S.C., minor child.

317.    Plaintiff Niv Caspi, Plaintiff May Caspi, and Plaintiff S.C., minor child, are siblings.

318.    Plaintiffs Sharon Caspi, Amit Caspi, Niv Caspi, May Caspi, and S.C., minor child, are hereinafter collectively referred to as "The Caspi Family."

319.    On October 7, 2023, Plaintiffs Sharon Caspi and S.C., minor child, were at their home, and May Caspi was at a nearby apartment, both at Kibbutz Kerem Shalom, Israel, and present when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

320.    When the distressing sounds of rockets and alerts began at approximately 6:30 a.m., Plaintiffs Sharon Caspi and S.C., minor child, did not fully understand what was happening but knew they were in severe danger, so they ran to their saferoom. Plaintiff Sharon Caspi grabbed some pans and knives along the way to use for defense. Soon thereafter, they heard gunfire nearby and knew that terrorists had infiltrated the kibbutz. They sat helplessly on the floor of their saferoom until the next evening, terrified, fearing that it was only a matter of time until the terrorists reached them, and they would be killed.

321.    Plaintiff Amit Caspi was on a flight to New York at the time.

322.    Plaintiff May Caspi was alone in her own apartment on Kibbutz Kerem Shalom.

323.    Plaintiff Niv Caspi was in Haifa, Israel, and was startled awake by a call from Plaintiff Sharon Caspi informing him what was happening in the kibbutz.

324.    Plaintiff Sharon Caspi, alone with her minor child, Plaintiff S.C., in the saferoom, felt utterly helpless and worried for the safety of her other children, Plaintiffs May Caspi and Niv

Caspi. Plaintiffs Sharon Caspi and S.C., minor child, received constant community text messages about the horrors taking place around them, which added to the fright and panic already overtaking them. They lived approximately 40 meters from the border, and their kibbutz was one of the closest to the direction from where the terrorists were coming. Plaintiff S.C., minor child, was receiving messages from his friends pleading for help, knowing that he could not do anything.

325.    In her apartment in Kibbutz Kerem Shalom, Plaintiff May Caspi awoke to a barrage of rockets and quickly took shelter in her saferoom. She had just turned 21 and was sick with a fever from a full week of celebrating. She was overwhelmed, alone, and terrified, listening to numerous terrifying explosions and gunfire coming from all directions and seemingly very close to her home. She learned about the invasion through text messages and online videos and kept looking through the peephole to watch for terrorists.

326.    Plaintiff May Caspi hid in her saferoom until she was called by the security team of her kibbutz to help take care of her wounded community members. She was trained as a military medic and had just been released from her service the month before. She collected medical supplies and ran out to help. For hours, Plaintiff May Caspi treated many injured victims. She did so at great personal risk, going to various locations, while unprotected from falling rockets, and exposed to gunfire and terrorists running amok through the kibbutz. She called her former commander as she was treating people with critical injuries and he told her that everyone was under attack, and no one could come to help her. Plaintiff May Caspi believed they were all going to be killed, yet tried to maintain a positive attitude, reassuring the wounded people around her that they would be fine.

327.    While treating people, Plaintiff May Caspi had to use a "packing" technique, which was only taught once and was never expected to be practiced. This technique entailed inserting her

hand deep into wounds to stop arterial bleeding. She did that treatment twice that day. She treated other badly injured people with improvised techniques and materials. There was no pain medication to give to the injured. There were some people for whom she could not do anything. There was one person whose hands had been blown off. She was forced to make life-or-death decisions about who could be saved and who could not. She will forever live with the results of her decisions that day.

328.     Plaintiff May Caspi also accompanied the team that informed families of their members who were murdered. She hit her breaking point when they told a family she knew of their murdered relative. She could not do that anymore and at 10:00 p.m. that night, she joined Plaintiffs Sharon Caspi and S.C., minor child, in the saferoom at their home, where she collapsed from exhaustion and devastation. They all remained on the floor in silence the whole night and the entire next day.

329.     At approximately 7:00 p.m. the night after the Attack, Plaintiffs Sharon Caspi, May Caspi, and S.C., minor child, were finally evacuated from the kibbutz to a hotel in Eilat with other displaced persons from their kibbutz and other kibbutzim. The drive was gut-wrenching and horrifying. Destroyed cars and dead bodies filled the roads. It was dark and smoky, with a burnt odor filling the air. It was eerily silent. No one spoke a word.

330.     After a week, Plaintiff May Caspi was mobilized to the reserves as a combat medic. Plaintiffs Sharon Caspi and S.C., minor child, resided at the hotel for three and a half months in one small room together with Plaintiff Amit Caspi. The tight accommodations were challenging and exacerbated the trauma they had already experienced.

331.     Plaintiff Sharon Caspi still suffers from severe trauma and cannot work or function normally. She experiences frequent panic attacks. The trauma of the Attack aggravated her

fibromyalgia, and she suffers from constant aches and pains all over her body which make it hard for her to move. She continues to experience anxiety and cries all the time. She is afraid of everything.

332.    Plaintiff S.C., minor child, continues to struggle from the trauma experienced in the Attack, having also learned in the days after about classmates and teammates who were murdered. Plaintiff S.C., minor child was unable to return to school for over four months, having only just returned in February 2024.

333.    Plaintiff May Caspi continues to struggle with sleep. She cannot fall asleep easily and when she eventually does, she suffers from nightmares. She is trying to adjust to her situation and just survive. She feels that there are still so many unknown factors of life all around her.

334.    Plaintiff Niv Caspi, a 24-year-old children's soccer coach for the Maccabee Haifa team, had been splitting his time between coaching in Haifa and his home in Kerem Shalom. He spent the entire excruciatingly long day worrying about his family as he could not get in touch with anyone until the night of October 8, 2023. He did not know if his family members were alive or dead.

335.    Risking his own safety, Plaintiff Niv Caspi finally found a ride late in the evening on October 7, 2023, from his location in Haifa, Israel, to Kerem Shalom. Along the way, he was almost murdered when he was shot at by the terrorists. While he managed to escape his own death, he sadly witnessed the aftermath of the destruction of the community he loved. Vehicles were riddled with gunshots, smashed up, and burning. Dismembered, wounded, and burned bodies were strewn about on the road and all around the ground. He feared the worst for his family and the kibbutz.

336.    As a former medic in his military service, Plaintiff Niv Caspi stopped at each body that he came across in case he could help, despite the great risk to his own safety. That drive, which normally takes two hours took him over twelve hours that day. He reached the Saad Junction the next morning, where he was stopped by security. He thought he was in a literal hell. Then he received a phone call informing him that he was being called up under emergency mobilization orders and was required to report immediately for reserve duty as a medic, and he did not make it to see his family. In fact, he did not get to see his family for about a month after that day.

337.    Plaintiff Niv Caspi now cannot sleep and feels like a broken person. He worries constantly about his family. He has become impatient and feels emotionally disconnected. He is hypervigilant, always on the lookout for terrorists.

338.    Plaintiff Amit Caspi continues to struggle with knowing that he was not there to protect his family at the time of the Attack. He suffers from anxiety and worries about what the future will hold for his family. He is required to travel away from home for his job. He feels constantly torn trying to balance his obligation to travel for work so that the family will not also lose their financial security with his need to be there for his family.

339.    The Caspi Family suffered immense injuries that are ongoing and permanent.

340.    As a result of the October 7 Attack and the injuries they suffered, Plaintiffs Sharon Caspi, Niv Caspi, May Caspi, and S.C., minor child each have past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, loss of earning capacity.

341.    As a result of the October 7 Attack, Plaintiffs Sharon Caspi, Niv Caspi, Amit Caspi, May Caspi, and S.C., minor child, and each suffered severe mental anguish, extreme emotional

pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked.

### Haramaty-Haramati-Mizrahi-Hyams Families

342.    Plaintiff Estate of Varda Haramaty was a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

343.    Plaintiff Ayelet Haramati Mizrahi is the child of Plaintiff Estate of Varda Haramaty. Plaintiff Ayelet Haramati Mizrahi is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel. Plaintiff Ayelet Haramati Mizrahi brings this action individually and as heir-at-law on behalf of the Estate of Varda Haramaty.

344.    Plaintiff Avraham Mizrahi is the spouse of Plaintiff Ayelet Haramati Mizrahi. Plaintiff Avraham Mizrahi is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

345.    Plaintiff Itamar Mizrahi is the child of Plaintiff Ayelet Haramati Mizrahi and Plaintiff Avraham Mizrahi. Plaintiff Itamar Mizrahi is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

346.    Plaintiff Tomer Mizrahi is the child of Plaintiff Ayelet Haramati Mizrahi and Plaintiff Avraham Mizrahi. Plaintiff Tomer Mizrahi is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

347.    Plaintiff Edith Hyams is the sibling of Plaintiff Estate of Varda Haramaty. Plaintiff Edith Hyams is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

348.    Plaintiffs Estate of Varda Haramaty, Ayelet Haramati Mizrahi, Avraham Mizrahi, Itamar Mizrahi, Tomer Mizrahi, and Edith Hyams are hereinafter collectively referred to as "The Haramati-Mizrahi-Hyams Family."

349.    On October 7, 2023, Plaintiff Estate of Varda Haramaty was in her home in Re'im, Israel, and present when she was ruthlessly attacked and killed by Hamas with machine guns, grenades, and other weapons.

350.    On October 7, 2023, Plaintiffs Ayelet Haramati Mizrahi and Avraham Mizrahi were present in their home in Re'im, Israel, when their kibbutz was ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

351.    On October 7, 2023, Plaintiff Itamar Mizrahi was at his apartment in Re'im, Israel, and present when he was ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

352.    At approximately 6:30 a.m., Plaintiffs Ayelet Haramati Mizrahi and Avraham Mizrahi were startled awake by the sounds of shooting missiles. They hurried to their saferoom. Plaintiff Ayelet Haramati Mizrahi immediately called her parent, Plaintiff Estate of Varda Haramaty, who lived in a nearby apartment, to check on her. Then she called her children, Roee Mizrahi and Plaintiff Itamar Mizrahi, who lived in the youth apartments nearby on the kibbutz. Everyone was securely hiding in their saferooms.

353.    Plaintiff Itamar Mizrahi awoke to sirens at 6:30 a.m. He hurried to his saferoom, but the room was not fully secure because the door did not lock, and the window did not fully close. He and a friend who was with him sat on the floor in silence, praying that they would not be harmed. About 30 minutes later, Plaintiff Itamar Mizrahi started to hear gunshots, and then, through a window, saw a terrorist walking outside of his house. He watched in horror as the terrorist kidnapped people who were hiding in a nearby bomb shelter. Shortly after that, around 8:15 a.m., terrorists broke the windows and doors to Plaintiff Itamar Mizrahi's home.

Miraculously, the terrorists did not enter his saferoom. He was terrified and unsure of what would happen next.

354.    Plaintiffs Ayelet Haramati Mizrahi and Avraham Mizrahi watched the television in their saferoom to stay aware of what was happening outside. They saw that the terrorists were in Sderot, and then they heard terrifying sound of gunshots. Plaintiff Avraham Mizrahi called the kibbutz's security and learned that the terrorists were on their kibbutz. Plaintiff Ayelet Haramati Mizrahi called Plaintiff Estate of Varda Haramaty, to warn her, but there was no answer. She then called Plaintiff Estate of Varda Haramaty's partner who lived in an adjacent apartment, and he went to check on her. The partner frantically called Plaintiff Ayelet Haramati Mizrahi back, screaming that Plaintiff Estate of Varda Haramaty had been murdered, shot in the head. Plaintiff Ayelet Haramati Mizrahi was horrified and overcome with grief.

355.    Despite her great sorrow for the loss of her parent, Plaintiff Ayelet Haramati Mizrahi knew that the unfolding situation was serious, and she needed to stay strong to survive. She gathered her senses and started making calls since she was responsible for contacting families in the kibbutz in emergencies.

356.    As a result, she also received information regarding the kibbutz members who were murdered. It was gut-wrenching to hear each name, as she knew everyone. Plaintiff Ayelet Haramati Mizrahi also had to respond to calls for help, and people asking someone to take their children to safety. It was all horrible and she was overwhelmed and distraught.

357.    Around 10:00 a.m., Plaintiff Itamar Mizrahi learned about the brutal murder of his dear grandparent. He was devastated and heartbroken.

358.    At some point, Plaintiffs Ayelet Haramati Mizrahi and Avraham Mizrahi lost contact with their child, Roee, whose phone charge had run out. They were extremely worried

about him and did not know if he was safe. They spent hours waiting for information about his status. Later in the evening, they were able to communicate with security and Israeli Defense Forces, who informed them that the terrorists had set up their base in the apartment next to Roee's and that they planned to destroy the area with rockets. Plaintiff Ayelet Haramati Mizrahi begged and pleaded with them not to do that because her child was in there and he would surely be killed.

359.    Plaintiff Itamar Mizrahi was rescued from his home by the community security team around noon and taken to another home that had not been destroyed and was thought to be safer. He remained there with five other people who had been saved from their hiding places for about 24 hours until they were all rescued and relocated once again. Throughout those 24 hours, Plaintiff Itamar Mizrahi painfully listened to the harrowing sounds of battle, gunshots, explosions, and dreadful screaming in Arabic. When Plaintiff Itamar Mizrahi finally left the kibbutz, he saw burned bodies, cars, and foliage in every direction. These images are forever seared into his mind.

360.    Plaintiffs Ayelet Haramati Mizrahi and Avraham Mizrahi remained in hiding in the saferoom all night. At one point, they heard people in their home speaking Arabic. They sat in silence and distress. Finally, the next afternoon, they received a call from one of the makeshift treatment centers set up, informing them that Roee was there and being treated for a gunshot wound. They were relieved to know his whereabouts but needed to get to him. They left the saferoom immediately and rushed to the treatment center, despite the great risk to their own safety.

361.    Roee had been shot in the hand and endured surgery to repair the damage. He remained in the hospital for four days. Plaintiff Ayelet Haramati Mizrahi stayed with him the entire time, but Plaintiff Avraham Mizrahi went back to check on their home. Everything in the area was destroyed. The once beautiful place he called home was now a war zone.

362.    Once Roee was released from the hospital, they all went to Eilat, where the displaced people had been relocated. They stayed there for two months. Roee's home had also been destroyed. Plaintiff Itamar Mizrahi joined them for a month.

363.    Plaintiff Tomer Mizrahi was in Thailand when he was alerted about the unfolding Attack, and he desperately tried to stay in contact with his family members and get information from afar. During that time, he was overwrought with worry, and feared for the worst, while also frantically trying to stay in touch with the civil emergency team of the kibbutz and the family.

364.    Plaintiff Edith Hyams, who lives in Moshav Ram On, was desperate to get in contact with her sibling, Plaintiff Estate of Varda Haramaty. When she first spoke to Plaintiff Estate of Varda Haramaty, she was safe. When she called again a second time, no one answered. A short while later, Plaintiff Estate of Varda Haramaty's partner called Plaintiff Edith Hyams, screaming that their angel was gone, that Plaintiff Estate of Varda Haramaty had been murdered. Plaintiff Edith Hyams screamed and cried, inconsolable, for two full days, to the point that she lost her voice. Plaintiff Estate of Varda Haramaty was her best friend, not just her sibling. She was lost without her.

365.    After the Attack, Plaintiff Ayelet Haramati Mizrahi could not return to work for two months. She became easily agitated, would lose patience with people easily, and was constantly overwhelmed with sadness.

366.    Plaintiff Ayelet Haramati Mizrahi and her family members are all heartbroken for the loss of Plaintiff Estate of Varda Haramaty, and for what happened to their family, their friends, and the community that they called home. Before the Attack, they enjoyed what they described as a wonderful life with a vision for a bright future. Now, that vision has drastically changed. None of them will ever be the same again.

367.     Plaintiff Itamar Mizrahi is no longer working and suffers from post-traumatic stress disorder, nightmares, and anxiety. He prefers to be by himself.

368.     The Plaintiffs detailed herein each suffered immense injuries that are ongoing and permanent.

369.     As a result of the October 7 Attack, Plaintiff Estate of Varda Haramaty suffered wrongful death.

370.      As a result of the October 7 Attack, and the injuries Varda Haramaty suffered, Plaintiff Estate of Varda Haramaty, has past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of Varda Haramaty's beneficiaries.

371.     As a result of the October 7 Attack, and Plaintiff Estate of Varda Haramaty's wrongful death, Plaintiff Ayelet Haramati Mizrahi and Plaintiff Edith Hyams suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Estate of Varda Haramaty, and the subsequent loss of her life, continue to have a lasting effect on her family members.

372.     As a result of the October 7 Attack and the injuries they suffered, Plaintiffs Ayelet Haramati Mizrahi, Avraham Mizrahi, and Itamar Mizrahi have past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, loss of earning capacity.

373.     As a result of the October 7 Attack, Plaintiffs Estate of Varda Haramaty, Ayelet Haramati Mizrahi, Avraham Mizrahi, Itamar Mizrahi, Tomer Mizrahi, and Edith Hyams, suffered

severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked.

### Sabag-Vage Families

374.    Plaintiff Asher Sabag is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

375.    Plaintiff Michal Sabag is the spouse of Plaintiff Asher Sabag. Plaintiff Michal Sabag is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

376.    Plaintiff Dor Michael Sabag is the child of Plaintiffs Asher Sabag and Michal Sabag. Plaintiff Dor Michael Sabag is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

377.    Plaintiffs Asher Sabag, Michal Sabag, and Dor Michael Sabag are hereinafter collectively referred to as "The Sabag Family."

378.    Plaintiff Danny Ofer Vage is the sibling of Plaintiff Michal Sabag. Plaintiff Danny Ofer Vage is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

379.    Plaintiff Gat Vage is the spouse of Plaintiff Danny Ofer Vage. Plaintiff Gat Vage is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

380.    Plaintiff H.V., minor child, is the child of Plaintiffs Danny Ofer Vage and Gat Vage. Plaintiff H.V., minor child, is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

381.    Plaintiff S.V., minor child, is the child of Plaintiffs Danny Ofer Vage and Gat Vage. Plaintiff S.V., minor child, is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

382.    Plaintiff Danny Ofer Vage brings this action individually and as legal guardian of Plaintiffs H.V., minor child, and S.V., minor child.

