# United Nations 🇺🇳 Nations Unies

HEADQUARTERS · SIEGE    NEW YORK, NY 10017

TEL.: 1 (212) 963.1234 · FAX: 1 (212) 963.4879

REFERENCE: 2024-OLC-000420

17 July 2024

Excellency,

Complaint in the United States District Court for the
Southern District of New York—*Estate of Tamar Kedem Siman Tov, et al. v.*
*United Nations Relief and Works Agency ("UNRWA"), et al.*

I have the honour to refer to the above-referenced Complaint that was initiated in the District Court of the Southern District of New York ("Court") against the United Nations Relief and Works Agency for Palestine Refugees in the Near East ("UNRWA") and current and former UNRWA officials, and to my letter of 26 June 2024 informing the United States Mission to the United Nations that the United Nations has expressly maintained its immunity with respect to the above-referenced case and requesting that the competent United States authorities to take appropriate action to ensure full respect or the privileges and immunities of the United Nations and its officials.

Since my letter of 26 June 2024, the United Nations has become aware that on 2 July 2024, the Court issued an initial pretrial scheduling order directing parties to submit a joint letter and a jointly proposed Case Management Plan and Scheduling Order by 23 August 2024.

The United Nations has also become aware that on 10 July 2024, the summons and complaint was left at the UNRWA office in Washington, D.C., and on 15 July 2024, the summons and complaint was left at the address of Ms. Ellis.  The summonses stipulate that within 21 days after service of the summonses, UNRWA and Ms. Ellis, respectively, must serve on the plaintiff an answer to the complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure, failing which a judgment by default will be entered against UNRWA and Ms. Ellis.

Her Excellency
Ms. Linda Thomas-Greenfield
Permanent Representative of the United States
 to the United Nations
New York

UNITED NATIONS 🌐 NATIONS UNIES                    PAGE **2**

Further, Mr. Grandi and Mr. Krähenbühl received letters, both dated 2 July 2024, from counsel for the plaintiffs notifying Mr. Grandi and Mr. Krähenbühl respectively, of the lawsuit and a copy of the complaint along with a formal request that Mr. Grandi and Mr. Krähenbühl waive service of the summons.

As previously mentioned in my letter of 26 June 2024, pursuant to the legal framework applicable to the United Nations, the United Nations has not waived, and indeed expressly maintains and reaffirms the privileges and immunities of UNRWA and the named current and former United Nations officials in respect of the above-referenced Complaint in the Court. In this connection, the United Nations maintains its immunity in this matter, including in respect of any attempts for service on the UNRWA and the individuals listed as defendants in the Complaint, and would not, accept such service.

Accordingly, the United Nations hereby returns to the summons and notifications.

I wish to further reiterate my request that the competent United States authorities take the appropriate action to ensure full respect for the privileges and immunities of the United Nations and the obligations of the United States under both international and United States law and to ensure that no judgment or other adverse decision is entered by the Court against the Organization and its officials and former officials. In particular, I wish to request that the competent United States authorities inform the Court and the counsel for the plaintiffs that the United Nations maintains its immunity and the immunity of its named current and former officials in respect of the Complaint and any legal process related to it.

Please accept, Excellency, the assurances of my highest consideration.

Miguel de Serpa Soares
Under-Secretary-General for Legal Affairs
and United Nations Legal Counsel

# United Nations ⬤ Nations Unies

HEADQUARTERS • SIEGE    NEW YORK, NY 10017

TEL.: 1 (212) 963.1234 • FAX: 1 (212) 963.4879

REFERENCE:    2024-OLC-000420

26 June 2024

Excellency,

<u>Complaint in the United States District Court for the
Southern District of New York—*Estate of Tamar Kedem Siman Tov, et al. v.
United Nations Relief and Works Agency ("UNRWA"), et al.*</u>

I write to inform you that the United Nations has become aware of the filing of the above-mentioned Complaint filed on 24 June 2024 by Estate of Tamar Kedem Siman Tov, et al. against the United Nations Relief and Works Agency for Palestine Refugees in the Near East ("UNRWA") and in their official capacities, (i) Mr. Philippe Lazzarini, Under-Secretary-General of the United Nations and Commissioner-General of UNRWA; (ii) Mr. Pierre Krähenbühl, former Commissioner-General of UNRWA; (iii) Mr. Filippo Grandi, former Commissioner-General of UNRWA, now United Nations High Commissioner for Refugees; (iv) Ms. Leni Stenseth, former Deputy Commissioner-General of UNRWA; (v) Ms. Sandra Mitchell, former Deputy Commissioner-General of UNRWA; (vi) Ms. Margot Ellis, former Deputy Commissioner-General of UNRWA; and (vii) Ms. Greta Gunnarsdottir, Director of the UNRWA Office in New York. The Complaint is related to the mandated functions of UNRWA.

With the present letter, I respectfully request the competent United States authorities to take appropriate action to ensure full respect for the privileges and immunities of the United Nations and its officials, in accordance with the obligations of the United States under both international and United States law.

Her Excellency
Ms. Linda Thomas-Greenfield
Permanent Representative of the United States
  to the United Nations
New York

UNITED NATIONS    NATIONS UNIES

As you are aware, the United Nations is an international inter-governmental organization established pursuant to the Charter of the United Nations (hereinafter referred to as "the UN Charter"), a multilateral treaty signed on 26 June 1945. The UN Charter was ratified by the Government of the United States of America on 8 August 1945 and came into force in the United States on 24 October 1945. *See* UN Charter, 59 Stat. 1031 (1945), *reprinted* in 1945 U.S. Code Cong. &Admin. News, 961 *et seq*.

As an international organization, the United Nations has been accorded certain privileges and immunities which are necessary for the fulfilment of its purposes. Article 105 of the UN Charter provides the general basis for the privileges and immunities of both the United Nations and its officials.  Pursuant to Article 105, paragraph 1 of the UN Charter, "[t]he Organization shall enjoy in the territory of each of its Members such privileges and immunities as are necessary for the fulfilment of its purposes". Article 105, paragraph 2 provides that "officials of the Organization shall similarly enjoy such privileges and immunities as are necessary for the independent exercise of their functions in connexion with the Organization". Article 105, paragraph 3 stipulates that "[t]he General Assembly may make recommendations with a view to determining the details of the application of paragraph 1 [...] of this Article or may propose conventions to the Members of the United Nations for this purpose".  UN Charter, Art. 105,1945 U.S. Code Cong. &Admin News, at 985.

In order to give effect to Article 105 of the UN Charter, the General Assembly of the United Nations adopted the Convention on the Privileges and Immunities of the United Nations (hereinafter referred to as "the General Convention") on 13 February 1946. 1 U.N.T.S. 15 (1946), General Convention, Art. II, 21 U.S.T. at 1422. The United States of America acceded to the General Convention on 29 April1970. 21 U.S.T. at 1418; [1970] TIAS No. 6900.  UNRWA was established pursuant to General Assembly Resolution 302 (IV) of 8 December 1949 and, as an integral part of the United Nations, UNRWA is entitled to the privileges and immunities provided for in the General Convention.

Article II, Section 2 of the General Convention provides that "[t]he United Nations, its property and assets wherever located and by whomsoever held, shall enjoy immunity from every form of legal process except insofar as in any particular case it has expressly waived its immunity.  It is, however, understood that no waiver of immunity shall extend to any measure of execution".  The immunity provided for under Article II is absolute and is neither qualified nor limited in any way under the terms of the General Convention.  Any exception to the provision that an express waiver is required would render the applicable immunity void and risk the United Nations being embroiled


in litigation in its 193 Member States, thereby defeating the purpose of the immunity granted to it by its Member States.

I hereby respectfully wish to inform you that the United Nations has not waived and is expressly maintaining its immunity with respect to the claims in the above-mentioned Complaint.

With respect to the named individual defendants, I wish to note that pursuant to Article V, Section 18(a) of the General Convention, they are "immune from legal process in respect of words spoken or written and all acts performed by them in their official capacity". Such immunity from legal process shall continue to be accorded notwithstanding that the individuals concerned are no longer employed by the United Nations. Furthermore, as Mr. Lazzarini and Mr. Grandi currently hold the official rank of Under-Secretary-General of the United Nations, pursuant to Article V, Section 19 of the General Convention, both enjoy "the privileges and immunities, exemptions and facilities accorded to diplomatic envoys, in accordance with international law". Pursuant to Article 31 of the Vienna Convention on the Diplomatic Relations, 500 UNTS 95 (18 April 1961), which entered into force with respect to the United States on 13 December 1972, 23 U.S.T. 3227; TIAS No. 7502, diplomatic envoys enjoy immunity from criminal, civil and administrative jurisdiction of the host country.

Pursuant to Article V, Section 20 of the General Convention, it is the Secretary-General who has the sole authority to waive the immunity of officials of the Organization. In this case, the claims made by the plaintiffs against all the individual defendants in the above-mentioned Complaint relate to actions undertaken or alleged omissions by them in the performance of their official functions. Specifically, the Complaint alleges that "[e]ach of the Individual Defendants, during their respective time in UNRWA's senior management, directed, ratified, and/or otherwise facilitated the wrongful policies and actions of UNRWA complained of herein". With regards to the defendants who are no longer affiliated with UNRWA, the Complaint states that the claims against them relate to "acts or omissions during their tenure with UNRWA but not for any act or omission following their departure from UNRWA's employment". Therefore, Mr. Lazzarini and Mr. Grandi enjoy both diplomatic immunity and functional immunity under the General Convention, and Mr. Krähenbühl, Ms. Stenseth, Ms. Mitchell, Ms. Ellis and Ms. Gunnarsdottir, enjoy or continue to enjoy functional immunity in relation to the present Complaint. The immunity of these current or former officials has not been waived and the United Nations is expressly asserting the immunity of Mr. Lazzarini, Mr. Krähenbühl, Mr. Grandi, Ms. Stenseth, Ms. Mitchell, Ms. Ellis and Ms. Gunnarsdottir in relation to the above-referenced Complaint.



UNITED NATIONS     NATIONS UNIES            PAGE **4**

       Pursuant to Section 34 of the General Convention, the Government of the United States undertook an obligation to be "in a position under its own law to give effect to the terms of this Convention". Any interpretation of the provisions of the General Convention must be carried out within the spirit of the underlying principles of the United Nations, and in particular Article 105 thereof, which provides that "the Organization shall enjoy such privileges and immunities as are necessary for the fulfillment of its purposes".

       In view of the above, please be advised that the United Nations has not waived, and indeed, expressly maintains the privileges and immunities of UNRWA and the named current and former United Nations officials in respect of the above-mentioned Complaint in the United States District Court for the Southern District of New York.

       I wish to further advise you that to my knowledge, a summons and the Complaint have not been duly served on the United Nations or the current and former United Nations officials referred to. In line with the foregoing, the United Nations maintains its immunity in respect of any attempts for service on the Organization and the individuals listed as defendants in the Complaint, and would not, accept such service.

       In this connection, I wish to recall that Article 9 (a) of the Agreement regarding the Headquarters of the United Nations, approved by the General Assembly on 31 October 1947, provides that the service of legal process in the Headquarters District can only take place with the consent of and under conditions prescribed by the Secretary-General. The Secretary-General of the United Nations has not prescribed any conditions under which service would be allowed. Accordingly, the United Nations has not agreed to service and, in the absence of its consent, no service against UNRWA or United Nations officials have been duly effected in this matter.

       Please accept, Excellency, the assurances of my highest consideration.

Miguel de Serpa Soares
Under-Secretary-General for Legal Affairs
and United Nations Legal Counsel

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 07/02/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
ESTATE OF TAMAR KEDEM SIMAN TOV, BY
HEIR-AT-LAW GAD KEDEM, ESTATE OF O. S.
T., BY HEIR-AT-LAW GAD KEDEM, GAD
KEDEM, INDIVIDUALLY, REUMA KEDEM,
TALIA BINER, ESTHER BINER, DITZA
HEIMAN, NETA HEIMAN MINA, DAFNA
SHAY HEIMAN, GIDEON HEIMAN GLATT,
YASMIN BEN GIGI, MAAYAN ELIAZ,
INDIVIDUALLY, ESTATE OF DIKLA ARAVA
ELIAZ, BY HEIR-AT-LAWS ODIN ELIAZ AND
STAV ELIAZ, ESTATE OF T.E., MINOR CHILD,
BY HEIR-AT-LAW MAAYAN ELIAZ, ODIN
ELIAZ, INDIVIDUALLY, STAV ARAVA
ELIAZ, INDIVIDUALLY, DOV ELIAZ, YIFAT
TANAMI, SAGI ARAVA, ALON ARAVA,
HADAR BEN DAVID, LIAT KOPERSTEIN,
YALI KOPERSTEIN, ZIV KOPERSTEIN,
NAAMA KOPERSTEIN, GONI KOPERSTEIN
AVNI, RAN AHARON AVNI, MAAYAN ZIN,
INDIVIDUALLY, D.E., MINOR CHILD, BY
LEGAL GUARDIAN MAAYAN ZIN, E.E.,
MINOR CHILD, BY LEGAL GUARDIAN
MAAYAN ZIN, MERAV TAL (TAL ALFASI),
RACHEL ALFENDRI, TOMER TAL ALFASI,
ORI TAL ALFASI, KEREN BLANK, SIGALIT
SHARABI, VIKTOR RAHMILOV, GALINA
RAHMILOV, INDIVIDUALLY, SOFIA
HODEDATOV, SIGAL BENBENISTE, NATALI
RAHMILOV, E.L.R, MINOR CHILD, BY LEGAL
GUARDIAN GALINA RAHMILOV, TAMIR
HODEDATOV, HANANEL BENBENISTE, EFIM
SOLOMONOV, ESTATE OF YUVAL BAR-ON,
BY HEIRS-AT-LAW ORIT BAR-ON AND
ITZHAK BAR-ON, ORIT BAR-ON,
INDIVIDUALLY, ITZHAK BAR-ON,
INDIVIDUALLY, ESTATE OF MOSHE SHUVA,
BY HEIR-AT-LAW YOSSEF SHUVA, YOSSEF
SHUVA, INDIVIDUALLY, SONIA SHUVA,
MAAYAN DEVIKO, SHIMON SHUVA,
ESTATE OF DROR KAPLUN, BY HEIRS-AT-
LAW NOAM KAPLUN, MAAYAN KAPLUN
KEIDAR, MORAN KAPLUN (TARASOV),
NOAM KAPLUN, INDIVIDUALLY, MAAYAN
KAPLUN KEIDAR, INDIVIDUALLY, MORAN

KAPLUN (TARASOV), INDIVIDUALLY,
ESTATE OF MARCEL FRAILICH, BY HEIRS-
AT-LAW MOR FRIDA STRIKOVKI, ZIV
FRAILICH, AMIT FRAILICH, MOR FRIDA
STRIKOVSKI, INDIVIDUALLY, ZIV
FRAILICH, INDIVIDUALLY, AMIT FRAILICH,
INDIVIDUALLY, SHARON CASPI, AMIT
CASPI, INDIVIDUALLY, NIV CASPI, MAY
CASPI, S. C., MINOR CHILD, BY LEGAL
GUARDIAN AMIT CASPI, ESTATE OF VARDA
HARAMATY, BY HEIR-AT-LAW AYELET
HARAMATI MIZRAHI, AYELET HARAMATI
MIZRAHI, INDIVIDUALLY, AVRAHAM
MIZRAHI, ITAMAR MIZRAHI, TOMER
MIZRAHI, EDITH HYAMS, ASHER SABAG,
MICHAL SABAG, DOR MICHAEL SABAG,
DANNY OFER VAGE, INDIVIDUALLY, GAT
VAGE, H. V., MINOR CHILD, BY LEGAL
GUARDIAN DANNY OFER VAGE, S. V.,
MINOR CHILD, BY LEGAL GUARDIAN
DANNY OFER VAGE, ESTATE OF MARK
SHINDEL, BY HEIR-AT-LAW JULIA SHINDEL,
JULIA SHINDEL, INDIVIDUALLY, IGOR
SHINDEL, GUY SHINDEL, B. S., MINOR
CHILD, BY LEGAL GUARDIAN JULIA
SHINDEL, ESTATE OF YUVAL SALOMON, BY
HEIR-AT-LAW DORON SALOMON, DORON
SALOMON, INDIVIDUALLY, ESTATE OF
GAYA HALIFA, BY HEIRAT-LAW AVRAHAM
HALIFA, AVRAHAM HALIFA,
INDIVIDUALLY, SIGAL HALIFA, NOGA
HALIFA, IDO HALIFA, IRIT LAHAV, TAMAR
LAHAV, ELIYAHU HANAN BUCH, NITZAN
LAHAV-PASTER, YAARA SZATMARI, ILAN
LAHAV, GALIT LAHAV, INDIVIDUALLY, GUI
LAHAV, R. L., MINOR CHILD, BY LEGAL
GUARDIAN GALIT LAHAV, AND OMER
LAHAV,

Plaintiffs,

-against-                                              24 Civ. 4765 (AT)

UNITED NATIONS RELIEF AND WORKS                        **INITIAL PRETRIAL**
AGENCY ("UNRWA"), PHILIPPE LAZZARINI,                  **SCHEDULING ORDER**
PIERRE KRÄHENBÜHL, FILIPPO GRANDI,
LENI STENSETH, SANDRA MITCHELL,

MARGOT ELLIS, AND GRETA
GUNNARSDOTTIR,

                                              Defendants.

ANALISA TORRES, District Judge:

       1.     Counsel for all parties are directed to submit a joint letter and a jointly proposed Case Management Plan and Scheduling Order by **August 23, 2024**, in accordance with Rule 16 of the Federal Rules of Civil Procedure and the instructions set forth below.

       2.     **COUNSEL FOR PLAINTIFFS IS DIRECTED TO IMMEDIATELY SEND A COPY OF THIS ORDER AND THE COURT'S INDIVIDUAL PRACTICES TO ALL PARTIES**.

       3.     This case has been designated for electronic case filing.  By the deadline for submissions, counsel for all parties are required to register as ECF filers and file a notice of appearance in accordance with the Electronic Case Filing Rules & Instructions (https://nysd.uscourts.gov/electronic-case-filing).

       4.     The parties are directed to submit a joint letter addressing the following in separate paragraphs: (1) a brief description of the case, including the factual and legal bases for the claim(s) and defense(s), (2) any contemplated motions, and (3) the prospect for settlement.

       5.     The parties are directed to submit with their joint letter a jointly proposed Case Management Plan and Scheduling Order.  The parties are directed to consult the Court's Individual Practices and model Case Management Plan and Scheduling Order, which are available at https://nysd.uscourts.gov/hon-analisa-torres.  Both the joint letter and the proposed Case Management Plan and Scheduling Order shall be filed electronically on ECF, with a courtesy copy of each, clearly marked as such, emailed to chambers (Torres_nysdchambers@nysd.uscourts.gov) in accordance with the Court's Individual Practices (*See* Rule I.B.)

       6.     Requests for adjournment of the deadline for the above submissions will be considered only if made in writing and in accordance with the Court's Individual Practices (*See* Rule I.C).

       7.     The parties are advised that the Court requires pre-motion letters before a motion is filed (*See* Rules III.A–C).

       8.     If this case has been settled or otherwise terminated, counsel are required to file a stipulation of discontinuance, voluntary dismissal, or other proof of termination electronically on ECF, with a courtesy copy emailed to chambers in accordance with the Court's Individual Practices.

       SO ORDERED.

