437.    At approximately 10:30 a.m., Plaintiff Estate of Yuval Salomon sent a final text to his father, in desperation, telling him that he could not hold the door any longer and that he was going to have to fight the terrorists. Plaintiff Estate of Yuval Salomon told his father that he loved him very much, and that they would not likely see each other again. It was a shattering moment for them.

438.    Plaintiff Estate of Yuval Salomon was killed by Hamas terrorists.

439.    Plaintiff Doron Salomon and Simcha remained trapped helplessly in their saferoom.

440.    At approximately 2:00 am on October 8, 2023, Plaintiff Doron Salomon's telephone battery was running out, so he crawled out of the saferoom to assess the situation and charge his phone. Because the Israeli Defense Forces were still very far from his location, he went back into the saferoom and closed the door. He continued to clutch the door closed until the next morning, through tears, devastation, and tremendous sorrow.

441.    On October 8, 2023, at approximately 9:00 am, Plaintiff Doron Salomon and Simcha were rescued and evacuated by the military.

442.    As of February 2024, Plaintiff Doron Salomon and Simcha were living in a dorm room at Reichmann University in Herzliya and were still unable to return to their home in Kfar Aza.

443.    The Salomon Family suffered immense injuries that are ongoing and permanent.

444.    As a result of the October 7 Attack, Plaintiff Estate of Yuval Salomon suffered wrongful death.

445.    As a result of the October 7 Attack, and the injuries suffered, Plaintiff Estate of Yuval Salomon has past and future noneconomic damages, including severe mental pain and

suffering and loss of enjoyment of life, and past and future economic damages, including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of Yuval Salomon's beneficiaries.

446.     As a result of the October 7 Attack, and Plaintiff Estate of Yuval Salomon's wrongful death, Plaintiff Doron Salomon suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by the Estate of Yuval Salomon, and the subsequent loss of his life, continue to have a lasting effect on his family members.

447.     As a result of the October 7 Attack and the injuries he suffered, Plaintiff Doron Salomon has past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, and loss of earning capacity.

**Halifa Family**

448.     Plaintiff Estate of Gaya Halifa was a citizen of Israel and at the time of the acts alleged, and at all times relevant hereto, was domiciled in Israel.

449.     Plaintiff Avraham Halifa is the parent of Plaintiff Estate of Gaya Halifa. Plaintiff Avraham Halifa is a citizen of Israel, and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel. Plaintiff Avraham Halifa brings this action individually and as legal guardian of the Estate of Gaya Halifa.

450.     Plaintiff Sigal Halifa is the parent of Plaintiff Estate of Gaya Halifa and the spouse of Plaintiff Avraham Halifa. Plaintiff Sigal Halifa is a citizen of Israel, and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

451.     Plaintiff Noga Halifa is the sibling of Plaintiff Estate of Gaya Halifa. Plaintiff Noga Halifa is also the child of Plaintiffs Sigal Halifa and Avraham Halifa. Plaintiff Noga Halifa is a

90

citizen of Israel, and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

452.    Plaintiff Ido Halifa is the sibling of Plaintiff Estate of Gaya Halifa. Plaintiff Ido Halifa is also the child of Plaintiffs Sigal Halifa and Avraham Halifa. Plaintiff Ido Halifa is a citizen of Israel, and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

453.    Plaintiffs Estate of Gaya Halifa, Sigal Halifa, Avraham Halifa, Noga Halifa, and Ido Halifa are hereinafter collectively referred to as "The Halifa Family."

454.    On the evening of October 6, 2023, Plaintiff Estate of Gaya Halifa met with her family and discussed her plans to attend the NOVA Music Festival the next day, and that she would be leaving with her girlfriend very early the next morning. She was so excited.

455.    On October 7, 2023, Plaintiffs Sigal Halifa, Avraham Halifa, Noga Halifa, and Ido Halifa woke up at approximately 6:30 a.m. to the sounds of blaring sirens, however, the magnitude of the situation did not immediately register with them. Plaintiff Sigal Halifa then began to receive numerous frantic text messages from other parents who had children at the NOVA Music Festival, concerned about their safety.

456.    Plaintiff Avraham Halifa was able to communicate with Plaintiff Estate of Gaya Halifa for most of the morning as she tried to escape to safety, which was incredibly difficult due to the open terrain around the concert venue. Hiding places were scarce. Plaintiff Avraham Halifa kept in close contact with Plaintiff Estate of Gaya Halifa as she updated him on her whereabouts, hoping that he could arrange a location where he could pick her up.

457.    Meanwhile, Plaintiff Ido Halifa had learned that in one of the simultaneous planned attacks that occurred that day, everyone who had attended a friend's event had been brutally

91

murdered. Plaintiff Ido Halifa realized the severity of the situation and repeatedly called family members to find out ~~what was happening with~~ everyone, but especially his sibling, ~~Plaintiff Estate~~ of Gaya Halifa.

458.    Throughout the morning, Plaintiff Avraham Halifa continued to communicate with Plaintiff Estate of Gaya Halifa and followed her efforts to escape the terrorists. He provided emotional support to her, reassuring her that she would be fine, and also logistical guidance in finding a place where she could hide. Then, they planned, they would arrange a location for him to pick her up when possible. He stayed strong and positive for her, despite the fear he felt for her safety.

459.    As was her nature not to worry her family, Plaintiff Estate of Gaya Halifa called Plaintiff Sigal Halifa to reassure her that she was okay and asked Plaintiff Sigal Halifa to let Plaintiff Ido Halifa know that as well because she knew he would be concerned. Plaintiff Sigal Halifa remembered this call well because it was the last time she spoke to her child. She will forever be riddled with guilt that she forgot to tell her that she loved her in the panic of the moment.

460.    Plaintiff Estate of Gaya Halifa managed to stay alive for several hours after the initial attack by hiding and moving when needed as she watched the advancement of the terrorists. She informed Plaintiff Avraham Halifa that a friend named Ben had picked her up by car and was helping her and others escape. She called him, "Ben the Hero" because he had returned several times with his vehicle to help people escape.

461.    Plaintiff Avraham Halifa felt an overwhelming need to do more to help Plaintiff Estate of Gaya Halifa, so he left his home to go pick her up even though he did not have an exact location point for where she could get to him safely. He was desperate and eager to have her in his care. He waited for the next call from Plaintiff Estate of Gaya Halifa, which came at 10:12 a.m.

Instead of details of a pickup location, the call was filled with Plaintiff Estate of Gaya Halifa's panic and screams that they were being shot at. The call lasted just a few seconds and then it was over. Plaintiff Avraham Halifa listened to his dear child's final breaths. Two deep breaths which were then followed by silence. He stopped his car and screamed, not knowing what else to do.

462.    On October 7, 2023, Plaintiff Estate of Gaya Halifa was murdered by terrorists while trying to escape the NOVA Music Festival.

463.    Plaintiff Avraham Halifa tried to collect himself enough to call Plaintiff Sigal Halifa, but he could not stop his screaming when she answered that the terrorists had shot their beautiful daughter. Plaintiff Sigal Halifa wailed and cried like she never had in her life. Plaintiff Sigal Halifa adored her child and was devastated by her murder. The pain was tremendous and indescribable.

464.    The Halifa Family suffered immense injuries that are ongoing and permanent.

465.    The Halifa family now receives psychological treatment and support from a public organization that specializes in grief and pain for their injuries.

466.    As a result of the attack on October 7, 2023, Plaintiff Estate of Gaya Halifa suffered wrongful death.

467.    As a result of the October 7 Attack, and the injuries Gaya Halifa suffered, Plaintiff Estate of Gaya Halifa has past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including lost income, loss of earning capacity, and funeral and burial expenses. In addition to a survival claim, the Estate brings a claim for wrongful death on behalf of Gaya Halifa's beneficiaries.

468.    As a result of the October 7 Attack, and Plaintiff Estate of Gaya Halifa's wrongful death, Plaintiff Sigal Halifa, Plaintiff Avraham Halifa, Plaintiff Noga Halifa, and Plaintiff Ido

Halifa suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, medical expenses, and economic loss. The injuries suffered by Estate of Gaya Halifa, and the subsequent loss of her life, continue to have a lasting effect on her family members.

### Lahav-Buch-Paster-Szatmari Families

469.    Plaintiff Irit Lahav is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

470.    Plaintiff Tamar Lahav is the sibling of Plaintiff Irit Lahav. Plaintiff Tamar Lahav is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

471.    Plaintiff Eliyahu Hanan Buch is the sibling of Plaintiff Irit Lahav. Plaintiff Eliyahu Hanan Buch is a citizen of Israel and Belgium and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Belgium.

472.    Plaintiff Nitzan Lahav-Paster is the sibling of Plaintiff Irit Lahav. Plaintiff Nitzan Lahav-Paster is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

473.    Plaintiff Yaara Szatmari is the sibling of Plaintiff Irit Lahav. Plaintiff Yaara Szatmari is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

474.    Plaintiff Ilan Lahav is the sibling of Plaintiff Irit Lahav. Plaintiff Ilan Lahav is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

475.    Plaintiff Galit Lahav is the spouse of Plaintiff Ilan Lahav. Plaintiff Galit Lahav is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

476.    Plaintiff Gui Lahav is the child of Plaintiffs Ilan Lahav and Galit Lahav. Plaintiff Gui Lahav is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

477.    Plaintiff R.L., minor child, is the child of Plaintiffs Ilan Lahav and Galit Lahav. Plaintiff R.L., minor child, is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel. Plaintiff Galit Lahav brings this action individually and as legal guardian of Plaintiff R.L., minor child.

478.    Plaintiff Omer Lahav is the child of Plaintiffs Ilan Lahav and Galit Lahav. Plaintiff Omer Lahav is a citizen of Israel and at the time of the acts alleged, and at all other times relevant hereto, was domiciled in Israel.

479.    Plaintiffs Irit Lahav, Tamar Lahav, Eliyahu Hanan Buch, Nitzan Lahav-Paster, Yaara Szatmari, Ilan Lahav, Galit Lahav, Gui Lahav, R.L., minor child, and Omer Lahav are hereinafter collectively referred to as "The Lahav Family."

480.    On October 7, 2023, Plaintiff Irit Lahav was at home with her child in Kibbutz Nir Oz, Israel, and present when she and her family were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

481.    On October 7, 2023, Plaintiffs Ilan Lahav, Gui Lahav, R.L., minor child, were at home in Moshav Ein Habsor, Israel, when they were ruthlessly attacked by Hamas with machine guns, grenades, and other weapons.

482.    Plaintiff Irit Lahav was sleeping in her bed around 6:30 a.m. when she was startled awake by the sounds of missiles shooting through the sky overhead. In 12 quick seconds, she managed to run to the saferoom with her child, grabbing their dog and a phone on the way. Immediately after she closed the door to the saferoom, which did not have a lock, she heard

shooting sounds outside. Her neighbor texted her and told her that someone was shooting at her house. Plaintiff Irit Lahav locked the windows in the saferoom and turned off the lights, so it was nearly pitch black. She and her child did not speak a word, not even a whisper. They texted on a single phone to communicate with each other. They were so scared and alone and feared for their safety.

483.    Plaintiffs Ilan Lahav, Gui Lahav, and R.L., minor child, were awakened by the sounds of alarms at the same time and hurried to their saferoom. When they turned their phones on, they saw numerous texts from others saying that terrorists were attacking and approaching their area. Shortly after that, Plaintiffs Ilan Lahav, Gui Lahav, and R.L., minor child, heard what sounded like a bomb explode, so they went outside to look around. A local police officer yelled for them to get back inside, and they realized the alarms that day were different. They were under attack. They hid in the saferoom for the entire day listening to the terrifying sounds of gunshots and bombs exploding all around them, not knowing if or when the terrorists would infiltrate their home.

484.    The alarms continued to blast, and the sounds of bombs and gunfire became more frequent, louder, and seemingly closer. Plaintiffs Ilan Lahav, Gui Lahav, and R.L., minor child, listened to every sound so they could have an idea of how close or far the terrorists were to their home.

485.    About an hour later, Plaintiffs Ilan Lahav, Gui Lahav, and R.L., minor child, started receiving horrifying videos of the massacre at the NOVA Music Festival, and disbelief set in. Plaintiffs Ilan Lahav, Gui Lahav, and R.L., minor child, then remembered that their saferoom door did not lock and they needed to secure the door for safety, so they built a makeshift lock with a broomstick and a suitcase strap by rigging the inside of the door. They still did not feel totally

secure, and they continued to hear gunshots and bombs exploding outside and the terrorists were trying to enter their moshav.

486.   Plaintiff Irit Lahav and her child remained in their saferoom all day fearing for their lives, listening to a barrage of nonstop weapons blasting from every direction. Grenades were detonating all around their home. At one point, a neighbor texted Plaintiff Irit Lahav reporting that he could see armed militants nearby and told Plaintiff Irit Lahav to lock her doors.

487.   Since her saferoom door also did not lock, Plaintiff Irit Lahav, built a makeshift lock out of a vacuum cleaner hose, a boat oar, and a leather strap, with instruction and guidance from her brother, Plaintiff Ilan Lahav, over the phone.

488.   Plaintiff Irit Lahav and her child then built a wall of books to add a layer of protection against gunfire and hid under a table. Then they just watched the messages coming in over the phone, with the grim details that the terrorists were burning down houses and the people in them. Everyone was desperately pleading for help.

489.   Meanwhile, Plaintiffs Ilan Lahav, Gui Lahav, and R.J., minor child, were viewing videos from their group chats which showed trucks full of terrorists rambling around the area. At one point, the sounds of yelling and shooting seemed to get farther away from them, but they continued texting friends and family in other areas to warn them that terrorists were coming in their direction. They were in shock and disbelief at what was happening all around them.

490.   Around 10:30 a.m. that morning, Plaintiff Irit Lahav heard voices shouting in Arabic and shooting at her house from the outside. Then terrorists burst through her back door. She could hear them breaking things all around her home. After a few minutes, they came to the saferoom, shouting and beating on the door. Plaintiff Irit Lahav held her child tight as they tearfully said their goodbyes to each other. After several excruciatingly long minutes, the terrorists gave up

and left. With the light from her phone, Plaintiff Irit Lahav could see a hole in the saferoom's doorpost. Using some silver wire she had since she is a jewelry designer, she attempted to strengthen the security of the door. She and her child hid under the table again.

491.    About forty-five minutes later, the terrorists came back to Plaintiff Irit Lahav's home, shouting and shooting indiscriminately once again. The terrorists again tried to get into the saferoom, but were unsuccessful, and left. Over the course of the entire day, terrorists came back and tried to get into their saferoom five separate times. It was a day of nonstop, terrifying, endless horror for Plaintiff Irit Lahav and her child.

492.    Around 5:30 p.m., Plaintiff Gui Lahav received a text message asking him to go on guard duty, which is something that all residents of the moshav volunteer to do to protect each other and the moshav. Plaintiff Gui Lahav bravely arrived at the guard location, was given a gun, and then shown the direction from where the terrorists were coming. He was on high alert to protect the people of his moshav.

