# Exhibit A

| 91st Congress 2d Session } | SENATE | { Executive Rept. No. 91–17 |
|---|---|---|

# CONVENTION ON THE PRIVILEGES AND IMMUNITIES OF THE UNITED NATIONS

MARCH 17, 1970.—Ordered to be printed

Mr. FULBRIGHT, from the Committee on Foreign Relations, submitted the following

# REPORT

### [To accompany Ex. J, 91st Cong., first sess.]

The Committee on Foreign Relations, to which was referred the Convention on Privileges and Immunities of the United Nations approved unanimously by the General Assembly on February 13, 1946 (Ex. J, 91–1), having considered the same, reports favorably thereon with reservations and recommends that the Senate give its advice and consent to ratification thereof.

### PURPOSE

The purpose of this convention is to give certain privileges and immunities to the United Nations, as an organization, and to the representatives of its members, officials of the United Nations, and experts on missions for the United Nations. For the most part, these privileges and immunities have already been conferred upon the United Nations through the International Organizations Immunities Act of 1945 and the Headquarters Agreement of 1947. In some minor ways, however, this convention goes beyond the scope of these instruments, and these are explained in a subsequent section of the report.

### BACKGROUND

The convention was adopted on February 13, 1946, by the General Assembly of the United Nations to implement articles 104 and 105 of the United Nations Charter, which follow:

### ARTICLE 104

The Organization shall enjoy in the territory of each of its Members such legal capacity as may be necessary for the exercise of its functions and the fulfillment of its purposes.

37–119—70——1

2

## ARTICLE 105

1. The Organization shall enjoy in the territory of each of its Members such privileges and immunities as are necessary for the fulfillment of its purposes.

2. Representatives of the Members of the United Nations and officials of the Organization shall similarly enjoy such privileges and immunities as are necessary for the independent exercise of their functions in connection with the Organization.

3. The General Assembly may make recommendations with a view to determining the details of the application of paragraphs 1 and 2 of this Article or may propose conventions to the Members of the United Nations for this purpose.

Secretary of State George C. Marshall on May 12, 1947, submitted a draft joint resolution, including the full text of the convention, which would have authorized the President to accept the convention on behalf of the United States. The joint resolution (S.J. Res. 136) passed the Senate by voice vote on July 17, 1947. Its provisions were reported to the House as part of an omnibus measure containing several other U.N.-related matters, but this bill did not pass. The matter was once more presented to the Congress on January 3, 1949, but no action was taken.

It was not again submitted until December 19, 1969, when President Nixon asked for the Senate's advice and consent to accession to the convention as a treaty. The 20-year delay between requests for action appears to have been the result of the executive branch being content to operate under the provisions of the International Organizations Immunities Act and the Headquarters Agreement.

In the meantime 101 members of the United Nations have become parties to the convention, including all the major powers. At the same time, the United States, as host country, has been increasingly subjected to criticism for its failure to accede. The Committee on Foreign Relations had a taste of this itself when it visited with Secretary General U Thant at the United Nations Headquarters on March 22, 1967. As a result of his representations the chairman inquired of the Department of State about the status of the convention and was subsequently informed that this was under reivew. In time, this review led to present recommendation that the United States become a party to the convention.

### PROVISIONS

Articles I, II, and III have the effect of giving the United Nations, as an organization, substantially the same legal capacities and the same privileges and immunities in the United States as are accorded to foreign governments. These articles do not change the present situation since the International Organizations Immunities Act already provides for the same legal capacities, privileges, and immunities.

Artilces IV, V, and VI set forth the privileges and immunities that are accorded to (1) representatives of members, (2) officials of the United Nations, and (3) experts on missions for the United Nations. For all of these categories, the convention changes present practice somewhat.

3

With regard to representatives of members, currently only resident representatives of permanent missions to the U.N. have full diplomatic immunities. Nonresident representatives enjoy only functional immunities; that is, immunities with respect to their official acts. Under the convention, these nonresident representatives will also be entitled to full diplomatic immunities. The group covered here consists of foreign officials coming to the United Nations for a short time to attend specific meetings—such as the annual fall meetings of the General Assembly. Foreign ministers and other high government officials, distinguished parliamentarians, and representatives of that caliber, fall into this category, which is estimated to number about 1,000 persons a year.

United Nations officials at present enjoy only functional immunities, and for the most part this will remain the same. With respect, however, to the Secretary-General, the Under Secretaries and the Assistant Secretaries—a total of about 40 persons—the convention would give full diplomatic immunities. This means that the Secretary-General will be able to enjoy the same benefits that a third secretary in any of the permanent missions, no matter how small, has at present.

Experts on missions for the United Nations now have no privileges or immunities at all, except for limited transit privileges. Under the convention, this group would be granted functional immunities—not full diplomatic immunities. An example of this group would be Ambassador Jarring and his staff, who would be in the United States for only a few days or weeks a year, if at all. Altogether, it is estimated that about 100 people a year would be affected by this provision of the convention.

The following table summarizes the changes in the various categories that would result from approval of the convention:

### HIGHLIGHTS OF PRIVILEGES AND IMMUNITIES

| | U.N. convention | Headquarters agreement | International Organization Immunities Act |
|---|---|---|---|
| (1) Diplomatic staff of member states: | | | |
| Permanent mission | Full diplomatic privileges and immunities.[1] | Full diplomatic privileges and immunities.[1] | Immunity for official acts. |
| Nonresident (temporary) diplomatic representatives. | do.[1] | Does not apply. | Do. |
| (2) United Nations officials: | | | |
| The Secretary-General, Under and Assistant Secretaries General (approximately 40). | do.[1] | do. | Do. |
| Other Secretariat employees | Immunity for official acts. | do. | Do. |
| (3) Experts on mission for the U.N. | do. | do. | Does not apply. |

[1] Consistent with the Vienna Convention on Diplomatic Relations.

Article VII authorizes the United Nations to issue its own travel document, a laissez-passer, which would be accepted by the parties as a valid travel document. This is consistent with established U.S. practice, which is to stamp a visa on the back of visa applications and regard this as a travel document for persons on United Nation business from nations which we do not recognize.

Article VIII provides various means for the settlement of disputes involving the interpretation or application of the convention, including reference to the International Court of Justice. The statute of the Court in article 36 provides that its jurisdiction comprises (1) of cases which

4

the parties refer to it * * * "in treaties or conventions in force" and (2) of matters referred to it under the compulsory jurisdiction clause. In accepting compulsory jurisdiction of the Court 1946, the Senate reserved to the United States the right to determine what matters it considered to be within its domestic jurisdiction and therefore excluded from the Court's. It is clear therefore that this reservation—the Connally reservation—would not apply to cases arising under the convention since these would fail under the provisions of article 36 (1) and not of 36 (2) to which the Connally reservation pertains.

Similar provisions have been included in many multilateral and bilateral treaties and have presented no problems.

The remaining article concerns the formalities of accession.

### RESERVATIONS AND OTHER MATTERS CONSIDERED BY THE COMMITTEE

(1) *Tax and military service obligations of U.S. nationals.*—The Department of State has recommended and the committee agrees that the United States accede to the Convention on Privileges and Immunities subject to the following reservation:

> Paragraph (b) of section 18 regarding immunity from taxation and paragraph (c) of section 18 regarding immunity from national service obligations shall not apply with respect to United States nationals and aliens admitted for permanent residence.

The reservation would reserve to the United States the right to tax and draft into military service American citizens and resident aliens working for the United Nations. It would preserve the present situation as to tax and military service obligations of U.S. citizens and resident aliens in U.N. employ.

(2) *Abuse of privileges and immunities.*—The committee and the executive branch place great weight on sections 14, 20, and 23 of the convention which, for each category of persons covered, provide that "privileges and immunities are granted * * * in the interests of the United Nations and not for the personal benefit of the individuals themselves."

Under the headquarters agreement, the United States now has procedures available to compel the departure of those representatives guilty of abuses of residence. The executive branch proposes a reservation modeled on this provision which would be applicable as well to nonresident representatives, United Nations officials, and experts on missions for the United Nations. The effect of the reservation is to continue present practice under which even the Secretary-General of the United Nations could be asked to leave the United States, in the unlikely event that he should abuse his privileges and immunities.

The reservation, which the committee endorses, reads as follows:

> Nothing in Article IV, regarding the privileges and immunities of representatives of Members, in Article V, regarding the privileges and immunities of United Nations officials, or in Article VI, regarding the privileges and immunities of experts on missions for the United Nations,

shall be construed to grant any person who has abused his privileges of residence by activities in the United States outside his official capacity exemption from the laws and regulations of the United States regarding the continued residence of aliens, provided that:

(a) No proceedings shall be instituted under such laws or regulations to require any such person to leave the United States except with the prior approval of the Secretary of State of the United States. Such approval shall be given only after consultation with the appropriate Member in the case of a representative of a Member (or a member of his family) or with the Secretary-General in the case of any person referred to in Articles V and VI;

(b) A representative of the Member concerned or the Secretary-General, as the case may be, shall have the right to appear in any such proceedings on behalf of the person against whom they are instituted;

(c) Persons who are entitled to diplomatic privileges and immunities under the Convention shall not be required to leave the United States otherwise than in accordance with the customary procedure applicable to members of diplomatic missions accredited or notified to the United States.

(3) *Protection of national security.*—As a final recourse, under the proposed reservation and present law, the United States can compel the departure from its territory of any one declared *persona non grata*, and thus protect its national security. For this reason, the effect on U.S. national security of granting full diplomatic immunities to 1,000 nonresident representatives to the United Nations and 40 high United Nations officials, as well as functional immunities to approximately 100 experts a year, was termed as not objectionable by executive branch witnesses.

(4) *No implementing legislation required.*—The convention is self-executing and will require no implementing legislation.

### COMMITTEE ACTION AND RECOMMENDATION

The Committee on Foreign Relations considered the convention at a public hearing on March 9 at which Ambassador Charles W. Yost, U.S. Permanent Representative to the United Nations, and John R. Stevenson, Legal Adviser, Department of State testified. The hearing is printed in the appendix for the information of the Senate. Subsequently, on March 12, the committee voted to report the convention favorably to the Senate subject to the reservations discussed above.

The committee agrees that U.S. security is adequately safeguarded by present law and the reservations. It further agrees that as host to the principal organs of the United Nations U.S. accession is overdue. The Secretary-General and his principal aides should be entitled to the same privileges and immunities as those with whom they deal daily. It should be noted that these privileges and immunities, by the terms of the convention itself, cannot be asserted by a national

6

against his own state and therefore Americans, whether in high positions in the Secretariat or permanent representatives to the United Nations, are not covered by the convention. Nor are any international or regional organizations other than the United Nations.

