# Exhibit B

*February 27, 1970* CONGRESSIONAL RECORD — SENATE 5263

cotton. Provision is made for adjusting reserve levels. Title VII would prohibit CCC sales from reserves for unrestricted domestic use at less than parity. For instance, CCC sales of wheat, when stocks were below the reserve level, would be at parity, less the cost of certificates; CCC sales of feed grain, when reserves were below the reserve level, would be at parity, less the payment. Provision is made for release from CCC stocks under certain emergency conditions. No additional costs are contemplated for this title.

Title VIII provides for the extension of marketing orders to any commodity when a majority of producers of that commodity approves. The title authorizes an advisory committee to help write the marketing order; for public hearings on the order; and for producer referendum, which requires a two-thirds vote of approval for the marketing order to become effective.

Title XI contains a permanent extension of the present cropland adjustment program, and removes the present $245 million limit on appropriation for this program.

Title X continues the rice program and provides authority for an acreage diversion program for rice if the national allotment is set at less than the 1965 level.

Mr. Chairman, it will be noted that several of the titles in our proposed Agricultural Stabilization Act continue the use of the parity concept. I know that a number of proposals are blowing around that would drop the use of parity in establishing price and income support level. Some of these proposals would base supports in a given year for particular commodities on a percentage of the average market price for such commodity during the preceding three-year period. More specifically, the proposal most often discussed would limit supports to 85 percent of this "moving" average. As some of us see it, this would mean that prices would generally trend downward year after year because of an unstable floor. For instance, if we assume a 3-year average market price of $1.05 for corn for the years 1968–1970, then 1971 supports would be set at only 89 cents per bushel (85 percent of the 3-year average). For wheat, a 3-year average of $1.25 per bushel would mean 1971 supports of only $1.06 per bushel.

How can we expect farmers to go along with a program that in a few years guarantees supports for corn, at say, 75 cents a bushel, and wheat at a dollar a bushel, when farm operating costs have been advancing at the rate of 3 percent a year—when in the 1960–69 period, farm machinery costs have jumped 39 percent; when farm wage rates have soared up by 74 percent; when property taxes have more than doubled; and when farm interest costs have more than tripled. What possible equity or justice can be involved in deflating farm prices when the rest of the economy is inflating?

Such a concept—this three-year "moving" average it seems to me, will succeed only in driving more farmers off the land. According to the January 9 estimate of the U.S.D.A., the number of farms in the United States since January 1, 1968—only 2 years ago—has declined nearly 160,000.

When we introduced this bill last October, the Senator from South Dakota said:

"Parity returns are, by definition, no more than equality with the rest of our society. The programs of the 1970's will not keep faith with farmers unless they contain a firm commitment to that goal."

Mr. Chairman, cur bill is based upon the premise that the parity concept is useable and should not be discarded for some untried method of deriving support levels by taking some percent of market average prices for the commodity during the previous three years. Parity has been through the fire—it is a valid, living concept, not unchanging but useable. Moreover we do not assume in S. 3068 that present programs are all wrong. It does make certain changes and amendments as have been discussed.

This is a time to hold to what is helpful until we have something better. This is a time to keep programs which are working reasonably well and to improve them if we can. Above all, this is the time to hold fast to *parity* as a concept, a time to achieve full parity pirces if it can be done, and to insist on somehow reaching parity income for that 5 percent of our population which feeds all of us and has enough left over to export the product of one-fourth of the acres farmed. This achievement deserves, and must have a more adequate reward than 80 percent of fair.

At this time, I wish to turn briefly to the Administration's new proposed Agricultural Act of 1970. This document, I assume, is the measure that has been in preparation over the past year, and arrived only very recently for our study. The literature which accompanied the proposal heralded it as a "consensus approach." The literature fails to point out the individuals or groups among whom there exists a "consensus" on these proposals but I am informed that those groups most certainly do not include the National Farmers Union, the Grange, the National Association of Wheat Growers, The Midcontinent Farmers Assccition, the National Farmers Organization. These groups characterized the so-called "consensus" approach as "inadequate," "unsound" and "totally unacceptable," in an announcement dated February 5, 1970. It is expected that the other coalition groups which support our bill will also speak out against the Administration's bill as soon as they have had an opportunity to try to digest its provisions.

