# Exhibit J

# Draft conclusions on identification and legal consequences of peremptory norms of general international law (*jus cogens*), with commentaries

**2022**

> Adopted by the International Law Commission at its seventy-third session, in 2022, and submitted to the General Assembly as a part of the Commission's report covering the work of that session (A/77/10). The report, which also contains commentaries to the draft conclusions (para. 44), will appear in *Yearbook of the International Law Commission, 2022*, vol. II, Part Two.



Copyright © United Nations
2022

3.　　If, however, any State concerned raises an objection, the States concerned should seek a solution through the means indicated in Article 33 of the Charter of the United Nations. If no solution is reached within a period of twelve months, and the objecting State offers to submit the matter to the International Court of Justice or to some other procedure entailing binding decisions, the invoking State should not carry out the measure which it has proposed until the dispute is resolved.

4.　　This draft conclusion is without prejudice to the procedures set forth in the Vienna Convention on the Law of Treaties, to the relevant rules concerning the jurisdiction of the International Court of Justice, or to other applicable dispute settlement provisions agreed by the States concerned.

### Conclusion 22
### Without prejudice to consequences that specific peremptory norms of general international law (*jus cogens*) may otherwise entail

The present draft conclusions are without prejudice to consequences that specific peremptory norms of general international law (*jus cogens*) may otherwise entail under international law.

### Conclusion 23
### Non-exhaustive list

Without prejudice to the existence or subsequent emergence of other peremptory norms of general international law (*jus cogens*), a non-exhaustive list of norms that the International Law Commission has previously referred to as having that status is to be found in the annex to the present draft conclusions.

### Annex

(*a*)　　The prohibition of aggression;

(*b*)　　the prohibition of genocide;

(*c*)　　the prohibition of crimes against humanity;

(*d*)　　the basic rules of international humanitarian law;

(*e*)　　the prohibition of racial discrimination and apartheid;

(*f*)　　the prohibition of slavery;

(*g*)　　the prohibition of torture;

(*h*)　　the right of self-determination.

## 2.　Text of the draft conclusions and commentaries thereto

44.　　The text of the draft conclusions adopted by the Commission, on second reading, together with commentaries thereto, is reproduced below.

### Identification and legal consequences of peremptory norms of general international law (*jus cogens*)

### Part One
### Introduction

### Conclusion 1
### Scope

The present draft conclusions concern the identification and legal consequences of peremptory norms of general international law (*jus cogens*).

### Commentary

(1)　　As is always the case with the Commission's outputs, the draft conclusions are to be read together with the commentaries.

(2)　　These draft conclusions concern peremptory norms of general international law (*jus cogens*), which have increasingly been referred to by international and regional courts,

national courts, States and other actors. These draft conclusions are aimed at providing guidance to all those who may be called upon to determine the existence of peremptory norms of general international law (*jus cogens*) and their legal consequences. Given the importance and potentially far-reaching implications of peremptory norms of general international law (*jus cogens*), it is essential that the identification of such norms and their legal consequences be done systematically and in accordance with a generally accepted methodology.

(3)    Draft conclusion 1 is introductory in nature and sets out the scope of the present draft conclusions. It provides in simple terms that the present draft conclusions concern the identification and legal consequences of peremptory norms of general international law (*jus cogens*). The draft conclusions, dealing with identification and legal consequences, are primarily concerned with methodology. They do not attempt to address the content of individual peremptory norms of general international law (*jus cogens*). It should also be noted that the commentaries will refer to different materials to illustrate methodological approaches in practice. The materials referred to as examples of practice, including views of States, serve to illustrate the methodology for the identification and consequences of peremptory norms of general international law (*jus cogens*). They do not imply agreement with, or endorsement of, the views expressed therein by the Commission.

(4)    The draft conclusions are concerned primarily with the method for establishing whether a norm of general international law has the added quality of having a peremptory character (that is, being accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law (*jus cogens*) having the same character). The draft conclusions are thus not concerned with the determination of the content of the peremptory norms themselves. The process of identifying whether a norm of international law is peremptory or not requires the application of the criteria developed in these draft conclusions.

(5)    In general, the draft conclusions use the word "identify" to signify the process of establishing that a norm is a peremptory norm of general international law (*jus cogens*). The word "determine", however, is also used at places.

(6)    In addition to the identification of peremptory norms of general international law (*jus cogens*), the draft conclusions also concern the legal consequences of such norms. The term "legal consequences" is used because it is broad. While there may be non-legal consequences of peremptory norms of general international law (*jus cogens*), it is only the legal consequences that are the subject of the present draft conclusions. Moreover, individual peremptory norms of general international law (*jus cogens*) may have specific consequences that are distinct from the general consequences flowing from all peremptory norms. The present draft conclusions, however, are not concerned with such specific consequences, nor do they seek to determine whether individual peremptory norms have specific consequences. The draft conclusions only address general legal consequences of peremptory norms of general international law (*jus cogens*).

(7)    The terms "*jus cogens*", "peremptory norms" and "peremptory norms of general international law" are sometimes used interchangeably in State practice, international jurisprudence and scholarly writings.[11] The Commission settled on the term "peremptory norms of general international law (*jus cogens*)" because it is clearer and also because it is the term used in the 1969 Vienna Convention on the Law of Treaties (1969 Vienna Convention).[12]

(8)    The term "peremptory norms of general international law (*jus cogens*)" also serves to indicate that the topic is concerned only with norms of general international law. *Jus cogens* norms in domestic legal systems, for example, do not form part of the topic. Similarly, norms of a purely bilateral or regional character are also excluded from the scope of the topic.

---

[11]    For a discussion on nomenclature, see D. Costelloe, *Legal Consequences of Peremptory Norms in International Law*, Cambridge University Press, 2017, pp. 11 *et seq.*

[12]    Vienna Convention on the Law of Treaties (Vienna, 23 May 1969), United Nations, *Treaty Series*, vol. 1155, No. 18232, p. 331. See, for example, article 53 of the 1969 Vienna Convention.

(9)     The word "norm" is used because it is understood to have a broader meaning than other related words such as "rules" and "principles" and to encompass both. It is, however, to be noted that, in some cases, the words "rules", "principles" and "norms" can be used interchangeably. The Commission, in its 1966 draft articles on the law of treaties, used the word "norm" in draft article 50 which became article 53 of the 1969 Vienna Convention. However, in the commentaries, the Commission used the word "rules".[13] Both articles 53 and 64 of the Convention use the word "norm". To be consistent with that Convention, the word "norm" is retained.

(10)    In general, the present draft conclusions apply to States, as the primary subjects of international law. For this reason, the text of the draft conclusions refers in the main to "States". Nonetheless, there are instances in which the draft conclusions also apply to international organizations. Where a particular draft conclusion applies to international organizations, the commentaries will make this clear.

### Conclusion 2
### Nature of peremptory norms of general international law (*jus cogens*)

> Peremptory norms of general international law (*jus cogens*) reflect and protect fundamental values of the international community. They are universally applicable and are hierarchically superior to other rules of international law.

**Commentary**

(1)     Draft conclusion 2 describes the general nature of peremptory norms of general international law (*jus cogens*). The general nature is described in terms of three essential characteristics associated with peremptory norms of general international law (*jus cogens*). The draft conclusion is placed after the provision on scope, in order to indicate that it provides a general orientation for peremptory norms of general international law (*jus cogens*).

(2)     The first characteristic referred to in draft conclusion 2 is that peremptory norms of general international law "reflect and protect fundamental values of the international community". The Commission chose the words "reflect and protect" to underline the dual function that fundamental values play in relation to peremptory norms of general international law. The word "reflect" is meant to indicate that the fundamental value(s) in question provide, in part, a rationale for the peremptory status of the norm of general international law at issue. Further, the word "reflect" seeks to establish the idea that the norm in question gives effect to particular values. The word "protect" is meant to convey that a specific peremptory norm of general international law serves to protect the value(s) in question. Put differently, it indicates the idea that underlying peremptory norms are particular values shared by the international community as a whole that the norms seek to protect. In some ways, these are mutually reinforcing concepts. A value reflected by a peremptory norm of general international law (*jus cogens*) will be protected by compliance with that norm.

(3)     The characteristic that peremptory norms of general international law (*jus cogens*) reflect and protect fundamental values of the international community relates to the content of the norm in question. Already in 1951, before the adoption of the 1969 Vienna Convention or the 1966 draft articles on the law of treaties, the International Court of Justice had linked the prohibition of genocide, a prohibition today widely accepted and recognized as a peremptory norm, to fundamental values, noting that the prohibition was inspired by the commitment "to condemn and punish genocide as 'a crime under international law' involving a denial of the right of existence of entire human groups, a denial which shocks the conscience of mankind and results in great losses to humanity, and which is contrary to moral law and to the spirit and aims of the United Nations".[14]

---

[13] See draft article 50 of the draft articles on the law of treaties, *Yearbook … 1966*, vol. II, document A/6309/Rev.1, Part II, p. 183, where the word "norm" is used. The commentaries, however, refer to "general rule[s] of international law … having the character of *jus cogens*" and "rules of *jus cogens*" (*ibid.*, p. 248, paras. (2)–(3) of the commentary to draft article 50).

[14] *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide, Advisory Opinion, I.C.J. Reports 1951*, p. 15, at p. 23. See also P. Bisazza, "Les crimes à la frontière

(4)    The references in the International Court of Justice advisory opinion on *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide* to "the conscience of mankind" and "moral law" evoke fundamental values shared by the international community. In subsequent decisions, the Court has reaffirmed this description of the underlying basis for the prohibition of genocide and, at the same time, affirmed the peremptory status of the prohibition of genocide.[15] Moreover, in its 2007 judgment in the case concerning the *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v. Serbia and Montenegro)*, the Court referred to peremptory norms along with "obligations which protect essential humanitarian values", thus indicating a relationship between them.[16] Similarly, in *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia v. Myanmar)*, the Court described the *erga omnes* character of the prohibition of genocide as based on, in part, "shared values".[17] The connection between values and the peremptory character of norms has also been made by other international courts and tribunals.[18]

(5)    Support for the link between peremptory norms of general international law (*jus cogens*) and fundamental values can be found in the practice of States. For example, many States have, in official statements, including before the United Nations, recognized the connection between fundamental values and peremptory norms.[19] The recognition of this link

---

du *jus cogens*", in L. Moreillon, *et al.* (eds.), *Droit pénal humanitaire*, Series II, vol. 4, Brussels, Bruylant, 2009, at p. 164, where she evokes, quoting Bassiouni, *la conscience de l'humanité*; and L. Boisson de Chazournes, "Commentaire", in R. Huesa Vinaixa and K. Wellens (eds.), *L'influence des sources sur l'unité et la fragmentation du droit international : travaux du séminaire tenu à Palma, les 20–21 Mai 2005*, Brussels, Bruylant, 2006, at p. 76, referring to a *conscience universelle*.

[15]    See, for example, *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v. Serbia and Montenegro), Judgment, I.C.J. Reports 2007*, p. 43, at pp. 110–111, para. 161; and *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Croatia v. Serbia), Judgment, I.C.J. Reports 2015*, p. 3, at p. 46, para. 87.

[16]    *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v. Serbia and Montenegro)* (see footnote 15 above), p. 104, para. 147.

[17]    *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia v. Myanmar), Provisional Measures, Order of 23 January 2020, I.C.J. Reports 2020*, p. 3, p. 17, at para. 41 ("In view of their shared values, all the States parties to the Genocide Convention have a common interest to ensure that acts of genocide are prevented"). On the relationship between peremptory norms of general international law (*jus cogens*) and *erga omnes* obligations, see draft conclusion 17 below.

[18]    See *Prosecutor v. Anto Furundžija* (*Case No. IT-95-17/1-T, Judgment of 10 December 1998*, Trial Chamber, International Criminal Tribunal for the Former Yugoslavia, *Judicial Reports 1998*, vol. 1, p. 466, at p. 569, paras. 153–154), where the Tribunal expressly linked the status of the prohibition of torture as a peremptory norm of general international law (*jus cogens*) to the "importance of the values it protects", noting that "[c]learly, the *jus cogens* nature of the prohibition against torture articulates the notion that the prohibition has now become one of the most fundamental standards of the international community". This holding was quoted with approval by the European Court of Human Rights in *Al-Adsani v. the United Kingdom, Application No. 35763/97, Judgment of 21 November 2001*, Grand Chamber, European Court of Human Rights, *Reports of Judgments and Decisions 2001-XI*, para. 30. In the case of *Goiburú*, et al. *v. Paraguay* (*Judgment of 22 September 2006 on Merits, Reparations and Costs*, Inter-American Court of Human Rights, *Series C*, No. 153, para. 128), that Court described offences prohibited by *jus cogens* as those that "harm essential values and rights of the international community". See also *Michael Domingues v. United States* (*Case 12.285, Merits, Judgment of 22 October 2002*, Inter-American Commission on Human Rights, *Report No. 62/02*, para. 49), where that Commission linked peremptory norms of general international law (*jus cogens*) to "public morality" and, more importantly, stated that they "derive their status from fundamental values held by the international community", noting that violations of *jus cogens* "shock the conscience of humankind".

[19]    See, for example, the statements by Germany (A/C.6/55/SR.14, para. 56): "[the Government of Germany] reiterated its conviction regarding the need to define more clearly peremptory norms of international law that protected fundamental humanitarian values"; Italy (A/C.6/56/SR.13, para. 15): "The Vienna Convention on the Law of Treaties contained a tautological definition of peremptory law, which doctrine and jurisprudence had endeavoured to interpret as being a framework of rules prohibiting conduct judged intolerable because of the threat it posed to the survival of States and peoples and to basic human values"; Mexico (A/C.6/56/SR.14, para. 13): "the very concept of

has been particularly pronounced in the decisions of national courts.[20] For example, in *Siderman de Blake v. Argentina*, the United States Court of Appeals for the Ninth Circuit quoted with approval the statement that peremptory norms of general international law (*jus cogens*) are "'derived from values taken to be fundamental by the international community'".[21] The Constitutional Tribunal of Peru referred to the "extraordinary importance of the values that underlie" *jus cogens* obligations.[22] Similarly, in the *Arancibia Clavel* case, the Supreme Court of Argentina held that the purpose of peremptory norms of general international law (*jus cogens*) was "to protect States from agreements concluded

---

peremptory norms had been developed to safeguard the most precious legal values of the community of States"; and Portugal, *ibid.*, para. 66: "the concepts of *jus cogens*, obligations *erga omnes* and international crimes of State or serious breaches of obligations under peremptory norms of general international law were based on a common belief in certain fundamental values of international law". See also the Federal Council of Switzerland, "La relation entre droit international et droit interne. Rapport du Conseil fédéral en réponse au postulat 07.3764 de la Commission des affaires juridiques du Conseil des Etats …", 5 March 2010, FF 2010 2067, at 2086: "Il s'agit donc d'une disposition si fondamentale pour la communauté internationale qu'aucune violation ne saurait être admise" ["It is therefore such a fundamental provision for the international community that no violation can be accepted"]; and Federal Council of Switzerland, "Clarifier la relation entre le droit international et le droit interne. Rapport du Conseil fédéral en exécution du postulat 13.3805", 12 June 2015, at p. 13: "Ces normes ont pour la communauté internationale un caractère fondamental tel qu'elles s'imposent à tous les Etats. Aucun d'eux ne peut les violer, sous aucun prétexte" ["These norms are of such fundamental importance to the international community that they are binding on all States. None of them may violate them under any pretext"].

[20] See, for example, *Bayan Muna as represented by Representative Satur Ocampo* et al. *v. Alberto Romulo, in his capacity as Executive Secretary* et al., where the Supreme Court of the Republic of the Philippines noted that *jus cogens* norms are "deemed … fundamental to the existence of a just international order" (*Case G.R. No. 159618, Judgment of 1 February 2011*), Supreme Court of the Republic of the Philippines, ILDC [*International Law in Domestic Courts*] 2059 (PH2011), p. 56). See also *Kaunda and Others v. President of the Republic of South Africa and Others (Society for the Abolition of the Death Penalty in South Africa intervening as Amicus Curiae)* 2005 (4) SA 235 (CC); *Minister of Justice and Constitutional Development and Others v. Southern African Litigation Centre and Others* (*Case No. 867/15, Judgment of 15 March 2016*), South Africa Supreme Court of Appeal, [2016] ZASCA 17, where the Court states that it agrees with the following sentiment: "As State sovereignty is increasingly viewed to be contingent upon respect for certain values common to the international community, it is perhaps unsurprising that bare sovereignty is no longer sufficient to absolutely shield High officials from prosecution for *jus cogens* violations"; and *Alessi and Others v. Germany and Presidency of the Council of Ministers of the Italian Republic (intervening) (Referral to the Constitutional Court of Italy, Order No. 85/2014 of 21 January 2014)*, Tuscany, Florence Court of First Instance, ILDC 2725 (IT 2014): "Not in dispute are the fact that the subject of this case is an international crime by nature and its potential detrimental effect on fundamental human rights as enshrined in the Italian Constitution and the Charter of Fundamental Rights of the European Union (2000/C 364/01). Also considering that in the Italian legal system, the fundamental human rights recognized by the Constitution are necessarily fused to the *jus cogens* norms that protect fundamental human rights in international law, highlighting the same basic universal values of protection of human dignity."

[21] *Siderman de Blake v. Republic of Argentina*, United States Court of Appeals for the Ninth Circuit, 965 F.2d 699 (9th Cir. 1992), at p. 715 (citing D. F. Klein, "A theory for the application of the customary international law of human rights by domestic courts", *Yale Journal of International Law*, vol. 13 (1998), pp. 332–365, at p. 351). This decision was cited with approval by lower courts in the Ninth Circuit including in: *Estate of Hernandez-Rojas v. United States*, District Court for the Southern District of California, 2013 U.S. Dist. LEXIS136922 (S.D.Cal. 2013), at p. 13; *Estate of Hernandez-Rojas v. United States*, District Court for the Southern District of California, 2014 U.S. Dist. LEXIS101385 (S.D. Cal. 2014), at p. 9; and *Doe I v. Reddy*, District Court for the Northern District of California, 2003 U.S. Dist. LEXIS26120 (N.D. Cal 2003), at pp. 32 and 34. See also the Ninth Circuit's opinion in *Alvarez-Machain v. United States* (331 F.3d 604 (9th Cir. 2003)), at p. 613. Although that decision was eventually overturned by the Supreme Court in *Sosa v. Alvarez-Machain* (542 U.S. 692 (2004)), the idea of peremptory norms reflecting values of the international community was itself not addressed by the Supreme Court of the United States.

[22] *25% del número legal de Congresistas contra el Decreto Legislativo N° 1097, EXP. No. 0024-2010-PI/TC, Judgment of the Jurisdictional Plenary of 21 March 2011*, Constitutional Tribunal of Peru, para. 53 (*de la extraordinaria importancia de los valores que subyacen a tal* [jus cogens] *obligación* ("of the extraordinary importance of the values that underlie [the *jus cogens*] obligation")).

against some of the general values and interests of the international community of States as a whole".[23] The Supreme Court of Canada has described peremptory norms as those norms of "fundamental importance".[24] In its *Order of 26 October 2004*, the Federal Constitutional Court of Germany described peremptory norms of general international law as those norms that were "firmly rooted in the legal conviction of the community of States [and which were] indispensable to the existence of public international law".[25]

(6)      The relationship between peremptory norms of general international law (*jus cogens*) and values is also accepted in scholarly writings. Kolb states that the idea that peremptory norms of general international law (*jus cogens*) are somehow connected with fundamental values "is the absolutely predominant theory" in international law.[26] Similarly, Gagnon-Bergeron describes the characteristic of "fundamental values" as "the only determinative feature of *jus cogens*".[27] Hannikainen, describing the role of peremptory norms of general international law (*jus cogens*), observes that "a legal community may find it necessary to establish peremptory norms for the protection of such overriding interests and values of the

---

[23]  *Arancibia Clavel, Enrique Lautaro s/ homicidio calificado y asociación ilícita y otros, Case No. 259, Judgment of 24 August 2004*, Supreme Court of Argentina, para. 29 (*es proteger a los Estados de acuerdos concluidos en contra de algunos valores e intereses generales de la comunidad internacional de Estados en su conjunto*).

[24]  *Nevsun Resources Ltd. v. Araya, Judgment of 28 February 2020*, Supreme Court of Canada, 2020 SCC 5, para. 99.

[25]  *Order of 26 October 2004, 2 BvR 1038/01*, Federal Constitutional Court of Germany, para. 97.

[26]  R. Kolb, *Peremptory International Law–Jus Cogens: a General Inventory*, Oxford, Hart Publishing, 2015, at p. 32. See also P. Galvão Teles, "Peremptory norms of general international law (*jus cogens*) and the fundamental values of the international community", *in* D. Tladi (ed.), *Peremptory Norms of General International Law (*Jus Cogens*): Disquisitions and Disputations*, Leiden, Brill Nijhoff, 2021. See also M. M. Mbengue and A. Koagne Zouapet, "Ending the splendid isolation: *jus cogens* and international economic law", *in* Tladi (ed.), *Peremptory Norms of General International Law (*Jus Cogens*)... (ibid.*), pp. 509–574, at p. 513; S. Karvatska, "*Jus cogens:* problem of the role in treaty interpretation", *Indonesian Law Journal*, vol. 9, No. 2 (2021), pp. 305–318, at p. 307 ("The *jus cogens* concept is an unchanging foundation of the international legal order designed to protect the fundamental interests"); H. Olasolo Alonso, A. Mateus Rugeles and A. Contreras Fonseca, "La naturaleza imperativa del principio 'no hay paz sin justicia' respecto a los máximos responsables del fenómeno de la lesa humanidad y sus consecuencias para el ámbito de actuación de la llamada 'justicia de transición'", *Boletín mexicano de derecho comparado*, vol. 49 (2016), pp. 135–171; C. Zelada, "Ius cogens y derechos humanos: luces y sombras para una adecuada delimitación de conceptos", *Agenda Internacional*, vol. 8, No. 17 (2002), pp. 129–156, at p. 139; A. A. Cançado Trindade, "*Jus cogens*: the determination and the gradual expansion of its material content in contemporary international case-law", *XXXV Course of International Law organized by the OAS [Organization of American States] Inter-American Juridical Committee in Rio de Janeiro from 4 to 29 August 2008*, Washington, D.C., OAS (2009), pp. 3–29, at pp. 6 and 12; F. J. Lara Castro, "El *ius cogens*: criterio de justicia universal", *Revista Perspectiva Jurídica*, UP 15 (2020, Semester II), pp. 127–159, at p. 130; K. Hossain, "The concept of *jus cogens* and the obligation under the U.N. Charter", *Santa Clara Journal of International Law*, vol. 3, No. 1 (2005), pp. 72–98, at p. 73; L. Henkin, "International law and the inter-State system", *Collected Courses of the Hague Academy of International Law*, vol. 216 (1989), pp. 21 *et seq.*, at p. 60; J. R. Argés, "*Ius cogens*: descripción, valoración y propuestas de aplicación actual de un tópico jurídico clásico", doctoral dissertation, Universidade de Santiago de Compostela, 2017, at p. 273; A. C. de Beer, *Peremptory Norms of General International Law (*Jus Cogens*) and the Prohibition of Terrorism*, Leiden, Brill, 2019, pp. 79–83; E. Petrič, "Principles of the Charter of the United Nations: *jus cogens*?", *Czech Yearbook of Public and Private International Law*, vol. 7 (2016), pp. 3–17; W. A. Schabas, "Le droit coutumier, les normes impératives (*jus cogens*), et la Cour européenne des droits de l'homme", *Revue québécoise de droit international*, vol. 33 (2020), pp. 681–704, at p. 698; K. Crow and L. Lorenzoni-Escobar, "From traction to treaty-bound: *jus cogens, erga omnes* and corporate subjectivity in international investment arbitration", *Journal of International Dispute Settlement*, vol. 13, No. 1 (March 2022), pp. 121–152; and M. A. Rodríguez Bolañoz and S. Portilla Parra, "Aplicación y límites de la inmunidad diplomática, a la luz de las normas del 'ius cogens'", *Opinión Jurídica*, vol. 19, No. 38 (January–June 2020), pp. 259–281, at p. 267. For a critique, see, generally, R. Kolb, "Peremptory norms as a legal technique rather than super norms", *in* Tladi (ed.), *Peremptory Norms of General International Law (*Jus Cogens*)... (see above).

[27]  N. Gagnon-Bergeron, "Breaking the cycle of deferment: *jus cogens* in the practice of international law", *Utrecht Law Review*, vol. 15, No. 1 (2019), pp. 50–64, at p. 64.

community itself".[28] Similarly, Pellet sees peremptory norms of general international law (*jus cogens*) as paving a way towards a more "moral value oriented public order",[29] while Tomuschat describes them as "the class of norms that protect the fundamental values of the international community".[30]

(7)    It is unnecessary and, indeed, impractical to specify the fundamental values to which draft conclusion 2 refers.[31] These values are not static and may evolve over time. While the values often associated with *jus cogens* are generally humanitarian in nature, other values, as long as they are shared by the international community, may also underlie peremptory norms of general international law (*jus cogens*).[32]

(8)    It will be noted from the discussion above that courts and scholarly writings have employed different terms to signify the relevance of fundamental values. For example, the terms "fundamental values"[33] and "interests",[34] or variations thereof, have been employed interchangeably. These different choices of words, however, are not mutually exclusive and they indicate the important normative and moral background of the norm in question.

(9)    A further terminological point is that while draft conclusion 2 refers to "the international community", other draft conclusions, including draft conclusion 3, draft conclusion 4 and draft conclusion 7, refer to "the international community of States as a whole". The "international community of States as a whole" is used in respect of the criteria for peremptory norms of general international law (*jus cogens*), because in so far as the application of the criteria is concerned, it is the views of States that matter. However, in respect of the values underlying peremptory norms, a more inclusive sense of the "international community" is relevant. This more inclusive international community of course includes States, but it includes other actors beyond States, which may play an important role in the emergence of fundamental values.

(10)    With respect to the second characteristic, draft conclusion 2 provides that peremptory norms of general international law (*jus cogens*) are universally applicable. The universal applicability of peremptory norms of general international law (*jus cogens*) means that they

---

[28]  L. Hannikainen, *Peremptory Norms* (Jus Cogens) *in International Law: Historical Development, Criteria, Present Status*, Helsinki, Finnish Lawyers' Publishing Company, 1988, at p. 2.

[29]  A. Pellet, "Comments in response to Christine Chinkin and in defense of *jus cogens* as the best bastion against the excesses of fragmentation", *Finnish Yearbook of International Law*, vol. 17 (2006), pp. 83–90, at p. 87.

[30]  C. Tomuschat, "The Security Council and *jus cogens*", *in* E. Cannizzaro (ed.), *The Present and Future of* Jus Cogens, Rome, Sapienza Università Editrice, 2015, at p. 8, who describes *jus cogens* as "the class of norms that protect the fundamental values of the international community". See also H. Ruiz Fabri, "Enhancing the rhetoric of *jus cogens*", *European Journal of International Law*, vol. 23, No. 4 (2012), pp. 1049–1058, at p. 1050; M. den Heijer and H. van der Wilt, "*Jus cogens* and the humanization and fragmentation of international law", *Netherlands Yearbook of International Law*, vol. 46 (2015), pp. 3–21, at p. 15; and D. Shelton, "Sherlock Holmes and the mystery of *jus cogens*", *ibid.*, pp. 23–50, especially from p. 42.

[31]  See, however, Galvão Teles (footnote 26 above), at p. 47, who identifies the inherent dignity of the human person as being amongst the fundamental values of the international community.

[32]  J. E. Viñuales, "The Friendly Relations Declaration and peremptory norms", *in* Tladi (ed.), *Peremptory Norms of General International Law (*Jus Cogens*)…* (footnote 26 above), pp. 668–688, at p. 668, stating that peremptory norms "rest primarily (although not exclusively) on humanitarian considerations". See also N. Oral, "Environmental protection as a peremptory norm of general international law: is it time?", *ibid.*, pp. 575–599, at p. 577, referring to the values as "fundamental values of humanity".

[33]  Tomuschat, "The Security Council and *jus cogens*" (see footnote 30 above), at p. 8. See also *Siderman de Blake v. Argentina* (footnote 21 above), at p. 715, where the United States Court of Appeals referred to "values taken to be fundamental by the international community", and the Constitutional Tribunal of Peru in *25% del número legal de Congresistas*, referring to "extraordinary importance of the values" (footnote 22 above).

[34]  See, for example, O. Quirico, "Towards a peremptory duty to curb greenhouse gas emissions?", *Fordham International Law Journal*, vol. 44, No. 4 (April 2021), pp. 923–965, at p. 947 ("protects a fundamental interest"). See also Hannikainen (footnote 28 above), at p. 2, referring to "overriding interests"; and *Arancibia Clavel* (footnote 23 above), where the Supreme Court of Argentina referred to "general interests of the international community" as the underlying source of peremptory norms.

are binding on all subjects of international law that they address, including States and international organizations. The idea that peremptory norms of general international law (*jus cogens*) are universally applicable, like that of their hierarchical superiority, flows from non-derogability. The fact that a norm is non-derogable, by extension, means that it is applicable to all, since States cannot derogate from it by creating their own special rules that conflict with it. The universal application of peremptory norms of general international law (*jus cogens*) is both a characteristic and a consequence of peremptory norms of general international law (*jus cogens*).

(11)    In its advisory opinion on *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide*, the International Court of Justice referred to "the universal character of the condemnation of genocide", which it considered to be a consequence of the fact that genocide "shocks the conscience of mankind and results in great losses to humanity, and [which] is contrary to moral law".[35] The universal character of peremptory norms of general international law (*jus cogens*) was affirmed by the judgments of the International Criminal Tribunal for the Former Yugoslavia.[36] The Inter-American Court of Human Rights has described peremptory norms of general international law (*jus cogens*) as being "applicable to all States" and as norms that "bind all States".[37] Similarly, in *Michael Domingues v. United States*, the Inter-American Commission on Human Rights determined that peremptory norms of general international law (*jus cogens*) "bind the international community as a whole, irrespective of protest, recognition or acquiescence".[38]

(12)    The universal character of peremptory norms of general international law (*jus cogens*) is further reflected in decisions of national courts. In *Tel-Oren v. Libyan Arab Republic*, the United States Court of Appeals for the District of Columbia Circuit referred to peremptory norms of general international law (*jus cogens*) as "universal and obligatory norms".[39] In *Youssef Nada v. State Secretariat for Economic Affairs and Federal Department of Economic Affairs*, the Swiss Federal Supreme Court described peremptory norms of general international law (*jus cogens*) as those norms that were "binding on all subjects of international law".[40] The Constitutional Court of Germany described peremptory norms of general international law (*jus cogens*) as "universally applicable public international law."[41] The view that peremptory norms of general international law (*jus cogens*) have a universal character is also reflected in the writings of scholars.[42]

---

[35]  *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide* (see footnote 14 above), at p. 23. This language has been reaffirmed by the International Court of Justice in recent judgments. See, for example, the judgments referred to in footnote 58 below.

[36]  See, for example, *Prosecutor v. Anto Furundžija* (footnote 18 above), at p. 571, para. 156. See also *Prosecutor v. Jelisić, Case No. IT-95-10-T, Judgment of 14 December 1999*, Trial Chamber, International Criminal Tribunal for the Former Yugoslavia, *Judicial Reports 1999*, p. 399, at pp. 431–433, para. 60.

[37]  *Juridical Condition and Rights of Undocumented Migrants, Advisory Opinion OC-18/03 of 17 September 2003, requested by the United Mexican States*, Inter-American Court of Human Rights, *Series A*, No. 18, p. 113, paras. 4–5.

[38]  *Michael Domingues v. United States* (see footnote 18 above), at para. 49.

[39]  *Tel-Oren v. Libyan Arab Republic*, United States Court of Appeals for the District of Columbia Circuit, 726 F.2d 774 (D.C. Cir. 1984). See also *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239 (2nd. Cir. 1996), at p. 242, in which the United States Court of Appeals for the Second Circuit noted that peremptory norms "do not depend on the consent of individual states, but are universally binding by their very nature" (citing A. C. Belsky, M. Merva and N. Roht-Arriaza, "Implied waiver under the FSIA: a proposed exception to immunity for violations of peremptory norms of international law", *California Law Review*, vol. 77, No. 2 (March 1989), pp. 365–415, at p. 399).

[40]  *Youssef Nada v. State Secretariat for Economic Affairs and Federal Department of Economic Affairs, Case No. 1A 45/2007, Administrative Appeal Judgment of 14 November 2007*, Federal Supreme Court of Switzerland, BGE 133 II 450, para. 7.

[41]  *Order of 26 October 2004*, Federal Constitutional Court of Germany (see footnote 25 above), para. 117.

[42]  See, for example, W. Conklin, "The peremptory norms of the international community", *European Journal of International Law*, vol. 23, No. 3; C. Rozakis, *The Concept of* Jus Cogens *in the Law of*

(13)   The characteristic of universal applicability of peremptory norms of general international law (*jus cogens*) itself has two implications. First, the persistent objector rule or doctrine is not applicable to peremptory norms of general international law (*jus cogens*). This aspect is considered further in draft conclusion 14. As described in paragraph (8) of the commentary to draft conclusion 1, a second implication of the universal application of peremptory norms of general international law (*jus cogens*) is that such norms do not apply on a regional or bilateral basis.[43]

(14)   As a third characteristic, draft conclusion 2 states that peremptory norms of general international law (*jus cogens*) are hierarchically superior to other norms of international law. The fact that peremptory norms of general international law (*jus cogens*) are hierarchically superior to other norms of international law is both a characteristic and a consequence of peremptory norms of general international law (*jus cogens*). It is a consequence in that the identification of a norm as a peremptory norm of general international law (*jus cogens*) has the effect that it will be superior to other norms not having the same character. Some of the implications of hierarchy are reflected in the consequences of peremptory norms described in Part Three of these draft conclusions, for example the consequence of invalidity of a conflicting treaty rule. Hierarchical superiority is also characteristic since it describes the nature of the peremptory norms of general international law (*jus cogens*).

(15)   International courts and tribunals have often referred to the hierarchical superiority of peremptory norms of general international law (*jus cogens*). The International Criminal Tribunal for the Former Yugoslavia, for example, held that a feature of the prohibition of torture "relates to the hierarchy of rules in the international normative order" and that the prohibition "has evolved into a peremptory norm or *jus cogens*, that is, a norm that enjoys a higher rank in the international hierarchy than treaty law and even 'ordinary' customary rules".[44] The Inter-American Court of Human Rights has similarly accepted the hierarchical superiority of peremptory norms of general international law (*jus cogens*).[45] In *Kadi v. Council and Commission*, the Court of First Instance of the European Communities described peremptory norms of general international law (*jus cogens*) as a "body of higher rules of public international law".[46] The European Court of Human Rights, in *Al-Adsani v. the United*

---

*Treaties*, Amsterdam, North-Holland, 1976, at p. 78; G. Gaja, "*Jus cogens* beyond the Vienna Convention", in *Collected Courses of the Hague Academy of International Law*, vol. 172 (1981), pp. 271–289, at p. 283; G. M. Danilenko, *Law-Making in the International Community*, Dordrecht, Martinus Nijhoff, 1993, at p. 211; L. A. Alexidze, "Legal nature of *jus cogens* in contemporary international law", *Collected Courses of the Hague Academy of International Law*, vol. 172 (1981), pp. 219–263; P-M. Dupuy and Y. Kerbrat, *Droit international public*, 11th ed., Paris, Précis Dalloz, 2012, at p. 322 (*la cohésion de cet ensemble normatif exige la reconnaissance par tous ses sujets d'un minimum de règles* imperatives ("the cohesion of this set of standards requires recognition by all its subjects of a minimum of *mandatory* rules")); A. Rohr, *La responsabilidad internacional del Estado por violación al* jus cogens, Buenos Aires, SGN Editora, 2015, at p. 6; D. Dubois, "The authority of peremptory norms in international law: State consent or natural law?", *Nordic Journal of International Law*, vol. 78 (2009), pp. 133–175, at p. 135 ("A *jus cogens* or peremptory norm … is applicable to all States regardless of their consenting to it"); and M. Saul, "Identifying *jus cogens* norms: the interaction of scholars and international judges", *Asian Journal of International Law*, vol. 5 (2014), pp. 26–54, at p. 31 ("*Jus cogens* norms are supposed to be binding on all states").