383.    Plaintiffs Danny Ofer Vage, Gat Vage, H.V., minor child, and S.V., minor child, are hereinafter collectively referred to as "The Vage Family."

384.    On October 7, 2023, The Sabag Family was at home in Kibbutz Nir Yitzhak, Israel, and present when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

385.    On October 7, 2023, The Vage Family was at home in Kibbutz Nir Yitzhak, Israel, and present when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

386.    Around approximately 6:15 a.m., The Sabag Family awoke to the frightening sounds of alarms and bombs exploding. They immediately rushed from their beds to their saferoom, where they remained until the terrifying sounds outside quieted. After some time, they felt like they could safely exit the saferoom, but the deafening alarms quickly sounded again, and they hurried back into the saferoom.

387.    Since they had a bed in the saferoom, Plaintiff Dor Sabag and his sibling, Oriya Sabag, tried to rest while Plaintiffs Michal Sabag and Asher Sabag watched in disbelief the images of Hamas terrorists riding around in Jeeps, waving their flag, and yelling with their weapons raised above their heads. Bombs were exploding all around them and they knew that Israel was being invaded.

388.    The Vage Family also awoke around 6:15 a.m. to dreadful sounds of warning alarms and rockets exploding. They immediately rushed to their saferoom and waited until the noises outside calmed down. They could hear gunshots and blasts outside, and, from neighborhood text messages, they learned that terrorists were marching around the kibbutz, entering people's homes, and wreaking havoc. The Vage Family quickly realized that something terrifying and shocking was happening in their kibbutz.

389.    When the noises quieted and they thought it was safe, The Vage Family hurried from their home to Plaintiff Michal Sabag's home because her two sons had military backgrounds and would be able to protect them.

390.    Since Plaintiff Dor Michael Sabag had already completed his mandatory military service, and his sibling, Oriya, was currently serving, they both bravely stood guard outside the saferoom with weapons. After receiving a desperate message from a friend who was alone and scared at the nearby youth neighborhood, Plaintiff Dor Michael Sabag decided he needed to help her and courageously left the house to get her, along with two other youths. Valiantly, Plaintiff Dor Michael Sabag successfully rescued them and brought them back to his house. They, along with Plaintiffs Michal Sabag, Asher Sabag, and The Vage Family, all huddled together, away from windows.

391.    The Sabag Family and the Vage Family could hear the relentless shooting of guns outside their home. Each of the Plaintiffs remained in constant contact with their friends and relatives through text messages, exchanging information. Some of their neighbors were asking for help. From these messages, they were able to track the terrorists' locations and knew the terrorists were coming closer to their house. They could also hear the gunshot sounds outside getting closer to them and they heard Arabic screaming all around. When the person in charge of the security of

the kibbutz did not reply to their messages, The Sabag and Vage families assumed he had been killed, which was later confirmed. The red alerts kept sounding and they felt helpless and defenseless.

392.     After a few hours fearing for their safety, at noon, a few Israeli Defense Forces soldiers came to their home. They informed Plaintiff Dor Michael Sabag and Oriya of the escalating and devastating attack going on outside. Over the fear and protests of their parents, Plaintiff Dor Michael Sabag and Oriya geared up to help the soldiers fight against the terrorists. Outside, Plaintiff Dor Michael Sabag and Oriya saw dead bodies all around the area. In what they now anticipated to be a life-and-death battle, they grabbed chest protectors and helmets from the bodies of dead soldiers to protect themselves and began the excruciating and atrocious task of clearing houses for the next 5 hours, while Plaintiffs Michal Sabag and Asher Sabag sat anxiously and desperately awaiting communications from their children again.

393.     Plaintiff Dor Michael Sabag eventually called, after what seemed like forever, and instructed Plaintiffs Asher Sabag and Michal Sabag not to leave the house and not to open the door for anyone. They did not hear from him, or Oriya, again until the next day and were distraught with distress and worry the entire time. They hid in the house, without any weapons, for hours, listening to the blaring sirens, exploding missiles, and deafening gunfire of the terrorists. For countless hours, the terrorists ransacked and destroyed homes, stole valuables, and murdered and kidnapped their innocent community members. It took the army what felt like an eternity to reach the kibbutz, engage in battle, and liberate their community from the hands of the evil terrorists.

394.     The Israeli Defense Forces eventually came to their home and directed them to evacuate to a nearby school, but Plaintiffs Michal Sabag, Asher Sabag, and The Vage Family did not feel it was safe to leave, so they remained in the home. During this time, they kept receiving

text messages from other people on the kibbutz that detailed loved ones being taken hostage, missing, or killed.

395.    Plaintiff Dor Michael Sabag met people who were looking for a friend at the NOVA Music Festival and he rode along with them to assist in the search. They flipped bodies to try to identify their friend but could not take the painful and gruesome task any longer. Plaintiff Dor Michael Sabag returned to the kibbutz and his family on the evening of Sunday, October 8, 2023, where he witnessed in horror and disbelief the brutal destruction of the once peaceful and beautiful neighborhood. Seven people were murdered, one a close friend. Four people were kidnapped. Countless people were injured. The kibbutz was destroyed. Oriya continues to serve in the military.

396.    On Monday, October 9, 2023, they were all evacuated with others who had been rescued and relocated to a hotel in Eilat, where they have lived ever since. Their thoughts remained with the community members who had been abducted and/or murdered.

397.    Before the October 7 Attack, The Sabag Family and the Vage Family each loved living in their kibbutz. They had a lot of friends on the kibbutz, and their lives were fulfilling.

398.    Since the Attack, Plaintiff Asher Sabag goes through every day severely frightened and listless. He has been unable to function normally. He is unable to motivate himself to do anything. He stays in the hotel room and sits in front of the television from the time he wakes until he goes to bed. He only watches the news channels. He cannot bring himself to work.

399.    For months, Plaintiff Michal Sabag experienced nightmares every night about terrorists. She does not feel like she has a safe home anymore. She feels unsettled. She does not think much about the future anymore.

400.     The Sabag Family and the Vage Family now live in small hotel rooms wondering about what they have left. With so much loss they have experienced, they feel sad and hopeless. They are afraid for their children.

401.     Plaintiff Dor Michael Sabag has gone through a variety of emotions. At times, he is strong and not in need of any help. At others, he is unable to focus and distant.

402.     Oriya continues to battle against the terrorists who he watched destroy the lives of his friends and family.

403.     They have all lost all sense of security and know that life on their kibbutz will never be the same again, even if the kibbutz is revived.

404.     The Plaintiffs detailed herein each suffered immense injuries that are ongoing and permanent.

405.     As a result of the October 7 Attack and the injuries they suffered, Plaintiffs Asher Sabag, Michal Sabag, and Dor Michael Sabag, have past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, loss of earning capacity.

406.     As a result of the October 7 Attack, Plaintiffs Asher Sabag, Michal Sabag, and Dor Michael Sabag, suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked.

407.     As a result of the October 7 Attack and the injuries they suffered, Plaintiffs Danny Ofer Vage, Gat Vage, H.V., minor child, and S.V., minor child, have past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, loss of earning capacity.

83

408.     As a result of the October 7 Attack, Plaintiffs Danny Ofer Vage, Gat Vage, H.V., minor child, and S.V., minor child, suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked.

**Shindel Family**

409.     Plaintiff Estate of Mark Shindel was a citizen of Israel and Estonia and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

410.     Plaintiff Julia Shindel is the parent of Plaintiff Estate of Mark Shindel. Plaintiff Julia Shindel is a citizen of Israel and at the times of the acts alleged and at all other times relevant hereto, was domiciled in the United States. Plaintiff Julia Shindel brings this action individually and as heir-at-law on behalf of the Estate of Mark Shindel.

411.     Plaintiff Igor Shindel is the parent of Plaintiff Estate of Mark Shindel. Plaintiff Igor Shindel is a citizen of Israel and at the times of the acts alleged and at all other times relevant hereto, was domiciled in the United States.

412.     Plaintiff Guy Shindel is the stepbrother of Plaintiff Estate of Mark Shindel. Plaintiff Guy Shindel is a citizen of Israel and at the times of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

413.     Plaintiff B.S., minor child, is the brother of Plaintiff Estate of Mark Shindel. Plaintiff B.S. is a citizen of Israel and at the times of the acts alleged, and at all other times relevant hereto, was domiciled in the United States.

414.     Plaintiff Julia Shindel also brings this action as legal guardian of Plaintiff B.S., minor child.

415.     Plaintiffs Estate of Mark Shindel, Julia Shindel, Igor Shindel, Guy Shindel, and B.S., minor child, are hereinafter referred to as "The Shindel Family."

416. Plaintiff Estate of Mark Shindel was admitted to Ben Gurion University and was scheduled to begin his studies on October 15, 2023. Until then, he volunteered to help with studies for at-risk youth. On October 7, 2023, Plaintiff Estate of Mark Shindel attended the NOVA Music Festival with friends to celebrate the start of the new academic year.

417. On the morning of October 7, 2023, shooting rockets began to zoom overhead. Plaintiff Estate of Mark Shindel sprinted to take refuge in a small valley nearby with other festival goers. While the horrors of the attack were unfolding around him, Plaintiff Estate of Mark Shindel tried to keep the others hiding with him in good spirits. He also shared water and, when possible, heroically assisted in getting people into cars to escape.

418. Plaintiffs Julia Shindel and Igor Shindel, who were in Chicago, Illinois, at the time of the Attack, stayed in contact via phone and messages with their child, Plaintiff Estate of Mark Shindel, for most of that morning, messaging with him. Plaintiff Estate of Mark Shindel continuously updated his parents on his status until around 10:30 a.m., which marked the final message they received from him, and his safety and whereabouts became unknown.

419. Plaintiff Julia Shindel promptly took a flight back to Israel to search for Plaintiff Estate of Mark Shindel. Once in Israel, Plaintiff Julia Shindel devastatingly provided authorities with a DNA sample to assist in the identification of his body, should it become necessary. After some time, it became clear to Plaintiffs Julia Shindel and Igor Shindel that there were only two possible results left for the families of those missing after October 7, and each of them was devastating to imagine. Their beloved son, Plaintiff Estate of Mark Shindel, was either murdered or kidnapped. For Plaintiffs Julia Shindel and Igor Shindel, it was an excruciating waiting game with likely devastating results.

420.   After several agonizing days later, Plaintiffs Julia Shindel and Igor Shindel received tragic and dreadful news that Plaintiff Estate of Mark Shindel had been cruelly murdered by terrorists at the NOVA Music Festival.

421.   Plaintiff Julia Shindel received her child's body on October 13, 2023. Plaintiff Estate of Mark Shindel's body had been deteriorating in a field for several days, so it smelled wretched and was covered in worms and insects. His left eye was replaced by the hole from close-range gunshot. Plaintiff Julia Shindel could not hug or kiss her son goodbye and is forever left with the lasting image of his mutilated body. Plaintiff Estate of Mark Shindel's friends who survived told Plaintiff Julia Shindel that her son died an undignified death at the hands of vile Hamas terrorists.

422.   Plaintiff Estate of Mark Shindel's father, Plaintiff Igor Shindel, and siblings, Plaintiffs Guy Shindel, and B.S., minor child, came directly to the funeral from the airport during wartime to say goodbye to their beloved brother.

423.   The Shindel Family suffered immense and unfathomable injuries that are ongoing and permanent. Plaintiff B.S., minor child, once a strong student, now struggles in school. Their loss is immeasurable, and it extends to the lost privilege of having grandchildren from their son.

424.   As a result of the October 7 Attack, Plaintiff Estate of Mark Shindel suffered wrongful death.

425.   As a result of the October 7 Attack, and the injuries Mark Shindel suffered, Plaintiff Estate of Mark Shindel has past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of Mark Shindel's beneficiaries.

426.     As a result of the October 7 Attack, and Plaintiff Estate of Mark Shindel's wrongful death, his family members, Plaintiffs Julia Shindel, Igor Shindel, Guy Shindel, and B.S., minor child, suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Estate of Mark Shindel, and the subsequent loss of his life, continue to have a lasting effect on his family members.

### Salomon Family

427.     Plaintiff Estate of Yuval Salomon was a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

428.     Plaintiff Doron Salomon is the parent of Plaintiff Estate of Yuval Salomon. Plaintiff Doron Salomon is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel. Plaintiff Doron Salomon brings this action individually and as heir-at-law on behalf of the Estate of Yuval Salomon.

429.     Plaintiffs Estate of Yuval Salomon and Doron Salomon are hereinafter collectively referred to as "The Salomon Family."

430.     On October 7, 2023, Plaintiff Estate of Yuval Salomon was at home in the kibbutz of Kfar Aza, Israel, when he was ruthlessly attacked and killed by Hamas with machine guns, grenades, and other weapons.

431.     On October 7, 2023, Plaintiff Doron Salomon was at home in the kibbutz of Kfar Aza, Israel, when he was ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

432.     On October 7, 2023, around 6:30 am, Plaintiff Doron Salomon was at home in Kfar Aza when he was awakened to the sound of gunfire, rockets, and explosions that permeated throughout the kibbutz. He woke his spouse, Simcha, who was sleeping without her hearing aids, and rushed her to the safety shelter in their house. On the way, they grabbed any source of light

they could find, batteries, and a butcher's knife, just in case they needed to defend themselves. Plaintiff Doron Salomon quickly locked the shelter door behind them.

433.    Through a Kfar Aza messaging group, Plaintiff Doron Salomon learned that the doors to many of the saferooms in the homes on the kibbutz could be opened from the outside. Plaintiff Doron Salomon, determined to protect Simcha and himself, braced his body on the door to the saferoom and held it closed tightly with one arm while holding the butcher's knife in the opposite hand.

434.    On October 7, 2023, Plaintiff Estate of Yuval Salomon, the youngest child of Plaintiff Doron Salomon and Simcha, was living in a small youth section of Kibbutz Kfar Aza that had been attacked that morning by over 100 armed terrorists. Tragically, very few from this part of the kibbutz survived the Attack. Most residents were brutally murdered, gravely injured, or mercilessly taken hostage.

435.    At approximately 7:30 a.m., Plaintiff Doron Salomon received a heart-stopping text from his child. Plaintiff Estate of Yuval Salomon told him that terrorists had infiltrated his living quarters and that he had been shot, but despite his injuries, he managed to kill one terrorist and fight off two others. He was bleeding and in pain, and in dire need of help.

436.    Plaintiff Doron Salomon continued to communicate with Plaintiff Estate of Yuval Salomon throughout the morning to keep abreast of what was happening. Plaintiff Doron Salomon heroically tried to comfort his child by telling him that help was on the way, and instructed Plaintiff Estate of Yuval Salomon to use a tourniquet to stop his bleeding from the gunshot wound. Meanwhile, Plaintiff Estate of Yuval Salomon was bleeding to death and fighting for his life, while also holding the door to his saferoom.

437.   At approximately 10:30 a.m., Plaintiff Estate of Yuval Salomon sent a final text to his father, in desperation, telling him that he could not hold the door any longer and that he was going to have to fight the terrorists. Plaintiff Estate of Yuval Salomon told his father that he loved him very much, and that they would not likely see each other again. It was a shattering moment for them.

438.   Plaintiff Estate of Yuval Salomon was killed by Hamas terrorists.

439.   Plaintiff Doron Salomon and Simcha remained trapped helplessly in their saferoom.

440.   At approximately 2:00 am on October 8, 2023, Plaintiff Doron Salomon's telephone battery was running out, so he crawled out of the saferoom to assess the situation and charge his phone. Because the Israeli Defense Forces were still very far from his location, he went back into the saferoom and closed the door. He continued to clutch the door closed until the next morning, through tears, devastation, and tremendous sorrow.

441.   On October 8, 2023, at approximately 9:00 am, Plaintiff Doron Salomon and Simcha were rescued and evacuated by the military.

442.   As of February 2024, Plaintiff Doron Salomon and Simcha were living in a dorm room at Reichmann University in Herzliya and were still unable to return to their home in Kfar Aza.

443.   The Salomon Family suffered immense injuries that are ongoing and permanent.

444.   As a result of the October 7 Attack, Plaintiff Estate of Yuval Salomon suffered wrongful death.

445.   As a result of the October 7 Attack, and the injuries suffered, Plaintiff Estate of Yuval Salomon has past and future noneconomic damages, including severe mental pain and

suffering and loss of enjoyment of life, and past and future economic damages, including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of Yuval Salomon's beneficiaries.

446.    As a result of the October 7 Attack, and Plaintiff Estate of Yuval Salomon's wrongful death, Plaintiff Doron Salomon suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by the Estate of Yuval Salomon, and the subsequent loss of his life, continue to have a lasting effect on his family members.

447.    As a result of the October 7 Attack and the injuries he suffered, Plaintiff Doron Salomon has past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, and loss of earning capacity.

**Halifa Family**

448.    Plaintiff Estate of Gaya Halifa was a citizen of Israel and at the time of the acts alleged, and at all times relevant hereto, was domiciled in Israel.

449.    Plaintiff Avraham Halifa is the parent of Plaintiff Estate of Gaya Halifa. Plaintiff Avraham Halifa is a citizen of Israel, and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel. Plaintiff Avraham Halifa brings this action individually and as legal guardian of the Estate of Gaya Halifa.