Dated: July 2, 2024
      New York, New York

                                      ANALISA TORRES
                           United States District Judge

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Southern District of New York

| | | |
|---|---|---|
| Estate of Tamar Kedem Siman Tov, et al. | ) ) ) ) ) | |
| *Plaintiff(s)* | ) | |
| v. | ) ) | Civil Action No.  24-cv-04765 |
| United Nations Relief and Works Agency (UNRWA), et al. | ) ) ) ) | |
| *Defendant(s)* | ) ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  United Nations Relief and Works Agency (UNRWA)
1901 Pennsylvania Avenue NW, Suite 804, Washington, D.C. 20006

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney whose name and address are:   Amini LLC
c/o Avery Samet
131 West 35th Street, 12th Floor, New York, NY 10001
(212) 490-4700

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date:     06/27/2024                                                           /s/ J. Gonzalez
                                                                      *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  24-cv-04765

### ~~PROOF OF SERVICE~~
#### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐ I personally served the summons on the individual at *(place)*
_____ on *(date)* _____ ; or

❐ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)*
_____ on *(date)* _____ ; or

❐ I returned the summons unexecuted because _____ ; or

❐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ESTATE OF TAMAR KEDEM SIMAN TOV, BY HEIR-AT-LAW GAD KEDEM, ESTATE OF O. S. T., BY HEIR-AT-LAW GAD KEDEM, GAD KEDEM, INDIVIDUALLY, REUMA KEDEM, TALIA BINER, ESTHER BINER, DITZA HEIMAN, NETA HEIMAN MINA, DAFNA SHAY HEIMAN, GIDEON HEIMAN GLATT, YASMIN BEN GIGI, MAAYAN ELIAZ, INDIVIDUALLY, ESTATE OF DIKLA ARAVA ELIAZ, BY HEIR-AT-LAWS ODIN ELIAZ AND STAV ELIAZ, ESTATE OF T.E., MINOR CHILD, BY HEIR-AT-LAW MAAYAN ELIAZ, ODIN ELIAZ, INDIVIDUALLY, STAV ARAVA ELIAZ, INDIVIDUALLY, DOV ELIAZ, YIFAT TANAMI, SAGI ARAVA, ALON ARAVA, HADAR BEN DAVID, LIAT KOPERSTEIN, YALI KOPERSTEIN, ZIV KOPERSTEIN, NAAMA KOPERSTEIN, GONI KOPERSTEIN AVNI, RAN AHARON AVNI, MAAYAN ZIN, INDIVIDUALLY, D.E., MINOR CHILD, BY LEGAL GUARDIAN MAAYAN ZIN, E.E., MINOR CHILD, BY LEGAL GUARDIAN MAAYAN ZIN, MERAV TAL (TAL ALFASI), RACHEL ALFENDRI, TOMER TAL ALFASI, ORI TAL ALFASI, KEREN BLANK, SIGALIT SHARABI, VIKTOR RAHMILOV, GALINA RAHMILOV, INDIVIDUALLY, SOFIA HODEDATOV, SIGAL BENBENISTE, NATALI RAHMILOV, E.L.R, MINOR CHILD, BY LEGAL GUARDIAN GALINA RAHMILOV, TAMIR HODEDATOV, HANANEL BENBENISTE, EFIM SOLOMONOV, ESTATE OF YUVAL BAR-ON, BY HEIRS-AT-LAW ORIT BAR-ON AND ITZHAK BAR-ON, ORIT BAR-ON, INDIVIDUALLY, ITZHAK BAR-ON, INDIVIDUALLY, ESTATE OF MOSHE SHUVA, BY HEIR-AT-LAW YOSSEF SHUVA, YOSSEF SHUVA, INDIVIDUALLY, SONIA SHUVA, MAAYAN DEVIKO, SHIMON SHUVA, ESTATE OF DROR KAPLUN, BY HEIRS-AT-LAW NOAM KAPLUN, MAAYAN KAPLUN KEIDAR, MORAN KAPLUN (TARASOV), NOAM KAPLUN, INDIVIDUALLY, MAAYAN KAPLUN KEIDAR, INDIVIDUALLY, MORAN KAPLUN (TARASOV), INDIVIDUALLY, ESTATE OF MARCEL FRAILICH, BY HEIRS-AT-LAW MOR FRIDA STRIKOVKI, ZIV FRAILICH, AMIT FRAILICH, MOR FRIDA STRIKOVSKI, INDIVIDUALLY, ZIV FRAILICH, INDIVIDUALLY, AMIT FRAILICH, INDIVIDUALLY, SHARON CASPI, AMIT CASPI, INDIVIDUALLY, NIV CASPI, MAY CASPI, S. C., MINOR CHILD, BY LEGAL GUARDIAN AMIT CASPI, | Civil Action No. _____<br><br>**COMPLAINT WITH JURY DEMAND** |

| | |
|---|---|
| ESTATE OF VARDA HARAMATY, BY HEIR-AT-LAW AYELET HARAMATI MIZRAHI, AYELET HARAMATI MIZRAHI, INDIVIDUALLY, AVRAHAM MIZRAHI, ITAMAR MIZRAHI, TOMER MIZRAHI, EDITH HYAMS, ASHER SABAG, MICHAL SABAG, DOR MICHAEL SABAG, DANNY OFER VAGE, INDIVIDUALLY, GAT VAGE, H. V., MINOR CHILD, BY LEGAL GUARDIAN DANNY OFER VAGE, S. V., MINOR CHILD, BY LEGAL GUARDIAN DANNY OFER VAGE, ESTATE OF MARK SHINDEL, BY HEIR-AT-LAW JULIA SHINDEL, JULIA SHINDEL, INDIVIDUALLY, IGOR SHINDEL, GUY SHINDEL, B. S., MINOR CHILD, BY LEGAL GUARDIAN JULIA SHINDEL, ESTATE OF YUVAL SALOMON, BY HEIR-AT-LAW DORON SALOMON, DORON SALOMON, INDIVIDUALLY, ESTATE OF GAYA HALIFA, BY HEIR-AT-LAW AVRAHAM HALIFA, AVRAHAM HALIFA, INDIVIDUALLY, SIGAL HALIFA, NOGA HALIFA, IDO HALIFA, IRIT LAHAV, TAMAR LAHAV, ELIYAHU HANAN BUCH, NITZAN LAHAV-PASTER, YAARA SZATMARI, ILAN LAHAV, GALIT LAHAV, INDIVIDUALLY, GUI LAHAV, R. L., MINOR CHILD, BY LEGAL GUARDIAN GALIT LAHAV, AND OMER LAHAV. §§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§ | |
| Plaintiffs, | |
| v. | |
| UNITED NATIONS RELIEF AND WORKS AGENCY ("UNRWA"), PHILIPPE LAZZARINI, PIERRE KRÄHENBÜHL, FILIPPO GRANDI, LENI STENSETH, SANDRA MITCHELL, MARGOT ELLIS, AND GRETA GUNNARSDOTTIR, | |
| Defendants. | |

ii

## TABLE OF CONTENTS

Page

NATURE OF THIS ACTION ......................................................................... 1

JURISDICTION AND VENUE ....................................................................... 6

THE PLAINTIFFS AND THEIR INJURIES FROM THE OCTOBER 7 ATTACK .......... 7

   Siman Tov-Kedem Families ................................................................. 7

   Biner Family ..................................................................................... 12

   Heiman-Mina-Glatt-Gigi Families ...................................................... 18

   Eliaz-Zin-Elyakim-Arava-Tanami-Koperstein-Avni-Ben David Families ...... 25

   Tal-Alfendri-Alfasi-Blank-Sharabi Families .......................................... 41

   Rahmilov-Hodedatov-Benbeniste-Solomonov Families ........................... 49

   Bar-On-Shuva-Deviko Families .......................................................... 56

   Kaplun-Keidar-Frailich-Strikovski Families ......................................... 61

   Caspi Family .................................................................................... 72

   Haramaty-Haramati-Mizrahi-Hyams Families ...................................... 78

   Sabag-Vage Families ......................................................................... 84

   Shindel Family ................................................................................. 87

   Salomon Family ............................................................................... 90

   Halifa Family ................................................................................... 94

   Lanav-Buch-Paster-Szatmari Families ................................................ 101

DEFENDANTS ........................................................................................ 101

BACKGROUND ON GAZA, HAMAS AND UNRWA ....................................... 103

   Background on Gaza and Takeover by Hamas ....................................... 103

   Background Regarding Hamas ............................................................ 104

   Background regarding UNRWA .......................................................... 111

UNRWA'S SUBSTANTIAL ASSISTANCE TO HAMAS .................................... 113

   A.   UNRWA facilitated construction of Hamas command and control centers, attack tunnels and underground bunkers under UNRWA headquarters, UNRWA schools, medical clinics, and offices. ....................................................... 113

   B.   Defendants knew that UNRWA permitted constructing weapons storage and deployment centers in its headquarters, schools, medical clinics, offices, warehouses and other facilities. ............................................................ 116

C.    Defendants knew that UNRWA permitted installation of rocket launching platforms and terrorist firing positions within and/or adjacent to UNRWA schools, medical clinics and offices. .................................................................................. 119

D.    UNRWA continues to provide material assistance to Hamas despite public concern and objections from within the UN system. ............................................................... 120

E.    UNRWA staff are and were members of Hamas and participated in the genocidal terrorist attacks on October 7, 2023. ..................................................................... 122

F.    UNRWA Staff held and tortured hostages taken in the attacks on October 7. ......... 125

G.    UNRWA knowingly and intentionally employed Hamas members as UNRWA management and staff. ........................................................................................... 126

H.    Defendants knew that senior Hamas operatives held influential positions in UNRWA.. .............................................................................................................. 129

I.    UNRWA pays its Gaza staff in a fashion calculated to further enrich Hamas. ........ 132

J.    Defendants knew Hamas controlled UNRWA's Staff Union in Gaza. ..................... 134

K.    UNRWA chose to use textbooks and teaching curricula approved by Hamas which contained incitement and indoctrination of Palestinian children to support and participate in Hamas' jihadi culture, rather than using textbooks consistent with principles and requirements of the United Nations.................................................. 135

L.    The indoctrination of hatred of Jews and Israel that is taught in UNRWA's curriculum is further exacerbated by UNRWA's allowance of Hamas' student activities in its schools. .......................................................................................... 143

THE NEW YORK SITUS OF DEFENDANTS' SUBSTANTIAL ASSISTANCE TO HAMAS ......................................................................................................................... 147

THE OCTOBER 7 ATTACK AND ITS AFTERMATH......................................................... 152

COUNT I ............................................................................................................................ 155

COUNT II............................................................................................................................ 159

COUNT III .......................................................................................................................... 160

COUNT IV........................................................................................................................... 161

COUNT V ........................................................................................................................... 161

The above-named plaintiffs, by their undersigned counsel, as and for their Complaint with Jury Demand against the above-named defendants, on personal knowledge as to their own actions and on information and belief as to all other matters, respectfully state as follows:

## NATURE OF THIS ACTION

1.      This is a tort action.  On October 7, 2023 (the "October 7 Attack" or "Attack"), the world was shocked by the brutal attack launched from Gaza by thousands of Hamas terrorists on innocent Israeli civilians, including the genocidal mass murder of over a thousand civilian victims, the wounding and/or attempted mass murder of many thousand more, the systematic, planned and weaponized mass rape and mutilation of numerous civilian victims, many of whom were also murdered, tortured, and the kidnapping of over two hundred civilians to be held as hostages.

2.      Hamas did not carry out these atrocities without assistance.  It was aided and abetted by, among others, the above-named defendants, who are current or former senior officials (the "Individual Defendants") of the United Nations Relief and Works Agency for Palestine Refugees in the Near East ("UNRWA"), as well as UNRWA itself, who collectively spent over a decade prior to the October 7 Attack helping Hamas build up the terror infrastructure and personnel that were necessary to carry out the October 7 Attack, including by knowingly providing Hamas with the U.S. dollars in cash that it needed to pay smugglers for weapons, explosives, and other terror materiel.  As discussed throughout, Defendants were warned repeatedly that their policies were directly providing assistance to Hamas.  In the face of those warnings, Defendants continued those very policies.

3.      Whether Defendants knew of the precise plans for the attack or its magnitude is irrelevant to their liability; they knew that Hamas openly proclaimed its goal to target and murder innocent civilians in violation of the law of nations and treaties of the United States and knew that

1

the material support they were providing would enhance Hamas' capability to do so.  The resulting atrocities were foreseeable, and the Defendants are liable for aiding and abetting Hamas' genocide, crimes against humanity, and torture.

4.     Plaintiffs are non-U.S.-citizen victims of the October 7 Attack and/or the estates and other survivors of such victims, whose individual stories and suffering are given in detail below.

5.     The atrocities committed by Hamas in the October 7 Attack were not only acts of terror, genocide, and crimes against humanity, they were torts in violation of the law of nations. Because, as detailed below, the Defendants' actions aiding and abetting those torts in violation of the law of nations, including but not limited to their funding of Hamas, occurred in significant part in the State of New York and in this federal judicial district, this Court has subject matter jurisdiction and venue over Plaintiffs' claims against these Defendants.  Many of the Plaintiffs separately have claims against Defendants for aiding and abetting Hamas' violations of the Torture Victim Protection Act of 1991 ("TVPA"), which requires no such New York nexus.

6.     Defendants' New-York-centered actions, as specified in more detail below, included:

    a.  Constant travel by the Individual Defendants to New York (other than those who were New-York-based) and other senior UNRWA personnel from the Middle East to solicit and receive approval of their budget for operations in Gaza and elsewhere and of the annual audit of their operations in Gaza and elsewhere.

    b.  Constant travel by the Individual Defendants and other senior UNRWA personnel to Manhattan to solicit, in Manhattan, the financial support from

donor countries necessary to fund their work, including but not limited to their material support of Hamas' terror infrastructure. Defendants obtain almost all of UNRWA's funding from donor nations, none of whom have any obligation to contribute to UNRWA. UNRWA depends on voluntary contributions which the Defendants must solicit, collect, manage, supervise and renew every year. The Defendants obtain that vital financial support via face-to-face interaction in New York, collect the funds in New York, and then disburse those funds from New York in installments as needed to fund UNRWA's operations (both legitimate and illegitimate) in accordance with the policies set by the Defendants.

    c. Oversight of UNRWA's permanent New-York based staff, who facilitate necessary ongoing support for UNRWA's work with other stakeholders and approve and implement funding disbursements from New York to UNRWA's field offices in the Middle East, including but not limited to the provision of financial and other material support to Hamas' terror infrastructure in Gaza.

    d. Sending over one billion dollars from UNRWA's New York bank account in Manhattan that Defendants then caused to be delivered to Gaza in cash U.S. dollars to benefit Hamas.

7. UNRWA has knowingly provided material support to Hamas in Gaza by:

    a. Providing Hamas access to, and safe harbor in UNRWA owned-and-funded facilities, including (but not limited to) schools to be used for weapons storage, command and control operations, and planning/staging areas for the October 7

Attack, including enabling underground facilities to access electricity and other utilities from UNRWA.

b.  Providing Hamas access to, and safe harbor in UNRWA property for launching rockets directed at civilian targets in Israel, including rockets launched as part of the barrage intended as a diversion and distraction to Israeli defenses on the morning of the October 7 Attack.

c.  Despite knowing of Hamas' use of UNRWA premises, consistently taking the position with Israel that UNRWA premises were inviolate, thus making them safe havens for terrorists and their materiel and preventing Israel from disabling Hamas' terror infrastructure prior to the October 7 Attack.  Indeed, this intentionally and predictably protected Hamas terror infrastructure not literally located on UNRWA property, but deliberately installed (including rocket launchers) so close to UNRWA property that it could not be struck by Israeli forces without risk of damage to UNRWA property and harm to children and noncombatants present in UNWRA schools and other facilities.

d.  Having the schools they operate in Gaza use Hamas-approved textbooks, curriculum and teachers' guides that indoctrinate children from a young age into a death-cult ideology of hatred and genocide, predictably producing the next generation of Hamas recruits willing to commit terrorist acts;

e.  Allowing Hamas' youth wing al-Kutla direct access to UNRWA schools and students to organize in-school and after-school programs to propagandize, indoctrinate, and recruit future terrorists, with the encouragement of Hamas-affiliated teaching staff;

4

    f.  Permitting local employees on UNRWA's payroll to simultaneously be active Hamas members, many of whom personally participated in the atrocities of the October 7 Attack;

    g.  Deliberately paying its local personnel in the form of cash US dollars, requiring them to turn to Hamas-affiliated moneychangers to receive the local currency (Israeli shekels) they actually need to be able to make purchases, thus predictably generating millions of dollars per month of additional income for Hamas from the spread charged by the moneychangers – income that was not merely denominated in dollars but was in cash; and

    h.  By doing so, providing Hamas with access to hard U.S currency, which Hamas desperately needed to pay its illicit weapons procurement network to smuggle into Gaza vast quantities weapons, ammunition, explosives, rockets, and other materials needed by Hamas to perpetrate the October 7 Attack as well as numerous other genocidal attacks on civilians.

8.    Plaintiffs understand that there are many politically charged controversies swirling around the October 7 Attack and its aftermath. Plaintiffs do not come to this Court seeking a forum to air political grievances, but as ordinary tort claimants seeking monetary compensation for their injuries from parties who are liable for those injuries on traditional tort principles. Plaintiffs' right to recover tort damages from these Defendants does not in any way depend on, for example, adjudicating any disagreements about the appropriateness or degree of the Israeli military response to the October 7 Attack or the prudence or wisdom of U.S. foreign policy either before or after the October 7 Attack, and Plaintiffs do not ask this Court to opine on such controversies.

9.      Similarly, Plaintiffs seek no injunctive or declaratory relief regarding UNRWA's future actions or policies, or regarding U.S. policy toward UNRWA. UNRWA's past actions in the numerous areas other than Gaza where it works with Palestinian populations, such as the West Bank, Jordan, Lebanon, and Syria, are likewise not at issue. Plaintiffs' claims are limited to the Defendants' New-York-centered actions in obtaining funding and approval for providing material support for Hamas in Gaza, and the related provision of that material support, both of which were carried out in a fashion that gives rise to aiding-and-abetting liability for the October 7 Attack under traditional tort principles.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1350 (the "ATS") without regard to the citizenship of the parties, because Plaintiffs are aliens seeking relief for torts committed in violation of the law of nations and treaties of the United States, and also in part under 28 U.S.C. § 1331 as certain Plaintiffs seek relief against certain Defendants under a federal statute, namely the TVPA.

11.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1367(a) because all of Plaintiffs' claims that may not arise under the law of nations or the TVPA arise from the same nucleus of operative facts as the ATS and/or TVPA claims and form part of the same Article III case or controversy.

12.     This Court has personal jurisdiction over all Defendants under, among other things, CPLR 302.

13.     Venue is proper in this Court under 28 U.S.C. § 1391 because, among other things, a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

14.     To the extent that relevant events or omissions giving rise to the claims occurred in buildings or other locations in this judicial district owned or controlled by the United Nations as part of its so-called "Headquarters District" in Manhattan, that does not limit or affect jurisdiction, venue, or choice of law, because, among other things, the UN's treaty with the United States regarding control over the Headquarters District provides that "except as otherwise provided … the federal, state and local law of the United States shall apply within the headquarters district."

## THE PLAINTIFFS AND THEIR INJURIES FROM THE OCTOBER 7 ATTACK

### Siman Tov-Kedem Families

15.     Plaintiff Estate of Tamar Kedem Siman Tov[1] was a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

16.     Plaintiff Estate of O.S.T., minor child, is the child of Plaintiff Estate of Tamar Kedem Siman Tov. Plaintiff Estate of O.S.T., minor child, was a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

17.     Plaintiff Gad Kedem is the parent of Plaintiff Estate of Tamar Kedem Siman Tov. Plaintiff Gad Kedem is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel. Plaintiff Gad Kedem brings this action individually and as heir-at-law, on behalf of Plaintiff Estate of Tamar Kedem Siman Tov, and on behalf of Plaintiff Estate of O.S.T., minor child.

18.     Plaintiff Reuma Kedem is the parent of Plaintiff Estate of Tamar Kedem Siman Tov. Plaintiff Reuma Kedem is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

---

[1] For consistency, all deceased Plaintiffs are formally referred to herein as "Plaintiff Estate of _____."

19.    Plaintiffs Estate of Tamar Kedem Siman Tov, Estate of O.S.T., minor child, Gad Kedem, and Reuma Kedem are hereinafter collectively referred to as "The Siman Tov-Kedem Family."

20.    On October 7, 2023, Yahonatan Siman Tov, spouse of Plaintiff Estate of Tamar Kedem Siman Tov, and parent of Plaintiff Estate of O.S.T., minor child, and twin children, Estate of A.S.T., minor child, and Estate of S.S.T., minor child, were all at home together in Kibbutz Nir Oz, Israel, when they were ruthlessly attacked and killed by Hamas.  The parents were first shot to death, and then the terrorists lit the home on fire, causing the death of the children from smoke inhalation in the arms of their mother.

21.    On October 7, 2023, Plaintiffs Gad Kedem and Reuma Kedem were at home together in Kibbutz Ein Hashlosha, Israel when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

22.    Around 6:30 a.m. that morning, Plaintiffs Gad Kedem and Reuma Kedem were awakened by the harrowing sounds of rockets and gunfire. Plaintiff Reuma Kedem immediately called her children, Plaintiff Estate of Tamar Kedem Siman Tov, Noa, and Maya, who lived nearby, to make sure everyone was safe and had gone to hide in their saferooms. Suddenly, Plaintiffs Gad Kedem and Reuma Kedem heard gunshots and voices shouting in Arabic close by. They looked outside and saw people running, in disbelief and horror.

23.    Plaintiff Reuma Kedem received a call from a panicked and hysterical neighbor, pleading for help. After waiting for a lull in the sounds coming from outside, Plaintiff Gad Kedem ran to get the neighbor and he brought her back to their house to all be together.

24.    They were all communicating with other people from their kibbutz to share information about what was happening. Plaintiffs Gad Kedem and Reuma Kedem, and their

neighbor, learned that terrorists were near their house, so they armed themselves with knives and hammers and watched from their closed pergola, which was out of sight. They turned chairs upside down to act as obstacles at their entrance so that if the terrorists tried to come in, they had time to run to the saferoom and they keenly remained vigilant.