493.    Plaintiff Gui Lahav also selflessly provided his services in various ways throughout the next day, which included helping create a makeshift base for Israeli Defense Forces soldiers, providing them with food and water, as well as assisting with accountability, and evacuating families.

494.    Around 6:00 p.m., Plaintiff Irit Lahav heard a man speaking Hebrew, who identified himself as an Israeli Defense Forces soldier. She was extremely wary about letting him in, but he had some personal information about a friend of hers that caused her to believe that he was really with Israeli Defense Forces, so she cautiously opened the saferoom door. He told Plaintiff Irit Lahav that her house was destroyed and gave her a comforting kiss on the forehead.

He then instructed Plaintiff Irit Lahav and her child to put their shoes on, grab their dog and their essentials, and then they walked out of the house to another, safer location in the kibbutz.

495.    Along the journey out of the kibbutz, Plaintiff Irit Lahav witnessed the destruction everywhere and was saddened to see that the once beautiful kibbutz looked like a battlefield. She and her child were brought to a house with other people who were rescued. They did not see many of their friends, but they did see some of their friends' children crying for their parents. Forty people from their kibbutz were murdered that day. Seventy-seven people from their kibbutz were abducted and taken to Gaza. Five very close friends of hers had been taken hostage. It was an unforgettable day of shock and horror that will forever haunt them.

496.    Plaintiff Irit Lahav and her child were later escorted to another location, a kindergarten, that was considered bomb-proof. So many people were packed into that building without food or water and nowhere to sit. Some people were later moved to another kindergarten, so Plaintiff Irit Lahav and her child could then lie down and sleep on the floor for a short time. They were exhausted but could still hear weapons shooting until late in the night.

497    At 4:00 p.m. the next day, Plaintiff Irit Lahav was allowed to return to her home to get the belongings that she would need to take with her to Eilat, where those rescued were being taken. Plaintiff Irit Lahav did not want to go to Eilat and wanted to be with her family, so and her child instead went to a relative's house in Yaara Szatmari, forty-five minutes away. Throughout the entire trip, they were stressed and feared that they would come across more terrorists. Nonetheless, Plaintiff Irit Lahav tried to stay calm for her child.

498.    Plaintiff Ilan Lahav and his family went to Eilat, Israel, two days after the Attack began and remained there until January 2024, away from their home and the place they loved.

They each now struggle with sleep and eating issues, hypervigilance, and hypersensitivity to loud noises.

499.    Plaintiff Gui Lahav used to be an avid runner, but he can no longer bring himself to even go for a jog. His personality has changed drastically. He is now quick to anger, remains sad most of the time, and cannot concentrate on simple tasks. Plaintiff Gui Lahav hardly spoke at all for the first month after the Attack.

500.    As a result of the October 7 Attack, Plaintiff Irit Lahav cried all day and night and did not sleep for six weeks. She no longer has peace of mind and her heart pounds nonstop. Her anxiety is never-ending. While some of her injuries have begun to improve with the passage of time, she continues to experience bouts of crying, hyper-awareness, and unease around groups of men. Arabic speaking and writing frighten her. She cannot focus on life and tasks for more than one day ahead. She does not feel at peace and continues to suffer from extreme anxiety. She is now a very nervous person and struggled to return to work for three months. She gets angry easily, which was not her normal character before the attack.

501.    For a while, Plaintiff Irit Lahav could not bring herself to reach out to friends for fear that they were dead or had lost family members. It was too hard for her to manage. She still suffers from the difficulty of knowing that the terrorists invaded her home and scavenged through her personal belongings, stealing her credit cards, jewelry, money, and appliances. The terrorists left nothing behind, and what they did not take, they broke or destroyed. She and her child have lost everything.

502.    Plaintiff Irit Lahav is now admirably the spokesperson for her kibbutz. She is also working tirelessly to help get the hostages released and returned.

100

503.    Plaintiffs Irit Lahav, Tamar Lahav, Eliyahu Hanan Buch, Nitzan Lahav-Paster, Yaara Szatmari, Ilan Lahav, Galit Lahav, Gui Lahav, R.L., minor child, and Omer Lahav suffered immense injuries that are on-going and permanent.

504.    As a result of the October 7 Attack and the injuries they suffered, Plaintiffs Irit Lahav, Ilan Lahav, Gui Lahav, and R.L., minor child, each have past and future noneconomic damages, including severe mental pain and suffering, loss of enjoyment of life, past and future economic damages including medical expenses, lost income, loss of earning capacity.

505.    As a result of the October 7 Attack, Plaintiffs Irit Lahav, Ilan Lahav, Galit Lahav, Gui Lahav, R.L., minor child, and Omer Lahav each suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked.

506.    As a result of the October 7 Attack, Plaintiffs Tamar Lahav, Eliyahu Hanan Buch, Nitzan Lahav-Paster, and Yaara Szatmari, each suffered severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss, because their family members were attacked

## DEFENDANTS

507.    Defendant UNRWA is affiliated with but distinct from, the United Nations. It was first established by a UN General Assembly resolution in December 1949 and has operated since 1950. It has an office in Manhattan on East 44th Street, and full-time New-York-based staff working in that office. It works with Palestinian populations in a number of areas outside Gaza, including Jordan, Lebanon, Syria, and the West Bank, and no claim is made against it herein regarding any of its activities in those other areas.

508.    Defendant Phillipe Lazzarini is believed to be a citizen of Switzerland. He has served as Commissioner-General of UNRWA (the agency's most senior position) since March 2020. As Commissioner-General he (and his predecessors) had final overall responsibility for setting policy, overseeing operations, and fundraising.

509.    Defendant Pierre Krähenbühl is also believed to be a citizen of Switzerland. He served as Commissioner-General of UNRWA from 2014 until he resigned in November 2019 amid controversy over alleged mismanagement, corruption, and abuse of authority.

510.    Defendant Filippo Grandi is believed to be a citizen of Italy. He served as Commissioner-General of UNRWA from 2010 to 2014.

511.    Defendant Leni Stenseth is believed to be a citizen of Norway. She served as Deputy Commissioner-General of UNRWA from June 2020 until in or about June 2023. In that role she (like her predecessors) was the agency's second-most-senior leader[2] and worked directly with the Commissioner-General in providing strategic direction and operational leadership for the agency, sharing overall responsibility for setting policy, overseeing operations, and fundraising.

512.    Defendant Sandra Mitchell is believed to be a citizen of the United States. She served as Deputy Commissioner-General of UNRWA from late 2014 (after previously working at other roles at UNRWA) until her resignation in July 2019 amid the same controversy that subsequently led to Mr. Krähenbühl's resignation.

513.    Defendant Margot Ellis is believed to be a citizen of the United States. She served as Deputy Commissioner-General of UNRWA from 2010 until 2014.

514.    Defendant Greta Gunnarsdottir is believed to be a citizen of Iceland. She presently serves as Director of UNRWA's "Representative Office" in New York and has held that position

---

[2] Following Ms. Stenseth's tenure, the Deputy Commissioner-General role was in late 2023 divided between two separate individuals.

since early 2020.  In that capacity, she is part of the agency's senior leadership team and also oversees and directs all of UNRWA's New-York-based staff, whose relevant actions are detailed below.

515.  Each of the Individual Defendants, during their respective time in UNRWA's senior management, directed, ratified, and/or otherwise facilitated the wrongful policies and actions of UNRWA complained of herein.

516.  Claims are asserted against certain Individual Defendants who are no longer affiliated with UNRWA for their acts or omissions during their tenure with UNRWA but not for any act or omission following their departure from UNRWA's employment.  Plaintiffs reserve the right to name additional individuals as defendants as their investigation continues.

## BACKGROUND ON GAZA, HAMAS AND UNRWA

517.  In order to provide the relevant background context to understand the significance of the assistance Defendants provided to Hamas following its 2007 seizure of de facto power in Gaza, we now briefly describe the relevant pre-2007 histories of Gaza, Hamas, and UNRWA.

### Background on Gaza and Takeover by Hamas

518.  The current border between Israel and Gaza was originally part of the so-called "Green Line," reflecting the 1949 armistice agreements that brought an end to the first Arab-Israeli War that began in 1948.  Gaza was outside the Israeli-controlled territory, and from then until the Six Day War in 1967 was controlled by the government of Egypt.  UNRWA began work in Gaza almost immediately after its formation and continued to work in Gaza throughout this period.

519.  Egypt's defeat in the Six-Day War led to Israeli control and administration of all of Gaza from 1967 until 1994. Following the Camp David agreements of 1978, Israel withdrew from Egyptian territory in the Sinai that it had controlled since 1967, but Egypt did not at that time or

thereafter seek to resume control or administration of Gaza. UNRWA continued to work in Gaza throughout this period.

520.    Following the Oslo Accords of 1993, day-to-day control and administration of much but not all of Gaza was turned over by Israel to the Palestinian Authority, with Israel continuing on-the-ground control and administration of certain areas of Gaza until 2005. UNRWA continued to work in Gaza throughout this period.

521.    In 2005, Israel withdrew its remaining ground forces and administrative personnel from Gaza, and all Israeli settlers in Gaza were compelled to withdraw by the Israeli government if they did not leave voluntarily. A subsequent period of political instability led to a de facto civil war in Gaza, which resulted in Hamas becoming the de facto rulers of Gaza by no later than June 2007, after killing, expelling, or otherwise neutralizing its political rivals from the Palestinian Authority and other Palestinian factions, most notably including Fatah, which remains politically dominant on the West Bank. UNRWA has continued to work in Gaza since the Hamas takeover and thereafter began to aid and abet Hamas' terrorist actions, as set forth in greater detail below.

### Background Regarding Hamas

522.    From its foundation in 1987 and through the present day, the explicit political goal of Hamas has been to eliminate the State of Israel and create a fundamentalist, radical, jihad-centered, Islamic state that governs Gaza, the West Bank, and all territory now or previously claimed by Israel.

523.    Various other Palestinian groups claim to support either a two-state solution or a "one-state solution" in which all of that territory is controlled by a single multi-religious multi-ethnic society with equal civil rights for all. Hamas, by contrast, explicitly rejects that view, and instead claims in its governing charter that "[t]here is no solution to the Palestinian problem except

by Jihad," by which it means a genocidal war of ethnic cleansing against the entire current

Jewish population of Israel.

    524.    The same charter asserts that, among many other incendiary claims:

       a.    "Israel will exist and will continue to exist until Islam will obliterate it, just as

           it [Islam] obliterated others before it."

       b.    "The day the enemies usurp part of Muslim land [meant to include all of the

           current territory of Israel], Jihad becomes the individual duty of every

           Muslim. In the face of the Jews' usurpation, it is compulsory that the banner of

           Jihad be raised."

    525.    Senior Hamas figures have further expounded this specific vision of Jihad (a

concept which may mean different things to different Muslims) by public statements such as

"Allah gathered the Jews in Palestine not for them to have a homeland, but with the intent that it

will become their mass grave."

    526.    Hamas' specific version and vision of Islam, not universally shared with other

Muslims, is of a death-cult society, seeking not only the elimination of Israel, but universal

conversion of all societies to its violent, Jihadi culture, where the death for the sake of Allah is its

highest value. Its slogan, as set forth in the charter, is: "Allah is its target, the Prophet its model,

the Koran its constitution: Jihad is its path and death for the sake of Allah is the loftiest of its

wishes."

    527.    Indeed, radical Islamic groups with the same ideology as Hamas have frequently

been banned in other Arab and Muslim countries and have frequently engaged in terrorist acts in

such countries, including the assassination of Arab and Muslim political figures perceived as

insufficiently radical.

528.    Hamas has been consistently committed to terror and human rights violations in its actions, not merely in its rhetoric. For this reason, the United States Government designated Hamas as a Specially Designated Terrorist in 1995 under E.O. 12947, a Foreign Terrorist Organization in 1997 under 8 U.S.C. § 1189, and a Specially Designated Global Terrorist Group in 2001 under E.O. 13224. Hamas has remained designated to this day. These designations of Hamas were public events, well known to the entire international community, including Defendants. In addition, numerous Hamas leaders and fundraisers have been designated by the United States Government as Specially Designated Nationals whose assets have been frozen as a result of their activities for Hamas. Similar designations of Hamas have been made by, among others, the European Union and the United Kingdom.

529.    In both word and deed, Hamas has consistently made it clear that it does not feel obligated to conform to the minimum norms imposed by the law of nations on all states and other armed groups, including the prohibitions against deliberate targeting of civilians, mass murder of civilians, mass rape, hostage-taking, torture, crimes against humanity, and genocide.

530.    Following the Oslo Accords, as traditional Palestinian political groups with their own histories of violence began to contemplate negotiated solutions rather than violence, Hamas, which had explicitly rejected and denounced the Oslo Accords, gained increased support from extremists unwilling to consider such moderate alternatives.

531.    Subsequent to 2007, Hamas exploited its de facto control of Gaza both to use it as a staging ground for cross-border terrorist attacks targeting Israeli civilians and to slowly but continuously build up an infrastructure of facilities and personnel that would enable larger-scale terror attacks to be launched in the future, predictably culminating in the October 7 Attack.

106

Case 1:24-cv-04765    Document 1    Filed 06/24/24    Page 111 of 167

532.    Hamas also had a track record before the October 7 Attack of taking and holding Israeli civilians hostage in Gaza, including, for example, the kidnapping of Avera Mengistu (an immigrant from Ethiopia who has been held captive since 2014) and of Hisham al-Sayed (a member of Israel's Bedouin Arab community who has been held captive since 2015).

533.    Hamas permits designated Foreign Terrorist Organization Palestinian Islamic Jihad ("PIJ"), to operate from Gaza with some autonomy and coordinates with PIJ terrorist attacks against Israeli civilians. PIJ likewise benefits from the material support provided by UNRWA to Hamas.

534.    UNRWA and its senior leadership are hardly the only third parties who have helped Hamas build the terror infrastructure in Gaza that was predictably and foreseeably used to launch the October 7 Attack. In particular, Hamas has received very substantial material support from the current regime governing Iran, a notorious state sponsor of terrorism. Hamas has also coordinated its strategy and tactics with other Iranian-backed terror groups in the region, including but not limited to Hezbollah in Lebanon and the Houthi faction in Yemen, which have a history of perpetrating terrorist attacks against American and other Western civilian targets as well as Israeli civilian targets.

535.    But UNRWA was able to, and did, provide material assistance in Gaza to Hamas of a different nature and kind than outside backers like the Iranian government. It could operate openly on the ground in Gaza where others could not, and exploit its claimed "civil servant" status to impede preemptive security measures aimed at protecting Israeli civilians from future terror attacks. UNRWA's staff, facilities, and ability to truck cash U.S. dollars into Gaza formed a potent pillar of Hamas' plan to undertake the October 7 attack.