For 25 years the United Nations has been working in New York. The Committee on Foreign Relations believes that this fact should be noted and honored by accession to the convention now that the executive branch has laid it before the Senate. It recommends that the Senate give its advice and consent, subject to the reservations, to the United Nations Convention on Privileges and Immunities.

# APPENDIX

_____

## MONDAY, MARCH 9, 1970

U.S. SENATE,
COMMITTEE ON FOREIGN RELATIONS,
*Washington, D.C.*

The committee met, pursuant to notice at 10:03 a.m., in room 4221, New Senate Office Building, Hon. J. W. Fulbright (chairman) presiding.

Present: Senators Fulbright, Sparkman, Symington, Pell, McGee, Aiken, Case, and Javits.

The CHAIRMAN. The committee will come to order.

\*       \*       \*       \*       \*       \*       \*

The CHAIRMAN. I wonder if we could now go to the Convention on Privileges of Immunities of the United Nations, Executive, J. 91–1. I believe, Mr. Yost, you have a statement along with Mr. Stevenson; do you not?

Ambassador YOST. That is right.

The CHAIRMAN. Both of you?

Ambassador YOST. Yes.

The CHAIRMAN. Mr. Stevenson, come up and support your Ambassador, if you will.

Who is going to make the statement?

Ambassador YOST. I will make a brief one, if I may, Senator, and then ask Mr. Stevenson to continue with a more detailed one.

## STATEMENT OF AMBASSADOR CHARLES W. YOST, U.S. PERMANENT REPRESENTATIVE TO THE UNITED NATIONS

The CHAIRMAN. Will you proceed.

Ambassador YOST. Mr. Chairman and members of the committee, I should like to express my appreciation for this opportunity to present my views with respect to the 1946 Convention on the Privileges and Immunities of the United Nations.

The President has recommended that the Senate give its advice and consent on accession to the convention. I strongly support the President's recommendation and believe prompt action now is decidedly in the interests of the United States. The Convention on the Privileges and Immunities of the United Nations has now been in operation over 20 years. France, Britain—indeed, most West European countries—and the Soviet Union have become parties. We have thus had a long period of experience with this convention and no problems have arisen under it. The convention is accepted as the standard document regulating the privileges and immunities of the United Nations. U.S. accession to the convention will regularize our legal relations with the United Nations in this respect.

8

## BACKGROUND OF THE CONVENTION

The convention was designed to implement Article 104 and 105 of the United Nations Charter. It was approved unanimously by the General Assembly on February 13, 1946. In 1947 the convention was submitted to Congress for approval by joint resolution together with the United Nations Headquarters Agreement. The headquarters agreement passed both Houses. The convention was approved by the Senate and the House Committee on Foreign Affairs, but the House itself took no action. The convention was resubmitted to the 81st Congress, but no action was taken in either House. In accordance with the more usual practice concerning conventions dealing with diplomatic and consular matters, the convention is now being submitted to the Senate for action under the treaty power of the Constitution.

The convention provides various privileges and immunities to the United Nations as an organization, to certain representatives of members of the United Nations, to certain U.N. officials, and to experts on mission for the United Nations. Many of these privileges and immunities are already enjoyed under the International Organizations Immunities Act and under the headquarters agreement between the United States and the United Nations.

## EXTENSION OF PRIVILEGES AND IMMUNITIES

The basic impact of the U.N. convention on current law would be to extend privileges and immunities in three areas:

First, nonresident representatives of U.N. members who attend U.N. meetings such as the General Assembly would receive broader privileges and immunities than they now receive. Many of these representatives are, of course, holders of high office in the executive or legislative branches of foreign governments, chiefs of state, prime ministers, foreign ministers' and members of parliament. Under current law, such representatives, unlike representatives permanently stationed in New York, are only afforded functional immunity for official acts. Under the U.N. convention they would be afforded privileges and immunities substantially equivalent to those accorded diplomats in Washington and New York. Approximately 1,000 individuals who come to New York during all or part of the 3-month General Assembly session each year would fall into this category.

Second, the Secretary General, Under Secretaries General, and Assistant Secretaries General would be accorded the same privileges and immunities accorded diplomats in Washington. Presently this most distinguished group of international civil servants, which numbers about 40, is only entitled to immunity for official acts.

Third, individual experts on mission for the United Nations would be guaranteed such privileges and immunities necessary for the performance of their missions. We estimate that in a given year about 100 individuals—some of them in the United States for only a few days or weeks—would fall into this category. Under current law they are only granted very limited transit privileges.

PRIVILEGES AND IMMUNITIES NOT FOR PERSONAL BENEFIT

I would wish to point out that the Convention contains in article 14 an express provision which states in relevant part: "Privileges and immunities are accorded to the representatives not for * * * personal benefit * * * but in order to safeguard the independent exercise of their functions. * * * Consequently a member not only has the right but is under a duty to waive the immunity of its representative in any case where in the opinion of the member the immunity would impede the course of justice * * *." This represents a greater obligation on sending states than exists with regard to diplomats in Washington and is in my view an improvement over existing law and a significant safeguard against any abuse.

PROMPT ACTION DESIRABLE

Mr. Chairman, I stated earlier that I believe prompt action now is decidedly in the interest of the United States. And this, Mr. Chairman, goes back to the discussion we have just been having on the other matter.

The United States has been privileged to be the headquarters of the United Nations. In addition to the great honor which this implies, the United States derives various measurable advantages from this—political, psychological and fiscal. Many countries who are aware of these advantages to us seek to move parts of the organization away from our shores. Other countries would like to have pieces of the organization set up in their own territories or closer at hand. In addition to the disadvantage to the United States flowing from any such move, it can be safely said that any such fragmentation of the Headquarters would decrease the efficiency of the Organization.

In arguing for moving parts of the Organization away, it is frequently stated that it is indeed anomalous that the United States is not sufficiently responsive to its responsibilities as the host to have joined the 101 states who have ratified the Convention on Privileges and Immunities. I can assure you that this argument comes up repeatedly in the councils of the United Nations and I must confess I have been hard put to answer it.

Our failure to ratify the convention is also a matter of great concern to the Secretary General of the United Nations. When immediately after my appointment as Permanent Representative of the United States I presented my credentials to the Secretary General, the first matter he raised with me was an urgent request that the United States ratify this convention. He said he was speaking both as a friend of the United States who considered it unfortunate that we made ourselves vulnerable to the criticism of others by this failure, and on behalf of the senior officials of the United Nations, including himself, who, under present arrangements, have less privileges and immunities than any third secretary of a permanent mission of a member state.

In addition, I have long feared that a visiting dignitary——

Senator CASE. Mr. Chairman, may I just make one point; raise one question at this point?

The CHAIRMAN. Yes.

U.S. RIGHT TO EXPEL U.N. OFFICIALS

Senator CASE. There is this difference, is there not, Mr. Yost, and I wish you would address yourself to it in your own way and own time, but at this time I just want to raise it.

The difference between a mission here and a mission to our Government and the United Nations representative, the United States can request that a foreign government take back any representative of that country to our Government at any time and we have no such privilege or power with regard to United Nations representatives. Is that not true?

Ambassador YOST. No. We can request they withdraw.

Senator CASE. I think that ought to be brought out.

Ambassador YOST. Yes, indeed, sir.

Senator CASE. I just want to be sure.

Ambassador YOST. We can and have both in the case of representatives at permanent missions to the United Nations, of member states, and in the case of members of the Secretariat.

Senator CASE. How about the United Nations officers?

Ambassador YOST. That also, yes.

Senator CASE. We could ask U Thant be withdrawn? By whom?

Ambassador YOST. Well, of course——

Senator CASE. I am not suggesting that he should be. But I just want that laid out if you will, in your own way.

Ambassador YOST. Yes, indeed. I think Mr. Stevenson will go into it more fully.

Senator CASE. I did not want to interrupt the flow.

Ambassador YOST. The fact is we do have this right with regard to the members of the Secretariat. Every one, every member of the Secretariat, of course, comes from a particular country. He is a national of a given country.

Senator CASE. I just want to be sure that an employee of the U.N., if we asked that he be withdrawn and taken away from New York, has got to be taken away from New York.

Ambassador YOST. Yes, indeed.

Senator CASE. OK.

Ambassador YOST. That has happened a number of times.

Senator CASE. And you would address——

Senator JAVITS. Will you yield there? Will Mr. Stevenson tell us whether he is on the same basis as an accredited diplomat from his country except that he is accredited to serve on the U.N. Secretariat?

Mr. STEVENSON. Yes, sir.

Senator CASE. But insofar as his presence in the United States is concerned, our Government has the same ability to have him——

Ambassador YOST. Declare him persona non grata and he is withdrawn.

Senator CASE. And his presence is undesirable here.

Ambassador YOST. Exactly.

Senator CASE. And he might then lose his job; might he not?

Ambassador YOST. Of course, he would. He would.

The CHAIRMAN. Would you finish your statement, please?

Senator CASE. I am sorry. That point, it seemed to me, was appropriate there.

Ambassador Yost. In addition, I have long feared that a visiting dignitary to the United Nations might some day be involved in difficulties not of his own making and that the U.S. Government would be powerless to accord him the privileges which would be appropriate and which would be expected of us. Our ratification is long overdue. For all of these reasons, I hope very much it will be possible for this committee to give speedy and affirmative consideration to this matter.

Mr. Stevenson, the legal adviser of the State Department, will give a more detailed analysis of the convention. I would, of course, be happy to answer any questions you may have.

Thank you.

The CHAIRMAN. Do you have a prepared statement, Mr. Stevenson?

Mr. STEVENSON. Yes, sir; I do.

The CHAIRMAN. Maybe you had better——

Mr. STEVENSON. Shall I just cover the highlights of it?

The CHAIRMAN. Why do you not put the whole thing in the record and cover the highlights. There is no use in repeating anything that Mr. Yost has said. The reporter will take the whole statement and you point out to us what is significant.

## STATEMENT OF HON. JOHN R. STEVENSON, LEGAL ADVISER, DEPARTMENT OF STATE

Mr. STEVENSON. Mr. Chairman, in the first place, like Ambassador Yost, I consider accession to this convention is in the best interests of the United States.

The CHAIRMAN. We would have assumed that. Go ahead.

Mr. STEVENSON. All right. Concentrating on the legal aspects of this convention, it really deals with three major areas.

In the first place, the capacity and privileges and immunities of the United Nations itself as an organization.

Secondly, the privileges and immunities of representatives of United Nations members.

Third, privileges and immunities of officials of the United Nations.

Fourth, the status of experts on United Nations missions.

With respect to the United Nations itself, there is no significant change. Substantially all the privileges and immunities which are granted by the proposed convention are already given by the headquarters agreement of 1947 and the International Organizations Immunities Act of 1945.