I shall not attempt here a detailed analysis of the Administration's proposal, but I do have a few observations to make and a few questions to raise, which I think will be of interest to Senators and others interested in the farm program.

On the mimeographed transmittal which accompanied the text of the bill, the goals of the proposal include some points about which most of us would not quarrel. I have noted a few of these points:

—to give farmers a wider range of decision making on their own farms;

—farmers would be free to do the kind of farming they are best prepared to do;

—to help farmers improve cash markets . . . and develop a greater reliance on the marketplace as a source of farm income. And so forth.

Farmers will appreciate these goals, but a few might scratch their heads and wonder about them as I do. It seems to me that farmers are called on today to make a pretty wide range of decisions. I suspect that most of them are doing the kind of farming they are best prepared to do. And I wonder how many farmers want to be told they need to develop "greater reliance" on the market? Someone ought to be reminded that farmers today rely pretty heavily on the marketplace.

This so-called "consensus" proposal contains seven titles; in addition to separate titles for dairy, feed grains, wheat and cotton, there is a title providing for long-term land retirement, and one which would extend Public Law 480.

The titles dealing with feed grains and wheat provide price support loans "not in excess of 90 percent of parity," or, as farmers would say, "zero to 90 percent." Might not one raise the question here whether Senators and farmers want to give the Secretary of Agriculture such wide discretionary authority that he could, say next year, or the next, reduce price support loans in effect to the 3-year "moving average" I mentioned a few moments ago? Do we want to do that? If memory serves me, this was proposed back in the 1950's and the Congress wisely rejected it.

The cotton title provides loans at "not in excess of 90 percent of the estimated world price," as compared with our proposal, which provides supports at between 65 and 90 percent of parity. I don't need to remind Senators or cotton farmers there is a great deal of difference between these two approaches.

One of the features of the so-called "consensus" proposal is the "set aside". As I read it, cooperators would be required to set aside acreage equal to a percentage of his base or allotment acres, plus his conserving base. He would then have "full freedom" (as the literature says) to use the rest of his cropland in anyway he wishes.

Apparently the Administration thinks that this "freed" acreage would be planted to crops other than those which would build surplus stocks. Nevertheless I am concerned that this feature might well spur additional acres of feed grains and soybeans, and perhaps in some areas, additional cotton. My concern again reminds me of the statement which I read at the outset of my remarks by the Chairman of the Committee on Agriculture dealing with overcapacity in American agriculture. I can assure you that I am happy it is the able and experienced Senator from Louisiana who will be presiding over the Committee's examination of this proposal.

I know that Senators will examine carefully the two proposals which I have discussed today. I firmly believe that our proposed Agricultural Stabilization Act, which extends and improves on the present agricultural legislation, is in the best interest of consumers, farmers and the economy in general. We welcome the prospect of having our proposals discussed in the up-coming hearings, and I feel sure Senators will give it their approval, when they have studied it and measured its terms alongside the alternatives.

## TUBERCULOSIS TESTING

Mr. MATHIAS. Mr. President, we all share the concern which has been generated by the discovery of an unusual incidence of tuberculosis on Capitol Hill.

I am sure that most Senators shared my surprise at the news that six active cases of tuberculosis had been discovered here, two of them fatal. The erroneous impression that tuberculosis has been controlled is all too prevalent, but this experience has provided a rude awakening.

A great effort has been required to test everyone here, including the cooperation of several governmental and voluntary health agencies. I am pleased that among those agencies which cooperated were the Maryland Tuberculosis Association and the Maryland State Department of Health. Maryland has made available one of the X-ray mobile units which has been used to help administer tuberculosis tests to Members of Congress and congressional employees.

I am glad that Maryland had an important share in making this effort a success.

## SHOULD UNITED NATIONS FUNDS FINANCE THE TRAINING OF ARAB TERRORISTS?

Mr. DODD. Mr. President, in recent months there have been a number of articles in the press reporting that many of the Arab refugee camps maintained by the United Nations Relief and Works Agency—UNRWA—have in effect become training grounds for Arab guerrillas. Some of the articles have carried

photographs of guerrilla units in training in these camps.