[43]  States were virtually unanimous on this point: see, for example, Finland (on behalf of the Nordic countries) (A/C.6/73/SR.24, para. 126); Greece (A/C.6/73/SR.27, para. 9); Malaysia (*ibid.*, para. 104); Portugal (A/C.6/73/SR.26, para. 119); South Africa (A/C.6/73/SR.27, para. 46); Thailand (A/C.6/73/SR.26, para. 96); the United Kingdom of Great Britain and Northern Ireland (A/C.6/73/SR.22, para. 84); and the United States of America (A/C.6/73/SR.29, para. 34).

[44]  *Prosecutor v. Anto Furundžija* (see footnote 18 above), at p. 569, para. 153.

[45]  *García Lucero*, et al. *v. Chile, Judgment 28 August 2013*, Inter-American Court of Human Rights, *Series C*, No. 267, para. 123, note 139, quoting with approval *Prosecutor v. Anto Furundžija* (see footnote 18 above). See also *Michael Domingues v. United States* (footnote 18 above), at para. 49, describing *jus cogens* norms as being derived from a "superior order of legal norms".

[46]  *Yassin Abdullah Kadi v. Council of the European Union and Commission of the European Communities, Case No. T-315-01, Judgment of 21 September 2005*, Second Chamber, Court of First Instance of the European Communities, [2005] ECR II-3649, para. 226. See also *Hassan v. Council of the European Union and Commission of the European Communities, Case No. T-49/04, Judgment of 12 July 2006*, Second Chamber, Court of First Instance of the European Communities, para. 92.

*Kingdom*, has similarly described a peremptory norm of general international law (*jus cogens*) as "a norm that enjoys a higher rank in the international hierarchy than treaty law and even 'ordinary' customary rules".[47]

(16)    The recognition of the hierarchical superiority of peremptory norms of general international law (*jus cogens*) can also be seen in the practice of States. For example, the High Court of Zimbabwe, in *Mann v. Republic of Equatorial Guinea*, described peremptory norms of general international law (*jus cogens*) as those norms "endowed with primacy in the hierarchy of rules that constitute the international normative order".[48] Courts in the United States have similarly recognized the hierarchical superiority of norms of peremptory norms of general international law (*jus cogens*). In *Siderman de Blake v. Argentina*, the United States Court of Appeals for the Ninth Circuit stated that freedom from torture, a peremptory norm of general international law (*jus cogens*), is "deserving of the highest status under international national law".[49] Various terms denoting hierarchical superiority have been used by different national courts to describe peremptory norms of general international law (*jus cogens*). They have been held to have "the highest hierarchical position amongst all other customary norms and principles",[50] to be "not only above treaty law, but over all other sources of law",[51] and to be norms which "prevail over both customary international law and treaties".[52] States have also, in their statements, referred to the hierarchical superiority of peremptory norms of general international law (*jus cogens*).[53]

(17)    The hierarchical superiority of peremptory norms of general international law (*jus cogens*) was recognized in the conclusions of the work of the Commission's Study Group on

---

[47]    *Al-Adsani v. the United Kingdom* (see footnote 18 above), para. 60.

[48]    *Mann v. Republic of Equatorial Guinea, Case No. 507/07, Judgment of 23 January 2008*, High Court of Zimbabwe, [2008] ZWHHC 1.

[49]    *Siderman de Blake v. Argentina* (see footnote 21 above), at p. 717.

[50]    *Bayan Muna v. Alberto Romulo* (see footnote 20 above), at para. 92. See also *Certain Employees of Sidhu and Sons Nursery Ltd.*, et al., *Case Nos. 61942, 61973, 61966, 61995, Decision of 1 February 2012*, BCLRB No. B28/2012, para. 44, where the British Columbia Labour Relations Board (Canada), identified peremptory norms of general international law (*jus cogens*) as enjoying a "higher rank in the international hierarchy than treaty law and even 'ordinary' customary rules". See also *Regina (Al Rawi and Others) v. Secretary of State for Foreign and Commonwealth Affairs and Another, Case No. C1/2006/1064, Judgment of 12 October 2006*, England, Court of Appeal (Civil Division), [2006] EWCA Civ 1279, ILR [*International Law Reports*], vol. 136, p. 624; and *Regina v. Bow Street Metropolitan Stipendiary Magistrate*, ex parte *Pinochet Ugarte (No. 3), Decision of 24 March 1999*, England, House of Lords, [2000] 1 A.C. 147, ILR, vol. 119 (2002), p. 198.

[51]    *Simón, Julio Héctor y otros s/ privación ilegítima de la libertad, Case No. 17.768, Judgment of 14 June 2005*, Supreme Court of Argentina, S. 1767. XXXVIII, para. 48 (*que se encuentra no sólo por encima de los tratados sino incluso por sobre todas las fuentes del derecho* ("which is not only above treaties but even above all sources of law")). See also *Julio Lilo Mazzeo y otros s/rec. de casación e inconstitucionalidad, Judgment of 13 July 2007*, Supreme Court of Argentina, para. 15 (*se trata de la más alta fuente del derecho internacional* (*jus cogens* "is the highest source of international law")).

[52]    *Sabbithi v. Al Saleh*, United States District Court for the District of Columbia, 605 F. Supp. 2d 122, (D.D.C. 2009), at p. 129. See also *Mario Luiz Lozano v. the General Prosecutor for the Italian Republic, Case No. 31171/2008, Appeal Judgment of 24 July 2008*, First Criminal Division, Supreme Court of Cassation, Italy, p. 6 ("priority should be given to the principle of higher rank and of *jus cogens*").

[53]    See, for example, the statements by the Netherlands (A/C.6/68/SR.25, para. 101) ("*Jus cogens* was hierarchically superior within the international law system, irrespective of whether it took the form of written law or customary law"); and the United Kingdom (*Official Records of the United Nations Conference on the Law Treaties, First Session, Vienna, 26 March–24 May 1968, Summary records of the plenary meetings and of the meetings of the Committee of the Whole* (A/CONF.39/11), 53rd meeting, para. 53) ("in a properly organized international society there was a need for rules of international law that were of a higher order than the rules of a merely dispositive nature from which States could contract out").

the fragmentation of international law.[54] This characteristic is also generally recognized in the writings of scholars.[55]

(18)    The characteristics contained in draft conclusion 2 are themselves not criteria for the identification of peremptory norms of general international law (*jus cogens*). Thus, draft conclusion 2 is not to be read as imposing additional criteria for the identification of peremptory norms of general international law (*jus cogens*). The criteria for the identification of peremptory norms of general international law (*jus cogens*) are contained in Part Two of the draft conclusions. To identify a norm as a peremptory norm of general international law (*jus cogens*), it is not necessary to advance evidence of the characteristics in draft conclusion 2. Nor can the advancement of the characteristics in draft conclusion 2 serve as substitutes for the criteria for the identification of peremptory norms of general international law (*jus cogens*) found in Part Two.

(19)    Though they themselves are not criteria, the existence of the characteristics contained in draft conclusion 2 may provide context in the assessment of evidence for the identification of peremptory norms of general international law (*jus cogens*). For example, evidence that a norm reflects and protects fundamental values of the international community, is hierarchically superior to other norms of international law and is universally applicable, may serve to support or confirm the peremptory status of a norm. This supplementary evidence cannot, however, in and of itself, constitute the basis for identifying peremptory norms of

---

[54]  Conclusion (32) of the conclusions of the work of the Study Group on the fragmentation of international law: difficulties arising from the diversification and expansion of international law (A/CN.4/L.702), at p. 20 ("[a] rule of international law may be superior to other rules on account of the importance of its content as well as the universal acceptance of its superiority. This is the case of peremptory norms of international law (*jus cogens*)"). See, further, the report of the Study Group on the fragmentation of international law: difficulties arising from the diversification and expansion of international law (finalized by Martti Koskenniemi) (*Yearbook ... 2006*, vol. II (Part One) (Addendum 2), document A/CN.4/L.682 and Add.1).

[55]  See, for support in the literature for the hierarchical superiority of peremptory norms of general international law (*jus cogens*), C. Ene, "*Jus cogens* (peremptory norms): a key concept of the international law", *Perspectives of Law and Public Administration*, vol. 8, No. 2 (December 2019), pp. 302–304, at p. 303; I. Handayani, "Concept and position of peremptory norms (*jus cogens*) in international law: a preliminary study", *Hasanuddin Law Review*, vol. 5, No. 2 (August 2019), pp. 235–252, at p. 241; T. Fleury Graff, "L'interdiction de l'esclavage, norme de jus cogens en droit international et droit inconditionnel en droit européen", *Les cahiers de la Justice*, vol. 2 (2020), pp. 197–206, at p. 205 (*Une règle de* jus cogens *est une règle hiérarchiquement supérieure à toute autre règle du droit international, si bien qu'une règle qui ne s'y conformerait pas encourrait la nullité* ("A rule of *jus cogens* is a rule hierarchically superior to any other rule of international law, so that a rule which does not comply with it would incur nullity")); A Orakhelashvili, *Peremptory Norms in International Law*, Oxford, 2006, at p. 8; G. M. Danilenko, "International *jus cogens*: issues of law-making", *European Journal of International Law*, vol. 2, No. 1 (1991), pp. 42–65, at p. 42; and Conklin (footnote 42 above), at p. 838 ("[T]he very possibility of a peremptory norm once again suggests a hierarchy of international law norms with peremptory norms being the 'fundamental standards of the international community' at the pinnacle"). See also M. M. Whiteman, "*Jus cogens* in international law, with a projected list", *Georgia Journal of International and Comparative Law*, vol. 7, No. 2 (1977), pp. 609–626, at p. 609; and M. W. Janis, "The nature of *jus cogens*", *Connecticut Journal of International Law*, vol. 3, No. 2 (Spring 1988), pp. 359–363, at p. 359. Tomuschat, for example, describes as a certainty that peremptory norms of general international law (*jus cogens*) are superior to other norms. See C. Tomuschat, "Reconceptualizing the debate on *jus cogens* and obligations *erga omnes*: concluding observations", *in* C. Tomuschat and J.-M. Thouvenin (eds.), *The Fundamental Rules of the International Legal Order:* Jus Cogens *and Obligations* Erga Omnes, Leiden, Martinus Nijhoff, 2006, at p. 425 ("One thing is certain, however: the international community accepts today that there exists a class of legal precepts which is hierarchically superior to 'ordinary' rules of international law"). See also A. Cassese, "For an enhanced role of *jus cogens*", in A. Cassese (ed.), *Realizing Utopia: the Future of International Law*, Oxford University Press, 2012, pp. 158–171, at p. 159. For a contrary view, see Kolb, "Peremptory norms as a legal technique …" (footnote 26 above), at p. 37, suggesting that the language of hierarchy should be avoided and that the focus should be on voidness since the former concept – of hierarchy – leads to confusion and misunderstanding.

general international law (*jus cogens*). Evidence supporting the criteria, as described in Part Two of the present draft conclusions, must always be present.

### Conclusion 3
### Definition of a peremptory norm of general international law (*jus cogens*)

A peremptory norm of general international law (*jus cogens*) is a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law (*jus cogens*) having the same character.

**Commentary**

(1)    Draft conclusion 3 provides a definition of peremptory norms of general international law (*jus cogens*). It is based upon article 53 of the 1969 Vienna Convention with modifications to fit the context of the draft conclusions. First, only the second sentence of article 53 of the 1969 Vienna Convention is reproduced. The first sentence of article 53, which concerns the invalidity of treaties in conflict with peremptory norms of general international law (*jus cogens*), does not form part of the definition. It is rather a legal consequence of peremptory norms of general international law (*jus cogens*), which is addressed in draft conclusion 10. Second, the phrase "[f]or the purposes of the present Convention" is omitted from the definition. As will be demonstrated below, the definition in article 53, though initially used for the purposes of the 1969 Vienna Convention, has come to be accepted as a general definition of peremptory norms of general international law (*jus cogens*) that applies beyond the law of treaties. Finally, in keeping with the general approach in this topic, the Commission has decided to insert the phrase "*jus cogens*" in parentheses after "peremptory norm of general international law".

(2)    This formulation was chosen because it is the most widely accepted definition in the practice of States and in the decisions of international courts and tribunals. It is also commonly used in scholarly writings. States have generally supported the idea of proceeding on the basis of 1969 Vienna Convention.[56] Decisions of national courts have generally also referred to article 53 when defining peremptory norms of general international law (*jus cogens*) including beyond the context of treaty law.[57] Similarly, international courts and tribunals have used article 53 of the 1969 Vienna Convention as a basis when addressing peremptory norms of general international law (*jus cogens*) in different contexts.[58] Article 53

---

[56]    See, for example, the statement by the Czech Republic (A/C.6/71/SR.24, para. 72). See also the statements by Canada (A/C.6/71/SR.27, para. 9), Chile (A/C.6/71/SR.25, para. 101), China (A/C.6/71/SR.24, para. 89), the Islamic Republic of Iran (A/C.6/71/SR.26, para. 118) ("The aim of the Commission's work on the topic was not to contest the two criteria established under article 53 … . On the contrary, the goal was to elucidate the meaning and scope of the two criteria"), and Poland (*ibid.*, para. 56). See, further, the statement by Ireland (A/C.6/71/SR.27, para. 19) (the delegation of Ireland "agreed with the view that articles 53 and 64 of the 1969 Vienna Convention on the Law of Treaties should be central to work on the topic").

[57]    See, for example, *Al Shimari*, et al. *v. CACI Premier Technology, Inc., Opinion of 22 March 2019,* United District Court for the Eastern District of Virginia, 368 F. Supp. 3d 935 No. 1:08-cv-827 (LMB/JFA), 2019 WL 1320052 (E.D. Va. 2019), at p. 26; *Committee of United States Citizens Living in Nicaragua v. Reagan*, United States Court of Appeals for the District of Columbia Circuit, 859 F.2d 929 (D.C. Cir. 1988), at p. 940; *Youssef Nada v. State Secretariat for Economic Affairs and Federal Department of Economic Affairs* (footnote 40 above), para. 7.1; *National Commissioner of The South African Police Service v. Southern African Human Rights Litigation Centre and Another, Case No. CC 02/14, Judgment of 30 October 2014*, Constitutional Court of South Africa, [2014] ZACC 30, para. 35; *Priebke, Erich s/ solicitud de extradición, Case No. 16.063/94, Judgment of 2 November 1995*, Supreme Court of Argentina, para. 70; *Bouzari v. Islamic Republic of Iran, Docket C38295, Decision of 30 June 2004*, Court of Appeal for Ontario, 71 OR (3d) 675 (Ont CA), ILDC 175 (CA 2004), para. 86; and *Gabriel Orlando Vera Navarrete, EXP. No. 2798-04-HC/TC, Decision of 9 December 2004*, Constitutional Tribunal of Peru, para. 8. See also *Jorgić Case, Order of 12 December 2000, 2BvR 1290/99*, Federal Constitutional Court of Germany, at para. 17.

[58]    See, for example, *Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, I.C.J. Reports 1996*, p. 226, at p. 258, para. 83; *Prosecutor v. Anto Furundžija* (footnote 18 above), at p. 571, para. 155; and *Prosecutor v. Jelisić* (footnote 36 above), at pp. 431–433, para. 60. See also *Jaime Córdoba*

of the 1969 Vienna Convention is also accepted as the general definition of peremptory norms of general international law (*jus cogens*) in scholarly writings.[59] While the formulation in article 53 of the 1969 Vienna Convention is for "the purposes of the Convention", it also applies in other contexts including in relation to State responsibility.[60] The Commission has, when addressing peremptory norms of general international law (*jus cogens*) in the context of other topics, also used the definition in article 53 of the 1969 Vienna Convention.[61] It is therefore appropriate for these draft conclusions to rely on article 53 for the definition of peremptory norms of general international law (*jus cogens*).

(3)     The definition of peremptory norms in article 53 contains two main elements. First, the norm in question must be a norm of general international law. Second, it must be accepted and recognized by the international community of States as a whole as one from which no derogation is permitted, and which can only be modified by a norm having the same character.

---

*Triviño, Case No. C-578/95, Sentence of 4 December 1995*, Constitutional Tribunal of Colombia. See, especially, the separate opinion of Judge *ad hoc* Dugard in *Armed Activities on the Territory of the Congo (New Application: 2002) (Democratic Republic of the Congo v. Rwanda), Jurisdiction and Admissibility, Judgment*, *I.C.J. Reports 2006*, p. 6, at p. 88, para. 8.

[59]  See, for example, Mbengue and Koagne Zouapet (footnote 26 above), at p. 510; S. Knuchel, Jus Cogens: *Identification and Enforcement of Peremptory Norms*, Zurich, Schulthess, 2015, at p. 19 ("Given that Article 53 provides the only written legal definition of the effects of *jus cogens* … as well as of the process by which such norms come into being … it is the necessary starting point for analyzing this concept"); S. Kadelbach, "Genesis, function and identification of *jus cogens* norms", *Netherlands Yearbook of International Law 2015*, vol. 46 (2016), pp. 147–172, at p. 166, noting that "treatises on *jus cogens* usually start" with article 53 of the 1969 Vienna Convention and, at p. 162, assessing enhanced responsibility and the *erga omnes* effects of *jus cogens* on the basis of article 53 of the 1969 Vienna Convention; and U. Linderfalk, "Understanding the *jus cogens* debate: the pervasive influence of legal positivism and legal idealism", *ibid.*, pp. 51–84, at p. 52. See also, generally, Costelloe (footnote 11 above), who, though never stating that article 53 of the 1969 Vienna Convention is the definition, certainly proceeds on that basis. Similarly, see Hannikainen (footnote 28 above), especially at pp. 5–12; and Alexidze (footnote 42 above), at p. 246.

[60]  See T. Weatherall, Jus Cogens: *International Law and Social Contract*, Cambridge University Press, 2015, at pp. 6–7 ("Although the Vienna Convention concerns the law of treaties and binds only signatories … Article 53 reflected a concept with legal effect beyond the treaty context. … The contemporary practice of international and domestic judicial organs, to refer to Article 53 for any consideration of *jus cogens*, is consistent with this view of a concept existing outside the treaty context"); E. Santalla Vargas, "In quest of the practical value of *jus cogens* norms", *Netherlands Yearbook of International Law 2015*, vol. 46 (2016), pp. 211–240, at pp. 223–224 ("However, the potential effects of *jus cogens* not only expand beyond treaty law but they even appear more significant in situations that are not concerned with treaty law"); and Cassese (footnote 55 above), at p. 160 ("Fortunately states, national courts, and international judicial bodies have invoked peremptory norms with regard to *areas other than treaty-making.* By so doing, these entities have expanded the scope and normative impacts of peremptory norms" (emphasis in original)). See also H. Charlesworth and C. Chinkin, "The gender of *jus cogens*", *Human Rights Quarterly*, vol. 15 (1993), pp. 63–76, at p. 63 ("A formal, procedural definition of the international law concept of *jus cogens* is found in the Vienna Convention on the Law of Treaties").

[61]  See paragraph (5) of the commentary to article 26 of the articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 85 ("The criteria for identifying peremptory norms of general international law are stringent. Article 53 of the 1969 Vienna Convention requires not merely that the norm in question should meet all the criteria for recognition as a norm of general international law … but further that it should be recognized as having peremptory character by the international community of States as whole"). See also the conclusions of the Study Group on the fragmentation of international law (footnote 54 above), conclusion (32) ("A rule of international law may be superior to other rules on account of the importance of its content as well as the universal acceptance of its superiority. This is the case of peremptory norms of international law (*jus cogens*, [article 53 of the 1969 Vienna Convention]), that is, norms 'accepted and recognized by the international community of States as a whole from which no derogation is permitted'"). See, further, the report of the Study Group on the fragmentation of international law (finalized by Martti Koskenniemi) (*ibid.*), para. 375 ("The starting-point [for establishing the criteria] must be the formulation of article 53 itself, identifying *jus cogens* by reference to what is 'accepted and recognized by the international community of States as a whole'").

These elements constitute the criteria for the identification of peremptory norms of general international law (*jus cogens*) and are elaborated upon further in draft conclusions 4 to 9.

### Part Two
### Identification of peremptory norms of general international law (*jus cogens*)

### Conclusion 4
### Criteria for the identification of a peremptory norm of general international law (*jus cogens*)

To identify a peremptory norm of general international law (*jus cogens*), it is necessary to establish that the norm in question meets the following criteria:

(*a*)    it is a norm of general international law; and

(*b*)    it is accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.

**Commentary**

(1)     Draft conclusion 4 sets out the criteria for the identification of a peremptory norm of general international law (*jus cogens*). The criteria are drawn from the definition of peremptory norms contained in article 53 of the 1969 Vienna Convention, which was reproduced in draft conclusion 3. Such criteria must be shown to be present in order to establish that a norm has a peremptory character.

(2)     The *chapeau* of the draft conclusion states "[t]o identify a peremptory norm of general international law (*jus cogens*), it is necessary to establish that the norm in question meets the following criteria". The phrase "it is necessary to establish" indicates that the criteria must be shown to be present and that they should not be assumed to exist. It is thus not sufficient to point to the importance or the role of a norm in order to show the peremptory character of that norm. Rather, "it is necessary to establish" the existence of the criteria enumerated in the draft conclusion.

(3)     On the basis of the definition contained in draft conclusion 3, draft conclusion 4 sets forth two criteria. First, the norm in question must be a norm of general international law. This criterion is derived from the phrase "norm of general international law" in the definition of peremptory norms (*jus cogens*) and is the subject of draft conclusion 5. Second, the norm must be accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted, and which can be modified only by a norm having the same character. It bears pointing out that this second criterion, though composed of various elements, is a single composite criterion. This criterion is the subject of draft conclusions 6 to 9. The two criteria are cumulative: they are both necessary for the establishment of the peremptory character of a norm of general international law.

(4)     The language of article 53 of the 1969 Vienna Convention is complex and has given rise to different interpretations. The phrase "and which can be modified only by a subsequent norm of general international law having the same character" could, for example, be viewed as a separate criterion.[62] Yet, the essence of the second criterion is the *acceptance and recognition* by the international community of States as a whole, not just that the norm is one from which no derogation is permitted, but also that it can be modified only by a subsequent norm of general international law having the same character. Hence, the non-derogation and modification elements are not themselves criteria but rather, form an integral part of the "acceptance and recognition" criterion. It is in this sense that the second criterion, though composed of several elements, constitutes a single criterion.

---

[62]   But see Knuchel (footnote 59 above), at pp. 49–136. See also the statement by the Islamic Republic of Iran (A/C.6/71/SR.26, para. 118), where the two criteria identified are said to be, first, a norm recognized by the international community of States as a whole as a norm from which no derogation was permitted and, second, a norm that could be modified only by a subsequent *jus cogens* norm.

(5)    Alternatively, it has been suggested that the phrase "accepted and recognized" qualifies "general international law" rather than the non-derogation and modification clauses. Seen from this perspective, article 53 would have three criteria for proving that a norm has peremptory character: (*a*) the norm must be a norm of general international law that is accepted and recognized (as a norm of general international law) by the international community of States as a whole; (*b*) it must be a norm from which no derogation is permitted; and (*c*) it must be a norm that can only be modified by a subsequent peremptory norm of general international law (*jus cogens*). Such an interpretation, however, raises at least two problems. First, it would render the first criterion tautologous, since "general international law" ought to be generally accepted and/or recognized by the international community to begin with. Second, in that form the second and third criteria would not be criteria but rather a consequence of peremptoriness and a description of how peremptory norms of general international law (*jus cogens*) can be modified, respectively.

(6)    Based on the foregoing, the two cumulative criteria in draft conclusion 4 imply a two-step approach to the identification of a peremptory norm of general international law (*jus cogens*). First, evidence that the norm in question is a norm of general international law is required. Second, the norm must be shown to be accepted and recognized by the international community of States as a whole as having a peremptory character. This two-step approach was aptly described by the Commission in the commentaries to the articles on responsibility of States for internationally wrongful acts:

> The criteria for identifying peremptory norms of general international law are stringent. Article 53 of the 1969 Vienna Convention requires not merely that the norm in question meet all the criteria for recognition as a norm of general international law, binding as such, but *further* that it should be recognized as having peremptory character by the international community of States as a whole.[63]

**Conclusion 5**
**Bases for peremptory norms of general international law (*jus cogens*)**

1.    Customary international law is the most common basis for peremptory norms of general international law (*jus cogens*).

2.    Treaty provisions and general principles of law may also serve as bases for peremptory norms of general international law (*jus cogens*).

**Commentary**

(1)    Draft conclusion 5 concerns the bases of peremptory norms of general international law (*jus cogens*). It addresses the first criterion specified in draft conclusion 4 to identify peremptory norms of general international law (*jus cogens*), namely that the norm in question must be a norm of "general international law". The draft conclusion is composed of two paragraphs. Paragraph 1 deals with customary international law as the basis for peremptory norms of general international law (*jus cogens*), while paragraph 2 addresses treaty provisions and general principles of law as possible bases of such norms.

(2)    The Study Group on the fragmentation of international law established by the Commission observed that "there is no accepted definition of 'general international law'".[64]

---

[63]    Paragraph (5) of the commentary to article 26 of the articles on responsibility of States for internationally wrongful acts, *Yearbook ... 2001*, vol. II (Part Two) and corrigendum, p. 85 (emphasis added). See also R. Rivier, *Droit international public*, 2nd ed., Paris, Presses universitaires de France, 2013, at p. 566 (*Ne peut accéder au rang de règle impérative qu'une provision déjà formalisée en droit positif et universellement acceptée comme règle de droit* ("Only a provision already formalized in positive law and universally accepted as law can achieve the rank of peremptory norm")). See also U. Linderfalk, "The creation of *jus cogens*–making sense of article 53 of the Vienna Convention", *Heidelberg Journal of International Law*, vol. 71 (2011), pp. 359–378, at p. 371 ("by 'the creation of a rule of *jus cogens*' I mean, not the creation of a rule of law, but rather the elevation of a rule of law to a *jus cogens* status").

[64]    Report of the Study Group on the fragmentation of international law: difficulties arising from the diversification and expansion of international law (A/CN.4/L.702), para. 14 (10), note 11. See also A.

The meaning of general international law will always be context-specific.[65] In some contexts, "general international law" could be construed in contradistinction to *lex specialis*.[66] In the context of peremptory norms of general international law (*jus cogens*), however, the term "general international law" is not a reference to *lex generalis* or law other than *lex specialis*. Rather, the word "general" in "norms of general international law", in the context of peremptory norms, refers to the scope of applicability of the norm in question. Norms of general international law are thus those norms of international law that, in the words of the International Court of Justice, "must have equal force for all members of the international community".[67]

(3)    The words "basis" in paragraph 1 and "bases" in paragraph 2 of draft conclusion 5 are to be understood flexibly and broadly. They are meant to capture the range of ways that various sources of international law may give rise to the emergence of a peremptory norm of general international law (*jus cogens*). The Commission decided not to use the words "source" or "sources" as these might create confusion with the notion of sources of international law in Article 38, paragraph 1, of the Statute of the International Court of Justice.

(4)    Paragraph 1 of draft conclusion 5 states that customary international law, which refers to a general practice accepted as law (*opinio juris*), is the most common basis for peremptory norms of general international law (*jus cogens*). This is because customary international law is the most obvious manifestation of general international law.[68] This position is borne out by State practice, which confirms that customary international law is the most common source for peremptory norms of general international law (*jus cogens*).[69] The Supreme Court of Argentina, for example, recognized that peremptory norms relative to war crimes and crimes

Zdravkovič, "Finding the core of international law: *jus cogens* in the work of the International Law Commission", *South Eastern and European Union Legal Issues*, vol. 5 (December 2019), pp. 141–158, at p. 144.

[65]    *Ibid.* See also footnote 667 to paragraph (2) of the commentary to conclusion 1 of the conclusions on identification of customary international law, *Official Records of the General Assembly, Seventy-third Session, Supplement No. 10* (A/73/10), p. 123 ("'general international law' is used in various ways (not always clearly specified) including to refer to rules of international law of general application, whether treaty law or customary international law or general principles of law").

[66]    See, for example, *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America), Merits, Judgment, I.C.J. Reports 1986*, p. 14, at pp. 137–138, para. 274. See also *Gabčíkovo-Nagymaros Project (Hungary/Slovakia), Judgment, I.C.J. Reports 1997*, p. 7, at p. 76, para. 132.

[67]    *North Sea Continental Shelf, Judgment, I.C.J. Reports 1969*, p. 3, at pp. 38–39, para. 63.

[68]    See Cassese (footnote 55 above), at p. 164 ("The second question amounts to asking by which means an international tribunal should ascertain whether a general rule or principle of international law has acquired the status of a peremptory norm. Logically, this presupposes the existence of such a *customary* rule or principle"); G. Cahin, *La coutume internationale et les organisations internationales : l'incidence de la dimension institutionnelle sur le processus coutumier*, Paris, Pédone, 2001, at p. 615, who states that customary international law is the "normal, if not exclusive, means" of formation of *jus cogens* norms (*voie normale et fréquente sinon exclusive*). See also Rivier (footnote 63 above), at p. 566 (*Le mode coutumier est donc au premier rang pour donner naissance aux règles destinées à alimenter le droit impératif* ("Customary international law is thus a primary source of rules that will form the basis of peremptory law")). See, further, J. E. Christófolo, *Solving Antinomies between Peremptory Norms in Public International Law*, Zurich, Schulthess, 2016, p. 115 ("As the most likely source of general international law, customary norms would constitute *ipso facto* and *ipso iure* a privileged source of *ius cogens* norms"); Gagnon-Bergeron (footnote 27 above), at p. 53; and A. Bianchi, "Human rights and the magic of jus cogens", *European Journal of International Law*, vol. 19 (2008), p. 491, at p. 493 ("the possibility that *jus cogens* could be created by treaty stands in sharp contrast to the view that peremptory norms can emerge only from customary law"). See, for a contrary view, Janis (footnote 55 above), at p. 361.

[69]    For statements by States, see the statement by Pakistan at the thirty-fourth session of the General Assembly (A/C.6/34/SR.22, para. 8) ("The principle of the non-use of force, and its corollary, were *jus cogens* not only by virtue of Article 103 of the Charter [of the United Nations], but also because they had become norms of customary international law recognized by the international community"). See also the statements by the United Kingdom (A/C.6/34/SR.61, para. 46) and Jamaica (A/C.6/42/SR.29, para. 3) ("The right of peoples to self-determination and independence was a right under customary international law, and perhaps even a peremptory norm of general international law").

against humanity emerged from rules of customary international law already in force.[70] Similarly, the Constitutional Tribunal of Peru stated that peremptory norms of general international law (*jus cogens*) referred to "customary international norms under the auspices of an *opinio juris seu necessitatis*".[71] In *Bayan Muna v. Alberto Romulo*, the Supreme Court of the Philippines defined *jus cogens* as "the highest hierarchical position among all other customary norms and principles".[72] Similarly, in *The Kenya Section of the International Commission of Jurists v. the Attorney-General and Others*, the High Court of Kenya determined the "duty to prosecute international crimes" to be both a rule of customary international law and a peremptory norm of general international law (*jus cogens*).[73] In *Kazemi Estate v. Islamic Republic of Iran*, the Supreme Court of Canada described peremptory norms of general international law (*jus cogens*) as a "higher form of customary international law".[74] In *Siderman de Blake v. Argentina*, the United States Court of Appeals for the Ninth Circuit described peremptory norms of general international law (*jus cogens*) as "an elite subset of the norms recognized as customary international law".[75] That Court also noted that, in contrast to ordinary rules of customary international law, *jus cogens* "embraces customary laws considered binding on all nations".[76] In *Buell v. Mitchell*, the United States Court of Appeals for the Sixth Circuit noted that "[s]ome customary norms of international law reach a 'higher status'", namely that of peremptory norms of general international law (*jus cogens*).[77] The description of peremptory norms of general international law (*jus cogens*) as a subset of customary international law is also reflected in the *Nevsun Resources Ltd. v. Araya*.[78] In determining that the prohibition of the death penalty was not a peremptory norm of general international law (*jus cogens*), the Court made the following observation: "Moreover, since the abolition of the death penalty is not a customary norm of international law, it cannot have risen to the level that the international community as a whole recognizes it as *jus cogens*, or a norm from which no derogation is permitted."[79]

(5)    The jurisprudence of the International Court of Justice equally provides strong evidence of the basis of peremptory norms of general international law (*jus cogens*) in customary international law. In the case concerning *Questions relating to the Obligation to Prosecute or Extradite*, the Court recognized the prohibition of torture as "part of customary

---

[70]  *Arancibia Clavel* (see footnote 23 above), para. 28.

[71]  *25% del número legal de Congresistas* (see footnote 22 above), para. 53 (*Las normas de* ius cogens *parecen pues encontrarse referidas a normas internacionales consuetudinarias que bajo el auspicio de una* opinio iuris seu necessitatis ("*jus cogens* norms seem like they refer more to international customary norms than to *opinio juris seu necessitatis*")).

[72]  *Bayan Muna v. Alberto Romulo* (see footnote 20 above), para. 92.

[73]  *The Kenya Section of the International Commission of Jurists v. the Attorney-General and Others, Miscellaneous Criminal Application 685 of 2010, Judgment of 28 November 2011*, High Court of Kenya, [2011] eKLR, p. 14.

[74]  *Kazemi Estate v. Islamic Republic of Iran, File No. 35034, Appeal Decision of 10 October 2014*, Supreme Court of Canada, 2014 SCC 62, [2014] 3 S.C.R. 176, at p. 249, para. 151. See also *Germany v. Milde (Max Josef), Case No. 1072/2009, Appeal Judgment of 13 January 2009*, First Criminal Section, Supreme Court of Cassation, Italy, ILDC 1224 (IT 2009), para. 6 ("customary rules aiming to protect inviolable human rights did not permit derogation because they belonged to peremptory international law or *jus cogens*").

[75]  *Siderman de Blake v. Argentina* (see footnote 21 above), at p. 715, citing *Committee of United States Citizens Living in Nicaragua v. Reagan* (see footnote 57 above), at p. 940.

[76]  *Ibid.* This contrast between "ordinary" rules of customary international law and *jus cogens* – suggesting the latter constitutes extraordinary rules of customary international law – is often based on the decision of the International Criminal Tribunal for the Former Yugoslavia in *Prosecutor v. Anto Furundžija* (see footnote 18 above), at p. 569, para. 153, where a similar distinction is drawn. It has been mentioned, with approval, in several decisions, including decisions of the courts of the United Kingdom. See, for example, *Regina v. Bow Street Metropolitan Stipendiary Magistrate*, ex parte *Pinochet Ugarte (No. 3)* (footnote 50 above), at p. 198. See also *Regina (Al Rawi and Others) v. Secretary of State for Foreign and Commonwealth Affairs* (*ibid.*).

[77]  *Buell v. Mitchell*, United States Court of Appeals for the Sixth Circuit, 274 F.3d 337 (6th Cir. 2001), at pp. 372–373.

[78]  See *Nevsun Resources Ltd. v. Araya* (footnote 24 above), at para. 83.