450.    Plaintiff Sigal Halifa is the parent of Plaintiff Estate of Gaya Halifa and the spouse of Plaintiff Avraham Halifa. Plaintiff Sigal Halifa is a citizen of Israel, and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

451.    Plaintiff Noga Halifa is the sibling of Plaintiff Estate of Gaya Halifa. Plaintiff Noga Halifa is also the child of Plaintiffs Sigal Halifa and Avraham Halifa. Plaintiff Noga Halifa is a

citizen of Israel, and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

452.    Plaintiff Ido Halifa is the sibling of Plaintiff Estate of Gaya Halifa. Plaintiff Ido Halifa is also the child of Plaintiffs Sigal Halifa and Avraham Halifa. Plaintiff Ido Halifa is a citizen of Israel, and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

453.    Plaintiffs Estate of Gaya Halifa, Sigal Halifa, Avraham Halifa, Noga Halifa, and Ido Halifa are hereinafter collectively referred to as "The Halifa Family."

454.    On the evening of October 6, 2023, Plaintiff Estate of Gaya Halifa met with her family and discussed her plans to attend the NOVA Music Festival the next day, and that she would be leaving with her girlfriend very early the next morning. She was so excited.

455.    On October 7, 2023, Plaintiffs Sigal Halifa, Avraham Halifa, Noga Halifa, and Ido Halifa woke up at approximately 6:30 a.m. to the sounds of blaring sirens, however, the magnitude of the situation did not immediately register with them. Plaintiff Sigal Halifa then began to receive numerous frantic text messages from other parents who had children at the NOVA Music Festival, concerned about their safety.

456.    Plaintiff Avraham Halifa was able to communicate with Plaintiff Estate of Gaya Halifa for most of the morning as she tried to escape to safety, which was incredibly difficult due to the open terrain around the concert venue. Hiding places were scarce. Plaintiff Avraham Halifa kept in close contact with Plaintiff Estate of Gaya Halifa as she updated him on her whereabouts, hoping that he could arrange a location where he could pick her up.

457.    Meanwhile, Plaintiff Ido Halifa had learned that in one of the simultaneous planned attacks that occurred that day, everyone who had attended a friend's event had been brutally

91

murdered. Plaintiff Ido Halifa realized the severity of the situation and repeatedly called family members to find out what was happening with everyone, but especially his sibling, Plaintiff Estate of Gaya Halifa.

458.    Throughout the morning, Plaintiff Avraham Halifa continued to communicate with Plaintiff Estate of Gaya Halifa and followed her efforts to escape the terrorists. He provided emotional support to her, reassuring her that she would be fine, and also logistical guidance in finding a place where she could hide. Then, they planned, they would arrange a location for him to pick her up when possible. He stayed strong and positive for her, despite the fear he felt for her safety.

459.    As was her nature not to worry her family, Plaintiff Estate of Gaya Halifa called Plaintiff Sigal Halifa to reassure her that she was okay and asked Plaintiff Sigal Halifa to let Plaintiff Ido Halifa know that as well because she knew he would be concerned. Plaintiff Sigal Halifa remembered this call well because it was the last time she spoke to her child. She will forever be riddled with guilt that she forgot to tell her that she loved her in the panic of the moment.

460.    Plaintiff Estate of Gaya Halifa managed to stay alive for several hours after the initial attack by hiding and moving when needed as she watched the advancement of the terrorists. She informed Plaintiff Avraham Halifa that a friend named Ben had picked her up by car and was helping her and others escape. She called him, "Ben the Hero" because he had returned several times with his vehicle to help people escape.

461.    Plaintiff Avraham Halifa felt an overwhelming need to do more to help Plaintiff Estate of Gaya Halifa, so he left his home to go pick her up even though he did not have an exact location point for where she could get to him safely. He was desperate and eager to have her in his care. He waited for the next call from Plaintiff Estate of Gaya Halifa, which came at 10:12 a.m.

Instead of details of a pickup location, the call was filled with Plaintiff Estate of Gaya Halifa's panic and screams that they were being shot at. The call lasted just a few seconds and then it was over. Plaintiff Avraham Halifa listened to his dear child's final breaths. Two deep breaths which were then followed by silence. He stopped his car and screamed, not knowing what else to do.

462.    On October 7, 2023, Plaintiff Estate of Gaya Halifa was murdered by terrorists while trying to escape the NOVA Music Festival.

463.    Plaintiff Avraham Halifa tried to collect himself enough to call Plaintiff Sigal Halifa, but he could not stop his screaming when she answered that the terrorists had shot their beautiful daughter. Plaintiff Sigal Halifa wailed and cried like she never had in her life. Plaintiff Sigal Halifa adored her child and was devastated by her murder. The pain was tremendous and indescribable.

464.    The Halifa Family suffered immense injuries that are ongoing and permanent.

465.    The Halifa family now receives psychological treatment and support from a public organization that specializes in grief and pain for their injuries.

466.    As a result of the attack on October 7, 2023, Plaintiff Estate of Gaya Halifa suffered wrongful death.

467.    As a result of the October 7 Attack, and the injuries Gaya Halifa suffered, Plaintiff Estate of Gaya Halifa has past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of Gaya Halifa's beneficiaries.

468.    As a result of the October 7 Attack, and Plaintiff Estate of Gaya Halifa's wrongful death, Plaintiff Sigal Halifa, Plaintiff Avraham Halifa, Plaintiff Noga Halifa, and Plaintiff Ido

93

Halifa suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Estate of Gaya Halifa, and the subsequent loss of her life, continue to have a lasting effect on her family members.

### Lahav-Buch-Paster-Szatmari Families

469.    Plaintiff Irit Lahav is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

470.    Plaintiff Tamar Lahav is the sibling of Plaintiff Irit Lahav. Plaintiff Tamar Lahav is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

471.    Plaintiff Eliyahu Hanan Buch is the sibling of Plaintiff Irit Lahav. Plaintiff Eliyahu Hanan Buch is a citizen of Israel and Belgium and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Belgium.

472.    Plaintiff Nitzan Lahav-Paster is the sibling of Plaintiff Irit Lahav. Plaintiff Nitzan Lahav-Paster is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

473.    Plaintiff Yaara Szatmari is the sibling of Plaintiff Irit Lahav. Plaintiff Yaara Szatmari is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

474.    Plaintiff Ilan Lahav is the sibling of Plaintiff Irit Lahav. Plaintiff Ilan Lahav is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

475.    Plaintiff Galit Lahav is the spouse of Plaintiff Ilan Lahav. Plaintiff Galit Lahav is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

476.     Plaintiff Gui Lahav is the child of Plaintiffs Ilan Lahav and Galit Lahav. Plaintiff Gui Lahav is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

477.     Plaintiff R.L., minor child, is the child of Plaintiffs Ilan Lahav and Galit Lahav. Plaintiff R.L., minor child, is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel. Plaintiff Galit Lahav brings this action individually and as legal guardian of Plaintiff R.L., minor child.

478.     Plaintiff Omer Lahav is the child of Plaintiffs Ilan Lahav and Galit Lahav. Plaintiff Omer Lahav is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

479.     Plaintiffs Irit Lahav, Tamar Lahav, Eliyahu Hanan Buch, Nitzan Lahav-Paster, Yaara Szatmari, Ilan Lahav, Galit Lahav, Gui Lahav, R.L., minor child, and Omer Lahav are hereinafter collectively referred to as "The Lahav Family."

480.     On October 7, 2023, Plaintiff Irit Lahav was at home with her child in Kibbutz Nir Oz, Israel, and present when she and her family were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

481.     On October 7, 2023, Plaintiffs Ilan Lahav, Gui Lahav, R.L., minor child, were at home in Moshav Ein Habsor, Israel, when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

482.     Plaintiff Irit Lahav was sleeping in her bed around 6:30 a.m. when she was startled awake by the sounds of missiles shooting through the sky overhead. In 12 quick seconds, she managed to run to the saferoom with her child, grabbing their dog and a phone on the way. Immediately after she closed the door to the saferoom, which did not have a lock, she heard

shooting sounds outside. Her neighbor texted her and told her that someone was shooting at her house. Plaintiff Irit Lahav locked the windows in the saferoom and turned off the lights, so it was nearly pitch black. She and her child did not speak a word, not even a whisper. They texted on a single phone to communicate with each other. They were so scared and alone and feared for their safety.

483.    Plaintiffs Ilan Lahav, Gui Lahav, and R.L., minor child, were awakened by the sounds of alarms at the same time and hurried to their saferoom. When they turned their phones on, they saw numerous texts from others saying that terrorists were attacking and approaching their area. Shortly after that, Plaintiffs Ilan Lahav, Gui Lahav, and R.L., minor child, heard what sounded like a bomb explode, so they went outside to look around. A local police officer yelled for them to get back inside, and they realized the alarms that day were different. They were under attack. They hid in the saferoom for the entire day listening to the terrifying sounds of gunshots and bombs exploding all around them, not knowing if or when the terrorists would infiltrate their home.

484.    The alarms continued to blast, and the sounds of bombs and gunfire became more frequent, louder, and seemingly closer. Plaintiffs Ilan Lahav, Gui Lahav, and R.L., minor child, listened to every sound so they could have an idea of how close or far the terrorists were to their home.

485.    About an hour later, Plaintiffs Ilan Lahav, Gui Lahav, and R.L., minor child, started receiving horrifying videos of the massacre at the NOVA Music Festival, and disbelief set in. Plaintiffs Ilan Lahav, Gui Lahav, and R.L., minor child, then remembered that their saferoom door did not lock and they needed to secure the door for safety, so they built a makeshift lock with a broomstick and a suitcase strap by rigging the inside of the door. They still did not feel totally

secure, and they continued to hear gunshots and bombs exploding outside and the terrorists were trying to enter their moshav.

486.    Plaintiff Irit Lahav and her child remained in their saferoom all day fearing for their lives, listening to a barrage of nonstop weapons blasting from every direction. Grenades were detonating all around their home. At one point, a neighbor texted Plaintiff Irit Lahav reporting that he could see armed militants nearby and told Plaintiff Irit Lahav to lock her doors.

487.    Since her saferoom door also did not lock, Plaintiff Irit Lahav, built a makeshift lock out of a vacuum cleaner hose, a boat oar, and a leather strap, with instruction and guidance from her brother, Plaintiff Ilan Lahav, over the phone.

488.    Plaintiff Irit Lahav and her child then built a wall of books to add a layer of protection against gunfire and hid under a table. Then they just watched the messages coming in over the phone, with the grim details that the terrorists were burning down houses and the people in them. Everyone was desperately pleading for help.

489.    Meanwhile, Plaintiffs Ilan Lahav, Gui Lahav, and R.L., minor child, were viewing videos from their group chats which showed trucks full of terrorists rambling around the area. At one point, the sounds of yelling and shooting seemed to get farther away from them, but they continued texting friends and family in other areas to warn them that terrorists were coming in their direction. They were in shock and disbelief at what was happening all around them.

490.    Around 10:30 a.m. that morning, Plaintiff Irit Lahav heard voices shouting in Arabic and shooting at her house from the outside. Then terrorists burst through her back door. She could hear them breaking things all around her home. After a few minutes, they came to the saferoom, shouting and beating on the door. Plaintiff Irit Lahav held her child tight as they tearfully said their goodbyes to each other. After several excruciatingly long minutes, the terrorists gave up

and left. With the light from her phone, Plaintiff Irit Lahav could see a hole in the saferoom's doorpost. Using some silver wire she had since she is a jewelry designer, she attempted to strengthen the security of the door. She and her child hid under the table again.

491.    About forty-five minutes later, the terrorists came back to Plaintiff Irit Lahav's home, shouting and shooting indiscriminately once again. The terrorists again tried to get into the saferoom, but were unsuccessful, and left. Over the course of the entire day, terrorists came back and tried to get into their saferoom five separate times. It was a day of nonstop, terrifying, endless horror for Plaintiff Irit Lahav and her child.

492.    Around 5:30 p.m., Plaintiff Gui Lahav received a text message asking him to go on guard duty, which is something that all residents of the moshav volunteer to do to protect each other and the moshav. Plaintiff Gui Lahav bravely arrived at the guard location, was given a gun, and then shown the direction from where the terrorists were coming. He was on high alert to protect the people of his moshav.

493.    Plaintiff Gui Lahav also selflessly provided his services in various ways throughout the next day, which included helping create a makeshift base for Israeli Defense Forces soldiers, providing them with food and water, as well as assisting with accountability, and evacuating families.

494.    Around 6:00 p.m., Plaintiff Irit Lahav heard a man speaking Hebrew, who identified himself as an Israeli Defense Forces soldier. She was extremely wary about letting him in, but he had some personal information about a friend of hers that caused her to believe that he was really with Israeli Defense Forces, so she cautiously opened the saferoom door. He told Plaintiff Irit Lahav that her house was destroyed and gave her a comforting kiss on the forehead.

He then instructed Plaintiff Irit Lahav and her child to put their shoes on, grab their dog and their essentials, and then they walked out of the house to another, safer location in the kibbutz.

495.    Along the journey out of the kibbutz, Plaintiff Irit Lahav witnessed the destruction everywhere and was saddened to see that the once beautiful kibbutz looked like a battlefield. She and her child were brought to a house with other people who were rescued. They did not see many of their friends, but they did see some of their friends' children crying for their parents. Forty people from their kibbutz were murdered that day. Seventy-seven people from their kibbutz were abducted and taken to Gaza. Five very close friends of hers had been taken hostage. It was an unforgettable day of shock and horror that will forever haunt them.

496.    Plaintiff Irit Lahav and her child were later escorted to another location, a kindergarten, that was considered bomb-proof. So many people were packed into that building without food or water and nowhere to sit. Some people were later moved to another kindergarten, so Plaintiff Irit Lahav and her child could then lie down and sleep on the floor for a short time. They were exhausted but could still hear weapons shooting until late in the night.

497.    At 4:00 p.m. the next day, Plaintiff Irit Lahav was allowed to return to her home to get the belongings that she would need to take with her to Eilat, where those rescued were being taken. Plaintiff Irit Lahav did not want to go to Eilat and wanted to be with her family, so she and her child instead went to a relative's house in Yaara Szatmari, forty-five minutes away. Throughout the entire trip, they were stressed and feared that they would come across more terrorists. Nonetheless, Plaintiff Irit Lahav tried to stay calm for her child.

498.    Plaintiff Ilan Lahav and his family went to Eilat, Israel, two days after the Attack began and remained there until January 2024, away from their home and the place they loved.

They each now struggle with sleep and eating issues, hypervigilance, and hypersensitivity to loud noises.

499.     Plaintiff Gui Lahav used to be an avid runner, but he can no longer bring himself to even go for a jog. His personality has changed drastically. He is now quick to anger, remains sad most of the time, and cannot concentrate on simple tasks. Plaintiff Gui Lahav hardly spoke at all for the first month after the Attack.

500.     As a result of the October 7 Attack, Plaintiff Irit Lahav cried all day and night and did not sleep for six weeks. She no longer has peace of mind and her heart pounds nonstop. Her anxiety is never-ending. While some of her injuries have begun to improve with the passage of time, she continues to experience bouts of crying, hyper-awareness, and unease around groups of men. Arabic speaking and writing frighten her. She cannot focus on life and tasks for more than one day ahead. She does not feel at peace and continues to suffer from extreme anxiety. She is now a very nervous person and struggled to return to work for three months. She gets angry easily, which was not her normal character before the attack.

501.     For a while, Plaintiff Irit Lahav could not bring herself to reach out to friends for fear that they were dead or had lost family members. It was too hard for her to manage. She still suffers from the difficulty of knowing that the terrorists invaded her home and scavenged through her personal belongings, stealing her credit cards, jewelry, money, and appliances. The terrorists left nothing behind, and what they did not take, they broke or destroyed. She and her child have lost everything.

502.     Plaintiff Irit Lahav is now admirably the spokesperson for her kibbutz. She is also working tirelessly to help get the hostages released and returned.

503.    Plaintiffs Irit Lahav, Tamar Lahav, Eliyahu Hanan Buch, Nitzan Lahav-Paster, Yaara Szatmari, Ilan Lahav, Galit Lahav, Gui Lahav, R.L., minor child, and Omer Lahav suffered immense injuries that are on-going and permanent.

504.    As a result of the October 7 Attack and the injuries they suffered, Plaintiffs Irit Lahav, Ilan Lahav, Gui Lahav, and R.L., minor child, each have past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, loss of earning capacity.

505.    As a result of the October 7 Attack, Plaintiffs Irit Lahav, Ilan Lahav, Galit Lahav, Gui Lahav, R.L., minor child, and Omer Lahav each suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked.

506.    As a result of the October 7 Attack, Plaintiffs Tamar Lahav, Eliyahu Hanan Buch, Nitzan Lahav-Paster, and Yaara Szatmari, each suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked.

### DEFENDANTS

507.    Defendant UNRWA is affiliated with, but distinct from, the United Nations.  It was first established by a UN General Assembly resolution in December 1949 and has operated since 1950.  It has an office in Manhattan on East 44th Street, and full-time New-York-based staff working in that office.  It works with Palestinian populations in a number of areas outside Gaza, including Jordan, Lebanon, Syria, and the West Bank, and no claim is made against it herein regarding any of its activities in those other areas.

508.    Defendant Phillipe Lazzarini is believed to be a citizen of Switzerland.  He has served as Commissioner-General of UNRWA (the agency's most senior position) since March 2020.  As Commissioner-General he (and his predecessors) had final overall responsibility for setting policy, overseeing operations, and fundraising.

509.    Defendant Pierre Krähenbühl is also believed to be a citizen of Switzerland.  He served as Commissioner-General of UNRWA from 2014 until he resigned in November 2019 amid controversy over alleged mismanagement, corruption, and abuse of authority.

510.    Defendant Filippo Grandi is believed to be a citizen of Italy.  He served as Commissioner-General of UNRWA from 2010 to 2014.

511.    Defendant Leni Stenseth is believed to be a citizen of Norway.  She served as Deputy Commissioner-General of UNRWA from June 2020 until in or about June 2023.  In that role she (like her predecessors) was the agency's second-most-senior leader[2] and worked directly with the Commissioner-General in providing strategic direction and operational leadership for the agency, sharing overall responsibility for setting policy, overseeing operations, and fundraising.

512.    Defendant Sandra Mitchell is believed to be a citizen of the United States.  She served as Deputy Commissioner-General of UNRWA from late 2014 (after previously working at other roles at UNRWA) until her resignation in July 2019 amid the same controversy that subsequently led to Mr. Krähenbühl's resignation.