25.     At one point, a terrorist approached the pergola, peeked inside, looked at their Sukkah with a photo of Plaintiff Estate of Tamar Kedem Siman Tov, and then thankfully continued on his way. Almost every home in Plaintiff Gad Kedem and Reuma Kedem's row of houses had been ravaged, but not theirs. One nearby neighbor had been murdered and her home burned down. Plaintiffs Gad Kedem and Reuma Kedem thought that maybe the obstacle of chairs they created made it look like other terrorists had already been there and that saved them.

26.     Plaintiff Reuma Kedem tried to contact the Community Security Coordinator, but he did not answer his phone. They later learned that he had been the first one killed and that the terrorists had planned the attack in great detail, strategically ambushing the security coordinators right away.

27.     Around 9:00 a.m., Plaintiff Estate of Tamar Kedem Siman Tov texted Plaintiff Reuma Kedem that she and her family were gathered together in silence in their saferoom, but that the terrorists were at their door. Then Plaintiff Reuma Kedem lost contact with Plaintiff Estate of Tamar Kedem Siman Tov. She tried desperately to reach Plaintiff Estate of Tamar Kedem Siman Tov through Yahonatan Siman Tov's phone, but he also did not answer. Plaintiff Reuma Kedem was overwrought with worry for the safety of her child and family.

28.     When Plaintiff Reuma Kedem's other child, Noa, finally texted her she was horrorstruck to learn that a terrorist tried to break down the door to Noa's saferoom and that Noa's spouse was shot trying to fend him off. Noa bravely used her skills as a veterinarian to stabilize

9

her spouse's wounds and save his life. Plaintiff Reuma Kedem desperately wanted to go to Kibbutz Nir Oz to save her children. She was willing to risk her life for those of her children and rummaged around for anything she could use as body armor, which included baking trays from the oven taped around her body, and a cooking pot on her head as a helmet. However, Plaintiff Gad Kedem would not let her go because it was too dangerous. Plaintiff Reuma Kedem then called one of her child's mothers-in-law at Kibbutz Nir Oz, Carol, to ask her to check on her children, but was met with an angry and hostile man's voice instead speaking in Arabic. It was a terrorist. In the little Arabic she knew, Plaintiff Reuma Kedem begged and pleaded with him for mercy, but the terrorist coldly stated that there was no one to talk to, no Carol, and no more Israel. That they eliminated them. Distraught and devastated, Plaintiff Reuma Kedem feared that worst, which was later confirmed, that Carol had been shot and killed by the terrorists.

29.    Later that evening, when it was safe to move, the families gathered at a sheltered children's house on Kibbutz Nir Oz. While searching for her family members, she received the devastating news that her sibling, Plaintiff Estate of Tamar Kedem Siman Tov, had been shot and killed by the merciless terrorists, and that Plaintiff Estate of Tamar Kedem Siman Tov's husband, Yahonatan, her 5-year-old twin daughters, and 2-year-old son had also been murdered. Noa then had to share this shattering information with her parent, Plaintiff Reuma Kedem. Plaintiff Reuma Kedem refused to believe that her innocent child and family members were dead at the hands of evil. She could not fathom that this beautiful couple and their pure children would cease to exist.

30.    When Plaintiff Reuma Kedem was eventually able to view the remains of Plaintiff Estate of Tamar Kedem Siman Tov's house, she was further shattered and traumatized when she saw bullets leading all the way into the saferoom, which was also the children's bedroom. Plaintiff Estate of Tamar Kedem Siman Tov's body was found lying in between her children's beds, and

the carpet there was saturated in blood. Plaintiff Reuma Kedem believes that Plaintiff Estate of Tamar Kedem Siman Tov was shot and then laid down in between her children's beds, keeping a hand on them to calm them while they were under their covers as she passed. The terrorists then set the home on fire, and the three beautiful children were in the inferno next to the bodies of their murdered parents, until they themselves died of suffocation from the smoke of their own home. They lived and died as a family.

31.     Everyone loved Plaintiff Estate of Tamar Kedem Siman Tov and her spouse. The two shared a great love with perfect synergy. They adored their children and were a very loving family.

32.     In Noa's house, Plaintiffs Gad Kedem and Reuma Kedem found a plastic bag with dates and biscuits, and a receipt from Gaza dated October 4. They were horrified at the thought that the terrorists indifferently sat down and ate, after committing the Attack on the kibbutz.

33.     The Siman Tov-Kedem Family suffered immense injuries that are ongoing and permanent.

34.     As a result of the October 7 Attack, Plaintiff Estate of Tamar Kedem Siman Tov and Plaintiff Estate of O.S.T., minor child, suffered wrongful death.

35     As a result of the October 7 Attack, and the injuries suffered, Plaintiff Estate of Tamar Kedem Siman Tov and Plaintiff Estate of O.S.T., have past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estates bring claims for wrongful death on behalf of Tamar Kedem Siman Tov and O.S.T.'s beneficiaries.

36.     As a result of the October 7 Attack, and Plaintiff Estate of Tamar Kedem Siman Tov's wrongful death, Plaintiff Gad Kedem and Plaintiff Reuma Kedem suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Estate of Tamar Kedem Siman Tov, and the subsequent loss of her life, continue to have a lasting effect on her family members.

37.     As a result of the October 7 Attack and the injuries they suffered, Plaintiffs Gad Kedem and Reuma Kedem have past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, loss of earning capacity.

38.     As a result of the October 7 Attack, Plaintiff Gad Kedem and Plaintiff Reuma Kedem suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked.

**Biner Family**

39.     Plaintiff Talia Biner is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

40.     Plaintiff Esther Biner is the mother of Talia Biner, is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

41.     On October 7, 2023, Plaintiff Esther Biner was at her home in Holon, Israel.

42.     On October 7, 2023, Plaintiff Talia Biner was at the NOVA Music Festival in Re'im, Negev, Israel when she was ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

43.     Plaintiff Talia Biner was so excited to attend the NOVA Music Festival to celebrate her 28th birthday, which was upcoming on Monday, October 8, 2023, with friends. They took the camping trailer to the festival grounds on the evening of October 5, 2023. They spent Friday,

12

October 6, 2023, with all the happy Festival attendees enjoying the day. Around 10:00 p.m., Plaintiff Talia Biner went to rest in the trailer before the festival began again. Around 2:00 a.m., Plaintiff Talia Biner and her friends awoke reenergized and ready to continue their carefree celebration. Everyone was relaxed and enjoying the sunrise.

44.    The peace of the early morning abruptly came to a halt when, around 6:30 am, the sounds of piercing sirens overtook the music and explosive rockets shot through the sky. Confusion quickly set in for the festival attendees. Plaintiff Talia Biner, completely unaware of the scale of the attack unfolding all around her, remained near the trailer in a parking lot and waited for the all-clear announcement that never came. Instead, the police appeared and urged everyone to evacuate. Plaintiff Talia Biner and her friends quickly ran from the open parking lot to a nearby tree, which, she thought, would serve as an acceptable shelter from the overhead dangers. She did not realize that additional dangers were approaching on the ground level as well.

45.    Plaintiff Talia Biner promptly got a text from her mother, Plaintiff Esther Biner, asking if she was safe from the overhead rockets. Since she did not want her mother to worry about her, she lied and told her that she was safe and in a bomb shelter. Plaintiff Talia Biner, however, grew increasingly worried about her family since the rockets were traveling in the direction of where they lived.

46.    Suddenly, the sound of gunfire began, and quickly got louder and closer to her. Plaintiff Talia Biner and her friends decided to rush back to their trailer to get out of the area. They swiftly reattached the trailer to their car, packed their belongings, and sped off towards the festival headquarters approximately one kilometer away to try to get additional information about what was happening.

13

47.    When Plaintiff Talia Biner and her friends arrived at the festival headquarters, they learned that terrorists had infiltrated Israel and many people had been shot and killed. Plaintiff Talia Biner was in disbelief. At that moment, she got a frantic message from her brother that 50 terrorists had infiltrated Sderot, and that she should escape immediately. With the sound of gunshots growing louder and coming from every direction, Plaintiff Talia Biner knew that they needed to get to safety, but since they were in an open field, their options were scarce. They had nowhere to run, so the seven of them squished into their trailer designed for four. Despite the tight confinement, they huddled together in silence, hoping and praying that they were safe. Since no one spoke a word, all they could hear was the never-ending barrage of explosions, screams for help, and chaos outside of their shelter. The ground under them was shaking from the constant pounding blasts. Plaintiff Talia Biner received a message in her reserves group chat requesting that everyone come to the base. She then knew that something immense was happening.

48.    Around approximately 9:00 am, Plaintiff Talia Biner heard voices yelling in Arabic just outside of the trailer. The terrorists were calling each other's names while indiscriminately and mercilessly executing hundreds of people with their guns. They were so close that she could hear the bullets whizzing past the trailer. She closed her eyes to try to shut it all out. She thought she was going to die.

49.    Her fears magnified in intensity when the terrorists tried to force their way into the trailer. Plaintiff Talia Biner was beside herself. The terrorists kept pulling at the door, but Plaintiff Talia Biner gathered herself and grasped the handle on the door of the trailer and, with the assistance of one of her friends, held it closed with all their strength. The terrorists thankfully gave up and left, probably thinking that the trailer had been abandoned, or that they had enough targets

with all the people running around on the festival grounds. Either way, Plaintiff Talia Biner could feel a brief wave of relief rush over her.

50.     That relief was short-lived when around 9:30 a.m., Plaintiff Talia Biner heard her friend, Dor's voice outside. The terrorists had shot him, and he was begging them to leave him alone. She listened as Dor's cries faded away. She assumed that he had been taken somewhere by the terrorists and she then started to think that she, too, would be kidnapped. She wished herself dead instead of that.

51.     Plaintiff Talia Biner continued to listen to the excruciating screams of victims outside her trailer. She was tormented by the fact that she could not do anything to help, which was against her nature and training as a nurse. At one point, she heard a young female voice pleading with the terrorists to stop and leave her alone. Her ear-piercing screams lasted about 15 minutes and were full of pain and suffering. The screams seemed to be directed at more than one person. Plaintiff Talia Biner agonized over the thought of what could be happening to this poor girl. Then she heard gunshots and the girl's voice stopped  All she could hear then was deafening silence.

52.     Then Plaintiff Talia Biner heard more bloodcurdling screams coming from a female a little farther away. She also heard a male voice futilely begging the terrorists to leave her alone. The female's screams were muffled, as if something was covering her mouth, but the screaming did not stop. Shrieks of agony came from all directions throughout the day. At least five different women were crying for help, pleas that continue to haunt Plaintiff Talia Biner today. The terrorists responded to the screams of the women by calling them horrific names and insults, then laughing at them. Then silence engulfed the area and the gunshots subsided.

53.     Plaintiff Talia Biner's momentary hope that the terrorists had left the area was shattered when the terrorists began their second attempt at breaking into the trailer. When they could not gain access to the inside, they then tried to hijack the entire trailer. They shattered the windows of the car to which the trailer was connected, but unsuccessfully tried to start the car. Plaintiff Talia Biner considered whether this time was an opportunity to jump out and escape, but then the terrorists tried to separate the car from the trailer and were, once again, unsuccessful. Determined to wreak havoc and pain on the innocent Festival attendees, the terrorists then lit the trailer on fire. The temperature in the trailer, already hot from the tight space and the large number of people inside, instantly intensified.

54.     Miraculously, the rescue forces started to arrive at that moment, and after some gunfire and battle noises, silence set in once again. Plaintiff Talia Biner and her friends, after six long and grueling hours wedged in the trailer, slowly and cautiously began to exit, but the door would not open. It was blocked by something. The terrorists had wedged the door of another car to block the trailer door to prevent them from escaping the inferno. When they squeezed their bodies through the small passageway they managed to force, Plaintiff Talia Biner devastatingly saw her friend, Dor's body immediately. He had been maliciously shot in the head. As she stepped out of the trailer, she tripped over a decapitated head on the ground, sickening her.

55.     Courageously, and despite the traumas she endured herself, Plaintiff Talia Biner asked the soldiers who rescued her if she could help anyone as she was a surgery room nurse. They told her to find and treat anyone that she could. While bravely searching the war-stricken area for survivors of the Attack, she witnessed many horrifying images that will remain forever seared in her brain. She saw countless lifeless and bloodied bodies. She found a girl tied to a tree. She saw another girl with her legs spread, no underwear and her shirt shredded. She saw one of her friends

16

murdered with his eyes gouged out. She saw a man bleeding from his anus. She saw countless dead bodies under the stage of the festival. Her shoes were saturated with blood by the time she could not take the devastation any longer and ceased her valiant efforts.

56.     Plaintiff Esther Biner endured one of the most painful and difficult days of her life as she awaited word whether her daughter was alive or dead. As Plaintiff Esther Biner was inundated with horrific videos and images from social media, her fear and panic grew to an almost intolerable level until approximately 1:30 p.m. when she finally received word that, despite enduring unimaginably hellish harms, her daughter had survived.

57.     Plaintiff Talia Biner attended 25 funerals in one week after that fateful day. Her life completely changed. She engaged in psychological treatment but continues to suffer. She struggles to sleep and has nightmares when she does. She drives in the carpool lanes because she dreads getting stuck in traffic and feeling trapped. She fears her own shadow. Scarred by the images of the abused girls she witnessed, Plaintiff Talia Biner was unable to engage in any intimacy with her boyfriend, so she ended their relationship. She moved back into her parents' home. She only gets up and out of bed every day to honor her commitment to do anything for the hostages. She cannot start her own healing until those still suffering at the hands of the evil terrorists come home.

58.     Plaintiff Talia Biner once believed in the human spirit. As a nurse, she treated people from Gaza weekly. She knew her path in life and was paving the way. Now, she does not feel healthy enough to even take care of herself, let alone treat others. The gruesome sexual violence with which Plaintiff Talia Biner was threatened and witnessed has caused her extreme and lasting injury.

59.     Plaintiff Talia Biner suffered immense injuries that are ongoing and permanent.

Case 1:24-cv-04765   Document 1   Filed 06/24/24   Page 22 of 167

60.     As a result of the October 7 Attack and the injuries she suffered, Plaintiff Talia Biner has past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, and loss of earning capacity.

61.     As a result of the October 7 Attack, Plaintiff Esther Biner suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because of the ruthless attack on her daughter, Plaintiff Talia Biner.

### Heiman-Mina-Glatt-Gigi Families

62.     Plaintiff Ditza Heiman is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

63.     Plaintiff Neta Heiman Mina is the child of Plaintiff Ditza Heiman. Plaintiff Neta Heiman Mina is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

64.     Plaintiff Daphna Shay Heiman is the child of Plaintiff Ditza Heiman. Plaintiff Daphna Shay Heiman is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

65.     Plaintiff Gideon Heiman Glatt is the child of Plaintiff Ditza Heiman. Plaintiff Gideon Heiman Glatt is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

66.     Plaintiff Yasmin Ben Gigi is the child of Plaintiff Ditza Heiman. Plaintiff Yasmin Ben Gigi is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

67.     Plaintiffs Neta Heiman Mina, Daphna Shay Heiman, Gideon Heiman Glatt, and Yasmin Ben Gigi, are siblings.

68.     Plaintiffs Ditza Heiman, Neta Heiman Mina, Daphna Shay Heiman, Gideon Heiman Glatt, and Yasmin Ben Gigi are hereinafter collectively referred to as "The Heiman Family."

69.     On October 7, 2023, Plaintiff Ditza Heiman, age 84, was at home in Nir Oz, Israel, and present when she was ruthlessly attacked and kidnapped by Hamas with machine guns, grenades, and other weapons.

70.     At approximately 6:30 a.m., Plaintiff Ditza Heiman awoke to a frightful red alert alarm and hurried to her saferoom. She promptly called each of her children to make sure they knew what was happening and had gotten to safety. After ensuring that her children were safe, Plaintiff Ditza Heiman then started making calls to everyone in the neighborhood per protocol since she was the Civil Emergency Team's hub.

71.     Plaintiff Daphna Shay Heiman awoke around 6:30 a.m. to shrieking alarms in Rehovot, Israel. She hurried to her saferoom and anxiously started making calls to her family members to check on their status and safety. She engaged in regular check-in calls every thirty minutes. She was more scared and worried than ever before. This day seemed different.

72.     Plaintiff Yasmin Ben Gigi awoke to piercing sirens around 6:30 a.m. She lived seven kilometers away from Gaza in Moshav Zohar, Israel. As Yasmin did not have a state-provided saferoom, or one in her house, she quickly gathered her family members, and they hid in their bathroom. She did not feel safe there and was terrified. She spoke with Plaintiff Ditza Heiman and confirmed she was safe around 8:30 a.m.

73.     Plaintiff Neta Heiman Mina was at home in Haifa, Israel on October 7, 2023. When she awoke, she learned what was happening in Kibbutz Nir Oz and called Plaintiff Ditza Heiman right away, who, at that time, was safe.

Case 1:24-cv-04765   Document 1   Filed 06/24/24   Page 24 of 167

74.    Plaintiff Gideon Heiman Glatt was at home in Kfar Warburg, Israel when he was awakened by sirens around 6:30 a.m. He and his family hurried to their saferoom, and Plaintiff Gideon Heiman Glatt called Plaintiff Ditza Heiman to see if she was aware of what was happening and that she was safe. At the time, everyone was secure and in hiding.

75.    Mid-morning, around 9:45 a.m., Plaintiff Daphna Shay Heiman spoke with Plaintiff Ditza Heiman, again, and she was thankfully still fine at that time, but that was the last time Plaintiff Daphna Shay Heiman would talk to Plaintiff Ditza Heiman for fifty-three long, gut-wrenching days.

76.    When Plaintiff Ditza Heiman did not hear any noises, except for the red alert, she did not think anything was happening and exited her saferoom. She used the washroom, changed out of her pajamas, and put her glasses on, then she went back to the saferoom and continued making calls. She was on a call when a terrorist dressed in all black with an assault rifle burst into her saferoom, grabbed her by the arm, confiscated her phone, and dragged her with him. Plaintiff Ditza Heiman was guided towards her front door, with the terrorist walking behind her. Once at the door, she turned around and the terrorist was not there anymore, so she darted outside yelling for help. The street was eerily empty, so she ran to a neighbor's house, but no one answered, so she buried herself between some bushes.

77.    Plaintiff Ditza Heiman's hiding place was discovered a few minutes later when a terrorist found her, grabbed her hand, and dragged her to a vehicle down the street. His face was covered. He put a hat and a surgical mask on her, but she could still see. He demanded that she be quiet. More terrorists were already in the car, also dressed in all black and wearing masks. They rambled around, driving in circles on the kibbutz grounds for a few minutes, and then started

driving towards Gaza. Plaintiff Ditza Heiman could see other terrorists riding bikes all around them. It looked like a mob in every direction.

78.     Plaintiff Ditza Heiman had no concept of time or how long they drove around on bumpy dirt roads, and she had no idea where she was. The terrorists moved her to different vehicles multiple times and stopped at numerous locations. In some of the locations, people were cheering outside. At one point they stopped and made her change into a Jellabiya. Two of the terrorists eventually took her to a house. All the windows were closed, but there was some light coming through. They sat her down in the living room and then talked amongst themselves, with a third man who was unmasked and appeared to be the owner of the house. They also used a radio device to communicate with others. Hamas marching music was playing, which haunts her to this day.

79.     By noon, Plaintiff Daphna Shay Heiman had learned about the massive terrorist attack on Kibbutz Nir Oz and in the moshavim near her moshav, where her child was home alone with the family dog, locked in their saferoom.

80.     Plaintiff Daphna Shay Heiman kept calling Plaintiff Ditza Heiman throughout the day, but there was no answer. At one point in the afternoon, Plaintiff Daphna Shay Heiman called Plaintiff Ditza Heiman again, but this time, a terrorist answered her phone. He told her he was Hamas. Plaintiff Daphna Shay Heiman started having trouble breathing and panicked. She called her siblings to tell them what she heard on the other end of the phone. Plaintiff Yasmin Ben Gigi's son, Saar, then called Plaintiff Ditza Heiman and a terrorist answered again, saying that there was, "No more grandma." Saar then called the army and asked them to go check on Plaintiff Ditza Heiman. When the army finally called back, they told Saar that no one was at Plaintiff Ditza Heiman's home. Plaintiff Ditza Heiman's family members were overwrought with concern, worry, and fear that something awful happened to her.

81.    Plaintiff Ditza Heiman remained at this house for about 24 hours. At one point, Plaintiff Ditza Heiman asked the homeowner if he spoke English. He knew a few words in English and then he showed Plaintiff Ditza Heiman his daughter's English workbook to show her that his children were learning English.

82.    The next day, the two masked terrorists took Plaintiff Ditza Heiman and left the house. She was again forced to dress in a Jellabiya. As they neared their destination, Plaintiff Ditza Heiman saw many cement buildings with the UNRWA logo.

83.    Plaintiff Ditza Heiman was then taken to an apartment in a building with many stairs. The owner of this apartment did not wear a mask. Plaintiff Ditza Heiman spent the next seven weeks in this apartment.