536.    The Defendants were all well aware of Hamas' continuing track record of genocidal terror attacks against Israeli civilians, both before and after its takeover of Gaza.  For example, the following is partial list of mass-murder attacks perpetrated by Hamas before it was in control of Gaza, all of which were extensively reported by the New York Times and/or other print media available in New York, and all major television media:

a.   August 31, 2004, 16 killed, 100 wounded, double suicide bombings on two buses;

b.   March 14, 2004, 10 killed, 16 wounded, double suicide bombings;

c.   September 9, 2003, 7 killed, 50 wounded, suicide bombing at Café Hillel;

d.   August 19, 2003, 22 killed, 135 wounded, suicide bombing on a bus;

e.   August 4, 2002, 9 killed, 38 wounded, suicide bombing on a bus;

f.   June 18, 2002, 19 killed, 74 wounded, suicide bombing on a bus;

g.   May 19, 2002, 3 killed, 59 wounded, suicide bombing in an outdoor market;

h.   May 7, 2002, 16 killed, 55 wounded, at a pool hall;

i.   April 10, 2002, 8 killed, 22 wounded, suicide bombing at Kibbutz Yagur;

j.   March 31, 2002, 14 killed, 40 wounded, suicide bombing at restaurant;

k.   March 27, 2002, 22 killed, 140 wounded, hotel Passover seder suicide bombing;

l.   March 9, 2002, 11 killed, 54 wounded, suicide bombing at a café;

m.   December 2, 2001, 15 killed, 46 wounded, suicide bombing on a bus;

n.   September 9, 2001, 3 killed, 90 wounded, suicide bombing oat train station;

o. August 9, 2001, 15 killed, more than 130 wounded, suicide bombing at pizzeria;

p. June 1, 2001, 21 killed, 120 wounded, all teenagers, suicide bombing of disco;

q. May 18, 2001, 5 killed, more than 100 wounded, suicide bombing at shopping mall;

r. April 22, 2001, 1 killed, 60 wounded, suicide bombing at bus stop;

s. March 27, 2001, 28 wounded, suicide bomber;

t. March 4, 2001, 3 killed, more than 65 wounded, suicide bombing;

u. February 14, 2001; 8 killed, 21 wounded, bus driver plowed into a crowd;

v. January 1, 2001, more than 50 wounded, car bomb;

w. October 29, 1998, 1 killed, 8 wounded, suicide bomber attacks school bus;

x. October 19, 1998, 59 wounded, grenades thrown in central bus station;

y. August 20, 1998, 14 wounded, bomb detonated in garbage dumpster;

z. September 4, 1997, 4 killed, 181 wounded, 3 suicide bombers at shopping mall;

aa. July 30, 1997, 3 killed, 178 wounded, 2 suicide bombers at outdoor market;

bb. March 21, 1997, 3 killed, 48 wounded, bomb detonated at a restaurant;

cc. March 3, 1996, 19 killed, 6 wounded, suicide bombing on a bus;

dd. February 25, 1996, 26 killed, 80 wounded, 2 suicide bombs on buses;

ee. July 24, 1995, 6 killed, 31 wounded, suicide bombing on a bus;

ff.  April 9, 1995, 8 killed, 50 wounded, 2 suicide bombers;

gg.  December 25, 1994, 13 wounded, suicide bombing at bus stop;

hh.  October 19, 1994, 22 killed, 56 wounded, suicide bombing on a bus;

ii.  October 9, 1994, 2 killed, 14 wounded, suicide bombing on a bus;

jj.  April 13, 1994, 5 killed, suicide bombing;

kk.  April 6, 1994, 8 killed, car bomb detonated next to public bus.

537.    Subsequent to Hamas' takeover of Gaza Hamas shifted its emphasis to cross-border

mortar and rocket attacks, since it now had control of territory from which to launch such attacks.

Hundreds and sometimes thousands of rockets were fired into Israel per year, with no attempt to

focus on military targets.  Due to Israel's "Iron Dome" anti-missile defenses, and poor targeting

technology used by Hamas, most of these rockets were either intercepted or crashed harmlessly in

empty fields.  However, a significant minority killed or wounded civilians throughout the decade-

plus before the October 7 Attack.  While many of these attacks attracted less worldwide media

coverage, Defendants were necessarily aware of them because of their own professional need to

keep abreast of developments in Gaza, and because these attacks often led to retaliatory or

preemptive military actions by Israel that UNRWA needed to take into account.  These attacks

include:

a.  A November 12, 2018 mortar attack on a bus, critically wounding a 19-year

old;

b.  An August 8, 2018 rocket attack on Sderot injuring two;

c.  A July 14, 2018 rocket attack of Sderot injuring three;

d.  A May 29, 2018 mortar attack wounding five;

110

    e.  An August 26, 2014 rocket attack killing two in Eshkol, together with multiple injuries in Eshkol and Ashdod from other rockets fired the previous day;

    f.  An August 22, 2014 mortar attack that killed a four-year-old in Sha'ar Hanegev; and

    g.  A July 28, 2014, mortar attack that killed four in Eshkol.

538.    Finally, attacks against Israeli civilians mounted by Hamas from Gaza in recent years before the October 7 Attack include:

    a.  Barrages of hundreds of rockets launched from Gaza on May 4 and 5, 2019, killing three Israeli civilians in Ashkelon.

    b.  Barrages adding up to over 4,000 rockets launched from Gaza on May 10-20, 2021, killing ten Israeli civilians in multiple locations.

    c.  Barrages adding up to approximately 1,500 rockets launched from Gaza on May 10-13, 2023, killing two civilians in Israel, one of whom was a Palestinian laborer from Gaza who was working in Israel.

539.    The common thread in all of these Hamas terror attacks, over a period of three decades, is the deliberate targeting of civilians for death.

**Background regarding UNRWA**

540.    UNRWA provides education, health care (including mental health care), relief and social services, emergency assistance and microcredit to approximately 5 million Palestinians located in Gaza, the West Bank, Jordan, Lebanon, and Syria. It employs a staff of over 30.000 people; by contrast the Office of the United Nations High Commissioner for Refugees has fewer than 20,000 employees to serve a much larger population of almost 30 million refugees around the world.

541.    In Gaza alone, UNRWA operates 183 schools in Gaza, staffed by over 9,400 employees and serving almost 287,000 students. It provides primary and secondary education to over half of the students in Gaza.

542.    Numerous UNRWA facilities (educational, medical, administrative etc.) in Gaza were converted to active terrorist/military bases, a cynical violation of international humanitarian law, by storing weapons and building underground tunnels and attack shafts. According to numerous press reports, the IDF uncovered assault rifles, ammunition, grenades and missiles of Hamas, hidden in and underneath UNRWA institutions on many occasions.

543.    UNRWA systematically and deliberately aided and abetted Hamas and its goals, but providing material support to Hamas as follows:

    a.  Turning UNRWA schools, medical clinics, warehouses and offices into military storage and deployment bases, including the storage and guarding over weapons, ammunition, explosives, and other military supplies, to be used by terrorists as prepositioning for immediate firing;

    b.  Facilitating the construction of underground bunkers, attack tunnels, prison cells to hold hostages, and command and control centers, for Hamas and PIJ;

    c.  Facilitating and creating the placement of batteries of rocket launching platforms and rockets on and/or adjacent to UNRWA schools and medical facilities, in violation of international humanitarian laws, and, despite knowing of Hamas' use of UNRWA premises, consistently taking the position with Israel that UNRWA premises were inviolate, thus making them safe havens for terrorists and their material in advance of the October 7 Attack.

d.  Knowingly employing Hamas terrorists, including senior Hamas members and Hamas commanders, as part of its staff.

e.  Infusing over one billion dollars in cash, thus providing Hams with hundreds of millions of dollars in currency conversion fees, and moreover providing United States currency to Hamas which was necessary to obtain and smuggle the vast amounts of weapons, explosives, and ammunitions required to launch the October 7th Attack and other terrorist attacks.

f.  Instructing and preparing children to die as martyrs for the cause of eliminating the Jewish people, by using Hamas-approved textbooks and curriculum for instruction at all UNRWA schools located in Gaza, without any modifications to remove incitement of genocide and antisemitism, and by employing teachers who are members of Hamas and allowing Hamas recruitment activities at UNRWA schools.

544.  Each of the Individual Defendants, during their respective employment with UNRWA, directed and approved of these acts and omissions by UNRWA, while well aware of Hamas' intention to use its terror infrastructure to commit genocide and other crimes against humanity against Israeli civilians.

## UNRWA'S SUBSTANTIAL ASSISTANCE TO HAMAS

**A.  UNRWA facilitated construction of Hamas command and control centers, attack tunnels and underground bunkers under UNRWA headquarters, UNRWA schools, medical clinics, and offices.**

545.  UNRWA Headquarters in Gaza City provided power and cover to a Hamas war room and strategic tunnel located directly underneath the building. This Hamas complex with rows of computer servers functioned as an important communications center and the central intelligence

113

hub that directed the October 7 Attack, and thousands of rocket attacks. Before, during and after the October 7 massacres, UNRWA's server room sat directly above the underground Hamas data center and supplied Hamas terrorist infrastructure with power through electric cables running down to and into the floor. The underground network also passed beneath a nearby UNRWA school. The tunnel was located at a depth of 18 meters, had a length of 700 meters, and contained several side doors. In offices within UNRWA headquarters itself, the personal effects of senior Hamas military commanders and many weapons were found, including guns, ammunition, grenades and explosives. In the offices of UNRWA officials, intelligence tools and documents were found that testified that the same offices were also used by Hamas terrorists.

546.    UNRWA previously admitted the discovery of underground tunnels in its facilities in, among other contexts, statements issued in December 2022, June 2021, October 2017, and June 2017, in each case after the investigation described below about Hamas' use of UNRWA facilities in the 2014-15 timeframe.

547.    On June 9, 2017, UNRWA Spokesperson Christopher Gunness reported the exposure of a tunnel running under two of its schools in the al-Maghazi refugee camp in the central Gaza Strip, namely the Maghazi Elementary Boys A&B School and the Maghazi Preparatory Boys School.

548.    On October 15, 2017, UNRWA admitted the existence of a tunnel underneath the UNRWA boys' middle school in Beit Hanoun in the northern Gaza Strip.

549.    On June 10, 2021, UNRWA admitted the existence of another Hamas tunnel under UNRWA's Zaitoun Preparatory Boys' School in Gaza City's Rimal neighborhood, after a rocket struck the courtyard.

550.    In 2022, the IDF also revealed an underground tunnel of Hamas in the Tufah neighborhood in Gaza city, in the close vicinity of UNRWA's "Daraj" elementary school.

551.    On December 1, 2022, UNRWA admitted the presence of a tunnel underneath another one of its schools in Gaza.

552.    In general, UNRWA claimed to be surprised whenever, over and over again, such use of its facilities by Hamas was discovered by third parties, but never took meaningful steps to prevent the next incident it could then pretend to be surprised by.

553.    On November 8, 2023, during the current war with Hamas, the IDF located and destroyed over 100 Hamas military fighting tunnels adjacent to UNRWA schools in northern Gaza.

554.    According to Israeli authorities, over thirty additional UNRWA facilities in Gaza, including UNRWA's headquarters complex, have recently been found to contain terror infrastructures such as tunnel shafts and weapons.

555.    Matthias Schmale, UNRWA's former Gaza director, admitted in an interview with NPR in 2021 that many individuals informed him about the pervasive presence of tunnels in or under UNRWA schools and offices. Indeed, Schmale was forced out of his UNRWA job for being unwilling to parrot Hamas' propaganda, and Defendant Stenseth subsequently apologized for Schmale's statements.

556.    The existence and the construction of the tunnels was public knowledge since at least 2014. Reports on the subject of tunnels were published by Hamas media outlets, and Hamas officials openly boosted about the importance of the tunnels, particularly in light of the deaths of many Hamas activists in collapses. Hamas officials warned repeatedly that the movement is continuing to excavate tunnels, even during periods of calm, in preparation for the next conflict with Israel.

557.   Hamas publicly announced the exact function of these attack tunnels, for example on January 29, 2016, when Hamas leader Ismail Haniyeh stated: "Gaza has constructed twice as many tunnels as there were in Vietnam. The Al-Qassam Brigades have dug tunnels around Gaza in order to defend the people and liberate Al-Aqsa and the holy places... This weapon, the weapon of tunnels, played a prominent role in achieving our victory. ... East of Gaza, there are heroes underground, digging through rock and constructing tunnels. West of Gaza, there are heroes who test-fire rockets every day - All these [activities] are preparations - underground in the tunnels, in the air by means of missiles, at sea, and everywhere. This constant preparation is for the sake of Palestine, for Jerusalem and Al-Aqsa, and for the Al-Quds Intifada".

**B.    Defendants knew that UNRWA permitted constructing weapons storage and deployment centers in its headquarters, schools, medical clinics, offices, warehouses and other facilities.**

558.   In 2014, a United Nations Headquarters Board of Inquiry investigated multiple incidents where weapons had been placed within UNRWA schools and UNRWA facilities that were used as terrorist firing platforms for launching rocket and mortar attacks.  On April 27, 2015, the Secretary General of the United Nations reported on the results of that inquiry to the Security Council, including that:

a.   On 16 July 2014, weaponry was discovered in the UNRWA Gaza Beach Elementary Co-educational "B" School. This school is located in the heart of the Beach refugee camp, in the midst of a densely populated area of Gaza City. Four other UNRWA schools and an UNRWA health center are located on the opposite side of the street. Two UNRWA school attendants were looking after the school prior to an on the day of the incident. Five guards hired as part of the UNRWA Job Creation Program were also assigned to the school. In addition,

116

the school principal inspected all the classrooms on some days. On 16 July 2015, a 120 mm mortar tube, a mortar bipod and twenty 120 mm mortar-round containers, with ammunition, were discovered under a blanket in a corner of a locked classroom. In the afternoon of 17 July, UNRWA admitted in a press release stating that a cache of approximately 20 rockets had been found hidden in a school. A UN Board of Inquiry confirmed in April 2015 that "a Palestinian armed group" (a term used as euphemism for Hamas) had used the school premises to hide the weaponry.

b. On 22 July 2014, weaponry was discovered in the UNRWA Jabalia Elementary "C" and Ayyobiya Boys School. The Board was informed that the area was known to be used by armed groups as a site for firing weapons and that it had been targeted by IDF in past conflicts. On 22 July 2014, UNRWA officials saw an object at the premises that seemed to be a weapon, covered with a piece of cloth, in an area under the cover of some trees behind the toilet block and near the boundary wall separating the school from the open area behind it. Though the UN Board of Inquiry was unable to confirm with certainty what type of weapon might have been hidden at the school, it concluded that it was highly likely that "a Palestinian armed group" [Hamas] used the premises to hide weapons. On the evening of 22 July, UNRWA issued a press release stating that rockets had been found hidden in a vacant school in Gaza. The Government of Israel showed the Board a video, which the Board concluded was authentic, showing the launching of a projectile from within the school premises on 14 July. The Israeli Government also provided a document to the Board that was

said to identify the places close to the school from which rockets had been launched, together with the dates of those launches. The Board concluded that it was highly likely that "an unidentified Palestinian armed group" [Hamas] could have used the school premises to launch attacks on or around 14 July.

c.   On 29 July 2014, weaponry was discovered in the UNRWA Nuseirat Preparatory Co-educational "B" School. This school is located in a semi-rural area, north-west of the Nuseirat camp, south of Gaza city. On 29 July, a 120 mm mortar tube, a 120 mm mortar bipod and three 120 mm mortar containers were found, covered by a blanket, behind a locked internal gate leading to a stairwell. In the evening, UNRWA issued a press release reporting that rockets had been found in an UNRWA school. On 17 August, a 120 mm mortar tube, a 120 mm mortar bipod and twenty 120 mm mortar containers were found in a small room under a stairwell. Water, lubricant oil bottles and boards apparently used as beds were also found as well as a blackboard with Arabic writing, seemingly depicting military operations. At the rear of the school, a mortar base plate was found embedded in the sand. The items were photographed. The mortar cases, mortar tube, bipod and base plate were removed from the school and rendered safe. The UN Board of Inquiry found that the presence of weapons and other evidence found in the school indicated that the premises could have been used for an unknown period of time by members of "a Palestinian armed group" [Hamas] and that it was likely that such a group may have fired the mortar from within the premises of the school.

    d.  Hamas thus exploited the safe haven provided by UNRWA facilities for storing weapons and firing at Israeli population centers.