### TREATMENT OF RESIDENT AND NON-RESIDENT REPRESENTATIVES TO THE U.N.

With respect to representatives of members of the United Nations, there is a difference. With respect to resident representatives, they are already afforded the protection granted in this convention by existing law. However, the convention would increase the amount of protection that nonresident representatives receive.

At the present time resident representatives are already granted full diplomatic privileges and immunities under the headquarters agreement. Nonresident representatives, on the other hand, are only

12

covered by the International Organizations Immunities Act and that grants them immunities relating to acts performed by them in their official capacity.

Under the convention, the nonresident representatives would also receive full diplomatic privileges and immunities.

The CHAIRMAN. They are the principal beneficiaries; is that right?

Mr. STEVENSON. They are in terms of numbers the principal beneficiaries. There are about 1,000 of them who would be covered who are not now.

As Ambassador Yost pointed out, many of the nonresident representatives are distinguished parliamentarians who come to New York for very short periods of time and we believe they should be treated with the same respect as the permanent representatives.

The convention makes clear, however, that privileges and immunities are to be waived whenever appropriate and do not apply, of course, as between a representative and the State which he represents or of which he is a national. Thus, no U.S. citizen could invoke these privileges and immunities against the United States.

## TREATMENT OF U.N. OFFICIALS

The next area, and this is almost second in importance as far as the changes are concerned, is the question of U.N. officials. The privileges and immunities granted to the overwhelming majority of U.N. officials are those invariably accorded officials of international organizations and these are already given to them under the International Organizations Immunities Act.

This sort of privilege and immunity is a privilege and immunity for official activity, immunity from legal process for acts in the performance of official duties, exemption of their salaries and that sort of thing.

I might point out, however, that as far as U.S. employees of the U.N. are concerned, that the President has proposed a reservation which would exclude U.S. nationals and permanent residents from the exemptions from taxation and national service obligations.

The convention would also explicitly accord full diplomatic privileges and immunities to approximately 40 high ranking U.N. officials—the Secretary General, the Under Secretaries General, and Assistant Secretaries General.

Under the Headquarters Agreement, the United States retains the right to compel the departure of any member of a mission accredited to the U.N. who abuses the privileges of his residence. We are proposing a reservation that would retain the same right for U.N. officers and employees. This is the point to which Senator Case referred earlier.

In addition, the convention is on solid ground in making clear that the immunities are granted so that the United Nations can operate effectively and that these immunities are not in any way intended for the personal benefit of Secretariat personnel.

Indeed, the convention requires the U.N. to cooperate in facilitating the administration of justice and to observe law enforcement regulations.

13

### TREATMENT OF EXPERTS ON U.N. MISSIONS

Finally, the convention grants experts on missions for the United Nations immunities to the extent necessary for the exercise of their functions. This would cover only a few people and is as stated limited to this official functional type of immunity.

### OTHER ASPECTS OF THE CONVENTION

There are three other relatively minor aspects of this convention I might touch on very briefly. The convention authorizes the United Nations to issue its own type of passport document which would be accepted as valid travel documents. This is consistent with our existing law. We follow a similar practice in cases in which we do not wish to recognize the validity of passports of nations which we do not recognize.

I might refer to the provision for dispute settlement in the convention. In the first instance the United Nations is authorized to establish dispute settlement procedure. This contemplates that in its ordinary commercial type transactions that there will be included an arbitration provision which, since the U.N. retains the capacity to waive immunity, would be a binding arbitration provision.

In the event that these types of arrangements and other negotiations are unsuccessful in settling a dispute, there is a requirement that legal disputes arising out of the interpretation or application of the convention shall be referred to the International Court of Justice. We think this is a good thing. We are favoring, as a matter of practice, including dispute settlement provisions of this nature where appropriate, and this is certainly an appropriate case.

Finally, I might say, and I would like to have the record reflect, that we regard the convention as self-executing. This is a point that is of some importance to the Secretary of the Treasury in supporting this convention. He indicated that he would like the record to reflect that so that it would not be necessary to make a relatively minor change in our customs legislation.

That concludes my formal statement. I would be delighted to answer any questions that any of you might have.

(Mr. Stevenson's full statement follows:)

STATEMENT BY JOHN R. STEVENSON, LEGAL ADVISER, DEPARTMENT OF STATE, BEFORE THE COMMITTEE ON FOREIGN RELATIONS ON THE U.N. CONVENTION ON PRIVILEGES AND IMMUNITIES, MARCH 9, 1970

Thank you for giving me the opportunity to testify before your committee on the Convention on the Privileges and Immunities of the United Nations. Like Ambassador Yost, I consider accession to the convention is in the best interests of the United States. Indeed, our accession is an unfinished piece of business that should have been taken care of long go.

Ambassador Yost has given you a general overview of the Convention. I believe it is appropriate for me to focus on the legal aspects.

14

The Convention covers several major topics. These are: legal capacity, privileges, and immunities of the United Nations as an organization; privileges and immunities of representatives of United Nations members; privileges and immunities of officials of the United Nations; and the status of experts on United Nations missions. I shall discuss provisions of the convention relating to these areas.

Substantially all the privileges and immunities that the Convention would grant to the United Nations as an organization are already accorded under U.S. law by the Headquarters Agreement of 1947 and the International Organizations Immunities Act of 1945.

There are two principal changes which the Convention would effect. First, provision is made that there shall be no restrictions on the transfer or holding of funds by the U.N.; while current law does not cover this, there are no such restrictions now. Second, the U.N.'s immunity from legal process extends to matters arising out of its commercial dealings; however, not only may the U.N. expressly waive this immunity, but, to insure equitable settlement of disputes, provision is made in the Convention for the U.N. to insert arbitration clauses in its commercial contracts.

The privileges and immunities of representatives of Members of the United Nations are covered in article IV of the Convention. While resident representatives are already afforded the protections granted in this article by existing law, protection of nonresident representatives is increased beyond the immunities currently accorded. Resident representatives are granted full diplomatic privileges and immunities now under sections 15(1) and 15(2) of the Headquarters Agreement; but nonresident representatives are only covered by section 7(b) of the International Organizations Immunities Act, which grants them immunities "relating to acts performed by them in their official capacity and falling within their functions." Under the Convention both are granted full diplomatic privileges and immunities. Many of the nonresident representatives, who temporarily come to New York for short periods of time, are parliamentarians serving on delegations to the General Assembly, and we believe they ought to be treated with no less respect than diplomats. The Convention makes clear that privileges and immunities are to be waived whenever appropriate and do not apply, of course, as between a representative and the state which he represents or of which he is a national. Thus, no American citizen who is a representative to the United Nations could avail himself of these privileges and immunities as against the United States.

Article V of the Convention deals with U.N. officials. The privileges and immunities granted to the overwhelming majority of U.N. employees are those invariably accorded officials of international organizations which are already granted under the International Organizations Immunities Act. These are privileges and immunities for official activities only. For example: immunity from legal process for acts in

the performance of official duties; exemption of U.N. salaries from taxation; immunity from military service obligations. I might point out, in this connection, that the President has proposed a reservation which would exclude U.S. nationals and permanent residents from the exemptions from taxation and national service obligations. This is reservation (1) on the sheet of proposed reservations that has been distributed.

In addition, the Convention in section 19 explicitly accords full diplomatic privileges and immunities to approximately 40 high-ranking U.N. officials—the Secretary-General, Under Secretaries-General, and Assistant Secretaries-General. If you will allow me an aside, I would note that the diplomatic immunities which the Convention would give the Secretary-General and his immediate deputies is no greater than existing U.S. law has long given to third secretaries of missions to the U.N.

Under the headquarters agreement, the United States retains the right to compel the departure of any member of a mission accredited to the U.N. who abuses the privileges of his residence. We are proposing a reservation that would retain an identical right with regard to U.N. officers and employees; it is before you in paragraph No. 2. In addition, the convention is on solid ground in making clear that the immunities are granted so that the United Nations can operate effectively, and that these immunities are not in any way intended for the personal benefit of Secretariat personnel. Indeed, the convention requires the U.N. to cooperate in facilitating the administration of justice and to observe law enforcement regulations.

Article VI grants experts on mission for the United Nations immunities only to the extent necessary for the exercise of their functions during the period of their mission. There would be few people covered by these provisions. The convention stresses the Secretary-General's duty to waive these immunities where failure to do so would impede the course of justice and waiver would be compatible with the work of the United Nations.

These are the major provisions of the convention. However, three more aspects should be commented on.

Article VII authorizes the United Nations to issue laissez-passer to its officials—that is, documents which would serve the function of passports. It is provided that these laissez-passer shall be accepted as valid travel documents, but that visas may still be required in addition. This article would not modify existing U.S. law with respect to the requirement of passports or other documentation of citizens or aliens because it is already established practice, in cases in which we do not wish to recognize the validity of passports of nations we do not recognize, to stamp a visa on the back of the visa applications and regard this as the travel document.

Article VIII deals with the settlement of disputes under the convention. First, the United Nations is authorized to establish procedures for settling disputes in which the im-

munity of the U.N. is a factor. For example, if the U.N. enters into a contract with a U.S. company for the performance of certain services, the U.S. company may not have the right to sue the U.N. on the contract because the U.N. has immunity from legal process; the United Nations therefore normally inserts an arbitration clause into the contract and disputes under the contract can thus be settled under that clause. Second, legal disputes "arising out of the interpretation or application" of the convention shall be referred to the International Court of Justice unless the disputing parties otherwise agree. While any dispute under the convention is likely to be resolved by agreement, we would consider it appropriate to refer a question that could not be so resolved to the Court at The Hague.

It is clear from the language of the convention, and from precedents involving similar provisions in other treaties to which the U.S. is a party, that the convention is self-executing; therefore no implementing legislation is necessary. Thus, our consular conventions, which provide tax and customs exemptions, are given full effect without any implementing legislation. Similarly, most-favored-nation clauses of treaties, which may result in tariff reductions, are given effect without additional legislation.

I would be glad to answer any additional questions you may have.

●        ●        ●        ●        ＊

### WHY NO FINAL ACTION IN 1948?

The CHAIRMAN. One point in Mr. Yost's statement. Why did the House of Representatives turn this down? I am just curious.

Ambassador YOST. I do not know. It did not turn it down. It just failed to act.

Mr. STEVENSON. They did not act.

The CHAIRMAN. Was it never brought up?

Mr. STEVENSON. I believe, sir, that you asked them on several occasions to move forward with it but it never progressed.

The CHAIRMAN. There may have been no good reason at all but it would be interesting to know just why it was held up. I wondered what kind of objection there might have been. In what form was it presented at that time?

Mr. STEVENSON. Joint resolution.

The CHAIRMAN. Joint resolution?

Mr. STEVENSON. Yes, but that was because the Headquarters Agreement went in that fashion, too.