This situation is the subject of an editorial captioned "We Accuse UNRWA" which appears in the current quarterly issue of the organ of the Society for the Prevention of World War III, a private organization headed by a group of highly distinguished Americans.

Pointing out that the United States contributes nearly two-thirds of the total budget of UNRWA, the editorial goes on to say:

> With the first-stated purpose of UNRWA— the giving of relief—we have the sincerest sympathy. The suffering of human beings everywhere is the concern of all of us.
>
> But the concept of refugee camps as recruiting centers for terrorists must be rejected as outrageous. Money spent for that purpose is worse than wasted: it is used dishonestly, and used to keep the Middle East at war.

Mr. President, in the hope that all Senators will find the time to study it, I ask unanimous consent to have printed in the RECORD the full text of the editorial captioned "We Accuse UNRWA."

There being no objection, the editorial was ordered to be printed in the RECORD, as follows:

### WE ACCUSE UNRWA

There seems to be two conflicting ideas about the purpose and use of UNRWA (the United Nations Relief and Works Agency for Palestine Refugees in the Near East).

UNRWA was founded 21 years ago to provide housing, food and education for displaced Arab refugees. It was also to train them for reemployment and to assist in their resettlement.

The Arab states, and in particular the several guerrilla and terrorist movements which they support, appear to have a very different view. It is perhaps best expressed in an editorial which appeared November 24, 1969, in one of the major Arab propaganda publications in the United States, a weekly edited by the director of the Action Committee on American-Arab Relations:

"The Palestinian refugee camps in Lebanon have been taken over by Palestinian commando units. . . . The process of the refugee camps becoming a training ground for the commando units is the logical development. . . . We sugest that the several Arab States in which the Palestinian refugee camps exist should delegate authority to the Palestianians to handle the affairs of the camps. . . ."

On the front page of the same publication, a week earlier, appeared a two-column photo of guerrilla units training in an unidentified camp, with the caption "Refugee Camps Become Training Grounds." (*The New York Times* a few days later published a similar photo, taken in the UNRWA camp near Sidon, Lebanon, and captioned "Commando Training in Refugee Camps.")

With the first-stated purpose of UNRWA— the giving of relief—we have the sincerest sympathy. The suffering of human beings everywhere is the concern of all of us.

But the concept of refugee camps as recruiting centers for terrorists must be rejected as outrageous. Money spent for that purpose is worse than wasted: it is used dishonestly, and used to keep the Middle East at war.

Until UNRWA can be restored to its original purposes, and until defects in several of its programs (especially the schools) can be remedied, UNRWA must stand accused of the gravest malfeasance.

(1). UNRWA has wrongfully permitted its facilities to be used for the training of illegal guerrilla and terrorist groups. The case of 14 camps in Lebanon which have been physically taken over by commando units—who have actually placed armed guards at the camp entrances and otherwise usurped control—is only the most recent example. As far back as 1966, the Commissioner-General of UNRWA complained that Egypt was training commando units at camps in the Gaza Strip. At that time, Egypt promised to make restitution ($150,000) for the rations and facilities used by the commandos. Up until this moment (our last inquiry was at the date of going to press) not a single dollar had been repaid. Meanwhile, the Arab press has regularly published accounts of commando units recruited in UNRWA camps in Jordan and Syria, and trained while subsisting on UNRWA rations.

(2). UNRWA has permitted local nationalistic control to be substituted for responsible international control. This was perhaps inevitable in an operation which should have been completed within a period of two or three years, but has been permitted to drag over more than a generation. As the Commissioner-General has frequently pointed out, the refugee camps are subject to the jurisdiction of the host countries. Moreover, the overwhelming majority of UNRWA employees are locally recruited (out of nearly 13,000 staff members at present, only 110 are members of the international staff) and are considered—with varying degree from country to country—to be subject to the control of local authorities. Thus UNRWA becomes not only a subsidy to needy persons, but also a powerful source of financial support for the political purposes of adventurous regimes. It should come as no surprise that one of the hijackers of a TWA plane detoured to Syria had not long before been employed on the local administrative staff of UNRWA in an Arab state.