[79]  *Buell v. Mitchell* (see footnote 77 above), at p. 373.

international law" that "has become a peremptory norm (*jus cogens*)".[80] Similarly, the Court's description of "many [of the] rules of humanitarian law" as constituting "intransgressible principles of international customary law" suggests that peremptory norms – referred to here as "intransgressible principles" – have a customary basis.[81]

(6)     Other international courts and tribunals have also accepted customary international law as the basis for peremptory norms of general international law (*jus cogens*).[82] The International Criminal Tribunal for the Former Yugoslavia, for example, has noted that the prohibition of torture is a "norm of customary international law" and that it "further constitutes a norm of *jus cogens*".[83] In *Prosecutor v. Anto Furundžija*, that Tribunal described peremptory norms as those that "enjoy a higher rank in the hierarchy of international law than treaty law or even 'ordinary' customary rules".[84] Similarly, in *Prosecutor v. Jelisić*, the Tribunal stated that "[t]here can be absolutely no doubt" that the prohibition of genocide in the Convention on the Prevention and Punishment of the Crime of Genocide falls "under customary international law" and is now "on the level of *jus cogens*".[85]

(7)     While customary international law is the most common basis for the emergence of peremptory norms of general international law (*jus cogens*), other sources listed in Article 38, paragraph 1, of the Statute of the International Court of Justice may also form the basis of peremptory norms of general international law (*jus cogens*) to the extent that they can be regarded as norms of general international law. Paragraph 2 of draft conclusion 5 captures this idea by stating that "[t]reaty provisions and general principles of law may also serve as bases for peremptory norms of general international law (*jus cogens*)". The words "may also" are meant to indicate that while there is little practice to support the emergence of peremptory norms from these sources, the possibility of these other sources of international law forming the basis of peremptory norms of general international law (*jus cogens*) cannot be *a priori* excluded.

(8)     Treaties are an important source of international law, as provided for in Article 38, paragraph 1 (*a*) of the Statute of the International Court of Justice. Paragraph 2 of draft conclusion 5 identifies treaty provisions as a possible basis for peremptory norms of general international law (*jus cogens*). The phrase "treaty provisions" is used instead of "treaties" to indicate that what is at issue are the one or more norms contained in the treaty rather than the treaty itself. Treaties, in most cases, are not "general international law" since they do not usually have a general scope of application with "equal force for all members of the international community".[86] There is, however, support in scholarly writings that provisions in treaties can form the basis of the peremptory norms of international law (*jus cogens*).[87]

---

[80] *Questions relating to the Obligation to Prosecute or Extradite (Belgium v. Senegal), Judgment, I.C.J. Reports 2012*, p. 422, at p. 457, para. 99.

[81] *Legality of the Threat or Use of Nuclear Weapons* (see footnote 58 above), at p. 257, para. 79.

[82] See, for example, *"Las Dos Erres" Massacre v. Guatemala, Judgment of 24 November 2009*, Inter-American Court of Human Rights, *Series C*, No. 211, at p. 41, para. 140.

[83] *Prosecutor v. Delalić*, et al., *Case No. IT-96-21-T, Judgment of 16 November 1998*, Trial Chamber, International Criminal Tribunal for the Former Yugoslavia, at para. 454.

[84] *Prosecutor v. Anto Furundžija* (see footnote 18 above), at p. 569, para. 153.

[85] *Prosecutor v. Jelisić* (see footnote 36 above), at pp. 431–433, para. 60.

[86] *North Sea Continental Shelf* (see footnote 67 above), at pp. 38–39, para. 63 ("for, speaking generally, it is a characteristic of purely conventional rules and obligations that, in regard to them, some faculty of making unilateral reservations may, within certain limits, be admitted; – whereas this cannot be so in the case of general or customary international law rules and obligations which, by their very nature, must have equal force for all members of the international community"). See also Bianchi (footnote 68 above), at p. 493 ("The possibility that *jus cogens* could be created by treaty stands in sharp contrast to the view that peremptory norms can emerge only from customary law").

[87] G. I. Tunkin, "Is general international law customary law only?", *European Journal of International Law*, vol. 4 (1993), at p. 534, especially p. 541 ("I believe that international lawyers should accept that general international law now comprises both customary and conventional rules of international law"). See, specifically in the context of *jus cogens*, G. I. Tunkin, "*Jus cogens* in contemporary international law", *The University of Toledo Law Review*, vol. 1971, Nos. 1–2 (Fall–Winter 1971), p. 107, at p. 116 ("principles of *jus cogens* consist of 'rules which have been accepted either expressly by treaty or tacitly by custom …'. Many norms of general international law are created jointly by

While recognizing the special character of the Charter of the United Nations, it is noteworthy that in the commentary to draft article 50 of the 1966 draft articles on the law of treaties, the Commission identified "the law of the Charter [of the United Nations] concerning the prohibition of the use of force" as a "conspicuous example of a rule of international law having the character of *jus cogens*".[88] The role of treaties as a basis for peremptory norms of general international law (*jus cogens*) may be understood as a consequence of the relationship between treaty rules and customary international law as described by the International Court of Justice in *North Sea Continental Shelf* cases.[89] In that case, the Court observed that a treaty rule can codify (or be declaratory of) an existing general rule of international law,[90] or the conclusion of a treaty rule can help crystallize an emerging general rule of international law,[91] or that a treaty rule can, after adoption, come to reflect a general rule on the basis of subsequent practice.[92] This general approach can also be seen in judgments of other international courts and tribunals.[93]

(9)    The phrase "general principles of law" in paragraph 2 of draft conclusion 5 refers to general principles of law in the sense of Article 38, paragraph 1 (*c*), of the Statute of the International Court of Justice. It is appropriate to refer to the possibility of general principles of law forming the basis of peremptory norms of general international law (*jus cogens*).[94]

---

treaty and custom"). See also Knuchel (footnote 59 above), at p. 50 ("Contemporary international law comprises, in the words of the [International Court of Justice], 'instruments of a universal or quasi-universal character,' and nothing precludes future conventions from creating universally binding norms which could be elevated to *jus cogens*"). See also R. Nieto-Navia, "International peremptory norms (*jus cogens*) and international humanitarian law", *in* L. Chand Vorah, *et al.* (eds.), *Man's Inhumanity to Man: Essays on International Law in Honour of Antonio Cassese*, The Hague, 2003, p. 595, at p. 613 ("One can state generally that norms of *jus cogens* can be drawn generally from the following identified sources of international law: (i) General treaties … and (ii) General principles of law recognized by civilized nations"). See, however, Weatherall (footnote 60 above), at pp. 125–126; Hannikainen (footnote 28 above), at p. 92; and E. J. Criddle and E. Fox-Decent, "A fiduciary theory of *jus cogens*", *Yale Journal of International Law*, vol. 34 (2009), p. 331. See, further, Orakhelashvili (footnote 55 above), at p. 113 ("The propensity for academics to place emphasis on custom seems to follow from the general acknowledgment of the unsuitability of treaties to create peremptory norms"); and U. Linderfalk, "The effect of *jus cogens* norms: whoever opened Pandora's box, did you ever think about the consequences?", *European Journal of International Law*, vol. 18 (2007), p. 853, at p. 860.

[88]  Paragraph (1) of the commentary to article 50 of the draft articles on the law of treaties, *Yearbook … 1966*, vol. II, document A/6309/Rev.1, Part II, p. 247.

[89]  *North Sea Continental Shelf* (see footnote 67 above). See also conclusion 11 of the conclusions on identification of customary international law, *Official Records of the General Assembly, Seventy-third Session, Supplement No. 10* (A/73/10), pp. 143–146.

[90]  *North Sea Continental Shelf* (see footnote 67 above), at p. 38, para. 61.

[91]  *Ibid.*, at pp. 38–41, paras. 61–69.

[92]  *Ibid.*, at pp. 41–43, paras. 70–74. See also *Margellos and Others v. Federal Republic of Germany, Case No. 6/2002, Petition for Cassation, Judgment of 17 September 2002*, Special Supreme Court of Greece, para. 14 ("the provisions contained in the … Hague Regulations attached to the Hague Convention IV of 1907 have become customary rules of international law (*jus cogens*)").

[93]  See, for example, *Prosecutor v. Tolimir, Case No. IT-05-88/2-T, Judgment of 12 December 2012*, Trial Chamber II, International Criminal Tribunal for the Former Yugoslavia, at para. 733 ("These provisions of the [Convention on the Prevention and Punishment of the Crime of Genocide] are widely accepted as customary international law rising to the level of *jus cogens*"); and *Questions Relating to the Obligation to Prosecute or Extradite* (footnote 80 above). See also the statement by Mr. Ago at the 828th meeting of the Commission in 1966, *Yearbook … 1966*, vol. I (Part One), p. 37, para. 15 ("Even if a rule of *jus cogens* originated in a treaty, it was not from the treaty as such that it derived its character but from the fact that, even though derived from the treaty … , it was already a rule of general international law").

[94]  While there is little practice in support of general principles of law as a basis for peremptory norms of general international law (*jus cogens*), the following cases, among others, may be considered in this connection: *Prosecutor v. Jelisić* (see footnote 36 above), at pp. 431–433, para. 60, where the International Criminal Tribunal for the Former Yugoslavia, having accepted that the prohibition of genocide was a norm of *jus cogens*, stated that the principles underlying the prohibition were "principles … recognized by civilised nations". The Inter-American Court of Human Rights determined the right to equality to be a peremptory norm of general international law (*jus cogens*)

General principles of law are part of general international law since they have a general scope of application with equal force for all members of the international community.[95] In the context of the interpretation of treaties under article 31, paragraph 3 (*c*), of the 1969 Vienna Convention, the conclusions of the Study Group on the fragmentation of international law distinguished between the application of treaty law on the one hand, and of general international law on the other.[96] The latter, according to the Commission, consists of both "customary international law and general principles of law".[97] There is, moreover, some support in writings for general principles of law as a basis of peremptory norms of general international law (*jus cogens*).[98]

(10)    The phrase "accepted and recognized" has a particular relevance for the sources which can serve as a basis for peremptory norms of general international law (*jus cogens*). The text "accepted and recognized by the international community of States as a whole" was adopted at the United Nations Conference on the Law of Treaties on the basis of a joint proposal of Finland, Greece and Spain with regard to what later became article 53 ("recognized by the international community"),[99] to which the Drafting Committee at the Conference inserted the word "accepted". As explained by the Chair of the Drafting Committee, this was done because Article 38 of the Statute of the International Court of Justice includes both the words "recognized" and "accepted"; "recognized" was used in connection with conventions and treaties and general principles of law, while "accepted" was used in connection with customary international law.[100] This language would seem to suggest that the Commission had in mind the possibility that treaties and general principles of law could also form bases of peremptory norms of general international law (*jus cogens*). For that reason, notwithstanding the scarcity of practice to that effect, the Commission decided to include, in draft conclusion 5, the possibility that treaty provisions and general principles of law may also serve as bases for peremptory norms of general international law (*jus cogens*).

---

flowing from its status as a general principle of law in its advisory opinion on the *Juridical Condition and Rights of Undocumented Migrants* (see footnote 37 above), at p. 99, para. 101: "Accordingly, this Court considers that the principle of equality before the law, equal protection before the law and non-discrimination belongs to *jus cogens*, because the whole legal structure of national and international public order rests on it and it is a fundamental principle that permeates all laws."

[95]    See *North Sea Continental Shelf* (footnote 67 above), at pp. 38–39, para. 63, where the Court described general international law as rules that, "by their very nature, must have equal force for all members of the international community".

[96]    Conclusions of the Study Group on the fragmentation of international law (see footnote 54 above), at paras. 20–21.

[97]    *Ibid.*

[98]    See, for example, Knuchel (footnote 59 above), at p. 52 ("general principles [of law] may be elevated to *jus cogens* if the international community of States as a whole accepts and recognizes them as such"); Shelton, "Sherlock Holmes and the mystery of *jus cogens*" (footnote 30 above), at pp. 30–34; and A. A. Cançado Trindade, "*Jus cogens* …" (footnote 26 above), at p. 27. See also Weatherall (footnote 60 above), at p. 133; and T. Kleinlein, "*Jus cogens* as the 'highest law'? Peremptory norms and legal hierarchies", *Netherlands Yearbook of International Law*, vol. 46 (2016), p. 173, at p. 195 ("a peremptory norm must first become general international law i.e. customary international law or general principles of law pursuant to Article 38(1) of the [Statute of the International Court of Justice]"). See also Conklin (footnote 42 above), at p. 840; O. M. Dajani, "Contractualism in the law of treaties", *Michigan Journal of International Law*, vol. 34 (2012), p. 1, at p. 60; Nieto-Navia, "International peremptory norms (*jus cogens*) and international humanitarian law" (footnote 87 above), at pp. 613 *et seq.* ("One can state generally that norms of *jus cogens* can be drawn generally from the following identified sources of international law: (i) General treaties … and (ii) General principles of law recognized by civilized nations"); Orakhelashvili (footnote 55 above), at p. 126; and Santalla Vargas (footnote 60 above), at p. 214 ("*jus cogens* derives from customary law and general principles of international law").

[99]    *Official Records of the United Nations Conference on the Law Treaties, First and Second Sessions, Vienna, 26 March–24 May 1968 and 9 April–22 May, Documents of the Conference* (A/CONF.39/11/Add.2), document A/CONF.39/C.1/L.306 and Add.1–2, p. 174.

[100]    *Official Records of the United Nations Conference on the Law Treaties, First Session* … (see footnote 53 above), Summary record of the eightieth meeting of the Committee of the Whole, p. 471 at para. 4.

**Conclusion 6**
**Acceptance and recognition**

1.    The criterion of acceptance and recognition referred to in draft conclusion 4, subparagraph (*b*), is distinct from acceptance and recognition as a norm of general international law.

2.    To identify a norm as a peremptory norm of general international law (*jus cogens*), there must be evidence that such a norm is accepted and recognized by the international community of States as a whole as one from which no derogation is permitted and which can only be modified by a subsequent norm of general international law having the same character.

**Commentary**

(1)    The second criterion for the identification of a peremptory norm of general international law (*jus cogens*) is that the norm in question must be accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can only be modified by a subsequent norm having the same character. As stated in paragraph (4) of the commentary to draft conclusion 4, this is a single criterion composed of different elements. While draft conclusion 5 addresses the first element, which is referred to in paragraph (*a*) of draft conclusion 4, namely that the norm in question must be a norm of general international law, draft conclusion 6 concerns the second element, referred to in paragraph (*b*) of draft conclusion 4, namely that the norm of general international law in question must be "accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted". The emphasis in this criterion is on "acceptance and recognition". The other elements of this second criterion indicate two aspects of that acceptance and recognition. First, they indicate what must be accepted and recognized, namely that the norm is one from which no derogation is permitted and that it can only be modified by a norm having the same character. Second, they indicate who must do the accepting and recognizing, namely the international community of States as a whole. Draft conclusion 7 addresses this latter aspect.

(2)    Paragraph 1 of draft conclusion 6 seeks to make clear that the acceptance and recognition referred to in the draft conclusion is distinct from the acceptance and recognition required for other rules of international law. In other words, the "acceptance and recognition" addressed in draft conclusion 6 is not the same as, for example, acceptance as law (*opinio juris*), which is an element for the identification of customary international law, or recognition, which is an element for the identification of general principles of law. Acceptance as law (*opinio juris*) addresses the question of whether States accept a practice as a rule of law and is a constitutive element of customary international law. Recognition as a general principle of law addresses the question of whether a principle has been recognized as provided for in Article 38, paragraph 1 (*c*), of the Statute of the International Court of Justice. The acceptance and recognition referred to in draft conclusion 6 is qualitatively different. Acceptance and recognition, as a criterion of peremptory norms of general international law (*jus cogens*), concerns the question of whether the international community of States as a whole recognizes a rule of general international law as having peremptory character. As Gagnon-Bergeron explains, there is an additional criterion, over and above the criteria for the existence of a rule of general international law, that must be met for peremptory norms of general international law (*jus cogens*).[101] It is this additional criterion that is referred to in draft conclusion 6.

(3)    Paragraph 2 explains what is meant by the acceptance and recognition required to elevate a norm of general international law to the status of a peremptory norm of general international law (*jus cogens*). It states that the norm in question must be accepted and recognized as one from which no derogation is permitted, and which can be modified only by a subsequent norm having the same character. This implies that in order to show that a norm is a peremptory norm of general international law (*jus cogens*), it is necessary to provide evidence that the norm is accepted and recognized as having the qualities mentioned, in other

---

[101]    Gagnon-Bergeron (see footnote 27 above), at p. 52.

words that it is a norm from which no derogation is permitted and that can only be modified by a subsequent norm having the same character.

(4)    This framework of acceptance and recognition by the international community of States as a whole is based on the generally accepted interpretation of article 53 of the 1969 Vienna Convention. [102] In keeping with the definition of peremptory norms of general international law in draft conclusion 3, derived from article 53 of the 1969 Vienna Convention, draft conclusion 4 (*b*) refers to acceptance and recognition. Yet these are not two separate requirements that have to be shown independently. Acceptance and recognition as a criterion for the identification of peremptory norms of general international law (*jus cogens*) is meant to denote the range of ways that States may show their view that a norm has peremptory character. It is, therefore, sufficient to show, in general, the acceptance and recognition of the norm of general international law as being peremptory in nature.

(5)    Draft conclusion 6 concerns the identification of peremptory norms of general international law (*jus cogens*). Such determination involves the weighing and assessment of evidence. The word "evidence" is used to indicate that it is not sufficient merely to assert that a norm is accepted and recognized by the international community of States as a whole as one from which no derogation is permitted. It is necessary to substantiate such a claim with evidence. The evidence that may be relied upon is addressed in draft conclusions 8 and 9. Draft conclusion 6, and the requirement for evidence, is not intended to undermine the value, as evidence, of different materials identified in draft conclusion 8. Those materials reveal the position of States in respect of particular norms and may be advanced as evidence, even if not themselves supported by evidence. Thus, individual assertions by States concerning the peremptory character of norms, with or without evidence, will still constitute material to be considered under draft conclusion 8, paragraph 2.

### Conclusion 7
### International community of States as a whole

1.    It is the acceptance and recognition by the international community of States as a whole that is relevant for the identification of peremptory norms of general international law (*jus cogens*).

2.    Acceptance and recognition by a very large and representative majority of States is required for the identification of a norm as a peremptory norm of general international law (*jus cogens*); acceptance and recognition by all States is not required.

3.    While the positions of other actors may be relevant in providing context and for assessing acceptance and recognition by the international community of States as a whole, these positions cannot, in and of themselves, form part of such acceptance and recognition.

---

[102]    See *Committee of United States Citizens Living in Nicaragua* (footnote 57 above), at p. 940 ("Finally, in order for such a customary norm of international law to become a peremptory norm, there must be a further recognition by 'the international community … *as a whole* [that this is] a norm from which no derogation is permitted'"); and *Michael Domingues v. United States* (footnote 18 above), at para. 85 ("Moreover, the Commission is satisfied, based upon the information before it, that this rule has been recognized as being of a sufficiently indelible nature to now constitute a norm of *jus cogens*, a development anticipated by the Commission in its Roach and Pinkerton decision"). See also *Prosecutor v. Simić, Case No. IT-95-9/2-S, Sentencing Judgment of 17 October 2002*, Trial Chamber, International Criminal Tribunal for the Former Yugoslavia, at para. 34. See, for discussion, J. Vidmar, "Norm conflicts and hierarchy in international law: towards a vertical international legal system?", *in* E. de Wet and J. Vidmar (eds.), *Hierarchy in International Law: the Place of Human Rights*, Oxford, 2011, p. 26. See also C. Costello and M. Foster, "Non-refoulement as custom and *jus cogens*? Putting the prohibition to the test", *Netherlands Yearbook of International Law*, vol. 46 (2016), p. 273, at p. 281 ("to be *jus cogens*, a norm must meet the normal requirements for customary international law … and furthermore have that additional widespread endorsement as to its non-derogability"); and A. Hameed, "Unravelling the mystery of *jus cogens* in international law", *British Yearbook of International Law*, vol. 84 (2014), p. 52, at p. 62. See, further, G. A. Christenson, "*Jus cogens*: guarding interests fundamental to international society", *Virginia Journal of International Law*, vol. 28 (1987–1988), p. 585, at p. 593 ("The evidence would also need to demonstrate requisite *opinio juris* that the obligation is peremptory, by showing acceptance of the norm's overriding quality").

**Commentary**

(1)     As already indicated in draft conclusion 6, the second criterion for the peremptory character of a norm is that the norm in question must be accepted and recognized as having a peremptory character. Draft conclusion 7 is concerned with the question of whose acceptance and recognition is relevant for the identification of peremptory norms of general international law (*jus cogens*). It provides, in general terms, that it is the "international community of States as a whole" that must accept and recognize the peremptory character of a norm.

(2)     It is worth recalling that the Commission itself, when adopting article 50 of its 1966 draft articles on the law of treaties, had not included the element of acceptance and recognition by the international community of States as a whole, stating only that a peremptory norm of general international law (*jus cogens*) is one "from which no derogation is permitted".[103] Rather, this element was added by States in the course of the 1968–1969 United Nations Conference on the Law of Treaties leading to the adoption of the 1969 Vienna Convention. However, even during the deliberations in the Commission, the link between peremptory norms of general international law (*jus cogens*) and the acceptance and recognition of the "international community of States" had been expressed by some members of the Commission.[104]

(3)     Paragraph 1 of draft conclusion 7 states that it is the acceptance and recognition by the international community of States as a whole that is relevant for the identification of peremptory norms of general international law (*jus cogens*). This paragraph seeks to make clear that it is the position of States that is relevant and not that of other actors. While there have been calls for the inclusion of other actors whose acceptance and recognition might be pertinent for the establishment of peremptory norms of general international law (*jus cogens*),[105] the current state of international law retains States as the entities whose acceptance and recognition is relevant. In the context of the draft articles on the law of treaties between States and international organizations or between international organizations, the Commission considered using the phrase "international community as a whole" and thus excluding the words "of States" from the phrase.[106] However, upon reflection, the Commission decided that "in the present state of international law, it is States that are called upon to establish or recognize peremptory norms".[107]

(4)     State practice and the decisions of international courts and tribunals have continued to link the elevation of norms of general international law to peremptory status with State acceptance and recognition. The International Criminal Court, for example, has stated that a peremptory norm of general international law (*jus cogens*) requires recognition by States.[108] The International Court of Justice, likewise, in the case concerning *Questions Relating to the Obligation to Prosecute or Extradite*, determined the peremptory character of the prohibition

---

[103]  See article 50 of the draft articles on the law of treaties, *Yearbook … 1966*, vol. II, document A/6309/Rev.1, Part II, p. 247.

[104]  See the statement by Mr. de Luna at the 828th meeting of the Commission, *Yearbook … 1966*, vol. I (Part One), p. 39, para. 34 ("[*jus cogens*] was positive law created by States, not as individuals but as organs of the international community").

[105]  See, for example, Canada (A/C.6/71/SR.27, para. 9), indicating that "it would be beneficial for the Commission … to enlarge the idea of the acceptance and recognition of peremptory norms to include other entities, such as international and non-governmental organizations".

[106]  See paragraph (3) of the commentary to article 53 of the draft articles on the law of treaties between States and international organizations or between international organizations, *Yearbook … 1982*, vol. II (Part Two), p. 56. See also, in the context of the current topic, the statement by Canada (footnote 105 above).

[107]  Paragraph (3) of the commentary to article 53 of the draft articles on the law of treaties between States and international organizations or between international organizations.

[108]  See *Prosecutor v. Katanga, Case No. ICC-01/04-01/07-34-05-tENg, Decision on the Application for the Interim Release of Detained Witnesses of 1 October 2013*, Trial Chamber II, International Criminal Court, at para. 30 ("peremptoriness [of the principle of *non-refoulement*] finds increasing recognition among States").

of torture on the basis of instruments developed by States.[109] Domestic courts have similarly continued to link the establishment of peremptory norms of general international law (*jus cogens*) with State recognition. For example, in determining that the prohibition of the death penalty was not a peremptory norm of general international law (*jus cogens*), the United States Court of Appeals for the Sixth Circuit stated, in *Buell v. Mitchell*, that "only sixty-one countries, or approximately thirty-two percent of countries, had completely abolished the use of the death penalty".[110] While peremptory norms of general international law (*jus cogens*) continue to be linked to notions of the conscience of humankind in practice and scholarly writings,[111] even then the material advanced to illustrate the peremptory character of norms remains acts and practice generated by States, including within international organizations.

(5)      Although draft conclusion 7 states that it is the acceptance and recognition of States that is relevant for determining whether a norm has a peremptory character, that does not mean that other actors do not play a role. Other actors may provide context and may contribute to the assessment of the acceptance and recognition by the international community of States as a whole. The subsidiary role of other actors has been recognized by the Commission in other topics. In its conclusions on identification of customary international law, the Commission stated that it is "primarily … the practice of States that contributes to the formation, or expression, of rules of customary international law", while noting that "[i]n certain cases, the practice of international organizations also contributes to the formation, or expression, of rules of customary international law". It went on to note that the conduct of non-State actors, even though not practice for such purposes, "may be relevant when assessing the practice" of States.[112] Likewise, in the topic "Subsequent agreements and subsequent practice in relation to the interpretation of treaties", the Commission concluded that the conduct of non-State actors did not constitute practice for the purposes of article 31 of the 1969 Vienna Convention but that it may "be relevant when assessing the subsequent practice of parties to a treaty".[113] Acts and practice of international organizations may provide evidence for the acceptance and recognition by States when determining whether a norm has a peremptory character.[114] Ultimately, however, the positions of entities other than States are not, of themselves, sufficient to establish the acceptance and recognition required for the elevation of a norm of general international law to peremptory status. This consideration is reflected in paragraph 3 of draft conclusion 7.

---

[109]  *Questions Relating to the Obligation to Prosecute or Extradite* (see footnote 80 above), at p. 457, para. 99. The Court cites, amongst others, the Universal Declaration of Human Rights, the Geneva Conventions for the protection of war victims, the International Covenant on Civil and Political Rights, General Assembly resolution 3452 (XXX) of 9 December 1975 and domestic legislation.

[110]  See, for example, *Buell v. Mitchell* (footnote 77 above), at p. 373. See also *On Application of Universally Recognized Principles and Norms of International Law and of International Treaties by Courts of the Russian Federation, Ruling No. 5 of 10 October 2003 as amended on 5 March 2013, Decision of the Plenary Session*, Supreme Court of the Russian Federation, at para. 1 ("The universally recognized principles of international law should be understood as the basic imperative norms of international law, accepted and recognized by the international community of states as a whole, deviation from which is inadmissible").

[111]  *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Croatia v. Serbia)* (see footnote 15 above), at p. 46, para. 87; and A. A. Cançado Trindade, "International law for humankind: towards a new *jus gentium* (I)", *Collected Courses of the Hague Academy of International Law*, vol. 316 (2005), pp. 9–312, at p. 183 ("It is my view that there is, in the multicultural world of our times, an irreducible minimum, which, in so far as international law-making is concerned, rests on its ultimate material source: human conscience").

[112]  Conclusion 4 of the conclusions on identification of customary international law, *Official Records of the General Assembly, Seventy-third Session, Supplement No. 10* (A/73/10), pp. 130–132.

[113]  Conclusion 5 of the conclusions on subsequent agreements and subsequent practice in relation to the interpretation of treaties, *ibid*., pp. 132–133.

[114]  See *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide* (footnote 14 above), p. 23: "The origins of the Convention show that it was the intention of the United Nations to condemn and punish genocide … . The Genocide Convention was therefore intended by the General Assembly and by the contracting parties to be definitely universal in scope" See also conclusion 12 of the conclusions on identification of customary international law, *Official Records of the General Assembly, Seventy-third Session, Supplement No. 10* (A/73/10), pp. 147–149.

(6)    Paragraph 2 of draft conclusion 7 seeks to explain what is meant by "as a whole". It states that what is required is the acceptance and recognition by a very large and representative majority of States. As explained by the Chair of the Drafting Committee during the United Nations Conference on the Law of Treaties, the words "as a whole" are meant to indicate that it was not necessary for the peremptory nature of the norm in question "to be accepted and recognized … by all States" and that it would be sufficient if "a very large majority did so".[115] This meaning is also captured by the phrase "community of States" as opposed to simply "States". The combination of the phrases "as a whole" and "community of States" serves to emphasize that it is States as a collective or community that must accept and recognize the non-derogability of a norm for it to be a peremptory norm of general international law (*jus cogens*).

(7)    The Commission considered that acceptance and recognition by a simple "majority" of States was not sufficient to establish the peremptory status of a norm. Rather, the majority had to be very large. Determining whether there was a very large majority of States accepting and recognizing the peremptory status of a norm was not, however, a mechanical exercise in which the number of States is to be counted. Rather than a purely quantitative assessment in which a majority was determined, the assessment had to be qualitative.

(8)    The idea that what is required is a qualitative assessment is also captured by the word "representative" to qualify "majority of States". The acceptance and recognition by the international community of States as a whole requires that the acceptance and recognition be across regions, legal systems and cultures.[116] The effect of paragraph 2 of draft conclusion 7 is that the majority of States accepting and recognizing the peremptory character of norms should be both very large and representative.

### Conclusion 8
### Evidence of acceptance and recognition

1.    Evidence of acceptance and recognition that a norm of general international law is a peremptory norm (*jus cogens*) may take a wide range of forms.

2.    Forms of evidence include, but are not limited to: public statements made on behalf of States; official publications; government legal opinions; diplomatic correspondence; constitutional provisions; legislative and administrative acts; decisions of national courts; treaty provisions; resolutions adopted by an international organization or at an intergovernmental conference; and other conduct of States.

**Commentary**

(1)    To identify a norm as a peremptory norm of general international law (*jus cogens*), it is necessary to show the acceptance and recognition by the international community of States as a whole of the non-derogability of such a norm. As implied in paragraph 2 of draft

---

[115]    Mr. Yasseen, Chair of the Drafting Committee, *Official Records of the United Nations Conference on the Law Treaties, First Session* … (see footnote 53 above), 80th meeting, at para. 12. This position has been affirmed by the Federal Tribunal of Switzerland. See *A v. Federal Department of the Economy, Case No. 2A.783/2006 /svc, Judgment of 23 January 2008*, Federal Tribunal of Switzerland, para. 8.2 ("Les mots « par la communauté internationale des Etats dans son ensemble » ne permettent pas d'exiger qu'une règle soit acceptée et reconnue comme impérative par l'unanimité des Etats. Il suffit d'une très large majorité" ["The words 'by the international community of States as a whole' do not mean that a norm must be accepted and recognized as peremptory by States unanimously. A very large majority is sufficient"]). See also E. de Wet, "*Jus cogens and obligations erga omnes*", in D. Shelton (ed.) *The Oxford Handbook of International Human Rights Law*, Oxford, 2013, p. 541, at p. 543 ("This threshold for gaining peremptory status is high, for although it does not require consensus among all states … it does require the acceptance of a large majority of states"). See, further, Christófolo (footnote 68 above), at p. 125 (The formation of peremptory norms reflects "a common will represent[ing] the consent of an overwhelming majority of States. Neither one State nor a very small number of States can obstruct the formative process of peremptory norms").

[116]    See *Michael Domingues v. United States* (footnote 18 above), at para. 85 ("The acceptance of this norm crosses political and ideological boundaries and efforts to detract from this standard have been vigorously condemned by members of the international community as impermissible under contemporary human rights standards").

conclusion 7, this requires that evidence of acceptance and recognition must be adduced. Draft conclusion 8 concerns the types of evidence necessary to identify that the international community of States as a whole accepts and recognizes that a norm has a peremptory character. Subsidiary means which may be relevant for the identification of peremptory norms of general international law (*jus cogens*) are addressed in draft conclusion 9.

(2)    Paragraph 1 of draft conclusion 8 is a general statement. It provides that evidence of acceptance and recognition may take a wide range of forms. In its judgment in *Questions Relating to the Obligation to Prosecute or Extradite*, the International Court of Justice relied on a variety of materials when stating that, "[i]n [its] opinion, the prohibition of torture is part of customary international law and it has become a peremptory norm (*jus cogens*)".[117] It should be recalled that what is at stake is the acceptance and recognition of the international community of States as a whole. Therefore, any material capable of expressing or reflecting the views of States would be relevant as evidence of acceptance and recognition.

(3)    Paragraph 2 of draft conclusion 8 describes the forms of materials that may be used as evidence that a norm is a peremptory norm of general international law (*jus cogens*). In keeping with the statement above that evidence of acceptance and recognition may take various forms, paragraph 2 of draft conclusion 8 states that the forms of evidence "include, but are not limited to". The list contained in paragraph 2 of draft conclusion 8 is therefore not a closed list. Other forms of evidence not mentioned in paragraph 2 of draft conclusion 8, if reflecting or expressing the acceptance and recognition of States, may be adduced in support of the peremptory character of a norm. The phrase "and other conduct of State" is intended to be a "catch-all" phrase that caters for the possibility of other materials that, although not reflected in the list, reveal the positions of States.

(4)    It will be noted that the forms of evidence listed in paragraph 2 of draft conclusion 8 are similar to those provided for in paragraph 2 of conclusion 10 of the conclusions on identification of customary international law, which concerns forms of evidence of acceptance as law (*opinio juris*).[118] This similarity is because the forms of evidence identified are those from which, as a general matter, the positions, opinions and views of States can be gleaned. The potential uses of these materials for the purposes of satisfying the acceptance and recognition criterion for peremptory norms of general international law (*jus cogens*), on the one hand, and their uses for the purposes of the identification of customary international law, on the other hand, must be distinguished. For the former, the materials must establish acceptance and recognition by the international community of States as a whole that the norm in question is one from which no derogation is permitted, while for the latter the materials are used to assess whether States accept the norm as a rule of customary international law.

(5)    The non-exhaustive list of forms of evidence in paragraph 2 of draft conclusion 8 have in common that they are materials expressing or reflecting the views of States. These materials are the result of processes capable of revealing the positions and views of States. States routinely express their views about the peremptory character of particular norms through public statements and statements in international forums.[119] Decisions of national

---

[117] See *Questions Relating to the Obligation to Prosecute or Extradite* (footnote 80 above), at p. 457, para. 99. Paragraph 99 continued: "[t]hat prohibition is grounded in a widespread international practice and on the *opinio juris* of States. It appears in numerous international instruments of universal application (in particular the Universal Declaration of Human Rights of 1948, the 1949 Geneva Conventions for the protection of war victims; the International Covenant on Civil and Political Rights of 1966; General Assembly resolution 3452/30 of 9 December 1975 on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment), and it has been introduced into the domestic law of almost all States; finally, acts of torture are regularly denounced within national and international fora."

[118] Conclusion 10 of the conclusions on identification of customary international law, *Official Records of the General Assembly, Seventy-third Session, Supplement No. 10* (A/73/10), pp. 140–142.

[119] See, for example, on aggression: Ghana (*Official Records of the United Nations Conference on the Law Treaties, First Session* … (footnote 53 above), 53rd meeting, para. 15); the Netherlands (A/C.6/SR.781, para. 2); Uruguay (*Official Records of the United Nations Conference on the Law Treaties, First Session* … (footnote 53 above), 53rd meeting, para. 48); Japan (S/PV.2350); Belarus (A/C.6/73/SR.26, para. 90); and Mozambique (A/C.6/73/SR.28, para. 3). In this respect, in the case

courts may also be a reflection of the views of States and have been relied upon in the determination of the peremptory character of norms.[120] Likewise, provisions in national constitutions, as well as legislative and administrative measures provide alternative avenues by which States express their views and may thus also provide evidence of the peremptory character of a norm of general international law.[121]

(6)    Treaties and resolutions adopted by States in international organizations or at intergovernmental conferences may be an obvious example of such materials since they may also reflect the views of States.[122] In assessing the weight of such treaties, various acts of States, in connection with the treaties and resolutions, must be taken into account. These include statements in explanation of vote, the extent of support expressed through positive or negative votes and abstentions, reservations, context and, in relation to treaties, the number of ratifications.