513.    Defendant Margot Ellis is believed to be a citizen of the United States.  She served as Deputy Commissioner-General of UNRWA from 2010 until 2014.

514.    Defendant Greta Gunnarsdottir is believed to be a citizen of Iceland.  She presently serves as Director of UNRWA's "Representative Office" in New York and has held that position

---

[2] Following Ms. Stenseth's tenure, the Deputy Commissioner-General role was in late 2023 divided between two separate individuals.

since early 2020.  In that capacity, she is part of the agency's senior leadership team and also oversees and directs all of UNRWA's New-York-based staff, whose relevant actions are detailed below.

515.     Each of the Individual Defendants, during their respective time in UNRWA's senior management, directed, ratified, and/or otherwise facilitated the wrongful policies and actions of UNRWA complained of herein.

516.     Claims are asserted against certain Individual Defendants who are no longer affiliated with UNRWA for their acts or omissions during their tenure with UNRWA but not for any act or omission following their departure from UNRWA's employment.  Plaintiffs reserve the right to name additional individuals as defendants as their investigation continues.

## BACKGROUND ON GAZA, HAMAS AND UNRWA

517.     In order to provide the relevant background context to understand the significance of the assistance Defendants provided to Hamas following its 2007 seizure of de facto power in Gaza, we now briefly describe the relevant pre-2007 histories of Gaza, Hamas, and UNRWA.

### Background on Gaza and Takeover by Hamas

518.     The current border between Israel and Gaza was originally part of the so-called "Green Line," reflecting the 1949 armistice agreements that brought an end to the first Arab-Israeli War that began in 1948.  Gaza was outside the Israeli-controlled territory, and from then until the Six-Day War in 1967 was controlled by the government of Egypt.  UNRWA began work in Gaza almost immediately after its formation and continued to work in Gaza throughout this period.

519.     Egypt's defeat in the Six-Day War led to Israeli control and administration of all of Gaza from 1967 until 1994. Following the Camp David agreements of 1978, Israel withdrew from Egyptian territory in the Sinai that it had controlled since 1967, but Egypt did not at that time or

thereafter seek to resume control or administration of Gaza.  UNRWA continued to work in Gaza throughout this period.

520.    Following the Oslo Accords of 1993, day-to-day control and administration of much but not all of Gaza was turned over by Israel to the Palestinian Authority, with Israel continuing on-the-ground control and administration of certain areas of Gaza until 2005.  UNRWA continued to work in Gaza throughout this period.

521.    In 2005, Israel withdrew its remaining ground forces and administrative personnel from Gaza, and all Israeli settlers in Gaza were compelled to withdraw by the Israeli government if they did not leave voluntarily.  A subsequent period of political instability led to a de facto civil war in Gaza, which resulted in Hamas becoming the de facto rulers of Gaza by no later than June 2007, after killing, expelling, or otherwise neutralizing its political rivals from the Palestinian Authority and other Palestinian factions, most notably including Fatah, which remains politically dominant on the West Bank.  UNRWA has continued to work in Gaza since the Hamas takeover and thereafter began to aid and abet Hamas' terrorist actions, as set forth in greater detail below.

### Background Regarding Hamas

522.    From its foundation in 1987 and through the present day, the explicit political goal of Hamas has been to eliminate the State of Israel and create a fundamentalist, radical, jihad-centered, Islamic state that governs Gaza, the West Bank, and all territory now or previously claimed by Israel.

523.    Various other Palestinian groups claim to support either a two-state solution or a "one-state solution" in which all of that territory is controlled by a single multi-religious multi-ethnic society with equal civil rights for all.  Hamas, by contrast, explicitly rejects that view, and instead claims in its governing charter that "[t]here is no solution to the Palestinian problem except

by Jihad," by which it means a genocidal war of ethnic cleansing against the entire current Jewish population of Israel.

524.    The same charter asserts that, among many other incendiary claims:

a.    "Israel will exist and will continue to exist until Islam will obliterate it, just as it [Islam] obliterated others before it."

b.    "The day the enemies usurp part of Muslim land [meant to include all of the current territory of Israel], Jihad becomes the individual duty of every Muslim. In the face of the Jews' usurpation, it is compulsory that the banner of Jihad be raised."

525.    Senior Hamas figures have further expounded this specific vision of Jihad (a concept which may mean different things to different Muslims) by public statements such as "Allah gathered the Jews in Palestine not for them to have a homeland, but with the intent that it will become their mass grave."

526.    Hamas' specific version and vision of Islam, not universally shared with other Muslims, is of a death-cult society, seeking not only the elimination of Israel, but universal conversion of all societies to its violent, Jihadi culture, where the death for the sake of Allah is its highest value.  Its slogan, as set forth in the charter, is: "Allah is its target, the Prophet is its model, the Koran its constitution: Jihad is its path and death for the sake of Allah is the loftiest of its wishes."

527.    Indeed, radical Islamic groups with the same ideology as Hamas have frequently been banned in other Arab and Muslim countries and have frequently engaged in terrorist acts in such countries, including the assassination of Arab and Muslim political figures perceived as insufficiently radical.

528.   Hamas has been consistently committed to terror and human rights violations in its actions, not merely in its rhetoric.  For this reason, the United States Government designated Hamas as a Specially Designated Terrorist in 1995 under E.O. 12947, a Foreign Terrorist Organization in 1997 under 8 U.S.C. § 1189, and a Specially Designated Global Terrorist Group in 2001 under E.O. 13224.  Hamas has remained designated to this day.  These designations of Hamas were public events, well known to the entire international community, including Defendants. In addition, numerous Hamas leaders and fundraisers have been designated by the United States Government as Specially Designated Nationals whose assets have been frozen as a result of their activities for Hamas.  Similar designations of Hamas have been made by, among others, the European Union and the United Kingdom.

529.   In both word and deed, Hamas has consistently made it clear that it does not feel obligated to conform to the minimum norms imposed by the law of nations on all states and other armed groups, including the prohibitions against deliberate targeting of civilians, mass murder of civilians, mass rape, hostage-taking, torture, crimes against humanity, and genocide.

530.   Following the Oslo Accords, as traditional Palestinian political groups with their own histories of violence began to contemplate negotiated solutions rather than violence, Hamas, which had explicitly rejected and denounced the Oslo Accords, gained increased support from extremists unwilling to consider such moderate alternatives.

531.   Subsequent to 2007, Hamas exploited its de facto control of Gaza both to use it as a staging ground for cross-border terrorist attacks targeting Israeli civilians and to slowly but continuously build up an infrastructure of facilities and personnel that would enable larger-scale terror attacks to be launched in the future, predictably culminating in the October 7 Attack.

532.     Hamas also had a track record before the October 7 Attack of taking and holding Israeli civilians hostage in Gaza, including, for example, the kidnapping of Avera Mengistu (an immigrant from Ethiopia who has been held captive since 2014) and of Hisham al-Sayed (a member of Israel's Bedouin Arab community who has been held captive since 2015).

533.     Hamas permits designated Foreign Terrorist Organization Palestinian Islamic Jihad ("PIJ"), to operate from Gaza with some autonomy and coordinates with PIJ terrorist attacks against Israeli civilians.  PIJ likewise benefits from the material support provided by UNRWA to Hamas.

534.     UNRWA and its senior leadership are hardly the only third parties who have helped Hamas build the terror infrastructure in Gaza that was predictably and foreseeably used to launch the October 7 Attack.  In particular, Hamas has received very substantial material support from the current regime governing Iran, a notorious state sponsor of terrorism.  Hamas has also coordinated its strategy and tactics with other Iranian-backed terror groups in the region, including but not limited to Hezbollah in Lebanon and the Houthi faction in Yemen, which have a history of perpetrating terrorist attacks against American and other Western civilian targets as well as Israeli civilian targets.

535.     But UNRWA was able to, and did, provide material assistance in Gaza to Hamas of a different nature and kind than outside backers like the Iranian government.  It could operate openly on the ground in Gaza where others could not, and exploit its claimed "civil servant" status to impede preemptive security measures aimed at protecting Israeli civilians from future terror attacks.   UNRWA's staff, facilities, and ability to truck cash U.S. dollars into Gaza formed a potent pillar of Hamas' plan to undertake the October 7 attack.

536.    The Defendants were all well aware of Hamas' continuing track record of genocidal terror attacks against Israeli civilians, both before and after its takeover of Gaza.  For example, the following is partial list of mass-murder attacks perpetrated by Hamas before it was in control of Gaza, all of which were extensively reported by the New York Times and/or other print media available in New York, and all major television media:

   a. August 31, 2004, 16 killed, 100 wounded, double suicide bombings on two buses;

   b. March 14, 2004, 10 killed, 16 wounded, double suicide bombings;

   c. September 9, 2003, 7 killed, 50 wounded, suicide bombing at Café Hillel;

   d. August 19, 2003, 22 killed, 135 wounded, suicide bombing on a bus;

   e. August 4, 2002, 9 killed, 38 wounded, suicide bombing on a bus;

   f. June 18, 2002, 19 killed, 74 wounded, suicide bombing on a bus;

   g. May 19, 2002, 3 killed, 59 wounded, suicide bombing in an outdoor market;

   h. May 7, 2002, 16 killed, 55 wounded, at a pool hall;

   i. April 10, 2002, 8 killed, 22 wounded, suicide bombing at Kibbutz Yagur;

   j. March 31, 2002, 14 killed, 40 wounded, suicide bombing at restaurant;

   k. March 27, 2002, 22 killed, 140 wounded, hotel Passover seder suicide bombing;

   l. March 9, 2002, 11 killed, 54 wounded, suicide bombing at a café;

   m. December 2, 2001, 15 killed, 46 wounded, suicide bombing on a bus;

   n. September 9, 2001, 3 killed, 90 wounded, suicide bombing oat train station;

o.  August 9, 2001, 15 killed, more than 130 wounded, suicide bombing at pizzeria;

p.  June 1, 2001, 21 killed, 120 wounded, all teenagers, suicide bombing of disco;

q.  May 18, 2001, 5 killed, more than 100 wounded, suicide bombing at shopping mall;

r.  April 22, 2001, 1 killed, 60 wounded, suicide bombing at bus stop;

s.  March 27, 2001, 28 wounded, suicide bomber;

t.  March 4, 2001, 3 killed, more than 65 wounded, suicide bombing;

u.  February 14, 2001; 8 killed, 21 wounded, bus driver plowed into a crowd;

v.  January 1, 2001, more than 50 wounded, car bomb;

w.  October 29, 1998, 1 killed, 8 wounded, suicide bomber attacks school bus;

x.  October 19, 1998, 59 wounded, grenades thrown in central bus station;

y.  August 20, 1998, 14 wounded, bomb detonated in garbage dumpster;

z.  September 4, 1997, 4 killed, 181 wounded, 3 suicide bombers at shopping mall;

aa. July 30, 1997, 3 killed, 178 wounded, 2 suicide bombers at outdoor market;

bb. March 21, 1997, 3 killed, 48 wounded, bomb detonated at a restaurant;

cc. March 3, 1996, 19 killed, 6 wounded, suicide bombing on a bus;

dd. February 25, 1996, 26 killed, 80 wounded, 2 suicide bombs on buses;

ee. July 24, 1995, 6 killed, 31 wounded, suicide bombing on a bus;

ff.  April 9, 1995, 8 killed, 50 wounded, 2 suicide bombers;

gg. December 25, 1994, 13 wounded, suicide bombing at bus stop;

hh. October 19, 1994, 22 killed, 56 wounded, suicide bombing on a bus;

ii.  October 9, 1994, 2 killed, 14 wounded, suicide bombing on a bus;

jj.  April 13, 1994, 5 killed, suicide bombing;

kk. April 6, 1994, 8 killed, car bomb detonated next to public bus.

537.    Subsequent to Hamas' takeover of Gaza Hamas shifted its emphasis to cross-border mortar and rocket attacks, since it now had control of territory from which to launch such attacks. Hundreds and sometimes thousands of rockets were fired into Israel per year, with no attempt to focus on military targets.  Due to Israel's "Iron Dome" anti-missile defenses, and poor targeting technology used by Hamas, most of these rockets were either intercepted or crashed harmlessly in empty fields.  However, a significant minority killed or wounded civilians throughout the decade-plus before the October 7 Attack.  While many of these attacks attracted less worldwide media coverage, Defendants were necessarily aware of them because of their own professional need to keep abreast of developments in Gaza, and because these attacks often led to retaliatory or preemptive military actions by Israel that UNRWA needed to take into account.  These attacks include:

a.  A November 12, 2018 mortar attack on a bus, critically wounding a 19-year old;

b.  An August 8, 2018 rocket attack on Sderot injuring two;

c.  A July 14, 2018 rocket attack of Sderot injuring three;

d.  A May 29, 2018 mortar attack wounding five;

e.  An August 26, 2014 rocket attack killing two in Eshkol, together with multiple injuries in Eshkol and Ashdod from other rockets fired the previous day;

f.  An August 22, 2014 mortar attack that killed a four-year-old in Sha'ar Hanegev; and

g.  A July 28, 2014, mortar attack that killed four in Eshkol.

538.    Finally, attacks against Israeli civilians mounted by Hamas from Gaza in recent years before the October 7 Attack include:

a.  Barrages of hundreds of rockets launched from Gaza on May 4 and 5, 2019, killing three Israeli civilians in Ashkelon.

b.  Barrages adding up to over 4,000 rockets launched from Gaza on May 10-20, 2021, killing ten Israeli civilians in multiple locations.

c.  Barrages adding up to approximately 1,500 rockets launched from Gaza on May 10-13, 2023, killing two civilians in Israel, one of whom was a Palestinian laborer from Gaza who was working in Israel.

539.    The common thread in all of these Hamas terror attacks, over a period of three decades, is the deliberate targeting of civilians for death.

**Background regarding UNRWA**

540.    UNRWA provides education, health care (including mental health care), relief and social services, emergency assistance and microcredit to approximately 5 million Palestinians located in Gaza, the West Bank, Jordan, Lebanon, and Syria.  It employs a staff of over 30,000 people; by contrast the Office of the United Nations High Commissioner for Refugees has fewer than 20,000 employees to serve a much larger population of almost 30 million refugees around the world.

541.    In Gaza alone, UNRWA operates 183 schools in Gaza, staffed by over 9,400 employees and serving almost 287,000 students.  It provides primary and secondary education to over half of the students in Gaza.

542.    Numerous UNRWA facilities (educational, medical, administrative etc.) in Gaza were converted to active terrorist/military bases, a cynical violation of international humanitarian law, by storing weapons and building underground tunnels and attack shafts. According to numerous press reports, the IDF uncovered assault rifles, ammunition, grenades and missiles of Hamas, hidden in and underneath UNRWA institutions on many occasions.

543.    UNRWA systematically and deliberately aided and abetted Hamas and its goals, but providing material support to Hamas as follows:

   a.    Turning UNRWA schools, medical clinics, warehouses and offices into military storage and deployment bases, including the storage and guarding over weapons, ammunition, explosives, and other military supplies, to be used by terrorists as prepositioning for immediate firing;

   b.    Facilitating the construction of underground bunkers, attack tunnels, prison cells to hold hostages, and command and control centers, for Hamas and PIJ;

   c.    Facilitating and concealing the placement of batteries of rocket launching platforms and rockets on and/or adjacent to UNRWA schools and medical facilities, in violation of international humanitarian laws, and, despite knowing of Hamas' use of UNRWA premises, consistently taking the position with Israel that UNRWA premises were inviolate, thus making them safe havens for terrorists and their material in advance of the October 7 Attack.

112

d. Knowingly employing Hamas terrorists, including senior Hamas members and Hamas commanders, as part of its staff.

e. Infusing over one billion dollars in cash, thus providing Hams with hundreds of millions of dollars in currency conversion fees, and moreover providing United States currency to Hamas which was necessary to obtain and smuggle the vast amounts of weapons, explosives, and ammunitions required to launch the October 7th Attack and other terrorist attacks.

f. Instructing and preparing children to die as martyrs for the cause of eliminating the Jewish people, by using Hamas-approved textbooks and curriculum for instruction at all UNRWA schools located in Gaza, without any modifications to remove incitement of genocide and antisemitism, and by employing teachers who are members of Hamas and allowing Hamas recruitment activities at UNRWA schools.

544. Each of the Individual Defendants, during their respective employment with UNRWA, directed and approved of these acts and omissions by UNRWA, while well aware of Hamas' intention to use its terror infrastructure to commit genocide and other crimes against humanity against Israeli civilians.

## UNRWA'S SUBSTANTIAL ASSISTANCE TO HAMAS

**A.      UNRWA facilitated construction of Hamas command and control centers, attack tunnels and underground bunkers under UNRWA headquarters, UNRWA schools, medical clinics, and offices.**

545. UNRWA Headquarters in Gaza City provided power and cover to a Hamas war room and strategic tunnel located directly underneath the building. This Hamas complex with rows of computer servers functioned as an important communications center and the central intelligence

hub that directed the October 7 Attack, and thousands of rocket attacks. Before, during and after the October 7 massacres, UNRWA's server room sat directly above the underground Hamas data center and supplied Hamas terrorist infrastructure with power through electric cables running down to and into the floor. The underground network also passed beneath a nearby UNRWA school. The tunnel was located at a depth of 18 meters, had a length of 700 meters, and contained several side doors. In offices within UNRWA headquarters itself, the personal effects of senior Hamas military commanders and many weapons were found, including guns, ammunition, grenades and explosives. In the offices of UNRWA officials, intelligence tools and documents were found that testified that the same offices were also used by Hamas terrorists.

546.    UNRWA previously admitted the discovery of underground tunnels in its facilities in, among other contexts, statements issued in December 2022, June 2021, October 2017, and June 2017, in each case after the investigation described below about Hamas' use of UNRWA facilities in the 2014-15 timeframe.