84.    While there, she noticed some notebooks on top of the refrigerator, so she asked for some paper. Plaintiff Ditza Heiman then made a calendar for three months ahead and marked family birthdays in Gematria to disguise her words. She noticed that the notebooks had the symbol of UNRWA on the cover.

85.    During her captivity there, Plaintiff Ditza Heiman communicated with the homeowner on a few occasions in Arabic, of which she had some knowledge, and using universal hand gestures that they both understood. One day, Plaintiff Ditza Heiman asked the homeowner if he was a teacher, to which he replied yes. She then asked him if he was a teacher for UNRWA given the notebooks she saw, and again, he replied yes. She asked him if he taught at the boys' school or the girls' school, and he replied that he taught boys. He was an UNRWA teacher.

86.    Plaintiff Ditza Heiman did not see the sun or moon during this time. She was only able to discern the hours of the day from the sounds of the Muezzin and roosters and the small amount of light that shone through the window blinds that were slightly open.

22

87.     Initially, Plaintiff Ditza Heiman was given food three times a day, but that was torturously reduced to two times a day, and eventually to once a day around 4:00 p.m. When she was not provided enough sustenance, she communicated with the homeowner to let him know that she was not a dog who only eats once a day, and that she needed food twice a day. He understood her and responded by providing her with something to eat twice a day. For food, Plaintiff Ditza Heiman was often given snacks that had the UNRWA label on the package. The packaging also said that the item was not for sale, and only for the consumption of the children of the UNRWA school.

88.     During these 53 days of captivity, Plaintiff Ditza Heiman only bathed three times in the form of a bucket of lukewarm water. In the first bathing, which was two and a half weeks into her abduction, she tried to wash her hair but did not have enough water, so the shampoo stayed in her hair until she was released as she never had enough time to wash herself completely.

89.     People were constantly peeking in at her through the door gap. Food was scarce. She was always being guarded by someone.

90.     One day, one of the daughters of the homeowner brought Plaintiff Ditza Heiman some clothing and told her that she would be in Tel Aviv by 5:00 p.m. After she put on the dress and hijab given to her, the terrorists blindfolded her and forced her into the trunk of a Club Car. She was then driven to another location and ordered to transfer into a commercial van, where she encountered two other hostages. A camera crew accosted her and filmed her outside the van against her will.

91.     Finally, after this traumatic ordeal and 53 days in captivity, the Hamas terrorists surrendered her at a hospital. There, she started to learn about what had happened in Kibbutz Nir Oz on October 7, 2023, from other people who were also held in the hospital. She had not heard

anything during her captivity, so hearing about the atrocities and the people murdered all at once was awful and shocking. Plaintiff Ditza Heiman was in disbelief.

92.    Plaintiff Ditza Heiman did not receive her daily medications for her medical issues while in captivity, so she was very concerned about her health. She is diabetic, has thyroid issues, and suffers from venous inflammation. Plaintiff Ditza Heiman was hospitalized upon her release and is still not completely stabilized to this day.

93.    For 53 days, Plaintiffs Daphna Shay Heiman, Yasmin Ben Gigi, Neta Heiman Mina, and Gideon Heiman Glatt suffered, not knowing the status or whereabouts of Plaintiff Ditza Heiman. They struggled daily trying to get updates or any information on Plaintiff Ditza Heiman's status and condition, and they worked tirelessly for her release.

94.    Plaintiff Daphna Shay Heiman sees a clinical psychologist regularly now and takes blood pressure medication that she did not need before the Attack. She cannot be in crowded places and feels detached and lonely.

95.    Plaintiff Yasmin Ben Gigi now suffers from post-traumatic stress disorder and sees a psychologist. She is anxious and noises frighten her. She struggles with sleep issues.

96.    Plaintiff Neta Heiman Mina felt terribly helpless. At one point early after her parent was taken, she saw a video posted by Hamas of Plaintiff Ditza Heiman's abduction. Plaintiff Neta Heiman Mina now receives regular treatment by a psychologist. She has difficulty sleeping, suffers frequent bouts of crying, anger, and sadness, and cannot be in crowded spaces.

97.    Plaintiff Gideon Heiman Glatt spent the day of the Attack in his saferoom desperately trying to get any information he could on his parent. He was overwrought with concern and panic. Plaintiff Gideon Heiman Glatt began receiving therapy right after his parent's abduction and continued to do so throughout her time in captivity.

98.    The Heiman Family suffered immense injuries that are ongoing and permanent.

99.    As a result of the October 7 Attack and the injuries they suffered, Plaintiff Ditza Heiman has past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, loss of earning capacity.

100.    As a result of the October 7 Attack, Plaintiffs Daphna Shay Heiman, Yasmin Ben Gigi, Neta Heiman Mina, and Gideon Heiman Glatt, each suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family member was attacked.

### Eliaz-Zin-Elyakim-Arava-Tanami-Koperstein-Avni-Ben David Families

101.    Plaintiff Maayan Eliaz is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

102.    Plaintiff Estate of Dikla Arava Eliaz was the former spouse of Plaintiff Maayan Eliaz. Plaintiff Estate of Dikla Arava Eliaz was a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

103.    Plaintiff Estate of T.E., minor child, is the child of Plaintiffs Maayan Eliaz and Estate of Dikla Arava. Plaintiff Estate of T.E., minor child, was a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

104.    Plaintiff Maayan Eliaz brings this action individually and as heir-at-law on behalf of the Estate of T.E., minor child.

105.    Plaintiff Odin Eliaz is the child of Plaintiffs Maayan Eliaz and Estate of Dikla Arava. Plaintiff Odin Eliaz is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

25

106.   Plaintiff Stav Arava Eliaz is the child of Plaintiffs Maayan Eliaz and Estate of Dikla Arava. Plaintiff Stav Eliaz is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

107.   Plaintiffs Odin Eliaz and Stav Eliaz bring this action individually and as heirs-at-law on behalf of the Estate of Dikla Arava.

108.   Plaintiff Dov Eliaz is the parent of Plaintiff Maayan Eliaz. Plaintiff Dov Eliaz is a citizen of Israel and at the time of the acts alleged, and at all other times thereto, was domiciled in Israel.

109.   Plaintiff Yifat Tanami is the sibling of Plaintiff Estate of Dikla Arava Eliaz. Plaintiff Yifat Tanami is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

110.   Plaintiff Sagi Arava is the sibling of Plaintiff Estate of Dikla Arava Eliaz. Plaintiff Sagi Arava is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

111.   Plaintiff Alon Arava is the sibling of Plaintiff Estate of Dikla Arava Eliaz. Plaintiff Alon Arava is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

112.   Plaintiff Hadar Ben David is the sibling of Plaintiff Estate of Dikla Arava Eliaz. Plaintiff Hadar Ben David is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

113.   Plaintiff Liat Koperstein is the domestic partner of Plaintiff Maayan Eliaz. Plaintiff Liat Koperstein is a citizen of Israel and at the time of the acts, alleged, and at all other times relevant hereto, was domiciled in Israel.

114.   Plaintiff Yali Koperstein is the child of Plaintiff Liat Koperstein. Plaintiff Yali Koperstein is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

115.   Plaintiff Ziv Koperstein is the child of Plaintiff Liat Koperstein. Plaintiff Ziv Koperstein is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

116.   Plaintiff Naama Koperstein is the child of Plaintiff Liat Koperstein. Plaintiff Naama Koperstein is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

117.   Plaintiff Goni Koperstein Avni is the child of Plaintiff Liat Koperstein. Plaintiff Goni Koperstein Avni is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

118.   Plaintiff Ran Aharon Avni is the spouse of Plaintiff Goni Koperstein Avni. Plaintiff Ran Aharon Avni is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

119.   Plaintiff Maayan Zin is the former spouse of Noam Elyakim, and the parent of Plaintiffs D.E., minor child, and E.E., minor child. Plaintiff Maayan Zin is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

120.   Plaintiff D.E., minor child, is the child of Plaintiff Maayan Zin and Noam Elyakim. Plaintiff D.E., minor child, is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

Case 1:24-cv-04765    Document 1    Filed 06/24/24    Page 32 of 167

121.    Plaintiff E.E., minor child, is the child of Plaintiff Maayan Zin and Noam Elyakim. Plaintiff E.E., minor child, is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

122.    Plaintiff Maayan Zin brings this action individually and as legal guardian of D.E., minor child, and E.E., minor child.

123.    On October 7, 2023, Plaintiffs Maayan Eliaz and Liat Koperstein were in a temporary home located at Kibbutz Mefalsim, Israel, and present when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

124.    On October 7, 2023, Plaintiff Estate of T.E., minor child, was at home with his mother, Plaintiff Estate of Dikla Arava Eliaz, her domestic partner, Noam Elyakim, and Plaintiffs D.E., minor child, and E.E., minor child, in Kibbutz Nahal Oz, Israel, and present when he was ruthlessly attacked and killed by Hamas with machine guns, grenades, and other weapons.

125.    On October 7, 2023, Plaintiff Odin Eliaz was at home in her apartment in Kibbutz Nahal Oz, Israel, and present when she was ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

126.    On October 7, 2023, Plaintiff Dov Eliaz, age 83, was at home in Kibbutz Nahal Oz, Israel, and present when he was ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

127.    On October 7, 2023, Plaintiffs D.E., minor child, and E.E., minor child, were at home with their father, Noam Elyakim, his domestic partner, Plaintiff Estate of Dikla Arava Eliaz, and Plaintiff Estate of T.E., minor child, in Kibbutz Nahal Oz, Israel, and present when they were ruthlessly attacked and abducted by Hamas with machine guns, grenades, and other weapons.

128.    On October 7, 2023, Plaintiffs Ran Aharon Avni and Goni Koperstein Avni were at the home located just behind Plaintiffs Maayan Eliaz and Liat Koperstein's temporary home, with Plaintiffs Ziv Koperstein and Naama Koperstein, in Kibbutz Mefalsim, Israel, and present when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

129.    On October 7, 2023, Plaintiff Hadar Ben David was at home in Kibbutz Nahal Oz, Israel, with her spouse and children, and present when she was ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

130.    Plaintiff Maayan Eliaz and Plaintiff Liat Koperstein left their home in Kibbutz Nahal Oz earlier that week and were preparing to relocate to the United States on October 11, 2023. They had packed all their belongings and were staying in temporary housing on Kibbutz Mefalsim, Israel.

131.    Plaintiffs Maayan Eliaz and Liat Koperstein's life plans were decimated at sunrise when, early in the morning of October 7, 2023, they were awoken by the piercing sound of gunfire and threats screamed by Hamas terrorists as they invaded the sanctity of Kibbutz Mefalsim. Terrified and alone in an unfamiliar home, they struggled to determine the proper emergency measures for this kibbutz. Out their window, they could see the alarming, spine-chilling scene of Hamas terrorists driving around indiscriminately shooting assault rifles at the NPVA Music Festival attendees, many of whom were frantically running barefoot trying to escape.

132.    As the Attack progressed around them, helpless and without a weapon, Plaintiff Maayan Eliaz tore apart closets in the house in an attempt to create a hiding place for Liat. Plaintiffs Maayan Eliaz and Liat Koperstein also frantically tried to contact each of their family members

133.    Through social media, Plaintiff Maayan Eliaz was devastated to learn that Hamas terrorists had broken into the home of Plaintiff Estate of Dikla Arava Eliaz and Noam Elyakim,

brutally assaulted and gravely wounded them. Plaintiff Maayan Eliaz watched a horrifying livestream video of the Hamas terrorists viciously demand that his youngest son, Plaintiff Estate of T.E., minor child, abandon the family and exit the saferoom. The video then showed the heartbreaking and futile pleas of Noam Elyakim begging the terrorists to take him instead. En route to their truck, the Hamas terrorists cruelly forced Plaintiff Estate of T.E., minor child, by gunpoint, to coerce his dear friends and neighbors to come out of their saferooms.

134.   The video then showed Hamas terrorists horrifyingly tear Plaintiffs D.E., minor child, and E.E., minor child, from weak and battered Plaintiff Estate of Dikla Arava Eliaz's grasp.

135.   After viewing this agonizing and life-shattering video, Plaintiff Maayan Eliaz frantically tried, but could not reach, his eldest child, Plaintiff Odin Eliaz, leaving him painfully unaware of her safety.

136.   Plaintiff Odin Eliaz had fallen asleep on her couch in the living room the night before, leaving her window open and the door unlocked, which was unusual for her. She awoke to the sounds of blaring sirens and explosive gunshots. She immediately called her mother, Plaintiff Estate of Dikla Arava Eliaz, to check on her. Plaintiff Estate of Dikla Arava Eliaz was okay at that time, and Plaintiff Odin Eliaz went to her saferoom. The window in her saferoom did not close all the way and the door did not close at all, so she was very nervous. She started receiving messages from friends, neighbors, and colleagues on the kibbutz group chats that terrorists were violently invading the area. When Plaintiff Odin Eliaz started to hear the terrorists getting closer to her, she knew that she needed to quickly hide, so she squished herself into a crack between the wall and her bed, crouched down to the floor, put a blanket over her, and prayed. The sounds were so close that she thought they were in the neighboring apartment.

137. Because she had fallen asleep in the living room, Plaintiff Odin Eliaz had not plugged her phone in to charge, so it only had a 10% battery life. There was a power outage, so she had no ability to charge her phone. The last message she saw before her phone died was someone asking what happened to the Arava-Elyakim family. That was her family, and it was clear to her that something had happened to them. She was completely cut off and did not have contact with anyone for many hours. She was beside herself with worry and distress.

138. Plaintiff Dov Eliaz awoke that morning to the sounds of bomb alarms and gunfire. He was in his saferoom, so he closed the door and the shutters, and went back to bed, assuming that it would be over soon. However, messages started coming in that the kibbutz was being attacked and he was told to stay in his saferoom. When his area seemed to quiet down, he left the saferoom to go to the bathroom, take his medicine, and get his phone. He also grabbed a bottle of water and a pack of waffles and then went back to the saferoom and locked the door, however the shutters would not close all the way. He began reading messages from others begging and pleading for help. Plaintiff Dov Eliaz could hear people screaming, shouting, and crying. He felt so scared and helpless.

139. Plaintiff Dov Eliaz called each of his family members to make sure everyone was safe. At the beginning, he connected with everyone, but later, he could not reach two of his family members, Plaintiff Odin Eliaz and Plaintiff Estate of Dikla Arava Eliaz, with whom he maintained a good relationship despite the demise of her relationship with his son.

140. Plaintiff Hadar Ben David awoke to the alarms and rushed with her family to their saferoom. She was the culture manager for the kibbutz and was planning for a holiday celebration that evening. Initially, she thought that it was a shame that the event was ruined. She realized the severity of the situation when gunfire erupted, and she started receiving messages in the kibbutz

Case 1:24-cv-04765   Document 1   Filed 06/24/24   Page 36 of 167

group chat that terrorists were crashing into homes and breaking through windows in a nearby neighborhood. She tried to contact the head of security of Nahal Oz, but he did not answer. The standby civil squad did not appear to be activated. Israeli Defense Forces soldiers were not arriving as they typically did in these situations. Suddenly, chaos was overtaking the kibbutz. Plaintiff Hadar Ben David's son called the police, but they were frenzied with the massive attack.

141.    Plaintiff Hadar Ben David could hear battle sounds outside her home, along with shouting in Arabic. Suddenly, her back door was blown up, sending glass shards everywhere. Terrorists poured into her home, but Plaintiff Hadar Ben David and her family remained silent and hidden in their saferoom. They were terrified as their saferoom door did not lock or even close all the way. When the terrorists tried to open the door, her spouse and sons held the door closed, with knives in their other hands for defense. The terrorists kept trying to force their way into the saferoom, but they were pushing the door the wrong way and fortunately would not open. After a few minutes, she could hear them walking around the house opening doors, and then they just left.

142.    Plaintiff Hadar Ben David continued contacting family members to ensure they were safe, but Plaintiff Estate of Dikla Arava Eliaz stopped answering her phone. Plaintiff Hadar Ben David promptly went to social media when she learned videos were being posted to try to learn anything about her family members, but it was so chaotic and unclear what was happening in the videos. Nonetheless, the gravity of the situation was growing, and she realized that no one was going to be able to come to help them. They were all alone. She felt broken and collapsed.

143.    The cellular telephone network crashed, and Plaintiff Hadar Ben David then lost power and did not have contact with anyone for several hours. When the network was restored, she promptly received a photo from Plaintiff Stav Arava Eliaz of Plaintiffs D.E., minor child, and E.E., minor child, abducted to Gaza. She was confused about what she was seeing. Everything was

happening so fast. She remained in contact with her family members for the remainder of the day, trying to piece together any information, while also fighting her own fear and trying to be strong for her family and keep her special needs child at ease. They did not exit the saferoom until 5:30 p.m.

144.    Plaintiff Hadar Ben David was the last one to exit the saferoom. She took a moment for herself, then came out to 30 soldiers with their guns drawn in her once peaceful, loving home. She was given two minutes to gather some belongings and leave.

145.    They gathered at a neighbor's house, and it was chaotic there, too. Many were in denial of what was happening and planned to return to their own homes to sleep that night. Plaintiff Hadar Ben David came to the reality that the day was worse than anything she imagined. Plaintiff Hadar Ben David had no choice but to hurry to the bus to evacuate her family to safety. On the bus, she saw her niece, Plaintiff Odin Eliaz crying hysterically. She had just been told about the attack at her mother's home by someone on the bus. Plaintiff Hadar Ben David did her best to console Plaintiff Odin Eliaz.

146.    When Plaintiff Hadar Ben David realized that the bus was going to Mishmar HaEmek, she called her sister, Plaintiff Yitat Tanami, in Be'er Ganim, to send someone to come get her at the bus stop in Mishmar Hanegev. Plaintiff Odin Eliaz joined her

147.    Plaintiff Stav Arava Eliaz, who was at his girlfriend's house in Haifa, Israel, awoke that morning around 8:00 a.m. to a phone call from a friend informing him what was happening. He immediately called and spoke with his mother, Plaintiff Estate of Dikla Arava Eliaz. Plaintiff Stav Arava Eliaz communicated with her until about 10:38 a.m., and then never spoke with her again. He did not know that would be the last time he heard her voice. He later saw a livestream video of his family being terrorized in their home. He fell, frozen and paralyzed in disbelief.

Plaintiff Stav Arava Eliaz still cannot get those images out of his head. He kept making calls to his family members and no one answered. He thought he was the only one left alive.

148.    Plaintiff Stav Arava Eliaz eventually connected with Plaintiffs Maayan Eliaz and Liat Koperstein. He shared the videos of terrorists in the home of Plaintiff Estate of Dikla Arava Eliaz and Noam Elyakim and the frightened children there, then Plaintiffs E.E., minor child, and D.E., minor child, in Gaza, and one of his siblings, Plaintiff Estate of T.E., minor child, taken by terrorists at gunpoint, being forced to go house to house to coerce the residents to come out of their saferooms. It was excruciating to see the wicked attack on their family.

149.    Throughout the day, the Community Security Coordinator and Israeli Defense Forces soldiers came to Plaintiff Odin Eliaz's house. She hysterically begged them each time to take her to Plaintiff Estate of Dikla Arava Eliaz's house, but they did not. She remained in her saferoom, terrified and alone, wedged in the crack between the wall and her bed, praying. At one point, when the terrorists came by her house and broke windows, the fear overtook her body, and she blacked out. While lying alone in her saferoom all day, Plaintiff Odin Eliaz thought she was going to die. Her life flashed before her eyes. She was completely disconnected, and so worried about her family.

150.    Around 8:00 p.m., her power came back on, and Plaintiff Odin Eliaz was able to turn on her phone. She froze while reading the barrage of messages coming through. Her cousin called at that time, and she sent her location. At 9:00 p.m. a crew of soldiers came to get her. As they headed out of the kibbutz, she could still hear gunfire erupting. First, she begged once again to go into her mother, Plaintiff Estate of Dikla Arava Eliaz's house, but upon stern refusal, she insisted there were others left behind, so they checked the homes of her friends and rescued about 40 more people.

151.    When they got to the gate of the kibbutz, without warning, someone showed Plaintiff Odin Eliaz the horrifying video from social media of her family members held at gunpoint at their home. Terror crashed over her like a tidal wave. In shock, she started to cry uncontrollably. The bus arrived and then she evacuated like a robot, in total disbelief that this massacre was destroying her family. Plaintiff Odin Eliaz's outcries grew more intense as she witnessed the dead bodies strewn everywhere and the destroyed homes of her friends and family. The horror continued as Plaintiff Odin Eliaz learned from social media, that her stepsisters, Plaintiffs E.E., minor child, and D.E., minor child, had been abducted and were forcibly kidnapped to Gaza.

152.    At 11:30 p.m. Plaintiff Dov Eliaz heard loud knocks on the door of the saferoom and a voice calling him by his nickname, "Dogel." The terrorists could not possibly know his nickname, so he opened the door and found the civil emergency squad and three armed soldiers there. They gave him ten minutes to gather a few things and evacuate the kibbutz. He organized a bag, closed all the windows, and went to his neighbor's house to help her get organized. Together, they left for the bus station.