559.    The Board of Inquiry report made a number of recommendations for UNRWA management to employ. Nevertheless, UNRWA did not take appropriate corrective action following this inquiry revealing the systematic employment of UNRWA facilities to support Hamas. Each of the Defendants were on notice of this United Nations inquiry and they continued to enact and fund the policies which allowed this activity to occur.

560.    Because UNRWA has consistently taken the position that its facilities are inviolate under international law, it has provided the terrorists using its facilities to prepare and launch attacks on innocent civilians, including the October 7 Attack, with a safe haven. As a result, UNRWA protected these Hamas facilities and weapons from discovery and dismantled by the IDF.

### C.    Defendants knew that UNRWA permitted installation of rocket launching platforms and terrorist firing positions within and/or adjacent to UNRWA schools, medical clinics and offices.

561.    In 2007, the Israeli Air Force delivered to UNRWA a video showing mortar shells fired from Gaza by a three-man terrorist squad. The squad situated itself in close proximity to the central building in an UNRWA educational compound in Beit Hanoun, in the northern Gaza Strip. The video shows the operatives setting up their firing position and firing mortar shells close to the building. After they fire the mortar shells, they took cover inside the UNRWA building. There were multiple similar incidents documented in 2014.

562.    On December 14, 2022, the IDF published a Hamas rocket launch site adjacent to UNRWA's Mo'ath Bin Jabal School in the Shejaiya neighborhood of Gaza City. Prior to May 2021, the school's principal, Mehammed Abu Oun, maintained contact with Jalal Abu Aoun, a commander in the Hamas rocket division, who operated this launching site.

D.    **UNRWA continues to provide material assistance to Hamas despite public concern and objections from within the UN system.**

563.    The military/terrorist use of UNRWA facilities by Hamas and other terrorist organizations was widely exposed during the 2014 conflict between Hamas and the IDF.  The letter dated April 27, 2015, from the Secretary General of the United Nations to the President of the Security Council, stated, inter alia:

> "in my capacity as the Chief Administrative Officer of the Organization, I decided to establish a United Nations Headquarters board of inquiry to review and investigate…incidents …in which the presence of weapons was reported at [UNRWA] premises. My aim in taking this step was to develop a clear record of the facts of those serious incidents and their causes and to determine the persons or entities to which they might be attributable. That would make it possible for me, inter alia, to identify any gaps that there might have been in the Organization's procedures and to take any measures and put in place any arrangements that might be needed, with a view to preventing a recurrence of such incidents in the future…"

564.    The Board made the following findings:

   a.    That even though security of UNRWA premises is a matter of "paramount importance that needs to be addressed seriously," 897 of the 1034 guards providing security for all UNRWA facilities in Gaza were recruited from local workers, with no prior security training, and were given only "minimal training."

   b.    "In relying upon the Job Creation Programme, UNRWA was entrusting one of the most dangerous and fundamental functions to low-paid individuals with no

training in security and no expectation of continued employment. The Board considered that a task bearing such a high level of responsibility requires specialized and properly trained individuals."

c.  "The guards worked only afternoons and evenings and no guards were on duty in the mornings."

d.  "UNRWA has no standard operating procedures articulating the duty of all staff members to report security incidents and the modalities for doing so. Witnesses informed the Board that there was no list of staff who should be informed of incidents, no lists of actions to be taken in the event of specific situations and no central mechanism for keeping a log of all events. As such, the transmission of information and the assignment of required actions were somewhat ad hoc, negatively affecting the ability of UNRWA to establish facts and account for actions taken and to be taken."

e.  "The Board further found that UNRWA did not have a policy or standard operating procedures to address situations involving the unauthorized presence of weapons on UNRWA premises. After the disappearance of weapons from UNRWA Jabalia Elementary 'C' and Ayvobiya Boys School on 22 July, United Nations Headquarters suggested a procedure to be followed. Those suggestions have yet to be 'operationalized' through the issuance of detailed standard operating procedures."

f.  "The Board also noted that there was no reference document setting out security levels, standards for the identification and evaluation of security risks and

mitigation measures that need to be in place for UNRWA premises, including its schools."

g.  "The Board concluded that, during the conflict, UNRWA was operating in Gaza with an understaffed Safety and Security Division, which struggled to secure hundreds of premises with unskilled personnel. The Board considered that priority."

h.  "The Board also considered that, as a matter of priority, UNRWA should reconsider its security approach in relation to its schools and other installations, both in the context of emergency situations and during normal operations, and revisit its school inspection systems, including during emergencies."

565.  Again, subsequent events show that UNRWA and its management did not make any serious efforts to "to take any measures and put in place any arrangements that might be needed, with a view to preventing a recurrence of such incidents in the future" as had been anticipated in the Secretary General's letter of April 27, 2015.

**E.   UNRWA staff are and were members of Hamas and participated in the genocidal terrorist attacks on October 7, 2023.**

566.  Numerous UNRWA staff took part in abductions, killings and torturing during the October 7 Attack in which approximately 1,200 people were killed and over 250 kidnapped and held hostage. Some examples of UNRWA staff who participated in the Attack include:

a.  UNRWA school counselor Mousa Subhi Musa El Qidra was the deputy to the Qassam Brigades' Khan Younis Brigade Commander Mohammad Sinwar (the brother of Hamas leader Yahya Sinwar). They were operating from the Qadsia compound in Khan Younis, which served as a training facility for Hamas to train terrorists to carry out the October 7th Attack. The compound contained

models simulating entrance gates of Israeli kibbutzim, military bases, and IDF armored vehicles. On October 7, Mousa and his son abducted a woman from Israel.

b. Ala Abd al-Hamid Qassem Jouda, who worked for the agency as an Arabic Religion teacher at an elementary school, was a company commander in the Qassam Brigades' Nuseirat Battalion that led the horrendous rampage in the Israeli border Kibbutz Be'eri, one tenth of whose residents were killed, including Plaintiff Estate of Dror Kaplun. The chilling aftermath of the Be'eri Attack exposed a scene of merciless brutality, with approximately 80% of the recovered bodies showing signs of torture, with many torture victims also having been systematically raped. Some bodies were found decapitated, or burnt to death with their hands bound together, and entire families were butchered. This orchestrated onslaught resulted in the ruthless murder of over 130 community members, with 28 kidnapped to Gaza, leaving behind a legacy of terror that devastated the kibbutz. Jouda was arrested in Israeli territory.

c. UNRWA social worker Faisal Ali Mussalem al-Naami was a combatant in the same Qassam Brigades' Nuseirat Battalion that attacked Be'eri. He was filmed abducting from Be'eri to Gaza the corpse of a 21-year-old Israeli civilian, Yonatan Samerano, who had fled to Be'eri from the Nova music festival to seek safety. He also coordinated the movements of pick-up trucks used by the raiders and of weapons supplies. Al-Naami was killed in an IDF airstrike on 17 November 2023.

d. UNRWA elementary school teacher Ibrahim Atiya Mohammad Abu Ghafra (cell commander in the Qassam Brigades' Nuseirat Battalion) participated in an attack on Reim, a district where a kibbutz was attacked and that was the site of a rave where more than 360 revelers died.

e. Three UNRWA employees, including an Arabic teacher at an UNRWA school, received a text from Hamas to arm themselves at a staging area: UNRWA school attendant Shadi Mohammad Jamal Razak Darabiah (operative in the Qassam Brigades' East Jabalia Battalion), UNRWA Arabic teacher Mohammad Tawfiq Ibrahim El Ghafari (Squad commander in the Qassam Brigades' Nuseirat Battalion), and UNRWA teacher Ali Isa Hamuda Matar (platoon commander in the Qassam Brigades' Nuseirat Battalion) all received a text calling them to report to the meeting point prior to the infiltration, along with logistical preparations.

f. UNRWA Deputy School Principal Abd Al-Rahman Atiya Salem Abu Awad (platoon commander in the Al Qassam Brigades' Nuseirat Battalion) was updated about the infiltration in real time, was instructed to follow the events over the PTT radio and make sure the other relevant operatives do the same.

g. The manager of a shop in an UNRWA school set up an operations room for the Palestinian Islamic Jihad on October 8, the day after the attack.

h. Amer Yaser Nazmi Sada, a 24-years old graduate of an UNRWA school participated in the October 7 Attack. His UNRWA diploma was found in a vehicle of one of the terrorists in Israel in the aftermath of October 7.

i.   UNWRA School Counselor Baker Mahmoud Abdallah Darwish (operative in Hamas' military intelligence unit) and UNWRA clerk Mohammad Nasser al-Din Mohammad Abu Naama were located in Israeli territory on October 7. Abu Naama was killed in an IDF airstrike on 11 October 2023. UNWRA health center clerk Ghassan Nabil Mohammad Sh'hadda El Jabari (an operative in the Qassam Brigades' al-Furkan Battalion) arrived in a hospital with a shot wound on October 7 and turned off his cellphone.

j.   UNRWA elementary school teacher Mamdouh Hussein Ahmad al-Qak (an operative in the PIJ Rafah Brigades) took part in the October 7 Attack and was revealed speaking on the phone as follows: "I'm inside, I'm inside with the Jews!" He is asked by the other side "How will you get home?" and he replies with a laugh: "When I die."

k.   Teachers and other educational staff of UNRWA have been reported praising Hamas's terrorism on social media, referring to it as an "unforgettable glorious morning" and a "splendid sight."

l.   As discussed in detail above, Plaintiff Ditza Heiman was held captive in the home of an UNRWA employee for 53 days.

**F.     UNRWA Staff held and tortured hostages taken in the attacks on October 7.**

567.   UNRWA teachers locked up at least two Israeli hostages in their homes in Gaza and tortured the victims there. One of the hostages, who was released from Gaza in November 2023, revealed that he was held for nearly 50 days in an attic by a teacher from UNRWA. The hostage also said that the teacher who held him captive was a father of 10 children. He was barely provided food or medical attention, and was locked away by the teacher, he said.

568.    UNRWA elementary school teacher Yusef Zidan Salimam Al-Khuajri (combatant in the Qassam Brigades' Central Camps Brigades) took part in the October 7 Attack and was revealed speaking on the phone roughly 7 hours after Hamas began invading Israel, bragging about the female captive that he captured. The Arabic term "sabaya" that he used to refer to the Israeli woman, is a term in Islam that describes women and children as the property of a Muslim man. The interpretation also has the context of a slave and is exactly the same word as ISIS used to refer to Yazidi women captured by them and used as sex slaves.

569.    UNRWA math teacher and Rami Mohammad Ramadan Sabbah was involved in receiving hostages on October 7 and holding them captive. He was also seen photographing an elderly female hostage held by two terrorists on a motorcycle.

570.    UNRWA school counselor Mousa Subhi Musa El Qidra (assistant to Qassam Brigades' Khan Younis Brigade Commander Mohammad Sinwar) worked together with his son in the abduction of a woman from Israel on October 7.

571.    Since October 7th, approximately 60 hostages were murdered by Hamas or Palestinian Islamic Jihad, 7 hostages were rescued by Israeli forces, and slightly over 100 hostages were released in negotiations. At least 30 female hostages endured sexual abuse by their captors. Approximately 125 hostages remain unaccounted for, although it is believed that a significant percentage of them have been killed, with their bodies remaining captive.

**G.    UNRWA knowingly and intentionally employed Hamas members as UNRWA management and staff.**

572.    UNRWA does not treat Hamas and PIJ as terrorist organizations, despite their formal designation as such by the United States, United Kingdom, Australia, Canada, the European Union, and numerous other civilized nations.

573.    Responding to the revelation of UNRWA staff's participation in the October 7

Attack, UNRWA posted to its official website a report entitled "Why Donors Should Not Suspend

Aid to UNRWA," arguing that "Hamas' deep roots in Gaza could make it difficult or impossible

for the agency to insulate itself from all indirect links with the militant group." The report also

argued that UNRWA's "ubiquity throughout Gaza, combined with the degree to which Hamas is

embedded in the local population, makes it difficult for UNRWA to guarantee that its safeguards

against staff misconduct or aid diversion are infallible." In light of the facts alleged herein, these

are not defenses but admissions that UNRWA knew of the risks and yet failed to take action to

mitigate them.

574.    UNRWA's leaders say the agency strives to ensure its 13,000 employees in Gaza

uphold standards of neutrality, regularly training its staff to stay above politics and investigating

those who do not. However, in practice Defendants turned a blind eye and covered up the

widespread infiltration of Hamas leaders and terrorists throughout UNRWA's Gaza operations,

only acting in response to unfavorable publicity. "What we want to make sure is that our staff

does not have a *public* political function, because that would be completely incompatible with the

function of a civil servant," Defendant Lazzarini said (emphasis added) in an interview with the

New York Times. But, Mr. Lazzarini added. "Our employees are part of the social fabric of Gaza

and its ecosystem. And as part of the social fabric in Gaza, you have also Hamas."

575.    But the problem is not that UNRWA failed to screen out 100% of terror-linked

employees; it is that the Defendants failed to address the pervasive presence of Hamas operatives

within their organization.  They only episodically reacted when third parties called attention to

deviations from its supposed neutrality policy.  According to a New York Times investigative

report, UNRWA "has variously responded to tips [about Hamas-linked employees] from Israel,

the United States and its own networks…Rather than addressing such issues in a systematic process, they dealt with them in a piecemeal way mostly in private, working with officials … in New York."

576.   In fact, UNRWA's auditors in their official reports to UNRWA management highlighted UNRWA's deficiencies with respect "lack of documentation and verification on the recruitment process." For example, in UNRWA's 2019 Financial Report and audited financial statements, the Board of Auditors reported that "the Board considers that there are concerns regarding the transparency of the recruitment and selection process, owing to such deficiencies with respect to checks and records for such relevant documents as the recruitment and selection report, as well as academic and professional qualifications, which provide traceability for the evaluation of candidates or the justification for hiring employees."