The CHAIRMAN. I do not see any serious problem about this myself. What I was interested in knowing was what objections of any substantive nature had been raised in the past to this. I am a little bit puzzled about it.

Mr. STEVENSON. The House Committee did report favorably on it.

The CHAIRMAN. It did?

Mr. STEVENSON. Yes.

17

The CHAIRMAN. But it was not submitted to a vote in the full House; is that what happened?

Mr. STEVENSON. That is correct.

The CHAIRMAN. Then, it was probably stopped in the Rules Committee, very likely, although I really do not know.

### NONRESIDENT REPRESENTATIVES

You said there were 1,000 nonresident representatives. I am not quite clear about the character of these. These are not people who simply come to meetings of the U.N. Assembly.

Mr. STEVENSON. Also special conferences. In other words, for example, they are having a meeting of the Sea Beds Committee of the U.N. right now.

The CHAIRMAN. And they would be among these 1,000 nonresident representatives on temporary visits?

Mr. STEVENSON. Correct, sir.

The CHAIRMAN. That is what you are talking about.

Mr. STEVENSON. That is what we are talking about.

The CHAIRMAN. But all of the people attached to the permanent missions——

Mr. STEVENSON. They are already covered.

The CHAIRMAN (continuing). I see. So, it is primarily to benefit those who just come to special meetings.

Mr. STEVENSON. Well, and come to the General Assembly.

The CHAIRMAN. The General Assembly?

Mr. STEVENSON. Yes.

### TREATMENT OF U.N. OFFICIALS

The CHAIRMAN. Now, about the U.N. officials, do you mean the Secretary General? Is the Secretary General in that classification?

Mr. STEVENSON. No. We treat that as a separate category.

The CHAIRMAN. I am trying to make it clear so we can explain it on the floor. How is that?

Mr. STEVENSON. Well, at the present time the Secretary General and even the top officials of the U.N. only have this so-called functional immunity for their official acts. This would propose to give them full diplomatic immunity.

The CHAIRMAN. This is all of the Secretariat or only those that you call officials?

Mr. STEVENSON. Only the top 40 officials.

The CHAIRMAN. Forty? Is that all?

Mr. STEVENSON. Yes. It is basically the Secretary General, the Under Secretaries General and the Assistant Secretaries General which adds up to approximately 40.

The CHAIRMAN. That is all that is covered.

Ambassador YOST. Just the very top level and I may say, Senator, that this is a matter that has been of very deep concern to the Secretary General for many years, that he feels that he and his top people are discriminated against vis-a-vis the humblest third secretary in a permanent mission. The privileges and immunities of the latter are greater than those of the Secretary General of the United Nations.

TREATMENT OF AMERICAN CITIZENS

The CHAIRMAN. I am inclined to think he has a good point there. What about the Americans? What is their status? Is it similar to that of a foreign delegation there?

Mr. STEVENSON. The American members of the Secretariat, sir?

The CHAIRMAN. And/or the resident representatives, all of it.

Mr. STEVENSON. Well, our representatives are not given protection by the convention vis-a-vis the United States.

The CHAIRMAN. Why not?

Mr. STEVENSON. Well, because the feeling is that they are U.S. representatives and it is up to the United States to decide what it wants to do with its own representatives.

The CHAIRMAN. But we have a Federal Government. What about New York State and the city police? Are they not given any protection?

Senator CASE. Jersey Turnpike.

The CHAIRMAN. They have no protection at all as members of the U.S. delegation in New York. Is that right?

Senator CASE. That is not quite right.

The CHAIRMAN. Is it or not? I am trying to make it clear.

Mr. STEVENSON. Well, vis-a-vis the United States, the exact provision is that they cannot assert the privileges and immunities against the United States.

The CHAIRMAN. What about New York?

Ambassador YOST. We are in the same position as a Federal official would be anywhere in this country. We have no special privileges except as we may be accorded courtesies.

Senator CASE. It is not just immunity that does not exist against the United States but it also does not exist against its several States and their subdivisions, is that right?

Ambassador YOST. Yes.

Senator CASE. That is correct, Mr. Stevenson?

Mr. STEVENSON. In fact, the provisions of this convention which, of course, was not drafted with the United States specifically in mind, do make it clear that the representative does not have the right to invoke this convention against his own government and that would also presumably apply that he could not invoke it against the State.

Now, obviously, the State and the city would afford him the same courtesies they would afford other Government officials but as far as the international obligation, it is not there. But when we get to the U.N. officials we do have a different case; theoretically, U.N. officials who are U.S. citizens are covered and for a very good reason. They are considered to be international civil servants.

Now, the exception there is that the U.S. Treasury has felt that there should be a reservation for them as far as their taxes are concerned. So that we do reserve the right to tax and we also reserve the right to impose national service obligations. But there is a very good reason why they should have the status of international civil servants so that they can act on an independent basis.

The CHAIRMAN. The Senator from Missouri, do you have any questions?

Senator SYMINGTON. Mr. Chairman, I have listened with interest to the proposal for the new building, and also to the United Nations Convention on Privileges and Immunities and the discussion incident thereto. I would digress for a minute and ask Mr. Stevenson several questions on another matter he and I have discussed over recent months.

### RELEASE OF SUBCOMMITTEE LAOS TRANSCRIPTS

As you know, Mr. Stevenson, I welcomed several weeks back your getting into the picture of these subcommittee commitment transcripts, but after many weeks there still seems to be a logjam. We have been working with the various branches of the executive branch. We have been referred to some 12 people all told who have had their finger, you might say, in the pie of what should or should not be released to the public about Laos.

I was traveling on a plane most of yesterday, so I did not see any of the television shows, but did see the "Today" Show this morning, and there was the majority leader and the distinguished Chairman of this committee, all on questions incident to Laos.

Instead of releasing the hearings last October when they were completed, a great deal of it has been slipped out in bits and pieces to the press by the Administration, but little has been officially presented by the Administration to the American people.

As I told the Secretary of State, we felt like a kid between 12 adults passing around a ball. I am surprised at some of the more recent developments because of the firmness exhibited in not releasing information on the grounds of security. Now apparently that has been completely reversed, you might say, by the actions of the executive branch, in releasing much of what you classified in our hearings. For over 4 months we have held these hearings up, because, as I told you before, we are not going to put out any meaningless hearings. If we had put out the hearings the way you have classified them, we would be classified as stooges for the State Department, because a great deal you classified has now been released by the Administration in one way or another.

I feel this action is not only a denigration of the subcommittee but also of the full committee and actually the Senate itself.

I would now ask several questions.

The staff tells me the State Department is reviewing the transcripts of the Laos hearings last October in light of the President's recent statements on Laos last Friday. Have you any knowledge as to when we can have another review in an effort to reach an understanding so the subcommittee can now put out information most of which has actually been released by the executive branch?

Mr. STEVENSON. I think the executive branch hopes that this can be done as promptly as possible. The President's statement will make it possible.

Senator SYMINGTON. That is a rather open-ended answer.

Mr. STEVENSON. Well, I think we are ready now at any time to proceed and we think it is in everyone's interest to get it out now.

Senator SYMINGTON. Now, the President's statement was couched in pretty general terms. I read it carefully. Does the Department propose to declassify the supporting specifics that have come out in our hearings?

Mr. Stevenson. Well, Senator, I think we can best work that out in discussions with your staff. But certainly, the hope will be to give as much information as we possibly can.

Senator Symington. At least one inaccuracy in the President's statement has already come to light. We knew about that, the specifics.

Is the Department prepared to declassify the hearings which are based on sworn testimony?

Mr. Stevenson. I do not think I could answer that general a question, Senator. We will attempt to go as far as we possibly can in the light of the statements.

### RELEASE OF U.S. AIR CASUALTY FIGURES IN LAOS

Senator Symington. Now, as I understand it, the executive branch told the people that no American had ever been killed in ground combat. Later they admitted Captain Bush was killed plus 26 civilians. If you are going to talk about combat, why not recognize the air? Is there any less respect for a dead airman over Laos than a dead man on the ground? If we are going to give the ground casualties, which we have, why do we not give the air casualties? It has been an air war in the main, not a ground war.

Mr. Stevenson. Well, I do not believe, Senator, that there is any lesser respect for air casualties.

Senator Symington. Then, why do we not report the air casualties of American planes over Laos as well as the ground casualties? What is the purpose in hiding the former?

Mr. Stevenson. Well, Senator, I think we should review the transcript to see what finally can appear at this time.

Senator Symington. As the subcommittee transcript is being reviewed by you, the facts are being released piecemeal by you all. As long as you release the deaths of Americans in Laos on the ground, why not release the deaths of Americans in the air? Wars are fought under the sea and on the ground and on the sea and in the air. I do not see why you make a big point of releasing the relatively few casualties on the ground, but do not release the much greater casualties in the air. Does that not make sense?

Mr. Stevenson. Well, Senator, I wish you would reserve judgment until we do have a chance in the light of developments to review the transcript with your staff.

Senator Symington. We are still reserving judgment, and have worked with you for days and weeks and months; and have gotten exactly nowhere. I wonder why you consider an airman who gives his life up for his country in attacking a target in northern Laos is noncombatant. I do not know what is going on. It would seem to be misleading. It would certainly be misleading to me if I did not know what was going on. That is rather sad.

The President said on November 3 last that the American people would not support any war they did not know the truth about. That is why I think this Laotian business is such an unfortunate development. We have tried to work with you, to no avail. How many Americans have been killed in the war in Laos, all told? Would you want to give that figure?

Mr. Stevenson. Senator, I do not have that information myself.

Senator FULBRIGHT. Well, will you discuss it with your principals and the Secretary of State and see if, as long as we have given the casualties of people on the ground, could we give them in the air too.

Mr. STEVENSON. Certainly, sir.

### AIR WAR IN LAOS

Senator SYMINGTON. The President also said that our air operations have increased in Laos only in response to the level of North Vietnamese aggression. Is it not a fact that planes once allotted for bombing North Vietnam are now directed to bombing in Laos?

Mr. STEVENSON. Senator, I do not think I am the appropriate witness to answer that.

Senator SYMINGTON. This business, in effect, was turned over to you. I have the greatest respect for you. You have been cooperative, as has Secretary Green. Putting it mildly, that is not true of some other members of the State Department on this question.

Is it not true that B-52's have been used in support of our efforts in Laos, diverted from Vietnam? Why is this such a secret? If we are in there because the North Vietnamese violated the 1962 agreements, why for 8 long years have we kept secret what we are doing?