(3). The children of the refugees, in the camps, are educated to hate their neighbors and to prepare for war against them. This appalling charge is documented in detail in an article elsewhere in this issue (see page 12). An international commission of educational experts named by UNESCO has recommended the removal or modification of a large part of the textbooks used in UNRWA schools—but the Arab states have refused to comply or to allow UNRWA to comply. In Syria, to take but one example, a first-year reading primer compels the young child to learn to pronounce the words: *"The Jews are the enemies of the Arabs. Soon we shall rescue Palestine from their hands."* The Syrian Minister of Education, replying to a complaint from UNESCO, said: "The hatred which we indoctrinate into the minds of our children from birth is sacred."

(4). UNRWA has failed to carry out its original obligation to work toward the resettlement of the refugees. In the beginning, the number of Arabs who departed the area that is now Israel were less than—and certainly not larger than—the number of Jews who were forced to leave Arab lands in the Middle East, such as Iraq, Yemen and Syria. The Jewish exiles were received with open arms in Israel; they were retrained, and they promptly found profitable employment. They have never received any restitution for their lost property, nor have the heirs of those who died in flight received even sympathy from their former Arab masters. In sharp contrast, the Arab refugees were not assimilated into the lands of their kinsmen, but in most cases were kept separated in camps, unable to compete in the employment market, or to sustain themselves. In the Gaza Strip, the controlling power, Egypt, would not even grant passports or other identification documents (except the ration cards provided by UNRWA) to its unfortunate wards. Funds originally allocated for resettlement were used for other purposes. Although committees of the United States Senate and House of Representatives, when considering UNRWA contributions, repeatedly urged that the process of resettlement must be speeded up, no action followed. On the contrary, the Arab propaganda organs accused the United States (which supplies the largest share of the funds of UNRWA) of trying to "liquidate the Palestine Question" by insisting upon its concern that those refugees who wished to do so should be given a chance to lead normal lives in the countries of their current domicile.

(5). UNRWA has permitted itself to be made an object of financial plunder by "host" governments in the Middle East. The fact that a mere census of the camp populations has been prevented in most places lies at the base of this scandal. Vital statistics show that the camp populations have the highest birth rate and the lowest death rate in any part of the Arab world. Medical care superior to that available in most Arab villages in part accounts for this, but it is also cynically said that "a refugee never dies, his ration card is sold in the market,"—and this charge is at least in part true. The Commissioner-General has for years, in annual reports, complained of "political obstacles" placed in the way of making any scientific verification of the origins and numbers of camp inhabitants.

Meanwhile, the number of "refugees" has skyrocketted by the birth of children and grandchildren, to reach the present total of approximately 1,400,000—far more than double the original 1948-9 figure.

Equally reprehensible is the manner in which certain Arab states have measurably enriched themselves by illegally charging customs duties on materials destined for refugee camps. Others have charged above-market rates for railway freight transportation, and other local services. Pending claims by UNRWA for excess rail charges alone, against the governments of Lebanon, Syria and Jordan, total more than one-and-a-half million dollars—money that has meanwhile come from the pockets of taxpayers in the United States and other contributing countries. Some Arab states have also derived tax revenues by taxing electrical power and other services sold to UNRWA— in defiance of international conventions exempting the agency from such taxation.

(6). National contributions to UNRWA are grossly disproportionate and the rights of the contributors are disregarded. The United States government alone pays nearly two-thirds of the total budget of UNRWA. If substantial contributions by private corporations and foundations are added, the American proportion of the total bill is still larger. In contrast, neither the Soviet Union nor any nation of the Soviet satellite group has ever pledged an official contribution—although the Soviets have expended vast sums on arming Egypt, Syria, Iraq and other Arab states, and have given backing to those states in their war-like propaganda. As a part of a general settlement in the Middle East, the United States should at least be permitted to have a reasonable voice in the conduct and future administration of UNRWA—and it is only fair to insist that the burden should be shared by financially able members of the United Nations, such as the USSR, who have thus far accepted no responsibility whatsoever.