---

concerning *Questions Relating to the Obligation to Prosecute or Extradite* (see footnote 80 above), the International Court of Justice referred to the fact that "acts of torture are regularly denounced within national and international fora" in asserting the peremptory character of the prohibition of torture (p. 457, para. 99).

[120]    See, for example, *Prosecutor v. Anto Furundžija* (footnote 18 above), at p. 569, note 170. See also *Al-Adsani v. the United Kingdom* (footnote 18 above), at paras. 60–61, where the Court relied, *inter alia*, on *Regina v. Bow Street Metropolitan Stipendiary Magistrate*, ex parte *Pinochet Ugarte (No. 3)* (footnote 50 above) and "other cases before … national courts" in its assessment of the peremptory character of the prohibition of torture.

[121]    In coming to the conclusion that the prohibition of torture was of a peremptory character, the International Court of Justice in the case concerning *Questions Relating to the Obligation to Prosecute or Extradite* (see footnote 80 above), referred to the fact that the prohibition had "been introduced into the domestic law of almost all States" (p. 457, para. 99). Similarly, in its decision on the prohibition of the execution of individuals below the age of 18, the Inter-American Commission on Human Rights in *Michael Domingues v. United States* (see footnote 18 above), at para. 85, took account of the fact that States had introduced relevant amendments to their national legislation.

[122]    See *Dispute Concerning Coastal States Rights in the Black Sea, Sea of Azov, and Kerch Strait (Ukraine v. the Russian Federation), PCA Case No. 2017-06, Award of 21 February 2020 concerning the Preliminary Objections of the Russian Federation*, Permanent Court of Arbitration, at paras. 173 *et seq.*, speaking of the value of General Assembly resolutions. In the case concerning *Questions Relating to the Obligation to Prosecute or Extradite* (see footnote 80 above), at p. 457, para. 99, the International Court of Justice referred to both treaties ("the 1949 Geneva Conventions for the protection of war victims; the International Covenant on Civil and Political Rights of 1966") and resolutions ("the Universal Declaration of Human Rights of 1948; … General Assembly resolution 3452/30 of 9 December 1975 on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment"), in expressing its recognition of the prohibition of torture as a peremptory norm of general international law (*jus cogens*). See also *Prosecutor v. Mucić, Case No. IT-96-21-T, Judgment of 16 November 1998*, International Criminal Tribunal for the Former Yugoslavia, and *Prosecutor v. Delalić*, et al. (see footnote 83 above), at para. 454, relying on the 1950 Convention for the Protection of Human Rights and Fundamental Freedoms (European Convention on Human Rights), the 1966 International Covenant on Civil and Political Rights, the 1984 Convention against Torture and Other Cruel, Inhuman or Degrading Punishment or Treatment, and the 1969 American Convention on Human Rights ("Pact of San José, Costa Rica"). See also *Prosecutor v. Anto Furundžija* (footnote 18 above), at p. 563, para. 144. In reaching its decision on the peremptory character of the prohibition of the execution of individuals under the age of 18, the Inter-American Commission on Human Rights in *Michael Domingues v. United States* (see footnote 18 above), at para. 85, relied on the ratification by States of treaties such as the 1966 International Covenant on Civil and Political Rights, the 1989 Convention on the Rights of the Child and the Pact of San José, Costa Rica, which it said were "treaties in which this proscription is recognized as non-derogable". See also the separate opinion of Vice-President Ammoun in *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) Notwithstanding Security Council Resolution 276 (1970)*, Advisory Opinion, *I.C.J. Reports 1971*, p. 16, at p. 79, relying on General Assembly and Security Council resolutions for the conclusion that the right of self-determination is a peremptory norm. See also the *Written Observations Submitted by the Government of the Solomon Islands to the International Court of Justice on the request by the World Health Organization for an Advisory Opinion on the Legality of the Use of Nuclear Weapons in View of their Effects on Human Health and the Environment*, at pp. 39–40, para. 3.28 ("It is quite normal in international law for the most common and the most fundamental rules to be reaffirmed and repeatedly incorporated into treaties").

(7)    In addition to the caveat that the forms of evidence in paragraph 2 of draft conclusion 8 are non-exhaustive, it should also be recalled that such materials must speak to whether the norm has a peremptory character. The question is not whether a particular norm has been reflected in these materials but, rather, whether the materials, when taken together, establish the acceptance and recognition of the international community of States as a whole that the norm in question is one from which no derogation is permitted.

(8)    Finally, it should be recalled that the materials listed in draft conclusion 8 provide evidence. As such they are not, individually, conclusive of the peremptory character of a norm. Thus, the fact that a resolution of the United Nations, a treaty provision, a national court decision, a public statement or any other conduct by a State indicates the belief that a norm has peremptory status, is not sufficient to establish that norm as a peremptory norm of general international law (*jus cogens*). The materials have to be weighed and assessed together, in their context, in order to determine whether they evince acceptance and recognition of the international community of States as a whole of the peremptory character of the norm in question.

### Conclusion 9
### Subsidiary means for the determination of the peremptory character of norms of general international law

1.    Decisions of international courts and tribunals, in particular of the International Court of Justice, are a subsidiary means for determining the peremptory character of norms of general international law. Regard may also be had, as appropriate, to decisions of national courts.

2.    The works of expert bodies established by States or international organizations and the teachings of the most highly qualified publicists of the various nations may also serve as subsidiary means for determining the peremptory character of norms of general international law.

**Commentary**

(1)    To identify a norm as being a peremptory norm of general international law (*jus cogens*), it is necessary to provide evidence that the international community of States as a whole accepts and recognizes the said norm as one from which no derogation is permitted and which can only be modified by a subsequent norm of general international law having the same character. As explained in draft conclusion 8, the forms of evidence relevant for this purpose are materials expressing or reflecting the views of States. Subsidiary means may also be used for the determination of the peremptory character of a norm. Draft conclusion 9 concerns such subsidiary means. It is important to emphasize that the word "subsidiary" in this context is not meant to diminish the importance of such materials, but is rather aimed at expressing the idea that those materials facilitate the identification of "acceptance and recognition" but do not, in themselves, constitute evidence of such acceptance and recognition.[123]

(2)    Paragraph 1 of draft conclusion 9 contains two sentences. The first sentence provides that decisions of international courts and tribunals are a subsidiary means for determining the peremptory character of norms of general international law. This provision mirrors Article 38, paragraph 1 (*d*), of the Statute of the International Court of Justice, which provides, *inter alia*, that judicial decisions are a "subsidiary means for the determination of rules of law". It is partly for that reason that paragraph 1 of draft conclusion 9 uses the words "means for determining" instead of "identifying" which has more often been resorted to in the present draft conclusions.

---

[123]    See also paragraph (2) of the commentary to conclusion 13 of the conclusions on identification of customary international law, *Official Records of the General Assembly, Seventy-third Session, Supplement No. 10* (A/73/10), p. 149 ("The term 'subsidiary means' denotes the ancillary role of such decisions in elucidating the law, rather than being themselves a source of international law (as are treaties, customary international law and general principles of law). The use of the term 'subsidiary means' does not, and is not intended to, suggest that such decisions are not important for the identification of customary international law").

(3)    There is an abundance of examples of decisions of international courts relying on other decisions of international courts and tribunals when identifying a peremptory norm of general international law (*jus cogens*).[124] As an example, the International Criminal Tribunal for the Former Yugoslavia, in *Prosecutor v. Anto Furundžija*, determined that the prohibition of torture was such a norm on the basis of, *inter alia*, the extensiveness of the prohibition including the fact that States are prohibited "from expelling, returning or extraditing" a person to a place where they may be subject to torture.[125] To demonstrate the extensiveness of this prohibition, the Court referred to judgments of the European Court of Human Rights, among others.[126] The judgment of the International Criminal Tribunal for the Former Yugoslavia in *Prosecutor v. Anto Furundžija* has itself often been referred to in order to illustrate the peremptory status of the prohibition of torture.[127] The Special Tribunal for Lebanon in *Prosecutor v. Ayyash*, et al., concluded that "[t]he principle of legality (*nullum crimen sine lege*) … [is] so frequently upheld by international criminal courts with regard to international prosecution of crimes that it is warranted to hold that by now it has the status of a peremptory norm (*jus cogens*)".[128] The Special Tribunal for Lebanon, in *El Sayed*, determined that the right of access to justice has "acquired the status of a peremptory norm (*jus cogens*)" based on, *inter alia*, jurisprudence of both national and international courts.[129] The decision in *El Sayed* provides a particularly apt illustration of the manner in which decisions of international courts and tribunals can be a subsidiary means for the identification of peremptory norms of general international law (*jus cogens*). There, the Tribunal, in the judgment written by its then-President, Antonio Cassese, relied on various forms of evidence, including evidence listed in draft conclusion 8, to come to the conclusion that, taken as a whole, the evidence suggested that there was an acceptance and recognition of the peremptory character of the right of access to courts.[130] The decision then refers to the decision in the case of *Goiburú*, et al. *v. Paraguay*, in which the Inter-American Court of Human Rights determined that the right of access to courts is a peremptory norm of general international law (*jus cogens*), in order to give context to the primary evidence relied upon and to solidify that evidence.[131]

(4)    The first sentence of paragraph 1 of draft conclusion 9 explicitly mentions the International Court of Justice as a subsidiary means for the determination of the peremptory character of norms. There are several reasons for this express mention. First, it is the principal

---

[124]  To this end, Cançado Trindade makes the point that the International Criminal Tribunal for the Former Yugoslavia and the Inter-American Court of Human Rights have made considerable contributions to the advancement of the law on peremptory norms (see Cançado Trindade, "International law for humankind …" (footnote 111 above), at p. 296.

[125]  *Prosecutor v. Anto Furundžija* (see footnote 18 above), para. 144.

[126]  *Soering v. the United Kingdom, Application No. 14038/88, Judgment of 7 July 1989*, European Court of Human Rights; *Cruz Varas and Others v. Sweden, Application No. 15576/89, Judgment of 20 March 1991*, European Court of Human Rights, *Series A: Judgments and Decisions*, vol. 201; and *Chahal v. the United Kingdom, Application No. 22414/93, Judgment of 15 November 1996*, Grand Chamber, European Court of Human Rights.

[127]  See, for example, *Al-Adsani v. the United Kingdom* (footnote 18 above), at para. 30; and *García Lucero*, et al. *v. Chile* (footnote 45 above), at paras. 123–124, especially note 139. See also, generally, *Regina v. Bow Street Metropolitan Stipendiary Magistrate*, ex parte *Pinochet Ugarte (No. 3)* (footnote 50 above), where several of the Lords referred to *Prosecutor v. Anto Furundžija* (footnote 18 above).

[128]  *Prosecutor v. Ayyash*, et al., *Case No. STL-11-01/I, Interlocutory Decision of 16 February 2011 on the Applicable Law: Terrorism, Conspiracy, Homicide, Perpetration, Cumulative Charging*, Appeals Chamber, Special Tribunal for Lebanon, at para. 76. For this decision the Court relied on, *inter alia*, the judgment of the International Criminal Tribunal for the Former Yugoslavia in *Prosecutor v. Duško Tadić (Case No. IT-94-1-AR-72), Decision of 2 October 1995 on the Defence Motion for Interlocutory Appeal on Jurisdiction*, International Criminal Tribunal for the Former Yugoslavia); *Prosecutor v. Delalić*, et al. (see footnote 83 above); and *Prosecutor v. Akayesu, Case No. ICTR-96-4-T, Judgment of 2 September 1998*, Trial Chamber I, International Criminal Tribunal for Rwanda.

[129]  *El Sayed, Case No. CH/PRES/2010/01, Order of 15 April 2010 assigning Matter to Pre-Trial Judge*, President of the Special Tribunal of Lebanon, para. 29, referring in particular to the case of *Goiburú*, et al. *v. Paraguay* (see footnote 18 above).

[130]  See *El Sayed* (footnote 129 above), paras. 21–28.

[131]  *Ibid.*, para. 29.

judicial organ of the United Nations and its members are elected by the main political organs of the United Nations. Second, it remains the only international court with general subject-matter jurisdiction. Moreover, while the Court has been reluctant to pronounce on peremptory norms of general international law (*jus cogens*), its jurisprudence has left a mark on the development both of the general concept of peremptory norms and of particular peremptory norms, even in cases where such norms were not explicitly invoked. In particular, its advisory opinions on *Reservations to the Convention on the Prevention and Punishment of Genocide*, the *Legal Consequences for States of the Continued Presence of South Africa in Namibia* and the *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, as well as its decisions in *Barcelona Traction, East Timor* and the *Military and Paramilitary Activities in and against Nicaragua*, have made major contributions to the understanding and evolution of peremptory norms of general international law (*jus cogens*), notwithstanding the fact that they do not expressly and unambiguously invoke, for their respective conclusions, such norms.[132] When the International Court of Justice has pronounced itself expressly on peremptory norms of general international law (*jus cogens*), its decisions have been even more influential. The judgment of the Court in *Questions relating to the Obligation to Prosecute or Extradite*, for example, has confirmed the peremptory status of the prohibition of torture.[133]

(5)    The second sentence of paragraph 1 of draft conclusion 9 provides that regard may also be had, as appropriate, to decisions of national courts. It will be recalled that Article 38, paragraph 1 (*d*), of the Statute of the International Court of Justice refers to "judicial decisions", which includes both decisions of international courts and decisions of national courts. Consequently, the second sentence is intended to capture the idea that decisions of national courts are also relevant as subsidiary means for the determination of the peremptory character of norms of general international law (*jus cogens*). The Commission decided to use the phrases "may also" and "as appropriate" to indicate that, although decisions of national courts may serve as subsidiary means for the determination of peremptory norms of general international law (*jus cogens*), they should be resorted to with caution. In particular, the weight to be accorded to such national decisions will be dependent on the reasoning applied in the particular decision.

(6)    In addition to serving as subsidiary means under Article 38, paragraph 1 (*d*), of the Statute of the International Court of Justice, decisions of national courts may also constitute primary evidence under draft conclusion 8. When relied upon under draft conclusion 8, decisions of national courts provide evidence of the acceptance and recognition of the State in question. In that context, the relevance of the decision of the court concerns whether it evidences that State's position and not its broader assessment of the recognition and acceptance of the norm in question by the international community of States as a whole as peremptory in nature.

(7)    Paragraph 2 of draft conclusion 9 concerns other subsidiary means for the determination of the peremptory character of norms of general international law (*jus cogens*). As with decisions of international courts and tribunals, these other means are subsidiary in the sense that they facilitate the determination of whether there is acceptance and recognition by States, but they themselves are not evidence of such acceptance and recognition. The paragraph lists, as examples of other subsidiary means, the works of expert bodies and teachings of the most highly qualified publicists of the various nations, also referred to as scholarly writings. The use of the phrase "may also" in paragraph 2, in contradistinction to the word "are" which is used to qualify decisions of international courts and tribunals in

---

[132] See *Reservations to the Convention on the Prevention and Punishment of the Genocide* (footnote 14 above); *Legal Consequences for States of the Continued Presence of South Africa in Namibia* (footnote 122 above), p. 16; *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory, Advisory Opinion, I.C.J. Reports 2004*, p. 136; *Legality of the Threat or Use of Nuclear Weapons* (footnote 58 above); *Barcelona Traction, Light and Power Company, Limited, Judgment, I.C.J. Reports 1970*, p. 3; *East Timor (Portugal v. Australia), Judgment, I.C.J. Reports 1995*, p. 90; and *Military and Paramilitary Activities in and against Nicaragua, Merits, Judgment* (footnote 66 above), at para. 190.

[133] See *Questions relating to the Obligation to Prosecute or Extradite* (footnote 80 above), at p. 457, para. 99.

paragraph 1, indicates that less weight may attach to works of expert bodies and scholarly writings in comparison to judicial decisions. The relevance of these other subsidiary means depends on various factors, including the reasoning of the works or writings, the extent to which the views expressed are accepted by States and the extent to which such views are corroborated either by other forms of evidence listed in draft conclusion 8 or decisions of international courts and tribunals.

(8)     The first category relates to the works of expert bodies. The phrase "established by States or international organizations" indicates that the paragraph refers to organs established by international organizations and subsidiary bodies of such organizations, such as the International Law Commission and expert treaty bodies. The qualification was necessary to emphasize that the expert body in question had to have an intergovernmental mandate and had to be created by States. The use of the phrase "established by States or by international organizations" means that private organizations which do not have an intergovernmental mandate are not included in the category of expert bodies. This does not mean that the works of expert bodies without an intergovernmental mandate are irrelevant. The works of the Institute of International Law or the International Law Association may, for example, qualify as "teachings of the most highly qualified publicists" under paragraph 2 of draft conclusion 9.[134] The term "works" covers not only the final outcomes of the expert bodies but also their work leading up to the final outcome.

(9)     The reliance on other materials is also supported by courts. In *RM v. Attorney-General*, for example, the High Court of Kenya relied on the Human Rights Committee general comment No. 18 on non-discrimination[135] for its determination that non-discrimination is a peremptory norm of general international law (*jus cogens*).[136] Similarly, for its conclusion that the principle of *non-refoulement* was a peremptory norm of general international law (*jus cogens*), the International Criminal Court relied on, *inter alia*, an advisory opinion of the Office of the United Nations High Commissioner for Refugees.[137] Likewise, the finding by the International Criminal Tribunal for the Former Yugoslavia in *Prosecutor v. Anto Furundžija* that the prohibition of torture was a norm of *jus cogens* was based, *inter alia*, on observations of the Inter-American Commission on Human Rights, the Human Rights Committee and a report of a Special Rapporteur, Mr. Kooijmans.[138]

(10)     The Commission has also often been referred to in the assessment of whether a particular norm has attained peremptory status. In assessing the status of the prohibition of the use of force, the International Court of Justice observed that the "International Law Commission … expressed the view that 'the law of the Charter [of the United Nations] concerning the prohibition of the use of force in itself constitutes a conspicuous example of

---

[134]  See paragraph (5) of the commentary to conclusion 14 of the conclusions on identification of customary international law, *Official Records of the General Assembly, Seventy-third Session, Supplement No. 10* (A/73/10), p. 151.

[135]  Human Rights Committee, general comment No. 18 (1989) on non-discrimination, *Official Records of the General Assembly, Forty-fifth Session, Supplement No. 40*, vol. I (A/45/40 (Vol. I)), annex VI, sect. A, para. 1.

[136]  *RM* v. *Attorney-General, Civil Case No. 1351 2002 (O.S.), Judgment of 1 December 2006*, High Court of Kenya at Nairobi, [2006] eKLR, at p. 18. See *Application of the International Convention on the Elimination of All Forms of Racial Discrimination (Qatar v. United Arab Emirates)* (*Preliminary Objections, Decision of 4 February 2021*, International Court of Justice, General List No. 172), where the Court, while recognizing that the determinations of expert bodies such as the Committee on the Elimination of Racial Discrimination should be accorded great weight, noted that it was "'in no way obliged, in the exercise of its judicial functions, to model its own interpretation of'" human rights treaties on the views of those expert bodies (para. 101).

[137]  See *Prosecutor v. Katanga* (footnote 108 above), at para. 30, referring to the 2007 Advisory Opinion of the Office of the United Nations High Commissioner for Refugees (UNHCR) on the *Extraterritorial Application of* Non-Refoulement *Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol* (available from the UNHCR website: www.unhcr.org/4d9486929.pdf). The International Criminal Court also referred to several UNHCR Executive Committee Conclusions.

[138]  See *Prosecutor v. Anto Furundžija* (footnote 18 above), at paras. 144 and 153. The Tribunal referred to the Inter-American Convention on Human Rights, General Comment on Article 7 and general comment No. 24 of the Human Rights Committee and a report by Special Rapporteur Kooijmans.

a rule in international law having the character of *jus cogens*'".[139] Scholarly writings that provide a list of generally accepted peremptory norms of general international law (*jus cogens*) often rely on the list provided by the Commission in the commentary to article 26 of the articles on responsibility of States for internationally wrongful acts.[140] The Commission's own work may thus also contribute to the identification of peremptory norms of general international law (*jus cogens*).

(11)    Paragraph 2 refers to "teachings of the most highly qualified publicists", which may also be useful as subsidiary material for the identification of peremptory norms of international law.[141] This refers to scholarly writings and other works that may be used as secondary material in assessing and providing context to the primary forms of acceptance and recognition of peremptory status. It is important to emphasize that the weight to be accorded to such teachings will vary greatly depending on the quality of the reasoning and the extent to which they find support in State practice and in the decisions of international courts and tribunals.[142]

(12)    It is worth pointing out that the subsidiary means identified in paragraphs 1 and 2 of draft conclusion 9 are not exhaustive. The means identified in the draft conclusion are, however, the most common subsidiary means that have been relied upon in the identification of peremptory norms of general international law (*jus cogens*).

---

[139] *Military and Paramilitary Activities in and against Nicaragua, Merits, Judgment* (see footnote 66 above), at pp. 100–101, para. 190. See also *Re Víctor Raúl Pinto, Re, Pinto (Víctor Raúl) v. Relatives of Tomás Rojas, Case No. 3125-94, Decision on Annulment of 13 March 2007*, Supreme Court of Chile, ILDC 1093 (CL 2007), at paras. 29 and 31.

[140] Paragraph (5) of the commentary to article 26 of the articles on responsibility of States for internationally wrongful acts (*Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 85). See den Heijer and van der Wilt (footnote 30 above), at p. 9, referring to the norms in the list as those "beyond contestation". See also Christófolo (footnote 68 above), at p. 151; and Weatherall (footnote 60 above), at p. 202. See also de Wet (footnote 115 above), at p. 543. She relies, however, not on a Commission list, but rather on the list from paragraph 374 of the report of the Study Group of the Commission (finalized by Martti Koskenniemi) (see footnote 54 above, p. 77), with a list that is slightly modified from that of the Study Group. For example, in the list de Wet provides, "the right of self-defence" is included as a peremptory norm of general international law (*jus cogens*) in its own right, while the list of the Study Group contains the "prohibition of aggression" but not "self-defence" as an independent peremptory norm of general international law (*jus cogens*).

[141] See, for example, *Nguyen Thang Loi v. Dow Chemical Company*, United States District Court for the Eastern District of New York, 373 F. Supp. 2d 7 (E.D.N.Y. 2005), at p. 135, relying on M. C. Bassiouni, "Crimes against humanity", *in* R. Gutman and D. Rieff (eds.), *Crimes of War: What the Public Should Know*, Norton, 1999; *Prosecutor v. Kallon and Kamara, Case Nos. SCSL-2004-15-AR72(E) and SCSL-2004-16-AR72(E), Decision of 13 March 2004 on Challenge to Jurisdiction: Lomé Accord Amnesty*, Appeals Chamber, Special Court for Sierra Leone, at para. 71, relying on L. Moir, *The Law of Internal Armed Conflict*, Cambridge, 2002; and *Bayan Muna v. Alberto Romulo* (see footnote 20 above), at p. 55, citing M. C. Bassiouni, "International crimes: *jus cogens* and *obligatio erga omnes*", *Law and Contemporary Problems*, vol. 59 (1996), p. 63. See also *Siderman de Blake v. Argentina* (footnote 21 above), at p. 717, citing several authors, including K. Parker and L. B. Neylon, "*Jus cogens*: compelling the law of human rights", *Hastings International and Comparative Law Review*, vol. 12, No. 2 (Winter 1989), pp. 411–463; and K. C. Randall, "Universal jurisdiction under international law", *Texas Law Review*, vol. 66 (1987–1988), pp. 785–841, in support of the proposition that the prohibition of torture is a peremptory norm of general international law (*jus cogens*).

[142] See also paragraph (3) of the commentary to conclusion 14 of the conclusions on identification of customary international law, *Official Records of the General Assembly, Seventy-third Session, Supplement No. 10* (A/73/10), p. 151 ("There is need for caution when drawing upon writings, since their value for determining the existence of a rule of customary international law varies: this is reflected in the words 'may serve as'. First, writers sometimes seek not merely to record the state of the law as it is (*lex lata*) but to advocate its development (*lex ferenda*). In doing so, they do not always distinguish (or distinguish clearly) between the law as it is and the law as they would like it to be. Second, writings may reflect the national or other individual viewpoints of their authors. Third, they differ greatly in quality. Assessing the authority of a given work is thus essential").

**Part Three**
**Legal consequences of peremptory norms of general international law (*jus cogens*)**

**Conclusion 10**
**Treaties conflicting with a peremptory norm of general international law (*jus cogens*)**

1.      A treaty is void if, at the time of its conclusion, it conflicts with a peremptory norm of general international law (*jus cogens*). The provisions of such a treaty have no legal force.

2.      Subject to paragraph 2 of draft conclusion 11, if a new peremptory norm of general international law (*jus cogens*) emerges, any existing treaty which is in conflict with that norm becomes void and terminates. The parties to such a treaty are released from any obligation further to perform the treaty.

**Commentary**

(1)      Draft conclusion 10 concerns the invalidity and termination of treaties on account of their being in conflict with peremptory norms of general international law (*jus cogens*). It is of course expected that States would not conclude treaties in conflict with peremptory norms of general international law (*jus cogens*). However, in the event that such treaties are concluded, such treaties will be void. The invalidity of treaties is the legal effect that is most closely associated with peremptory norms of general international law (*jus cogens*).[143] Article 53 of the 1969 Vienna Convention has rarely been relied upon to invalidate a treaty, so much so that it has been questioned whether that article remains relevant.[144] The fact that treaties have rarely been invalidated on account of a conflict with peremptory norms is, however, not because the rule in article 53 is not accepted by States, but simply because States do not generally enter into treaties that conflict with peremptory norms of general international law (*jus cogens*).[145] Thus, the rule that a treaty in conflict with peremptory norms is invalid continues to be applicable even though it has rarely been applied.

(2)      While instances of invalidity of treaties on account of conflict with peremptory norms of general international law (*jus cogens*) have been rare, this does not mean that there has been no practice at all that may be relevant to this question. There have been statements made by individual States assessing whether a particular treaty was consistent or not with a peremptory norm of general international law (*jus cogens*) and, accordingly, whether it could

---

[143] Danilenko, *Law-Making in the International Community* (see footnote 42 above), at p. 212 ("As originally conceived, within the codification process relating to the law of treaties, the concept of *jus cogens* applies only to treaty relationships … to invalidate bilateral and multilateral agreements contrary to fundamental community rules recognized as 'higher law'"). See also Kleinlein (footnote 98 above), at p. 181; K. Kawasaki, "A brief note on the legal effects of *jus cogens* in international law", *Hitotsubashi Journal of Law and Politics*, vol. 34 (2006), p. 27; and den Heijer and van der Wilt (footnote 30 above), at p. 7.

[144] See Costelloe (see footnote 11 above), at p. 55 ("the relevant [provisions of the 1969 Vienna Convention] are very narrow, and the question whether they still have much relevance … and are now virtually a dead letter, is justified"). See Charlesworth and Chinkin (footnote 60 above), pp. 65–66 ("Despite fears that the inclusion of [article 53 of the Vienna Convention] would subvert the principle of *pacta sunt servanda* and act to destabilize the certainty provided by treaty commitments, *jus cogens* doctrine has been only rarely invoked in this context. It thus has had little practical impact upon the operation of treaties"); and Kadelbach (footnote 59 above), p. 161 ("direct conflict in the sense that a treaty has an illicit subject-matter is a theoretical case"). See also Cassese (footnote 55 above), pp. 159–160 ("Should we conclude that consequently what is normally asserted to be a major advance accomplished by the 1969 Vienna Convention … has in fact proved over the years to be an outright flop?"). See, for examples, Shelton, "Sherlock Holmes and the mystery of *jus cogens*" (footnote 30 above), at p. 36; and Kadelbach (footnote 59 above), p. 152. See, for discussion, Knuchel (footnote 59 above), at p. 141.

[145] See C. Maia, "*Jus cogens* and (in)application of the 1969 Vienna Convention on the Law of Treaties in the jurisprudence of the International Court of Justice", *in* Tladi (ed.), *Peremptory Norms of General International Law (*Jus Cogens*)…* (footnote 26 above), pp. 342–365, at p. 355.

be considered as valid or not.[146] The General Assembly has also adopted relevant resolutions[147] which have been interpreted as recognizing that the validity of certain agreements is to be determined by reference to their consistency with certain fundamental principles. There have also been judicial decisions that have considered the invalidity of treaties on account of possible inconsistency with peremptory norms of general international law (*jus cogens*). In *Prosecutor v. Charles Ghankay Taylor*, the Special Court for Sierra Leone had to determine whether the provision in its own statute, which did not recognize the immunities of any officials, was invalid.[148] The Court held that since the provision was "not in conflict with any peremptory norm of general international law, [it] must be given effect" to the Court.[149] It seems to follow that had the provision been in conflict it would not have been given effect by the Court. Similarly, in the *Aloeboetoe and Others v. Suriname* case before the Inter-American Court of Human Rights, reliance had been placed on an agreement concluded between the Netherlands and the Saramaka community for the purposes of reparation.[150] The Court noted that, under some provisions of the treaty, the Saramaka undertook to capture any escaped slaves and return them to slavery.[151] On that account, the Court held that if the agreement in question were a treaty, it would be "null and void because it contradicts the norms of *jus cogens superveniens*".[152]

(3)    Draft conclusion 10 follows the approach of the 1969 Vienna Convention by distinguishing between, on the one hand, treaties that, at the time of their conclusion, are in

---

[146]  For general statements to this effect, see the statement by the Netherlands during the eighteenth session of the Sixth Committee (A/C.6/SR.781, para. 2) (on the question of *jus cogens*, the "Agreement concerning the Sudeten German Territory, signed at Munich on 29 September 1938, was one of the few examples of treaties which had come to be regarded as contrary to international public order"). Cyprus, at the same session and in order to show the practice in support of nullity as a consequence of conflict with peremptory norms of general international law (*jus cogens*), listed a number of treaties as providing for nullity on account of conflict with a peremptory norm, namely the prohibition on the use of force (A/C.6/SR.783, para. 18) ("The Covenant of the League of Nations, the General Treaty for the Renunciation of War as an Instrument of National Policy (known as the Briand Kellogg Pact); the Charter of the Nürnberg Tribunal; the Charter of the International Military Tribunal for the trial of the major war criminals in the Far East and, most recently, Article 2, paragraph 4, of the Charter of the United Nations made it *lex lata* in modern international law that a treaty procured by the illegal threat or use of force was void *ab initio*"). See also the statement by the Ukrainian Soviet Socialist Republic during the eighteenth session of the Sixth Committee (A/C.6/SR.784, para. 8). For more specific statements, see *East Timor (Portugal v. Australia), Counter-Memorial of the Government of Australia of 1 June 1992*, para. 223 (available from: www.icj-cij.org), declaring that the "Timor Gap Treaty" (the Treaty on the zone of cooperation in an area between the Indonesian province of East Timor and Northern Australia, signed over the zone of cooperation, above the Timor Sea, on 11 December 1989, United Nations, *Treaty Series*, vol. 1654, No. 28462, p. 105), if in conflict with the right of self-determination, would be null on account of being in breach of a norm of *jus cogens*; and the Memorandum from Roberts B. Owen, Legal Adviser of the State Department to Warren Christopher, Acting Secretary of State 29 December 1979, in *U.S. Digest*, chapter 2, section 1, para. 4, reproduced in M. L. Nash, "Contemporary practice of the United States relating to international law", *American Journal of International Law*, vol. 74, No. 2 (April 1980), p. 418, at p. 419 ("Nor is it clear that the treaty between the USSR and Afghanistan … is valid. If it actually does lend itself to support of Soviet intervention of the type in question in Afghanistan, it would be void under contemporary principles of international law, since it would conflict with what the Vienna Convention on the Law of Treaties describes as a 'peremptory norm of general international law' … , namely that contained in Article 2, paragraph 4 of the Charter" of the United Nations).

[147]  General Assembly resolutions 33/28A of 7 December 1978, 34/65 B of 29 November 1979, 36/51 of 24 November 1981 and 39/42 of 5 December 1984.

[148]  *Prosecutor v. Taylor, Case No. SCSL-2003-01-I, Decision of 31 May 2004 on Immunity from Jurisdiction*, Appeals Chamber, Special Court for Sierra Leone, para. 53. See also *Prosecutor v. Kallon, Case No. SCSL-2004-15-AR72(E), Decision of 13 March 2004 on Constitutionality and Lack of Jurisdiction*, Appeals Chamber, Special Court for Sierra Leone.

[149]  *Prosecutor v. Taylor* (see footnote 148 above), para. 53.

[150]  *Aloeboetoe and Others v. Suriname, Judgment of 10 September 1993 on Reparation and Costs*, Inter-American Court of Human Rights, *Series C*, No. 15.

[151]  *Ibid.*, at para. 57.

[152]  *Ibid.*

conflict with a peremptory norm of general international law (*jus cogens*) (paragraph 1) and, on the other hand, treaties that conflict with a peremptory norm of general international law (*jus cogens*) that emerges subsequent to the conclusion of the treaty (paragraph 2).[153] The first alternative is addressed in the first sentence of article 53 of the 1969 Vienna Convention while the second alternative is addressed in article 64 of that Convention. Paragraphs 1 and 2 of the present draft conclusion follow closely the text of the 1969 Vienna Convention.

(4)    The first sentence of paragraph 1 of draft conclusion 10 states simply that a treaty is void if, at the time of its conclusion, it conflicts with a peremptory norm of general international law (*jus cogens*). The sentence follows closely the first sentence of article 53 of the 1969 Vienna Convention. The import of this sentence is that such a treaty is void *ab initio.* The second sentence of paragraph 1 of draft conclusion 10 is taken from paragraph 1 of article 69 of the Convention and provides that the provisions of a treaty that is invalid on account of being in conflict with a peremptory norm at the time of its conclusion have no legal force.

(5)    Paragraph 2 of draft conclusion 10 concerns the consequences of a newly emerged peremptory norm of general international law (*jus cogens*) on an existing treaty. It states that such a treaty becomes void and terminates. The phrase "becomes void and terminates" indicates that the treaty is not void *ab initio* but only *becomes* void at the emergence of the peremptory norm. The treaty becomes void from the moment the norm in question is recognized and accepted as one from which no derogation is permitted. The consequence of the treaty *becoming* void is that it is only the continuing legal or subsequent legal effects of the provisions of the treaty that terminate. It is for this reason that the second sentence of paragraph 2 provides that the parties to such a treaty are released from any obligation further to perform the treaty. This formulation is drawn from article 71, paragraph 2 (*a*), of the 1969 Vienna Convention. The effect of the text is to recognize that the treaty provisions were valid and could produce legal consequences prior to the emergence of the peremptory norm of general international law (*jus cogens*). Subject to draft conclusion 12, it is only the obligation to "further" perform that is affected by any termination. Prior to the acceptance and recognition, the rights and obligations under the impugned treaty are fully valid and applicable.

(6)    The rule contained in paragraph 2 of draft conclusion 10 should be read together with draft conclusion 11 which makes provision for separability in certain cases. For this reason, paragraph 2 begins with the words "Subject to paragraph 2 of draft conclusion 11".

(7)    Draft conclusion 10 on the invalidity of treaties on account of conflict with peremptory norms should also be read together with draft conclusion 21 on the recommended procedure for invoking invalidity. In accordance with draft conclusion 21, a party to a treaty cannot unilaterally declare that a treaty is contrary to a peremptory norm and excuse itself from the duty to perform under the treaty. The procedure set out in draft conclusion 21 is to be followed to confirm, objectively, the invalidity of the treaty before any consequences of invalidity can be relied upon.