547.    On June 9, 2017, UNRWA Spokesperson Christopher Gunness reported the exposure of a tunnel running under two of its schools in the al-Maghazi refugee camp in the central Gaza Strip, namely the Maghazi Elementary Boys A&B School and the Maghazi Preparatory Boys School.

548.    On October 15, 2017, UNRWA admitted the existence of a tunnel underneath the UNRWA boys' middle school in Beit Hanoun in the northern Gaza Strip.

549.    On June 10, 2021, UNRWA admitted the existence of another Hamas tunnel under UNRWA's Zaitoun Preparatory Boys' School in Gaza City's Rimal neighborhood, after a rocket struck the courtyard.

550.    In 2022, the IDF also revealed an underground tunnel of Hamas in the Tufah neighborhood in Gaza city, in the close vicinity of UNRWA's "Daraj" elementary school.

551.    On December 1, 2022, UNRWA admitted the presence of a tunnel underneath another one of its schools in Gaza.

552.    In general, UNRWA claimed to be surprised whenever, over and over again, such use of its facilities by Hamas was discovered by third parties, but never took meaningful steps to prevent the next incident it could then pretend to be surprised by.

553.    On November 8, 2023, during the current war with Hamas, the IDF located and destroyed over 100 Hamas military fighting tunnels adjacent to UNRWA schools in northern Gaza.

554.    According to Israeli authorities, over thirty additional UNRWA facilities in Gaza, including UNRWA's headquarters complex, have recently been found to contain terror infrastructures such as tunnel shafts and weapons.

555.    Matthias Schmale, UNRWA's former Gaza director, admitted in an interview with NPR in 2021 that many individuals informed him about the pervasive presence of tunnels in or under UNRWA schools and offices.  Indeed, Schmale was forced out of his UNRWA job for being unwilling to parrot Hamas' propaganda, and Defendant Stenseth subsequently apologized for Schmale's statements.

556.    The existence and the construction of the tunnels was public knowledge since at least 2014.  Reports on the subject of tunnels were published by Hamas media outlets, and Hamas officials openly boosted about the importance of the tunnels, particularly in light of the deaths of many Hamas activists in collapses. Hamas officials warned repeatedly that the movement is continuing to excavate tunnels, even during periods of calm, in preparation for the next conflict with Israel.

557.    Hamas publicly announced the exact function of these attack tunnels, for example on January 29, 2016, when Hamas leader Ismail Haniyeh stated: "Gaza has constructed twice as many tunnels as there were in Vietnam. The Al-Qassam Brigades have dug tunnels around Gaza in order to defend the people and liberate Al-Aqsa and the holy places… This weapon, the weapon of tunnels, played a prominent role in achieving our victory.  …  East of Gaza, there are heroes underground, digging through rock and constructing tunnels. West of Gaza, there are heroes who test-fire rockets every day - All these [activities] are preparations - underground in the tunnels, in the air by means of missiles, at sea, and everywhere. This constant preparation is for the sake of Palestine, for Jerusalem and Al-Aqsa, and for the Al-Quds Intifada".

**B.    Defendants knew that UNRWA permitted constructing weapons storage and deployment centers in its headquarters, schools, medical clinics, offices, warehouses and other facilities.**

558.    In 2014, a United Nations Headquarters Board of Inquiry investigated multiple incidents where weapons had been placed within UNRWA schools and UNRWA facilities that were used as terrorist firing platforms for launching rocket and mortar attacks.  On April 27, 2015, the Secretary General of the United Nations reported on the results of that inquiry to the Security Council, including that:

a.   On 16 July 2014, weaponry was discovered in the UNRWA Gaza Beach Elementary Co-educational "B" School. This school is located in the heart of the Beach refugee camp, in the midst of a densely populated area of Gaza City. Four other UNRWA schools and an UNRWA health center are located on the opposite side of the street. Two UNRWA school attendants were looking after the school prior to an on the day of the incident. Five guards hired as part of the UNRWA Job Creation Program were also assigned to the school. In addition,

the school principal inspected all the classrooms on some days. On 16 July 2015, a 120 mm mortar tube, a mortar bipod and twenty 120 mm mortar-round containers, with ammunition, were discovered under a blanket in a corner of a locked classroom. In the afternoon of 17 July, UNRWA admitted in a press release stating that a cache of approximately 20 rockets had been found hidden in a school. A UN Board of Inquiry confirmed in April 2015 that "a Palestinian armed group" (a term used as euphemism for Hamas) had used the school premises to hide the weaponry.

b. On 22 July 2014, weaponry was discovered in the UNRWA Jabalia Elementary "C" and Ayyobiya Boys School. The Board was informed that the area was known to be used by armed groups as a site for firing weapons and that it had been targeted by IDF in past conflicts. On 22 July 2014, UNRWA officials saw an object at the premises that seemed to be a weapon, covered with a piece of cloth, in an area under the cover of some trees behind the toilet block and near the boundary wall separating the school from the open area behind it. Though the UN Board of Inquiry was unable to confirm with certainty what type of weapon might have been hidden at the school, it concluded that it was highly likely that "a Palestinian armed group" [Hamas] used the premises to hide weapons. On the evening of 22 July, UNRWA issued a press release stating that rockets had been found hidden in a vacant school in Gaza. The Government of Israel showed the Board a video, which the Board concluded was authentic, showing the launching of a projectile from within the school premises on 14 July. The Israeli Government also provided a document to the Board that was

said to identify the places close to the school from which rockets had been launched, together with the dates of those launches. The Board concluded that it was highly likely that "an unidentified Palestinian armed group" [Hamas] could have used the school premises to launch attacks on or around 14 July.

c. On 29 July 2014, weaponry was discovered in the UNRWA Nuseirat Preparatory Co-educational "B" School. This school is located in a semi-rural area, north-west of the Nuseirat camp, south of Gaza city. On 29 July, a 120 mm mortar tube, a 120 mm mortar bipod and three 120 mm mortar containers were found, covered by a blanket, behind a locked internal gate leading to a stairwell. In the evening, UNRWA issued a press release reporting that rockets had been found in an UNRWA school. On 17 August, a 120 mm mortar tube, a 120 mm mortar bipod and twenty 120 mm mortar containers were found in a small room under a stairwell. Water, lubricant oil bottles and boards apparently used as beds were also found as well as a blackboard with Arabic writing, seemingly depicting military operations. At the rear of the school, a mortar base plate was found embedded in the sand. The items were photographed. The mortar cases, mortar tube, bipod and base plate were removed from the school and rendered safe. The UN Board of Inquiry found that the presence of weapons and other evidence found in the school indicated that the premises could have been used for an unknown period of time by members of "a Palestinian armed group" [Hamas] and that it was likely that such a group may have fired the mortar from within the premises of the school.

    d.  Hamas thus exploited the safe haven provided by UNRWA facilities for storing weapons and firing at Israeli population centers.

559.  The Board of Inquiry report made a number of recommendations for UNRWA management to employ.  Nevertheless, UNRWA did not take appropriate corrective action following this inquiry revealing the systematic employment of UNRWA facilities to support Hamas.  Each of the Defendants were on notice of this United Nations inquiry and they continued to enact and fund the policies which allowed this activity to occur.

560.  Because UNRWA has consistently taken the position that its facilities are inviolate under international law, it has provided the terrorists using its facilities to prepare and launch attacks on innocent civilians, including the October 7 Attack, with a safe haven.  As a result, UNRWA protected these Hamas facilities and weapons from discovery and dismantled by the IDF.

**C.  Defendants knew that UNRWA permitted installation of rocket launching platforms and terrorist firing positions within and/or adjacent to UNRWA schools, medical clinics and offices.**

561.  In 2007, the Israeli Air Force delivered to UNRWA a video showing mortar shells fired from Gaza by a three-man terrorist squad. The squad situated itself in close proximity to the central building in an UNRWA educational compound in Beit Hanoun, in the northern Gaza Strip. The video shows the operatives setting up their firing position and firing mortar shells close to the building. After they fire the mortar shells, they took cover inside the UNRWA building.  There were multiple similar incidents documented in 2014.

562.  On December 14, 2022, the IDF published a Hamas rocket launch site adjacent to UNRWA's Mo'ath Bin Jabal School in the Shejaiya neighborhood of Gaza City.  Prior to May 2021, the school's principal, Mehammed Abu Oun, maintained contact with Jalal Abu Aoun, a commander in the Hamas rocket division, who operated this launching site.

D.    **UNRWA continues to provide material assistance to Hamas despite public concern and objections from within the UN system.**

563.    The military/terrorist use of UNRWA facilities by Hamas and other terrorist organizations was widely exposed during the 2014 conflict between Hamas and the IDF.  The letter dated April 27, 2015, from the Secretary General of the United Nations to the President of the Security Council, stated, inter alia:

> "in my capacity as the Chief Administrative Officer of the Organization, I decided to establish a United Nations Headquarters board of inquiry to review and investigate…incidents …in which the presence of weapons was reported at [UNRWA] premises. My aim in taking this step was to develop a clear record of the facts of those serious incidents and their causes and to determine the persons or entities to which they might be attributable. That would make it possible for me, inter alia, to identify any gaps that there might have been in the Organization's procedures and to take any measures and put in place any arrangements that might be needed, with a view to preventing a recurrence of such incidents in the future…"

564.    The Board made the following findings:

a.    That even though security of UNRWA premises is a matter of "paramount importance that needs to be addressed seriously," 897 of the 1034 guards providing security for all UNRWA facilities in Gaza were recruited from local workers, with no prior security training, and were given only "minimal training."

b.    "In relying upon the Job Creation Programme, UNRWA was entrusting one of the most dangerous and fundamental functions to low-paid individuals with no

training in security and no expectation of continued employment. The Board considered that a task bearing such a high level of responsibility requires specialized and properly trained individuals."

c.  "The guards worked only afternoons and evenings and no guards were on duty in the mornings."

d.  "UNRWA has no standard operating procedures articulating the duty of all staff members to report security incidents and the modalities for doing so. Witnesses informed the Board that there was no list of staff who should be informed of incidents, no lists of actions to be taken in the event of specific situations and no central mechanism for keeping a log of all events. As such, the transmission of information and the assignment of required actions were somewhat ad hoc, negatively affecting the ability of UNRWA to establish facts and account for actions taken and to be taken."

e.  "The Board further found that UNRWA did not have a policy or standard operating procedures to address situations involving the unauthorized presence of weapons on UNRWA premises. After the disappearance of weapons from UNRWA Jabalia Elementary 'C' and Ayyobiya Boys School on 22 July, United Nations Headquarters suggested a procedure to be followed. Those suggestions have yet to be 'operationalized' through the issuance of detailed standard operating procedures."

f.  "The Board also noted that there was no reference document setting out security levels, standards for the identification and evaluation of security risks and

mitigation measures that need to be in place for UNRWA premises, including its schools."

g. "The Board concluded that, during the conflict, UNRWA was operating in Gaza with an understaffed Safety and Security Division, which struggled to secure hundreds of premises with unskilled personnel. The Board considered that priority."

h. "The Board also considered that, as a matter of priority, UNRWA should reconsider its security approach in relation to its schools and other installations, both in the context of emergency situations and during normal operations, and revisit its school inspection systems, including during emergencies."

565.  Again, subsequent events show that UNRWA and its management did not make any serious efforts to "to take any measures and put in place any arrangements that might be needed, with a view to preventing a recurrence of such incidents in the future" as had been anticipated in the Secretary-General's letter of April 27, 2015.

**E.  UNRWA staff are and were members of Hamas and participated in the genocidal terrorist attacks on October 7, 2023.**

566.  Numerous UNRWA staff took part in abductions, killings and torturing during the October 7 Attack in which approximately 1,200 people were killed and over 250 kidnapped and held hostage. Some examples of UNRWA staff who participated in the Attack include:

a.  UNRWA school counselor Mousa Subhi Musa El Qidra was the deputy to the Qassam Brigades' Khan Younis Brigade Commander Mohammad Sinwar (the brother of Hamas leader Yahya Sinwar). They were operating from the Qadsia compound in Khan Younis, which served as a training facility for Hamas to train terrorists to carry out the October 7th Attack. The compound contained

models simulating entrance gates of Israeli kibbutzim, military bases, and IDF armored vehicles. On October 7, Mousa and his son abducted a woman from Israel.

b. Ala Abd al-Hamid Qassem Jouda, who worked for the agency as an Arabic Religion teacher at an elementary school, was a company commander in the Qassam Brigades' Nuseirat Battalion that led the horrendous rampage in the Israeli border Kibbutz Be'eri, one tenth of whose residents were killed, including Plaintiff Estate of Dror Kaplun. The chilling aftermath of the Be'eri Attack exposed a scene of merciless brutality, with approximately 80% of the recovered bodies showing signs of torture, with many torture victims also having been systematically raped. Some bodies were found decapitated, or burnt to death with their hands bound together, and entire families were butchered. This orchestrated onslaught resulted in the ruthless murder of over 130 community members, with 28 kidnapped to Gaza, leaving behind a legacy of terror that devastated the kibbutz. Jouda was arrested in Israeli territory.

c. UNRWA social worker Faisal Ali Mussalem al-Naami was a combatant in the same Qassam Brigades' Nuseirat Battalion that attacked Be'eri. He was filmed abducting from Be'eri to Gaza the corpse of a 21-year-old Israeli civilian, Yonatan Samerano, who had fled to Be'eri from the Nova music festival to seek safety. He also coordinated the movements of pick-up trucks used by the raiders and of weapons supplies. Al-Naami was killed in an IDF airstrike on 17 November 2023.

d.  UNRWA elementary school teacher Ibrahim Atiya Mohammad Abu Ghafra (cell commander in the Qassam Brigades' Nuseirat Battalion) participated in an attack on Reim, a district where a kibbutz was attacked and that was the site of a rave where more than 360 revelers died.

e.  Three UNRWA employees, including an Arabic teacher at an UNRWA school, received a text from Hamas to arm themselves at a staging area: UNRWA school attendant Shadi Mohammad Jamal Razak Darabiah (operative in the Qassam Brigades' East Jabalia Battalion), UNRWA Arabic teacher Mohammad Tawfiq Ibrahim El Ghafari (Squad commander in the Qassam Brigades' Nuseirat Battalion), and UNRWA teacher Ali Isa Hamuda Matar (platoon commander in the Qassam Brigades' Nuseirat Battalion) all received a text calling them  to report to the meeting point prior to the infiltration, along with logistical preparations.

f.  UNRWA Deputy School Principal Abd Al-Rahman Atiya Salem Abu Awad (platoon commander in the Al Qassam Brigades' Nuseirat Battalion) was updated about the infiltration in real time, was instructed to follow the events over the PTT radio and make sure the other relevant operatives do the same.

g.  The manager of a shop in an UNRWA school set up an operations room for the Palestinian Islamic Jihad on October 8, the day after the attack.

h.  Amer Yaser Nazmi Sada, a 24-years old graduate of an UNRWA school participated in the October 7 Attack. His UNRWA diploma was found in a vehicle of one of the terrorists in Israel in the aftermath of October 7.

i.   UNWRA School Counselor Baker Mahmoud Abdallah Darwish (operative in Hamas' military intelligence unit) and UNWRA clerk Mohammad Nasser al-Din Mohammad Abu Naama were located in Israeli territory on October 7. Abu Naama was killed in an IDF airstrike on 11 October 2023.  UNWRA health center clerk Ghassan Nabil Mohammad Sh'hadda El Jabari (an operative in the Qassam Brigades' al-Furkan Battalion) arrived in a hospital with a shot wound on October 7 and turned off his cellphone.

j.   UNRWA elementary school teacher Mamdouh Hussein Ahmad al-Qak (an operative in the PIJ Rafah Brigades) took part in the October 7 Attack and was revealed speaking on the phone as follows: "I'm inside, I'm inside with the Jews!" He is asked by the other side "How will you get home?" and he replies with a laugh: "When I die."

k.   Teachers and other educational staff of UNRWA have been reported praising Hamas's terrorism on social media, referring to it as an "unforgettable glorious morning" and a "splendid sight."

l.   As discussed in detail above, Plaintiff Ditza Heiman was held captive in the home of an UNRWA employee for 53 days.

**F.    UNRWA Staff held and tortured hostages taken in the attacks on October 7.**

567.    UNRWA teachers locked up at least two Israeli hostages in their homes in Gaza and tortured the victims there. One of the hostages, who was released from Gaza in November 2023, revealed that he was held for nearly 50 days in an attic by a teacher from UNRWA. The hostage also said that the teacher who held him captive was a father of 10 children. He was barely provided food or medical attention, and was locked away by the teacher, he said.

568.     UNRWA elementary school teacher Yusef Zidan Salimam Al-Khuajri (combatant in the Qassam Brigades' Central Camps Brigades) took part in the October 7 Attack and was revealed speaking on the phone roughly 7 hours after Hamas began invading Israel, bragging about the female captive that he captured. The Arabic term "sabaya" that he used to refer to the Israeli woman, is a term in Islam that describes women and children as the property of a Muslim man. The interpretation also has the context of a slave and is exactly the same word as ISIS used to refer to Yazidi women captured by them and used as sex slaves.

569.     UNRWA math teacher and Rami Mohammad Ramadan Sabbah was involved in receiving hostages on October 7 and holding them captive. He was also seen photographing an elderly female hostage held by two terrorists on a motorcycle.

570.     UNRWA school counselor Mousa Subhi Musa El Qidra (assistant to Qassam Brigades' Khan Younis Brigade Commander Mohammad Sinwar) worked together with his son in the abduction of a woman from Israel on October 7.

571.     Since October 7th, approximately 60 hostages were murdered by Hamas or Palestinian Islamic Jihad, 7 hostages were rescued by Israeli forces, and slightly over 100 hostages were released in negotiations. At least 30 female hostages endured sexual abuse by their captors. Approximately 125 hostages remain unaccounted for, although it is believed that a significant percentage of them have been killed, with their bodies remaining captive.