153.    At the bus station, Plaintiff Dov Eliaz started asking if anyone had seen or heard from any of his family members. When he recognized one of Plaintiff Estate of Dikla Arava Eliaz's neighbors, he asked her about Plaintiff Estate of Dikla Arava Eliaz. The neighbor told him that she had heard gunshots and was very scared, so she went under the bed. Beyond that, she knew nothing.

154.    Someone else told Plaintiff Dov Eliaz that she saw Plaintiff Odin Eliaz with her aunt, Plaintiff Hadar Ben David, evacuating the area. When Plaintiff Dov Eliaz heard that, he knew that something had happened, otherwise she would not have gone there without the family.

35

155.    Shortly after his arrival at a military camp, Plaintiff Dov Eliaz received a call from his brother-in-law telling him that he would be coming to get him. When he arrived, he immediately told Plaintiff Dov Eliaz about that attack on Plaintiff Estate of Dikla Arava Eliaz, Noam Elyakim, and Plaintiff Estate of T.E., minor child, and that Plaintiffs D.E., minor child, and E.E., minor child, had been kidnapped. Two days later, Plaintiff Dov Eliaz learned about a video showing the kidnappings. He was shattered. He later learned that Plaintiff Estate of T.E., minor child, was a hero that day when he rescued a small child that had been left alone in a saferoom and returned that child to its parent.

156.    Plaintiff Maayan Zin, the former spouse of Noam Elyakim, and mother of Plaintiffs D.E., minor child, and E.E., minor child, was notified of the malevolent and wicked kidnapping of her young daughters, which pained her beyond consolation.

157.    Plaintiff Stav Arava Eliaz found his sister, Plaintiff Odin Eliaz the next day at a gathering of other extended family members in Be'er Ganim. He was so thankful to see her and know that she was alive.

158.    Plaintiffs Ran Aharon Avni, Goni Koperstein Avni, Naama Koperstein, and Ziv Koperstein, remained barricaded in their saferoom, huddled together and praying for their safety, in Mefalsim, Israel, while the tormenting sounds of the Attack persisted outside their home.

159.    Plaintiffs Sagi Arava and Alon Arava, on Kfar Maimon, and Plaintiff Yifat Tanami, at Be'er Ganim, spent the day desperately trying to get any information they could on their family members and feared for their safety. They found live-stream videos, posted by the terrorists holding their wounded and bleeding family members at gunpoint, which simultaneously devastated them and also gave them false hope their their beloveds were still alive and might survive. They worked relentlessly for a week, trying to piece together the information they

36

gathered, thinking their beloveds were abducted to Gaza, as they had viewed videos of the two girls in Gaza. They were distraught beyond consolation when they learned that Plaintiff Estate of Dikla Arava Eliaz, their dear sister, was brutally murdered along with her dedicated and loving partner, Noam Elyakim, and that their darling nephew, Plaintiff Estate of T.E., minor child, had been murdered. Upon hearing this news, their hearts were crushed as they were harboring hope that the terrorists would grow fond of the child, as everyone did, and would spare his life.

160.    Plaintiff Yali Koperstein was in her apartment in Herzliya, Israel, overcome with worry and concern for her mother, Plaintiff Liat Koperstein's safety, feverishly trying to stay in contact with her throughout the day, while viewing horrific videos, in real time, of the atrocities being committed by Hamas.

161.    Plaintiff Maayan Eliaz had no information regarding the whereabouts of Plaintiff Estate of Dikla Arava Eliaz and Noam Elyakim. Plaintiff Stav Arava Eliaz searched endlessly through social media outlets for any information he could find on them and about his brother, Plaintiff Estate of T.E., minor child. In the process, Plaintiff Stav Arava Eliaz reviewed countless graphic and shocking images and videos posted online.

162.    Approximately one week later, the family received the devastating news that Plaintiff Estate of Dilka Arava Eliaz had been murdered. Plaintiff Hadar Ben David had to provide DNA samples to confirm the identity of Plaintiff Estate of Dikla Arava Eliaz's body. The next day, they learned that Plaintiff Estate of T.E., had likewise been viciously murdered, shot three times in the back, destroying their hope that he had only been abducted. The videos of Plaintiff Estate of T.E., minor child, are the last haunting images his family has of him alive. Two days later, they received the news that Noam Elyakim had also been murdered.

163.    While sitting shiva, Plaintiff Hadar Ben David was diagnosed with breast cancer. Her entire family now lives in darkness and uncertainty.

164.    Plaintiffs D.E., minor child, and E.E., minor child, were held captive for 53 torturous days. On the first night of their captivity, Plaintiffs D.E., minor child, and E.E., minor child, were awoken and moved to another location because the Israeli Defense Forces had located them and the other hostages in the building. The Hamas terrorists forced them to put on hijabs for the transfer, and again, when they were transferred to a house in the daylight.

165.    During their imprisonment, they frighteningly heard bombs exploding all around them. The building in which they were being kept shook so vigorously that plaster fell from the ceiling.

166.    At one point, they were again forced to wear hijabs and move to another location that was a school purportedly controlled by UNRWA. There, Plaintiffs D.E., minor child, and E.E., minor child, slept on the cold, hard floor. They built a wall out of blankets to hide themselves from the civilians so they could remove the hijabs they were forced to wear to disguise themselves so they could breathe. They were not allowed to speak, or they would be killed. Hamas terrorists also forced them to make a propaganda video in which they begged for their lives and to be saved by whatever means necessary. The Hamas terrorists mercilessly tortured these young, harmless children.

167.    Plaintiff D.E., minor child, was afraid to sleep at night and dreaded what the next day would bring. She anticipated that the terrorists would kill her or her sibling overnight, or that the building would be bombed.

168.    Miraculously, after 53 days of captivity, Plaintiffs D.E., minor child, and E.E., minor child, were freed from Gaza. Upon returning from their harrowing nightmare, Plaintiffs

D.E., minor child, and E.E., minor child tragically learned the sickening news that their father, Noam Elyakim, and his domestic partner with whom they lived, Plaintiff Estate of Dikla Arava Eliaz, were gruesomely murdered.

169.   Plaintiff Maayan Eliaz, Plaintiff Odin Eliaz, Plaintiff Stav Arava Eliaz, and Plaintiff Liat Koperstein are each now being treated by psychologists and therapists. The entire Eliaz family is in therapy.

170.   Plaintiffs Maayan Eliaz and Liat Koperstein cancelled their plans to relocate to the United States so that they could remain present for their children and were both out of work. As a result of the Attack, they lost family and friends from Kibbutz Nahal Oz, and they have also lost their financial security. They now live in a house in Sde Warburg, with friends who are hosting them. They are unsure of what they will do next. Their suitcases are still packed and sitting in the house on Kibbutz Mefalsim as the Plaintiffs Maayan Eliaz and Liat Koperstein do not have the mental or emotional stamina to return to the house to retrieve them.

171.   Plaintiff Odin Eliaz struggles with not telling her mother that she loved her the last time they spoke. She cannot be alone and does not feel safe anywhere. She is restless and never feels at peace. She also struggles with sleep and cannot return to work.

172.   The Plaintiffs detailed herein each suffered immense injuries that are ongoing and permanent.

173.   As a result of the October 7 Attack, Plaintiff Estate of T.E., minor child, suffered wrongful death.

174.   As a result of the October 7 Attack, and the injuries T.E., minor child, suffered, Plaintiff Estate of T.E., minor child, has past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages,

including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of T.E., minor child's beneficiaries.

175.    As a result of the October 7 Attack, and Plaintiff Estate of T.E., minor child's wrongful death, Plaintiff Maayan Eliaz, Plaintiff Estate of Dikla Arava Eliaz, Plaintiff Odin Eliaz, and Plaintiff Stav Arava Eliaz suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Plaintiff Estate of T.E., minor child, and the subsequent loss of his life, continue to have a lasting effect on his family members.

176.    As a result of the October 7 Attack, Plaintiff Estate of Dikla Arava Eliaz suffered wrongful death.

177.    As a result of the October 7 Attack, and the injuries Dikla Arava suffered, Plaintiff Estate of Dikla Arava Eliaz has past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of Dikla Arava's beneficiaries.

178.    As a result of the October 7 Attack, and Plaintiff Estate of Dikla Arava Eliaz's wrongful death, Plaintiff Maayan Eliaz, Plaintiff Estate of T.E., Plaintiff Odin Eliaz, Plaintiff Stav Arava Eliaz, Plaintiff Yifat Tanami, Plaintiff Sagi Arava, Plaintiff Alon Arava, and Plaintiff Hadar Ben David, suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Plaintiff Estate of Dikla Arava Eliaz, and the subsequent loss of her life, continue to have a lasting effect on her family members.

40

179.    As a result of the October 7 Attack and the injuries they suffered, Plaintiffs Maayan Eliaz, Liat Koperstein, Odin Eliaz, Dov Eliaz, D.E., minor child, E.E., minor child, Ran Aharon Avni, Goni Koperstein Avni, Hadar Ben David, Naama Koperstein, and Ziv Koperstein, have past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, loss of earning capacity.

180.    As a result of the October 7 Attack, Plaintiffs Maayan Eliaz, Liat Koperstein, Odin Eliaz, Dov Eliaz, D.E., minor child, E.E., minor child, Ran Aharon Avni, Goni Koperstein Avni, Hadar Ben David, Naama Koperstein, Ziv Koperstein, Maayan Zin, Stav Arava Eliaz, Sagi Arava, Alon Arava, Yifat Tanami, and Yali Koperstein each suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked.

## Tal-Alfendri-Alfasi-Blank Sharabi Families

181.    Plaintiff Merav Tal (Tal Alfasi) is a citizen of Israel and at the times of the acts alleged and at all other times relevant hereto, was domiciled in the United States.

182.    Plaintiff Rachel Alfendri is the parent of Plaintiff Merav Tal (Tal Alfasi). Plaintiff Rachel Alfendri is a citizen of Israel and at the times of the acts alleged and at all other times relevant hereto, was domiciled in the United States.

183.    Plaintiff Tomer Tal Alfasi is the child of Plaintiff Merav Tal (Tal Alfasi). Plaintiff Tomer Tal Alfasi a citizen of Israel and at the times of the acts alleged and at all other times relevant hereto, was domiciled in the United States.

184.    Plaintiff Ori Tal Alfasi is the child of Plaintiff Merav Tal (Tal Alfasi). Plaintiff Ori Tal Alfasi a citizen of Israel and at the times of the acts alleged and at all other times relevant hereto, was domiciled in the United States.

185.    Plaintiff Keren Blank is the sibling of Plaintiff Merav Tal (Tal Alfasi). Plaintiff Keren Blank is a citizen of Israel and at the times of the acts alleged and at all other times relevant hereto, was domiciled in the United States.

186.    Plaintiff Sigalit Sharabi is the sibling of Plaintiff Merav Tal (Tal Alfasi). Plaintiff Sigalit Sharabi is a citizen of Israel and at the times of the acts alleged and at all other times relevant hereto, was domiciled in the United States.

187.    On October 7, 2023, Plaintiff Merav Tal (Tal Alfasi) was at home with her partner, Yair Yaakov, at Kibbutz Nir Oz, Israel, and present when she was ruthlessly attacked and abducted by Hamas with machine guns, grenades, and other weapons.

188.    Plaintiff Merav Tal (Tal Alfasi) and Yair were sleeping after celebrating Yair's birthday the night before with his children when, around 6:30 a.m., they were startled awake by ear-piercing sirens. They quickly ran to their saferoom. Since they were not in any group chats with their neighborhood, they had no communication or information about what was happening on the kibbutz.

189.    While hiding in their saferoom, Plaintiff Merav Tal (Tal Alfasi) and Yair saw on television that there was an invasion of terrorists attacking their kibbutz. Their family members were calling each other to make sure everyone was safe and in hiding. They were all terrified. Then they heard someone yelling for help outside, so Yair went to see if he could do anything. He rushed back into the house within seconds because the kibbutz was full of terrorists shooting and screaming indiscriminately. Yair instructed Plaintiff Merav Tal (Tal Alfasi) to quickly get dressed as she was still in her nightgown and secure herself in the saferoom. Plaintiff Merav Tal (Tal Alfasi) grabbed her overnight bag and a knife from the kitchen for protection. Yair was just starting

42

to put on his shoes when they heard Arabic voices inside their home. As soon as the terrorists found the saferoom, they started shooting.

190.    Yair pulled the door to the saferoom tightly closed, but the terrorists kept shooting. Yair suddenly yelled in agony when multiple bullets struck his body near his groin. He was bleeding profusely. Plaintiff Merav Tal (Tal Alfasi) tried to calm him by telling him not to worry, that they could take care of his injuries later, and that he would be okay.

191.    In the horror of the moment, Plaintiff Merav Tal (Tal Alfasi) frantically called her family and left a message telling them that Yair had been shot and was gravely injured, that they needed help, and to call the police quickly. Gunshots could be heard in the background.

192.    The terrorists in their home were yelling to others that they found hostages. Plaintiff Merav Tal (Tal Alfasi) went into shock. Yair, weakened by his injuries, could not hold the door any longer. Suddenly an explosion blasted them backwards and plunging them to the floor. Plaintiff Merav Tal (Tal Alfasi) was covered with shrapnel and bleeding wounds all over her legs. She felt like she was burning, but she did not move, hoping to appear dead and deter the terrorists from doing anything else to her. She whispered to Yair to do the same and added that she loved him very much.

193.    The terrorists burst into the saferoom, yelling at them in Arabic to get up or else they would shoot them. They dragged Yair out of the room. Plaintiff Merav Tal (Tal Alfasi) urged him not to fight them. Then the terrorists seized her. On their way out of their once beautiful, cherished home, they saw that the terrorists had destroyed it. The terrorists were videoing everything. Yair, while being carried out of the house by four terrorists, yelled to Plaintiff Merav Tal (Tal Alfasi) that he was going to die. Plaintiff Merav Tal (Tal Alfasi) pleaded and begged with

43

Case 1:24-cv-04765  Document 1  Filed 06/24/24  Page 48 of 167

all her might for them not to harm them. The terrorists shot Yair in the shoulder. She did not see Yair ever again.

194.    Plaintiff Merav Tal (Tal Alfasi) was thrown onto a moped with two terrorists holding her. The one in front of her had a weapon and one behind her held a knife at her throat. They rode all the way to Gaza like that. Once they got to Khan Yunis, a terrorist smacked her hard on the head as they moved her from the moped to a car and ripped off her jewelry, most of which was profoundly sentimental to her.

195.    As the car sped away, Plaintiff Merav Tal (Tal Alfasi) could see that they were being followed by a crowd of people cheering in excitement, celebrating, and shooting bullets into the air. Plaintiff Merav Tal (Tal Alfasi) signaled to bystanders to take pictures, even though the terrorists were commanding them not to take pictures. She hoped that the pictures would help in finding her.

196.    From there, she was moved to a different car, and then another, and eventually to a small open storage room. It seemed to be a little wooden greenhouse that was part of a house. She saw a friend, Oded Lipschitz, injured and lying on the floor and then dragged away. The terrorists told her that they treated Oded, but she never heard anything about him after that. While there, many terrorists, and even some women and children, came to look at her and the other hostages.

197.    Plaintiff Merav Tal (Tal Alfasi) was in that house for two and a half days. On her last day, she was taken to a "shower," which was a room with just a sink and walls. Plaintiff Merav Tal (Tal Alfasi) was told that she would need to be searched for electronic chips. A large male terrorist with a flashlight stood at the door to the shower. She quickly realized what was going to happen next, that he was going to search her naked body, and she ran out screaming, managing to squeeze herself under his arm.

198.    Plaintiff Merav Tal (Tal Alfasi) called for help from someone who spoke English. Miraculously, someone came to her aid and a scary and violent argument about who should conduct the search flared between the two terrorists. Next, Plaintiff Merav Tal (Tal Alfasi) was threatened that if she did not comply she would be blindfolded, have her hands tied behind her back taken to another location to get checked. Eventually, she was checked by a female, but it was still a horrible, degrading outcome. Every single mark on her body was questioned by the woman. Plaintiff Merav Tal (Tal Alfasi) feared she would be cut open or killed with each spot checked. The terrorists threw all her clothing away and gave her one shirt, which she wore for 53 days.

199.    After the horrific shower incident, the terrorists filmed Plaintiff Merav Tal (Tal Alfasi) and the another hostage with their guns drawn. She was forced to state her personal information, that she was kidnapped, and that she missed her children. Then she was moved to another house, where she was held captive for the next 45 days. She was confined to a children's bedroom that contained metal bunk beds. The window, except for a small opening for air, was intentionally blocked with a closet by the terrorists. The terrorists sat on two small armchairs every night, all night, with their guns pointed at her. Under these frightening circumstances, Plaintiff Merav Tal (Tal Alfasi) could not sleep. When she did sleep, she had terrifying nightmares, which she still experiences today. The other hostage being held with her told her that she screamed in her sleep.

200.    Plaintiff Merav Tal (Tal Alfasi) spent each day filled with uncertainty, not knowing what to expect. She spent much of her time thinking about when she would be saved. Notwithstanding the fear and worry she felt every single day, she and the other hostages would play category games to keep their minds working and strong, and to pass the time. She would hear banging and screaming often.

45

201.    One day, the terrorists let her listen to the news on an old transistor radio. She was shocked and horrified at what was happening in her beloved country. The amount of people injured, kidnapped, or killed overwhelmed her.

202.    One male hostage that arrived after Plaintiff Merav Tal (Tal Alfasi) told her what he knew about and witnessed of the Attack.  The terrorists then removed him and isolated him in a different room, preventing further conversation, and it is believed subsequently murdered him.

203.    A few days into her captivity, Plaintiff Merav Tal (Tal Alfasi) noticed that one of her shrapnel wounds was infected. Pus and discharge were oozing out of it. She asked for medical treatment from the terrorists, but they told her she was fine and only gave her an ointment. The wound was burning and painful, and it was untreated until her release.

204.    Initially, Plaintiff Merav Tal (Tal Alfasi) was provided rice, chicken, and bread. She only ate half and hid the other half to eat later in the day when she got hungry. Sometimes she was given macaroni, bread, labneh, and dry tuna. She was given lentil soup once. Shortly thereafter  the terrorists stopped giving her bread and she only received spaghetti or rice. She was given a good amount of water for the first two weeks, but that quickly decreased to a small portion.

205.    She and the other hostages did not have water to shower or flush the toilet. They would use the toilet, often diarrhea, one on top of the other, without flushing. It was disgusting, degrading, and inhumane.

206.    After approximately 48 days, on a Friday morning, Plaintiff Merav Tal (Tal Alfasi) was taken out of her room by a particularly scary man. He asked her numerous personal questions and then informed her that she was going home. He allowed her to watch the news, which detailed that a ceasefire had been established. He then took Plaintiff Merav Tal (Tal Alfasi) and the hostage who had been held with her away by car, with black plastic garbage bags sealed on their heads

46

with masking tape. Their heads were down the entire time, and they could not see a thing, which was frightening not knowing if they were going to be released or killed. The terrorist switched cars a few times. It was a tortuous day. At one point, they were forced to stand outside a greenhouse, under armed guard for about five hours with their heads against the wall. 15 terrorists were filming them and asking political questions. Plaintiff Merav Tal (Tal Alfasi) was too scared to speak and did not know what to answer. She did not want to say the wrong thing.

207.    After many hours, the terrorists took Plaintiff Merav Tal (Tal Alfasi) and other hostages to Natzer hospital. Seven people in total were placed in a tiny room without windows for five days. When one of them needed to use the bathroom, they had to knock on the door three times and then wait for someone to come get them, which would take an hour or two before someone came. When they finished going to the bathroom, they had to knock on the door again for someone to come and let them out.

208.    Plaintiff Merav Tal (Tal Alfasi) saw one of Yair's children, screaming and crying, at the hospital. She did not know that he had been kidnapped, and she was incredibly sad to see him there. She could not help him, and she felt like dying. She had an emotional reunion with him and the chance to talk to him. He was now startlingly speaking Arabic, which he had learned while in captivity. She also learned that Yair had not survived his injuries and had died, crushing her. As far as she knows, his body is still in Gaza and has not been able to properly lay her beloved partner to rest.

209.    Plaintiffs Rachel Alfendri, Keren Blank, and Sigalit Sharabi were in Holon, Israel at the time of the Attack. Plaintiffs Tomer Tal Alfasi and Ori Tal Alfasi were in Rishon L^Zion, Israel, at the time of the Attack. They each received text messages from Plaintiff Merav Tal (Tal Alfasi) early in the morning on October 7, 2023, begging and pleading for help. Their lives

collapsed at the moment. They were all in shock and chaos erupted. They called the police, but they could not help. They felt helpless and alone. When they tried to call Plaintiff Merav Tal (Tal Alfasi), and got no answer, they tried calling Yair. Again, no answer. They had learned through the news that some people had been murdered and others had been kidnapped. They did not know anything about their beloved family member for two days when they received a video telegram showing Plaintiff Merav Tal (Tal Alfasi) and Yair being hauled out of their home, and Yair gravely injured and bleeding.