577.   Nevertheless, UNRWA falsely asserts that it maintains strict staff conduct policies to ensure that its members are not affiliated with any other groups. Nevertheless in 2021, UNRWA spokeswoman Tamara Alrifai admitted that the organization takes action only when its employees are found to hold a political position with Hamas, and added that "after that, I don't know where the line is drawn".

578.   UNRWA directors meet in person with senior Hamas leaders at least once a year, including with Hamas head Yahya Sinwar, designated by the United States State Department as a Specially Designated Global Terrorist pursuant to Executive Order 13224 and the mastermind of the October 7 Attack, contradicting their spin that they are merely unable to avoid certain "indirect" links to Hamas.

579.    In a 2004 interview, then UNRWA Commissioner-General Peter Hansen encapsulated the governing attitude at UNRWA, stating, "I am sure that there are Hamas members on the UNRWA payroll, and I don't see that as a crime."

**H.    Defendants knew that senior Hamas operatives held influential positions in UNRWA.**

580.    Senior Hamas military operatives held influential positions within UNRWA for years. The following are examples:

    a.    Member of Hamas' Leadership in Gaza and long-time senior Hamas member Suhail Ahmed Hassan al-Hindi, served as the Chairman of the UNRWA Staff Union in the Gaza Strip and principal of the UNRWA Palestine Boys' Elementary School for refugee children. In 1981, al-Hindi initially joined the Muslim Brotherhood and was involved in student politics in Ramallah. In 1984 he obtained a diploma from the Teachers' Institute affiliated with UNRWA in Ramallah. In 1987, after the founding of Hamas, he assumed an active role in the movement's activities and was repeatedly detained by Israeli authorities. He was a member of Hamas' Leadership in Gaza between 2006 and 2021; the elected head of the administrative body of Hamas in the northern region between 2012-2015; and head of the Return Marches and Breaking the Siege Committee in the Hamas' Leadership in Gaza in 2018. The Return Marches, where hundreds of Hamas activists charged forward to the border wall, were the dry runs for the Hamas infiltration on October 7. All this time, since 1988, al-Hindi worked as a teacher in UNRWA schools, and between 2006-2016 he served as a director for UNRWA schools. Between 2000 and 2016, he held senior positions in the UNRWA staff union, including President. In 2017 al-

Hindi was finally suspended by UNRWA after the agency was confronted with al-Hindi's re-election to Hamas' Leadership in Gaza, or what the movement purports to be its "Political Bureau". This, after UNRWA's management had been fully aware for years that Suhail al-Hindi was a senior Hamas activist, an elected member of multiple Hamas bodies, and that he condoned jihad against Israel and suicide attacks carried out by Hamas. UNRWA spokesperson, Chris Gunness, admitted knowledge of al-Hindi's senior role in Hamas leadership in a published article on January 27, 2009. Despite this knowledge, UNRWA management continued to employ al-Hindi until 2017.

b. Another member of Hamas' Leadership in Gaza and long-time Hamas member, Muhammad al-Jamassi, was chairman of the board of directors in the UNRWA engineering department for refugee camps in the central Gaza Strip. In February 2017, al-Jamassi, reportedly assumed a role in Hamas' Leadership in Gaza. Jamassi had been involved with Hamas since 2007.

c. Jawad Abu Shamala, Hamas's Minister of Economy Jawad Abu Shamala, a longtime former UNRWA teacher, was killed by the IDF on October 10, 2023. He was responsible for financially planning the funding of the Oct 7th attack.

d. PIJ member Awad al-Qiq, an UNRWA science teacher and school headmaster in Rafah with an eight-year tenure, was at the same time leading a rocket engineering squad for the PIJ. Following his death in an Israeli airstrike in May 2008, Islamic Jihad hailed Al-Qiq as a martyr destined for 'paradise.' The terrorist organization prominently displayed a poster at the entrance of the

UNRWA school where he taught, lauding Al-Qiq's involvement in terrorist activities.

e.  Issa Abd al-Hadi al-Batran, a graduate and longtime teacher in UNRWA schools was Hamas's senior rocket-maker. Al-Batran graduated from UNRWA's elementary and middle schools in al-Bureij and UNRWA's Gaza Training Center. For years, al-Batran worked as a teacher in UNRWA's schools in the central district of the Gaza Strip. He joined Hamas in 1989 and by the beginning of the 1990s he was recruited to the al-Qassam Brigades. He participated in attacks against IDF forces without being a lawful combatant, placed explosive charges, participated in digging tunnels, took part in producing explosive charges, bombs, rockets and other military equipment needed. He also founded the media office of al-Qassam Brigades in al-Bureij refugee camp. According to al-Qassam Brigades, IDF failed to assassinate al-Batran in four attempts – the last failed attempt being during Operation Cast Lead (January 2009), in which his wife and children were killed. Despite this information that was publicly known, especially in the Gaza Strip, no action was taken by UNRWA against al-Batran even after he had been the target of four failed assassination attempts, which exposed his connection to terrorist activity. John Ging, UNRWA Director of Operations in Gaza, was notified as early as December 2008, that Issa al-Batran is an active operative of al-Qassam Brigades, and UNRWA took no action. All that time, al-Batran continued to work as a teacher in a school run by UNRWA in al-Bureij refugee camp. He was finally dismissed by UNRWA in 2009 months after being seriously wounded while assembling a

131

bomb for the Izz al-Din al-Qassam Brigades where he served as a weapons expert, manufacturing explosives, IEDs and rockets, as well as excavation tools to build Hamas's tunnel network. He was killed in an Israeli air strike on July 31, 2010.

f.   Hamas leader Ismail Haniyeh was a teacher in UNRWA schools.

g.   At least eighteen school principals in Gaza are members of Hamas' military wing.

**I.      UNRWA pays its Gaza staff in a fashion calculated to further enrich Hamas.**

581.   Gaza does not have a currency of its own but uses the Israeli shekel for ordinary local transactions.  Large local employers pay their employees in shekels.  UNRWA does not do so, even though it is logistically feasible for it to do so and even though it pays its staff in the West Bank in local currency (there, Israeli shekels).  Indeed, UNRWA likewise pays its staff in Jordan, Lebanon, and Syria in the respective local currencies.

582.   By contrast, UNRWA paid its Gaza local staff in U.S. dollars and does so in cash. Because U.S. dollars are not commonly accepted by merchants in Gaza for the staff's necessary routine purchases of groceries and other necessities, this compels the staff to go to local moneychangers to exchange their cash dollars for shekels.  However, Hamas runs the majority of the Gaza moneychangers, and those are that are not actually run by Hamas are required by Hamas to pay Hamas a share of the fees they earn (often ranging from 10% up to 25%) for such exchange transactions, thus ensuring that a predictable percentage of UNRWA's payroll went to Hamas. Hamas uses the moneychangers to finance its military activities, and there are multiple examples in recent years of Hamas using currency exchange facilities in Gaza to finance its military activities. *See e.g.* Buy Cash, designated by the Treasury Department's Office of Foreign Assets

Control. In addition to these profits, Hamas desperately needed the U.S. currency itself. U.S. dollars in cash form are vital to Hamas for purposes such as obtaining weapons on the international black market to be smuggled into Gaza and used for terrorist purposes, including the October 7 Attack. From 2018 until September 2023, UNRWA inserted into Gaza at least $20 million a month in cash, and by putting into the hands of the Hamas controlled moneychangers into Hamas' hands.

583. In fact, a 2018 report commissioned by UNRWA warned of numerous risks associated with making cash disbursements in cash in Gaza, including money laundering risks, the likelihood that funds could be diverted to terrorists or other inappropriate recipients ("leakage"), and the use of cash to facilitate illegal trade. Similarly, UNRWA's audits also warned UNRWA management of risks with the cash distribution system in Gaza. For example, warning in the 2022 audit that "UNRWA may not always have the ability to monitor cash distributions in a timely manner, which could potentially increase the risk of incorrect, missed or multiple cash payments being distributed in Gaza."

584. Each month, UNRWA staff in New York instruct JP Morgan Chase to wire budgeted and approved amounts in U.S. dollars, via Arab Bank in New York, to Arab Bank's branch in Ramallah, in the West Bank. Funds required for UNRWA payroll and operations in the West Bank are converted and paid in Israeli shekels. By contrast, funds required for UNRWA payroll and operations in Gaza are transferred to the Bank of Palestine in Ramallah, which are withdrawn in cash U.S. dollars and then physically transported (across Israeli territory) in trucks to Gaza, with each truck containing millions of dollars in cash and posing significant security risks. If UNRWA paid its Gaza local staff in shekels, which could be transferred electronically from the Arab Bank or the Bank of Palestine in Ramallah directly to banks in Gaza (as, for example, the Palestinian Authority does for payment of its employees in Gaza), these burdens and risks would

be unnecessary, and the staff would benefit from increased purchasing power from their salaries because they would not need to pay fees to moneychangers. Only Hamas benefits from UNRWA's current cash-handling practices.

585.    By way of note, Hamas was otherwise prevented from obtaining U.S. cash dollars by, among other things, United States anti-money laundering statutes and regulations. UNRWA has provided an estimated two thirds of the cash U.S. dollars physically transferred into Gaza since 2018. Hamas has used the over one billion in cash U.S. dollars brought into Gaza by UNRWA to buy via smugglers its weapons, ammunition, explosives, construction materials for the tunnels, and rocket-making supplies that have been used for a multitude of terrorist acts including but not limited to the October 7 Attack. Hamas' ability to carry out the October 7 Attack would have been significantly, and possibly fatally weakened without that UNRWA-provided cash. Hamas' sponsors such as the current government of Iran lack the same ability to physically bring cash U.S. dollars in such quantities into Gaza due to Israeli control of Gaza's external borders.

586.    This entirely predictable consequence of UNRWA's Gaza payroll and cash infusion policy is not a hidden side effect but was and is well-known to Defendants. Defendants were aware that UNRWA's auditors as well as various other outside third parties had raised concerns about their cash-handling policies in Gaza. The risk that these massive amounts of funds would be used for wrongful purposes was fully known and foreseeable to the Defendants.

**J.    Defendants knew Hamas controlled UNRWA's Staff Union in Gaza.**

587.    Hamas has controlled the UNRWA Gaza Staff Union since 2009. In September 2012, the Hamas bloc, headed by senior Hamas activist Suhail al-Hindi, again won a landslide victory in the elections to UNRWA Staff Union elections. With a high turnout of approximately 11,500 UNRWA employees who cast their ballot, the Hamas bloc won all 11 seats of the teachers'

sector, 6 out of 7 seats of the workers sector and 8 out of 9 seats of the services sector (winning 25 out of 27 seats in a vote among 10,000 staffers). Defendants knew the outcome of these elections, were aware of the overwhelming majority of its employees' affinity with Hamas yet took no meaningful steps to prevent these employees from using their UNRWA positions to promote Hamas' terror agenda.

**K.    UNRWA, with Defendants knowledge and approval, chose to use textbooks and teaching curricula approved by Hamas which contained incitement and indoctrination of Palestinian children to support and participate in Hamas' jihadi culture, rather than using textbooks consistent with principles and requirements of the United Nations.**

588.    UNRWA has made a deliberate and conscious decision that its schools teach a Hamas-approved curriculum in Gaza even though it is not required to do so.

589.    Countless studies by governments and NGOs, known to Defendants, have found that UNRWA's textbooks glorify violence and terrorism, encourage jihad and martyrdom, incite antisemitism and hatred of Jews, reject the very existence of Israel and call for its destruction.

590.    More than 500,000 students study at schools in the Gaza Strip, with over half attending UNRWA-operated schools. Studies available to UNRWA New York staff by governments and international organizations such as the U.S. Government Accountability Office ("GAO"), the European Union, the UN's Committee on the Elimination of Racial Discrimination (CERD), the Institute for Monitoring Peace and Cultural Tolerance in School Education (IMPACT-se), and reviews by UNRWA itself all show the problematic nature of the Palestinian Authority/Hamas approved textbooks used in its schools.

591.    The U.S. Government Accountability Office revealed in a 2019 report that UNRWA schools failed to offset "potentially problematic content" in the textbooks used in Gaza.

UNRWA did not train teachers or complete distributing complementary teaching materials even after it had identified these issues in its own review.

592.    A 2021 study commissioned by the European Union on Palestinian textbooks found "anti-Semitic narratives and glorifications of violence" in the same textbooks. The European Parliament repeatedly, and most recently in 2021, deplored "the problematic and hateful material in Palestinian school textbooks and study cards which has still not been removed".

593.    The UN's Committee on the Elimination of Racial Discrimination stated in September 2019 that it is concerned "About the existence of hate speech, in particular hate speech directed against Israelis, which at times fuels anti-Semitism towards this group, in certain media outlets, in particular those controlled by Hamas, as well as on social media, in public officials' statements and in school curricula and textbooks, which also fuels hatred and may incite violence (art. 4)."

594.    The Institute for Monitoring Peace and Cultural Tolerance in School Education (IMPACT-se)'s extensive research of UNRWA-used school textbooks "has consistently found a systematic promotion of violence, martyrdom, overt antisemitism, and jihad across all grades and subjects, with the proliferation of extreme nationalism and Islamist ideologies throughout the curriculum, including science and math textbooks".

595.    UNRWA's willingly and knowingly keeps the hateful content in the curriculum taught in its schools intact. Thus, UNRWA students are intentionally, systematically and constantly indoctrinated to internalized victimization, glorify violence, mayhem and jihad, and support genocide of Jews, Israelis, and the State of Israel itself.

596.    UNRWA also produces its own institutional original teaching materials branded with its logo to complement and enrich host-country curricula. These supplement the teaching of

136

PA textbooks. Multiple studies by the NGO IMPACT-se in 2023, 2022 and 2021 reviewing these institutional UN supplementary materials found that UNRWA teachers, principals, schools, and education departments were regularly involved in drafting, approving, printing, and distributing thousands of pages of teaching materials including content that incites antisemitism, glorifies terrorism, and encourages jihad and martyrdom.

597.    Therefore, UNRWA makes a false claim when it states on its website:

"In its more than 700 schools educating more than 500,000 Palestine refugee children across the Middle East, the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA) curriculum emphasizes the UN values of neutrality, human rights, tolerance, equality and non-discrimination with regard to race, gender, language and religion. As a matter of course, UNRWA consistently reviews all educational materials and textbooks against these values, and rarely, in cases where discrepancies are found, provides enrichment materials to teachers to enable them to enter into critical thinking discussions with their students to address any issues identified."

598.    The content of these textbooks violates the UN's own standards for education. According to the Universal Declaration of Human Rights, adopted by the United Nations General Assembly in 1948, "Education shall be directed to the full development of human personality and to the strengthening of respect for human rights and fundamental freedoms. It shall promote understanding, tolerance and friendship among all nations, racial and religious groups and shall further the activities of the United Nations for the maintenance of peace."