### SOLUTION TO LAOTIAN AND VIETNAMESE CONFLICTS

I see now that Souvanna Phouma and his brother who runs the Communist Pathet Lao are talking about getting together again. Maybe they can work something out in the way of a joint government, which idea some people believe right for the Vietnamese situation. It is hard to believe in Vietnamization because, if 800,000 Americans—that is the true figure—could not do it—counting those in the fleet and Thailand and those in Japan working exclusively on Vietnam, and Okinawa and the Philippines—add them all up together it is closer to 800,000 than 700,000. They are the bravest and the finest, as fine as any other people in the world. If we could not win with them, how can the South Vietnamese win if we take out these some 800,000 and keep the same ground rules, which I understand is going to be enforced on the South Vietnamese forces if we put up the money, which we plan.

### ADMINISTRATION'S RELEASE OF LAOS INFORMATION

I do feel that, after the months we put in, and the respect we showed your witnesses and yourself and the State Department, it is incredible that for 4 long months you have refused to give out information which you are now releasing to the press.

What are your thoughts about that, Mr. Counsel?

Mr. STEVENSON. Well, Senator, all I can say to you, having come in from the outside, I think that any problems here are based solely on the concern of the people involved with doing what is in our national interest.

Now, there can be disagreement I know about this and I think that it is in everyone's interest that the transcript come out as soon as possible and I very much hope in view of the statements that have been made in the last week that it will be possible to get the transcript out. But I do not think there is any question of trying to protect previous positions. It is simply——

Senator SYMINGTON. I am not sure about that. I triggered this Laos business after going out there, always a rather good idea, lived with the situation in Laos on several visits. They told me most but they did not tell me all of what was going on with American money and American military.

As the Chairman pointed out, one member of the State Department has told us that Laos was actually more important than Vietnam. Well, we have put over $100 billion in Vietnam already, regardless of whether it was right or wrong. That gigantic sum could help a lot with the growing problems in the United States. We have not near enough money for the latter. Let's hope we are not going to put another $100 billion in Laos because it is more important than Vietnam?

The lawyers say partial truth is an evasion of truth. If you are going to go on with this war in Laos, you ought to tell the people what you are doing. My reference for the logic of this observation is the first paragraph in the President's nationally televised speech on the third of November.

Senator JAVITS. Will the Senator yield for a point there? I am on his subcommittee. First, I would like to——

Senator SYMINGTON. We are honored to have the distinguished Senator from New York. He has made superb contributions to our effort.

### AUTHORITY FOR AIR OR GROUND WAR

Senator JAVITS. I thank my colleague. I would like to join Senator Symington in the request to our Government and the President to release the transcript. I would also like to raise this point. Is there any legal difference between the authority to wage an air war and the authority to wage a ground war? Is this not a war just the same, air or ground? The authority that the President exercises must necessarily be the same.

I am obliged to Mr. Marcy for this very point which I think is very pertinent.

What is this business that we are really not in a war because it is an air war?

Mr. STEVENSON. Senator, I think certainly in terms of the problems and duties of working out with the Senate with the appropriate consultation machinery and respecting the role of Senate, that various uses of military force do involve the necessity for appropriate consultation. The type of consultation and the type of relationship, I think, obviously has to vary depending on the particular facts, but certainly I would not take the point of view that airpower can be used with no reference to given circumstance at the time.

### ACTIONS OF U.S. AMBASSADOR TO LAOS

Senator SYMINGTON. When I was in Laos, the Ambassador had a more authoritative position with respect to military matters than any Ambassador I have seen in the years I have been in Government. He instructed the American military outside of the country what to hit, when to hit, how much to hit and where to hit, and so forth.

Three newspapermen, realizing they were being hoodwinked, decided they would go to Long Cheng and see for themselves. So

apparently they walked. That is quite a walk. Our Ambassador was then reported to have said that as a result of this walk he was going to give no further cooperation to the press whatsoever.

So we have asked to have the Ambassador back here before the subcommittee. Perhaps he was misquoted.

### STATE DEPARTMENT ATTITUDE ON RELEASE OF INFORMATION

I notice the Secretary of Defense stresses what he took over when he came in, very proper. But apparently the State Department wants to embrace everything that has happened in recent years, and keep the past from the people. It is a mystery to me why.

Perhaps, Mr. Chairman, we better give up trying to get information about what is going on out there in Laos; but I don't intend to as long as you permit the subcommittee to function.

### LEGAL BASIS FOR STATE DEPARTMENT TO WITHHOLD INFORMATION

The CHAIRMAN. I think it premature to give up on it. The information will come out.

In that connection, Mr. Stevenson, since you are the top legal officer of the State Department, could you tell us just what rights you think you have to prevent the publication of an executive hearing in this committee? Under what law do you have any authority to do that? Or is this entire matter merely a matter of comity between the Department and the committee?

Mr. STEVENSON. Mr. Chairman, some of these same points have been raised and I would like to submit this to you in writing.

The CHAIRMAN. I will be glad to have it in writing. I have been asked by some of the press just what legal authority you do have. What basis is there for your presuming to say this shall not be published? We have never run into this. I have had two or three unique experiences. I have never had an Ambassador before in all the time I have been here refuse to answer a question of the committee on the grounds he had been instructed not to answer it. That was one question.

Senator SYMINGTON. In executive session.

The CHAIRMAN. In executive session. Then there is this other question. I should know it, I suppose, but it has never arisen quite this way. It just hadn't aroused my curiosity to make this inquiry. I suppose you think it is a little odd having been here as long as I have that I hadn't made the inquiry, but I would appreciate it if you would give me, and the committee, a brief, so to speak, on the authority of the Department to classify these hearings and just how far you think your authority goes, and so on. I would be very interested.

Mr. STEVENSON. I would like to submit this in writing, Mr. Chairman.

The CHAIRMAN. Yes.

Mr. STEVENSON. I think that generally in the past classification has been respected by committees where the executive branch has treated something as classified.

The CHAIRMAN. I think it has been, as I say, a matter of comity. We never challenged it. This is what I believe. I wonder if you would therefore go a little further. I still want to be as cooperative as I can

with the Department. I don't like to get into a situation of confrontation or antagonism and I hope we won't any longer. I think that we have a common interest. There may be differences of views as to how best to pursue it, but I don't relish this kind of relationship and I would like to have an agreement around that.

However, just for my own interests and that of the public, a delineation of the issues by legal authority would be interesting. I would appreciate it if you would do it fairly soon, if you can.

Mr. STEVENSON. Thank you, sir.

(The information requested is set forth below.)

MARCH 13, 1970.

Hon. J. WILLIAM FULBRIGHT,
*Chairman, Committee on Foreign Relations,*
*U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: I am writing in response to your question the other day concerning the authority to declassify defense information.

Official information which requires protection in the interest of national defense may be classified by a number of named agencies of the Government under Executive Order No. 10501, as amended. This order appears in the United States Code as a note to the National Security Act of 1947 (50 U.S.C. 401).

The order provides that the heads of departments or agencies originating classified information or materials and their designees, may declassify or downgrade classified material when it "no longer requires its present level of protection in the defense interest" (sec. 4). It is specifically stated that in order for downgrading or declassification to be made "the consent of the appropriate classifying authority [must be] obtained" (sec. 4(b)).

The order further provides that "if the recipient of classified material believes that it has been classified too highly, he may make a request to the reviewing official who may downgrade or declassify the material after obtaining the consent of the appropriate classifying authority." (Section 4(f)).

Finally, the order provides with respect to the furnishing of material to persons not in the executive branch of the Government, that:

"When classified material affecting the national defense is furnished authorized persons, in or out of Federal service, other than those in the executive branch, the following notation, in addition to the assigned classification marking, shall whenever practicable be placed on the material, on its container, or on the written notification of its assigned classification:

"This material contains information affecting the national defense of the United States within the meaning of the espionage laws, title 18, U.S.C., sections 793 and 794, the transmission or revelation of which in any manner to an unauthorized person is prohibited by law." (Section 5(j)).

I am enclosing for your convenience copies of the statutes cited in section 5(j) of the order.

I hope this information is helpful to you.

Sincerely,

JOHN R. STEVENSON,
*The Legal Adviser.*

Enclosure: As stated.

TITLE 18.—CRIMES AND CRIMINAL PROCEDURE

§793. Gathering, transmitting or losing defense information.

(a) Whoever, for the purpose of obtaining information respecting the national defense with intent or reason to believe that the information is to be used to the injury of the United States, or to the advantage of any foreign nation, goes upon, enters, flies over, or otherwise obtains information concerning any vessel, aircraft, work of defense, navy yard, naval station, submarine base, fueling station, fort, battery, torpedo station, dockyard, canal, railroad arsenal, camp, factory, mine, telegraph, telephone, wireless, or signal station, building, office, research laboratory or station or other place connected with the national defense owned or constructed, or in progress of construction by the United States or under the control of the United States, or of any of its officers, departments, or agencies, or within the exclusive jurisdiction of the United States, or any place in which any vessel, aircraft, arms, munitions, or other materials or instruments for use in time of war are being made, prepared, repaired, stored, or are the subject of research or development, under any contract or agreement with the United States, or any department or agency thereof, or with any person or behalf of the United States, or otherwise on behalf of the United States, or any prohibited place so designated by the President by proclamation in time of war or in case of national emergency in which anything for the use of the Army, Navy, or Air Force is being prepared or constructed or stored, information as to which prohibited place the President has determined would be prejudicial to the national defense; or

(b) Whoever, for the purpose aforesaid, and with like intent or reason to believe, copies, takes, makes, or obtains, or attempts to copy, take, make, or obtain, any sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, document, writing, or note of anything connected with the national defense; or

(c) Whoever, for the purpose aforesaid, receives or obtains or agrees or attempts to receive or obtain from any person, or from any source whatever, any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note, of anything connected with the national defense, knowing or having reason to believe, at the time he receives or obtains, or agrees or attempts to receive or obtain it, that it has been or will be obtained, taken, made, or disposed of by any person contrary to the provisions of this chapter; or

(d) Whoever, lawfully having possession of, access to, control over, or being entrusted with any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possesor has reason to believe could be used to the injury of the United

States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted or attempts to communicate, deliver, transmit or cause to be communicated, delivered or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it on demand to the officer or employee of the United States entitled to receive it; or

(e) Whoever having unauthorized possession of, access to, or control over any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage or any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted, or attempts to communicated, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it; or

(f) Whoever, being entrusted with or having lawful possession or control of any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, note, or information, relating to the national defense, (1) through gross negligence permits the same to be removed from its proper place of custody or delivered to anyone in violation of his trust, or to be lost, stolen, abstracted, or destroyed, or (2) having knowledge that the same has been illegally removed from its proper place of custody or delivered to anyone in violation of its trust, or lost or stolen, abstracted, or destroyed, and fails to make prompt report of such loss, theft, abstraction, or destruction to his superior officer—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

(g) If two or more persons conspire to violate any of the foregoing provisions of this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be subject to the punishment provided for the offense which is the object of such conspiracy. (June 25, 1948, ch. 645, 62 Stat. 736; Sept. 23, 1950, ch. 1024, title I, § 18, 64 Stat. 1003.)