### WHAT IS THE VERDICT?

The editorial quoted at the beginning of this indictment, from the publication edited by the head of the Action Committee on American-Arab Relations, concludes with an interesting suggestion. Should "pressure" cause the United States government to decrease its subsidy to UNRWA, "the Arab States should make up the balance." Then, says the Arab editor, the affairs of the camps could be delegated entirely to the direction of the "Palestinian refugees."

Considering the war-like and terroristic attitude of the commandos and terrorists to

whose whims the refugees would thus be left, we can hardly approve the latter part of this suggestion. But if the largesse of the free nations is to be misused through the misconduct of certain governments, then it is logical that those governments should bear the burdens which we up to this point have shouldered.

THE SOCIETY FOR THE PREVENTION OF WORLD WAR III has expressed its views in a telegram to President Richard M. Nixon, reading in part as follows:

"It is authoritatively reported in the press and officially conceded by the Commissioner-General of UNRWA that control and policing of 14 Arab refugee camps in Lebanon is in hands of Palestine commandoes or guerrillas primarily armed with weapons of communist origin. . . . In Jordan also UNRWA camps have long been used by guerrillas as centers for training and recruitment. For years UNRWA has been derelict in its duties in failing to correct this situation. Continuation of large American financial support for these camps is therefore tantamount to maintaining a guerrilla army operating against our own interests and condoning terrorism. The American government has no right to use tax money to subsidize terrorism. We therefore urge that you refrain from making new financial commitments to UNRWA until such time as the use of UNRWA installations for guerrilla war purposes has been effectively ended and the control of refugee camps is vested exclusively in the hands of dependable authorities."

We deeply regret the necessity for such a conclusion. We are firmly devoted to the amelioration of human needs wherever they may be discovered but we are also pledged to give such advice as will advance the permanent peace of the world, or at least not contribute to plunging it again into the holocaust of war. We think that the misuse of UNRWA funds is at this time contributing to the latter danger.

We also think that UNRWA, as at present functioning, is not viably performing its primary duty of relief. It has let the refugees become pawns in an international power play, and has permitted war-makers to traffic with their fate for alien purposes. Until this is corrected, the United States ought not to make any further unrestricted pledges to UNRWA—and its support should be explicitly contingent, from month to month, upon a thorough housecleaning of this entire operation.

## NOMINATION OF JUDGE CARSWELL

Mr. ALLOTT. Mr. President, yesterday the Senator from Massachusetts (Mr. KENNEDY) placed in the RECORD a statement from the Senator from South Dakota (Mr. McGOVERN) explaining why Senator McGOVERN is going to vote against the confirmation of the nomination of Judge G. Harrold Carswell.

Most of the objections Senator McGOVERN mentions have been discussed in recent weeks. But one objection which Senator McGOVERN shares with journalist Michael Harrington does merit special attention.

Mr. Harrington, with Senator McGOVERN concurring, argues that President Nixon is trying to politicize the Supreme Court even more than Franklin Roosevelt did in his ill-fated attempt to pack the Court.

Mr. President, this is a misunderstanding of what President Nixon is trying to do.

It is not true that President Nixon is trying to pack the Court. It would be closer to the truth to say that the President is trying to unpack it. He is trying to restore some semblance of balance to the Court.

If we are faithful to the meaning of "court packing" as that term emerged from President Roosevelt's attack on the Court, we must surely see that what President Nixon is doing has nothing to do with packing the Court.

In fact, the President is acting in accordance with nothing more radical than the U.S. Constitution, which vests in him the responsibility for appointing new members to the Court.

Unlike Franklin Roosevelt, President Nixon is not trying to alter the very structure of the Court.

Unlike Franklin Roosevelt, President Nixon is not asking the Senate to tamper with the number of Justices.

On the contrary, President Nixon is asking the Senate to fulfill its part of the constitutional partnership by bringing the Court up to full strength.

In fact, whereas Franklin Roosevelt was convinced that nine justices were insufficient, there are some persons today who seem to think that nine justices are too many.

Mr. President, I think President Nixon is correct in his approach to this matter. He believes that the court should be composed of nine members as Congress has specified. He thinks that a team of nine can afford a few strict constructionists.