(8)    Draft conclusion 10 should also be read together with draft conclusion 20 on interpretation and application of peremptory norms of general international law (*jus cogens*).

---

[153] See paragraph (6) of the commentary to article 50 of the draft articles on the law of treaties, *Yearbook … 1966*, vol. II, document A/6309/Rev.1, Part II, p. 248 (draft article 50 "has to be read in conjunction with article 61 (Emergence of a new rule of *jus cogens*), and in the view of the Commission, there is no question of the present article having retroactive effects. It concerns cases where a treaty is void *at the time of its conclusion* by reason of the fact that its provisions are in conflict with an already existing rule of *jus cogens.* The treaty is wholly void because its actual conclusion conflicts with a peremptory norm of general international law … . Article 61, on the other hand, concerns cases where a treaty, valid when concluded, becomes void and terminates by reason of the subsequent development establishment of a new rule of *jus cogens* with which its provisions are in conflict. The words '*becomes* void and *terminates*' make it quite clear, the Commission considered that the emergence of a new rule of *jus cogens* is not to have retroactive effects on the validity of a treaty. The invalidity is to attach only from the time of the establishment of the new rule of *jus cogens*").

**Conclusion 11**
**Separability of treaty provisions conflicting with a peremptory norm of general international law (*jus cogens*)**

1.      A treaty which, at the time of its conclusion, conflicts with a peremptory norm of general international law (*jus cogens*) is void in whole, and no separation of the provisions of the treaty is permitted.

2.      A treaty which is in conflict with a new peremptory norm of general international law (*jus cogens*) becomes void and terminates in whole, unless:

(*a*)      the provisions that are in conflict with a peremptory norm of general international law (*jus cogens*) are separable from the remainder of the treaty with regard to their application;

(*b*)      it appears from the treaty or is otherwise established that acceptance of the said provisions was not an essential basis of the consent of the parties to be bound by the treaty as a whole; and

(*c*)      continued performance of the remainder of the treaty would not be unjust.

**Commentary**

(1)      Draft conclusion 11 addresses circumstances where only some provisions of a treaty are in conflict with a peremptory norm of general international law (*jus cogens*) while other provisions are not in conflict with such a norm. As with draft conclusion 10 concerning invalidity of treaties, the draft conclusion follows the general approach of the 1969 Vienna Convention, namely to distinguish between, on the one hand, treaties which, at the time of their conclusion, conflict with a peremptory norm of general international law (*jus cogens*) and, on the other hand, treaties which conflict with a peremptory norm of general international law (*jus cogens*) that emerges subsequent to the conclusion of the treaty. The draft conclusion also follows closely the text contained in the relevant provisions of the 1969 Vienna Convention.

(2)      Paragraph 1 of draft conclusion 11 concerns those cases where the treaty, at the time of its conclusion, is in conflict with a peremptory norm of general international law (*jus cogens*). Under the 1969 Vienna Convention, in such cases, the treaty becomes void in whole. Article 53 of the Convention provides that the "treaty is void" and not that the relevant provision of the treaty concerned is void. Moreover, article 44, paragraph 5, of the 1969 Vienna Convention makes it express that, in such cases, severance of the impugned provisions from the treaty is not permitted. Draft conclusion 11 thus makes it clear that the whole treaty is void *ab initio* and that there is no possibility of separating those provisions that are in conflict with peremptory norms from other provisions of the treaty. First, the phrase "void in whole" in the draft conclusion is meant to clarify that the whole treaty and not only the offending provision is void. Second, to emphasize this basic point, the second part of the sentence explicitly states that "no separation of the provisions of the treaty is permitted". The first part of the sentence follows the text of article 53 of the 1969 Vienna Convention, while the second part of the sentence is based on paragraph 5 of article 44 of the Convention, which excludes cases of invalidity under article 53 from the rules on separability in article 44.

(3)      Paragraph 2 addresses circumstances where a treaty (or particular provisions of a treaty) conflict with a peremptory norm of general international law (*jus cogens*) which emerges subsequent to the conclusion of the treaty. The formulation of paragraph 2 follows closely that of paragraph 3 of article 44 of the 1969 Vienna Convention. It recognizes the possibility of separation in cases where a treaty becomes invalid due to the emergence of a peremptory norm of general international law (*jus cogens*) subsequent to the conclusion of the treaty.

(4)      The *chapeau* of paragraph 2 makes plain that, as a general rule, a treaty becomes void as a whole if it conflicts with a peremptory norm of general international law (*jus cogens*), even in cases where the peremptory norm emerges subsequent to the conclusion of the treaty. For that reason, the first part of the *chapeau* of paragraph 2 of draft conclusion 11 provides

that a treaty which becomes void because of the emergence of a new peremptory norm of general international law (*jus cogens*) terminates in whole. The word "unless", at the end of the *chapeau*, however, signifies that in limited instances, which are covered by subparagraphs (*a*) to (*c*), separation may take place. The elements listed in subparagraphs (*a*) to (*c*) are cumulative in nature. In other words, all three elements must be present in order for provisions that conflict with a peremptory norm to be separated from the rest of the treaty.

(5)     The elements listed in paragraph 2 of draft conclusion 11 are taken from article 44, paragraph 3, of the 1969 Vienna Convention. The first element, as stipulated in subparagraph (*a*), is that the provisions that are in conflict with a peremptory norm of general international law (*jus cogens*) must be separable from the remainder of the treaty with regard to their application. This means that it must be possible to apply the rest of the treaty without the provisions which are in conflict with the peremptory norm of general international law (*jus cogens*). Where the other provisions serve the function of facilitating the implementation of the impugned provision, such a provision can obviously not be separated from the rest of the treaty with regard to its application.

(6)     It is not enough that it is possible to apply the treaty without the impugned provision. Subparagraph (*b*) of paragraph 2 of draft conclusion 11 states that it must appear from the treaty or be otherwise established that the acceptance of the said provisions was not an essential basis of the consent of the parties to be bound by the treaty as a whole. Even if a treaty could be applied without the impugned provision, it would be contrary to the consensual nature of treaties for a treaty to be applied without a provision that was "an essential basis" for its conclusion, since without that provision there would have been no consent to the treaty.

(7)     Pursuant to subparagraph (*c*), the last condition that has to be met is that the continued performance under the treaty would not be unjust. The word "unjust", in this context, is meant to refer to the essential balance of rights and obligations created by the treaty, which could be disturbed if some provisions were separated while others were retained. Furthermore, to decide whether continued performance of the treaty would be "unjust", consideration needs to be given not only to the impact on the parties to the treaty, but also impacts beyond the parties, if relevant and necessary.

(8)     Whether the three conditions set out in paragraph 2 are present is to be established by a consideration of all the relevant circumstances, including the subject of the provision, its relation to other clauses of the treaty and the *travaux préparatoires*, amongst other factors.[154]

**Conclusion 12**
**Consequences of the invalidity and termination of treaties conflicting with a peremptory norm of general international law (*jus cogens*)**

1.     Parties to a treaty which is void as a result of being in conflict with a peremptory norm of general international law (*jus cogens*) at the time of the treaty's conclusion have a legal obligation to:

        (*a*)     eliminate as far as possible the consequences of any act performed in reliance on any provision of the treaty which conflicts with a peremptory norm of general international law (*jus cogens*); and

        (*b*)     bring their mutual relations into conformity with the peremptory norm of general international law (*jus cogens*).

2.     The termination of a treaty on account of the emergence of a new peremptory norm of general international law (*jus cogens*) does not affect any right, obligation or legal situation of the parties created through the execution of the treaty prior to the termination of the treaty, provided that those rights, obligations or situations may thereafter be maintained only to the extent that their maintenance is not in itself in conflict with the new peremptory norm of general international law (*jus cogens*).

---

[154] See paragraph (5) of the commentary to article 41 of the draft articles on the law of treaties, *ibid.*, p. 238.

**Commentary**

(1)     One of the consequences of a conflict with a peremptory norm of general international law (*jus cogens*) is that the treaty is void or, in the case of the emergence of the peremptory norm subsequent to the adoption of the treaty, the treaty becomes void. Yet a treaty, even a void one, may lead to consequences through, for example, parties acting pursuant to the treaty. Those consequences may manifest themselves through the creation of rights and obligations or by the establishment of factual situations. Draft conclusion 12 addresses the consequences of the invalidation of treaties as a result of a conflict with a peremptory norm of general international law (*jus cogens*). There is therefore a close relationship between draft conclusion 10 and draft conclusion 12. Draft conclusion 12 addresses the consequences of a treaty that has been rendered void.

(2)     As is the case for draft conclusions 10 and 11, draft conclusion 12 is structured on the basis of the distinction between articles 53 and 64 of the 1969 Vienna Convention: those cases of invalidity as a result of a conflict with an existing peremptory norm of general international law (*jus cogens*) and those cases of invalidity on account of conflict with a peremptory norm of general international law (*jus cogens*) that emerges subsequent to the adoption of the treaty. Furthermore, as with draft conclusions 10 and 11, draft conclusion 12 follows closely the text of the 1969 Vienna Convention. Finally, as is the case with draft conclusion 10, the consequences for the invalidity of a treaty are subject to the recommended procedure set out in draft conclusion 21.

(3)     Paragraph 1 of draft conclusion 12 addresses cases where a treaty is void as a result of a conflict with a peremptory norm of general international law (*jus cogens*) at the time of the treaty's conclusion. The formulation of the paragraph follows closely the formulation of article 71, paragraph 1, of the 1969 Vienna Convention concerning "a treaty which is void under article 53". Since in that case no treaty comes into being – which is the essence of *void ab initio* – no reliance can be placed on the provisions of the treaty. However, acts may have been performed in good faith in reliance on the void treaty producing particular consequences. To address these consequences, paragraph 1 of draft conclusion 12 refers to two obligations.

(4)     The first obligation of the parties to the void treaty, expressed in subparagraph (*a*), is to eliminate as far as possible the consequences of any act performed in reliance on any of its provisions in conflict with a peremptory norm of general international law (*jus cogens*). First, it will be noted that the obligation is to eliminate "as far as possible". The obligation is thus not one of result but one of conduct. It recognizes that it may not be possible to eliminate the relevant consequences, but requires States to make best efforts to eliminate any such consequences. Second, the duty is not to eliminate the consequences of any acts performed in reliance on any part of the treaty, but only the consequences of those acts performed in reliance on the impugned provisions of the treaty. Thus, while the whole treaty is void, there is no obligation to eliminate consequences of acts performed in reliance on provisions of the treaty that are not in conflict with peremptory norms of general international law (*jus cogens*). The second obligation, which flows from the first and is expressed in subparagraph (*b*), is that the parties are to bring their mutual relations into conformity with the peremptory norm of general international law (*jus cogens*). This means that, moving forward, the parties to the treaty should ensure that their relations are consistent with the peremptory norm in question. Thus, while the first obligation is concerned with past conduct, the second is concerned with future conduct.

(5)     Paragraph 2 concerns the situation addressed by article 64 of the 1969 Vienna Convention, namely those cases in which a treaty becomes void as a result of a peremptory norm that emerges subsequent to the adoption of the treaty. The formulation in paragraph 2 of draft conclusion 12 follows closely the text of article 71, paragraph 2, of the 1969 Vienna Convention. It must be reiterated that, in such cases, the treaty only becomes invalid after the emergence of the peremptory norm of general international law (*jus cogens*). In other words, during the period between the adoption of the treaty and the emergence of the peremptory norm, the treaty remains valid and, consequently, acts performed and rights and obligations created pursuant to it remain valid. There can therefore, in general, be no obligation to eliminate consequences of acts validly performed. The draft conclusion states that the termination of a treaty due to conflict with a peremptory norm that emerges subsequent to the adoption of the treaty does not affect any right, obligation or legal situation created

through the execution of the treaty prior to the termination of the treaty. Thus, while the treaty becomes void, rights, obligations or legal situations created through the lawful performance under the treaty will in principle not be affected. However, those rights, obligations or legal situations may be maintained or relied upon only to the extent that their continued existence is not itself a violation of a peremptory norm of general international law (*jus cogens*).

(6)     Paragraph 2 of draft conclusion 12 specifies, as does article 71 of the 1969 Vienna Convention, that it is the rights, obligations or legal situations "of the parties" that are unaffected. This does not mean, however, that rights, obligations or legal situations of third States created prior to the invalidation of the treaty will necessarily be affected. The Commission decided to specify "of the parties" because draft conclusion 12 concerns treaty relations. Thus, any right, obligation or legal situation of a third State or person, created through the execution of the treaty prior to its invalidation, is not affected to the extent that its maintenance is not in itself in conflict with peremptory norms of general international law (*jus cogens*).

### Conclusion 13
### Absence of effect of reservations to treaties on peremptory norms of general international law (*jus cogens*)

1.     A reservation to a treaty provision that reflects a peremptory norm of general international law (*jus cogens*) does not affect the binding nature of that norm, which shall continue to apply as such.

2.     A reservation cannot exclude or modify the legal effect of a treaty in a manner contrary to a peremptory norm of general international law (*jus cogens*).

**Commentary**

(1)     Draft conclusion 13 concerns the effects of peremptory norms of general international law (*jus cogens*) on the rules of international law relating to reservations to treaties. The purpose of the draft conclusion is not to regulate reservations, which are dealt with in articles 19 to 23 of the 1969 Vienna Convention.

(2)     Paragraph 1 addresses the case where a reservation is entered to a treaty provision that reflects a peremptory norm of general international law (*jus cogens*). The formulation of paragraph 1 of draft conclusion 13 is based on the Commission's Guide to Practice on Reservations to Treaties.[155] It states that a reservation to a provision in a treaty that reflects a peremptory norm does not affect the binding nature of that norm which shall continue to apply as such. The phrase "as such" is intended to indicate that even when reflected in a treaty provision, a peremptory norm of general international law (*jus cogens*) continues to exist independently of the treaty provision. This means that, while the reservation may well affect the legal effect of the treaty provision in respect of the reserving State, the norm, as a peremptory norm of general international law (*jus cogens*), will not be affected and will continue to apply.[156] The rule reflected in this paragraph of draft conclusion 13 flows from the normal operation of international law. It derives, in particular, from the fact that the treaty provision reflecting a peremptory norm of general international law (*jus cogens*) has, in accordance with the jurisprudence of the International Court of Justice, an existence separate from the underlying peremptory norm.[157]

---

[155]  Guideline 4.4.3. The guidelines constituting the Guide to Practice on Reservations to Treaties adopted by the Commission and the commentaries thereto are reproduced in *Yearbook ... 2011*, vol. II (Part Three) and Corr.1–2, pp. 23 *et seq*. See also General Assembly resolution 68/111 of 16 December 2013, annex.

[156]  *Military and Paramilitary Activities in and against Nicaragua, Merits, Judgment* (see footnote 66 above), at pp. 93–94, para. 175 (addressing this issue in the context of a reservation to a declaration recognizing as compulsory the jurisdiction of the Court under Article 36, paragraph 2, of the Statute of the International Court of Justice).

[157]  See *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America), Jurisdiction and Admissibility, Judgment, I.C.J Reports 1984*, p. 392, at p. 424, para. 73 ("The fact that the above-mentioned principles, recognized as such, have been codified or embodied

(3)　　The rule in paragraph 1 of draft conclusion 13 does not relate to the validity of the reservation. In many cases, it would be expected that a reservation to a treaty provision reflecting a peremptory norm of general international law (*jus cogens*) would be contrary to the object and purpose of the treaty and thus invalid. However, whether the reservation is valid or not, and the consequences of any invalidity, are matters that are governed by the rules contained in the 1969 Vienna Convention and not the rules on peremptory norms of general international law (*jus cogens*). It would, thus, be going too far to prohibit a reservation to a provision in a treaty which reflects a peremptory norm of general international law (*jus cogens*) outright since such a determination should always be dependent upon ascertaining the object and purpose of the treaty in question – an exercise that can only be done through the interpretation of each particular treaty. It is nonetheless important to emphasize that, whatever the validity of the reservation in question, a State cannot escape the binding nature of a peremptory norm of general international law (*jus cogens*) by formulating a reservation to a treaty provision reflecting that norm.

(4)　　Paragraph 2 of draft conclusion 13 concerns reservations which, on their face, are neutral and do not relate to peremptory norms, but whose application would be contrary to a peremptory norm of general international law (*jus cogens*). Such reservations are invalid. Drawing on paragraph 2 of guideline 4.4.3 of the Guide to Practice on Reservations to Treaties, draft conclusion 13 states that a reservation cannot exclude or modify the legal effect of a treaty in a manner contrary to a peremptory norm of general international law (*jus cogens*). The typical example identified in the commentary to guideline 4.4.3 is a reservation "intended to exclude a category of persons from benefitting from certain rights granted under a treaty".[158] The right to education, though very important, is not at this time a peremptory norm of general international law (*jus cogens*). Thus, the formulation of a reservation to a treaty provision proclaiming a right to education would not, as such, be contrary to a peremptory norm of general international law (*jus cogens*), nor would it constitute a reservation to a treaty provision reflecting a peremptory norm of general international law (*jus cogens*). However, a reservation that limits the implementation of such right to a particular racial group or excludes a particular racial group from the enjoyment of the treaty right may well be found to violate the peremptory norm of general international law (*jus cogens*) prohibiting racial discrimination.[159]

### Conclusion 14
### Rules of customary international law conflicting with a peremptory norm of general international law (*jus cogens*)

1.　　A rule of customary international law does not come into existence if it would conflict with an existing peremptory norm of general international law (*jus cogens*). This is without prejudice to the possible modification of a peremptory norm of general international law (*jus cogens*) by a subsequent norm of general international law having the same character.

2.　　A rule of customary international law not of a peremptory character ceases to exist if and to the extent that it conflicts with a new peremptory norm of general international law (*jus cogens*).

3.　　The persistent objector rule does not apply to peremptory norms of general international law (*jus cogens*).

---

in multilateral conventions does not mean that they cease to exist and to apply as principles of customary law"). See also *Military and Paramilitary Activities in and against Nicaragua, Merits, Judgment* (see footnote 66 above), at pp. 93–94, para. 174. This view is also implicit in *North Sea Continental Shelf* (footnote 67 above), at pp. 41 *et seq.*, paras. 71 *et seq.*

[158]　Guide to Practice on Reservations to Treaties (see footnote 155 above), para. (5) of the commentary to guideline 4.4.3.

[159]　See, for example, paragraph (5) of the commentary to article 26 of the articles on responsibility of States for internationally wrongful acts, *Yearbook ... 2001*, vol. II (Part Two) and corrigendum, p. 85.

**Commentary**

(1)     Draft conclusion 14 addresses the consequences of peremptory norms of general international law (*jus cogens*) for customary international law. Draft conclusion 14 is divided into three paragraphs. Paragraph 1 concerns the consequences that an existing peremptory norm of general international law (*jus cogens*) has on the formation of a new rule of customary international law. Paragraph 2 concerns the consequences that a new peremptory norm of general international law (*jus cogens*) has on existing rules of customary international law. Paragraph 3 addresses the non-applicability of the persistent objector rule to peremptory norms of general international law (*jus cogens*). Paragraphs 1 and 2 mirror draft conclusion 10, which distinguishes between the situation of a treaty at the time of its conclusion conflicting with an existing peremptory norm of general international law (*jus cogens*), on the one hand, and that of a treaty conflicting with a peremptory norm of general international law (*jus cogens*) that emerges subsequent to the conclusion of a treaty.

(2)     The first sentence of paragraph 1 of draft conclusion 14 provides that a rule of customary international law does not come into existence if it would conflict with a peremptory norm of general international law (*jus cogens*). The words "does not come into existence" are meant to indicate that, even if the constituent elements of customary international law were to be present (practice and *opinio juris*), a rule of customary international law would not come into existence if the putative rule conflicted with a peremptory norm of general international law (*jus cogens*). Unlike in the case of treaties, the terms "invalid" or "void" are not appropriate since the putative rule of customary international law does not come into existence in the first place.

(3)     Peremptory norms of general international law (*jus cogens*) are hierarchically superior to other norms of international law and therefore override such norms in the case of conflict. Decisions of national courts have recognized that peremptory norms of general international law (*jus cogens*) prevail over conflicting rules of customary international law. In *Siderman de Blake v. Argentina*, the United States Court of Appeals for the Ninth Circuit considered that "[i]ndeed … the supremacy of *jus cogens* extends over all rules of international law" and noted that "norms that have attained the status of *jus cogens* 'prevail over and invalidate international agreements and other rules of international law in conflict with them'".[160] The Supreme Court of Argentina has similarly stated that crimes against humanity had the "character of *jus cogens*, meaning that [the prohibition is] above both treaty law, and all other sources of international law".[161]

(4)     The position that peremptory norms of general international law (*jus cogens*) prevail over conflicting rules of customary international law has also been recognized in decisions of international courts and tribunals. In the *Jurisdictional Immunities of the State* case, the International Court of Justice noted the proposition of Italy that "*jus cogens* rules always prevail over any inconsistent rule of international law, whether contained in a treaty or in customary international law".[162] The Court did not reject that proposition, but declined to find that there was a conflict between the rule on State immunities in civil proceedings and peremptory norms of general international law (*jus cogens*).[163] The hierarchical superiority of peremptory norms of general international law (*jus cogens*) over customary international law was also recognized in *Al-Adsani v. the United Kingdom*, in which the European Court of Human Rights determined, having considered *Prosecutor v. Anto Furundžija*, that peremptory norms of general international law (*jus cogens*) are those norms that enjoy "a

---

[160]  *Siderman de Blake v. Argentina* (see footnote 21 above), p. 716 (citing the *Restatement (Third) of the Foreign Relations Law of the United States* (1987), § 102, comment k).

[161]  *Simón, Julio Héctor y otros s/ privación ilegítima de la libertad* (see footnote 51 above), para. 48 (*el carácter de* ius cogens *de modo que se encuentra no sólo por encima de los tratados sino incluso por sobre todas las fuentes del derecho*).

[162]  *Jurisdictional Immunities of the State (Germany v. Italy: Greece intervening), Judgment, I.C.J. Reports 2012*, p. 99, at p. 140, para. 92.

[163]  *Ibid.*, paras. 92–93. See, in this regard, U. Linderfalk, *Understanding* Jus Cogens *in International Law and International Legal Discourse*, Edward Elgar, 2020, at section 1.3.1 (examples include the priority-rule implicitly confirmed by the International Court of Justice in the case of *Jurisdictional Immunities of the State* (see footnote 162 above): in the event of a conflict between a *jus cogens* norm and a rule of customary international law, States must act upon the former).

higher rank in the international hierarchy than treaty law and even 'ordinary' customary rules".[164] The consequences of peremptory norms of general international law (*jus cogens*) on the existence of a conflicting rule of customary international law is aptly captured in the joint dissenting opinion of Judges Rozakis and Caflisch in the *Al-Adsani v. the United Kingdom* case:

> By accepting that the rule on prohibition of torture is a rule of *jus cogens*, the majority recognise that it is hierarchically higher than any other rule of international law … . For the basic characteristic of a *jus cogens* rule is that … it overrides any other rule which does not have the same status. In the event of a conflict between a *jus cogens* rule and any other rule of international law, the former prevails.[165]

(5)    The rule in the first sentence of paragraph 1 of draft conclusion 14, which states that a rule of customary international law does not come into existence if it conflicts with a peremptory norm of general international law (*jus cogens*), follows from the fact that peremptory norms of general international law (*jus cogens*) prevail over conflicting rules of customary international law. Thus, the High Court of Kenya, in *The Kenya Section of the International Commission of Jurists v. the Attorney-General and Others*, stated that peremptory norms of general international law (*jus cogens*) "rendered void" any other rules of international law "which come into conflict with them".[166]

(6)    The second sentence of paragraph 1 of draft conclusion 14 provides that the general principle captured in the first sentence is without prejudice to the possible modification of a peremptory norm of general international law (*jus cogens*) by a subsequent norm of general international law having the same character.[167] This is based on the recognition that, as provided for in draft conclusion 5, customary international law is the most common basis for peremptory norms of general international law (*jus cogens*) and that, therefore, modification of a peremptory norm of general international law (*jus cogens*) is most likely to occur through the subsequent acceptance and recognition of an existing rule of customary international law as a peremptory norm of general international law (*jus cogens*) or the emergence of a new rule of customary international law so accepted and recognized.

(7)    While the current draft conclusions do not address the modification of peremptory norms of general international law (*jus cogens*), the second sentence of paragraph 1 serves to emphasize that, in principle, modification of peremptory norms of general international law (*jus cogens*) is possible. The threshold for modification of a peremptory norm of general international law (*jus cogens*) is, however, very high.[168] To be able to modify a peremptory norm of general international law (*jus cogens*), the rule of customary international law in question must have the same character as the peremptory norm of general international law (*jus cogens*) being modified. The phrase "having the same character", which is taken from article 53 of the 1969 Vienna Convention, indicates that such a rule of customary international law must itself be recognized and accepted as one from which no derogation is permitted and which can only be modified by a subsequent peremptory norm of general international law (*jus cogens*). In practice, this means that there must be, at the point of the emergence of a peremptory norm of general international law (*jus cogens*), a practice accepted as law (*opinio juris*) and which the international community of States as a whole,

---

[164] *Al-Adsani v. the United Kingdom* (see footnote 18 above), para. 60. See also *Prosecutor v. Anto Furundžija* (footnote 18 above), para. 153.

[165] Joint dissenting opinion of Judges Rozakis and Caflisch (joined by Judges Wildhaber, Costa, Cabral Barreto and Vajić) in *Al-Adsani v. the United Kingdom* (see footnote 18 above), para. 1. See also Kleinlein (footnote 98 above), p. 187 ("it is a relatively straightforward case to perceive a structural hierarchy between *jus cogens* and regional or local customary rules").

[166] *The Kenya Section of the International Commission of Jurists v. the Attorney-General and Others* (see footnote 73 above). See also *C v. Director of Immigration*, HCAL 132/2006, [2008] 2 HKC 165, [2008] HKCFI 109, ILDC 1119 (HK 2008), 18 February 2008, para. 75.

[167] The modification of peremptory norms of general international law (*jus cogens*) is considered in M. Payandeh, "Modification of peremptory norms of general international law", *in* Tladi (ed.), *Peremptory Norms of General International Law (*Jus Cogens*)…* (footnote 26 above), pp. 92–131.

[168] See *ibid.*, at p. 122. See also D. Tladi, "Grotian moments and peremptory norms of general international law: friendly facilitators or fatal foes?", *Grotiana*, vol. 42 (2021), pp. 335–353, at p. 346 ("an exceedingly onerous threshold").

A/77/10

at the same time, accept and recognize as having peremptory character. That a rule of customary international law could only derogate from, and thus modify, a peremptory norm of general international law (*jus cogens*) if such a rule of customary international law also had a peremptory character is supported by a judgment of the Queen's Bench Division of the England and Wales High Court of Justice in *R (Mohamed) v. Secretary of State for Foreign and Commonwealth Affairs*, which, having referred to the hierarchical superiority of peremptory norms of general international law (*jus cogens*), stated that their "derogation by States through treaties or rules of customary law not possessing the same status [was] not permitted".[169]

(8)     Paragraph 2 of draft conclusion 14 concerns situations where a rule of customary international law, which at the time of its formation did not conflict with an existing peremptory norm of general international law (*jus cogens*), conflicts with such a norm that emerges subsequent to the formation of the rule of customary international law. It provides that such a rule of customary international law "ceases to exist if and to the extent that it conflicts with a new peremptory norm of general international law (*jus cogens*)". The phrase "ceases to exist" indicates that, prior to the emergence of the new peremptory norm of general international law (*jus cogens*), the rule of customary international law was in force, but that it ceases to exist upon the emergence of the peremptory norm of general international law (*jus cogens*). The phrase "if and to the extent" is meant to indicate that only those parts of the rule of customary international law in question that conflict with the peremptory norm of general international law (*jus cogens*) will cease to exist. This phrase operates like a separability provision, in order to maintain those parts of the rule of customary international law that are consistent with the peremptory norm of general international law (*jus cogens*). The qualifier "if and to the extent" does not apply to paragraph 1 of draft conclusion 14 since, in the case of a pre-existing peremptory norm of general international law (*jus cogens*), the rule of customary international law in question does not come into existence at all.

(9)     Paragraph 3 of draft conclusion 14 deals with the persistent objector rule. It provides that the persistent objector rule does not apply to peremptory norms of general international law (*jus cogens*). Conclusion 15 of the Commission's conclusions on identification of customary international law states that a rule of customary international law is not opposable to a State that has persistently objected to that rule of customary international law while it was in the process of formation for as long as that State maintains its objection. Conclusion 15 of the conclusions on identification of customary international law also states, however, that this rule is without prejudice to any question concerning peremptory norms of general international law (*jus cogens*).[170]

(10)     That the persistent objector rule does not apply to peremptory norms of general international law (*jus cogens*) flows from both the universal application and hierarchical superiority of peremptory norms of general international law (*jus cogens*) as reflected in draft conclusion 2.[171] This means that peremptory norms of general international law (*jus cogens*) apply to all States. In this respect, the Federal Supreme Court of Switzerland, in *Youssef Nada v. State Secretariat for Economic Affairs and Federal Department of Economic Affairs*, stated

---

[169]  *R (Mohamed) v. Secretary of State for Foreign and Commonwealth Affairs*, [2008] EWHC 2048 (Admin), [2009] 1 WLR 2579, para. 142 (ii). See also A. C. de Beer and D. Tladi, "The use of force against Syria in response to alleged use of chemical weapons by Syria: a return to humanitarian intervention?", *Heidelberg Journal of International Law*, vol. 79, No. 2 (2019), p. 217, in which the authors noted that if the prohibition on the use of force were regarded as a peremptory norm of general international law (*jus cogens*), a subsequent rule of customary international law could only emerge if it were "'accepted and recognized' as having a peremptory character, in a way that would modify the" pre-existing peremptory norm of general international law (*jus cogens*).

[170]  Conclusion 15 of the conclusions on identification of customary international law, *Official Records of the General Assembly, Seventy-third Session, Supplement No. 10* (A/73/10), pp. 152–154.

[171]  On the universal application of these norms, see, for example, the written statement of 19 June 1995 by the Government of Mexico on the request for an advisory opinion submitted to the International Court of Justice by the General Assembly at its forty-ninth session (resolution 49/75K), para. 7 ("The norms … are of a legally binding nature for all the States (*jus cogens*)").

that *jus cogens* norms "were binding on *all subjects* of international law".[172] The Inter-American Court of Human Rights has concluded that peremptory norms of general international law (*jus cogens*) "bind all States".[173] The rule that, by virtue of their universal application and hierarchical superiority, peremptory norms of general international law (*jus cogens*) cannot be subject to the persistent objector rule has been reflected in statements by States.[174] Specifically in response to an argument about the persistent objector rule, the Inter-American Commission on Human Rights, in *Michael Domingues v. United States*, determined that peremptory norms of general international law (*jus cogens*) "bind the international community as a whole, irrespective of protest, recognition or acquiescence".[175]

(11)    A question that arises in scholarly writings is whether a peremptory norm of general international law (*jus cogens*) can ever emerge in the face of persistent objection of one or a few States.[176] It can because persistent objection to a rule of customary international law by a few States does not prevent the rule's emergence; rather, such objection merely renders that rule not opposable to the State or States concerned for so long as the objection is maintained. For that reason, the persistent objector rule does not prevent the emergence of a peremptory norm of general international law (*jus cogens*) based on a rule of customary international law to which one or more States have persistently objected. At the same time, if a rule of customary international law, to which a State has persistently objected, becomes accepted and recognized by the international community of States as a whole as one from which no derogation is permitted and which can only be modified by a subsequent norm of general international law having the same character, the effect of the persistent objection falls away.

---

[172] *Youssef Nada v. State Secretariat for Economic Affairs and Federal Department of Economic Affairs* (see footnote 40 above), para. 7 (emphasis added).

[173] *Juridical Condition and Rights of Undocumented Migrants* (see footnote 37 above), p. 113, paras. 4–5.

[174] See also the Islamic Republic of Iran, "the 'persistent objector' … had no place in the formation of *jus cogens*" (A/C.6/68/SR.26, para. 4). See also statements by States in the 2016 and 2018 meetings of the Sixth Committee (agenda item 78: report of the International Law Commission), particularly the following: Brazil "welcomed the clarification in draft conclusion 15 [of the conclusions on identification of customary international law] that the inclusion of the persistent objector rule was without prejudice to any issues of *jus cogens*" (A/C.6/71/SR.22, para. 18); Chile stated that "[w]here the rules of *jus cogens* were concerned, the persistent objector institution did not apply" (A/C.6/71/SR.21, para. 102); Cyprus "welcomed paragraph 3 [of conclusion 15 of the conclusions on identification of customary international law] … [as] without prejudice to any question concerning peremptory norms of general international law (*jus cogens*)" (A/C.6/73/SR.23, para. 43); El Salvador "agreed with the Special Rapporteur that the doctrine of the persistent objector was not applicable to *jus cogens* norms" (A/C.6/71/SR.25, para. 63); Finland, on behalf of the Nordic countries (Denmark, Finland, Iceland, Norway and Sweden), "welcomed the inclusion in the draft conclusions [on identification of customary international law] of the persistent objector rule … . Nonetheless, the category of rule to which the State objected should be taken into account and particular consideration must be given to universal respect for fundamental rules, especially those relating to the protection of individuals" (A/C.6/71/SR.20, para. 52); Greece "reiterated [the] delegation's doubts about the applicability of the persistent objector rule in relation not only to the rules of *jus cogens* but also to the broader category of the general principles of international law" (A/C.6/71/SR.22, para. 10); Iceland, speaking on behalf of the Nordic countries (Denmark, Finland, Iceland, Norway and Sweden), stated that "the notion of persistent objector was not compatible with the concept of *jus cogens*" (A/C.6/71/SR.24, para. 63); Mexico stated that "there could be no persistent objection to *jus cogens* rules" (A/C.6/71/SR.22, para. 25); Slovenia "agreed with the enunciation of *jus cogens* norms as being of a special and exceptional nature, reflecting the common and overarching values adhered to by the international community. For that reason, [the] delegation reaffirmed its view that the persistent objector was incompatible with the nature of *jus cogens*" (A/C.6/71/SR.26, para. 114); South Africa "agreed with [the Special Rapporteur's] preliminary observation that there could be no objection to *jus cogens* norms" (*ibid.*, para. 86); and Spain stated that "it was regrettable that it had not been specifically stated in draft conclusion 15 [of the conclusions on identification of customary international law] that there could be no persistent objection to peremptory norms of general international law" (A/C.6/73/SR.21, para. 91).

[175] *Michael Domingues v. United States* (see footnote 18 above), para. 49.

[176] C. Mik, "*Jus cogens* in contemporary international law", *Polish Yearbook of International Law*, vol. 33, No. 27 (2013), p. 50. See also Costelloe (footnote 11 above), pp. 21–23.

(12)   Whether there is such acceptance and recognition of a rule of general international law (*jus cogens*), however, may be affected by persistent objections to the establishment of the rule. According to paragraph 2 of draft conclusion 7, the phrase "international community of States as a whole" does not require the acceptance and recognition of all States, but does require the acceptance and recognition of a very large and representative majority. Thus, if a rule of customary international law was the object of persistent objections from several States, such objections might not be sufficient to preclude the emergence of a rule of customary international law, but might be sufficient to preclude the norm from being recognized as a peremptory norm of general international law (*jus cogens*). In other words, to the extent that such persistent objection implies that the norm in question is not accepted and recognized by the international community of States as a whole as one from which no derogation is permitted, then a peremptory norm of general international law (*jus cogens*) might not arise.