**G.     UNRWA knowingly and intentionally employed Hamas members as UNRWA management and staff.**

572.     UNRWA does not treat Hamas and PIJ as terrorist organizations, despite their formal designation as such by the United States, United Kingdom, Australia, Canada, the European Union, and numerous other civilized nations.

573.     Responding to the revelation of UNRWA staff's participation in the October 7 Attack, UNRWA posted to its official website a report entitled "Why Donors Should Not Suspend Aid to UNRWA," arguing that "Hamas' deep roots in Gaza could make it difficult or impossible for the agency to insulate itself from all indirect links with the militant group." The report also argued that UNRWA's "ubiquity throughout Gaza, combined with the degree to which Hamas is embedded in the local population, makes it difficult for UNRWA to guarantee that its safeguards against staff misconduct or aid diversion are infallible." In light of the facts alleged herein, these are not defenses but admissions that UNRWA knew of the risks and yet failed to take action to mitigate them.

574.     UNRWA's leaders say the agency strives to ensure its 13,000 employees in Gaza uphold standards of neutrality, regularly training its staff to stay above politics and investigating those who do not. However, in practice Defendants turned a blind eye and covered up the widespread infiltration of Hamas leaders and terrorists throughout UNRWA's Gaza operations, only acting in response to unfavorable publicity.  "What we want to make sure is that our staff does not have a *public* political function, because that would be completely incompatible with the function of a civil servant," Defendant Lazzarini said (emphasis added) in an interview with the New York Times. But, Mr. Lazzarini added, "Our employees are part of the social fabric of Gaza and its ecosystem. And as part of the social fabric in Gaza, you have also Hamas."

575.     But the problem is not that UNRWA failed to screen out 100% of terror-linked employees; it is that the Defendants failed to address the pervasive presence of Hamas operatives within their organization.  They only episodically reacted when third parties called attention to deviations from its supposed neutrality policy.  According to a New York Times investigative report, UNRWA "has variously responded to tips [about Hamas-linked employees] from Israel,

the United States and its own networks…Rather than addressing such issues in a systematic process, they dealt with them in a piecemeal way mostly in private, working with officials … in New York."

576.    In fact, UNRWA's auditors in their official reports to UNRWA management highlighted UNRWA's deficiencies with respect "lack of documentation and verification on the recruitment process." For example, in UNRWA's 2019 Financial Report and audited financial statements, the Board of Auditors reported that "the Board considers that there are concerns regarding the transparency of the recruitment and selection process, owing to such deficiencies with respect to checks and records for such relevant documents as the recruitment and selection report, as well as academic and professional qualifications, which provide traceability for the evaluation of candidates or the justification for hiring employees."

577.    Nevertheless, UNRWA falsely asserts that it maintains strict staff conduct policies to ensure that its members are not affiliated with any other groups. Nevertheless in 2021, UNRWA spokeswoman Tamara Alrifai admitted that the organization takes action only when its employees are found to hold a political position with Hamas, and added that "after that, I don't know where the line is drawn".

578.    UNRWA directors meet in person with senior Hamas leaders at least once a year, including with Hamas head Yahya Sinwar, designated by the United States State Department as a Specially Designated Global Terrorist pursuant to Executive Order 13224 and the mastermind of the October 7 Attack, contradicting their spin that they are merely unable to avoid certain "indirect" links to Hamas.

579.    In a 2004 interview, then UNRWA Commissioner-General Peter Hansen encapsulated the governing attitude at UNRWA, stating, "I am sure that there are Hamas members on the UNRWA payroll, and I don't see that as a crime."

**H.    Defendants knew that senior Hamas operatives held influential positions in UNRWA.**

580.    Senior Hamas military operatives held influential positions within UNRWA for years. The following are examples:

   a.    Member of Hamas' Leadership in Gaza and long-time senior Hamas member Suhail Ahmed Hassan al-Hindi, served as the Chairman of the UNRWA Staff Union in the Gaza Strip and principal of the UNRWA Palestine Boys' Elementary School for refugee children. In 1981, al-Hindi initially joined the Muslim Brotherhood and was involved in student politics in Ramallah. In 1984 he obtained a diploma from the Teachers' Institute affiliated with UNRWA in Ramallah. In 1987, after the founding of Hamas, he assumed an active role in the movement's activities and was repeatedly detained by Israeli authorities. He was a member of Hamas' Leadership in Gaza between 2006 and 2021; the elected head of the administrative body of Hamas in the northern region between 2012-2015; and head of the Return Marches and Breaking the Siege Committee in the Hamas' Leadership in Gaza in 2018. The Return Marches, where hundreds of Hamas activists charged forward to the border wall, were the dry runs for the Hamas infiltration on October 7. All this time, since 1988, al-Hindi worked as a teacher in UNRWA schools, and between 2006-2016 he served as a director for UNRWA schools. Between 2000 and 2016, he held senior positions in the UNRWA staff union, including President. In 2017 al-

Hindi was finally suspended by UNRWA after the agency was confronted with al-Hindi's re-election to Hamas' Leadership in Gaza, or what the movement purports to be its "Political Bureau". This, after UNRWA's management had been fully aware for years that Suhail al-Hindi was a senior Hamas activist, an elected member of multiple Hamas bodies, and that he condoned jihad against Israel and suicide attacks carried out by Hamas. UNRWA spokesperson, Chris Gunness, admitted knowledge of al-Hindi's senior role in Hamas leadership in a published article on January 27, 2009. Despite this knowledge, UNRWA management continued to employ al-Hindi until 2017.

b. Another member of Hamas' Leadership in Gaza and long-time Hamas member, Muhammad al-Jamassi, was chairman of the board of directors in the UNRWA engineering department for refugee camps in the central Gaza Strip. In February 2017, al-Jamassi, reportedly assumed a role in Hamas' Leadership in Gaza. Jamassi had been involved with Hamas since 2007.

c. Jawad Abu Shamala, Hamas's Minister of Economy Jawad Abu Shamala, a longtime former UNRWA teacher, was killed by the IDF on October 10, 2023. He was responsible for financially planning the funding of the Oct 7th attack.

d. PIJ member Awad al-Qiq, an UNRWA science teacher and school headmaster in Rafah with an eight-year tenure, was at the same time leading a rocket engineering squad for the PIJ. Following his death in an Israeli airstrike in May 2008, Islamic Jihad hailed Al-Qiq as a martyr destined for 'paradise.' The terrorist organization prominently displayed a poster at the entrance of the

UNRWA school where he taught, lauding Al-Qiq's involvement in terrorist activities.

e. Issa Abd al-Hadi al-Batran, a graduate and longtime teacher in UNRWA schools was Hamas's senior rocket-maker. Al-Batran graduated from UNRWA's elementary and middle schools in al-Bureij and UNRWA's Gaza Training Center. For years, al-Batran worked as a teacher in UNRWA's schools in the central district of the Gaza Strip. He joined Hamas in 1989 and by the beginning of the 1990s he was recruited to the al-Qassam Brigades. He participated in attacks against IDF forces without being a lawful combatant, placed explosive charges, participated in digging tunnels, took part in producing explosive charges, bombs, rockets and other military equipment needed. He also founded the media office of al-Qassam Brigades in al-Bureij refugee camp. According to al-Qassam Brigades, IDF failed to assassinate al-Batran in four attempts – the last failed attempt being during Operation Cast Lead (January 2009), in which his wife and children were killed. Despite this information that was publicly known, especially in the Gaza Strip, no action was taken by UNRWA against al-Batran even after he had been the target or four failed assassination attempts, which exposed his connection to terrorist activity. John Ging, UNRWA Director of Operations in Gaza, was notified as early as December 2008, that Issa al-Batran is an active operative of al-Qassam Brigades, and UNRWA took no action. All that time, al-Batran continued to work as a teacher in a school run by UNRWA in al-Bureij refugee camp. He was finally dismissed by UNRWA in 2009 months after being seriously wounded while assembling a

131

bomb for the Izz al-Din al-Qassam Brigades where he served as a weapons expert, manufacturing explosives, IEDs and rockets, as well as excavation tools to build Hamas's tunnel network. He was killed in an Israeli air strike on July 31, 2010.

f.   Hamas leader Ismail Haniyeh was a teacher in UNRWA schools.

g.   At least eighteen school principals in Gaza are members of Hamas' military wing.

I.   **UNRWA pays its Gaza staff in a fashion calculated to further enrich Hamas.**

581.   Gaza does not have a currency of its own but uses the Israeli shekel for ordinary local transactions.  Large local employers pay their employees in shekels.  UNRWA does not do so, even though it is logistically feasible for it to do so and even though it pays its staff in the West Bank in local currency (there, Israeli shekels).  Indeed, UNRWA likewise pays its staff in Jordan, Lebanon, and Syria in the respective local currencies.

582.   By contrast, UNRWA paid its Gaza local staff in U.S. dollars and does so in cash. Because U.S. dollars are not commonly accepted by merchants in Gaza for the staff's necessary routine purchases of groceries and other necessities, this compels the staff to go to local moneychangers to exchange their cash dollars for shekels.  However, Hamas runs the majority of the Gaza moneychangers, and those are that are not actually run by Hamas are required by Hamas to pay Hamas a share of the fees they earn (often ranging from 10% up to 25%) for such exchange transactions, thus ensuring that a predictable percentage of UNRWA's payroll went to Hamas. Hamas uses the moneychangers to finance its military activities, and there are multiple examples in recent years of Hamas using currency exchange facilities in Gaza to finance its military activities.  *See e.g.* Buy Cash, designated by the Treasury Department's Office of Foreign Assets

Control.  In addition to these profits, Hamas desperately needed the U.S. currency itself.  U.S. dollars in cash form are vital to Hamas for purposes such as obtaining weapons on the international black market to be smuggled into Gaza and used for terrorist purposes, including the October 7 Attack.  From 2018 until September 2023, UNRWA inserted into Gaza at least $20 million a month in cash, and by putting into the hands of the Hamas controlled moneychangers into Hamas' hands.

583.    In fact, a 2018 report commissioned by UNRWA warned of numerous risks associated with making cash disbursements in cash in Gaza, including money laundering risks, the likelihood that funds could be diverted to terrorists or other inappropriate recipients ("leakage"), and the use of cash to facilitate illegal trade.  Similarly, UNRWA's audits also warned UNRWA management of risks with the cash distribution system in Gaza.  For example, warning in the 2022 audit that "UNRWA may not always have the ability to monitor cash distributions in a timely manner, which could potentially increase the risk of incorrect, missed or multiple cash payments being distributed in Gaza."

584.    Each month, UNRWA staff in New York instruct JP Morgan Chase to wire budgeted and approved amounts in U.S. dollars, via Arab Bank in New York, to Arab Bank's branch in Ramallah, in the West Bank.  Funds required for UNRWA payroll and operations in the West Bank are converted and paid in Israeli shekels.  By contrast, funds required for UNRWA payroll and operations in Gaza are transferred to the Bank of Palestine in Ramallah, which are withdrawn in cash U.S. dollars and then physically transported (across Israeli territory) in trucks to Gaza, with each truck containing millions of dollars in cash and posing significant security risks.  If UNRWA paid its Gaza local staff in shekels, which could be transferred electronically from the Arab Bank or the Bank of Palestine in Ramallah directly to banks in Gaza (as, for example, the Palestinian Authority does for payment of its employees in Gaza), these burdens and risks would

be unnecessary, and the staff would benefit from increased purchasing power from their salaries because they would not need to pay fees to moneychangers.  Only Hamas benefits from UNRWA's current cash-handling practices.

585.   By way of note, Hamas was otherwise prevented from obtaining U.S. cash dollars by, among other things, United States anti-money laundering statutes and regulations.  UNRWA has provided an estimated two thirds of the cash U.S. dollars physically transferred into Gaza since 2018.  Hamas has used the over one billion in cash U.S. dollars brought into Gaza by UNRWA to buy via smugglers its weapons, ammunition, explosives, construction materials for the tunnels, and rocket-making supplies that have been used for a multitude of terrorist acts including but not limited to the October 7 Attack.  Hamas' ability to carry out the October 7 Attack would have been significantly, and possibly fatally weakened without that UNRWA-provided cash.  Hamas' sponsors such as the current government of Iran lack the same ability to physically bring cash U.S. dollars in such quantities into Gaza due to Israeli control of Gaza's external borders.

586.   This entirely predictable consequence of UNRWA's Gaza payroll and cash infusion policy is not a hidden side effect but was and is well-known to Defendants.  Defendants were aware that UNRWA's auditors as well as various other outside third parties had raised concerns about their cash-handling policies in Gaza.  The risk that these massive amounts of funds would be used for wrongful purposes was fully known and foreseeable to the Defendants.

**J.    Defendants knew Hamas controlled UNRWA's Staff Union in Gaza.**

587.   Hamas has controlled the UNRWA Gaza Staff Union since 2009. In September 2012, the Hamas bloc, headed by senior Hamas activist Suhail al-Hindi, again won a landslide victory in the elections to UNRWA Staff Union elections. With a high turnout of approximately 11,500 UNRWA employees who cast their ballot, the Hamas bloc won all 11 seats of the teachers'

sector, 6 out of 7 seats of the workers sector and 8 out of 9 seats of the services sector (winning 25 out of 27 seats in a vote among 10,000 staffers).  Defendants knew the outcome of these elections, were aware of the overwhelming majority of its employees' affinity with Hamas yet took no meaningful steps to prevent these employees from using their UNRWA positions to promote Hamas' terror agenda.

**K.      UNRWA, with Defendants knowledge and approval, chose to use textbooks and teaching curricula approved by Hamas which contained incitement and indoctrination of Palestinian children to support and participate in Hamas' jihadi culture, rather than using textbooks consistent with principles and requirements of the United Nations.**

588.      UNRWA has made a deliberate and conscious decision that its schools teach a Hamas-approved curriculum in Gaza even though it is not required to do so.

589.      Countless studies by governments and NGOs, known to Defendants, have found that UNRWA's textbooks glorify violence and terrorism, encourage jihad and martyrdom, incite antisemitism and hatred of Jews, reject the very existence of Israel and call for its destruction.

590.      More than 500,000 students study at schools in the Gaza Strip, with over half attending UNRWA-operated schools. Studies available to UNRWA New York staff by governments and international organizations such as the U.S. Government Accountability Office ("GAO"), the European Union, the UN's Committee on the Elimination of Racial Discrimination (CERD), the Institute for Monitoring Peace and Cultural Tolerance in School Education (IMPACT-se), and reviews by UNRWA itself all show the problematic nature of the Palestinian Authority/Hamas approved textbooks used in its schools.

591.      The U.S. Government Accountability Office revealed in a 2019 report that UNRWA schools failed to offset "potentially problematic content" in the textbooks used in Gaza.

UNRWA did not train teachers or complete distributing complementary teaching materials even after it had identified these issues in its own review.

592.    A 2021 study commissioned by the European Union on Palestinian textbooks found "anti-Semitic narratives and glorifications of violence" in the same textbooks. The European Parliament repeatedly, and most recently in 2021, deplored "the problematic and hateful material in Palestinian school textbooks and study cards which has still not been removed".

593.    The UN's Committee on the Elimination of Racial Discrimination stated in September 2019 that it is concerned  "About the existence of hate speech, in particular hate speech directed against Israelis, which at times fuels anti-Semitism towards this group, in certain media outlets, in particular those controlled by Hamas, as well as on social media, in public officials' statements and in school curricula and textbooks, which also fuels hatred and may incite violence (art. 4)."

594.    The Institute for Monitoring Peace and Cultural Tolerance in School Education (IMPACT-se)'s extensive research of UNRWA-used school textbooks "has consistently found a systematic promotion of violence, martyrdom, overt antisemitism, and jihad across all grades and subjects, with the proliferation of extreme nationalism and Islamist ideologies throughout the curriculum, including science and math textbooks".

595.    UNRWA's willingly and knowingly keeps the hateful content in the curriculum taught in its schools intact. Thus, UNRWA students are intentionally, systematically and constantly indoctrinated to internalized victimization, glorify violence, mayhem and jihad, and support genocide of Jews, Israelis, and the State of Israel itself.

596.    UNRWA also produces its own institutional original teaching materials branded with its logo to complement and enrich host-country curricula. These supplement the teaching of

PA textbooks. Multiple studies by the NGO IMPACT-se in 2023, 2022 and 2021 reviewing these institutional UN supplementary materials found that UNRWA teachers, principals, schools, and education departments were regularly involved in drafting, approving, printing, and distributing thousands of pages of teaching materials including content that incites antisemitism, glorifies terrorism, and encourages jihad and martyrdom.

597.    Therefore, UNRWA makes a false claim when it states on its website:

"In its more than 700 schools educating more than 500,000 Palestine refugee children across the Middle East, the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA) curriculum emphasizes the UN values of neutrality, human rights, tolerance, equality and non-discrimination with regard to race, gender, language and religion. As a matter of course, UNRWA consistently reviews all educational materials and textbooks against these values, and rarely, in cases where discrepancies are found, provides enrichment materials to teachers to enable them to enter into critical thinking discussions with their students to address any issues identified."

598.    The content of these textbooks violates the UN's own standards for education. According to the Universal Declaration of Human Rights, adopted by the United Nations General Assembly in 1948, "Education shall be directed to the full development of human personality and to the strengthening of respect for human rights and fundamental freedoms. It shall promote understanding, tolerance and friendship among all nations, racial and religious groups and shall further the activities of the United Nations for the maintenance of peace."

599.    The UN maintains that school education should promote respect, peace and tolerance, and should be "free of wording, imagery and ideologies likely to create prejudices,

misconceptions, stereotypes, misunderstandings, mistrust, racial hatred, religious bigotry and national hatred, as well as any other form of hatred or contempt for other groups or peoples". Moreover, the curriculum should be "free of language, content, and imagery that disseminate ideas or theories which justify or promote acts and expressions of violence, incitement to violence, hostility, harm and hatred toward other national, ethnic, racial or religious groups".

600.    In April 2021, the European Union froze all its funding to the Palestinian Authority of over 220 million EUR in April 2021 for 13 months due to problematic content in textbooks also used in UNRWA schools in Gaza, following an EU-funded report that found "antisemitic narratives and glorification of violence".