210.    Plaintiff Merav Tal (Tal Alfasi)'s entire family received her in Israel upon her release. The reunion was momentous, but the damage to all was significant. Plaintiff Merav Tal (Tal Alfasi) struggles with sleep and now takes medication to help with that, and also for depression. She has recurrent and severe migraines, and now suffers from fibromyalgia. Nightmares are frequent. She sees a psychologist and a psychiatrist.

211.    For the entire time of Plaintiff Merav Tal (Tal Alfasi)'s captivity, her family members struggled with stress, anxiety, worry, and despair. Every single day, they awaited any information about their loved one that never came. They each needed to begin some form of psychological therapy to get through the dark and never-ending days of waiting.

212.    The Plaintiffs detailed herein each suffered immense injuries that are ongoing and permanent.

213.    As a result of the October 7 Attack and the injuries she suffered, Plaintiff Merav Tal (Tal Alfasi) has past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, loss of earning capacity.

214.    As a result of the October 7 Attack, Plaintiffs Rachel Alfendri, Keren Blank, Sigalit Sharabi, Tomer Tal Alfasi, and Ori Tal Alfasi, each suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked.

### Rahmilov-Hodedatov-Benbeniste-Solomonov Families

215.    Plaintiff Viktor Rahmilov is a citizen of Israel and Russia and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

216.    Plaintiff Galina Rahmilov is the spouse of Plaintiff Viktor Rahmilov. Plaintiff Galina Rahmilov is a citizen of Israel and Russia and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

217.    Plaintiff Sofia Hodedatov is the child of Plaintiff Viktor Rahmilov and Plaintiff Galina Rahmilov. Plaintiff Sofia Hodedatov is a citizen of Israel and Russia and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

218.    Plaintiff Sigal Benbeniste is the child of Plaintiff Viktor Rahmilov and Plaintiff Galina Rahmilov. Plaintiff is a citizen of Israel and Russia and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

219.    Plaintiff Natali Rahmilov is the child of Plaintiff Viktor Rahmilov and Plaintiff Galina Rahmilov. Plaintiff is a citizen of Israel and Russia and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

220.    Plaintiff E.L.R., minor child, is the child of Plaintiff Viktor Rahmilov and Plaintiff Galina Rahmilov. Plaintiff is a citizen of Israel and Russia and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel. Plaintiff Galina Rahmilov brings this action individually and as legal guardian of Plaintiff E.L.R., minor child.

221.    Plaintiff Tamir Hodedatov is the spouse of Plaintiff Sofia Hodedatov. Plaintiff is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

222.    Plaintiff Hananel Benbeniste is the spouse of Plaintiff Sigal Benbeniste. Plaintiff Hananel Benbeniste is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

223.    Plaintiff Efim Solomonov is the parent of Plaintiff Galina Rahmilov. Plaintiff Efim Solomonov is a citizen of Israel at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

224.    Plaintiffs Viktor Rahmilov, Galina Rahmilov, Sofia Hodedatov, Sigal Benbeniste, Natali Rahmilov, E.L.R., minor child, Tamir Hodedatov, Hananel Benbeniste, and Efim Solomonov are hereinafter collectively known as "The Rahmilov-Hodedatov-Benbeniste-Solomonov Family."

225.    On October 7, 2023, Plaintiffs Viktor Rahmilov, Galina Rahmilov, E.L.R., minor child, Efim Solomonov, and Natali Rahmilov were at home in Mishor Hagefen, Ofakim, Israel, and present when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

226.    On October 7, 2023, Plaintiff Sofia Hodedatov and Plaintiff Tamir Hodedatov were at home in Ofakim, Israel, with their children, and present when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

227.    On October 7, 2023, Plaintiff Sigal Benbeniste and Plaintiff Hananel Benbeniste were at home in Ofakim, Israel, with their children, and present when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

228.    At approximately 6:30 a.m., Plaintiffs Viktor Rahmilov, Galina Rahmilov, E.L.R.,
minor child, Efim Solomonov, and Natali Rahmilov, were startled awake by the frightening blare
of sirens in their neighborhood. Still dressed in their pajamas, they quickly ran from the house to
the city shelter, which was about fifty meters away. They could see rockets soaring in the sky
overhead. Many neighbors were also running to the shelter, but the doors were locked, and no one
could enter.

229.    Plaintiff Viktor Rahmilov directed his family to get in the car and he would take
them to the house of their eldest daughter, Plaintiff Sofia Hodedatov. Plaintiff Sofia Hodedatov
lived in a nearby neighborhood just a few minutes away, and she had a saferoom. Plaintiff Sofia
Hodedatov had been startled awake at the same time by terrifying loud booms that shook her house.
She woke her husband, Plaintiff Tamir Hodedatov, and they grabbed their kids and ran to their
saferoom.

230.    Plaintiff Sigal Benbeniste and her husband, Plaintiff Hananel Benbeniste, were
awakened by the pounding alarms as well. They ran with their two babies to a synagogue near
their house since they did not have a saferoom. After a half hour, Plaintiff Sigal Benbeniste begged
Plaintiff Hananel Benbeniste to go to her parents' house. She wanted to all be together. Since they
are religious orth. dox Jews that keep the Sabbath, and therefore they could not drive, they headed
out on foot. Along the way, they learned from others running around that terrorists were in her
parents' neighborhood. In a panic, they rushed back home.

231.    Plaintiffs Galina Rahmilov, Efim Solomonov, and E.L.R., minor child, got in the
car right away, but Plaintiff Natali Rahmilov was so distraught that she froze. She eventually
calmed herself enough to go, but she wanted to follow the family in her own car. Plaintiff Viktor
Rahmilov started to drive off, but promptly got a call from Plaintiff Natali Rahmilov, who was

screaming and crying, terrified because terrorists were indiscriminately shooting throughout the neighborhood. Plaintiff Viktor Rahmilov could hear the barrage of gunfire over the phone and immediately realized that they were being invaded. He quickly delivered Plaintiffs Galina Rahmilov, Efim Solomonov, and E.L.R., minor child, to Plaintiff Sofia Hodedatov's house where they hid in the saferoom, and he then rushed back to rescue Plaintiff Natali Rahmilov from the deadly attack around her.

232.    Worried about her father's safety, Plaintiff Natali Rahmilov insisted that Plaintiff Viktor Rahmilov not come back to get her because it was too dangerous, but Plaintiff Viktor Rahmilov kept her on the phone to try to calm her down and instructed her to go in the house to wait for him and lock the doors.

233.    As soon as Plaintiff Viktor Rahmilov entered the neighborhood, a large group of terrorists bombarded him and opened fire. He was shot in his arm, both legs, and his chest. Despite his horrific injuries, he kept driving to get to Plaintiff Natali Rahmilov before the terrorists did. As he neared his house, he yelled for Plaintiff Natali Rahmilov to get in the car. She jumped into the backseat, and they attempted to speed away, but they could not avoid the overwhelming number of terrorists stalking and shooting at them. The terrorists pummeled the car with about 80 bullets, and the wheels were shredded from the erratic driving, rendering the car immobile. Plaintiff Viktor Rahmilov had nowhere to go and had to make an excruciating life-or-death decision for both himself, and his daughter, and he prayed that getting out of the car and running would give them a fighting chance to survive.

234.    With more terrorists approaching, Plaintiff Viktor Rahmilov told Plaintiff Natali Rahmilov to get out of the car and run between houses to escape the neighborhood. He felt like he was sending his child to her death. As soon as Plaintiff Natali Rahmilov started running, Plaintiff

Viktor Rahmilov saw a terrorist aim his gun at her. Somehow Plaintiff Viktor Rahmilov selflessly managed to insert himself in between the terrorist and Plaintiff Natali Rahmilov, to save her life. In doing so, he took four bullets to his legs, but kept his focus on getting his daughter to safety and just kept yelling at her to run.

235.    Despite the seven bullets in his body, Plaintiff Viktor Rahmilov and Plaintiff Natali Rahmilov managed to get out onto the main road and to a nearby neighborhood, Ramat Shaked. They desperately pounded on so many doors to get into a saferoom, but no one answered. They continued running until they found themselves at Plaintiff Viktor Rahmilov's nephew's home, and he answered the door for them. Both Plaintiff Viktor Rahmilov and Plaintiff Natali Rahmilov were saturated in blood.

236.    Plaintiff Natali Rahmilov hysterically called her family members to let them know what happened to them and that Plaintiff Viktor Rahmilov needed medical attention immediately. They all tried calling around to get medical assistance for Plaintiff Viktor Rahmilov, but no one could come. The medical service gave Plaintiff Natali Rahmilov and Plaintiff Viktor Rahmilov's nephew instructions over the phone to stop Plaintiff Viktor Rahmilov's bleeding. Despite their valiant efforts, Plaintiff Viktor Rahmilov laid on the floor for three hours, bleeding and on the verge of death.

237.    At this point, Plaintiff Sigal Benbeniste and her family had arrived back at their home and, although it was the Sabbath, she turned on her phone due to the severity of the situation and learned that her father had been shot and was dying. She and her family immediately got in their car and headed to her sister Plaintiff Sofia Hodedatov's house to go to her saferoom and all be together.

53

238.    Over the phone, the family used their connections to get Plaintiff Viktor Rahmilov medical attention from a rescue team who got him out of the house and to the hospital. At the emergency room, Plaintiff Viktor Rahmilov was the 132nd person in line to be treated, but his blood pressure and pulse were dangerously low, and his injuries were so severe that the doctors had to intervene to stop him from fatally hemorrhaging. He was eventually taken into surgery.

239.    The rest of the family members sat in Plaintiff Sofia Hodedatov's saferoom, in silence, in the dark, and in fear for their lives. At the same time, they feared for the life of Plaintiff Viktor Rahmilov, whom they knew was fighting for his life. They had lost contact with him after he was evacuated to the hospital as his phone had been left in the car, and Plaintiff Natali Rahmilov had stayed in the saferoom with Plaintiff Viktor Rahmilov's nephew and his family. To this day, she refuses any mention of the events of that day.

240.    Despite two surgeries, Plaintiff Viktor Rahmilov still suffers from many pieces of shrapnel lodged in his body that feel like knives when he walks  The bullets used by the terrorists exploded upon entry into the body. The doctors could not believe how he was able to run with those injuries.

241.    Plaintiff Viktor Rahmilov's rehabilitation continues with physiotherapy and hydrotherapy, but he can only painstakingly walk short distances. He has severe pain in his left leg that feels like electricity pulsing through. He cannot feel his right leg. He has constant pain and electricity in his arm due to shrapnel. He has lost the joy in his life. Everything annoys him and he is short-tempered. He continuously sees images of terrorists all around him.

242.    Plaintiff E.L.R., minor child, was traumatized and would not leave the saferoom at Plaintiff Sofia Hodedatov's house for two months.

243.    After a few months at Plaintiff Sofia Hodedatov's house, Plaintiffs Viktor
Rahmilov and Galina Rahmilov decided it was time to return to their home in Mishor Hagefen,
Ofakim. Their neighborhood looked like a haunted cemetery. It was covered with memorial
candles, photos, and obituaries of the murdered, all of whom they knew. It was difficult for them
to recognize what was once home. They are still struggling to adapt.

244.    Plaintiff Galina Rahmilov took care of Plaintiff Viktor Rahmilov around the clock
when he was released from the hospital, cleaning his wounds, and changing his bandages. She now
sees a psychologist. The stress she experienced from the Attack has resulted in chronic physical
pain and stiffness. Despite her injuries, she had to return to work as she was now the only one able
to support her family.

245.    The Rahmilov-Hodedatov-Benbeniste-Solomonov families suffer from anxiety,
hypervigilance, sleep issues, fear of other people, fear of loud noises, and constant worry for their
safety, for which they are receiving treatment from psychiatrists. Their once peaceful, joyful, and
optimistic lives are now filled with feelings of loss, stress, skepticism, and tears.

246.    The Rahmilov-Hodedatov-Benbeniste-Solomonov families suffered immense
injuries that are ongoing and permanent.

247.    As a result of the October 7 Attack and the injuries they suffered, Plaintiff Viktor
Rahmilov, Plaintiff Galina Rahmilov, Plaintiff Sofia Hodedatov, Plaintiff Sigal Benbeniste,
Plaintiff Natali Rahmilov, Plaintiff E.L.R., minor child, Plaintiff Tamir Hodedatov, Plaintiff
Hananel Benbeniste, and Plaintiff Efim Solomonov have past and future noneconomic damages,
including severe mental pain and suffering, loss of enjoyment of life, past and future economic
damages including medical expenses, lost income, and loss of earning capacity.

55

248.    As a result of the October 7 Attack, Plaintiff Viktor Rahmilov, Plaintiff Galina

Rahmilov, Plaintiff Sofia Hodedatov, Plaintiff Sigal Benbeniste, Plaintiff Natali Rahmilov,

Plaintiff E.L.R., minor child, Plaintiff Tamir Hodedatov, Plaintiff Hananel Benbeniste, and

Plaintiff Efim Solomonov suffered severe mental anguish, extreme emotional pain and suffering,

loss of solatium, loss of services, and economic loss, because their family members were attacked.

**Bar-On-Shuva-Deviko Families**

249.    Plaintiff Estate of Yuval Bar-On was a citizen of Israel and at the time of the acts

alleged, and at all times relevant hereto, was domiciled in Israel.

250.    Plaintiff Orit Bar-On is the parent of Plaintiff Estate of Yuval Bar-On, and the

spouse of Plaintiff Itzhak Bar-On. Plaintiff Orit Bar-On is a citizen of Israel and at the time of the

acts alleged, and at all other times relevant hereto, was domiciled in Israel. Plaintiff Orit Bar-On

brings this action individually and as heir-at-law on behalf of the Estate of Yuval Bar-On.

251.    Plaintiff Itzhak Bar-On is the parent of Plaintiff Estate of Yuval Bar-On. Plaintiff

Itzhak Bar-On is a citizen of Israel, and at the time of the acts alleged, and at all other times relevant

hereto, was domiciled in Israel. Plaintiff Itzhak Bar-On brings this action individually and on

behalf of the Estate of his child, Yuval Bar-On.

252.    Plaintiffs Estate of Yuval Bar-On, Orit Bar-On, and Itzhak Bar-On, are hereinafter

collectively referred to as "The Bar-On Family."

253.    Plaintiff Estate of Moshe Shuva was the fiancé of Plaintiff Estate of Yuval Bar-On.

Plaintiff Estate of Moshe Shuva was a citizen of Israel, and at the time of the acts alleged, and at

all times relevant hereto, was domiciled in Israel.

254.    Plaintiff Yossef Shuva is the parent of Plaintiff Estate of Moshe Shuva. Plaintiff

Yossef Shuva is a citizen of Israel, and at the time of the acts alleged, and at all other times relevant

hereto, was domiciled in Israel. Plaintiff Yossef Shuva brings this action individually and as heir-at-law on behalf of the Estate of Moshe Shuva.

255.    Plaintiff Sonia Shuva is the parent of Plaintiff Estate of Moshe Shuva, and the spouse of Plaintiff Yossef Shuva.  Plaintiff Sonia Shuva is a citizen of Israel, and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

256.    Plaintiff Maayan Deviko is the sibling of Plaintiff Estate of Moshe Shuva, and the child of Plaintiffs Yossef Shuva and Sonia Shuva. Plaintiff Maayan Deviko is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

257.    Plaintiff Shimon Shuva is the sibling of Plaintiff Estate of Moshe Shuva, and the child of Plaintiffs Yossef Shuva and Sonia Shuva. He is also the sibling of Plaintiff Maayan Deviko. Plaintiff Shimon Shuva is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

258.    Plaintiffs Estate of Moshe Shuva, Yossef Shuva, Sonia Shuva. Maayan Deviko, and Shimon Shuva are hereinafter collectively referred to as "The Shuva Family."

259.    Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva were engaged to be married on Valentine's Day, February 14, 2024. They were all so excited and plans were well underway. A reception hall had been rented for the event. Plaintiff Estate of Yuval Bar-On had chosen her stunning wedding gown. They were deeply in love and shared many of the same passions in life. They especially loved nature.

260.    Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva were both the youngest children in their respective families. At the time, they had been happily living together in the additional living space attached to the Shuva Family's home.

57

261.    Late on the evening of October 6, 2023, Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva excitedly informed their families that they planned to attend the NOVA Music festival and would leave early in the morning. Plaintiff Estate of Yuval Bar-On reassured the Bar-On Family that she would let the family know when they had arrived safely at the event. Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva left for the event around 4:00 a.m., on October 7, 2023.

262.    At 5:37 a.m., Plaintiff Itzhak Bar-On received a text from Plaintiff Estate of Yuval Bar-On that they had arrived at the event safely, so Plaintiff Itzhak Bar-On and Plaintiff Orit Bar-On returned to bed. They had no idea it would be the last contact they would ever have with their beloved child.

263.    On the morning of October 7, 2023, Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva were ruthlessly attacked and killed by Hamas terrorists with machine guns, grenades, and other weapons, while trying to escape in their car from the NOVA Music Festival. Neither the Bar-On Family nor the Shuva Family would discover what happened to their children for three days, and they desperately waited for information the entire excruciating time.

264.    Plaintiff Maayan Deviko awoke from a bad dream around 3:00 a.m. on October 7, 2024, made some coffee, and watched television. She was still awake when, shortly after 6:00 a.m., she started to hear an unusually large number of alarms and sirens. Plaintiff Maayan Deviko woke her husband and told him to go buy water supplies for them and for her parents so that, if need be, they would be prepared in their shelter. She felt that this time, something was different than other times when alarms would sound.

58

265.   Plaintiff Orit Bar-On learned of rocket attacks and chaos occurring in the South from the news on the morning of October 7, 2023. She woke her spouse, Plaintiff Itzhak Bar-On, at approximately 8:00 a.m. to alert him as to what was happening across Israel.

266.   Around 8:30 a.m., Plaintiff Maayan Deviko received a call from a friend who asked her if she heard about the chaos transpiring in the south. She was stunned to learn of the attack as she knew that was where Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva lived. From that moment, she felt overwhelming feelings of panic and concern. She tried endlessly contacting Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva, to no avail.

267.   All attempts by the Bar-On Family to contact Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva were unsuccessful.

268.   On October 10, 2023, police informed the Bar-On family that Plaintiff Estate of Yuval Bar-On had been found brutally murdered. On October 11, 2023, Plaintiff Itzhak Bar-On went with police to identify his child's remains. It took him 30 minutes to identify her mutilated body. It was an experience that he will relive for the rest of his life.

269.   When Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva's bodies were found, they were rotten, and the family was not allowed to touch them.

270.   To spare the family distress, Plaintiff Estate of Moshe Shuva was identified by the rabbi of his community who knew him personally. Plaintiff Maayan Deviko later saw a horrific video taken by a terrorist of her beloved brother and his beautiful fiancée shot dead.

271.   As part of the mass recognition efforts following the Attack, a special unit was connecting mobile batteries to phones found in the areas attacked. Earlier that day, in a pile of cell phones found in a wooded area near Re'im, a battery was connected to a phone that showed a

screensaver image of Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva. It was Plaintiff

Estate of Moshe Shuva's cell phone.

272.    Rather than uniting the families of Plaintiff Estate of Yuval Bar-On and Plaintiff

Estate of Moshe Shuva through their joyful nuptials, instead the two families were united in sorrow

at the cemetery for the funerals and final burials of their loved ones.

273.    Plaintiffs Estate of Yuval Bar-On and Estate of Moshe Shuva were a beautiful

young couple. They were a perfect match who made each other and everyone around them very

happy. They were so excited to be getting married soon. Plaintiffs Estate of Yuval Bar-On and

Estate of Moshe Shuva did not have a chance to say goodbye.

274.    Plaintiff Estate of Moshe Shuva was a source of light, joy, and comfort to his whole

family, especially for Plaintiff Maayan Deviko, who now must take care of her family alone. Prior

to the Attack and Plaintiff Estate of Moshe Shuva's murder, Plaintiff Estate of Moshe Shuva helped

Plaintiff Maayan Deviko care for her family since her husband is disabled and she worked a full-

time job. Plaintiff Estate of Moshe Shuva also took care of his parents.

275.    Plaintiff Shimon Shuva has not returned to work.

276.    Plaintiff Sonia Shuva was later diagnosed with cancer.

277.    The Plaintiffs detailed herein each suffered immense injuries that are ongoing and

permanent.

278.    As a result of the October 7 Attack, Plaintiffs Estate of Yuval Bar-On and Estate of

Moshe Shuva suffered wrongful deaths.