599.    The UN maintains that school education should promote respect, peace and tolerance, and should be "free of wording, imagery and ideologies likely to create prejudices,

137

misconceptions, stereotypes, misunderstandings, mistrust, racial hatred, religious bigotry and national hatred, as well as any other form of hatred or contempt for other groups or peoples". Moreover, the curriculum should be "free of language, content, and imagery that disseminate ideas or theories which justify or promote acts and expressions of violence, incitement to violence, hostility, harm and hatred toward other national, ethnic, racial or religious groups".

600.    In April 2021, the European Union froze all its funding to the Palestinian Authority of over 220 million EUR in April 2021 for 13 months due to problematic content in textbooks also used in UNRWA schools in Gaza, following an EU-funded report that found "antisemitic narratives and glorification of violence".

601.    Defendant Lazzarini admitted UNRWA's awareness of incitement to violence, discrimination, antisemitism, intolerance, and glorification of terrorism in UNRWA's internal reviews of textbooks used in its schools in a September 2021 hearing in the European Parliament.

602.    In his testimony, Lazzarini admitted:

> "We as UNRWA have identified three categories of problems in the textbooks when it comes to being in line with UN value[s], which is age appropriateness, gender perception, and then the issues related to incitement to violence, discrimination, and so on, [Turning to the Committee Chair, adding:] antisemitism, intolerance, absolutely. So, these are the type of issues which have been identified by UNRWA through the review of 150 books and we keep reviewing each of the books being issued by the authorities whenever they need to be used in our class[es]. And whenever we enter difficult issues, either we give guidance to our teachers on how to use it or we ask it not to be taught in the class. Especially when

we start to talk about glorification of terrorism for example which has also been an issue."

603.    Findings of IMPACT-se's research contradict statements and promises made by UNRWA and Defendant Lazzarini to donor nations in relation to a change in using and teaching the Hamas-approved curriculum.

604.    UNRWA admitted in 2021 that its teachers drafted hateful content, contradicting its claim of extensive training in countering hate.

605.    According to its own statements, UNRWA reviews the Hamas-approved textbooks used in its school and is thus necessarily aware of their content.

606.    At the same time, UNRWA refuses to disclose the results or criteria of its textbook reviews that showcase lessons they deem problematic. It also refuses to disclose teacher guidance materials that allegedly instruct teachers to critically address itemized problematic content.

607.    Defendants knew that the European Parliament adopted resolutions in May and July 2023, May and December 2022, 2021, 2020 and 2018 which condemned the teaching of hate in textbooks used in UNRWA schools, expressed concerns over the continued failure to remove content not in line with UNESCO standards, and called for conditioning funding on the basis of a curricula reform. The EU commissioned a report from 2021 from the Georg Eckhart Institute, a German academic institution forcing on international textbook research, which raised similar concerns about the textbooks used by UNRWA in Gaza to those set forth above.

608.    Moreover, intermittent and episodic attempts to make the curriculum in the Gaza schools more balanced were rapidly abandoned whenever Hamas objected, as in 2011 when UNRWA proposed to teach children about the historical fact of the Holocaust but then failed to follow through.

609.     In 2024, UNRWA finally committed to make limited modifications in the textbooks it uses in Gaza, following a firestorm of international criticism. But by this time the October 7 Attack and Plaintiffs' injuries had already occurred, facilitated in part by UNRWA's own role in indoctrinating future terrorists.

610.     The following are selected examples from Hamas-authorized textbooks and other instructional material used by UNRWA in Gaza:

a.   3rd grade:

> Arithmetic is taught by counting martyrs. Math questions in Grade 3 ask children to write the number of martyrs killed during the First Intifada and the 2014 Gaza War. An Arabic language exercise instructs students to sing and learn by heart: "The land of Kurāma' [generosity]. I swear, I will sacrifice my blood to irrigate the land of generosity, And will remove the usurper from my country. And will exterminate the remnants of the foreigners."

b.   5th grade:

> An UNRWA-created 5th grade Arabic Language summary glorifies as heroes infamous terrorists and others affiliated with war, violence, and religious extremism. These include Dalal Mughrabi, known for her role in the 1978 Coastal Road Attack in which 38 civilians including 13 children were killed, and Izz ad-Din al-Qassam, the namesake of Hamas's military wing who promoted Jihad against the British and the Zionists and was killed in action in 1935. These "heroes" are venerated as "the crown of their nation" and "the title of its glory." The text (p. 4) encourages impressionable Palestinian students to see these heroes as their role models: "each of us wishes to be like them."

140

Moreover, it encourages students to take the path of martyrs, as follows: "Drinking the cup of bitterness with glory is much sweeter than a pleasant long life accompanied by humiliation."

c.  6th grade:

UNRWA-produced 6th grade Arabic study material includes an exercise under a lesson titled "Loving the Homeland" that promotes sacrificing one's life— "the most precious thing" a person has—for the homeland "to nourish the homeland with his blood." Another exercise under the title "My Land" teaches students that their obligation to the homeland is to sacrifice "their blood" for it. The clear intention is to encourage students to pursue violent jihad to "liberate the homeland." This is confirmed by grammar exercises which include the example sentence "I will commit jihad to liberate the homeland".

d.  7th grade:

In the PA's Arabic Language study cards, 7th grade students are presented with a summary of a poem saying that the Palestinian "Right of Return" into Israel proper will take place though violence using "all the means of warfare" against Israel rescuing the land from the "filth of the occupation" instead of through negotiation. The horizon of the "Return" is described in the summary as "painted with the blood of martyrs.'

e.  8th grade:

Reading comprehension is taught through a violent story which glorifies suicide bombings, recounting that "the daggers of the fedayeen [Arab guerilla fighters, commandos] fell on the necks" of enemy soldiers and that they "wore explosive

141

belts." Israeli forces are said to "leave behind some of the bodies and body parts, to become food for wild animals on land and birds of prey in the sky." An accompanying illustration depicts Israeli soldiers in a tank, shot dead by a Palestinian gunman.

f.   9th grade:

A reading comprehension exercise in 9th grade Arabic Language study material created by UNRWA, contains a story about a Palestinian firebombing attack on a Jewish bus near the West Bank city of Ramallah. The reading comprehension text celebrates the attack as a 'barbecue party' (*haflat shiwaa'*). The translation of the text presented to the student as a reading comprehension exercise is as follows:

The neighbor: "The curfew does not include us in Al-Sharafah [neighborhood]. It is imposed on Al-Tatarish [neighborhood]. It seems that there is a barbecue party [*haflat shiwaa'*] there with firebombs on one of the buses of the colonial settlement Psagot on Mount Al-Tawil."

g.   10th grade:

In Islamic Education, students are taught that Jihad is "for the liberation of Palestine" and a "private obligation for every Muslim."

h.   11th Grade:

An eleventh-grade Palestinian history textbook implies that Jews control the world, using classic antisemitic imagery.

i.   12th Grade:

PA Islamic Education textbook teach students that giving their lives is a religious duty that carries great rewards and much honor. It amounts to the central meaning of life, the highest point toward which one can aspire.

**L.    The indoctrination of hatred of Jews and Israel that is taught in UNRWA's curriculum is further exacerbated by UNRWA's allowance of Hamas' student activities in its schools.**

611.    In every UNRWA school, Hamas has a representative of its "Islamic Bloc", called in Arabic "Al-Kutla al-Islamiya" ("al-Kutla"). Al-Kutla is Hamas' student wing and its official arm operating in all educational institutions in Gaza, from elementary schools to colleges and universities, including the educational institutions run by UNRWA. Al-Kutla's strategy in elementary and middle school is focused on attracting students to Hamas through organizing a variety of activities inside school and after school hours that intend to strengthen the students' religious beliefs and exposing them gradually to Hamas ideology in order to recruit them to the movement.

612.    Examples of al-Kutla's activities inside UNRWA's facilities in Gaza or for students at middle schools run by UNRWA, are as follows:

    a.  On January 1, 2010, al-Kutla organized a soccer tournament in Rafah commemorating Mohammad al-Sharif, an operative of al-Qassam Brigades, who was killed on December 12, 2007. Teams from 18 middle schools in Rafah participated in the tournament, including those run by UNRWA. Rafah middle school G (UNRWA) won the finals defeating al-Omaria middle school (UNRWA). The event was held in the football field of the Services Club founded by UNRWA. This is just one example of the many sports tournaments that al-Kutla organizes for students of UNRWA schools.

b. On March 7, 2011, al-Kutla held an event in UNRWA's al-Qarara middle school to honor outstanding students. Hamas senior official Hamad al-Ruqab and the UNRWA school's principle participated in this Hamas event.

c. On April 27, 2011, al-Kutla organized a knowledge competition between Khan Yunis' middle schools, including schools run by UNRWA (al Qarara and al Ma'ari middle schools). Al Ma'ari middle school (UNRWA) won the competition, which was held in commemoration of Hamas co-founder and former supreme leader 'Abd al Aziz al Rantisi, who directed many terrorist attacks by Hamas during the Second Intifadah.

d. Events honoring senior leaders of Hamas, including Sheikh Ahmad Yassin, founder and supreme religious authority of Hamas, and Ahmad al-Ja'bari, former commander of al-Qassam Brigades, Hamas' military/terrorist wing.

e. The Islamic bloc spurred schoolchildren to participate in the 2018 so-called "Great March of Return" rallies along the border with Israel, which included acts of violence and terrorist attacks (shooting, throwing explosives, stabbing, arson and more) and served as test runs for the breaches of the border in the October 7 Attack. Videos prepared by the Islamic Bloc call for active participation in the "Great March of Return" rallies, and state that their ultimate goal is to bring about the destruction of the State of Israel.

613.    The UNRWA education system, its employment of teachers who are Hamas members, its textbooks, and the activities of al Kutla are a powerful vehicle for Hamas to indoctrinate youth in UNRWA schools in the Gaza Strip and to pave the way for their future recruitment to al-Qassam Brigades.

144

614.   Reviewing the bio sketches of al-Qassam Brigades' fatalities reveals a repeated pattern. Hundreds of al-Qassam operatives are graduates of UNRWA's schools in Gaza, who joined Hamas and later its military wing al-Qassam Brigades. All were also involved in terrorist attacks against Israel or in attacks against IDF forces.

615.   UNRWA teachers and staff applauded the Oct. 7th attack on social media. Examples:

  a.   At 9:09 AM on October 7th, as news began to spread about the terrorist atrocities in Israel, UNRWA Gaza teacher Osama Ahmed posted "Allah is Great, Allah is Great, reality surpasses our wildest dreams."

  b.   UNRWA principal Iman Hassan justified the Attack as "restoring rights" and "redressing" Palestinian "grievances."

  c.   Rawia Helles, Director of the Khan Younis Training Center and featured in an UNRWA video, glorified one of the terrorists as a "hero," "raider," and "prince of Khan Younis."

  d.   UNRWA Gaza School employee Hmada Ahmed, posted on October 7: "[We] welcome the great October" and on October 14: "This land cannot accommodate two identities. [It's] either us or us. We are the ones who will remain, and they are the ones passing by."

  e.   UNRWA teachers in a 3,000-member UNRWA staff Telegram group cheered and celebrated the October 7 Attack. The UNRWA staff in the group shared photos and video footage of those events and prayed for the terrorists' success and for Israel's destruction. Examples:

145

i.  On the morning of October 7th, Israa Abdul Kareem Mezher (UNRWA Elementary School Arabic Language Teacher), ecstatically celebrated the Hamas terrorists and prayed for their success ("May God keep their feet steady and guide their aim"; "pray for the Mujahidin")[3]. At 7:38 AM, as news of the Hamas atrocities began to spread, Mezher cheered "God is the greatest God is the greatest." Minutes later he shared a photo of one of the Hamas terrorists armed and in uniform, declaring that "Israel's time is over."

ii.  UNRWA math teacher Snatha Husam Al Nawajha wished for the terrorists' "safe" return "and with booty." At 8:00 AM, she lauded the terrorists for taking "their destiny into their own hands," and again prayed for God to "protect" them and make them "victorious."

iii.  UNRWA teacher Moreed Abdulaziz Issa Shouka (Elementary Coed School) exulted in the success of Hamas' October 7th attack, calling it "beyond expectations."

616.  Besides such blatant incitement for ethnic cleaning and genocidal attacks, UNWRA employees are violating the following UN's principles of neutrality with their statements and actions:

a.  UNRWA Staff Regulation 1.4 (staff must "avoid any action and in particular any kind of public pronouncement which may adversely reflect on their status or integrity, independence or impartiality…");

---

[3] Mujahidin (Arabic) means "holy warrior" that is one who conducts jihad.

b. UNRWA Staff Regulation 1.7 (staff must not engage in "any political activity which is inconsistent with or might reflect upon the independence and impartiality required by their status).

## THE NEW YORK SITUS OF DEFENDANTS' SUBSTANTIAL ASSISTANCE TO HAMAS

617.   Money is the lifeblood of terrorism, just as fundraising is the lifeblood of any charitable or humanitarian organization.  Virtually all of the money UNRWA has spent in assisting Hamas to build up its terror infrastructure in Gaza came from UNRWA's New York city bank account at JPMorgan Chase and came into that account in the first place as a result of donations solicited in New York as a result of Defendants' travel to New York to solicit donors face to face there.

618.   As already noted, to obtain virtually all of its financing UNRWA solicits donations from donor countries, and sometimes donor organizations.  In general, it is not funded out of general UN revenues, however, the United Nations may supply occasional emergency bail-out funding or other incidental support.

619.   That solicitation effort culminates in an annual event held in New York known as the Pledging Conference, where donors from around the world are solicited face to face to renew or increase the funding they each agreed to provide UNRWA the prior year.  Senior UNRWA personnel, including the Individual Defendants, typically travel in person to New York to solicit funding in person at this event.  For example:

a. At the end of 2010 and 2012, Defendant Ellis traveled to New York to attend the Pledging Conference and solicit funds for calendar years 2011 and 2013, respectively

147

b.  At the end of 2013, Defendant Ellis traveled to New York to attend the Pledging Conference and solicit funds for calendar year 2014, apologizing to those present that defendant Grandi was not there in person that year.

c.  In December 2014, Defendant Ellis traveled to New York to attend the Pledging Conference and solicit funds for calendar year 2015,

d.  In October 2015, Defendant Mitchell traveled to New York to solicit funds in person at that year's Pledging Conference, claiming that UNWRA had just "emerge[d] from a financial crisis that was unprecedented in its severity" thanks to additional donations obtained to cover a $100 million shortfall but that reforms would be undertaken to reassure donors in the future.

e.  By 2018, the Pledging Conference had been re-scheduled from year-end to June, so that UNWRA could try to solicit additional funds mid-year to deal with its chronic financial shortfalls.  Defendant Krähenbühl traveled to New York to solicit funds in person at that June 2018 conference.

f.  In June 2019, Defendant Krähenbühl traveled to New York again to solicit funds in person at the Pledging Conference, where he proudly proclaimed: "Today in New York, we witnessed another remarkable mobilization and great generosity in support of UNRWA. I am deeply grateful for the trust of United Nations (UN) member states, for the pledges of more than US$ 110 million, and for the commitment to the dignity and rights of Palestine refugees."

g.  In June 2022 Defendant Stenseth traveled to New York to solicit funds in person at that year's Pledging Conference, and while there was distracted by the need to brief donors "on allegations of hate speech recently levied against several

148

[UNWRA] staff members." Indeed, UNRWA complained in a press release that the allegations were "timed to disrupt" the Pledging Conference, even though Stenseth conceded that the allegations were credible enough for the accused staff to have been placed on administrative leave pending further investigation.

h. In June 2023, at the last Pledging Conference before the October 7 Attack, Defendant Lazzarini traveled to New York to solicit funds in person.