### § 794. Gathering or delivering defense information to aid foreign government.

(a) Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or un-

recognized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished by death or by imprisonment for any term of years or for life.

(b) Whoever, in time of war, with intent that the same shall be communicated to the enemy, collects, records, publishes, or communicates, or attempts to elicit any information with respect to the movement, numbers, description, condition, or disposition of any of the Armed Forces, ships, aircraft, or war materials of the United States, or with respect to the plans or conduct, or supposed plans or conduct of any naval or military operations, or with respect to any works or measures undertaken for or connected with, or intended for the fortification or defense of any place, or any other information relating to the public defense, which might be useful to the enemy, shall be punished by death or by imprisonment for any term of years or for life.

(c) If two or more persons conspire to violate this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be subject to the punishment provided for the offense which is the object of such conspiracy. (June 25, 1948, ch. 645, 62 Stat. 737; Sept. 3, 1954, ch. 1261, title II, § 201, 68 Stat. 1219.)

The CHAIRMAN. The Senator from New York is very anxious to ask a question.

Senator JAVITS. I think, Mr. Chairman, what you and Senator Symington have been placing in the record is critically important and I join it. But because I think you have explored the subject so very well and this committee has a tradition of not plowing the same grounds over again, I would just go on to the text of our hearing.

The CHAIRMAN. Yes, I wish you would, I have some questions on that, too.

## CONSTITUTIONAL RELATION OF COMMITTEE TO STATE DEPARTMENT

Senator SYMINGTON. If the Senator from New York will yield, I would make just one further observation. We have had fine cooperation from the Defense Department. Our problem is with State. The State Department, as I understand it, operates under two constitutional clauses which affect this committee; one the advise and consent clause, the other appropriations.

Mr. Stevenson, I thank you personally for your courtesy and consideration in discussing these problems. I am sure at times it has been just as difficult for you to find out who is calling the final shots on these transcripts as it has been for us.

Senator JAVITS. Mr. Chairman, might I say just as there is an executive privilege, there is also legislative right. We are an independent branch of Government and, as the Chair said, these need

to be reconciled but they cannot be reconciled if one of the parties remains obdurate. If the other party should remain obdurate you could have a very real constitutional crisis.

Suppose this committee felt in the interests of the people of the United States it had to release a transcript which the President did not wish to see released. That would confront us with quite a constitutional crisis. And we certainly have a right to hope that no such thing will be brought about, and yet it is coming right up the road as my colleagues have said. So I hope very much that the President will now resolve the issue by allowing this, whatever the State and Defense Departments wish to exercise or sanitize, to be presented to the committee and the committee may then vote to release the transcript and we will cease to be in this twilight zone in which we seem to have existed so long.

I think Senator Symington is absolutely right when he speaks about the partial releases as the President wishes. I don't think that is entirely fair to the committee considering the labor that has gone into it and the fact that so much of this originated here. We have to be willing to call them as we see them just as the President does.

## TABLE SHOWING IMMUNITIES IN DIFFERENT CASES

Mr. Chairman, I was going to propose to Mr. Stevenson, who is an extraordinarily fine lawyer as I testified when he came for confirmation, to perhaps help us and help the Congress with this question of the immunities agreement or the Convention as follows. Could we take a classic case of a civil situation and could we take a classic case of a criminal situation and then analyze for the Congress what happens in each of the four categories? That is, the permanent resident diplomat, accredited to the U.N., the nonresident diplomat accredited to the U.N., the U.N. Secretariat and the advisers, so-called, or experts.

Now, the two classic situations that occur to me are, one, a civil suit for nonpayment of rent. You know, there is a big problem in New York about renting to U.N. personnel official quarters because of the fear that you can never get them out and you can never sue them and that is a very serious matter. Mrs. Loeb has had a lot of problems with them and she has solved them magnificently, a wonderful woman, and with the mayor's full cooperation, but it is a serious problem.

The other question is, suppose a man has FC or diplomatic plates on his car and he hits somebody and kills him and let's say it is a manslaughter charge or gross negligence charge.

What will be the new situation, if we ratify this Convention? I have given you my classic cases. Maybe you can pick better ones but I don't think the Congress will be able to visualize unless it is translated into reality instead of abstraction.

Don't you agree with that, Mr. Stevenson?

Mr. STEVENSON. Yes, Senator. Do you wish me to do this now or——

Senator JAVITS. You can or choose your cases. I don't want to push you on this. This is important and may have the material effect on getting this done or not getting it done.

Mr. STEVENSON. I think we can perhaps do that in a written statement more easily.

Senator JAVITS. I think you should do it.

29

Mr. STEVENSON. It is a clear picture but I think it might be better to put it in writing.

Senator JAVITS. You may want to choose two State and one Federal situation or two Federal situations because after all, you can be sued civilly in the Federal courts as well, but I do think you ought to present the matter to us in a way that will be realistic to the individual Members of the Congress.

Mr. STEVENSON. I would like to present it in terms of the change. Of course——

Senator JAVITS. That is right.

Mr. STEVENSON. Some of the situations with respect to complete immunity exists already. We can do this quite simply.

Senator JAVITS. Good. Would you agree, Mr. Chairman?

The CHAIRMAN. Yes.

I think that makes it much easier for us to explain this on the floor. As you are quite aware in recent years we had difficulty with the consular convention and part of it was because these concrete examples were missing. I think the Senator is quite right asking for this.

Senator JAVITS. That is all, Mr. Chairman.

(The table referred to follows:)

### U.N. CONVENTION ON PRIVILEGES AND IMMUNITIES—EFFECT IN TWO TYPICAL SITUATIONS

(1) *Civil suit.*—Nonofficial activity: Is person immune for failure to make payments due on the lease for his private residence? [1]

(2) *Criminal prosecution.*—Nonofficial activity: Is person immune from manslaughter prosecution resulting from negligent driving? [1]

| | U.N. Convention | Prior law |
|---|---|---|
| Permanent representative of member State. | Yes; immune from suit or prosecution under sec. 11(g). | Yes; immune from suit or prosecution under sec. 15 of the Headquarters Agreement. |
| Nonresident (temporary) representative of member State. | Do. | No; neither immune from suit or prosecution. Only had immunity for official acts under sec. 7(b) of the International Organizations Immunities Act. |
| U.N. officials (except approximately 40 high officials). | No; neither immune from suit or prosecution. Only immune for official acts under sec. 18(a). | No; neither immune from suit or prosecution. Only immune for official acts under sec. 7(b) of the International Organizations Immunities Act. |
| Secretary-General, Assistant and Under Secretaries-General. | Yes; immune from suit or prosecution under sec. 19. | No; neither immune from suit or prosecution. Only immune for official acts under sec. 7(b) of the International Organizations Immunities Act. |
| Experts on mission for U.N. | No; neither immune from suit or prosecution. Only immune for official acts under sec. 22(b). | Not now covered at all. Thus not immune from suit or prosecution. |

The CHAIRMAN. These are some questions the staff has given me. Maybe I will run over them very quickly. It might help the record.

[1] Both have same result because the controlling distinction is between official and unofficial activity, not between civil and criminal actions.

### PROCEDURES FOR EXPULSION

Can the United States declare any of the persons covered by the Convention as persona non grata and demand their departure?

Mr. STEVENSON. Have we in the past?

The CHAIRMAN. Can they?

Mr. STEVENSON. Yes.

We have—one of the reservations——

The CHAIRMAN. You wouldn't have a right. I am trying to be careful. I don't mean that we could ask U Thant to be recalled. Could we?

Mr. STEVENSON. We are proposing a reservation which would cover the privileges and immunities of U.N. officials, all U.N. officials, which would provide that in the case of any person who has abused his privilege of residence by activities in the United States outside his official capacity, we could initiate procedures for his removal.

Now, this contemplates that we would consult with the Secretary General. So I don't think we are talking about the Secretary General; we are not contemplating he will be carrying on activities——

The CHAIRMAN. I am not contemplating it either. I am only trying to develop answers to questions if one of my colleagues should ask, what happens if the Secretary General becomes involved in a disgraceful episode. Can we ask his recall? I was only trying to seek answers. I am not contemplating it. I think very highly of the Secretary General. That isn't the point.

Mr. STEVENSON. The answer is under our reservation we would theoretically have that right. We would have to consult with him about his own status.

The CHAIRMAN. I don't expect him to be, but I wanted to try to elicit an answer.

Mr. STEVENSON. It is to take care of this concern that the President has proposed this reservation.

Senator JAVITS. For that matter the President of the United States is not absolutely immune from everything; is he? Isn't that true?

Mr. STEVENSON. That is true.

Senator JAVITS. The President is amenable to the criminal law and civil law as are we. We can be sued. I think it is very important to juxtapose that. I don't think Congress is foolish enough to want you in your zeal to get this approval to embarrass the United States with the Secretary General. So I think it ought to be clear that the President of the United States is much more vulnerable than the Secretary General if you are going to take it theoretically. Isn't that true?

Mr. STEVENSON. Yes, sir; it is.

The CHAIRMAN. This helps the thinking of people. It makes it easier to accept it. You know in these days of warfare, we are burdened with prejudices of all kinds and I think the more answers you can give of this kind, the easier it will be to get it accepted.

### WHY IS RATIFICATION SOUGHT NOW?

I am not sure these questions haven't been answered, but I will put them in a simple way so you can give very simple and concise answers. Can either one of you give a short reason why this is so important at this time because this has been pending, you see, for 20-odd years?

I mean, we have gotten along; we are still functioning. I was going to ask you also in connection with this why has it been so long since the executive department has urged us to act on this? I don't think this has been before this committee, has it, until last December. Didn't you just submit it?

Ambassador Yost. Yes, Senator.

The Chairman. Why is the accession to this treaty so necessary now to this country?

Ambassador Yost. I am not sure, Senator, why it has been so long. I have not been around the U.N. so long.

The Chairman. Can anybody in your delegation there tell us?

Ambassador Yost. I can give you the reason why we feel it is important now.

The Chairman. All right.

Ambassador Yost. Once again it is psychological and symbolic. That is, here is a convention that 101 states have ratified, including most of the leading countries of the world, and yet we, the host country to the major part of the U.N. operation, haven't ratified it. This is used by people at the U.N. who are hostile to us to indicate, to suggest that we are not as interested in the U.N. as we pretend to be and it does cause us very considerable embarrassment in public debates on a whole variety of issues.

Senator Javits. Would the chairman yield? I think I can give a better answer, if you will forgive me.

Ambassador Yost. Please do.