I do not think that a baseball manager is "packing" his lineup if he includes a mixture of lefthanded and righthanded batters. And President Nixon does not think that a judicious mixture of judicial philosophies constitutes a "packing" of the Supreme Court lineup.

In short, Mr. President, the nomination of Judge Carswell tests the willingness of some persons to practice what they preach.

There are some persons who express great enthusiasm for dissent and diversity in many parts of our national life, but who became very nervous when they believe dissent and diversity may emerge in places more important than undergraduate rallies.

Mr. President, the confirmation of the nomination of Judge Carswell will help the Court to perform its difficult functions. American institutions thrive on diversity. The Court is no exception to this rule.

## THE RELATIONSHIP OF FUTURE FOREIGN ASSISTANCE PROGRAMS, THE NATIONAL INTEREST, AND THE NEEDS OF DEVELOPING NATIONS—AN ADDRESS BY SENATOR EDMUND S. MUSKIE

Mr. EAGLETON. Mr. President, this past Wednesday, at a luncheon meeting of the International Development Conference in Washington, the Senator from Maine (Mr. MUSKIE) delivered a thoughtful as well as thought-provoking address on foreign aid. He has pointedly raised the urgent matter of restructuring our foreign assistance programs and simultaneously restructuring the political base for them. So that all Senators may have an opportunity to read it, I ask unanimous consent that Senator MUSKIE's address be printed in the RECORD.

There being no objection, the address was ordered to be printed in the RECORD, as follows:

THE CHALLENGE OF THE 1970's—A NEW LOOK AT FOREIGN ASSISTANCE

(Remarks by Senator EDMUND E. MUSKIE, of Maine, at a luncheon meeting of the International Development Conference, Washington, D.C., February 25, 1970)

If I had believed the headlines and the public opinion polls, I would have called my talk: "Epitaph for a Lost Cause." The subject of foreign aid is not popular, and its prognosis is not favorable. My presence here may be more a testimony to the unsinkable optimism of an elected Maine Democrat than an indicator of my political judgment.

But, to paraphrase Mark Twain: Rumors of the death of foreign aid are greatly exaggerated, and calls for its end, or its decline, are greatly misguided.

I share the conviction of the young people who are involved in the International Development Conference: "Our aim must be to change international attitudes so as to make it impossible for our political leaders to continue to neglect, and often to aggravate, the obscene inequities that disfigure our world."

The time has come, friends of development aid, not to bury that aid, not to praise its past accomplishments, but to commit ourselves to a new understanding of its place in our world and a determination to use it effectively. We must use it to give new life and hope to those who are the victims of those "obscene inequities."

To do that, we need the energy, and the enthusiasm which move the young people who have joined in this conference. We need to reinforce that energy and enthusiasm with the perspective of those who know where we have been, what has worked and what hasn't, and why we went there in the first place.

In looking backward, we can derive some satisfaction from what has been achieved. Foreign aid, properly speaking, began with the Marshall Plan, a success which had everything working for it.

After two world wars, Americans believed that Europe was worth sacrifices in peacetime, too. The dramatic results were due in part to the fact that aid was used, not to build, but to reconstruct previously developed economies. In a sense the early 1950's, with their stress and achievement, are a heroic period in the history of foreign aid, but it is one to which we cannot return.

By the mid-1950's, the Marshall Plan had proved its worth. Europe for the moment seemed to have been made safe for the West and freedom. The succeeding decade presented new challenges to respond to development needs on a broader scale. The newly independent nations of the world needed all the assistance they could get. And we suspected that if we did not help, others might act in our place.

As the front between the two blocs became stabilized in Europe, each side sought to protect or advance its interests in Africa and Asia.

Today, however, I think many would agree that the relationship between foreign assistance and the national interests of the donor powers is not as direct as it once appeared. No nation since World War II has lost its sovereignty because of Communist foreign aid.

That fact has cut some of the urgency of the security arguments for foreign aid. At the same time other supports were weakening, too.

There have always been those profoundly critical of foreign aid. In recent years, they have been joined by those sunshine supporters of aid who—like some university alumni—have come to doubt whether the