(13)   Paragraph 3 of draft conclusion 14 refers to the persistent objector "rule". The Commission settled on the "persistent objector rule" since this concept is often referred to as a "rule" and since the Commission has already referred to it as either a "rule" or a "doctrine" in its prior work.[177]

(14)   The application of draft conclusion 14 is to be read together with the interpretative rule set out in draft conclusion 20 and the recommended procedure set forth in draft conclusion 21.

### Conclusion 15
### Obligations created by unilateral acts of States conflicting with a peremptory norm of general international law (*jus cogens*)

1.   A unilateral act of a State manifesting the intention to be bound by an obligation under international law that would be in conflict with a peremptory norm of general international law (*jus cogens*) does not create such an obligation.

2.   An obligation under international law created by a unilateral act of a State ceases to exist if and to the extent that it conflicts with a new peremptory norm of general international law (*jus cogens*).

### Commentary

(1)   Draft conclusion 15 addresses the legal consequences of peremptory norms of general international law (*jus cogens*) for unilateral acts of States manifesting the intention to be bound by an obligation under international law.[178] Draft conclusion 15 is based on the understanding that unilateral acts may, under certain conditions described below, establish obligations for the State performing the unilateral act. Paragraph 1 of draft conclusion 15 addresses those cases in which the unilateral act, at the time of its performance, is in conflict with a peremptory norm of general international law (*jus cogens*). It provides that, in such cases, the unilateral act does not create any such obligation. This consequence of peremptory norms of general international law (*jus cogens*) mirrors those in the first sentence of paragraph 1 of conclusions 10 and 14 of the present draft conclusions, namely that no obligations come into existence at all.

(2)   Paragraph 1 of draft conclusion 15 is inspired by article 53 of the 1969 Vienna Convention.[179] The Commission, in its guiding principles applicable to unilateral declarations

---

[177]   For example, see the commentary to Part Four, as well as paragraph (4) of the commentary to conclusion 15, of the conclusions on identification of customary international law, *Official Records of the General Assembly, Seventy-third Session, Supplement No. 10* (A/73/10), p. 153.

[178]   The scope of this draft conclusion is thus broader than the scope of the 2006 guiding principles applicable to unilateral declarations of States capable of creating legal obligations, which "relate only to unilateral acts *stricto sensu*, i.e. those taking the form of formal declarations formulated by a State with the intent to produce obligations under international laws" (fifth preambular paragraph, *Yearbook ... 2006*, vol. II (Part Two), pp. 161 *et seq.*, paras. 176–177).

[179]   See the Guide to Practice on Reservations to Treaties (footnote 155 above), p. 224, paragraph (18) of the commentary to guideline 3.1.5.3, stating that it was true that "the rule prohibiting derogation from a rule of *jus cogens* applies not only to treaty relations, but also to all legal acts, including unilateral acts".

of States capable of creating legal obligations, formulated the rule in the following terms: "A unilateral declaration which is in conflict with a peremptory norm of general international law is void."[180] Although the guiding principles use the phrase "is void" in the context of a unilateral declaration, the present draft conclusion uses broader phrases, "does not create such an obligation" and "ceases to exist", so as to capture more fully the broader context of the draft conclusion, which is addressing unilateral acts in a broader sense. The focus is therefore on the legal obligations intended to be created by the unilateral act in question. As indicated in paragraph 1, such obligations are not created if they conflict with a peremptory norm of general international law (*jus cogens*).

(3)    Paragraph 2 concerns those cases in which a peremptory norm of general international law (*jus cogens*) emerges subsequent to the creation of an obligation under international law resulting from a unilateral act. The scope of this paragraph is different from that of paragraph 1 because paragraph 2 refers to obligations that have already been created by a unilateral act. Paragraph 2 provides that such an obligation would cease to exist if, subsequent to its creation, it comes into conflict with a new peremptory norm of general international law (*jus cogens*). Paragraph 2 of draft conclusion 15 mirrors paragraph 2 of draft conclusions 10 and 14. It recognizes that, in these circumstances, an obligation does come into existence and only ceases to exist at the time of the emergence of a new peremptory norm of general international law (*jus cogens*). The rule in paragraph 2 of draft conclusion 15 is inspired by article 64 of the 1969 Vienna Convention.

(4)    The obligations arising from a unilateral act that conflict with a new peremptory norm of general international law (*jus cogens*) emerging subsequent to the performance of the unilateral act cease to exist only to the extent that such obligations are inconsistent with the new peremptory norm of general international law (*jus cogens*). As in paragraph 2 of draft conclusion 14, the phrase "if and to the extent" is meant to indicate that only those aspects of the obligation in question that conflict with the peremptory norm of general international law (*jus cogens*) will cease to exist. Other aspects of the obligation would continue to exist and apply, but only if it is possible to maintain them in the absence of the aspects of the obligations that cease to exist.

(5)    Draft conclusion 15 does not concern all unilateral acts, nor does it concern all acts creating obligations. It is concerned with unilateral acts by a State undertaken with the intention to create obligations only for the State itself. This draft conclusion does not concern sources of obligations, such as treaties and customary international law, which are addressed in previous draft conclusions. Similarly, it does not address reservations, which are dealt with in draft conclusion 13. Moreover, draft conclusion 15 does not cover other acts in conflict with peremptory norms of general international law (*jus cogens*), which are addressed by other draft conclusions concerning responsibility for wrongful acts under international law. For example, a unilateral act that is not intended to create obligations on the State but that, nonetheless, constitutes a breach of a peremptory norm of general international law (*jus cogens*), is subject to conclusions 17, 18, 19 and 22 of the present draft conclusions. Draft conclusion 15 concerns only those unilateral acts by which a State manifests the intention to unilaterally assume obligations, and not other acts.[181]

(6)    Paragraph 1 of draft conclusion 15 describes the unilateral act under consideration as one "manifesting the intention to be bound by an obligation under international law". The State performing the unilateral act must thus intend to establish obligations under international law. This requires an ascertainment of the intention of the State performing a unilateral act. In *Frontier Dispute (Burkina Faso/Republic of Mali)*, the International Court of Justice determined that whether a unilateral act could create obligations "all depends on the intention of the State in question".[182] The words "manifesting the intention" intend to

---

[180]    Guiding principle 8 of the guiding principles applicable to unilateral declarations of States capable of creating legal obligations (see footnote 178 above), p. 165.

[181]    See the commentary to guiding principle 2 of the 2006 guiding principles applicable to unilateral declarations of States capable of creating legal obligations (*ibid.*, p. 162).

[182]    *Frontier Dispute (Burkina Faso/Republic of Mali), Judgment, I.C.J. Reports 1986*, p. 554, at p. 573, para. 39. See also *Nuclear Tests (Australia v. France), Judgment, I.C.J. Reports 1974*, p. 253, at p.

convey that, although it is the subjective intention of the State that is sought, this intention has to be determined from the overall facts and circumstances of each particular case.[183] The subjective intention is therefore to be sought by relying on objective facts. In the words of the International Court of Justice, whether a unilateral act was intended to create a legal obligation is to be "ascertained by interpretation of the act".[184] Likewise, paragraph 2 of draft conclusion 15 only applies to unilateral acts as described in paragraph (5) of this commentary.

(7)     Draft conclusion 15 applies to unilateral acts of States. Unilateral acts of international organizations that create or are intended to create obligations for that international organization are addressed in draft conclusion 16. The fact that draft conclusion 15 applies to unilateral acts of States is without prejudice to the possible legal consequences of peremptory norms of general international law (*jus cogens*) for unilateral acts of non-State actors.

(8)     The application of draft conclusion 15 is to be read together with the interpretative rule set out in draft conclusion 20 and the recommended procedure set forth in draft conclusion 21.

### Conclusion 16
### Obligations created by resolutions, decisions or other acts of international organizations conflicting with a peremptory norm of general international law (*jus cogens*)

A resolution, decision or other act of an international organization that would otherwise have binding effect does not create obligations under international law if and to the extent that they conflict with a peremptory norm of general international law (*jus cogens*).

### Commentary

(1)     Draft conclusion 16 concerns the legal consequences of peremptory norms of general international law (*jus cogens*) for resolutions, decisions and other acts of international organizations.

(2)     Draft conclusion 16 applies to resolutions, decisions or other acts of international organizations whatever their designation. The phrase "resolution, decision or other act" of an international organization is intended to convey the same meaning as the description of "resolution" in paragraph (2) of the commentary to conclusion 12 of the conclusions on identification of customary international law.[185] It also covers unilateral acts of international organizations manifesting an intention to be bound. The words "that would otherwise have binding effect" serve to limit the scope of the draft conclusion to resolutions, decisions and acts of international organizations that would ordinarily have binding effect, but for the conflict with the peremptory norm of general international law (*jus cogens*). Examples of a resolution, decision or act of an international organization that would otherwise have binding effect include a decision in a resolution of the Security Council,[186] taken under Chapter VII of the Charter of the United Nations,[187] or a decision of the General Assembly admitting a

---

267, para. 43 ("When it is the intention of the State making the declaration that it should become bound according to its terms, that intention confers on the declaration the character of a legal undertaking, the State being thenceforth legally required to follow a course of conduct consistent with the declaration").

[183]  *Frontier Dispute* (see footnote 182 above), p. 574, para. 40.

[184]  *Nuclear Tests (Australia v. France)* (see footnote 182 above), p. 267, para. 44.

[185]  See paragraph (2) of the commentary to conclusion 12 of the conclusions on identification of customary international law, *Official Records of the General Assembly, Seventy-third Session, Supplement No. 10* (A/73/10), p. 147.

[186]  By virtue of Article 25 of the Charter of the United Nations, which provides that the "Members of the United Nations agree to accept and carry out the decisions of the Security Council", the decisions of the Security Council under Chapter VII of the Charter of the United Nations are binding.

[187]  For the statements by States, see for example, Switzerland, on behalf of Germany, Sweden and Switzerland: "some courts have also expressed their willingness to ensure that Security Council decisions comply with" peremptory norms of general international law (*jus cogens*), "from which

State to membership in the Organization. The question of whether such a decision has binding effect (or is one that would otherwise have binding effect) is to be determined by an interpretation of the relevant decision.[188] The European Union also produces acts in the form of directives, regulations and decisions, which are binding on member States. Other international organizations, such as the International Civil Aviation Organization, the African Union and the World Trade Organization may also produce resolutions, decisions or other acts that, but for the rule set forth in this draft conclusion, would have binding effect. Draft conclusion 16 is thus meant to be broad, covering all resolutions, decisions and acts that would otherwise establish obligations under international law.

(3)      Following the language of draft conclusions 14 and 15, draft conclusion 16 states that resolutions, decisions and other acts, as described in paragraph (2) of this commentary, do not create obligations under international law if and to the extent that such obligations conflict with peremptory norms of general international law (*jus cogens*). As in paragraph 2 of draft conclusion 14 and paragraph 2 of draft conclusion 15, the words "if and to the extent" are meant to indicate that only those obligations that conflict with a peremptory norm of general international law (*jus cogens*) will be affected by the operation of the draft conclusion. Other obligations not in conflict with peremptory norms of general international law (*jus cogens*) will not be affected by the operation of draft conclusion 16. Provisions in a resolution, decision or other act of an international organization that are not in conflict with a peremptory norm of general international law (*jus cogens*) will continue to apply if they are separable.

(4)      The rule in draft conclusion 16, that a resolution, decision or act does not create obligations under international law if those obligations conflict with a peremptory norm of general international law (*jus cogens*), follows from the hierarchical superiority of

---

neither the Member States nor the United Nations may derogate" (S/PV.5446, p. 28); and Qatar: while, by virtue of Article 103 of the Charter of the United Nations, obligations flowing from Security Council resolutions supersede other obligations, this did not apply to peremptory norms of general international law (*jus cogens*) (S/PV.5779, p. 23). See also Argentina and Nigeria (S/PV.5474, p. 20; and S/PV.5474 (Resumption 1), p. 19, respectively); Finland, speaking on behalf of the Nordic countries (Denmark, Finland, Iceland, Norway and Sweden), observing that there was a "widely held view that the powers of the Security Council, albeit exceptionally wide, were limited by the peremptory norms of international law" (A/C.6/60/SR.18, para. 18); and the Islamic Republic of Iran (A/C.6/66/SR.7, para. 84). For other views by States, see the United States (A/C.6/60/SR.20, para. 36), which cautioned that "general pronouncements about the relationship" between peremptory norms of general international law (*jus cogens*) and obligations flowing from Article 103 of the Charter of the United Nations (of which the Security Council resolutions were a prominent example) "should be avoided"; the United Kingdom (A/C.6/73/SR.27, para. 73, citing paragraph 5 of the annex to the written statement), stating that there is no "State practice to support the contention that a State can refuse to comply with a binding [Security Council] resolution based on an assertion of a breach of a *jus cogens* norm"; and the Russian Federation (A/C.6/73/SR.26, para. 131), which emphasized that discussions on the issue of Security Council resolutions in connection with *jus cogens* norms "were not based on any practice", and that the draft conclusion could be misinterpreted in a way "which would undermine the activities of the Security Council". For the views of Courts see, for example, *R (On the Application of Al-Jedda) v. Secretary of State for Defence, Appeal Judgment of 12 December 2007*, House of Lords [2008] 3 All ER 28 (Lord Bingham), para. 35; *Youssef Nada v. State Secretariat for Economic Affairs and Federal Department of Economic Affairs* (see footnote 40 above), para. 7 ("Yet *jus cogens*, the peremptory law binding on all subjects of international law, marks the limit of the obligation to apply resolutions of the Security Council. For this reason, it must be determined whether, as the petitioner asserts, the resolutions of the Security Council containing the sanctions violate *jus cogens*"); *Prosecutor v. Duško Tadić, Case No. IT-94-1, Decision of 15 July 1999*, Appeals Chamber, International Criminal Tribunal for the Former Yugoslavia, para. 296; and *Yassin Abdullah Kadi v. Council of the European Union and Commission of the European Communities* (see footnote 46 above), para. 226 (on appeal, the European Court did not address the matter).

[188] *Legal Consequences for States of the Continued Presence of South Africa in Namibia* (see footnote 122 above), p. 53, para. 114 ("The language of a resolution of the Security Council should be carefully analysed before a conclusion can be made as to its binding effect. In view of the nature of the powers under Article 25, the question whether they have been in fact exercised is to be determined in each case, having regard to the terms of the resolution to be interpreted, the discussions leading to it, the Charter provisions invoked and, in general, all circumstances that might assist in determining the legal consequences of the resolution of the Security Council").

peremptory norms of general international law (*jus cogens*). If rules of international law that are inconsistent with peremptory norms of general international law (*jus cogens*) cannot be created through treaties, customary international law and unilateral acts, it follows that such rules cannot be created through resolutions, decisions or other acts of international organizations either. Obligations arising under the Charter of the United Nations, however, require additional consideration since, pursuant to Article 103, such obligations prevail in the event of conflict over other rules of international law.[189] If a resolution, decision or other act of the United Nations does not create obligations under international law due to a conflict with a peremptory norm of general international law (*jus cogens*) then no obligations arise that implicate Article 103. For this reason, considering the hierarchical superiority of peremptory norms of general international law (*jus cogens*), the Commission considered it important to highlight that draft conclusion 16 applies equally to binding resolutions, decisions and acts of the Security Council.

(5)    The application of the rule in draft conclusion 16 has to be read together with the interpretative rule set out in draft conclusion 20 and the procedures laid out in draft conclusion 21. While the procedural rules laid out in draft conclusion 21 apply also to other sources of obligations, these are particularly important in relation to resolutions of the United Nations adopted under Chapter VII of the Charter of the United Nations.[190] Draft conclusion 16 should therefore not be read as providing cover for unilateral repudiation of obligations flowing under binding resolutions of the United Nations. Indeed, while the commentary states that Security Council resolutions are covered by draft conclusion 16, the Commission is conscious that it is highly unlikely that a Security Council resolution would, on its face, be in conflict with a peremptory norm of general international law (*jus cogens*).[191] Thus, in the first place, before determining that there is a conflict between a Security Council decision and a peremptory norm of general international law (*jus cogens*), the rule of interpretation contained in draft conclusion 20 should be applied in order to avoid, where possible, such a conflict.[192] Second, prior to adopting any measure on the strength of a belief that a binding Security Council resolution is in conflict with a peremptory norm of general international law (*jus cogens*), a State should follow the procedure set forth in draft conclusion 21.

### Conclusion 17
### Peremptory norms of general international law (*jus cogens*) as obligations owed to the international community as a whole (obligations *erga omnes*)

1.    Peremptory norms of general international law (*jus cogens*) give rise to obligations owed to the international community as a whole (obligations *erga omnes*), in relation to which all States have a legal interest.

2.    Any State is entitled to invoke the responsibility of another State for a breach of a peremptory norm of general international law (*jus cogens*), in accordance with the rules on the responsibility of States for internationally wrongful acts.

---

[189]  Article 103 of the Charter of the United Nations provides that "[i]n the event of a conflict between the obligations of the Members of the United Nations under the present Charter and their obligations under any other international agreement, their obligations under the present Charter shall prevail". While this provision speaks only of international agreements, it has been interpreted as applying to customary international law and certainly to resolutions, decisions and acts of other international organizations. See, for discussion, the report of the Study Group on the fragmentation of international law (finalized by Martti Koskenniemi) (footnote 54 above), paras. 344–345, especially at para. 345 ("Therefore it seems sound to join the prevailing opinion that Article 103 should be read extensively – so as to affirm that [C]harter obligations prevail also over United Nations Member States' customary law obligations").

[190]  See, on the importance of the procedural rules for the application of peremptory norms of general international law (*jus cogens*), M. Wood, "The unilateral invocation of *jus cogens* norms", *in* Tladi (ed.), *Peremptory Norms of General International Law (*Jus Cogens*)…* (footnote 26 above), pp. 366–385.

[191]  See D. Costelloe, "Peremptory norms and resolutions of the United Nations Security Council", *ibid.*, at pp. 441–467.

[192]  *Ibid.*, at p. 444 ("Interpretation of the Security Council resolution in its context and in light of other applicable rules of international law may already provide an answer").

**Commentary**

(1)      Draft conclusion 17 addresses obligations *erga omnes*. It consists of two paragraphs. Paragraph 1 states that peremptory norms of general international law (*jus cogens*) give rise to obligations owed to the international community as a whole (obligations *erga omnes*). The relationship between peremptory norms of general international law (*jus cogens*) and obligations *erga omnes* has been recognized in the practice of States. The Democratic Republic of the Congo, for example, in a statement in the Sixth Committee of the General Assembly, proposed a treaty on the prohibition of the use of force and stated that the proposed treaty should have an *erga omnes* effect in view of the fact that the prohibition of the use of force was a peremptory norm of general international law (*jus cogens*).[193] Similarly, the Czech Republic stated that "*jus cogens* obligations were *erga omnes* obligations, which did not allow for any derogation, including by means of an agreement".[194] The Federal Court of Australia, in *Nulyarimma and Others v. Thompson*, also accepted the contention of the parties that "the prohibition of genocide is a peremptory norm of customary international law (*jus cogens*) giving rise to non derogable obligations *erga omnes* that is, enforcement obligations owed by each nation State to the international community as a whole".[195] Similarly, in *Kane v. Winn*, the United States District Court for the District of Massachusetts determined that "the prohibition against torture" is an obligation *erga omnes* that, "as [a] *jus cogens* [norm is] 'non-derogable and peremptory'".[196] The Federal Constitutional Court of Germany has also stated that norms that are part of *jus cogens* enjoy *erga omnes* effect.[197]

(2)      The International Court of Justice has not explicitly pronounced that a link exists between peremptory norms of general international law (*jus cogens*) and obligations *erga omnes*. Nevertheless, such a link could be deduced from some of its judgments and advisory opinions. First, every norm described by the Court[198] as one having an *erga omnes* character is also one that has been included in the non-exhaustive list of norms previously referred to by the Commission as having peremptory status. This list is reproduced in the annex to the present draft conclusions. Second, the Court has applied the legal consequences under article

---

[193]  The Democratic Republic of the Congo (formerly known as Zaire) (A/C.6/35/SR.32, para. 38). See also the statement of the Netherlands at the 25th meeting of the Sixth Committee during the forty-ninth session of the General Assembly, in which it stated that "an international crime would always involve a breach of a *jus cogens* or *erga omnes* obligation" (A/C.6/49/SR.25, para. 38).

[194]  Czech Republic (A/C.6/49/SR.26, para. 19). See also Burkina Faso (A/C.6/54/SR.26).

[195]  *Nulyarimma and Others v. Thompson, Appeal Decision of 1 September 1999*, [1999] FCA 1192, 165 ALR 621, 96 FCR 153, ILDC 2773 (AU 1999), para. 81.

[196]  *Kane v. Winn*, United States District Court for the District of Massachusetts, 319 F. Supp. 2d 162, 199 (D. Mass. 2004). See also *R and Office of the United Nations High Commissioner for Refugees v. Secretary of State for Foreign and Commonwealth Affairs and Secretary of State for Home Affairs, Appeal Judgment of 12 October 2006 of the High Court*, [2006] ALL ER (D) 138, para. 102, referring to "*ius cogens erga omnes*".

[197]  *Jorgić Case* (see footnote 57 above), at para. 17.

[198]  See, for example, *Legal Consequences of the Separation of the Chagos Archipelago from Mauritius in 1965, Advisory Opinion of 25 February 2019, I.C.J. Reports 2019*, p. 95, at p. 139, para. 180 (viewing the right of self-determination as having an *erga omnes* character). See also *East Timor (Portugal v. Australia)* (footnote 132 above), p. 102, para. 29, in which the Court described the statement that self-determination had an *erga omnes* character as being "irreproachable". In *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Croatia v. Serbia)* (see footnote 15 above), the Court affirmed "that the Genocide Convention contains obligations *erga omnes*" and "that the prohibition of Genocide has the character of a peremptory norm (*jus cogens*)" (*ibid.*, p. 47, para. 87). See also *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia v. Myanmar)* (footnote 17 above); *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (footnote 132 above), paras. 88, 149 and 155; and *Barcelona Traction* (*ibid.*), p. 32, paras. 33–34, in which the Court determined "obligations [that] derive … from the outlawing of acts of aggression, and of genocide … [and] including protection from slavery and racial discrimination". See also conclusion (33) of the conclusions of the Study Group on the fragmentation of international law (footnote 54 above). The conclusions also appear in *Yearbook … 2006*, vol. II (Part Two), para. 251. Although in the context of *erga omnes inter partes*, see also *Application of the Convention on the Prevention and Punishment of the Crime of Genocide. Provisional Measures (The Gambia v. Myanmar)* (footnote 17 above).

41 of the articles on responsibility of States for internationally wrongful acts (which concern breaches of peremptory norms) to breaches of such *erga omnes* obligations.[199] The Commission itself has been more explicit in recognizing a close relationship between obligations *erga omnes* and peremptory norms of general international law (*jus cogens*).[200] The relationship between peremptory norms and obligations *erga omnes* has also been recognized in scholarly writings.[201]

(3)    Although all peremptory norms of general international law (*jus cogens*) give rise to obligations *erga omnes,* it is widely considered that not all obligations *erga omnes* arise from peremptory norms of general international law (*jus cogens*).[202] For example, certain rules relating to common spaces, in particular common heritage regimes, may produce *erga omnes* obligations independent of whether they have peremptory status. The International Tribunal for the Law of the Sea determined that the obligations of States parties relating to preservation of the environment of the high seas and the deep seabed under the 1982 United Nations Convention on the Law of the Sea had an *erga omnes* character.[203]

(4)    Paragraph 1 of draft conclusion 17 is intended to capture, in a general way, the relationship described above between peremptory norms of general international law (*jus cogens*) and obligations *erga omnes*. It states that peremptory norms of general international law (*jus cogens*) "give rise to" obligations *erga omnes*. This wording is based on the Commission's articles on responsibility of States for internationally wrongful acts, in which obligations *erga omnes* are described as including those obligations which "arise under

---

[199]  See the articles on responsibility of States for internationally wrongful acts (*Yearbook ... 2001*, vol. II (Part Two) and corrigendum, para. 76, and the commentaries thereto, para. 77). The articles also appear in General Assembly resolution 56/83 of 12 December 2001, annex, as modified by A/56/49(Vol. I)/Corr.4. See, in particular, *Legal Consequences of the Separation of the Chagos Archipelago from Mauritius in 1965* (footnote 198 above), at p. 139, para. 180; and *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (footnote 132 above), para. 159.

[200]  See Part Two, chapter III, of the articles on responsibility of States for internationally wrongful acts, especially paragraph (4) of the general commentary to that chapter, in which "the recognition of the concept of peremptory norms of international law" is said to be a development "closely related" to obligations *erga omnes*, and paragraph (7) of the general commentary, in which the Commission states that "there is at the very least substantial overlap between" obligations *erga omnes* and peremptory norms of general international law (*jus cogens*) (*Yearbook … 2001*, vol. II (Part Two) and corrigendum, pp. 111–112).

[201]  See, for example, R. J. Barber, "Cooperating through the General Assembly to end serious breaches of peremptory norms", *International and Comparative Law Quarterly*, vol. 71 (2022), pp. 1–35, at p. 4; A. Pigrau, "Peremptory norms in the advisory opinion of the International Court of Justice on the decolonisation of Mauritius and the Chagos Archipelago", *in* T. Burri and J. Trinidad (eds.), *The International Court of Justice and Decolonisation: New Directions from the* Chagos *Advisory Opinion*, Cambridge University Press, 2021, at p. 119; Ene (footnote 55 above), at p. 302; M. Cherif Bassiouni, "International crimes: *jus cogens* and *obligatio erga omnes*" (footnote 141 above); I. Scobbie, "The invocation of responsibility for the breach of 'obligations under peremptory norms of general international law'", *European Journal of International Law*, vol. 13, No. 5 (2002), p. 1210 ("Following *Barcelona Traction*, the Commission has taken the view that peremptory norms and obligations 'owed to the international community as a whole' are essentially two sides of the one coin"); F. Forrest Martin, "Delineating a hierarchical outline of international law sources and norms", *Saskatchewan Law Review*, vol. 65 (2002), p. 353; S. Villalpando, *L'émergence de la communauté internationale dans la responsabilité des États*, Paris, Presses Universitaires de France, 2005, p. 106; Tomuschat, "Reconceptualizing the debate …" (footnote 55 above), p. 430; A. Pellet, "Conclusions", *in* Tomuschat and Thouvenin (*ibid*.); and M. M. Bradley, "*Jus cogens'* preferred sister: obligations *erga omnes* and the International Court of Justice–fifty years after *Barcelona Traction* case", *in* Tladi (ed.), *Peremptory Norms of General International Law (*Jus Cogens*)…* (footnote 26 above), pp. 193–226.

[202]  See, for example, Villalpando (footnote 201 above); Forrest Martin (footnote 201 above); and P. Lorenzo, "The protection of the environment as an imperative norm of international law (*jus cogens*)", *Revista de derecho de la Universidad de Montevideo*, vol. 37 (2020), pp. 41–69, at p. 48.

[203]  *Responsibilities and Obligations of States sponsoring persons and entities with respect to activities in the area, Advisory Opinion*, ITLOS [*International Tribunal for the Law of the Sea*] *Reports 2011*, at p. 59, para. 180.

peremptory norms of general international law".[204] The phrase "in relation to which all States have a legal interest" describes the main consequence of the *erga omnes* character of peremptory norms of general international law (*jus cogens*).[205] The words "legal interest" encompass the protection of the legal norm as such, including rights and obligations.

(5)    The phrase "in relation to which" is intended to capture the variety of ways that States may have an interest in obligations *erga omnes* (including obligations *erga omnes partes*). In *Barcelona Traction*, for example, the International Court of Justice referred to the legal interest in the "protection" of the rights covered by *erga omnes* obligations.[206] That formulation has also been used in *Questions Relating to the Obligation to Prosecute or Extradite*,[207] the advisory opinion on *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*,[208] the advisory opinion on *Legal Consequences of the Separation of the Chagos Archipelago from Mauritius in 1965*[209] and the *East Timor (Portugal v. Australia)* judgment.[210] In its judgment in the *Barcelona Traction* case, which has been subsequently reiterated, the Court referred to the legal interest of all States in the "observance" of the obligation in question.[211] The notion that all States have an interest in the "observance" or "compliance" with the obligation has also been reflected in *Questions Relating to the Obligation to Prosecute or Extradite*[212] and in *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia v. Myanmar)*.[213] The Court has also referred to the legal interest of States in the prevention of acts covered by *erga omnes* obligations.[214] In its advisory opinion on *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide*, the Court referred to the "common interest" in the "accomplishment of those high purposes which are the *raison d'être* of the

---

[204]   Paragraph (7) of the general commentary to Part Two, chapter III, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, pp. 111–112.

[205]   *Legal Consequences of the Separation of the Chagos Archipelago from Mauritius in 1965* (see footnote 198 above), at p. 139, para. 180 ("all States have a legal interest in protecting that right"); and *Barcelona Traction* (see footnote 132 above), p. 32, para. 33 ("all States can be held to have a legal interest in their protection)". See also *Prosecutor v. Blaškić, Case No. IT-95-14-AR108* bis, *Judgment on the request of the Republic of Croatia for review of the Decision of Trial Chamber II of 18 July 1997, Judgment of 29 October 1997*, Appeals Chamber, International Criminal Tribunal for the Former Yugoslavia, ILR, vol. 110 (1998), p. 688, at para. 26 ("Article 29 [of the Statute of the International Criminal Tribunal for the Former Yugoslavia] imposes an 'obligation *erga omnes partes*' … . By the same token, Article 29 posits a community interest in its observance. In other words, every Member State of the United Nations has a legal interest in the fulfilment of the obligation laid down in Article 29").

[206]   See *Barcelona Traction* (footnote 132 above), p. 32, para. 33.

[207]   *Questions Relating to the Obligation to Prosecute or Extradite* (see footnote 80 above), at p. 449, para. 68 ("These obligations may be defined as 'obligations *erga omnes partes*' in the sense that each State party has an interest in compliance with them in any given case").

[208]   See *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (footnote 132 above), at para. 155.

[209]   See *Legal Consequences of the Separation of the Chagos Archipelago from Mauritius in 1965* (footnote 198 above), at p. 139, para. 180.

[210]   See *East Timor (Portugal v. Australia)* (footnote 132 above), p. 102, para. 29.

[211]   See *Barcelona Traction* (footnote 132 above), at p. 32, para. 35 ("It cannot be held, when one such obligation in particular is in question [diplomatic protection], in a specific case, that all States have a legal interest in its observance."). See also *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia v. Myanmar)*, Preliminary Objections, International Court of Justice, Judgment of 22 July 2022, para. 107.

[212]   *Questions Relating to the Obligation to Prosecute or Extradite* (see footnote 80 above), at p. 449, para. 68 ("These obligations may be defined as 'obligations *erga omnes partes*' in the sense that each State party has an interest in compliance with them in any given case").

[213]   *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia v. Myanmar)* (see footnote 17 above), at p. 17, para. 41 ("these provisions generated 'obligations [which] may be defined as "obligations *erga omnes partes*" in the sense that each State party has an interest in compliance with them in any given case'").

[214]   *Ibid.* ("In view of their shared values, all the States parties to the Genocide Convention have a common interest to ensure that acts of genocide are prevented and that, if they occur, their authors do not enjoy impunity").

convention".[215] The phrase "in relation to which" is intended to capture all these different formulations.

(6)    Paragraph 2 of draft conclusion 17 builds on paragraph 1 by describing a distinct consequence of the connection between obligations *erga omnes* and peremptory norms of general international law (*jus cogens*). It describes, in more precise terms, the implications of the phrase "in which all States have a legal interest" in paragraph 1. This consequence is that any State is entitled to invoke the responsibility of another State for the latter's breach of a peremptory norm of general international law (*jus cogens*). The words used in paragraph 2 of draft conclusion 17 follow the text of article 48 of the Commission's articles on responsibility of States for internationally wrongful acts, which provides that "[a]ny State … is entitled to invoke the responsibility of another State … if … the obligation breached is owed to the international community as a whole".[216]

(7)    The rule contained in paragraph 2 of draft conclusion 17 is consistent with judicial decisions of international courts and tribunals. In *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia v. Myanmar)*, the International Court of Justice determined that a State party to the Convention on the Prevention and Punishment of the Crime of Genocide, even if not "a specially affected State, may invoke the responsibility of another State party" in respect of "the alleged failure to comply with its obligations *erga omnes partes*".[217] On this basis, the Court concluded that the Gambia had *prima facie* standing to submit a dispute concerning violations of the obligations under the Convention, alleged to have been committed in Myanmar, even though it was not specially affected by those breaches.[218] The Court subsequently confirmed that the Gambia had standing to invoke the responsibility of Myanmar for alleged violations of its obligations under the Convention.[219] While the case concerned obligations *erga omnes partes*, the principle applies equally to *erga omnes* obligations generally. Similarly, in *Responsibilities and Obligations of States Sponsoring Persons and Entities*, the International Tribunal for the Law of the Sea determined that each State party to the Convention might be entitled to submit a claim for damage, "in light of the *erga omnes* character of the obligations relating to preservation of the environment of the high seas and in the Area".[220]

(8)    According to paragraph 2 of draft conclusion 17, the right of a State to invoke the responsibility of another State for the latter's breach of a peremptory norm of general international law (*jus cogens*) is to be exercised in accordance with the rules on responsibility of States for internationally wrongful acts. This qualification is intended to emphasize the distinction between the invocation of responsibility by an injured State and the invocation of responsibility by any other State. Under the articles on responsibility of States for internationally wrongful acts, the right of an injured State to invoke the responsibility of another State for the breach of a peremptory norm of general international law (*jus cogens*) is to be exercised according to article 42, whereas any State other than an injured State is entitled to invoke the responsibility for such a breach under article 48.[221] A State other than an injured State may claim "cessation of the internationally wrongful act, and assurances and

---

[215]    *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide* (footnote 14 above), at p. 23.

[216]    Article 48, paragraph 1 (*b*), *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 126.

[217]    *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia v. Myanmar)* (see footnote 17 above), p. 17, para. 41. In the Preliminary Objections phase, the Court used the term "special interest": *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia v. Myanmar)*, Preliminary Objections (see footnote 211 above), para. 108.

[218]    See *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia v. Myanmar)* (see footnote 17 above), p. 17, para. 42; *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia v. Myanmar)*, Preliminary Objections (see footnote 211 above), para. 108.

[219]    *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia v. Myanmar)*, Preliminary Objections (see footnote 211 above), para. 114.

[220]    *Responsibilities and Obligations of States Sponsoring Persons and Entities* (see footnote 203 above), at p. 59, para. 180.

[221]    See *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 126, paragraph (1) of the commentary to article 48.

guarantees of non-repetition".[222] When invoking the responsibility of another State in its capacity as an injured State, the injured State is entitled to claim all the forms of reparation provided for in chapter II of Part Two of the articles on responsibility of States for internationally wrongful acts. In contrast, a State other than an injured State may only claim "performance of the obligation of reparation … in the interest of the injured State or of the beneficiaries of the obligation breached" and not for its own benefit.[223]

(9)    While draft conclusion 17 provides for the entitlement of States to invoke the responsibility of other States, it is without prejudice to the rules of international law concerning the invocation of the responsibility of other actors. Draft conclusion 17 is also without prejudice to the entitlement of international organizations to invoke the responsibility of States or other international organizations.[224]

### Conclusion 18
### Peremptory norms of general international law (*jus cogens*) and circumstances precluding wrongfulness

No circumstance precluding wrongfulness under the rules on the responsibility of States for internationally wrongful acts may be invoked with regard to any act of a State that is not in conformity with an obligation arising under a peremptory norm of general international law (*jus cogens*).