601.    Defendant Lazzarini admitted UNRWA's awareness of incitement to violence, discrimination, antisemitism, intolerance, and glorification of terrorism in UNRWA's internal reviews of textbooks used in its schools in a September 2021 hearing in the European Parliament.

602.    In his testimony, Lazzarini admitted:

"We as UNRWA have identified three categories of problems in the textbooks when it comes to being in line with UN value[s], which is age appropriateness, gender perception, and then the issues related to incitement to violence, discrimination, and so on. [Turning to the Committee Chair, adding:] antisemitism, intolerance, absolutely. So, these are the type of issues which have been identified by UNRWA through the review of 150 books and we keep reviewing each of the books being issued by the authorities whenever they need to be used in our class[es]. And whenever we enter difficult issues, either we give guidance to our teachers on how to use it or we ask it not to be taught in the class. Especially when

138

we start to talk about glorification of terrorism for example which has also been an issue."

603.    Findings of IMPACT-se's research contradict statements and promises made by UNRWA and Defendant Lazzarini to donor nations in relation to a change in using and teaching the Hamas-approved curriculum.

604.    UNRWA admitted in 2021 that its teachers drafted hateful content, contradicting its claim of extensive training in countering hate.

605.    According to its own statements, UNRWA reviews the Hamas-approved textbooks used in its school and is thus necessarily aware of their content.

606.    At the same time, UNRWA refuses to disclose the results or criteria of its textbook reviews that showcase lessons they deem problematic. It also refuses to disclose teacher guidance materials that allegedly instruct teachers to critically address itemized problematic content.

607.    Defendants knew that the European Parliament adopted resolutions in May and July 2023, May and December 2022, 2021, 2020 and 2018 which condemned the teaching of hate in textbooks used in UNRWA schools, expressed concerns over the continued failure to remove content not in line with UNESCO standards, and called for conditioning funding on the basis of a curriculum reform.  The EU commissioned a report from 2021 from the Georg Eckhart Institute, a German academic institution forcing on international textbook research, which raised similar concerns about the textbooks used by UNRWA in Gaza to those set forth above.

608.    Moreover, intermittent and episodic attempts to make the curriculum in the Gaza schools more balanced were rapidly abandoned whenever Hamas objected, as in 2011 when UNRWA proposed to teach children about the historical fact of the Holocaust but then failed to follow through.

609.     In 2024, UNRWA finally committed to make limited modifications in the textbooks it uses in Gaza, following a firestorm of international criticism.  But by this time the October 7 Attack and Plaintiffs' injuries had already occurred, facilitated in part by UNRWA's own role in indoctrinating future terrorists.

610.     The following are selected examples from Hamas-authorized textbooks and other instructional material used by UNRWA in Gaza:

a.   3rd grade:

Arithmetic is taught by counting martyrs. Math questions in Grade 3 ask children to write the number of martyrs killed during the First Intifada and the 2014 Gaza War. An Arabic language exercise instructs students to sing and learn by heart:  "The land of Kurāma' [generosity].  I swear, I will sacrifice my blood to irrigate the land of generosity, And will remove the usurper from my country. And will exterminate the remnants of the foreigners."

b.   5th grade:

An UNRWA-created 5th grade Arabic Language summary glorifies as heroes infamous terrorists and others affiliated with war, violence, and religious extremism. These include Dalal Mughrabi, known for her role in the 1978 Coastal Road Attack in which 38 civilians including 13 children were killed, and Izz ad-Din al-Qassam, the namesake of Hamas's military wing who promoted Jihad against the British and the Zionists and was killed in action in 1935. These "heroes" are venerated as "the crown of their nation" and "the title of its glory." The text (p. 4) encourages impressionable Palestinian students to see these heroes as their role models: "each of us wishes to be like them."

Moreover, it encourages students to take the path of martyrs, as follows: "Drinking the cup of bitterness with glory is much sweeter than a pleasant long life accompanied by humiliation."

c.  6th grade:

UNRWA-produced 6th grade Arabic study material includes an exercise under a lesson titled "Loving the Homeland" that promotes sacrificing one's life— "the most precious thing" a person has—for the homeland "to nourish the homeland with his blood." Another exercise under the title "My Land" teaches students that their obligation to the homeland is to sacrifice "their blood" for it. The clear intention is to encourage students to pursue violent jihad to "liberate the homeland." This is confirmed by grammar exercises which include the example sentence "I will commit jihad to liberate the homeland".

d.  7th grade:

In the PA's Arabic Language study cards, 7th grade students are presented with a summary of a poem saying that the Palestinian "Right of Return" into Israel proper will take place though violence using "all the means of warfare" against Israel rescuing the land from the "filth of the occupation" instead of through negotiation. The horizon of the "Return" is described in the summary as "painted with the blood of martyrs."

e.  8th grade:

Reading comprehension is taught through a violent story which glorifies suicide bombings, recounting that "the daggers of the fedayeen [Arab guerilla fighters, commandos] fell on the necks" of enemy soldiers and that they "wore explosive

belts." Israeli forces are said to "leave behind some of the bodies and body parts, to become food for wild animals on land and birds of prey in the sky." An accompanying illustration depicts Israeli soldiers in a tank, shot dead by a Palestinian gunman.

f.   9th grade:

A reading comprehension exercise in 9th grade Arabic Language study material created by UNRWA, contains a story about a Palestinian firebombing attack on a Jewish bus near the West Bank city of Ramallah. The reading comprehension text celebrates the attack as a 'barbecue party' (*haflat shiwaa'*). The translation of the text presented to the student as a reading comprehension exercise is as follows:

The neighbor: "The curfew does not include us in Al-Sharafah [neighborhood]. It is imposed on Al-Tatarish [neighborhood]. It seems that there is a barbecue party [*haflat shiwaa'*] there with firebombs on one of the buses of the colonial settlement Psagot on Mount Al-Tawil."

g.   10th grade:

In Islamic Education, students are taught that Jihad is "for the liberation of Palestine" and a "private obligation for every Muslim."

h.   11th Grade:

An eleventh-grade Palestinian history textbook implies that Jews control the world, using classic antisemitic imagery.

i.   12th Grade:

PA Islamic Education textbook teach students that giving their lives is a religious duty that carries great rewards and much honor. It amounts to the central meaning of life, the highest point toward which one can aspire.

**L.     The indoctrination of hatred of Jews and Israel that is taught in UNRWA's curriculum is further exacerbated by UNRWA's allowance of Hamas' student activities in its schools.**

611.   In every UNRWA school, Hamas has a representative of its "Islamic Bloc", called in Arabic "Al-Kutla al-Islamiya" ("al-Kutla"). Al-Kutla is Hamas' student wing and its official arm operating in all educational institutions in Gaza, from elementary schools to colleges and universities, including the educational institutions run by UNRWA. Al-Kutla's strategy in elementary and middle school is focused on attracting students to Hamas through organizing a variety of activities inside school and after school hours that intend to strengthen the students' religious beliefs and exposing them gradually to Hamas ideology in order to recruit them to the movement.

612.   Examples of al-Kutla's activities inside UNRWA's facilities in Gaza or for students at middle schools run by UNRWA, are as follows:

a.   On January 1, 2010, al-Kutla organized a soccer tournament in Rafah commemorating Mohammad al-Sharif, an operative of al-Qassam Brigades, who was killed on December 12, 2007. Teams from 18 middle schools in Rafah participated in the tournament, including those run by UNRWA. Rafah middle school G (UNRWA) won the finals defeating al-Omaria middle school (UNRWA). The event was held in the football field of the Services Club founded by UNRWA. This is just one example of the many sports tournaments that al-Kutla organizes for students of UNRWA schools.

b. On March 7, 2011, al-Kutla held an event in UNRWA's al-Qarara middle school to honor outstanding students. Hamas senior official Hamad al-Ruqab and the UNRWA school's principle participated in this Hamas event.

c. On April 27, 2011, al-Kutla organized a knowledge competition between Khan Yunis' middle schools, including schools run by UNRWA (al Qarara and al Ma'ari middle schools). Al Ma'ari middle school (UNRWA) won the competition, which was held in commemoration of Hamas co-founder and former supreme leader 'Abd al Aziz al Rantisi, who directed many terrorist attacks by Hamas during the Second Intifadah.

d. Events honoring senior leaders of Hamas, including Sheikh Ahmad Yassin, founder and supreme religious authority of Hamas, and Ahmad al-Ja'bari, former commander of al-Qassam Brigades, Hamas' military/terrorist wing.

e. The Islamic bloc spurred schoolchildren to participate in the 2018 so-called "Great March of Return" rallies along the border with Israel, which included acts of violence and terrorist attacks (shooting, throwing explosives, stabbing, arson and more) and served as test runs for the breaches of the border in the October 7 Attack. Videos prepared by the Islamic Bloc call for active participation in the "Great March of Return" rallies, and state that their ultimate goal is to bring about the destruction of the State of Israel.

613.    The UNRWA education system, its employment of teachers who are Hamas members, its textbooks, and the activities of al-Kutla are a powerful vehicle for Hamas to indoctrinate youth in UNRWA schools in the Gaza Strip and to pave the way for their future recruitment to al-Qassam Brigades.

614. Reviewing the bio sketches of al-Qassam Brigades' fatalities reveals a repeated pattern. Hundreds of al-Qassam operatives are graduates of UNRWA's schools in Gaza, who joined Hamas and later its military wing al-Qassam Brigades. All were also involved in terrorist attacks against Israel or in attacks against IDF forces.

615. UNRWA teachers and staff applauded the Oct. 7th attack on social media. Examples:

a. At 9:09 AM on October 7th, as news began to spread about the terrorist atrocities in Israel, UNRWA Gaza teacher Osama Ahmed posted "Allah is Great, Allah is Great, reality surpasses our wildest dreams."

b. UNRWA principal Iman Hassan justified the Attack as "restoring rights" and "redressing" Palestinian "grievances."

c. Rawia Helles, Director of the Khan Younis Training Center and featured in an UNRWA video, glorified one of the terrorists as a "hero," "raider," and "prince of Khan Younis."

d. UNRWA Gaza School employee Hmada Ahmed, posted on October 7: "[We] welcome the great October" and on October 14: "This land cannot accommodate two identities. [It's] either us or us. We are the ones who will remain, and they are the ones passing by."

e. UNRWA teachers in a 3,000-member UNRWA staff Telegram group cheered and celebrated the October 7 Attack. The UNRWA staff in the group shared photos and video footage of those events and prayed for the terrorists' success and for Israel's destruction. Examples:

145

i.   On the morning of October 7th, Israa Abdul Kareem Mezher (UNRWA Elementary School Arabic Language Teacher), ecstatically celebrated the Hamas terrorists and prayed for their success ("May God keep their feet steady and guide their aim"; "pray for the Mujahidin")[3]. At 7:38 AM, as news of the Hamas atrocities began to spread, Mezher cheered "God is the greatest God is the greatest." Minutes later he shared a photo of one of the Hamas terrorists armed and in uniform, declaring that "Israel's time is over."

ii.   UNRWA math teacher Shatha Husam Al Nawajha wished for the terrorists' "safe" return "and with booty." At 8:00 AM, she lauded the terrorists for taking "their destiny into their own hands," and again prayed for God to "protect" them and make them "victorious."

iii.   UNRWA teacher Moreed Abdulaziz Issa Shouka (Elementary Coed School) exulted in the success of Hamas' October 7th attack, calling it "beyond expectations."

616.   Besides such blatant incitement for ethnic cleaning and genocidal attacks, UNWRA employees are violating the following UN's principles of neutrality with their statements and actions:

a.   UNRWA Staff Regulation 1.4 (staff must "avoid any action and in particular any kind of public pronouncement which may adversely reflect on their status or integrity, independence or impartiality…");

---

[3] Mujahidin (Arabic) means "holy warrior" that is one who conducts jihad.

b. UNRWA Staff Regulation 1.7 (staff must not engage in "any political activity which is inconsistent with or might reflect upon the independence and impartiality required by their status).

## THE NEW YORK SITUS OF DEFENDANTS' SUBSTANTIAL ASSISTANCE TO HAMAS

617. Money is the lifeblood of terrorism, just as fundraising is the lifeblood of any charitable or humanitarian organization. Virtually all of the money UNRWA has spent in assisting Hamas to build up its terror infrastructure in Gaza came from UNRWA's New York city bank account at JPMorgan Chase and came into that account in the first place as a result of donations solicited in New York as a result of Defendants' travel to New York to solicit donors face to face there.

618. As already noted, to obtain virtually all of its financing UNRWA solicits donations from donor countries, and sometimes donor organizations. In general, it is not funded out of general UN revenues, however, the United Nations may supply occasional emergency bail-out funding or other incidental support.

619. That solicitation effort culminates in an annual event held in New York known as the Pledging Conference, where donors from around the world are solicited face to face to renew or increase the funding they each agreed to provide UNRWA the prior year. Senior UNRWA personnel, including the Individual Defendants, typically travel in person to New York to solicit funding in person at this event. For example:

a. At the end of 2010 and 2012, Defendant Ellis traveled to New York to attend the Pledging Conference and solicit funds for calendar years 2011 and 2013, respectively

b.  At the end of 2013, Defendant Ellis traveled to New York to attend the Pledging Conference and solicit funds for calendar year 2014, apologizing to those present that defendant Grandi was not there in person that year.

c.  In December 2014, Defendant Ellis traveled to New York to attend the Pledging Conference and solicit funds for calendar year 2015,

d.  In October 2015, Defendant Mitchell traveled to New York to solicit funds in person at that year's Pledging Conference, claiming that UNWRA had just "emerge[d] from a financial crisis that was unprecedented in its severity" thanks to additional donations obtained to cover a $100 million shortfall but that reforms would be undertaken to reassure donors in the future.

e.  By 2018, the Pledging Conference had been re-scheduled from year-end to June, so that UNWRA could try to solicit additional funds mid-year to deal with its chronic financial shortfalls.   Defendant Krähenbühl traveled to New York to solicit funds in person at that June 2018 conference.

f.  In June 2019, Defendant Krähenbühl traveled to New York again to solicit funds in person at the Pledging Conference, where he proudly proclaimed: "Today in New York, we witnessed another remarkable mobilization and great generosity in support of UNRWA.  I am deeply grateful for the trust of United Nations (UN) member states, for the pledges of more than US$ 110 million, and for the commitment to the dignity and rights of Palestine refugees."

g.  In June 2022 Defendant Stenseth traveled to New York to solicit funds in person at that year's Pledging Conference, and while there was distracted by the need to brief donors "on allegations of hate speech recently levied against several

[UNWRA] staff members." Indeed, UNRWA complained in a press release that the allegations were "timed to disrupt" the Pledging Conference, even though Stenseth conceded that the allegations were credible enough for the accused staff to have been placed on administrative leave pending further investigation.

h.  In June 2023, at the last Pledging Conference before the October 7 Attack, Defendant Lazzarini traveled to New York to solicit funds in person.

620.  Without the Individual Defendants' systematic and repeated travel to and other actions in New York to solicit this funding in person here, Defendants would be unable to fund any of UNRWA's policies in Gaza discussed herein. The Individual Defendants knew this, and purposefully availed themselves of New York's status as the world's financial capital to secure the funding they knew they needed to continue to knowingly provide material assistance to Hamas in Gaza.

621.  Each of the Defendants who served as Commissioner-General or Deputy Commissioner-General had direct oversight of UNRWA's Gaza operations and in that capacity was fully aware of the material support for Hamas that UNRWA was providing in Gaza. They possessed such knowledge before and during each trip they took to New York to solicit funds, with full knowledge that a material portion of any funds they successfully solicited in New York would be disbursed in Gaza in fashions that enabled Hamas to build up its terror infrastructure, and likewise with full knowledge of Hamas' prior track record and ongoing present and future intent to use its terror infrastructure for the genocidal murder of Israeli civilians. In short, while raising these funds, they knew exactly what the funds were going to be used for and what policies they were going to support.

622.    Defendants have also traveled to New York to solicit and receive money outside the usual "conference" cycle.  For example, in June 2015 Defendant Krähenbühl flew to New York to obtain a one-off $15 million donation from Kuwait via its UN ambassador, even though Kuwait's own capital is located much closer to UNRWA's offices in Jordan than either of those locations is to New York.

623.    Similarly, in September 2019 the Foreign Minister of the Kingdom of Saudi Arabia, announced a contribution of $50 Million to the core program budget of UNRWA for 2019 in a meeting with Defendant Krähenbühl in New York.

624.    UNRWA's Commissioner-General also hosts and typically attends the UNRWA Ministerial Meeting in New York, an annual meeting co-hosted by the ministers of various nations with the goal of mobilizing political and financial support for UNRWA.

625.    For example, in September 2018, Defendant Krähenbühl flew personally to New York to attend a Ministerial Meeting and raised $122 million. Krähenbühl thanked the donors, stating: "The results of the New York meeting, added to the support received from other partners this year, represent a very significant achievement."

626.    In September 2021, Defendant Lazzarini attended a Ministerial Meeting in New York co-hosted by the Foreign Ministers of Sweden and Jordan and attended by ministers and representatives from Egypt, the European Union, Germany, the Netherlands, Norway, Palestine, Qatar, Saudi Arabia, the United Kingdom, and the United States. The participants "agreed on the vital importance to break the vicious cycle of financial crises of UNRWA... confirmed that UNRWA needs to be provided with sufficient, sustainable, and predictable funding... [and] agreed to invite all donors to actively support UNRWA, to help the Agency bridge the 2021 funding gap and ensure sustainable financial support in 2022 and beyond."

627.    Money pledged to UNRWA as a result of the Individual Defendants' solicitation activities in New York is typically not immediately paid in full by the donors.  UNRWA's New York-based staff, supervised by Defendant Gunnarsdottir, follows up to ensure payment in appropriate installments into UNRWA's New York bank account at JPMorgan Chase before the funds are then sent on to various locations in the Middle East to be spent there, including the funds spent in Gaza to enhance Hamas' terror infrastructure there.  Such amounts are wired from New York to various locations in the Middle East in regular installments, not an entire year's funding at once.  UNRWA's New-York-based staff may also follow up with donors to encourage earmarks on particular donations to be removed or softened to give UNRWA additional spending flexibility.