279.    As a result of the October 7 Attack, and the injuries Yuval Bar-On suffered,

Plaintiff Estate of Yuval Bar-On, has past and future noneconomic damages, including severe

mental pain and suffering and loss of enjoyment of life, and past and future economic damages,

including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of Yuval Bar-On's beneficiaries.

280. As a result of the October 7 Attack, and the injuries Moshe Shuva suffered, Plaintiff Estate of Moshe Shuva, has past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of Moshe Shuva's beneficiaries.

281. As a result of the October 7 Attack, and Plaintiff Estate of Yuval Bar-On's wrongful death, Plaintiff Itzhak Bar-On and Plaintiff Orit Bar-On suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Plaintiff Estate of Yuval Bar-On, and the subsequent loss of her life, continue to have a lasting effect on her family members.

282. As a result of the October 7 Attack, and Plaintiff Estate of Moshe Shuva's wrongful death, Plaintiff Yossef Shuva, Plaintiff Simona Shuva, Plaintiff Maayan Deviko, and Plaintiff Shimon Shuva suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Estate of Moshe Shuva, and the subsequent loss of his life, continue to have a lasting effect on his family members.

**Kaplun-Keidar-Frailich-Strikovski Families**

283. Plaintiff Estate of Dror Kaplun was a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

284.    Plaintiff Noam Kaplun is the child of Plaintiff Estate of Dror Kaplun. Plaintiff Noam Kaplun is a citizen of Israel and the United Kingdom and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

285.    Plaintiff Maayan Kaplun Keidar is the child of Plaintiff Estate of Dror Kaplun. Plaintiff Maayan Kaplun Keidar is a citizen of Israel and the United Kingdom and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

286.    Plaintiff Moran Kaplun (Tarasov) is the child of Plaintiff Estate of Dror Kaplun. Plaintiff Moran Kaplun (Tarasov) is a citizen of Israel and the United Kingdom and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

287.    Plaintiffs Noam Kaplun, Maayan Kaplun Keidar, and Moran Kaplun (Tarasov) bring this action individually and as heirs-at-law on behalf of the Estate Dror Kaplun.

288.    Plaintiff Noam Kaplun, Maayan Kaplun Keidar, and Moran Kaplun (Tarasov) are siblings.

289.    Plaintiffs Estate of Dror Kaplun, Noam Kaplun, Maayan Kaplun Keidar, and Moran Kaplun (Tarasov) are hereinafter collectively referred to as "The Kaplun Family."

290.    Plaintiff Estate of Marcel Frailich is the spouse of Plaintiff Estate of Dror Kaplun. Plaintiff Estate of Marcel Frailich was a citizen of Israel and Morocco and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

291.    Plaintiff Mor Frida Strikovski is the child of Plaintiff Estate of Marcel Frailich. Plaintiff Mor Frida Strikovski is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

292.    Plaintiff Ziv Frailich is the child of Plaintiff Estate of Marcel Frailich. Plaintiff Ziv Frailich is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

293.    Plaintiff Amit Frailich is the child of Plaintiff Estate of Marcel Frailich. Plaintiff Amit Frailich is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

294.    Plaintiff Mor Frida Strikovski, Ziv Frailich, and Amit Frailich bring this action individually and as heirs-at-law on behalf of the Estate of Marcel Frailich.

295.    Plaintiffs Mor Frida Strikovski, Ziv Frailich, and Amit Frailich are siblings.

296.    Plaintiffs Estate of Marcel Frailich, Mor Frida Strikovski, Ziv Frailich, and Amit Frailich are hereinafter collectively referred to as "The Frailich Family."

297.    On October 7, 2023, Plaintiff Estate of Dror Kaplun and his spouse Plaintiff Estate of Marcel Frailich were in their home in Be'eri, Israel, and present when they were ruthlessly attacked with machine guns, grenades, and other weapons, abducted, and then murdered by Hamas, with their hands tied behind their backs.

298.    On October 7, 2023, between 10:30 a.m. and 11:00 a.m., Plaintiff Estate of Dror Kaplun and Plaintiff Estate of Marcel Frailich were mercilessly abducted from their home by Hamas terrorists, barefoot, and wearing nothing but pajamas.

299.    On October 7, 2023, Plaintiff Noam Kaplun awoke to numerous disturbing text messages announcing that terrorists had infiltrated the kibbutz and were attacking. His parent, Plaintiff Estate of Dror Kaplun, wrote reassuringly that Israeli Defense Forces had come, so the family hoped that Plaintiffs Estate of Dror Kaplun and Estate of Marcel Frailich were safe and had been rescued. Nonetheless, out of fear of risking their safety, Plaintiff Noam Kaplun did not call

them to avoid risking their safety until approximately 10:30 a.m., but he could not reach them. Distraught, Plaintiff Noam Kaplun desperately kept trying to reach Plaintiffs Estate of Dror Kaplun and Estate of Marcel Frailich, but he never spoke to either of them again.

300.    On October 10, 2023, a video was released showing Plaintiffs Estate of Dror Kaplun and Estate of Marcel Frailich being dragged through the kibbutz by armed terrorists, with their hands savagely tied behind their backs. Their families' relief at seeing them alive lasted for only twodays. After that, another video was published that showed Plaintiff Estate of Marcel Frailich's lifeless and ravaged body lying on the ground.

301.    The family painstakingly waited a week for more information on Plaintiff Estate of Marcel Frailich, and then received the unwanted and shattering news that her deceased body had been found and identified.

302.    For the next two months, the families nervously waited for information on Plaintiff Estate of Dor Kaplun. The Kaplun Family fought valiantly for his release, presuming he had been taken hostage and transported to Gaza. In fact, the terrorists tried to abduct Plaintiff Estate of Dror Kaplun's body to Gaza as evidenced in a video showing his body on a bicycle with terrorists who ran into Israeli Defense Forces soldiers and then abandoned his body there. But, on December 7, 2023, Plaintiff Estate of Dror Kaplun's body was positively identified. Archaeologists from Israel's Antiquities Authority aided in locating and identifying his remains.

303.    In February and April 2024, additional body parts of Plaintiff Estate of Dror Kaplun had been found, traumatizing his family further and forcing them to endure the re-opening of his grave.

304.    The Plaintiffs detailed herein each suffered immense injuries that are ongoing and permanent.

64

305.    Plaintiff Estate of Dror Kaplun was a humble man who only wanted to enjoy life. He retired in 2023 and dedicated himself to spending time with his five grandchildren, volunteering at Kibbutz Be'eri's library, cooking healthy foods, practicing yoga, and listening to podcasts. He was a father of three children and the son of Holocaust survivor parents. His wife, Plaintiff Estate of Marcel Frailich, was a Doctor of Chemistry at the Weizmann Institute of Science.

306.    As a result of the October 7 Attack, Plaintiff Estate of Dror Kaplun suffered wrongful death.

307.    As a result of the October 7 Attack, and the injuries Dror Kaplun suffered, Plaintiff Estate of Dror Kaplun, has past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of Dror Kaplun's beneficiaries.

308.    As a result of the October 7 Attack, and Plaintiff Estate of Dror Kaplun's wrongful death, Plaintiff Noam Kaplun, Plaintiff Maayan Kaplun Keidar, Plaintiff Moran Kaplun (Tarasov), and Plaintiff Estate of Marcel Frailich suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Estate of Dror Kaplun, and the subsequent loss of his life, continue to have a lasting effect on his family members.

309.    As a result of the October 7 Attack, Plaintiff Estate of Marcel Frailich suffered wrongful death.

310.    As a result of the October 7 Attack, and the injuries Marcel Frailich suffered, Plaintiff Estate of Marcel Frailich, has past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages,

65

including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of Marcel Frailich's beneficiaries.

311.    As a result of the October 7 Attack, and Plaintiff Estate of Marcel Frailich's wrongful death, Plaintiff Estate of Dror Kaplun, Plaintiff Mor Frida Strikovski, Plaintiff Ziv Frailich, and Plaintiff Amit Frailich suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Estate of Marcel Frailich, and the subsequent loss of her life, continue to have a lasting effect on her family members.

### Caspi Family

312.    Plaintiff Sharon Caspi is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

313.    Plaintiff Amit Caspi is the spouse of Plaintiff Sharon Caspi. Plaintiff Amit Caspi is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

314.    Plaintiff Niv Caspi is the child of Plaintiff Sharon Caspi and the child of Plaintiff Amit Caspi. Plaintiff Niv Caspi is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

315.    Plaintiff May Caspi is the child of Plaintiff Sharon Caspi and the child of Plaintiff Amit Caspi. Plaintiff May Caspi is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

316.    Plaintiff S.C., minor child, is the child of Plaintiff Sharon Caspi and the child of Plaintiff Amit Caspi. Plaintiff S.C., minor child, is a citizen of Israel and at the time of the acts

alleged, and at all other times relevant hereto, was domiciled in Israel. Plaintiff Amit Caspi brings this action individually and as legal guardian of Plaintiff, S.C., minor child.

317.    Plaintiff Niv Caspi, Plaintiff May Caspi, and Plaintiff S.C., minor child, are siblings.

318.    Plaintiffs Sharon Caspi, Amit Caspi, Niv Caspi, May Caspi, and S.C., minor child, are hereinafter collectively referred to as "The Caspi Family."

319.    On October 7, 2023, Plaintiffs Sharon Caspi and S.C., minor child, were at their home, and May Caspi was at a nearby apartment, both at Kibbutz Kerem Shalom, Israel, and present when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

320.    When the distressing sounds of rockets and alerts began at approximately 6:30 a.m., Plaintiffs Sharon Caspi and S.C., minor child, did not fully understand what was happening but knew they were in severe danger, so they ran to their saferoom. Plaintiff Sharon Caspi grabbed some pans and knives along the way to use for defense. Soon thereafter, they heard gunfire nearby and knew that terrorists had infiltrated the kibbutz. They sat helplessly on the floor of their saferoom until the next evening, terrified, fearing that it was only a matter of time until the terrorists reached them, and they would be killed.

321.    Plaintiff Amit Caspi was on a flight to New York at the time.

322.    Plaintiff May Caspi was alone in her own apartment on Kibbutz Kerem Shalom.

323.    Plaintiff Niv Caspi was in Haifa, Israel, and was startled awake by a call from Plaintiff Sharon Caspi informing him what was happening in the kibbutz.

324.    Plaintiff Sharon Caspi, alone with her minor child, Plaintiff S.C., in the saferoom, felt utterly helpless and worried for the safety of her other children, Plaintiffs May Caspi and Niv

Caspi. Plaintiffs Sharon Caspi and S.C., minor child, received constant community text messages about the horrors taking place around them, which added to the fright and panic already overtaking them. They lived approximately 40 meters from the border, and their kibbutz was one of the closest to the direction from where the terrorists were coming. Plaintiff S.C., minor child, was receiving messages from his friends pleading for help, knowing that he could not do anything.

325.    In her apartment in Kibbutz Kerem Shalom, Plaintiff May Caspi awoke to a barrage of rockets and quickly took shelter in her saferoom. She had just turned 21 and was sick with a fever from a full week of celebrating. She was overwhelmed, alone, and terrified, listening to numerous terrifying explosions and gunfire coming from all directions and seemingly very close to her home. She learned about the invasion through text messages and online videos and kept looking through the peephole to watch for terrorists.

326.    Plaintiff May Caspi hid in her saferoom until she was called by the security team of her kibbutz to help take care of her wounded community members. She was trained as a military medic and had just been released from her service the month before. She collected medical supplies and ran out to help. For hours, Plaintiff May Caspi treated many injured victims. She did so at great personal risk, going to various locations, while unprotected from falling rockets, and exposed to gunfire and terrorists running amok through the kibbutz. She called her former commander as she was treating people with critical injuries and he told her that everyone was under attack, and no one could come to help her. Plaintiff May Caspi believed they were all going to be killed, yet tried to maintain a positive attitude, reassuring the wounded people around her that they would be fine.

327.    While treating people, Plaintiff May Caspi had to use a "packing" technique, which was only taught once and was never expected to be practiced. This technique entailed inserting her

hand deep into wounds to stop arterial bleeding. She did that treatment twice that day. She treated other badly injured people with improvised techniques and materials. There was no pain medication to give to the injured. There were some people for whom she could not do anything. There was one person whose hands had been blown off. She was forced to make life-or-death decisions about who could be saved and who could not. She will forever live with the results of her decisions that day.

328.    Plaintiff May Caspi also accompanied the team that informed families of their members who were murdered. She hit her breaking point when they told a family she knew of their murdered relative. She could not do that anymore and at 10:00 p.m. that night, she joined Plaintiffs Sharon Caspi and S.C., minor child, in the saferoom at their home, where she collapsed from exhaustion and devastation. They all remained on the floor in silence the whole night and the entire next day.

329.    At approximately 7:00 p.m. the night after the Attack, Plaintiffs Sharon Caspi, May Caspi, and S.C., minor child, were finally evacuated from the kibbutz to a hotel in Eilat with other displaced persons from their kibbutz and other kibbutzim. The drive was gut-wrenching and horrifying. Destroyed cars and dead bodies filled the roads. It was dark and smoky, with a burnt odor filling the air. It was eerily silent. No one spoke a word.

330.    After a week, Plaintiff May Caspi was mobilized to the reserves as a combat medic. Plaintiffs Sharon Caspi and S.C., minor child, resided at the hotel for three and a half months in one small room together with Plaintiff Amit Caspi. The tight accommodations were challenging and exacerbated the trauma they had already experienced.

331.    Plaintiff Sharon Caspi still suffers from severe trauma and cannot work or function normally. She experiences frequent panic attacks. The trauma of the Attack aggravated her

69

fibromyalgia, and she suffers from constant aches and pains all over her body which make it hard for her to move. She continues to experience anxiety and cries all the time. She is afraid of everything.

332.    Plaintiff S.C., minor child, continues to struggle from the trauma experienced in the Attack, having also learned in the days after about classmates and teammates who were murdered. Plaintiff S.C., minor child was unable to return to school for over four months, having only just returned in February 2024.

333.    Plaintiff May Caspi continues to struggle with sleep. She cannot fall asleep easily and when she eventually does, she suffers from nightmares. She is trying to adjust to her situation and just survive. She feels that there are still so many unknown factors of life all around her.

334.    Plaintiff Niv Caspi, a 24-year-old children's soccer coach for the Maccabee Haifa team, had been splitting his time between coaching in Haifa and his home in Kerem Shalom. He spent the entire excruciatingly long day worrying about his family as he could not get in touch with anyone until the night of October 8, 2023. He did not know if his family members were alive or dead.

335.    Risking his own safety, Plaintiff Niv Caspi finally found a ride late in the evening on October 7, 2023, from his location in Haifa, Israel, to Kerem Shalom. Along the way, he was almost murdered when he was shot at by the terrorists. While he managed to escape his own death, he sadly witnessed the aftermath of the destruction of the community he loved. Vehicles were riddled with gunshots, smashed up, and burning. Dismembered, wounded, and burned bodies were strewn about on the road and all around the ground. He feared the worst for his family and the kibbutz.

336.    As a former medic in his military service, Plaintiff Niv Caspi stopped at each body that he came across in case he could help, despite the great risk to his own safety. That drive, which normally takes two hours took him over twelve hours that day. He reached the Saad Junction the next morning, where he was stopped by security. He thought he was in a literal hell. Then he received a phone call informing him that he was being called up under emergency mobilization orders and was required to report immediately for reserve duty as a medic, and he did not make it to see his family. In fact, he did not get to see his family for about a month after that day.

337.    Plaintiff Niv Caspi now cannot sleep and feels like a broken person. He worries constantly about his family. He has become impatient and feels emotionally disconnected. He is hypervigilant, always on the lookout for terrorists.

338.    Plaintiff Amit Caspi continues to struggle with knowing that he was not there to protect his family at the time of the Attack. He suffers from anxiety and worries about what the future will hold for his family. He is required to travel away from home for his job. He feels constantly torn trying to balance his obligation to travel for work so that the family will not also lose their financial security with his need to be there for his family.

339.    The Caspi Family suffered immense injuries that are ongoing and permanent.

340.    As a result of the October 7 Attack and the injuries they suffered, Plaintiffs Sharon Caspi, Niv Caspi, May Caspi, and S.C., minor child each have past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, loss of earning capacity.

341.    As a result of the October 7 Attack, Plaintiffs Sharon Caspi, Niv Caspi, Amit Caspi, May Caspi, and S.C., minor child, and each suffered severe mental anguish, extreme emotional

71

pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked.

### Haramaty-Haramati-Mizrahi-Hyams Families

342.    Plaintiff Estate of Varda Haramaty was a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

343.    Plaintiff Ayelet Haramati Mizrahi is the child of Plaintiff Estate of Varda Haramaty. Plaintiff Ayelet Haramati Mizrahi is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel. Plaintiff Ayelet Haramati Mizrahi brings this action individually and as heir-at-law on behalf of the Estate of Varda Haramaty.

344.    Plaintiff Avraham Mizrahi is the spouse of Plaintiff Ayelet Haramati Mizrahi. Plaintiff Avraham Mizrahi is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

345.    Plaintiff Itamar Mizrahi is the child of Plaintiff Ayelet Haramati Mizrahi and Plaintiff Avraham Mizrahi. Plaintiff Itamar Mizrahi is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

346.    Plaintiff Tomer Mizrahi is the child of Plaintiff Ayelet Haramati Mizrahi and Plaintiff Avraham Mizrahi. Plaintiff Tomer Mizrahi is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

347.    Plaintiff Edith Hyams is the sibling of Plaintiff Estate of Varda Haramaty. Plaintiff Edith Hyams is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

348.    Plaintiffs Estate of Varda Haramaty, Ayelet Haramati Mizrahi, Avraham Mizrahi, Itamar Mizrahi, Tomer Mizrahi, and Edith Hyams are hereinafter collectively referred to as "The Haramati-Mizrahi-Hyams Family."

349.    On October 7, 2023, Plaintiff Estate of Varda Haramaty was in her home in Re'im, Israel, and present when she was ruthlessly attacked and killed by Hamas with machine guns, grenades, and other weapons.

350.    On October 7, 2023, Plaintiffs Ayelet Haramati Mizrahi and Avraham Mizrahi were present in their home in Re'im, Israel, when their kibbutz was ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

351.    On October 7, 2023, Plaintiff Itamar Mizrahi was at his apartment in Re'im, Israel, and present when he was ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

352.    At approximately 6:30 a.m., Plaintiffs Ayelet Haramati Mizrahi and Avraham Mizrahi were startled awake by the sounds of shooting missiles. They hurried to their saferoom. Plaintiff Ayelet Haramati Mizrahi immediately called her parent, Plaintiff Estate of Varda Haramaty, who lived in a nearby apartment, to check on her. Then she called her children, Roee Mizrahi and Plaintiff Itamar Mizrahi, who lived in the youth apartments nearby on the kibbutz. Everyone was securely hiding in their saferooms.

353.    Plaintiff Itamar Mizrahi awoke to sirens at 6:30 a.m. He hurried to his saferoom, but the room was not fully secure because the door did not lock, and the window did not fully close. He and a friend who was with him sat on the floor in silence, praying that they would not be harmed. About 30 minutes later, Plaintiff Itamar Mizrahi started to hear gunshots, and then, through a window, saw a terrorist walking outside of his house. He watched in horror as the terrorist kidnapped people who were hiding in a nearby bomb shelter. Shortly after that, around 8:15 a.m., terrorists broke the windows and doors to Plaintiff Itamar Mizrahi's home.

Miraculously, the terrorists did not enter his saferoom. He was terrified and unsure of what would happen next.

354.    Plaintiffs Ayelet Haramati Mizrahi and Avraham Mizrahi watched the television in their saferoom to stay aware of what was happening outside. They saw that the terrorists were in Sderot, and then they heard terrifying sound of gunshots. Plaintiff Avraham Mizrahi called the kibbutz's security and learned that the terrorists were on their kibbutz. Plaintiff Ayelet Haramati Mizrahi called Plaintiff Estate of Varda Haramaty, to warn her, but there was no answer. She then called Plaintiff Estate of Varda Haramaty's partner who lived in an adjacent apartment, and he went to check on her. The partner frantically called Plaintiff Ayelet Haramati Mizrahi back, screaming that Plaintiff Estate of Varda Haramaty had been murdered, shot in the head. Plaintiff Ayelet Haramati Mizrahi was horrified and overcome with grief.

355.    Despite her great sorrow for the loss of her parent, Plaintiff Ayelet Haramati Mizrahi knew that the unfolding situation was serious, and she needed to stay strong to survive. She gathered her senses and started making calls since she was responsible for contacting families in the kibbutz in emergencies.

356.    As a result, she also received information regarding the kibbutz members who were murdered. It was gut-wrenching to hear each name, as she knew everyone. Plaintiff Ayelet Haramati Mizrahi also had to respond to calls for help, and people asking someone to take their children to safety. It was all horrible and she was overwhelmed and distraught.

357.    Around 10:00 a.m., Plaintiff Itamar Mizrahi learned about the brutal murder of his dear grandparent. He was devastated and heartbroken.