620. Without the Individual Defendants' systematic and repeated travel to and other actions in New York to solicit this funding in person here, Defendants would be unable to fund any of UNRWA's policies in Gaza discussed herein. The Individual Defendants knew this, and purposefully availed themselves of New York's status as the world's financial capital to secure the funding they knew they needed to continue to knowingly provide material assistance to Hamas in Gaza.

621. Each of the Defendants who served as Commissioner-General or Deputy Commissioner-General had direct oversight of UNRWA's Gaza operations and in that capacity was fully aware of the material support for Hamas that UNRWA was providing in Gaza. They possessed such knowledge before and during each trip they took to New York to solicit funds, with full knowledge that a material portion of any funds they successfully solicited in New York would be disbursed in Gaza in fashions that enabled Hamas to build up its terror infrastructure, and likewise with full knowledge of Hamas' prior track record and ongoing present and future intent to use its terror infrastructure for the genocidal murder of Israeli civilians. In short, while raising these funds, they knew exactly what the funds were going to be used for and what policies they were going to support.

622.     Defendants have also traveled to New York to solicit and receive money outside the usual "conference" cycle. For example, in June 2015 Defendant Krähenbühl flew to New York to obtain a one-off $15 million donation from Kuwait via its UN ambassador, even though Kuwait's own capital is located much closer to UNRWA's offices in Jordan than either of those locations is to New York.

623.     Similarly, in September 2019 the Foreign Minister of the Kingdom of Saudi Arabia, announced a contribution of $50 Million to the core program budget of UNRWA for 2019 in a meeting with Defendant Krähenbühl in New York.

624.     UNRWA's Commissioner-General also hosts and typically attends the UNRWA Ministerial Meeting in New York, an annual meeting co-hosted by the ministers of various nations with the goal of mobilizing political and financial support for UNRWA.

625.     For example, in September 2018, Defendant Krähenbühl flew personally to New York to attend a Ministerial Meeting and raised $122 million. Krähenbühl thanked the donors, stating: "The results of the New York meeting, added to the support received from other partners this year, represent a very significant achievement."

626.     In September 2021, Defendant Lazzarini attended a Ministerial Meeting in New York co-hosted by the Foreign Ministers of Sweden and Jordan and attended by ministers and representatives from Egypt, the European Union, Germany, the Netherlands, Norway, Palestine, Qatar, Saudi Arabia, the United Kingdom, and the United States. The participants "agreed on the vital importance to break the vicious cycle of financial crises of UNRWA... confirmed that UNRWA needs to be provided with sufficient, sustainable, and predictable funding... [and] agreed to invite all donors to actively support UNRWA, to help the Agency bridge the 2021 funding gap and ensure sustainable financial support in 2022 and beyond."

627.    Money pledged to UNRWA as a result of the Individual Defendants' solicitation activities in New York is typically not immediately paid in full by the donors.  UNRWA's New York-based staff, supervised by Defendant Gunnarsdottir, follows up to ensure payment in appropriate installments into UNRWA's New York bank account at JPMorgan Chase before the funds are then sent on to various locations in the Middle East to be spent there, including the funds spent in Gaza to enhance Hamas' terror infrastructure there.  Such amounts are wired from New York to various locations in the Middle East in regular installments, not an entire year's funding at once.  UNRWA's New-York-based staff may also follow up with donors to encourage earmarks on particular donations to be removed or softened to give UNRWA additional spending flexibility.

628.    Moneys earmarked for Gaza are broken out separately in UNRWA's budget documents, which are approved in New York with New-York-based staff involved in shepherding the proposals through the approval process.  When installments of money are wired from New York to the Middle East they are earmarked specifically either for Gaza or some other region.  Because of the way the cash is transmitted, the relevant UNWRA staff in New York are aware that moneys destined to Gaza are disbursed differently, as detailed above, from moneys sent for use in Jordan, Lebanon, Syria, or the West Bank.

629.    A 2018 report commissioned by UNRWA from an outside consultant reminded it, as Defendants were aware, of numerous risks associated with dealing in cash in Gaza, including money laundering risks, the likelihood that funds could be diverted to terrorists or other inappropriate recipients ("leakage"), and the use of cash to facilitate illegal trade.

630.    UNRWA's New-York-based staff and its fundraising, accounting, and disbursement functions are all overseen and directed by Defendant Gunnarsdottir, who is also a member of UNRWA's senior policy-making team.  Because of her close work with the rest of

senior management, she was aware at all relevant times of how UNRWA disbursed its funds and conducted its activities in Gaza and the benefits provided thereby to Hamas, and was thus aware of how her own actions benefited Hamas. Defendant Gunnarsdottir's work was in turn overseen and directed by Defendants Lazzarini and (during her UNRWA employment) Stenseth, as their predecessors as Commissioner-General and Deputy Commissioner-General had overseen and directed the New York duties of Defendant Gunnarsdottir's own predecessors in her position.

631.    Defendants and the New York staff under their supervision also continuously act in New York to lobby and liaise with representatives of significant countries to raise political support for UNRWA and with representatives of other United Nations affiliates. UNRWA's website is hosted in New York, and the substantial assets of UNRWA's pension fund for its employees in all locations, including Gaza, are held in the United States, and senior personnel are paid out of New York even if they are primarily based in the Middle East.

## THE OCTOBER 7 ATTACK AND ITS AFTERMATH

632.    All of the assistance provided over the prior decade-plus to Hamas by the Defendants had, by October 2023, the result and effect, which was at all relevant times entirely foreseeable to Defendants, of building up Hamas' terror infrastructure to the point where atrocities of the magnitude of the October 7 Attack could be carried out. Given Hamas' prior words and deeds, Defendants knew of Hamas' specific intent to perpetrate genocide and it was entirely foreseeable that the capacity to commit genocidal atrocities of that magnitude against Israeli civilians would in time be used to actually do so.

633.    The stories of the horrific experiences of the named Plaintiffs herein and their murdered loved ones are given above in considerable detail but represent only a fraction of what the much larger number of other victims suffered that day and afterwards.

634.    In addition to genocide, mass murder, torture, and hostage-taking, the October 7 Attack included, as has been widely reported, numerous incidents of weaponized rape and sexual assault as a terror tactic. The horrific methods employed in these rapes were sufficiently uniform in different locations to show preplanning and coordination by Hamas rather than opportunistic outrages committed by individual Hamas terrorists. Gang rape, sexualized torture, and deliberately leaving the mutilated and naked corpses of murdered rape victims in public locations in order to instill terror in others were all part of this modus operandi. The United Nations confirmed these reports in statements by Pramila Patten, the Secretary General's Special Representative on Sexual Violence in Conflict, as have other prominent international figures with no pro-Israeli leanings.

635.    Numerous terrorists who directly and personally participated in the October 7 Attack were UNRWA employees, as detailed above.

636.    In addition to these direct participants in the attack, as noted above, Plaintiff Ditza Heiman was taken hostage and held captive in Gaza for almost two months while imprisoned in the home of an UNRWA employee.

637.    The October 7 Attack was a human catastrophe for its victims, but separately created a public relations and financial crisis for UNRWA, as it became subject to heightened and unwelcome international scrutiny regarding its prior Hamas-enabling activities in Gaza and the U.S. and many other donor countries suspended their financial support.

638.    UNRWA has not denied that a material number of its staff personally participated in the October 7 Attack, although it has quibbled with the numbers estimated by credible outside sources. Indeed, UNRWA has since the attack carried out a spin campaign trying to minimize the nature and degree of its institutional culpability in providing material support to Hamas, trying to

portray it as the work of a few rogue low-level employees rather than reflecting conscious institutional policy decisions made at the highest levels by the Individual Defendants.

639.   For example, on January 26, 2024, Defendant Lazzarini, despite his own culpable actions, knowledge, and intent as set forth in detail above, issued the following statement (emphasis added): "The Israeli Authorities have provided UNRWA with information about the alleged involvement of several UNRWA employees in the horrific attacks on Israel on 7 October…I have taken the decision to immediately terminate the contracts of these staff members and launch an investigation in order to establish the truth without delay. *Any* UNRWA employee who was involved in acts of terror will be held accountable, including through criminal prosecution."

640.   The same day, a spokesperson for United Nations Secretary-General Antonio Guterres issued the following statemen (emphasis added): "The Secretary-General has been briefed by the Commissioner-General of the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA), Philippe Lazzarini, regarding extremely serious allegations which implicate several UNRWA staff members in the terror attacks of 7 October in Israel. The Secretary-General is horrified by this news and has asked Mr. Lazzarini to investigate this matter swiftly and to ensure that *any* UNRWA employee shown to have participated or *abetted* what transpired on 7 October, or in any other criminal activity, be terminated immediately and referred for potential criminal prosecution."

641.   A recent purportedly-independent inquiry into certain aspects of UNRWA's conduct in Gaza headed by the French diplomat Catherine Colonna was largely a whitewash of UNRWA's culpability, but did find that certain aspects of UNRWA's school curriculum were inappropriate and contrary to the UN's espoused values. UNRWA immediately pledged to take

corrective action, but the damage from the prior terrorist-indoctrination curriculum has already been done, regardless of belated efforts supposedly now being undertaken "to mitigate the risks attached to the promotion of hate and the incitation of violence in textbooks and the classroom."

## COUNT I

### (Aiding and Abetting Torts Committed by Hamas in Violation of the Law of Nations, Including Genocide and Crimes Against Humanity, and Treaties of the United States)

642.   Paragraphs 1 through 641 are incorporated by reference as if fully stated herein.

643.   All Plaintiffs suffered compensable injuries that were proximately caused by intentional torts committed by Hamas in violation of the law of nations and treaties of the United States.

644.   "Violations of the law of nations" include "those 'violations of . . . international law norm[s] with [as] definite content and acceptance among civilized nations [as] the historical paradigms familiar when [the ATS] was enacted" in 1789. *Mastafa v. Chevron Corp.*, 770 F.3d 170, 180 (2d Cir. 2014).   Relevant treaties of the United States include, among others, the Convention on the Prevention and Punishment of the Crime of Genocide, the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment, and the International Convention for the Suppression of the Financing of Terrorism.

645.   These norms universal among civilized nations that were violated by Hamas during the October 7 Attack include:   (a) the prohibition against the deliberate targeting of civilians, whether by regular military forces or irregular armed factions such as Hamas; (b) the prohibition against actual or attempted mass killing of civilians, whether by regular military forces or irregular armed factions such as Hamas; (c) the prohibition against taking civilian hostages,  whether by regular military forces or irregular armed factions such as Hamas; (d) the prohibition against

systematic and "weaponized" rape as a tool of terror and intimidation; and (e) the prohibition against actual or attempted genocide, whether by state actors or non-state actors.

646.    Genocide is defined by international treaty as "any of the following acts committed with intent to destroy, in whole or in part, a national, ethical, racial or religious group, as such:

    a.   Killing members of the group;

    b.   Causing serious bodily or mental harm to members of the group;

    c.   Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;

    d.   Imposing measures intended to prevent births within the group;

    e.   Forcibly transferring children of the group to another group."

647.    Treaties and the practice of international war-crimes tribunals in recent decades make clear that attempted genocide, conspiracy to commit genocide, and aiding and abetting of, or other complicity in, genocide are just as proscribed as direct commission of genocide. Because the intent to destroy the group may be "in whole or in part" Hamas' goal to kill or drive into exile all Jews living in Israel is genocidal even if not coupled with a plan to commit genocide against Jews in other parts of the world. Because Hamas' mass murder, mass hostage-taking, and weaponized mass rape in connection with the October 7 Attack were and are recognized as crimes against humanity (and thus torts in violation of the law of nations) whether or not they constitute genocide. For example, the definition of "crime against humanity" in article 7(1) of the so-called Rome Statute of 1997 includes among other things, murder, enslavement "rape, sexual slavery … or any other form[s] of sexual violence of comparable gravity" if "committed as part of a widespread or systematic attack directed against any civilian population." *See also id.*, article 8(2)(a)(viii) (taking of hostages).

648.   As already stated, all Plaintiffs were injured by Hamas' torts in violation of the law of nations and/or have standing to recover for those torts, some in multiple ways:

a.  Some Plaintiffs are the estate representatives or other legally-relevant survivors of mass murder victims, entitled to recover damages flowing from the murders of their specific loved one;

b.  Several Plaintiffs were taken hostage and held captive in Gaza for lengthy periods;

c.  Several Plaintiffs were non-fatally wounded by Hamas gunmen who intended to kill them;

d.  Many other Plaintiffs survived the October 7 Attack solely because their saferooms successfully protected them against the Hamas gunmen who attempted to kill them, or otherwise escaped death or physical injury through sheer fortuity or good fortune that does not exculpate Hamas' murderous and genocidal intent.

e.  Some Plaintiffs, such as Tali Biner, were severely traumatized by witnessing the immediate aftermath of the systematic mass rapes, including the torture and mutilation of rape victims.

f.  All Plaintiffs suffered extremely serious mental harm as a result of Hamas' actual or attempted murder of their loved ones and, in most cases, themselves. This mental harm was not an incidental side effect of the October 7 Attack but a specifically intended consequence, as part of a deliberate Hamas terror strategy to panic Jews into fleeing Israel before they are murdered, raped, tortured and/or mutilated.

157

649. Via their actions set forth above, the Defendants individually and collectively aided and abetted Hamas' commission of these torts via their prior knowing provision of substantial assistance to Hamas, which was of a degree sufficient to constitute conscious, voluntary, and culpable participation in Hamas' wrongdoing and are thus jointly and severally liable to Plaintiffs for the damages caused by Hamas' torts. As the Supreme Court has recently reiterated in *Twitter, Inc. v. Taamneh*, aiding-and-abetting is a well-established common-law doctrine that is fact-intensive in its application and cannot be reduced to a mechanical verbal formula.

650. Moreover, as that decision reaffirmed, aiding and abetting liability may arise whether or not the defendants who aided and abetted the tortfeasor knew "all particulars of the primary actor's plan." Committing genocidal terrorist attacks deliberately targeting Jewish Israeli civilians was the intended purpose of the terror infrastructure the Defendants' substantial assistance helped Hamas fund, build up, and enhance.

651. Defendants were well aware of Hamas' intended purpose for the terror infrastructure and intended to assist Hamas. Each Defendant knew Hamas' genocidal intent to eliminate the State of Israel and its Jewish citizens. Hamas, on numerous occasions, publicly announced its intentions to perpetrate the genocidal terrorist attacks that in fact it perpetrated on October 7, 2023. This assistance was provided continuously for over a decade prior to the October 7 Attack, at a time when Defendants were likewise well-aware that the E.U., U.S. and many other states had designated Hamas as an unlawful terrorist organization. Throughout that decade they were aware of the benefits Hamas was deriving from UNRWA's actions described above, and, as further evidence of their knowledge, purpose, and intent, they frequently attempted to conceal, deny, or distract attention from the benefits they were providing to Hamas.