Senator Javits. I ask you this. Isn't it a fact that now that you are coming here to expand the U.N. Headquarters and sort of even more deeply vest it in the United States by material expansion—$80 million is a lot of money for a group of structures—that the question naturally arises this is now pretty permanently embedded here and it had better be institutionalized.

Ambassador Yost. Yes, indeed, and this question did arise in the debate on the expansion on a number of occasions and as I said in my statement, it is something that the Secretary General feels very deeply about.

The Chairman. Mr. Yost, you don't need to tell me this. As a matter of fact, when this committee visited the Secretary General over 2 years ago, he mentioned it to us and I wrote the Secretary, urging him to bring this up but that was still 2 years ago.

This is a fact. The record will show that. The Secretary General did bring it up. You don't have to convince us the Secretary General wants it. What we are trying to examine is why you have been so long and why do you think it is now necessary when you didn't 2 years ago or 20 years ago?

Ambassador Yost. Well, we were reminded of it not only by the Secretary General but as Senator Javits points out by the debates on the expansion and the fact that it was brought up and then, of course, we are in this 25th anniversary year trying to take a whole series of steps which will indicate our continued and stronger support of the United Nations and this is one of the things that, as I say, has been allowed to lie all these years without any real reason apparently.

Senator Javits. Mr. Ambassador, if the Chair will yield again, did the President send this convention up with a message?

Ambassador Yost. Yes.

32

The Chairman. He sent it up in December, just near the end of the year.

Senator Javits. With a message?

The Chairman. I don't remember the message. I think there was a short message. But I wrote the Department as soon as we returned in 1967 from that luncheon with U Thant, and asked that they look into this again and move forward with it.

### DEPARTMENT OF JUSTICE VIEWS

Mr. Stevenson or Mr. Yost, is the Department of Justice in accord with this recommendation. Have they approved it?

Mr. Stevenson. The Department of Justice indicated that they would interpose no objection. They indicated that in their view there might be a slight increase in the security risk but that if we felt that there were foreign policy reasons justifying this, that they would not object further and the State Department indicated——

The Chairman. Did you have a letter from the FBI, Mr. Hoover, approving this?

Mr. Stevenson. They approved the statement that was sent reflecting this point of view which is in the Secretary of State's letter of transmittal.

The Chairman. It is?

I have been handed the correspondence between me and the State Department on this convention. It might be put in the record, Miss Reporter.

(The correspondence referred to follows:)

DEPARTMENT OF STATE,
*Washington, D.C., December 14, 1967.*

Hon. J. W. Fulbright,
*Chairman, Committee on Foreign Relations,*
*U.S. Senate, Washington, D.C.*

Dear Mr. Chairman: The Secretary has asked me to reply to your inquiry of last spring on the feasibility of action by this Congress on the Convention on the Privileges and Immunities of the United Nations.

The question of resubmitting the Convention to Congress has been given the most careful consideration by the Department and the Administration during the period since your letter was received. Such consideration has included necessary but time-consuming consultations within the Department and with other agencies of the executive branch.

By the time this process had been completed, this session of Congress was well advanced. Accordingly, we decided not to submit the convention at that time, as it seemed unlikely that the convention could be acted on so late in the session.

The Department will keep the matter under review and will give serious consideration to resubmitting the convention to the Congress during the next session. We would welcome an opportunity to discuss this matter with you or your staff especially in view of the enclosed U.N. resolution on this subject which was recently adopted unanimously by the General Assembly's Sixth Committee.

Sincerely yours,

William B. Macomber, Jr.,
*Assistant Secretary for Congressional Relations.*

33

Enclosure: U.N. resolution.

## UNITED NATIONS GENERAL ASSEMBLY

Distr.
Limited
A/RES/2328 (XXII)
29 December 1967

## Twenty-second session, Agenda item 98

### RESOLUTION ADOPTED BY THE GENERAL ASSEMBLY

[on the report of the Sixth Committee (A/6965)]

2328 (XXII). *Question of diplomatic privileges and immunities*

*The General Assembly,*

*Having considered* the item entitled:

"Question of diplomatic privileges and immunities:

"(*a*) Measures tending to implement the privileges and immunities of representatives of Member States to the principal and subsidiary organs of the United Nations and to conferences convened by the United Nations and the privileges and immunities of the staff and of the Organization itself, as well as the obligations of States concerning the protection of diplomatic personnel and property;

"(*b*) Reaffirmation of an important immunity of representatives of Member States to the principal and subsidiary organs of the United Nations and to conferences convened by the United Nations",

*Recognizing* the importance of the work of the organs of the United Nations and of conferences convened by it and also of the contribution of the Organization itself and its officials to the maintenance of peaceful relations and cooperation among States,

*Conscious* that the unimpeded functioning of the diplomatic channels for communication and consultation between Governments is vital to avoid misunderstandings and friction,

*Recognizing* that, for the independent exercise of their functions, it is essential that representatives of Member States, the United Nations itself and its officials, as well as diplomatic agents, shall enjoy the necessary privileges and immunities,

*Recalling* that Article 105 of the Charter of the United Nations provides that the Organization shall enjoy in the territory of its Members such privileges and immunities as are necessary for the fulfillment of its purposes and that representatives of the Members of the United Nations and officials of the Organization shall similarly enjoy such privileges and immunities as are necessary for the independent exercise of their functions in connexion with the Organization,

*Recalling further* that the 1946 Convention on the Privileges and Immunities of the United Nations [1] confirms and specifies the provisions of Article 105 of the Charter and lays down rules, *inter alia,* regarding immunity of the property and inviolability of the premises of the Organization, regarding facilities for its official communications, regarding privileges and immunities of representatives of Members to

---

[1] United Nations, *Treaty Series*, vol. 1 (1946), No. 4, p. 15.

34

organs of the United Nations and conferences convened by it while exercising their functions and during their journey to and from the place of meeting,

*Recalling* that the rules of international law governing diplomatic relations embodied in the Vienna Convention of 1961[2] aim at protecting diplomatic missions and diplomatic representatives and otherwise facilitating their functions,

*Conscious* of its duty to strengthen by every means peaceful relations and co-operation among States,

1. *Deplores* all departures from the rules of international law governing diplomatic privileges and immunities and privileges and immunities of the Organization;

2. *Urges* States Members of the United Nations which have not yet done so to accede to the Convention on the Privileges and Immunities of the United Nations, adopted by the General Assembly of the United Nations on 13 February 1946;

3. *Urges* States Members of the United Nations, whether or not they have acceded to the Convention on the Privileges and Immunities of the United Nations, to take every measure necessary to secure the implementation of the privileges and immunities accorded under Article 105 of the Charter to the Organization, to the representatives of Members and to the officials of the Organization;

4. *Urges* States which have not yet done so to ratify or accede to the Vienna Convention on Diplomatic Relations of 18 April 1961;

5. *Urges* States, whether or not they are parties to the Vienna Convention on Diplomatic Relations, to take every measure necessary to secure the implementation of the rules of international law governing diplomatic relations and, in particular, to protect diplomatic missions and to enable diplomatic agents to fulfil their tasks in conformity with international law.

*1637th plenary meeting,*
*18 December 1967.*

———

APRIL 7, 1967.

Hon. DEAN RUSK,
*Secretary of State,*
*Washington, D.C.*

DEAR MR. SECRETARY: During the committee's visit at the United Nations March 22, Secretary General U Thant brought up the question of the Convention on the Privileges and Immunities of the United Nations, and I agreed to make inquiry to see whether action could be taken on this convention.

I have since been informed by the staff that after submitting this agreement for approval by means of a joint resolution in the 80th and 81st Congresses, the Executive branch has not resubmitted it to succeeding Congresses. I am further informed that the Convention is listed in the Department's projected legislative program for 1967 under "Other Important Legislation."

---

[2] See United Nations Conference on Diplomatic Intercourse and Immunities, *Official Records*, vol. II (United Nations publication, Sales No.: 62.X.1), p. 82.

35

There may be problems about this legislation of which the committee is unaware and therefore, I solicit your frank opinion on the feasibility of action in this Congress.

Your cooperation is greatly appreciated.

Sincerely yours,

J. W. FULBRIGHT, *Chairman.*

Do you think there is any chance that the FBI is what has held us up for 20 years? Is there disapproval?

Mr. STEVENSON. I would doubt it, sir.

The CHAIRMAN. I think you covered this, the specific ways in which accession would enlarge U.N. obligations to grant privileges and immunities. You have covered that I believe, haven't you?

Are there any conflicts between this convention, the International Organization Privileges and Immunities Acts and the Headquarters Act?

Mr. STEVENSON. Well, sir, there are no conflicts. The main burden of my testimony was to show the limited number of areas where the convention would increase the immunity for the different categories, but there are no conflicts. In fact, the headquarters agreements itself says it shall be interpreted to give effect where possible to both conventions. So the idea is to interpret them, to give full effect to both of them.

The CHAIRMAN. When was the International Organization Privileges and Immunities Act accepted?

Mr. STEVENSON. When was it adopted?

The CHAIRMAN. Yes. How long ago?

Mr. STEVENSON. 1945, I believe.

The CHAIRMAN. But it just wasn't quite broad enough to cover all these categories; is that right?

Mr. STEVENSON. The primary difficulties is it gives only immunity for official acts.

CONNALLY AMENDMENT AND INTERNATIONAL COURT OF JUSTICE

The CHAIRMAN. Is it correct to say that if disputes about the interpretation of this convention arose and were referred to the International Court of Justice under section 30 the Connally amendment would not apply?

Mr. STEVENSON. Senator, as you know, the Connally amendment gives the United States the discretion to determine whether this is a matter of domestic jurisdiction. I personally as legal advisor would find it very difficult to find anything covered by this treaty to be a matter of domestic jurisdiction.

The CHAIRMAN. But some of our amendments, I mean some of our international treaties or conventions specifically provide that we will not take refuge under the Connally amendment. Does this one or not?

You are familiar with what I mean.

Mr. STEVENSON. Yes. In theory the Connally amendment would apply. All I am saying is that I would find it very difficult to construe anything arising under this Convention as a matter of domestic jurisdiction.

The CHAIRMAN. But that Connally amendment doesn't require that the finding be reasonable at all. It can be quite arbitrary. That was the purpose of it. The determination is entirely within the discretion of this government.

Mr. STEVENSON. Correct.

The CHAIRMAN. You certainly wouldn't be here saying that we always act rationally, would you?

Mr. STEVENSON. We try to.

The CHAIRMAN. In other words, the Connally amendment would technically apply and those who would say that we are exposing ourselves to unwarranted trials and tribulations are wrong because the Connally amendment does apply, doesn't it? This is important on the floor of the Senate. You never know when the FBI contacts a Senator and says this is dangerous and then we get a block on it. This has happened I think. So you have to make as strong a case as you can here giving us protection.