## Commentary

(1)    Draft conclusion 18 addresses circumstances precluding wrongfulness in relation to a breach of a peremptory norm of general international law (*jus cogens*). As a general rule, the existence of certain circumstances can serve to preclude the wrongfulness of an act of a State that would otherwise be unlawful.[225] Draft conclusion 18 sets out an exception to this general rule on responsibility under international law by providing that where the breach in question concerns a peremptory norm of general international law (*jus cogens*), the circumstances precluding wrongfulness may not be invoked.

(2)    Draft conclusion 18 is based on article 26 of the articles on responsibility of States for internationally wrongful acts,[226] which excludes the invocation of grounds precluding wrongfulness, as spelled out in chapter V of Part One of the articles, for any act that is not in conformity with an obligation arising under a peremptory norm of general international law (*jus cogens*). The effect of this rule is that, where the responsibility of a State for a breach of a peremptory norm of general international law (*jus cogens*) is invoked, the State against which the breach is invoked cannot seek to excuse itself from responsibility by raising any circumstance that might ordinarily preclude wrongfulness. This applies even where the circumstance precluding wrongfulness itself involves a peremptory norm of general international law (*jus cogens*). As the Commission has previously stated, a genocide cannot be invoked as a justification for the commission of a counter-genocide.[227]

(3)    This rule was applied in *Bernhard von Pezold and others v. Republic of Zimbabwe* where a Tribunal of the International Centre for Settlement of Investment Disputes (ICSID) held that Zimbabwe could not raise any of the grounds precluding wrongfulness, in that case necessity, for breaches of the prohibition of discrimination, which the Tribunal described as an obligation *erga omnes*.[228] While the Tribunal did not conclude that prohibition of racial discrimination is a peremptory norm of general international law (*jus cogens*), it did rely on

---

[222]    *Ibid.*, art. 48, para. 2 (*a*).

[223]    *Ibid.*, art. 48, para. 2 (*b*).

[224]    *Yearbook … 2011*, vol. II (Part Two), pp. 89–91.

[225]    See, generally, Part One, chapter V, of the articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, pp. 71 *et seq*. Paragraph (1) of the general commentary to Part One, chapter V, states that the existence of these grounds "provides a shield against an otherwise well-founded claim for the breach of an international obligation" (*ibid.*, p. 71).

[226]    *Ibid.*, pp. 84–85.

[227]    See *ibid.*, p. 85, paragraph (4) of the commentary to article 26.

[228]    See *Bernhard von Pezold and others v. Republic of Zimbabwe*, Case No. ARB/10/15, *Award of 28 July 2015*, ICSID, at para. 657.

article 26 of the articles on responsibility of States for internationally wrongful acts for its finding that necessity was not available for Zimbabwe.[229] In another award, in *CMS Gas Transmission Company v. the Argentine Republic*, the ICSID Tribunal found that it could not refuse to admit necessity because a peremptory norm of general international law (*jus cogens*) was not in issue.[230] The Federal Constitutional Court of Germany also stated, on the strength of article 26, that circumstances precluding wrongfulness did not apply to obligations arising from peremptory norms of general international law (*jus cogens*).[231]

(4)     Article 26 of the articles on the responsibility of international organizations[232] also provides that the wrongfulness of an act of an international organization not in conformity with a peremptory norm of general international law (*jus cogens*) will not be precluded by the invocation of a circumstance precluding the wrongfulness of that act.

### Conclusion 19
### Particular consequences of serious breaches of peremptory norms of general international law (*jus cogens*)

1.     States shall cooperate to bring to an end through lawful means any serious breach by a State of an obligation arising under a peremptory norm of general international law (*jus cogens*).

2.     No State shall recognize as lawful a situation created by a serious breach by a State of an obligation arising under a peremptory norm of general international law (*jus cogens*), nor render aid or assistance in maintaining that situation.

3.     A breach of an obligation arising under a peremptory norm of general international law (*jus cogens*) is serious if it involves a gross or systematic failure by the responsible State to fulfil that obligation.

4.     This draft conclusion is without prejudice to the other consequences that any breach by a State of an obligation arising under a peremptory norm of general international law (*jus cogens*) may entail under international law.

**Commentary**

(1)     Draft conclusion 19 concerns particular consequences of serious breaches of obligations arising under peremptory norms of general international law (*jus cogens*). It is based on article 41 of the articles on responsibility of States for internationally wrongful acts. Draft conclusion 19 is concerned only with "additional consequences" arising from serious breaches of peremptory norms of general international law (*jus cogens*).[233] It does not address consequences arising from breaches of rules of international law that are not of a peremptory character, nor does it address the consequences of breaches of peremptory norms that are not serious in nature.

(2)     The first particular consequence of serious breaches of obligations arising under peremptory norms of general international law (*jus cogens*) is provided in paragraph 1 of draft conclusion 19. Paragraph 1 of the draft conclusion, which is based on article 41, paragraph 1, of the articles on responsibility of States for internationally wrongful acts, provides that States shall cooperate to bring to an end serious breaches of obligations arising under peremptory norms of general international law (*jus cogens*). The obligation to "cooperate to bring to an end through lawful means" serious breaches of peremptory norms of general international law (*jus cogens*) builds on the general obligation to cooperate under

---

[229]   *Ibid.*
[230]   *CMS Gas Transmission Company v. the Argentine Republic, Case No. ARB/01/08, Award of 12 May 2005*, ICSID, at para. 325.
[231]   See *Order of 26 October 2004*, Federal Constitutional Court of Germany (footnote 25 above), para. 121.
[232]   *Yearbook … 2011*, vol. II (Part Two), p. 75.
[233]   See *Yearbook … 2001*, vol. II (Part Two) and corrigendum, paragraph (7) of the general commentary to Part Two, chapter III, of the articles on responsibility of States for internationally wrongful acts, pp. 111–112. See also C. Gutiérrez Espada, *De la alargada sombra del 'ius cogens'*, Granada, Comares, 2021, p. 3.

international law.[234] Although at the time of the adoption of its articles on responsibility of States for internationally wrongful acts, the Commission expressed some doubt as to whether the obligation expressed in paragraph 1 of article 41 constituted customary international law,[235] the obligation to cooperate to bring to an end serious breaches of obligations arising under peremptory norms of general international law (*jus cogens*) is now recognized under international law.

(3)      This obligation has been recognized in judicial decisions. The United Kingdom House of Lords in *A, Amnesty International (intervening) and Commonwealth Lawyers Association (intervening) v. Secretary of State for the Home Department*, for example, referred explicitly to the obligation under international law "to cooperate to bring to an end through lawful means any serious breach of an obligation under a peremptory norm of general international law", and cited both article 41 of the articles on responsibility of States for internationally wrongful acts and the advisory opinion of the International Court of Justice on *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*.[236] The Federal Constitutional Court of Germany, in a 2004 order, referred to the articles on responsibility of States for internationally wrongful acts when setting out the duty to cooperate.[237]

(4)      An example from a regional court can be found in the *Case of La Cantuta v. Peru*, wherein the Inter-American Court of Human Rights identified "the duty of cooperation among States for" the purpose of eradicating breaches as itself a consequence of breaches of obligations arising under peremptory norms of general international law (*jus cogens*).[238]

(5)      In its advisory opinion on *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, the Court determined that there is an obligation to cooperate to bring to an end breaches of "obligations to respect the right … to self-determination, and certain … obligations under international humanitarian law".[239] The Court determined that one of the obligations arising from the breaches of such obligations was an obligation on other States "while respecting the [Charter of the United Nations] and international law, to see to it that any impediment, resulting from" the breaches are "brought to an end".[240] Similarly, in its advisory opinion on *Legal Consequences of the Separation of the Chagos Archipelago from Mauritius in 1965*, the Court determined that all States "must co-operate

---

[234] See, for example, the Declaration on Principles of International Law Concerning Friendly Relations and Cooperation among States in accordance with the Charter of the United Nations, General Assembly resolution 2625 (XXV) of 24 October 1970, annex, para. 1 ("States have the duty to cooperate with one another, irrespective of the differences in their political, economic and social systems, in the various spheres of international relations, in order to maintain international peace and security and to promote international economic stability and progress, the general welfare of nations and international cooperation free from discrimination based on such differences"). See also the draft articles on the protection of persons in the event of disasters, *Yearbook … 2016*, vol. II (Part Two), paragraph (1) of the commentary to draft article 7, p. 37 ("The duty to cooperate is well established as a principle of international law and can be found in numerous international instruments").

[235] See paragraph (3) of the commentary to article 41 of the articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 114.

[236] *A, Amnesty International (intervening) and Commonwealth Lawyers Association (intervening) v. Secretary of State for the Home Department, Judgment of the House of Lords of 8 December 2005*, [2006] 1 All ER 575, para. 34.

[237] See *Order of 26 October 2004*, Federal Constitutional Court of Germany (footnote 25 above), para. 98.

[238] *Case of La Cantuta v. Peru, Merits, Reparations and Costs, Judgment of 29 November 2006*, Inter-American Court of Human Rights, para. 160 ("As pointed out repeatedly, the acts involved in the instant case have violated peremptory norms of international law (*jus cogens*). … In view of the nature and seriousness of the events … the need to eradicate impunity reveals itself to the international community as a duty of cooperation among states").

[239] *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (see footnote 132 above), para. 155.

[240] *Ibid.*, para. 159.

with the United Nations" to bring to an end the breach of obligations arising from the right of self-determination.[241]

(6)     While in both advisory opinions on *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* and on *Legal Consequences of the Separation of the Chagos Archipelago from Mauritius in 1965* the Court does not make an explicit reference to peremptory norms of general international law (*jus cogens*), the norms to which the Court attached the duty to cooperate to bring to an end serious breaches are peremptory in character. As noted above in the commentary to draft conclusion 17, paragraphs 1 and 2, there is a significant overlap between peremptory norms of general international law (*jus cogens*) and obligations *erga omnes* such that the deduction that the Court in these decisions was referring to peremptory norms of general international law (*jus cogens*) is not unwarranted.[242] A similar deduction, that the International Court of Justice was referring to peremptory norms, was made by the House of Lords in *A, Amnesty International (intervening) and Commonwealth Lawyers Association (intervening) v. Secretary of State for the Home Department*.[243] At any rate, since in judicial decisions *erga omnes* obligations have been said to produce the duty to cooperate to bring to an end all serious breaches, given the character and importance of the rights and obligations involved,[244] and since all peremptory norms of general international law (*jus cogens*) produce *erga omnes* obligations, it follows that all peremptory norms would also produce this duty.

(7)     The obligation to cooperate to bring to an end serious breaches of obligations arising under peremptory norms of general international law (*jus cogens*) is to be carried out "through lawful means". This means that the breach of a peremptory norm of general international law (*jus cogens*) may not serve as a justification for the breach of other rules of international law. Although international law does not prohibit unilateral measures to bring to an end a serious breach of a peremptory norm of general international law (*jus cogens*) if such unilateral measures are consistent with international law, the emphasis in paragraph 1 of draft conclusion 19 is on collective measures. This is the essence of "cooperation".[245]

(8)     Depending on the type of breach and the type of the peremptory norm in question, the collective system of the United Nations is the preferred framework for cooperative action.[246] It is for this reason that, in light of the determination by the International Court of Justice of a breach of "self-determination" and "basic principles of humanitarian law", the Court stated that "the United Nations, and especially the General Assembly and the Security Council, should consider what further action is required to bring to an end the illegal situation".[247] Similarly, in its advisory opinion on *Legal Consequences of the Separation of the Chagos Archipelago from Mauritius in 1965*, the Court referred to the obligation of "all Member

---

[241] *Legal Consequences of the Separation of the Chagos Archipelago from Mauritius in 1965* (see footnote 198 above), at pp. 139–140, para. 182.

[242] See Pigrau (see footnote 201 above), at p. 129.

[243] *A, Amnesty International (intervening) and Commonwealth Lawyers Association (intervening) v. Secretary of State for the Home Department* (see footnote 236 above).

[244] See, for example, *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (footnote 132 above), para. 159.

[245] See, for example, paragraph (3) of the commentary to article 41 of the articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 114 ("What is called for in the face of serious breaches is a joint and coordinated effort by all States to counteract the effects of these breaches").

[246] See, for example, article VIII of the Convention on the Prevention and Punishment of the Crime of Genocide (Paris, 9 December 1948, *ibid.*, vol. 78, No. 1021, p. 277) ("Any Contracting Party may call upon the competent organs of the United Nations to take such action under the Charter of the United Nations as they consider appropriate for the prevention and suppression of acts of genocide or any of the other acts enumerated in article III"), and article VIII of the International Convention on the Suppression and Punishment of the Crime of Apartheid (New York, 30 November 1973, United Nations, *Treaty Series*, vol. 1015, No. 14861, p. 243) ("Any State Party to the present Convention may call upon any competent organ of the United Nations to take such action under the Charter of the United Nations as it considers appropriate for the prevention and suppression of the crime of apartheid").

[247] *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (see footnote 132 above), para. 160.

States" to "co-operate with the United Nations" to end the breach in question.[248] Other international organizations may also adopt measures, consistent with international law, to bring to an end serious breaches of peremptory norms of general international law (*jus cogens*) if their mandates permit them to do so.[249]

(9)    There are numerous examples of resolutions of organs of international organizations, in particular the United Nations, that illustrate the duty to cooperate to bring to an end serious breaches of obligations that are widely recognized as arising from peremptory norms of general international law (*jus cogens*). These include resolutions condemning breaches of

---

[248]   *Legal Consequences of the Separation of the Chagos Archipelago from Mauritius in 1965* (see footnote 198 above), pp. 139–140, para. 182.

[249]   See, for example, art. 4, subpara. (*h*), of the Constitutive Act of the African Union (Lomé, 11 July 2000, United Nations, *Treaty Serie*s, vol. 2158, No. 37733, p. 3) ("the right of the Union to intervene in a Member State pursuant to a decision of the Assembly in respect of grave circumstances, namely war crimes, genocide and crimes against humanity"). See also Treaty on the European Union (consolidated version), *Official Journal*, C 326, p. 13, 26 October 2012, arts. 21, para. 2, and 29. See further Treaty on the Functioning of the European Union (consolidated version), *Official Journal*, C 326, p. 47, 26 October 2012, art. 215. See further Regulation (EU) 2018/1727 of the European Parliament and the Council of 14 November 2018, replacing and repealing Council Decision 2002/187/JHA, *Official Journal*, L 295, p. 138, 21 November 2018, and Regulation (EU) 2022/838 of the European Parliament and the Council of 30 May 2022 amending Regulation (EU) 2018/1727, *Official Journal*, L 148, p. 1, 31 May 2022.

such obligations,[250] resolutions calling for the cessation of breaches of such obligations,[251] and resolutions establishing accountability mechanisms to address such breaches.[252]

---

[250] See General Assembly resolution 2022 (XX) of 5 November 1965, para. 4 ("Condemns the policies of racial discrimination and segregation practised in Southern Rhodesia, which constitute a crime against humanity"); General Assembly resolution 2184 (XXI) of 12 December 1966, para. 3 ("Condemns, as a crime against humanity, the policy of the Government of Portugal, which violates the economic and political rights of the indigenous population by the settlement of foreign immigrants in the Territories and by the exporting of African workers to South Africa"); General Assembly resolution ES-8/2 of 14 September 1981, para. 4 ("Strongly condemns South Africa for its continued illegal occupation of Namibia"); General Assembly resolution 36/27 of 13 November 1981, concerning Israeli aggression against Iraqi nuclear installations, para. 1 ("Strongly condemns Israel for its premeditated and unprecedented act of aggression in violation of the Charter of the United Nations and the norms of international conduct"); General Assembly resolution 38/7 of 2 November 1983, para. 1 ("Deeply deplores the armed intervention in Grenada which constitutes a flagrant violation of international law and of the independence, sovereignty and territorial integrity of that State"); General Assembly resolution 41/35 A of 10 November 1986, para. 1 ("Strongly condemns once again the policies and practices of apartheid of the racist régime of South Africa, in particular its brutal oppression, repression and genocidal violence against the people of South Africa"), para. 10 ("Vehemently condemns the racist régime of South Africa for its continued illegal occupation of Namibia"); General Assembly resolution 43/50 A of 5 December 1988, para. 3 ("Condemns the racist régime and its policies and practices of apartheid"); General Assembly resolution 44/240 of 29 December 1989, para. 1 ("Strongly deplores the intervention in Panama by the armed forces of the United States of America, which constitutes a flagrant violation of international law and of the independence, sovereignty and territorial integrity of States"); General Assembly resolution 46/47 of 9 December 1991, para. 5 ("Condemns the continued and persistent violation by Israel of the Geneva Convention relative to the Protection of Civilian Persons in Time of War … and condemns in particular those violations which the Convention designates as 'grave breaches' thereof"); General Assembly resolution ES-11/1 of 2 March 2022, para. 2 ("Deplores in the strongest terms the aggression by the Russian Federation against Ukraine in violation of Article 2 (4) of the Charter" of the United Nations), para. 5 ("Deplores the 21 February 2022 decision by the Russian Federation related to the status of certain areas of the Donetsk and Luhansk regions of Ukraine as a violation of the territorial integrity and sovereignty of Ukraine and inconsistent with the principles of the Charter" of the United Nations), and para. 11 ("Condemns all violations of international humanitarian law and violations and abuses of human rights"); Human Rights Council resolution 49/1 of 4 March 2022, para. 1 ("Condemns in the strongest possible terms the human rights violations and abuses and violations of international humanitarian law resulting from the aggression against Ukraine by the Russian Federation").

[251] See General Assembly resolution 2184 (XXI) of 12 December 1966, para. 5 ("Calls upon Portugal to apply immediately the principle of self-determination to the peoples of the Territories under its administration"), para. 6 ("Appeals to all States to give the peoples of the Territories under Portuguese domination the moral and material support necessary for the restoration of their inalienable rights and to prevent their nationals from cooperating with the Portuguese authorities, especially in regard to investment in the Territories"); General Assembly resolution 36/27 of 13 November 1981, para. 3 ("Reiterates its call to all States to cease forthwith any provision to Israel of arms and related material of all types which enable it to commit acts of aggression against other States"); General Assembly resolution 38/7 of 2 November 1983, para. 4 ("Calls for an immediate cessation of the armed intervention and the immediate withdrawal of the foreign troops from Grenada"); General Assembly resolution 44/240 of 29 December 1989, para. 2 ("Demands the immediate cessation of the intervention and the withdrawal from Panama of the armed invasion forces of the United States"), para. 4 ("Calls upon all States to uphold and respect the sovereignty, independence and territorial integrity of Panama"); Security Council resolution 2334 (2016) of 23 December 2016, para. 2 ("Reiterates its demand that Israel immediately and completely cease all settlement activities in the occupied Palestinian territory, including East Jerusalem, and that it fully respect all of its legal obligations in this regard"); General Assembly resolution ES-11/2 of 24 March 2022, paras. 1–2 ("Demands an immediate cessation of the hostilities by the Russian Federation against Ukraine, in particular of any attacks against civilians and civilian objects"); General Assembly resolution ES-11/3 of 7 April 2022, para. 1 ("Decides to suspend the rights of membership in the Human Rights Council of the Russian Federation"); Human Rights Council resolution 49/28 of 11 April 2022, seventh preambular para. ("Reaffirming the right of the Palestinian people to self-determination in accordance with the provisions of the Charter, relevant United Nations resolutions and declarations, and the provisions of international covenants and instruments relating to the right to

(10)    It is not only measures under institutionalized cooperation mechanisms that may be adopted. The obligation to cooperate to bring to an end serious breaches of peremptory norms of general international law (*jus cogens*) may also be implemented through non-institutionalized cooperation, including through *ad hoc* arrangements by a group of States acting together to bring to an end a breach of a peremptory norm.[253] Indeed, the International Court of Justice, in its advisory opinion on *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, seems to suggest that, over and above collective action, there is an obligation on individual States to make efforts to bring situations created by the breach to an end.[254] In that opinion, in addition to referring to the measures that may be adopted by the General Assembly and the Security Council, the Court stated that "[i]t is *also* for all States" to take measures to end the breach of a peremptory norm of general international law (*jus cogens*).[255] The requirement, however, is that such measures should be consistent with international law.[256]

(11)    The obligation of States to act collectively to bring to an end serious breaches of peremptory norms of general international law (*jus cogens*) has particular consequences for cooperation within the organs of the United Nations and other international organizations. It means that, in the face of serious breaches of peremptory norms of general international law (*jus cogens*), international organizations should act, within their respective mandates and when permitted to do so under international law, to bring to an end such breaches. Thus, where an international organization has the discretion to act, the obligation to cooperate

---

self-determination as an international principle and as a right of all peoples in the world, and emphasizing that this *jus cogens* norm of international law is a basic prerequisite for achieving a just, lasting and comprehensive peace in the Middle East"), para. 7 ("Calls upon all States to ensure their obligations of non-recognition, non-aid or assistance with regard to the serious breaches of peremptory norms of international law by Israel, in particular of the prohibition of the acquisition of territory by force, in order to ensure the exercise of the right to self-determination, and also calls upon them to cooperate further to bring, through lawful means, an end to these serious breaches and a reversal of Israel's illegal policies and practices").

[252]    See Human Rights Council resolution S-17/1 of 22 August 2011, para. 13 ("Decides to dispatch urgently an independent international commission of inquiry, to be appointed by the President of the Human Rights Council, to investigate all alleged violations of international human rights law since March 2011 in the Syrian Arab Republic, to establish the facts and circumstances that may amount to such violations and of the crimes perpetrated and, where possible, to identify those responsible with a view to ensuring that perpetrators of violations, including those that may constitute crimes against humanity, are held accountable"); Human Rights Council resolution 39/2 of 27 September 2018, para. 22 ("Decides to establish an ongoing independent mechanism to collect, consolidate, preserve and analyse evidence of the most serious international crimes and violations of international law committed in Myanmar since 2011"); Human Rights Council resolution S-33/1 of 17 December 2021, para. 9 ("Decides to establish, for a period of one year, renewable as necessary, an international commission of human rights experts on Ethiopia, comprising three human rights experts, to be appointed by the President of the Human Rights Council, to complement the work undertaken by the joint investigative team"); Human Rights Council resolution 49/1 of 4 March 2022, para. 11 ("Decides to urgently establish an independent international commission of inquiry, comprising three human rights experts … to investigate all alleged violations and abuses of human rights and violations of international humanitarian law, and related crimes in the context of the aggression against Ukraine by the Russian Federation, and to establish the facts, circumstances and root causes of any such violations and abuses").

[253]    See paragraph (2) of the commentary to article 41 of the articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 114.

[254]    *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (see footnote 132 above), at p. 200, para. 159.

[255]    *Ibid*. See also Barber (footnote 201 above), at p. 23 ("The unique powers and responsibility of the Security Council do not obviate the obligations of other States to cooperate to end serious breaches of peremptory norms, using all means available to them, including their membership of other international organisations").

[256]    *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (see footnote 132 above), at p. 200, para. 159 ("It is also for all States, *while respecting the [Charter of the United Nations] and international law*, to see to it that any impediment, resulting from the construction of the wall, to the exercise by the Palestinian people of its right to self-determination is brought to an end") (emphasis added).

imposes a duty on the members of that international organization to act with a view to the organization exercising that discretion in a manner to bring to an end the breach of a peremptory norm of general international law (*jus cogens*).[257] A duty of international organizations to exercise discretion in a manner that is intended to bring to an end serious breaches of peremptory norms of general international law (*jus cogens*) is a necessary corollary of the obligation to cooperate provided for in paragraph 1 of draft conclusion 19.

(12)    Paragraph 2 of draft conclusion 19 states that States shall not "recognize as lawful" a situation created by a breach of an obligation arising under a peremptory norm of general international law (*jus cogens*) nor "render aid or assistance" in the maintenance of such a situation. Paragraph 2 of draft conclusion 19, which is derived from article 41, paragraph 2, of the articles on responsibility of States for internationally wrongful acts, contains two separate obligations. The first is the obligation not to recognize as lawful situations created by a serious breach of a peremptory norm of international law (*jus cogens*). The second is the obligation not to render aid or assistance in maintaining the situation created by the serious breach of a peremptory norm of general international law (*jus cogens*). While these two obligations are separate and distinct obligations, they are related in the sense that the obligation of non-assistance is a logical consequence of the obligation of non-recognition of a situation as lawful. Unlike the obligation in paragraph 1 of draft conclusion 19, the duties of non-recognition and non-assistance are negative duties. In other words, while paragraph 1 of draft conclusion 19 requires States to do something – to cooperate to bring to an end serious breaches of peremptory norms of general international law (*jus cogens*) – the duties of non-recognition and non-assistance in paragraph 2 require States to refrain from acting. The duties in paragraph 2 of draft conclusion 19 are thus less onerous.

(13)    Already in 2001, the Commission had recognized that the duties of non-recognition and non-assistance were part of customary international law.[258] In *Kuwait Airways Corporation v. Iraqi Airways Company and Others*, the United Kingdom House of Lords refused to give legal validity to acts resulting from the Iraqi invasion of Kuwait, a breach of the peremptory norm of general international law (*jus cogens*) relating to the use of force.[259] The obligation of non-recognition had been recognized in decisions of the International Court of Justice and in the practice of States acting in international organizations. In its advisory opinion on *Legal Consequences for States of the Continued Presence of South Africa in Namibia*, for example, the Court recalled that "qualification of a situation as illegal does not by itself put an end to" the situation.[260] The Court held that there was an obligation on all

---

[257] See Barber (footnote 201 above), at p. 23 ("And as for members of the Security Council, duly diligent members of the General Assembly should normally be expected to support resolutions aimed at ending serious breaches of peremptory norms, unless they can provide good reason for not doing so"). See also R.M. Essawy, "The responsibility not to veto revisited under the theory of 'consequential *jus cogens*'", *Global Responsibility to Protect*, vol. 12 (2020), pp. 299–335, at p. 303.

[258] See paragraphs (6), (11) and (12) of the commentary to article 41 of the articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, pp. 114–115. See O. Corten and V. Koutroulis, "The *jus cogens* status of the prohibition on the use of force: what is its scope and why does it matter?", *in* Tladi (ed.), *Peremptory Norms of General International Law (*Jus Cogens*)...* (footnote 26 above), pp. 629–667, at p. 664, suggesting that it is beyond doubt that the duty of non-recognition for serious breaches of international law is accepted as part of international law. See, further, A. Lagerwall, "The non-recognition of Jerusalem as Israel's capital: a condition for international law to remain relevant?", *Questions of International Law*, vol. 50 (2018), pp. 33–46, arguing that the duty of non-recognition applies, beyond serious breaches of peremptory norms of general international law (*jus cogens*), to breaches of international law. See also Barber (footnote 201 above), at p. 16. See, however, H.P. Aust, "Legal consequences of serious breaches of peremptory norms in the law of State responsibility: observations in the light of the recent work of the International Law Commission", *in* Tladi (ed.), *Peremptory Norms of General International Law (*Jus Cogens*)...* (footnote 26 above), pp. 227–255, at p. 254, suggesting that "not everything [in relation to the duty] is well and support[ed]".

[259] *Kuwait Airways Corporation v. Iraqi Airways Company and Others*, (Nos. 4 and 5) [2002] UKHL 19, [2002] 2 AC 883, para. 29. See also *A, Amnesty International (intervening) and Commonwealth Lawyers Association (intervening) v. Secretary of State for the Home Department* (footnote 236 above), para. 34.

[260] *Legal Consequences for States of the Continued Presence of South Africa in Namibia* (see footnote 122 above), para. 111.

States "to recognize the illegality and invalidity of South Africa's continued presence".[261] Similarly, in its advisory opinion on *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, the Court determined that "all States are under an obligation not to recognize the illegal situation resulting from" the breach of an obligation widely recognized as having peremptory character.[262] In the same vein, the International Criminal Court in *The Prosecutor v. Bosco Ntaganda* also recalled that "as a general principle of law, there is a duty not to recognise situations created by certain serious breaches of international law".[263]

(14)    The Security Council has also recognized the obligation of States not to recognize the situation created by a breach of the prohibition of apartheid and the obligation to respect self-determination.[264] Similarly, the General Assembly has made decisions calling for the non-recognition of situations created by the breach of acts widely accepted as constituting breaches of peremptory norms of general international law (*jus cogens*).[265] The obligation not to assist or render aid to the maintenance of a situation created by a serious breach of an obligation arising under a peremptory norm of general international law (*jus cogens*) has also been recognized in the decisions of the International Court of Justice and resolutions of the

---

[261]    *Ibid.*, para. 119.

[262]    *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (see footnote 132 above), para. 159.

[263]    *The Prosecutor v. Bosco Ntaganda, Case No. ICC-01/04-02/06-1707, Second decision on the Defence's challenge to the jurisdiction of the Court in respect of Counts 6 and 9, of January 2017*, Trial Chamber VI, International Criminal Court, para. 53.

[264]    See Security Council resolution 276 (1970) of 30 January 1970. On the duty not to recognize the "Turkish Republic of Northern Cyprus", see Security Council resolution 541 (1983) of 18 November 1983, para. 7 ("Calls upon all States not to recognize any Cypriot State other than the Republic of Cyprus"). In relation to the occupation of Kuwait, see Security Council resolution 662 (1990) of 9 August 1990, para. 2 ("Calls upon all States, international organizations and specialized agencies not to recognize that annexation [of Kuwait by Iraq], and to refrain from any action or dealing that might be interpreted as an indirect recognition of the annexation"). Likewise, see General Assembly resolution 73/295, paras. 6–7 ("Calls upon the United Nations and all its specialized agencies … to refrain from impeding that process [of decolonization] by recognizing, or giving effect to any measure taken by or on behalf of, the 'British Indian Ocean Territory'", and "Calls upon all other international, regional and intergovernmental organizations … to refrain from impeding that process by recognizing, or giving effect to any measure taken by or on behalf of, the 'British Indian Ocean Territory'").

[265]    General Assembly resolution 3411 (XXX) D of 28 November 1975, para. 3. See, especially, General Assembly resolution ES-10/19 of 21 December 2017, para. 1 ("Affirms that any decisions and actions which purport to have altered the character, status or demographic composition of the Holy City of Jerusalem have no legal effect, are null and void and must be rescinded in compliance with relevant resolutions of the Security Council, and in this regard calls upon all States to refrain from the establishment of diplomatic missions in the Holy City of Jerusalem"); General Assembly resolution 46/47 of 9 December 1991, para. 19 ("Reiterates its call upon all States … not to recognize any changes carried out by Israel, the occupying Power, in the occupied territories and to avoid actions … that might be used by Israel in its pursuit of the policies of annexation and colonization"). See, in relation to the duty not to recognize unlawfully established settlements in Jerusalem, Security Council resolution 2334 (2016), para. 3 ("Underlines that it will not recognize any changes to the 4 June 1967 lines, including with regard to Jerusalem, other than those agreed by the parties through negotiations"). See, for the duty not to recognize situations created by the unlawful use of force and threats to territorial integrity in relation to the situation in Crimea, General Assembly resolution 68/262 of 27 March 2014, para. 6 ("Calls upon all States, international organizations and specialized agencies not to recognize any alteration of the status of the Autonomous Republic of Crimea and the city of Sevastopol on the basis of the above-mentioned referendum and to refrain from any action or dealing that might be interpreted as recognizing any such altered status").

United Nations for example, in respect of the application of apartheid by South Africa in Namibia[266] and in respect of the situation in Ukraine.[267]

(15)   While the obligation of non-recognition is settled, this duty is not to be implemented to the detriment of the affected population and deprive it of any advantages derived from international cooperation.[268] In its advisory opinion on *Legal Consequences for States of the Continued Presence of South Africa in Namibia*, the International Court of Justice declared that the consequences of non-recognition should not negatively affect or disadvantage the affected population and, consequently, that acts related to the civilian population, such as registration of births, deaths and marriages, ought to be recognized notwithstanding the breach.[269]

(16)   It is important to emphasize that the duty in paragraph 2 of draft conclusion 19 is concerned with a "situation created by a serious breach", rather than the breach itself. Thus, contribution or support of the actual breach, while possibly entailing responsibility for that breach, is not covered under this draft conclusion.[270]

(17)   The obligations in draft conclusion 19 apply to serious breaches of peremptory norms of general international law (*jus cogens*). A serious breach is defined in paragraph 3 of draft conclusion 19 as a breach that "involves a gross or systematic failure by the responsible State to fulfil [the obligation in question]". This definition is taken from article 40, paragraph 2, of the articles on responsibility of States for internationally wrongful acts.[271] It is important to underscore that, by referring to "serious breaches", the Commission did not mean to indicate that there were breaches of peremptory norms of general international law (*jus cogens*) that were less than serious.[272] Rather, it is intended to convey the sense that particular consequences flowed from breaches of peremptory norms of general international law (*jus cogens*) that met the threshold in paragraph 3.

(18)   Paragraph 4 of draft conclusion 19 provides that the obligations in draft conclusion 19 are without prejudice to other consequences that any breach by a State of an obligation arising out of a peremptory norm (*jus cogens*) may entail under international law.[273] Draft

---

[266]  See, for example, *Legal Consequences for States of the Continued Presence of South Africa in Namibia* (footnote 122 above), para. 119, stating that States are under an obligation "to refrain from lending any support or any form of assistance to South Africa with reference to its occupation of Namibia". See also *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (footnote 132 above), para. 159; and General Assembly resolution 3411 D (XXX), para. 3.

[267]  See General Assembly resolution ES-11/1, para. 10 ("Deplores the involvement of Belarus in this unlawful use of force against Ukraine, and calls upon it to abide by its international obligations"). See also General Assembly resolution 2022 (XX) para. 5 ("Condemns any support or assistance rendered by any State to the minority régime in Southern Rhodesia") and para. 6 ("Calls upon all States to refrain from rendering any assistance whatsoever to the minority régime in Southern Rhodesia"); General Assembly resolution 36/27 para. 3 ("Reiterates its call to all States to cease forthwith any provision to Israel of arms and related material of all types which enable it to commit acts of aggression against other States").

[268]  *Legal Consequences for States of the Continued Presence of South Africa in Namibia* (see footnote 122 above), para. 125.

[269]  *Ibid.*

[270]  See *Humanitarian Intervention and Political Support for Interstate Use of Force: Report of the Expert Group established by the Minister of Foreign Affairs of the Netherlands*, December 2019, at para. 43. This position has been supported by the Government of the Netherlands in a letter of 17 April 2020 to the Chairperson of the House of Representatives of the Netherlands, although noting that an international tribunal might come to a different conclusion ("Although the Cabinet shares this interpretation, it cannot be ruled out in advance that an international tribunal might come to a different conclusion").

[271]  A detailed elaboration of the elements of seriousness – gross or systematic violations – can be found in paragraphs (7) and (8) of the commentary to article 40 of the articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 113.

[272]  See paragraph (7) of the commentary to article 40 of the articles on responsibility of States for internationally wrongful acts, *ibid.* ("The word 'serious' … is not intended to suggest that any violation of these obligations is not serious or is somehow excusable").

[273]  See, generally, paragraph (13) of the commentary to article 41 of the articles on responsibility of States for internationally wrongful acts, *ibid.*, p. 115.

conclusion 19, for example, does not specifically address the consequences of breaches, whether meeting the threshold in paragraph 3 or not, for the responsible State. The International Court of Justice has routinely declared an obligation of cessation on the responsible State.[274] Other examples of consequences of breaches of obligations under international law that are not addressed can be found in chapters I and II of Part Two of the articles on responsibility of States for internationally wrongful acts.[275] Thus, the draft conclusions do not address the question of whether the peremptory character of the obligation breached will affect, for example, the issue of the amount of compensation.[276] Although not addressed in the present draft conclusions, these other consequences of responsibility continue to apply.