628.    Moneys earmarked for Gaza are broken out separately in UNRWA's budget documents, which are approved in New York with New-York-based staff involved in shepherding the proposals through the approval process.  When installments of money are wired from New York to the Middle East they are earmarked specifically either for Gaza or some other region. Because of the way the cash is transmitted, the relevant UNWRA staff in New York are aware that moneys destined to Gaza are disbursed differently, as detailed above, from moneys sent for use in Jordan, Lebanon, Syria, or the West Bank.

629.    A 2018 report commissioned by UNRWA from an outside consultant reminded it, as Defendants were aware, of numerous risks associated with dealing in cash in Gaza, including money laundering risks, the likelihood that funds could be diverted to terrorists or other inappropriate recipients ("leakage"), and the use of cash to facilitate illegal trade.

630.    UNRWA's New-York-based staff and its fundraising, accounting, and disbursement functions are all overseen and directed by Defendant Gunnarsdottir, who is also a member of UNRWA's senior policy-making team.  Because of her close work with the rest of

senior management, she was aware at all relevant times of how UNRWA disbursed its funds and conducted its activities in Gaza and the benefits provided thereby to Hamas, and was thus aware of how her own actions benefited Hamas.  Defendant Gunnarsdottir's work was in turn overseen and directed by Defendants Lazzarini and (during her UNRWA employment) Stenseth, as their predecessors as Commissioner-General and Deputy Commissioner-General had overseen and directed the New York duties of Defendant Gunnarsdottir's own predecessors in her position.

631.    Defendants and the New York staff under their supervision also continuously act in New York to lobby and liaise with representatives of significant countries to raise political support for UNRWA and with representatives of other United Nations affiliates.  UNRWA's website is hosted in New York, and the substantial assets of UNRWA's pension fund for its employees in all locations, including Gaza, are held in the United States, and senior personnel are paid out of New York even if they are primarily based in the Middle East.

## THE OCTOBER 7 ATTACK AND ITS AFTERMATH

632.    All of the assistance provided over the prior decade-plus to Hamas by the Defendants had, by October 2023, the result and effect, which was at all relevant times entirely foreseeable to Defendants, of building up Hamas' terror infrastructure to the point where atrocities of the magnitude of the October 7 Attack could be carried out.  Given Hamas' prior words and deeds, Defendants knew of Hamas' specific intent to perpetrate genocide and it was entirely foreseeable that the capacity to commit genocidal atrocities of that magnitude against Israeli civilians would in time be used to actually do so.

633.    The stories of the horrific experiences of the named Plaintiffs herein and their murdered loved ones are given above in considerable detail but represent only a fraction of what the much larger number of other victims suffered that day and afterwards.

634.     In addition to genocide, mass murder, torture, and hostage-taking, the October 7 Attack included, as has been widely reported, numerous incidents of weaponized rape and sexual assault as a terror tactic.  The horrific methods employed in these rapes were sufficiently uniform in different locations to show preplanning and coordination by Hamas rather than opportunistic outrages committed by individual Hamas terrorists.  Gang rape, sexualized torture, and deliberately leaving the mutilated and naked corpses of murdered rape victims in public locations in order to instill terror in others were all part of this modus operandi.  The United Nations confirmed these reports in statements by Pramila Patten, the Secretary General's Special Representative on Sexual Violence in Conflict, as have other prominent international figures with no pro-Israeli leanings.

635.     Numerous terrorists who directly and personally participated in the October 7 Attack were UNRWA employees, as detailed above.

636.     In addition to these direct participants in the attack, as noted above, Plaintiff Ditza Heiman was taken hostage and held captive in Gaza for almost two months while imprisoned in the home of an UNRWA employee.

637.     The October 7 Attack was a human catastrophe for its victims, but separately created a public relations and financial crisis for UNRWA, as it became subject to heightened and unwelcome international scrutiny regarding its prior Hamas-enabling activities in Gaza and the U.S. and many other donor countries suspended their financial support.

638.     UNRWA has not denied that a material number of its staff personally participated in the October 7 Attack, although it has quibbled with the numbers estimated by credible outside sources.  Indeed, UNRWA has since the attack carried out a spin campaign trying to minimize the nature and degree of its institutional culpability in providing material support to Hamas, trying to

portray it as the work of a few rogue low-level employees rather than reflecting conscious institutional policy decisions made at the highest levels by the Individual Defendants.

639.    For example, on January 26, 2024, Defendant Lazzarini, despite his own culpable actions, knowledge, and intent as set forth in detail above, issued the following statement (emphasis added): "The Israeli Authorities have provided UNRWA with information about the alleged involvement of several UNRWA employees in the horrific attacks on Israel on 7 October…I have taken the decision to immediately terminate the contracts of these staff members and launch an investigation in order to establish the truth without delay.  *Any* UNRWA employee who was involved in acts of terror will be held accountable, including through criminal prosecution."

640.    The same day, a spokesperson for United Nations Secretary-General Antonio Guterres issued the following statemen (emphasis added): "The Secretary-General has been briefed by the Commissioner-General of the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA), Philippe Lazzarini, regarding extremely serious allegations which implicate several UNRWA staff members in the terror attacks of 7 October in Israel. The Secretary-General is horrified by this news and has asked Mr. Lazzarini to investigate this matter swiftly and to ensure that *any* UNRWA employee shown to have participated or *abetted* what transpired on 7 October, or in any other criminal activity, be terminated immediately and referred for potential criminal prosecution."

641.    A recent purportedly-independent inquiry into certain aspects of UNRWA's conduct in Gaza headed by the French diplomat Catherine Colonna was largely a whitewash of UNRWA's culpability, but did find that certain aspects of UNRWA's school curriculum were inappropriate and contrary to the UN's espoused values.  UNRWA immediately pledged to take

corrective action, but the damage from the prior terrorist-indoctrination curriculum has already been done, regardless of belated efforts supposedly now being undertaken "to mitigate the risks attached to the promotion of hate and the incitation of violence in textbooks and the classroom."

## COUNT I

**(Aiding and Abetting Torts Committed by Hamas in Violation of the Law of Nations, Including Genocide and Crimes Against Humanity, and Treaties of the United States)**

642.    Paragraphs 1 through 641 are incorporated by reference as if fully stated herein.

643.    All Plaintiffs suffered compensable injuries that were proximately caused by intentional torts committed by Hamas in violation of the law of nations and treaties of the United States.

644.    "Violations of the law of nations" include "those 'violations of . . . international law norm[s] with [as] definite content and acceptance among civilized nations [as] the historical paradigms familiar when [the ATS] was enacted" in 1789. *Mastafa v. Chevron Corp.*, 770 F.3d 170, 180 (2d Cir. 2014).   Relevant treaties of the United States include, among others, the Convention on the Prevention and Punishment of the Crime of Genocide, the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment, and the International Convention for the Suppression of the Financing of Terrorism.

645.    These norms universal among civilized nations that were violated by Hamas during the October 7 Attack include:  (a) the prohibition against the deliberate targeting of civilians, whether by regular military forces or irregular armed factions such as Hamas; (b) the prohibition against actual or attempted mass killing of civilians, whether by regular military forces or irregular armed factions such as Hamas; (c) the prohibition against taking civilian hostages,  whether by regular military forces or irregular armed factions such as Hamas; (d) the prohibition against

systematic and "weaponized" rape as a tool of terror and intimidation; and (e) the prohibition against actual or attempted genocide, whether by state actors or non-state actors.

646.    Genocide is defined by international treaty as "any of the following acts committed with intent to destroy, in whole or in part, a national, ethical, racial or religious group, as such:

     a.  Killing members of the group;

     b.  Causing serious bodily or mental harm to members of the group;

     c.  Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;

     d.  Imposing measures intended to prevent births within the group;

     e.  Forcibly transferring children of the group to another group."

647.    Treaties and the practice of international war-crimes tribunals in recent decades make clear that attempted genocide, conspiracy to commit genocide, and aiding and abetting of, or other complicity in, genocide are just as proscribed as direct commission of genocide.  Because the intent to destroy the group may be "in whole or in part" Hamas' goal to kill or drive into exile all Jews living in Israel is genocidal even if not coupled with a plan to commit genocide against Jews in other parts of the world.   Because Hamas' mass murder, mass hostage-taking, and weaponized mass rape in connection with the October 7 Attack were and are recognized as crimes against humanity (and thus torts in violation of the law of nations) whether or not they constitute genocide.  For example, the definition of "crime against humanity" in article 7(1) of the so-called Rome Statute of 1997 includes among other things, murder, enslavement "rape, sexual slavery … or any other form[s] of sexual violence of comparable gravity" if "committed as part of a widespread or systematic attack directed against any civilian population."  *See also id.*, article 8(2)(a)(viii) (taking of hostages).

648.    As already stated, all Plaintiffs were injured by Hamas' torts in violation of the law of nations and/or have standing to recover for those torts, some in multiple ways:

   a.  Some Plaintiffs are the estate representatives or other legally-relevant survivors of mass murder victims, entitled to recover damages flowing from the murders of their specific loved one;

   b.  Several Plaintiffs were taken hostage and held captive in Gaza for lengthy periods;

   c.  Several Plaintiffs were non-fatally wounded by Hamas gunmen who intended to kill them;

   d.  Many other Plaintiffs survived the October 7 Attack solely because their saferooms successfully protected them against the Hamas gunmen who attempted to kill them, or otherwise escaped death or physical injury through sheer fortuity or good fortune that does not exculpate Hamas' murderous and genocidal intent.

   e.  Some Plaintiffs, such as Tali Biner, were severely traumatized by witnessing the immediate aftermath of the systematic mass rapes, including the torture and mutilation of rape victims.

   f.  All Plaintiffs suffered extremely serious mental harm as a result of Hamas' actual or attempted murder of their loved ones and, in most cases, themselves. This mental harm was not an incidental side effect of the October 7 Attack but a specifically intended consequence, as part of a deliberate Hamas terror strategy to panic Jews into fleeing Israel before they are murdered, raped, tortured and/or mutilated.

649.     Via their actions set forth above, the Defendants individually and collectively aided and abetted Hamas' commission of these torts via their prior knowing provision of substantial assistance to Hamas, which was of a degree sufficient to constitute conscious, voluntary, and culpable participation in Hamas' wrongdoing and are thus jointly and severally liable to Plaintiffs for the damages caused by Hamas' torts.  As the Supreme Court has recently reiterated in *Twitter, Inc. v. Taamneh*, aiding-and-abetting is a well-established common-law doctrine that is fact-intensive in its application and cannot be reduced to a mechanical verbal formula.

650.     Moreover, as that decision reaffirmed, aiding and abetting liability may arise whether or not the defendants who aided and abetted the tortfeasor knew "all particulars of the primary actor's plan."  Committing genocidal terrorist attacks deliberately targeting Jewish Israeli civilians was the intended purpose of the terror infrastructure the Defendants' substantial assistance helped Hamas fund, build up, and enhance.

651.     Defendants were well aware of Hamas' intended purpose for the terror infrastructure and intended to assist Hamas.  Each Defendant knew Hamas' genocidal intent to eliminate the State of Israel and its Jewish citizens.  Hamas, on numerous occasions, publicly announced its intentions to perpetrate the genocidal terrorist attacks that in fact it perpetrated on October 7, 2023.  This assistance was provided continuously for over a decade prior to the October 7 Attack, at a time when Defendants were likewise well-aware that the E.U., U.S. and many other states had designated Hamas as an unlawful terrorist organization.  Throughout that decade they were aware of the benefits Hamas was deriving from UNRWA's actions described above, and, as further evidence of their knowledge, purpose, and intent, they frequently attempted to conceal, deny, or distract attention from the benefits they were providing to Hamas.

652.    Defendants intended to assist Hamas in its ability to pursue its genocidal goals whether or not they consciously shared Hamas' specific genocidal intent, and the October 7 Attack, utilizing the terror infrastructure UNRWA had helped Hamas build and with numerous UNRWA employees as active participants committing atrocities, was a foreseeable consequence of the substantial assistance.  Defendants had an obligation and duty, under United Nations Regulations and under international law, to comply with United Nations Security Council Resolution 1373 and prevent UNRWA for providing funding for Hamas and others to commit acts of terrorism, especially form within its headquarters and facilities, which it claimed were *inviolate* and under its sole control and responsibility.  As a matter of tort law, criminal law, and international human rights law, that suffices to establish aiding and abetting liability.

653.    For the reasons described above, Defendants are jointly and severally liable to Plaintiffs for the damages caused by Hamas' torts which they aided and abetted.

## COUNT II

### (Aiding and Abetting Liability Under the TVPA, Against Individual Defendants Only)

654.    Paragraphs 1 through 653 are incorporated by reference as if fully stated herein.

655.    The decedents from whom certain Plaintiffs derive their standing to recover damages were subjected to extrajudicial killing within the meaning of the TVPA.

656.    Other Plaintiffs were subjected to torture within the meaning of the TVPA, including by being subjected, for reasons based on religious and ethnic discrimination, to the threat of imminent death, the threatened infliction of severe physical pain or suffering, and/or the threat that others would be imminently subjected to death, severe physical pain, or suffering, all at a time when they were in de facto Hamas custody during the October 7 Attack.

657.    The Hamas terrorists who carried out these acts of extrajudicial killing and torture were individuals acting "under actual or apparent authority, or color of law, of any foreign nation," because Hamas is in this context a de facto government as recognized in the case law. *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) (even though other countries did not afford diplomatic recognition to armed faction in actual control of one portion of former Yugoslavia, it was potentially a de facto state for these purposes); *Doe v. Islamic Salvation Front*, 993 F. Supp. 3 (D.D.C. 1998) (armed faction in de facto control of significant portion of Algerian territory during civil war could potentially be "foreign nation" for TVPA purposes even though it was not the recognized government of Algeria).

658.    For the reasons described above Defendants (except for UNRWA as an entity) are jointly and severally liable for the damages caused to Plaintiffs by the TVPA violations by Hamas-affiliated individuals whom they aided and abetted.

659.    Under the circumstances, the "color of law" requirement does not separately apply to aiders and abettors or, in the alternative, an international organization like UNRWA is a "foreign nation" within the meaning of the statute and the Individual Defendants' acts were carried out under the actual or apparent authority of UNRWA.

## COUNT III[4]

### (Aiding and Abetting Assault and Battery and Wrongful Death)

660.    Paragraphs 1 through 659 are incorporated by reference as if fully stated herein.

661.    The intentional tortious actions of Hamas described above also constituted assault and battery under international law, the common law and/or other applicable law, which

---

[4] Choice of law issues need not be resolved at this preliminary stage of the action.  However, we note that, due to the legacy of pre-1948 British rule, the tort principles of Israeli law largely derive from English common-law roots, just as those of New York do.

proximately caused damage to each of the Plaintiffs and/or the deceased predecessors-in-interest of certain Plaintiffs.

662.    The fatal injuries Hamas inflicted upon those deceased predecessors-in-interest also gave rise to wrongful death and/or survival causes of action in favor of their estates, estate representatives, and/or legally appropriate survivors and family members.

663.    For the reasons described above Defendants are jointly and severally liable to Plaintiffs for the damages caused by Hamas' torts which they aided and abetted.

## COUNT IV

### (Aiding and Abetting Intentional Infliction of Emotional Distress)

664.    Paragraphs 1 through 663 are incorporated by reference as if fully stated herein.

665.    The actions of Hamas described above also constituted intentional infliction of emotional distress under international law, the common law and/or other applicable law, which proximately caused damage to each of the Plaintiffs and/or the deceased predecessors-in-interest of certain Plaintiffs.

666.    For the reasons described above Defendants are jointly and severally liable for the damages caused by Hamas' torts which they aided and abetted.

## COUNT V

### (Aiding and Abetting Loss of Consortium)

667.    Paragraphs 1 through 666 are incorporated by reference as if fully stated herein.

668.    As a result of the intentional tortious actions of Hamas described above, each of the surviving Plaintiffs has a claim under applicable law for loss of consortium and those Plaintiffs who are the survivors and/or estate representatives of murder victims have survival and/or wrongful death claims under applicable law.

161

669.    For the reasons described above Defendants are jointly and severally liable for the damages to which Plaintiffs are entitled in respect of these claims, all of which were caused by Hamas' torts which they aided and abetted.

**WHEREFORE**, Plaintiffs demand judgment against each and every Defendant, jointly and severally (except only against the Individual Defendants jointly and severally with regard to the TVPA claims), for:

a. A money judgment for compensatory damages in an amount to be proven at trial;

b. An award of punitive damages in an appropriate amount to be determined at trial;

c. Pre- and post-judgment interest;

d. Costs of this action, including reasonable attorneys' fees to the full extent permitted by applicable law; and

e. Such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims.


Dated:  New York, New York
        June 24, 2024

                                        AMINI LLC

                                        By ____/s/ Avery Samet_____
                                            Bijan Amini
                                            Avery Samet
                                            John W. Brewer
                                        131 West 35th Street, 12th Floor
                                        New York, New York 10001
                                        Tel. (212) 490-4700
                                        bamini@amnillc.com
                                        asamet@aminillc.com
                                        jbrewer@aminillc.com

                                        MM~LAW LLC

                                        By ____/s/ Gavriel Mairone_____
                                            Gavriel Mairone (admitted to S.D.N.Y. Bar)
                                            Adora Sauer
                                            (pro hac vice application to be filed)
                                            Ariel Mairone (N.Y. state bar # 4993259,
                                            pro hac vice application to be filed)
                                        875 North Michigan Avenue, Suite 3100
                                        Chicago, Illinois 60611
                                        Tel. (312) 253-7444

                                        *Attorneys for Plaintiffs*


Of Counsel:
Mark Sunshine, Esq.
Thomas Berner, Esq.