358.    At some point, Plaintiffs Ayelet Haramati Mizrahi and Avraham Mizrahi lost contact with their child, Roee, whose phone charge had run out. They were extremely worried

about him and did not know if he was safe. They spent hours waiting for information about his status. Later in the evening, they were able to communicate with security and Israeli Defense Forces, who informed them that the terrorists had set up their base in the apartment next to Roee's and that they planned to destroy the area with rockets. Plaintiff Ayelet Haramati Mizrahi begged and pleaded with them not to do that because her child was in there and he would surely be killed.

359.    Plaintiff Itamar Mizrahi was rescued from his home by the community security team around noon and taken to another home that had not been destroyed and was thought to be safer. He remained there with five other people who had been saved from their hiding places for about 24 hours until they were all rescued and relocated once again. Throughout those 24 hours, Plaintiff Itamar Mizrahi painfully listened to the harrowing sounds of battle, gunshots, explosions, and dreadful screaming in Arabic. When Plaintiff Itamar Mizrahi finally left the kibbutz, he saw burned bodies, cars, and foliage in every direction. These images are forever seared into his mind.

360.    Plaintiffs Ayelet Haramati Mizrahi and Avraham Mizrahi remained in hiding in the saferoom all night. At one point, they heard people in their home speaking Arabic. They sat in silence and distress. Finally, the next afternoon, they received a call from one of the makeshift treatment centers set up, informing them that Roee was there and being treated for a gunshot wound. They were relieved to know his whereabouts but needed to get to him. They left the saferoom immediately and rushed to the treatment center, despite the great risk to their own safety.

361.    Roee had been shot in the hand and endured surgery to repair the damage. He remained in the hospital for four days. Plaintiff Ayelet Haramati Mizrahi stayed with him the entire time, but Plaintiff Avraham Mizrahi went back to check on their home. Everything in the area was destroyed. The once beautiful place he called home was now a war zone.

362.    Once Roee was released from the hospital, they all went to Eilat, where the displaced people had been relocated. They stayed there for two months. Roee's home had also been destroyed. Plaintiff Itamar Mizrahi joined them for a month.

363.    Plaintiff Tomer Mizrahi was in Thailand when he was alerted about the unfolding Attack, and he desperately tried to stay in contact with his family members and get information from afar. During that time, he was overwrought with worry, and feared for the worst, while also frantically trying to stay in touch with the civil emergency team of the kibbutz and the family.

364.    Plaintiff Edith Hyams, who lives in Moshav Ram On, was desperate to get in contact with her sibling, Plaintiff Estate of Varda Haramaty. When she first spoke to Plaintiff Estate of Varda Haramaty, she was safe. When she called again a second time, no one answered. A short while later, Plaintiff Estate of Varda Haramaty's partner called Plaintiff Edith Hyams, screaming that their angel was gone, that Plaintiff Estate of Varda Haramaty had been murdered. Plaintiff Edith Hyams screamed and cried, inconsolable, for two full days, to the point that she lost her voice. Plaintiff Estate of Varda Haramaty was her best friend, not just her sibling. She was lost without her.

365.    After the Attack, Plaintiff Ayelet Haramati Mizrahi could not return to work for two months. She became easily agitated, would lose patience with people easily, and was constantly overwhelmed with sadness.

366.    Plaintiff Ayelet Haramati Mizrahi and her family members are all heartbroken for the loss of Plaintiff Estate of Varda Haramaty, and for what happened to their family, their friends, and the community that they called home. Before the Attack, they enjoyed what they described as a wonderful life with a vision for a bright future. Now, that vision has drastically changed. None of them will ever be the same again.

367.    Plaintiff Itamar Mizrahi is no longer working and suffers from post-traumatic stress disorder, nightmares, and anxiety. He prefers to be by himself.

368.    The Plaintiffs detailed herein each suffered immense injuries that are ongoing and permanent.

369.    As a result of the October 7 Attack, Plaintiff Estate of Varda Haramaty suffered wrongful death.

370.    As a result of the October 7 Attack, and the injuries Varda Haramaty suffered, Plaintiff Estate of Varda Haramaty, has past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of Varda Haramaty's beneficiaries.

371.    As a result of the October 7 Attack, and Plaintiff Estate of Varda Haramaty's wrongful death, Plaintiff Ayelet Haramati Mizrahi and Plaintiff Edith Hyams suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Estate of Varda Haramaty, and the subsequent loss of her life, continue to have a lasting effect on her family members.

372.    As a result of the October 7 Attack and the injuries they suffered, Plaintiffs Ayelet Haramati Mizrahi, Avraham Mizrahi, and Itamar Mizrahi have past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, loss of earning capacity.

373.    As a result of the October 7 Attack, Plaintiffs Estate of Varda Haramaty, Ayelet Haramati Mizrahi, Avraham Mizrahi, Itamar Mizrahi, Tomer Mizrahi, and Edith Hyams, suffered

severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked.

### Sabag-Vage Families

374.    Plaintiff Asher Sabag is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

375.    Plaintiff Michal Sabag is the spouse of Plaintiff Asher Sabag. Plaintiff Michal Sabag is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

376.    Plaintiff Dor Michael Sabag is the child of Plaintiffs Asher Sabag and Michal Sabag. Plaintiff Dor Michael Sabag is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

377.    Plaintiffs Asher Sabag, Michal Sabag, and Dor Michael Sabag are hereinafter collectively referred to as "The Sabag Family."

378.    Plaintiff Danny Ofer Vage is the sibling of Plaintiff Michal Sabag. Plaintiff Danny Ofer Vage is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

379.    Plaintiff Gat Vage is the spouse of Plaintiff Danny Ofer Vage. Plaintiff Gat Vage is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

380.    Plaintiff H.V., minor child, is the child of Plaintiffs Danny Ofer Vage and Gat Vage. Plaintiff H.V., minor child, is a citizen of Israel and at the time of the acts alleged  and at all other times relevant hereto, was domiciled in Israel.

381.    Plaintiff S.V., minor child, is the child of Plaintiffs Danny Ofer Vage and Gat Vage. Plaintiff S.V., minor child, is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

382.    Plaintiff Danny Ofer Vage brings this action individually and as legal guardian of Plaintiffs H.V., minor child, and S.V., minor child.

383.    Plaintiffs Danny Ofer Vage, Gat Vage, H.V., minor child, and S.V., minor child, are hereinafter collectively referred to as "The Vage Family."

384.    On October 7, 2023, The Sabag Family was at home in Kibbutz Nir Yitzhak, Israel, and present when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

385.    On October 7, 2023, The Vage Family was at home in Kibbutz Nir Yitzhak, Israel, and present when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

386.    Around approximately 6:15 a.m., The Sabag Family awoke to the frightening sounds of alarms and bombs exploding. They immediately rushed from their beds to their saferoom, where they remained until the terrifying sounds outside quieted. After some time, they felt like they could safely exit the saferoom, but the deafening alarms quickly sounded again, and they hurried back into the saferoom.

387.    Since they had a bed in the saferoom, Plaintiff Dor Sabag and his sibling, Oriya Sabag, tried to rest while Plaintiffs Michal Sabag and Asher Sabag watched in disbelief the images of Hamas terrorists riding around in Jeeps, waving their flag, and yelling with their weapons raised above their heads. Bombs were exploding all around them and they knew that Israel was being invaded.

388.    The Vage Family also awoke around 6:15 a.m. to dreadful sounds of warning alarms and rockets exploding. They immediately rushed to their saferoom and waited until the noises outside calmed down. They could hear gunshots and blasts outside, and, from neighborhood text messages, they learned that terrorists were marching around the kibbutz, entering people's homes, and wreaking havoc. The Vage Family quickly realized that something terrifying and shocking was happening in their kibbutz.

389.    When the noises quieted and they thought it was safe, The Vage Family hurried from their home to Plaintiff Michal Sabag's home because her two sons had military backgrounds and would be able to protect them.

390.    Since Plaintiff Dor Michael Sabag had already completed his mandatory military service, and his sibling, Oriya, was currently serving, they both bravely stood guard outside the saferoom with weapons. After receiving a desperate message from a friend who was alone and scared at the nearby youth neighborhood, Plaintiff Dor Michael Sabag decided he needed to help her and courageously left the house to get her, along with two other youths. Valiantly, Plaintiff Dor Michael Sabag successfully rescued them and brought them back to his house. They, along with Plaintiffs Michal Sabag, Asher Sabag, and The Vage Family, all huddled together, away from windows.

391.    The Sabag Family and the Vage Family could hear the relentless shooting of guns outside their home. Each of the Plaintiffs remained in constant contact with their friends and relatives through text messages, exchanging information. Some of their neighbors were asking for help. From these messages, they were able to track the terrorists' locations and knew the terrorists were coming closer to their house. They could also hear the gunshot sounds outside getting closer to them and they heard Arabic screaming all around. When the person in charge of the security of

the kibbutz did not reply to their messages, The Sabag and Vage families assumed he had been killed, which was later confirmed. The red alerts kept sounding and they felt helpless and defenseless.

392.    After a few hours fearing for their safety, at noon, a few Israeli Defense Forces soldiers came to their home. They informed Plaintiff Dor Michael Sabag and Oriya of the escalating and devastating attack going on outside. Over the fear and protests of their parents, Plaintiff Dor Michael Sabag and Oriya geared up to help the soldiers fight against the terrorists. Outside, Plaintiff Dor Michael Sabag and Oriya saw dead bodies all around the area. In what they now anticipated to be a life-and-death battle, they grabbed chest protectors and helmets from the bodies of dead soldiers to protect themselves and began the excruciating and atrocious task of clearing houses for the next 5 hours, while Plaintiffs Michal Sabag and Asher Sabag sat anxiously and desperately awaiting communications from their children again.

393.    Plaintiff Dor Michael Sabag eventually called, after what seemed like forever, and instructed Plaintiffs Asher Sabag and Michal Sabag not to leave the house and not to open the door for anyone. They did not hear from him, or Oriya, again until the next day and were distraught with distress and worry the entire time. They hid in the house, without any weapons, for hours, listening to the blaring siren, exploding missiles, and deafening gunfire of the terrorists. For countless hours, the terrorists ransacked and destroyed homes, stole valuables, and murdered and kidnapped their innocent community members. It took the army what felt like an eternity to reach the kibbutz, engage in battle, and liberate their community from the hands of the evil terrorists.

394.    The Israeli Defense Forces eventually came to their home and directed them to evacuate to a nearby school, but Plaintiffs Michal Sabag, Asher Sabag, and The Vage Family did not feel it was safe to leave, so they remained in the home. During this time, they kept receiving

text messages from other people on the kibbutz that detailed loved ones being taken hostage, missing, or killed.

395.    Plaintiff Dor Michael Sabag met people who were looking for a friend at the NOVA Music Festival and he rode along with them to assist in the search. They flipped bodies to try to identify their friend but could not take the painful and gruesome task any longer. Plaintiff Dor Michael Sabag returned to the kibbutz and his family on the evening of Sunday, October 8, 2023, where he witnessed in horror and disbelief the brutal destruction of the once peaceful and beautiful neighborhood. Seven people were murdered, one a close friend. Four people were kidnapped. Countless people were injured. The kibbutz was destroyed. Oriya continues to serve in the military.

396.    On Monday, October 9, 2023, they were all evacuated with others who had been rescued and relocated to a hotel in Eilat, where they have lived ever since. Their thoughts remained with the community members who had been abducted and/or murdered.

397.    Before the October 7 Attack, The Sabag Family and the Vage Family each loved living in their kibbutz. They had a lot of friends on the kibbutz, and their lives were fulfilling.

398.    Since the Attack, Plaintiff Asher Sabag goes through every day severely frightened and listless. He has been unable to function normally. He is unable to motivate himself to do anything. He stays in the hotel room and sits in front of the television from the time he wakes until he goes to bed. He only watches the news channels. He cannot bring himself to work.

399.    For months, Plaintiff Michal Sabag experienced nightmares every night about terrorists. She does not feel like she has a safe home anymore. She feels unsettled. She does not think much about the future anymore.

82

400.    The Sabag Family and the Vage Family now live in small hotel rooms wondering about what they have left. With so much loss they have experienced, they feel sad and hopeless. They are afraid for their children.

401.    Plaintiff Dor Michael Sabag has gone through a variety of emotions. At times, he is strong and not in need of any help. At others, he is unable to focus and distant.

402.    Oriya continues to battle against the terrorists who he watched destroy the lives of his friends and family.

403.    They have all lost all sense of security and know that life on their kibbutz will never be the same again, even if the kibbutz is revived.

404.    The Plaintiffs detailed herein each suffered immense injuries that are ongoing and permanent.

405.    As a result of the October 7 Attack and the injuries they suffered, Plaintiffs Asher Sabag, Michal Sabag, and Dor Michael Sabag, have past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, loss of earning capacity.

406.    As a result of the October 7 Attack, Plaintiffs Asher Sabag, Michal Sabag, and Dor Michael Sabag, suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked.

407.    As a result of the October 7 Attack and the injuries they suffered, Plaintiffs Danny Ofer Vage, Gat Vage, H.V., minor child, and S.V., minor child, have past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, loss of earning capacity.

83

408.    As a result of the October 7 Attack, Plaintiffs Danny Ofer Vage, Gat Vage, H.V., minor child, and S.V., minor child, suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked.

**Shindel Family**

409.    Plaintiff Estate of Mark Shindel was a citizen of Israel and Estonia and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

410.    Plaintiff Julia Shindel is the parent of Plaintiff Estate of Mark Shindel. Plaintiff Julia Shindel is a citizen of Israel and at the times of the acts alleged and at all other times relevant hereto, was domiciled in the United States. Plaintiff Julia Shindel brings this action individually and as heir-at-law on behalf of the Estate of Mark Shindel.

411.    Plaintiff Igor Shindel is the parent of Plaintiff Estate of Mark Shindel. Plaintiff Igor Shindel is a citizen of Israel and at the times of the acts alleged and at all other times relevant hereto, was domiciled in the United States.

412.    Plaintiff Guy Shindel is the stepbrother of Plaintiff Estate of Mark Shindel. Plaintiff Guy Shindel is a citizen of Israel and at the times of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

413.    Plaintiff B.S., minor child, is the brother of Plaintiff Estate of Mark Shindel. Plaintiff B.S. is a citizen of Israel and at the times of the acts alleged, and at all other times relevant hereto, was domiciled in the United States.

414.    Plaintiff Julia Shindel also brings this action as legal guardian of Plaintiff B.S., minor child.

415.    Plaintiffs Estate of Mark Shindel, Julia Shindel, Igor Shindel, Guy Shindel, and B.S., minor child, are hereinafter referred to as "The Shindel Family."

416.    Plaintiff Estate of Mark Shindel was admitted to Ben Gurion University and was scheduled to begin his studies on October 15, 2023. Until then, he volunteered to help with studies for at-risk youth. On October 7, 2023, Plaintiff Estate of Mark Shindel attended the NOVA Music Festival with friends to celebrate the start of the new academic year.

417.    On the morning of October 7, 2023, shooting rockets began to zoom overhead. Plaintiff Estate of Mark Shindel sprinted to take refuge in a small valley nearby with other festival goers. While the horrors of the attack were unfolding around him, Plaintiff Estate of Mark Shindel tried to keep the others hiding with him in good spirits. He also shared water and, when possible, heroically assisted in getting people into cars to escape.

418.    Plaintiffs Julia Shindel and Igor Shindel, who were in Chicago, Illinois, at the time of the Attack, stayed in contact via phone and messages with their child, Plaintiff Estate of Mark Shindel, for most of that morning, messaging with him. Plaintiff Estate of Mark Shindel continuously updated his parents on his status until around 10:30 a.m., which marked the final message they received from him, and his safety and whereabouts became unknown.

419.    Plaintiff Julia Shindel promptly took a flight back to Israel to search for Plaintiff Estate of Mark Shindel. Once in Israel, Plaintiff Julia Shindel devastatingly provided authorities with a DNA sample to assist in the identification of his body, should it become necessary. After some time, it became clear to Plaintiffs Julia Shindel and Igor Shindel that there were only two possible results left for the families of those missing after October 7, and each of them was devastating to imagine. Their beloved son, Plaintiff Estate of Mark Shindel, was either murdered or kidnapped. For Plaintiffs Julia Shindel and Igor Shindel, it was an excruciating waiting game with likely devastating results.

420.    After several agonizing days later, Plaintiffs Julia Shindel and Igor Shindel received tragic and dreadful news that Plaintiff Estate of Mark Shindel had been cruelly murdered by terrorists at the NOVA Music Festival.

421.    Plaintiff Julia Shindel received her child's body on October 13, 2023. Plaintiff Estate of Mark Shindel's body had been deteriorating in a field for several days, so it smelled wretched and was covered in worms and insects. His left eye was replaced by the hole from close-range gunshot. Plaintiff Julia Shindel could not hug or kiss her son goodbye and is forever left with the lasting image of his mutilated body. Plaintiff Estate of Mark Shindel's friends who survived told Plaintiff Julia Shindel that her son died an undignified death at the hands of vile Hamas terrorists.

422.    Plaintiff Estate of Mark Shindel's father, Plaintiff Igor Shindel, and siblings, Plaintiffs Guy Shindel, and B.S., minor child, came directly to the funeral from the airport during wartime to say goodbye to their beloved brother.

423.    The Shindel Family suffered immense and unfathomable injuries that are ongoing and permanent. Plaintiff B.S., minor child, once a strong student, now struggles in school. Their loss is immeasurable, and it extends to the lost privilege of having grandchildren from their son.

424.    As a result of the October 7 Attack, Plaintiff Estate of Mark Shindel suffered wrongful death.

425.    As a result of the October 7 Attack, and the injuries Mark Shindel suffered, Plaintiff Estate of Mark Shindel has past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of Mark Shindel's beneficiaries.

426.    As a result of the October 7 Attack, and Plaintiff Estate of Mark Shindel's wrongful death, his family members, Plaintiffs Julia Shindel, Igor Shindel, Guy Shindel, and B.S., minor child, suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Estate of Mark Shindel, and the subsequent loss of his life, continue to have a lasting effect on his family members.

### Salomon Family

427.    Plaintiff Estate of Yuval Salomon was a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

428.    Plaintiff Doron Salomon is the parent of Plaintiff Estate of Yuval Salomon. Plaintiff Doron Salomon is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel. Plaintiff Doron Salomon brings this action individually and as heir-at-law on behalf of the Estate of Yuval Salomon.

429.    Plaintiffs Estate of Yuval Salomon and Doron Salomon are hereinafter collectively referred to as "The Salomon Family."

430.    On October 7, 2023, Plaintiff Estate of Yuval Salomon was at home in the kibbutz of Kfar Aza, Israel, when he was ruthlessly attacked and killed by Hamas with machine guns, grenades, and other weapons.

431.    On October 7, 2023, Plaintiff Doron Salomon was at home in the kibbutz of Kfar Aza, Israel, when he was ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

432.    On October 7, 2023, around 6:30 am, Plaintiff Doron Salomon was at home in Kfar Aza when he was awakened to the sound of gunfire, rockets, and explosions that permeated throughout the kibbutz. He woke his spouse, Simcha, who was sleeping without her hearing aids, and rushed her to the safety shelter in their house. On the way, they grabbed any source of light

Case 1:24-cv-04765    Document 1    Filed 06/24/24    Page 92 of 167

they could find, batteries, and a butcher's knife, just in case they needed to defend themselves. Plaintiff Doron Salomon quickly locked the shelter door behind them.

433.    Through a Kfar Aza messaging group, Plaintiff Doron Salomon learned that the doors to many of the saferooms in the homes on the kibbutz could be opened from the outside. Plaintiff Doron Salomon, determined to protect Simcha and himself, braced his body on the door to the saferoom and held it closed tightly with one arm while holding the butcher's knife in the opposite hand.

434.    On October 7, 2023, Plaintiff Estate of Yuval Salomon, the youngest child of Plaintiff Doron Salomon and Simcha, was living in a small youth section of Kibbutz Kfar Aza that had been attacked that morning by over 100 armed terrorists. Tragically, very few from this part of the kibbutz survived the Attack. Most residents were brutally murdered, gravely injured, or mercilessly taken hostage.

435.    At approximately 7:30 a.m., Plaintiff Doron Salomon received a heart-stopping text from his child. Plaintiff Estate of Yuval Salomon told him that terrorists had infiltrated his living quarters and that he had been shot, but despite his injuries, he managed to kill one terrorist and fight off two others. He was bleeding and in pain, and in dire need of help.

436.    Plaintiff Doron Salomon continued to communicate with Plaintiff Estate of Yuval Salomon throughout the morning to keep abreast of what was happening. Plaintiff Doron Salomon heroically tried to comfort his child by telling him that help was on the way, and instructed Plaintiff Estate of Yuval Salomon to use a tourniquet to stop his bleeding from the gunshot wound. Meanwhile, Plaintiff Estate of Yuval Salomon was bleeding to death and fighting for his life, while also holding the door to his saferoom.