652.    Defendants intended to assist Hamas in its ability to pursue its genocidal goals whether or not they consciously shared Hamas' specific genocidal intent, and the October 7 Attack, utilizing the terror infrastructure UNRWA had helped Hamas build and with numerous UNRWA employees as active participants committing atrocities, was a foreseeable consequence of the substantial assistance. Defendants had an obligation and duty, under United Nations Regulations and under international law, to comply with United Nations Security Council Resolution 1373 and prevent UNRWA for providing funding for Hamas and others to commit acts of terrorism, especially form within its headquarters and facilities, which it claimed were *inviolate* and under its sole control and responsibility. As a matter of tort law, criminal law, and international human rights law, that suffices to establish aiding and abetting liability.

653.    For the reasons described above, Defendants are jointly and severally liable to Plaintiffs for the damages caused by Hamas' torts which they aided and abetted.

## COUNT II

### (Aiding and Abetting Liability Under the TVPA, Against Individual Defendants Only)

654.    Paragraphs 1 through 653 are incorporated by reference as if fully stated herein.

655.    The decedents from whom certain Plaintiffs derive their standing to recover damages were subjected to extrajudicial killing within the meaning of the TVPA.

656.    Other Plaintiffs were subjected to torture within the meaning of the TVPA, including by being subjected, for reasons based on religious and ethnic discrimination, to the threat of imminent death, the threatened infliction of severe physical pain or suffering, and/or the threat that others would be imminently subjected to death, severe physical pain, or suffering, all at a time when they were in de facto Hamas custody during the October 7 Attack.

657.    The Hamas terrorists who carried out these acts of extrajudicial killing and torture were individuals acting "under actual or apparent authority, or color of law, of any foreign nation," because Hamas is in this context a de facto government as recognized in the case law. *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) (even though other countries did not afford diplomatic recognition to armed faction in actual control of one portion of former Yugoslavia, it was potentially a de facto state for these purposes); *Doe v. Islamic Salvation Front*, 993 F. Supp. 3 (D.D.C. 1998) (armed faction in de facto control of significant portion of Algerian territory during civil war could potentially be "foreign nation" for TVPA purposes even though it was not the recognized government of Algeria).

658.    For the reasons described above Defendants (except for UNRWA as an entity) are jointly and severally liable for the damages caused to Plaintiffs by the TVPA violations by Hamas-affiliated individuals whom they aided and abetted.

659.    Under the circumstances, the "color of law" requirement does not separately apply to aiders and abettors or, in the alternative, an international organization like UNRWA is a "foreign nation" within the meaning of the statute and the Individual Defendants' acts were carried out under the actual or apparent authority of UNRWA.

## COUNT III[4]

### (Aiding and Abetting Assault and Battery and Wrongful Death)

660.    Paragraphs 1 through 659 are incorporated by reference as if fully stated herein.

661.    The intentional tortious actions of Hamas described above also constituted assault and battery under international law, the common law and/or other applicable law, which

---

[4] Choice of law issues need not be resolved at this preliminary stage of the action. However, we note that, due to the legacy of pre-1948 British rule, the tort principles of Israeli law largely derive from English common-law roots, just as those of New York do.

proximately caused damage to each of the Plaintiffs and/or the deceased predecessors-in-interest of certain Plaintiffs.

662.    The fatal injuries Hamas inflicted upon those deceased predecessors-in-interest also gave rise to wrongful death and/or survival causes of action in favor of their estates, estate representatives, and/or legally appropriate survivors and family members.

663.    For the reasons described above Defendants are jointly and severally liable to Plaintiffs for the damages caused by Hamas' torts which they aided and abetted.

## COUNT IV

### (Aiding and Abetting Intentional Infliction of Emotional Distress)

664.    Paragraphs 1 through 663 are incorporated by reference as if fully stated herein.

665.    The actions of Hamas described above also constituted intentional infliction of emotional distress under international law, the common law and/or other applicable law, which proximately caused damage to each of the Plaintiffs and/or the deceased predecessors-in-interest of certain Plaintiffs.

666.    For the reasons described above Defendants are jointly and severally liable for the damages caused by Hamas' torts which they aided and abetted.

## COUNT V

### (Aiding and Abetting Loss of Consortium)

667.    Paragraphs 1 through 666 are incorporated by reference as if fully stated herein.

668.    As a result of the intentional tortious actions of Hamas described above, each of the surviving Plaintiffs has a claim under applicable law for loss of consortium and those Plaintiffs who are the survivors and/or estate representatives of murder victims have survival and/or wrongful death claims under applicable law.

669.    For the reasons described above Defendants are jointly and severally liable for the damages to which Plaintiffs are entitled in respect of these claims, all of which were caused by Hamas' torts which they aided and abetted.

**WHEREFORE,** Plaintiffs demand judgment against each and every Defendant, jointly and severally (except only against the Individual Defendants jointly and severally with regard to the TVPA claims), for:

a. A money judgment for compensatory damages in an amount to be proven at trial;

b. An award of punitive damages in an appropriate amount to be determined at trial;

c. Pre- and post-judgment interest;

d. Costs of this action, including reasonable attorneys' fees to the full extent permitted by applicable law; and

e. Such other and further relief as may be just and proper.

162

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims.

Dated: New York, New York
      June 24, 2024

                                      AMINI LLC

                                      By _____*/s/ Avery Samet*_____
                                        Bijan Amini
                                        Avery Samet
                                        John W. Brewer
                                  131 West 35th Street, 12th Floor
                                  New York, New York 10001
                                  Tel. (212) 490-4700
                                  bamini@aminillc.com
                                  asamet@aminillc.com
                                  jbrewer@aminillc.com

                                      MM~LAW LLC

                                      By _____*/s/ Gavriel Mairone*_____
                                      Gavriel Mairone (admitted to S.D.N.Y. Bar)
                                  Adora Sauer
                                  (pro hac vice application to be filed)
                                  Ariel Mairone (N.Y. state bar # 4993259,
                                  pro hac vice application to be filed)
                                  875 North Michigan Avenue, Suite 3100
                                  Chicago, Illinois 60611
                                  Tel. (312) 253-7444

                                  *Attorneys for Plaintiffs*

Of Counsel:
Mark Sunshine, Esq.
Thomas Berner, Esq.

2) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| Estate of Tamar Kedem Siman Tov, et al. | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. 24-cv-04765 |
| United Nations Relief and Works Agency (UNRWA), et al. | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Margot Ellis
2024 Rhode Island Avenue, McLean, VA 22101

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Amini LLC
c/o Avery Samet
131 West 35th Street, 1 th Floor, New York, NY 10001
(212) 490-4700

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:   06/27/2024

/s/ J. Gonzalez
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 24-cv-04765

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*

was received by me on *(date)*

❏ I personally served the summons on the individual at *(place)*

on *(date)* ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*

, a person of suitable age and discretion who resides there,

on *(date)* , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* , who is

designated by law to accept service of process on behalf of *(name of organization)*

on *(date)* ; or

❏ I returned the summons unexecuted because ; or

❏ Other *(specify)*:

My fees are $                for travel and $                for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date:

*Server's signature*

*Printed name and title*

*Server's address*

Additional information regarding attempted service, etc:

# AMINI℠

John W. Brewer
MEMBER NY BAR

212.497.8238
jbrewer@aminillc.com

## PERSONAL AND CONFIDENTIAL

July 2, 2024

Mr. Filippo Grandi
c/o UNHCR
Rue de Montbrillant 94
1201 Geneva
SWITZERLAND

**Re:    Estate of Kedem et al. v. UNRWA et al., S.D.N.Y. No. 24-cv-04765**

Dear Mr. Grandi:

The enclosed documents concern a lawsuit that has been filed against you and others in U.S. federal court in Manhattan. You should consult an appropriately-qualified lawyer. Please note that as specified in paragraph 516 of the complaint this lawsuit does not involve any of your actions subsequent to your employment with UNRWA. This is not an attempt to accomplish formal service of process on you, but a notification of the lawsuit and a copy of the complaint along with a formal request that you waive service of the summons, as provided for and encouraged in Federal Rule of Civil Procedure 4(d).

While the enclosed papers regarding the waiver request are in the standard form language suggested by the federal court system, we did want to make clear that in connection with a waiver we are open to negotiating a schedule for you to respond to the lawsuit that might be more accommodating than what the rules provide by default. Please have your lawyers contact myself or my colleague Avery Samet if they would like to discuss that or any other logistical or scheduling issues.

Sincerely,

/s/ John W. Brewer

John W. Brewer

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ESTATE OF TAMAR KEDEM TOV, *et al.*,

                    Plaintiffs,

      vs.

UNITED NATIONS RELIEF AND WORKS
AGENCY (UNRWA), *et al.*,

                Defendants.

Civil Action No. 24-cv-04765

## Rule 4 Notice of a Lawsuit and Request to Waive Service of Summons.

To:    Filippo Grandi

*Why are you getting this?*

A lawsuit has been filed against you in this court under the number shown above. A copy of the complaint is attached.

This is not a summons, or an official notice from the court. It is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the enclosed waiver. To avoid these expenses, you must return the signed waiver within 60 days from the date shown below, which is the date this notice was sent. Two copies of the waiver form are enclosed, along with a stamped, self-addressed envelope or other prepaid means for returning one copy. You may keep the other copy.

*What happens next?*

If you return the signed waiver, I will file it with the court. The action will then proceed as if you had been served on the date the waiver is filed, but no summons will be served on you and you will have 60 days from the date this notice is sent (see the date below) to answer the complaint (or 90 days if this notice is sent to you outside any judicial district of the United States).

If you do not return the signed waiver within the time indicated, I will arrange to have the summons and complaint served on you. And I will ask the court to require you, if appropriate, to pay the expenses of making service.

Please read the enclosed statement about the duty to avoid unnecessary expenses.

I certify that this request is being sent to you on the date below.

Date: July 2, 2024

/s/ John W. Brewer
John W. Brewer
AMINI LLC
131 West 35th Street, 12th Floor
New York, New York 10001
Tel. (212) 490-4700
jbrewer@aminillc.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ESTATE OF TAMAR KEDEM TOV, *et al.*,

                    Plaintiffs,

          vs.

UNITED NATIONS RELIEF AND WORKS
AGENCY (UNRWA), *et al.*,

                    Defendants.

Civil Action No. 24-cv-04765

**Rule 4 Waiver of the Service of Summons.**

To:    AMINI LLC, attn: John W. Brewer:

I, Filippo Grandi, have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I agree to save the expense of serving a summons and complaint in this case.

I understand that I will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from July 2, 2024, the date when this request was sent (or 90 days if it was sent outside the United States). If I fail to do so, a default judgment will be entered against me.

Date: _____


_____
(Signature of the attorney or unrepresented party)


_____
(Printed name)

_____
(Address)

_____
(E-mail address)

_____
(Telephone number)

**Duty to Avoid Unnecessary Expenses of Serving a Summons**

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does not include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

# A M I N I LLC

John W. Brewer
MEMBER NY BAR

212.497.8238
jbrewer@aminillc.com

## PERSONAL AND CONFIDENTIAL

July 2, 2024

Mr. Pierre Krähenbühl
c/o ICRC
19 Avenue de la Paix
1202 Geneva
SWITZERLAND

Re:    **Estate of Kedem et al. v. UNRWA et al., S.D.N.Y. No. 24-cv-04765**

Dear Mr. Krähenbühl:

The enclosed documents concern a lawsuit that has been filed against you and others in U.S. federal court in Manhattan.  You should consult an appropriately-qualified lawyer.  Please note that as specified in paragraph 516 of the complaint this lawsuit does not involve any of your actions subsequent to your employment with UNRWA.  This is not an attempt to accomplish formal service of process on you, but a notification of the lawsuit and a copy of the complaint along with a formal request that you waive service of the summons, as provided for and encouraged in Federal Rule of Civil Procedure 4(d).

While the enclosed papers regarding the waiver request are in the standard form language suggested by the federal court system, we did want to make clear that in connection with a waiver we are open to negotiating a schedule for you to respond to the lawsuit that might be more accommodating than what the rules provide by default.  Please have your lawyers contact myself or my colleague Avery Samet if they would like to discuss that or any other logistical or scheduling issues.

Sincerely,

*/s/ John W. Brewer*

John W. Brewer

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ESTATE OF TAMAR KEDEM TOV, *et al.*,

                        Plaintiffs,

vs.

UNITED NATIONS RELIEF AND WORKS
AGENCY (UNRWA), *et al.*,

                        Defendants.

Civil Action No. 24-cv-04765

---

**Rule 4 Notice of a Lawsuit and Request to Waive Service of Summons.**

To:    Pierre Krähenbühl

*Why are you getting this*?

A lawsuit has been filed against you in this court under the number shown above. A copy of the complaint is attached.

This is not a summons, or an official notice from the court. It is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the enclosed waiver. To avoid these expenses, you must return the signed waiver within 60 days from the date shown below, which is the date this notice was sent. Two copies of the waiver form are enclosed, along with a stamped, self-addressed envelope or other prepaid means for returning one copy. You may keep the other copy.

*What happens next?*

If you return the signed waiver, I will file it with the court. The action will then proceed as if you had been served on the date the waiver is filed, but no summons will be served on you and you will have 60 days from the date this notice is sent (see the date below) to answer the complaint (or 90 days if this notice is sent to you outside any judicial district of the United States).

If you do not return the signed waiver within the time indicated, I will arrange to have the summons and complaint served on you. And I will ask the court to require you, if appropriate, to pay the expenses of making service.

Please read the enclosed statement about the duty to avoid unnecessary expenses.

I certify that this request is being sent to you on the date below.

Date: July 2, 2024

/s/ John W. Brewer
John W. Brewer
AMINI LLC
131 West 35th Street, 12th Floor
New York, New York 10001
Tel. (212) 490-4700
jbrewer@aminillc.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ESTATE OF TAMAR KEDEM TOV, *et al.*,

                                    Plaintiffs,                    Civil Action No. 24-cv-04765

            vs.

UNITED NATIONS RELIEF AND WORKS
AGENCY (UNRWA), *et al.*,

                                    Defendants.

**Rule 4 Waiver of the Service of Summons.**

To:      AMINI LLC, attn: John W. Brewer:

I, Pierre Krähenbühl, have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I agree to save the expense of serving a summons and complaint in this case.

I understand that I will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from July 2, 2024, the date when this request was sent (or 90 days if it was sent outside the United States).  If I fail to do so, a default judgment will be entered against me.

Date: _____

_____
(Signature of the attorney or unrepresented party)

_____
(Printed name)

_____
(Address)


_____
(E-mail address)


_____
(Telephone number)

**Duty to Avoid Unnecessary Expenses of Serving a Summons**

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does not include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.