(The following clarifying statement was subsequently submitted for the record.)

MARCH 11, 1970.

Hon. J. W. FULBRIGHT,
*Chairman, Foreign Relations Committee,*
*U.S. Senate.*

DEAR MR. CHAIRMAN: Thinking over my testimony on Monday on the Convention on the Privileges and Immunities of the United Nations, I would like to add a clarification concerning the Connally amendment and the jurisdiction of the International Court of Justice. I would appreciate it if the enclosed statement could be inserted in the record.

Sincerely yours,

JOHN R. STEVENSON.

Enclosure: Statement.

The following statement is submitted for clarification in connection with questions concerning the International Court of Justice

The Connally amendment, or self-judging aspect of our domestic jurisdiction reservation, could be employed to prevent the International Court of Justice from deciding a case brought against the United States based on our 1946 across-the-board acceptance of compulsory jurisdiction to any international legal dispute under paragraph 2 of article 36 of the Court's statute. The amendment could not, however, be invoked in a proceeding brought under section 30 of the Convention on the Privileges and Immunities of the United Nations since the basis for the Court's jurisdiction would be paragraph 1 of article 36 of the statute, which gives the Court jurisdiction to decide legal disputes arising under "treaties and conventions in force." Section 30 of the convention thus has the effect of avoiding the application of the Connally amendment in the extremely small class of potential cases that may arise from unresolvable differences over the interpretation or application of the convention. As the committee noted in its favorable report on a similar provision in

37

the Optional Protocol to the Vienna Convention on Diplomatic Relations, "The protocol has the effect of eliminating application of the Connally amendment to a narrow group of cases which might arise only out of disputes as to the meaning or application of this particular convention. Similar provisions have been included in at least 31 treaties and 10 other international agreements to which the United States has become a party in recent years." (Ex. Report No. 6, 88th Cong., 1st Sess., p. 9.)

Section 30 also provides that where a legal dispute under the terms of the Convention between the United Nations and a party is not resolved by other means, the General Assembly is expected to request an advisory opinion from the I.C.J. on the legal question involved and the opinion is to be accepted as decisive. Here, too, the Connally amendment could not be invoked. We do not anticipate any unresolvable dispute between the U.N. and the United States under this Convention. The 1947 headquarters agreement between the United States and the United Nations contains an arbitration provision which in the two decades it has been in force has never been invoked against the United States. We have always been able to resolve differences by negotiation.

### SPECIALIZED AND REGIONAL ORGANIZATIONS NOT COVERED

The CHAIRMAN. Does this convention apply only to the United Nations, or does it also cover the OAS, regional organizations or specialized United Nations agencies?

Mr. STEVENSON. There is a separate convention on specialized agencies which is not before the Senate. There is no present intention to bring it before the Senate.

The CHAIRMAN. Does it apply to OAS?

Mr. STEVENSON. It does not.

### OTHER ASPECTS

The CHAIRMAN. The Soviet bloc and several other countries reserved their positions on the reference of disputes to the International Court of Justice under section 30. Why did they do so?

Mr. STEVENSON. I do not know specifically. They in general oppose any sort of compulsory third party settlements. They simply do not like to accept it. So I am sure it is because of that general policy that they oppose it.

The CHAIRMAN. Do you think there is any need for us to do so?

Mr. STEVENSON. No, sir.

The CHAIRMAN. Will implementing legislation be required?

Mr. STEVENSON. No, sir. It is a self-executing treaty.

The CHAIRMAN. Will the approval of this convention result in any Federal, State or local tax losses? .

Mr. STEVENSON. No, sir; because there are reservations for U.S. nationals.

The CHAIRMAN. What is the situation with respect to income taxes on American nationals and resident aliens employed by the United Nations?

Mr. STEVENSON. We are including a reservation so they will continue to be subject to U.S. taxes.

The CHAIRMAN. Resident aliens?

Mr. STEVENSON. Yes, residents.

The CHAIRMAN. Resident aliens as well?

Mr. STEVENSON. Yes, sir; because the point is the permanent residents are not resident aliens in our sense.

The CHAIRMAN. But resident aliens will be subject?

Mr. STEVENSON. Subject to our tax under the reservation.

The CHAIRMAN. As of course our own citizens will be?

Mr. STEVENSON. Yes.

The CHAIRMAN. Do you know of any opposition to this convention?

Mr. STEVENSON. I had better defer to the Ambassador.

The CHAIRMAN. Do you, Mr. Yost?

Ambassador YOST. No, sir; I do not.

The CHAIRMAN. So far as you know, there is no one opposing it?

Ambassador YOST. No.

Mr. STEVENSON. No domestic opposition.

The CHAIRMAN. Have you any other questions?

Oh, I am sorry. I didn't see you Senator Pell. I would have recognized you earlier.

Senator PELL. I apologize for being late. I was out of town.

I just wanted to come and pay my respects to Ambassador Yost. I would like to have heard his testimony right through.

I would strongly support the Privileges and Immunities Convention. The question of expanding the U.N. at this time or moving perhaps parts to other parts of the globe, I gather, has been gone over by other Senators. My support here is more muted and I will read the record. I am sure that Ambassador Yost can logically persuade me that the U.N. should be expanded in New York and not as I thought in the past in other parts of the globe.

Ambassador YOST. Thank you, Senator, I hope so.

The CHAIRMAN. Coming back to the U.N. expansion matter, I think, Mr. Yost, you can see that they are not exactly enthusiastic about it for various reasons. Partially the status of our Government, but also the question of, aside from, putting greater concentration of these activities in New York City as a city which is already burdened with a great many problems and there is a doubt I think in the minds of a number of people whether this question of the efficiency in New York is really as real as you have represented it.

I think some of us may have a feeling that New York as such is not a community that contributes to the efficiency of operations. We are all familiar with the fact that many of the great corporations formerly who had headquarters in New York and they are devoted to efficiency of their own operations, moved out of New York. They moved out into smaller communities. This is well known. We have read about it on numerous occasions. It is true of other cities, not just New York. A great many big corporations who are certainly concerned about their efficiency have found that the working conditions, the attitudes of their people who work for them and the opportunities for relaxation, I suppose the peace of mind in being relieved from a constant fear of being attacked physically and other things, just generally more decent living conditions have been worthwhile. I know myself of a great many moves on their part by private corporations.

So I think you may need to make a better case about it. You may, I don't know. I am very dubious about it myself. Geneva is a very fine city.

Ambassador YOST. Let me put it in a nutshell, Senator, if I may. The U.N. is being decentralized. This is a process that is going on all the time. As I pointed out, more than half of its employees are already outside of New York. And I have no doubt that this process will continue.

But we do think that it is of very great importance to maintain the central focus in New York, to maintain the control and direction of the whole family of U.N. institutions at headquarters in New York, and as I say, it is not proposed to move headquarters. It is too late for that really. It is there.

The CHAIRMAN. Oh, nobody is proposing to move headquarters.

Ambassador YOST. So I think what we are trying to do with this expansion is merely to maintain, provide the inevitable and necessary expansion of the parts that are already there, not to put any new parts there and indeed there will in the future be review about moving some things that are already there abroad but we do want to maintain most particularly this economic and social part of the Secretariat, not to mention the political part, which is responsible for coordinating all of these specialized agencies, all of these regional——

The CHAIRMAN. But the agencies themselves—I don't want to repeat this, but I would mention the UNICEF. I don't see why the development program—the development doesn't take place here. It takes place elsewhere. I can't see any particular reason why it is better that it stay in New York. That is quite a large operation.

Ambassador YOST. That, Senator, I beg to differ on. That is a very—the Pearson report reiterated what is our conviction, that the U.N. development program should be the center for the entire multilateral——

The CHAIRMAN. It didn't say it had to be in New York City, did it?

Ambassador YOST. No.

The CHAIRMAN. That is the only point I am making.

Mr. STEVENSON. But we have got an American head of it which we think is very important and we do think the location is important in order—in part for us to be able to have some influence, a major influence over its operation.

The CHAIRMAN. I don't know. Maybe you have had too much influence. No one is saying it is a perfect institution. I won't argue with you any longer. I just want you to put in the facts, I think I have already asked you to: the number of people involved in these various subsidiary agencies who are now in New York occupying space in this headquarters which if they were moved to Geneva or maybe some other city that is not as big as Geneva or maybe is less developed that could take it.

There was at one time a great deal of talk about trying to improve the status of Berlin by moving some kind of international organization there in the hopes that it could ease the burden. I don't care about injecting that into this debate. The point is to put in the record the alternative. If you want to assume there is no alternative, it may be difficult. I don't know.

Ambassador YOST. Well, as I said earlier, it is all a matter of degree. Some of it will be moving but these central control agencies we would like to keep, particularly the development program, its proximity to the World Bank we view as of great importance.

The CHAIRMAN. But the World Bank itself has offices all over the world practically. They don't operate just in Washington.

Ambassador YOST. So does the development program. It has offices in almost every developing country.

The CHAIRMAN. Well, I won't delay it any more.

Thank you very much.

Ambassador YOST. Thank you, Senator.

(Whereupon at 1:07 p.m., the hearing was concluded.)

### TEXT OF RESOLUTION OF RATIFICATION (WITH RESERVATIONS)

*Resolved, (two thirds of the Senators present concurring therein),* That the Senate advise and consent to the ratification of The Convention on Privileges and Immunities of the United Nations, approved unanimously by the General Assembly on February 13, 1946, (Executive J, Ninety-first Congress, first session) subject to the following reservations:

(1) Paragraph (b) of section 18 regarding immunity from taxation and paragraph (c) of section 18 regarding immunity from national service obligations shall not apply with respect to United States nationals and aliens admitted for permanent residence.

(2) Nothing in Article IV, regarding the privileges and immunities of representatives of Members, in Article V, regarding the privileges and immunities of United Nations officials, or in Article VI, regarding the privileges and immunities of experts on missions for the United Nations, shall be construed to grant any person who has abused his privileges of residence by activities in the United States outside his official capacity exemption from the laws and regulations of the United States regarding the continued residence of aliens, provided that:

(a) No proceedings shall be instituted under such laws or regulations to require any such person to leave the United States except with the prior approval of the Secretary of State of the United States. Such approval shall be given only after consultation with the appropriate Member in the case of a representative of a Member (or a member of his family) or with the Secretary-General in the case of any person referred to in Articles V and VI;

(b) A representative of the Member concerned or the Secretary-General, as the case may be, shall have the right to appear in any such proceedings on behalf of the person against whom they are instituted;

(c) Persons who are entitled to diplomatic privileges and immunities under the Convention shall not be required to leave the United States otherwise than in accordance with the customary procedure applicable to members of diplomatic missions accredited or notified to the United States.

O