(19)    As with draft conclusions 17 and 18, draft conclusion 19 applies, as appropriate, to international organizations.[277] Consequently, if States are under an obligation not to recognize as lawful situations created by a serious breach of a peremptory norm or to assist in the maintenance of such situations, it stands to reason that international organizations are under a similar obligation.

### Part Four
### General provisions

### Conclusion 20
### Interpretation and application consistent with peremptory norms of general international law (*jus cogens*)

Where it appears that there may be a conflict between a peremptory norm of general international law (*jus cogens*) and another rule of international law, the latter is, as far as possible, to be interpreted and applied so as to be consistent with the former.

**Commentary**

(1)    Draft conclusion 20 contains an interpretative rule applicable in the case of potential conflicts between peremptory norms of general international law (*jus cogens*) and other rules of international law. Draft conclusions 10, 14, 15 and 16 provide for the invalidity or non-existence of rules of international law that conflict with peremptory norms of general international law (*jus cogens*). Whether or not a rule of international law conflicts with a peremptory norm of general international law (*jus cogens*) is a matter to be determined through interpretation. The rule in draft conclusion 20 applies as part of the process of interpretation under applicable rules on interpretation to determine whether a conflict in fact exists.[278] The draft conclusions do not define conflict, but it may be understood, in this

---

[274]    See, for example, *Legal Consequences of the Separation of the Chagos Archipelago from Mauritius in 1965* (footnote 198 above), at p. 139, para. 178; *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (footnote 132 above), paras. 149 *et seq.*; and *Legal Consequences for States of the Continued Presence of South Africa in Namibia* (footnote 122 above), para. 118.

[275]    See, generally, Part Two of the articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, pp. 86 *et seq*. The consequences include cessation and non-repetition (art. 30) and reparation (art. 31). Reparation itself may take different forms, including restitution (art. 35), compensation (art. 36), satisfaction (art. 37) and interest (art. 38).

[276]    See, for discussion, R. Elphick (with J. Dugard), "*Jus cogens* and compensation", *in* Tladi (ed.), *Peremptory Norms of General International Law (*Jus Cogens*)… (footnote 26 above), pp. 413–440.

[277]    See, in respect of international organizations, articles 41 and 42 of the articles on the responsibility of international organizations. The articles on the responsibility of international organizations adopted by the Commission and the commentaries thereto are reproduced in *Yearbook … 2011*, vol. II (Part Two), pp. 40 *et seq.*, paras. 87–88. See also General Assembly resolution 66/100 of 9 December 2011, annex.

[278]    See D. Costelloe, "Peremptory norms and resolutions of the United Nations Security Council", *in* Tladi (ed.), *Peremptory Norms of General International Law (*Jus Cogens*)… (footnote 26 above), pp. 441–467, at pp. 443 *et seq.*

context, as the situation where two rules of international law cannot both be simultaneously applied without infringing on, or impairing, the other.[279]

(2)      Draft conclusion 20 is not to be applied in all cases concerning the interpretation of a rule or the determination of its content. It is to be applied only in the limited instances where "it appears that there may be a conflict" between a rule of international law not of a peremptory character and a peremptory norm of general international law (*jus cogens*).[280] In such a case, the interpreter is directed to interpret the rule of international law that is not of a peremptory character in such a way that it is consistent with the peremptory norm of general international law (*jus cogens*). The words "as far as possible" in the draft conclusion are intended to emphasize that, in the exercise of interpreting rules of international law in a manner consistent with peremptory norms of general international law (*jus cogens*), the bounds of interpretation may not be exceeded. In other words, the rule in question may not be given a meaning or content that does not flow from the normal application of the rules and methodology of interpretation in order to achieve consistency with peremptory norms of general international law (*jus cogens*).

(3)      Draft conclusion 20 uses the words "interpreted and applied". The interpretation and application of a rule are interrelated but separate concepts. The words "interpretation and application" were also used in paragraph (3) of the commentary to article 26 of the articles on responsibility of States for internationally wrongful acts, which addressed this interpretative effect of peremptory norms of general international law (*jus cogens*). It recognizes that, in some cases, what may be at issue is not the interpretation of the rule in question but its application. This may be the case, for example, where a rule is, on its face, consistent with the relevant peremptory norm of general international law (*jus cogens*), but its application in a particular way would be contrary to the relevant peremptory norm.

(4)      In the context of treaty rules, the rule in draft conclusion 20 may be seen as an application of article 31, paragraph 3 (*c*), of the 1969 Vienna Convention, which provides that in the interpretation of treaties "[a]ny relevant rules of international law applicable in the relations between the parties … shall be taken into account". Peremptory norms of general international law (*jus cogens*) are rules of international law applicable in relations primarily between States and international organizations and must therefore, where relevant, be taken into account in the interpretation of treaties.[281]

(5)      Although the interpretative rule in draft conclusion 20 constitutes a concrete application of article 31, paragraph 3 (*c*), of the 1969 Vienna Convention, it does not apply only in relation to treaties but to the interpretation and application of all other rules of international law. In this respect, the Commission has stated that "[w]hen there is an apparent conflict between primary obligations, one of which arises for a State directly under a peremptory norm of general international law, it is evident that such an obligation must

---

[279]  See, for discussion, E. Vranes, "The definition of 'norm conflict' in international law and legal theory", *The European Journal of International Law*, vol. 17, No. 2 (2006), pp. 395–418. See also V. Jeutner, "Rebutting four arguments in favour of resolving *ius cogens* conflicts by means of proportionality tests", *Nordic Journal of International Law*, vol. 89, No. 3 (2020), pp. 453–470, at p. 455.

[280]  S.B. Traoré, "Peremptory norms and interpretation in international law", *in* Tladi (ed.), *Peremptory Norms of General International Law (*Jus Cogens*)…* (footnote 26 above), pp. 132–176.

[281]  See, for example, the report of the Study Group on the fragmentation of international law (finalized by Martti Koskenniemi) (footnote 54 above), p. 85, para. 414. This was done for example in *Council of the European Union v. Front populaire pour la libération de la saguia-el-hamra et du rio de oro (Front Polisario), Case C-104/16 P, Judgment of 21 December 2016*, Grand Chamber, Court of Justice of the European Union, *Official Journal of the European Union*, C 53/19 (20 February 2017), at paras. 88 *et seq.*, especially para. 114, in which the Court, having determined that the principle of self-determination was "one of the essential principles of international law" and one establishing *erga omnes* obligations (para. 88), proceeded to interpret a treaty between the European Commission and Morocco in such a way as to respect this rule: "It follows that the Liberalisation Agreement could not be understood at the time of its conclusion as meaning that its territorial scope included the territory of Western Sahara" (para. 114).

prevail … [P]eremptory norms of general international law generate strong interpretative principles which will resolve all or most apparent conflicts".[282]

(6)     As noted in paragraph (2) of this commentary, the words "as far as possible" are meant to indicate that the rule in this draft conclusion does not permit the limits of interpretation to be exceeded. Where it is not possible to arrive at an interpretation of the rule not of a peremptory character that is consistent with the peremptory norm of general international law (*jus cogens*), the rule that is not of a peremptory character is to be invalidated in accordance with draft conclusions 10, 14, 15 and 16.

(7)     The phrase "another rule of international law" in draft conclusion 20 is to be understood as referring to obligations under international law, whether arising under a treaty, customary international law, a general principle of law, a unilateral act or a resolution, decision or other act of an international organization. Draft conclusion 20 therefore applies in the interpretation of the rules or obligations identified in draft conclusions 10, 14, 15 and 16.

### Conclusion 21
### Recommended procedure

1.     A State which invokes a peremptory norm of general international law (*jus cogens*) as a ground for the invalidity or termination of a rule of international law should do so by notifying other States concerned of its claim. The notification should be in writing and should indicate the measure proposed to be taken with respect to the rule of international law in question.

2.     If none of the other States raises an objection within a period which, except in cases of special urgency, will not be less than three months, the invoking State may carry out the measure which it has proposed.

3.     If, however, any State concerned raises an objection, the States concerned should seek a solution through the means indicated in Article 33 of the Charter of the United Nations. If no solution is reached within a period of twelve months, and the objecting State offers to submit the matter to the International Court of Justice or to some other procedure entailing binding decisions, the invoking State should not carry out the measure which it has proposed until the dispute is resolved.

4.     This draft conclusion is without prejudice to the procedures set forth in the Vienna Convention on the Law of Treaties, to the relevant rules concerning the jurisdiction of the International Court of Justice, or to other applicable dispute settlement provisions agreed by the States concerned.

**Commentary**

(1)     Draft conclusion 21 concerns the procedure that is recommended for the invocation of, and the reliance on, the invalidity of rules of international law, including treaties, by reason of being in conflict with peremptory norms of general international law (*jus cogens*). It is important to recall that during the United Nations Conference on the Law of Treaties, States generally supported the provisions relating to peremptory norms of general international law (*jus cogens*), but concerns arose that the right to invoke the invalidity of treaties could be abused by States unilaterally invoking articles 53 and 64 and thus threatening the stability of treaty relations.[283] To address the concerns, the 1969 Vienna

---

[282]    Paragraph (3) of the commentary to article 26 of the articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 85. See also conclusion (42) of the conclusions of the Study Group on the fragmentation of international law (footnote 54 above); and Mik (footnote 176 above), pp. 73 *et seq.*

[283]    See *Official Records of the United Nations Conference on the Law of Treaties, First Session …* (see footnote 53 above), 4 May 1968, statements by: France, 54th meeting, para. 29 ("[t]he article as it stood gave no indication how a rule of law could be recognized as having the character of *jus cogens*, on the content of which divergent, even conflicting interpretations had been advanced during the discussion. … Also, no provision had been made for any jurisdictional control over the application of

Convention subjects any reliance on articles 53 and 64 to a process involving judicial settlement procedures. In the context of the present draft conclusions, invocation of the rules set forth in Part Three without some type of mechanism to avoid unilateral measures raises similar concerns as those raised at the United Nations Conference on the Law of Treaties. Draft conclusion 21 is thus aimed at avoiding, or minimizing, the potential for unilateralism and auto-interpretation in connection with peremptory norms of general international law (*jus cogens*).[284]

(2)    The formulation of an appropriate provision for the purposes of the present draft conclusions is, however, not without its difficulties. The principal difficulty is that detailed dispute resolution provisions are embedded in treaties and do not operate as a matter of customary international law. They operate in the context of treaty law, applicable only to States that have accepted the application of those rules. Thus, with respect to peremptory norms of general international law (*jus cogens*), the 1969 Vienna Convention contains an elaborate dispute settlement framework.[285] Under this framework, a State party that claims that a treaty is invalid on any ground, including for reason of being in conflict with a peremptory norm of general international law (*jus cogens*), must notify other States parties of its claim. If, after the expiry of a specified period, no objections to its notification are received, the consequences of invalidity may be implemented. If, however, there is an objection, the 1969 Vienna Convention requires that the States parties concerned seek a solution through the means provided for in the Charter of the United Nations. These means include negotiation, mediation, conciliation, arbitration, judicial settlement, resort to regional agencies or other peaceful means.[286] If the claim of invalidity is based on a conflict with a peremptory norm under article 53 or article 64 and a solution to the conflict is not found using such means, then any party to the dispute may refer the matter to the International Court of Justice unless there is an agreement to submit it instead to arbitration.

(3)    In the *Gabčíkovo-Nagymaros Project* case, the International Court of Justice stated that "both Parties agree that [a]rticles 65 to 67 of the Vienna Convention on the Law of Treaties, if not codifying customary international law, at least generally reflect customary international law and contain certain procedural principles which are based on an obligation to act in good faith".[287] This observation by the Court refers primarily to the consultation process leading up to any termination of the agreement. The Court did not, by this statement, determine that there was a customary international law rule concerning the establishment of jurisdiction of the Court for the settlement of disputes relating to invalidation of treaties on the basis of peremptory norms of general international law (*jus cogens*). The provisions of articles 65 to 67 of the 1969 Vienna Convention, in particular the provisions pertaining to the submission to the International Court of Justice of a dispute, cannot be said to reflect customary international law. As treaty provisions, they cannot be imposed on States that are not party to the 1969 Vienna Convention. Moreover, even amongst States that are party to the Convention, a number of States have formulated reservations to the application of the dispute settlement mechanism, particularly as it relates to the submission of disputes to the International Court of Justice and arbitration (art. 66 (*a*) of the 1969 Vienna Convention).[288]

(4)    In formulating a provision for dispute settlement in relation to the invalidation of rules of international law on account of inconsistency with peremptory norms of general international law (*jus cogens*), the Commission had to ensure, on the one hand, that it did not purport to impose treaty rules on States not bound by such rules while, on the other hand, that the concerns regarding the need to avoid unilateral invalidation of rules was taken

---

such a new and imprecise notion"); and Norway, 56th meeting, para. 37 ("[t]he article gave no guidance on some important questions, namely, what were the existing rules of *jus cogens* and how did such rules come into being? The Commission's text stated the effects of those rules but did not define them, so that serious disputes might arise between States; and it provided no effective means of settling such disputes").

[284]  See, generally, Wood (footnote 190 above).

[285]  See articles 65 and 66 of the 1969 Vienna Convention.

[286]  See Article 33, paragraph 1, of the Charter of the United Nations.

[287]  *Gabčíkovo-Nagymaros Project* (see footnote 66 above), at p. 66, para. 109.

[288]  For a full list of the reservations to the 1969 Vienna Convention, see United Nations, *Treaty Series*, vol. 1155, p. 131.

account of. Moreover, the Commission also had to ensure that the procedures established under the 1969 Vienna Convention, or any other treaty provision, were not undermined by the inclusion of the present provision. Draft conclusion 21 sets forth a recommended procedure designed to achieve such a balance. The draft conclusion is couched in hortatory terms, to avoid any implication that its content is binding on States.

(5)    Paragraphs 1 and 2 of draft conclusion 21 follow article 65 of the 1969 Vienna Convention. Paragraph 1 provides that a State which seeks to impugn a rule of international law for being in conflict with a peremptory norm of general international law (*jus cogens*) should notify other States of its claim. Although this paragraph follows closely the wording of the 1969 Vienna Convention, there are two important differences. First, as is the case throughout the draft conclusion, the word "should" is used to indicate that the provision is a non-binding one. Second, the paragraph refers to "a rule of international law", to signify that it applies to treaties and other international obligations deriving from other sources of international law. Consequently, the paragraph refers to "States concerned" to indicate that the potential addressees of the notification are broader than the parties to a treaty. The phrase "States concerned" is also used to indicate that in relation to treaties with limited membership, the requirement to notify is limited to the parties to the treaties. In line with paragraph (10) of the commentary to draft conclusion 1, the words "State" and "States concerned" in this draft conclusion should be understood to include *mutatis mutandis* international organizations that may be affected by any measures that may be adopted.

(6)    Paragraph 1 of draft conclusion 21 also provides that the notification is to indicate the measures proposed to remedy the conflict. Such measures may be those referred to in Part Three of the draft conclusions. The requirement to specify the measures proposed is in keeping with the purposes of the notification, which is to enable other States to respond appropriately, if necessary. The notification can be distributed to other States through a variety of means, including through the Secretary-General of the United Nations.

(7)    Paragraph 2 of draft conclusion 21 states that if no other State raises an objection to the notification, then the State making the claim may carry out the measure it has proposed. The right to carry out these measures, however, can only be exercised after "a period which, except in cases of special urgency, shall not be less than three months". This means, in the first place, that the notification referred to in paragraph 1 should specify a period within which an objection must be made to the notification. The period should be a reasonable period and the Commission determined that, as a general rule, a minimum of three months was a reasonable period. Second, it is only after the expiry of the said period, and if there has been no objection, that the State invoking the invalidity of a treaty can carry out the measure proposed. There may be cases where a three-month period may be too long. For this purpose, paragraph 2 of draft conclusion 21 sets out the possibility of a shorter period "in cases of special urgency". The draft conclusions do not define "cases of special urgency". This is to be determined on the basis of the facts in each particular case. However, it can be said that "cases of special urgency" will be those in which time is of the essence.

(8)    Paragraph 3 of draft conclusion 21 addresses those cases in which any State concerned raises an objection against a claim that a rule of international law is void as a result of a conflict with a peremptory norm of general international law (*jus cogens*). If there is such an objection, then the invoking State cannot unilaterally implement the proposed measures. In such a case, the invoking State and the other States concerned are then required to seek a solution of their choice amongst the means indicated in Article 33 of the Charter of the United Nations.

(9)    Paragraph 3 of draft conclusion 21 also addresses those cases in which the States concerned are not able to find a solution through the means indicated in Article 33 of the Charter of the United Nations. It provides that, in such cases, where the objecting State has offered to submit the matter to the International Court of Justice or some other procedure of a binding nature, the invoking State should not carry out the measure it had proposed until the dispute is resolved. The Commission proceeded from the basis that the invocation of the invalidity of a rule of international law as a result of inconsistency with a peremptory norm of general international law (*jus cogens*) did not, as such, constitute the basis for the

jurisdiction of the International Court of Justice.[289] However, in the spirit of avoiding unilateralism, the Commission found it appropriate, without obliging submission to the International Court of Justice, to encourage submission of the dispute to the International Court of Justice. The purpose of paragraph 3 of the draft conclusion is thus to encourage submission of an unresolved dispute to judicial settlement of disputes.

(10)    Draft conclusion 21 is a procedural provision, without implication for the lawfulness of any measures that may be carried out. If, after the expiration of the twelve-month period, no offer to submit the matter to the International Court of Justice is made by the other States concerned, the invoking State is no longer precluded by the procedural provisions of draft conclusion 21 from taking the proposed measures. It is important to emphasize that there is, under this provision, no obligation to submit the matter to the International Court of Justice, nor does this provision establish compulsory jurisdiction. Instead, the provision precludes the State invoking invalidity from carrying out the proposed measures if the other concerned States offer to submit the matter to the International Court of Justice. In the event that such an offer to submit the matter to the International Court of Justice is made, the State invoking invalidity will then only be entitled to carry out the proposed measures after the dispute is resolved and in accordance with a determination by the Court that the measures are justified under international law.

(11)    Paragraph 4 is a "without prejudice" clause. As explained above, draft conclusion 21 does not establish the jurisdiction of the International Court of Justice, nor does it create an obligation for any State to submit a matter to the Court or to accept the Court's jurisdiction. By the same token, draft conclusion 21 does not affect any basis for jurisdiction that may exist under any other rule in international law, including the dispute settlement mechanisms under the 1969 Vienna Convention or other applicable dispute settlement provisions agreed to by the States concerned (including the invoking State).

### Conclusion 22
### Without prejudice to consequences that specific peremptory norms of general international law (*jus cogens*) may otherwise entail

The present draft conclusions are without prejudice to consequences that specific peremptory norms of general international law (*jus cogens*) may otherwise entail under international law.

**Commentary**

(1)    Draft conclusion 22 is a "without prejudice" clause. It provides that the current draft conclusions are without prejudice to the consequences that specific peremptory norms of general international law (*jus cogens*) may otherwise entail under international law.

(2)    The scope of the present draft conclusions concerns the identification and legal consequences of peremptory norms of general international law (*jus cogens*). As described in paragraph (3) of the commentary to draft conclusion 1, the present draft conclusions are not intended to address the content of individual peremptory norms of general international law (*jus cogens*). In addition to the methodology and process for identifying peremptory norms of general international law (*jus cogens*), the draft conclusions also address, in general, the legal consequences flowing from peremptory norms of general international law (*jus cogens*). These include consequences for treaty rules, customary international law, unilateral acts and binding resolutions, decisions or other acts of international organizations. The contents of individual peremptory norms of general international law (*jus cogens*) may themselves have legal consequences that are distinct from the general legal consequences identified in the present draft conclusions. Hence, draft conclusion 22 is intended to convey

---

[289]    *Armed Activities on the Territory of the Congo* (see footnote 58 above), at p. 32, para. 64 ("The same applies to the relationship between peremptory norms of general international law (*jus cogens*) and the establishment of the Court's jurisdiction: the fact that a dispute relates to compliance with a norm having such a character, which is assuredly the case with regard to the prohibition of genocide, cannot of itself provide a basis for the jurisdiction of the Court").

that the draft conclusions are without prejudice to any such legal consequences that may otherwise arise from specific peremptory norms of general international law (*jus cogens*).

(3)    One area in which the issue of legal consequences for specific peremptory norms has been raised concerns the consequences of crimes the commission of which are prohibited by peremptory norms of general international law (*jus cogens*), such as the prohibition of genocide, war crimes and crimes against humanity, and, in particular, the possible consequences for immunity and the jurisdiction of national courts. These consequences are not general consequences of peremptory norms of general international law (*jus cogens*), but rather relate to specific peremptory norms of general international law. As such, they are not addressed in the present draft conclusions.

### Conclusion 23
### Non-exhaustive list

Without prejudice to the existence or subsequent emergence of other peremptory norms of general international law (*jus cogens*), a non-exhaustive list of norms that the International Law Commission has previously referred to as having that status is to be found in the annex to the present draft conclusions.

**Commentary**

(1)    Draft conclusion 1 sets out the scope of the present draft conclusions as concerning the identification and legal consequences of peremptory norms of general international law (*jus cogens*). As indicated in paragraph (3) of the commentary to draft conclusion 1 and paragraph (2) of the commentary to draft conclusion 22, the present draft conclusions are methodological in nature and do not attempt to address the content of individual peremptory norms of general international law (*jus cogens*). As a result, the present draft conclusions do not seek to elaborate a list of peremptory norms of general international law (*jus cogens*).

(2)    To elaborate a list of peremptory norms of general international law (*jus cogens*), even a non-exhaustive list, would require a detailed and rigorous study of many potential norms to determine which of those potential norms meet the criteria set out in Part Two of the present draft conclusions. Such an exercise falls beyond the scope of the exercise of elaborating draft conclusions on identification and legal consequences of peremptory norms of general international law (*jus cogens*).

(3)    Although the identification of specific norms that have a peremptory character falls beyond the scope of the present draft conclusions, the Commission has decided to include in an annex a non-exhaustive list of norms previously referred to by the Commission as having peremptory character. Draft conclusion 23 refers to this annex. The Commission emphasizes that, in putting together this list, it did not apply the methodology it set forth in draft conclusions 4 to 9. The list is intended to illustrate, by reference to previous work of the Commission, the types of norms that have routinely been identified as having peremptory character, without itself, at this time, making an assessment of those norms.

(4)    Draft conclusion 23 provides, first, that this annex is without prejudice to the existence or subsequent emergence of other peremptory norms of general international law (*jus cogens*). The phrase "[w]ithout prejudice to the existence or subsequent emergence of other peremptory norms of general international law (*jus cogens*)" is meant to indicate that the inclusion of the list in the annex in no way precludes the existence at present of other norms that may have peremptory character or the emergence of other norms in the future having that character. Second, draft conclusion 23 provides, as a statement of fact, that the norms contained in the annex are those that have been previously referred to by the Commission as having peremptory status. Finally, draft conclusion 23 states that the list contained in the annex is non-exhaustive, which serves to reinforce the fact that this list is without prejudice to other norms having the same character.[290] It is non-exhaustive in two ways. It is non-

---

[290] See also paragraph (6) of the commentary to article 40 of the articles on responsibility of States for internationally wrongful acts addressing the non-exhaustive nature of the norms referred to in those articles, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 113 ("It should be stressed that the

exhaustive, first, in the sense that beyond the norms identified in the list, there are or may be other peremptory norms of general international law (*jus cogens*). Second, it is non-exhaustive in the sense that, in addition to the norms listed in the annex, the Commission has also referred previously to other norms as having peremptory character. The annex should therefore not be seen as excluding the peremptory character of these other norms.

(5)    The fact that the annex referred to in draft conclusion 23 contains norms previously referred to by the Commission has two implications for the list. First, the formulation of each norm is based on a formulation previously used by the Commission. The Commission has therefore not attempted to reformulate the norms on the list. As will be seen in the following paragraphs of the commentary to draft conclusion 23, in some cases the Commission has used different formulations in its previous works. The second implication is that there has been no attempt to define the scope, content or application of the norms identified. The annex merely lists norms previously identified by the Commission, relying on the same formulations and without seeking to address any aspects of the content of the rules.

(6)    In its previous works, the Commission has used different phrases to qualify the norms to which it has referred. In its commentary to draft article 50 of the draft articles on the law of treaties, it used the phrases "conspicuous example" and "example" respectively when referring to two of the norms.[291] In its commentary to article 26 of the draft articles on responsibility of States for internationally wrongful acts, the Commission referred to the norms on its list as those "clearly accepted and recognized",[292] while in its commentary to article 40 of the same articles, it used the phrase "generally agreed" to qualify the norm of "prohibition of aggression" as peremptory, and said there "seems to be widespread agreement" with regard to other norms listed in that paragraph.[293]

(7)    The first norm identified in the annex is the prohibition of aggression. The prohibition of aggression was referred to by the Commission in the commentary to the articles on responsibility of States for internationally wrongful acts.[294] In 1966, the Commission stated that the "law of the Charter [of the United Nations] concerning the prohibition of the use of force in itself constitutes a conspicuous example of a rule in international law having the character of *jus cogens*".[295] Although not strictly the output of the Commission itself, the 2006 work of its Study Group on the fragmentation of international law is also noteworthy. Like the commentary to the articles on responsibility of States for internationally wrongful acts, the conclusions of the Study Group on the fragmentation of international law referred to the prohibition of aggression as a peremptory norm.[296] The report of the Study Group on the fragmentation of international law, after referring to the Commission's identification of

---

examples given above may not be exhaustive. In addition, article 64 of the 1969 Vienna Convention contemplates that new peremptory norms of general international law may come into existence through the processes of acceptance and recognition by the international community of States as a whole, as referred to in article 53. The examples given here are thus without prejudice to existing or developing rules of international law which fulfil the criteria for peremptory norms under article 53").

[291]    Paragraphs (1) and (3) of the commentary to draft article 50 of the draft articles on the law of treaties, *Yearbook … 1966*, vol. II, document A/6309/Rev.1, Part II, pp. 247–248.

[292]    Paragraph (5) of the commentary to article 26 of the articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 85.

[293]    *Ibid.*, paragraph (4) of the commentary to article 40, pp. 112–113.

[294]    See *ibid.* ("Among these prohibitions, it is generally agreed that the prohibition of aggression is to be regarded as peremptory"). See also paragraph (5) of the commentary to article 26, *ibid.*, p. 85 ("Those peremptory norms that are clearly accepted and recognized include the [prohibition] of aggression").

[295]    See paragraph (1) of the commentary to draft article 50 of the draft articles on the law of treaties, *Yearbook … 1966*, vol. II, document A/6309/Rev.1, Part II, p. 247. In paragraph (3) of the same commentary, the Commission referred to the "unlawful use of force contrary to the principles of the Charter" of the United Nations.

[296]    See conclusion (33) of the conclusions of the Study Group on the fragmentation of international law (footnote 54 above).

the prohibition of aggression, included "the prohibition of aggressive use of force" on its list of the "most frequently cited candidates for the status of *jus cogens*".[297]

(8)     The second norm identified in the annex is the prohibition of genocide. The prohibition of genocide has been referred to by the Commission with a consistent formulation in all its relevant work. In particular, the articles on responsibility of States for internationally wrongful acts, both in the commentary to article 26 and in the commentary to article 40, referred to the prohibition of genocide.[298] Similarly, both the conclusions and the report of the Study Group on the fragmentation of international law refer to the prohibition of genocide.[299]

(9)     The prohibition of crimes against humanity is the third norm included in the annex. The fourth paragraph of the preamble to the 2019 draft articles on prevention and punishment of crimes against humanity recalled that "the prohibition of crimes against humanity is a peremptory norm of general international law (*jus cogens*)".[300] In the commentary to article 26 of the articles on responsibility of States for internationally wrongful acts, the Commission referred not to the prohibition of crimes against humanity separately, but to the prohibition of "crimes against humanity and torture".[301] The prohibition of crimes against humanity is also referred to in the report of the Study Group on the fragmentation of international law as one of the "most frequently cited candidates" for norms with *jus cogens* status.[302]

(10)     The basic rules of international humanitarian law, the fourth norm in the annex, has been referred to by the Commission in its commentary to article 40 of its articles on responsibility of States for internationally wrongful acts.[303] The conclusions of the Study Group on the fragmentation of international law refer to basic rules of international humanitarian law applicable in armed conflict.[304] The report of the Study Group on the fragmentation of international law, on the other hand, refers to "the prohibition of hostilities directed at civilian population ('basic rules of international humanitarian law')".[305]

(11)     The fifth norm in the annex is the prohibition of racial discrimination and apartheid. The prohibition of racial discrimination and apartheid is referred to in the commentary to article 40 of the articles on responsibility of States for internationally wrongful acts.[306] The commentary to article 26 of the same articles, however, only refers to the prohibition of racial discrimination, without any reference to apartheid.[307] The report of the Study Group on the fragmentation of international law also refers to the prohibition of racial discrimination and

---

[297]    Report of the Study Group on the fragmentation of international law (finalized by Martti Koskenniemi) (footnote 54 above), p. 77, para. 374. It should be noted that the report of the Study Group also refers, as a separate norm, to the right to self-defence.

[298]    See paragraph (5) of the commentary to article 26 and paragraph (4) of the commentary to article 40 of the articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, pp. 85 and 112–113.

[299]    Conclusion (33) of the conclusions of the Study Group on the fragmentation of international law (see footnote 54 above) and the report of the Study Group on the fragmentation of international law (finalized by Martti Koskenniemi) (footnote 54 above), p. 77, para. 374.

[300]    See the preamble to the draft articles on prevention and punishment of crimes against humanity, *Official Records of the General Assembly, Seventy-fourth Session, Supplement No. 10* (A/74/10), chap. IV, sect. E.1, para. 44.

[301]    Paragraph (5) of the commentary to article 26 of the articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 85.

[302]    Report of the Study Group on the fragmentation of international law (finalized by Martti Koskenniemi) (see footnote 54 above), p. 77, para. 374.

[303]    Paragraph (5) of the commentary to article 40 of the articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 113.

[304]    See conclusion (33) of the conclusions of the Study Group on the fragmentation of international law (footnote 54 above).

[305]    Report of the Study Group on the fragmentation of international law (finalized by Martti Koskenniemi) (see footnote 54 above), p. 77, para. 374.

[306]    Paragraph (4) of the commentary to article 40 of the articles on responsibility of States for internationally wrongful acts *Yearbook … 2001*, vol. II (Part Two) and corrigendum, pp. 112–113.

[307]    *Ibid.*, p. 85, paragraph (5) of the commentary to article 26.

apartheid.[308] The conclusions of the Study Group on the fragmentation of international law, however, refer to the prohibition of apartheid along with torture, without any reference to racial discrimination.[309]

(12)    The annex also includes the prohibition of slavery as the sixth norm on the list of peremptory norms of general international law (*jus cogens*) previously referred to by the Commission. The prohibition of slavery was referred to by the Commission as a peremptory norm of general international law (*jus cogens*) in the commentary to article 26 of the articles on responsibility of States for internationally wrongful acts.[310] The commentary to article 40 of the same articles refers to the prohibition of slavery and the slave trade.[311] The commentary to the draft articles on the law of treaties, for its part, refers to the prohibition of the trade in slaves.[312]

(13)    The prohibition of torture is the seventh norm in the annex. The prohibition of torture is referred to by the Commission in its commentary to article 40 of the articles on responsibility of States for internationally wrongful acts.[313] In the commentary to article 26 of the same articles, the Commission refers to the prohibition of "crimes against humanity and torture".[314] The conclusions of the Study Group on the fragmentation of international law, on the other hand, refer to the prohibition of "apartheid and torture".[315]

(14)    The final norm listed in the annex is the right of self-determination. In describing the norm as having peremptory character, the Commission has used the formulation "the right of self-determination", although it has at times referred to the "right to self-determination".[316]

(15)    As explained in paragraph (2), the list is non-exhaustive not only in the sense that it does not purport to cover all peremptory norms of general international law (*jus cogens*) that may exist or that may emerge in the future, but also in the sense that it does not reflect all the norms that have been referred to in some way by the Commission as having a peremptory character. This includes those norms that the Commission has considered in the course of its deliberations. For example, in its commentary to article 50 of the draft articles on the law of treaties, the Commission referred, *inter alia*, to the prohibition of piracy and to the principle

---

[308]    See the report of the Study Group on the fragmentation of international law (finalized by Martti Koskenniemi) (footnote 54 above), p. 77, para. 374.

[309]    See conclusion (33) of the conclusions of the Study Group on the fragmentation of international law (footnote 54 above).

[310]    Paragraph (5) of the commentary to article 26 of the articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 85.

[311]    *Ibid.*, pp. 112–113, paragraph (4) of the commentary to article 40. This is the formulation used in the report of the Study Group on the fragmentation of international law (finalized by Martti Koskenniemi) (see footnote 54 above), p. 77, para. 374.

[312]    Paragraph (3) of the commentary to article 50 of the draft articles on the law of treaties, *Yearbook … 1966*, vol. II, document A/6309/Rev.1, Part II, p. 248.

[313]    Paragraph (5) of the commentary to article 40 of the articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 113. The report of the Study Group on the fragmentation of international law (finalized by Martti Koskenniemi) (see footnote 54 above), p. 77, para. 374, also referred to the prohibition of torture as an example of a peremptory norm of general international law (*jus cogens*).

[314]    Paragraph (5) of the commentary to article 26 of the articles on responsibility of States for internationally wrongful acts, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 85.

[315]    See conclusion (33) of the conclusions of the Study Group on the fragmentation of international law (footnote 54 above).

[316]    See paragraph (5) of the commentary to article 40 of the articles on responsibility of States for internationally wrongful acts, in which the Commission referred to the "the obligation to respect the right of self-determination", *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 113. See also conclusion (33) of the conclusions of the Study Group on the fragmentation of international law (footnote 54 above) and the report of the Study Group on the fragmentation of international law (finalized by Martti Koskenniemi) (*ibid.*), p. 77, para. 374. In paragraph (3) of the commentary to article 50 of the draft articles on the law of treaties, the Commission referred to the "principle of self-determination", *Yearbook … 1966*, vol. II, document A/6309/Rev.1, Part II, p. 248. In paragraph (5) of the commentary to article 26 of the articles on responsibility of States for internationally wrongful acts, the Commission referred to the right to self-determination, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 85.

of the sovereign "equality of States" – a fundamental principle under the Charter of the United Nations.[317] The Commission had also referred to the important role of the Charter of the United Nations, especially its provisions setting out the purposes and principles of the United Nations for the development of peremptory norms of general international law (*jus cogens*). In draft article 19, adopted in 1976 during the first reading of the topic "State responsibility", the Commission also referred to obligations "of essential importance for the safeguarding and preservation of the human environment, such as those prohibiting massive pollution of the atmosphere or of the seas" as peremptory norms of general international law (*jus cogens*).[318]

(16)    The norms in the annex are presented in no particular order. Their order does not, in any way, signify a hierarchy among them.

**Annex**

(*a*)    The prohibition of aggression;

(*b*)    the prohibition of genocide;

(*c*)    the prohibition of crimes against humanity;

(*d*)    the basic rules of international humanitarian law;

(*e*)    the prohibition of racial discrimination and apartheid;

(*f*)    the prohibition of slavery;

(*g*)    the prohibition of torture;

(*h*)    the right of self-determination.

---

[317]    Paragraph (3) of the commentary to article 50 of the draft articles on the law of treaties, *Yearbook … 1966*, vol. II, document A/6309/Rev.1, Part II, p. 248.

[318]    See article 19, paragraph 3 (*d*), of the draft articles on State responsibility, *Yearbook … 1976*, vol. II (Part Two), pp. 95–96, read in conjunction with paragraphs (17) and (18) of the commentary to that article (*ibid.*, p. 102).