# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ESTATE OF TAMAR KEDEM SIMAN TOV, BY HEIR-AT-LAW GAD KEDEM, ET AL.,<br><br>              Plaintiffs,<br><br>        v.<br><br>UNITED NATIONS RELIEF AND WORKS AGENCY ("UNRWA"), ET AL.,<br><br>              Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.<br><u>24 Civ. 4765 (AT)</u> |

### PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO
### THE GOVERNMENT'S LETTER CONCERNING IMMUNITY ISSUES

AMINI LLC
Bijan Amini
Avery Samet
John W. Brewer
131 West 35th Street, 12th Floor
New York, New York 10001
Tel. (212) 490-4700

MM~LAW LLC
Gavriel Mairone (admitted to S.D.N.Y. Bar)
Adora Sauer
    (pro hac vice application to be filed)
 Ariel Mairone (N.Y. state bar # 4993259,
    pro hac vice application to be filed)
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
Tel. (312) 253-7444

*Attorneys for Plaintiffs*

<u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................. 1

RELEVANT FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY ........................... 4

ARGUMENT ................................................................................................................................ 7

   I.     DEFENDANTS BEAR THE BURDEN OF ESTABLISHING THEIR IMMUNITY
   DEFENSE ............................................................................................................................. 7

   II.    UNRWA IS NOT ENTITLED TO IMMUNITY ................................................................. 7

       a.   *The CPIUN's Text, Historical Context, and U.S. Ratification History Indicate No Intent
           to Immunize UNRWA* ................................................................................................ 8

       b.   *The Government's Cited Caselaw Does Not Establish that the CPIUN Immunizes
           UNRWA* ................................................................................................................... 10

       c.   *The Government's "Integral Part" Contention is an Unsupported Factual Assertion
           Contradicted by the Evidence* ................................................................................. 13

       d.   *The CPIUN Does Not and Cannot Apply to Claims for Aiding and Abetting Genocide
           and Other "Jus Cogens" Violations* ...................................................................... 16

   III.   THE INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO ANY OFFICIAL-
   ACTS IMMUNITY UNDER CPIUN SECTION 18 .......................................................... 20

       a.   *No Presumption of Protection Under Either the CPIUN or IOIA Has Been Shown* ..... 20

       b.   *Any Individual Immunity That Might Otherwise Be Available Does Not Extend to Jus
           Cogens Violations* .................................................................................................. 22

       c.   *Any Individual Immunity That Might Otherwise Be Available Has Been Waived* ........ 24

   IV.   DEFENDANTS LAZZARINI AND GRANDI DO NOT HAVE DIPLOMATIC
   IMMUNITY FOR THE CLAIMS AGAINST THEM ....................................................... 26

   V.    NO DEFERENCE SHOULD BE ACCORDED TO THE GOVERNMENT'S
   POSITION ABOUT THE CPIUN'S LEGAL MEANING OR FACTUAL APPLICATION . 27

   VI.   THE IMMUNITY ARGUMENTS CANNOT BE RESOLVED IN DEFENDANTS'
   FAVOR WITHOUT EVIDENCE ..................................................................................... 28

CONCLUSION .......................................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                         **Page(s)**

*A.J. Ruiz Consultatoria Empresarial S.A. v. Banco Bilbao Vizcaya Argentaria, S.A.*,
    2024 WL 460482 (Bankr. S.D.N.Y. Feb. 6, 2024) ....................................................... 7

*Abdullahi v. Pfizer, Inc.*,
    562 F.3d 163 (2d Cir. 2009) ........................................................................... 16, 17

*Askir v. Boutros-Ghali*,
    993 F. Supp. 368 (S.D.N.Y. 1996) ............................................................................. 12

*BG Group plc v. Republic of Argentina*,
    572 U.S. 25 (2014) .................................................................................................. 26, 27

*Boimah v. United Nations General Assembly*,
    664 F. Supp. 69 (E.D.N.Y. 1987) .............................................................................. 12

*Brzak v. United Nations*,
    597 F.3d 107 (2d Cir. 2010) ............................................................................... 10, 21

*Caltagirone v. Grant*,
    629 F.2d 739 (2d Cir. 1980) ..................................................................................... 27

*Carpenter v. Republic of Chile*,
    610 F.3d 776 (2d Cir. 2010) ..................................................................................... 16

*Filus v. Lot Polish Airlines*,
    907 F.2d 1328 (2d Cir. 1990) ............................................................................. 28, 29

*Flores v. S. Peru Copper Corp.*,
    414 F.3d 233 (2d Cir. 2003) ..................................................................................... 19

*Friends of the East Hampton Airport, Inc. v. Town of East Hampton*,
    841 F.3d 133 (2d Cir. 2016) ..................................................................................... 11

*Funk v. Belneftekhim*,
    861 F.3d 354 (2d Cir. 2017) ..................................................................................... 28

*Georges v. United Nations*,
    834 F.3d 88 (2d Cir. 2016) ............................................................................. 10-12, 17

*In re Terrorist Attacks on Sept. 11*,
    349 F. Supp.2d 765 (S.D.N.Y. 2005) ....................................................................... 28

*Kashef v. BNP Paribas, S.A.*,
   925 F.3d 53 (2d Cir. 2019) ................................................................. 16, 17, 23

*Kolovrat v. Oregon*,
   366 U.S. 187 (1961) ................................................................................. 26

*Kulhawik v. Holder*,
   571 F.3d 296 (2d Cir. 2009) ................................................................... 13

*Mazengo v. Mzengi*,
   542 F. Supp. 2d 96 (D.D.C. 2008) ..................................................... 7, 21

*Medellin v. Texas*,
   552 U.S. 491 (2008) ................................................................................. 26

*Mora v. New York*,
   524 F.3d 183 (2d Cir. 2008) ............................................................. 17, 18

*Ocean Line Holdings Ltd. v. China National Chartering Corp.*,
   578 F.Supp.2d 621 (S.D.N.Y. 2008) ........................................................ 7

*Rodriguez v. Pan American Health Organization*,
   29 F.4th 706 ............................................................................................... 8

*Rodriguez v. Pan American Health Organization*,
   502 F. Supp. 3d 200 (D.D.C. 2020) ....................................................... 10

*Sadikoglu v. United Nations Development Programme*,
   2011 WL 4953994 (S.D.N.Y. Oct. 14, 2011) ......................................... 12

*Sarei v. Rio Tinto, PLC*,
   487 F.3d 1193 (9th Cir. 2007) ................................................................ 23

*Shechter v. Comptroller of City of New York*,
   79 F.3d 265 (2d Cir. 1996) ....................................................................... 7

*Siderman de Blake v. Republic of Argentina*,
   965 F.2d 699 (9th Cir. 1992) ............................................................. 16, 17

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ................................................................................. 27

*Sumitomo Shoji America, Inc. v. Avagiano*,
   457 U.S. 176 (1982) ........................................................................... 27, 28

*Tachiona v. United States*,
   386 F.3d 205 (2d Cir. 2004) .................................................................... 27

iii

*United States v. Bahel*,
    662 F.3d 610 (2d Cir. 2011) ................................................... 24

*United States v. Norman*,
    935 F.3d 232 (4th Cir. 2019) ........................................... 11, 12

*Varrone v. Bilotti*,
    123 F.3d 75 (2d Cir. 1997) ...................................................... 7

*Von Saher v. Norton Simon Museum of Art*,
    754 F.3d 712 (9th Cir. 2014) ................................................. 27

*Yaman v. Yaman*,
    730 F.3d 1 (1st Cir. 2013) ...................................................... 27

*Young v. Selsky*,
    41 F.3d 47 (2d Cir. 1994) ........................................................ 7

*Yousuf v. Samantar*,
    699 F.3d 763 (4th Cir. 2012) ........................................... 22, 23

## Statutes

22 U.S.C. §288 et seq. ............................................................ passim

22 U.S.C. §288e ........................................................................ 21

22 U.S.C. §288 ........................................................................... 9

22 U.S.C. §288d(b) ........................................................... 21, 22, 24

28 U.S.C. §1602 et seq. .......................................................... passim

## Treaties

Convention on the Privileges and Immunities of the Specialized Agencies ................................. 8

Convention on the Privileges and Immunities of the United Nations .................................. passim

Vienna Convention on the Law of Treaties (1969) ................................................. 17

## Official UN Documents

"Draft Conclusions on Identification and Legal Consequences of Peremptory Norms of General
    International Law (*jus cogens*), with commentaries"
    (A/77/10) ................................................................................ 18

iv

General Assembly Resolution 60/147
    "Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of
    Gross Violations of International Human Rights Law and Serious Violations of International
    Humanitarian Law, A/RES/60/147 ................................................................................. 19

General Assembly Resolution 76(I)
    "Privileges and Immunities of the Staff of the Secretariat of the United Nations",
    A/RES/76(I)… ................................................................................................................ 20

General Assembly Resolution 177(III)
    "Formulation of the Principles Recognized in the Charter of the Nuremberg Tribunal in the
    Judgement of the Tribunal", A/RES/177(III)… ........................................................... 22

General Assembly Resolution 302
    "Assistance to Palestine Refugees", A/RES/302(IV) ...................................... 8, 13, 14

Security Council Resolution 1373
    S/RES/1373 (2001) ................................................................................................ 18, 25

**Executive Orders**

Executive Order 9698
    F.R. 1809 (Feb. 19, 1946) .......................................................................................... 9

Executive Order 12628
    F.R. 7725 (Mar. 8, 1988) ........................................................................................... 9

**Other Authorities**

Restatement (3d) of Foreign Relations Law of the United States §102 ....................... 17

Plaintiffs, 101 victims of Hamas' genocidal October 7 Attack of last year, respectfully oppose the July 30, 2024 letter (Doc. No. 17) filed by the United States Department of Justice (the "Government") arguing for the immunity of the Defendants to this action: the United Nations Relief and Works Association ("UNRWA") and seven of its current and former executives (the "Individual Defendants").

## PRELIMINARY STATEMENT

The Government contends that the treaty known as the Convention on the Privileges and Immunities of the United Nations, 21 U.S.T. 1418, puts the Defendants above the law and authorizes the Defendants to aid and abet genocide, mass murder, mass rape, and commit other violations of fundamental human rights with impunity. The Government is wrong.[1]

On October 7, 2023, the Plaintiffs were mercilessly hunted, tortured, kidnapped, sexually assaulted and killed by an organized attack launched by Hamas with genocidal intent. Hamas is a Specially Designated Global Terrorist Group, and, on September 3, 2024, the Government filed a criminal complaint against Hamas' leaders in this Court for committing the October 7 Attack. By this action, Plaintiffs seek redress from the Defendants for aiding and abetting Hamas in perpetrating those same atrocities. Plaintiffs' Complaint details how UNRWA knowingly provided over $1 billion U.S. dollars to Hamas to pay smugglers for the weapons and explosives used in the October 7 Attack; UNRWA knowingly provided Hamas with the safe haven of its Gaza facilities to plan, stage and coordinate the October 7 Attack (including UNRWA's own headquarters); UNRWA knowingly allowed Hamas to indoctrinate recruits and control its schools through Hamas teacher guides, Hamas teachers and al Kutla programming; and UNRWA

---

[1] While the Government refers to this treaty as the "General Convention," we will call it the "CPIUN" as appears to be more common in the caselaw.

knowingly employed Hamas members on staff and in leadership positions, and regularly met with senior Hamas leaders.  The Complaint alleges how the Defendants set in motion these acts here in New York, through New York bank accounts and New York-based planning, budgeting, solicitation and fundraising.

The Government refers to these actions as "international torts," but the Defendants' actions violate the norms of jus cogens, the most serious and fundamental rules of international law.  As the Second Circuit recently explained, these norms "may not be violated, irrespective of the consent or practice of a given State," and "enjoy the highest status within international law." Similarly, the United Nations itself maintains that any action or decision of any international organization that conflicts with a jus cogens norm is ineffective.  Indeed, the United Nations Security Council has mandated that all states, including the United States, must "ensure that any person who participates in the financing, planning, preparation or perpetration of terrorist acts … is brought to justice."  Thus, an assertion that an individual or organization who perpetrates such acts is immune from justice must be met with skepticism.

The activities of UNRWA fall far outside of the immunity intended by the CPIUN.  First, the CPIUN applies to the United Nations itself, not to the myriad agencies, like UNRWA, which are affiliated with the UN.  Per its Charter, the United Nations consists of six principal organs, such as the Secretariat and Security Council.  However, since its founding, over 100 international organizations affiliated with the United Nations have come into existence.  These organizations employ hundreds of thousands and conduct all manner of disparate activities, and they have a wide variety of relationships to, coordination with and reporting obligations to the United Nations. During the ratification debate over CPIUN, the State Department maintained that CPIUN represented only a minor change to existing law and, under questioning by the Senate, confirmed

2

that the treaty was intended to cover the United Nations only, not other UN-affiliated entities. Indeed, the Senate has never ratified other treaties which would immunize other such entities, and the Executive Branch has never designated UNRWA under the International Organizations Immunities Act of 1945 ("IOIA"), 22 U.S.C. §288 et seq.  Glossing over this key point, the Government's letter simply quotes the UN's own letter, which asserts without any explanation or support, that "UNRWA is an integral part of the United Nations." DOJ Letter at 4.  There is no evidence this is true and, although it would be Defendants' burden to prove, there is voluminous evidence that it is false.

Second, even if this Court were to extend the CPIUN beyond the United Nations itself to affiliated agencies like UNRWA – something no Court has previously done – such immunity would not extend to the jus cogens violations alleged here.  Under international law, no treaty or international act may validate any action in support of genocide, mass rape or ethnic cleansing. Moreover, it is absurd for the United Nations to suggest that UNRWA is immunized from knowingly participating in acts which under its own official pronouncements are fundamentally contrary to the UN's own purposes.

Third, even if UNRWA itself were immunized, the Individual Defendants would not be immunized under Section 18 of the CPIUN for "official acts."  Official act immunity extends only to an individual's official acts; acts in support of genocide and crimes against humanity can *never* be considered an official act.  The same principle would apply to the two Individual Defendants who claim immunity under CPIUN Section 19, as these actions cannot be considered "official functions."  Indeed, after UNRWA's activities began to come to light, UNRWA attempted to distance itself from the October 7 atrocities by waiving immunity for those who "participated or abetted what transpired."

UNRWA and the Individual Defendants certainly cloaked their heinous acts in the drapery of the United Nations.  But they did not take any of these actions at the behest of the Security Council, Secretary General, or any of the principal organs of the United Nations.  In fact, as detailed in the Complaint, they ignored the explicit warnings from the actual United Nations to cease supporting Hamas and they openly violated the United Nations' rules, principles and stated purposes.  In any event, the principle that officials – even governmental officials – may not be shielded by immunity when they aid and abet genocide goes back to the Nuremberg tribunal, and regardless of the Government's position in its letter is the true principle to which this Government still adheres.  In the absence of direct Congressional authorization, UNRWA should not be provided immunity for committing the most fundamental violations of international law.  This Court should deny the Government's suggestion of immunity and require the Defendants to respond to the Complaint.  At the very least, the Court should require the Defendants to bring actual evidence concerning their defenses, including their immunity defense.

Finally, we remind the Court that the United Nations and the treaties discussed herein were formed in the years immediately following the Second World War as an antidote to the unrestrained trampling of jus cogens norms.  In the midst of that era, on September 29, 1947, the Government itself opened the Einsatzgruppen Trial by declaring: "If these men be immune, then law has lost its meaning and man must live in fear."  It would be a grim irony if the same treaties now gave license and immunity to aid and abet genocide, crimes against humanity, torture, mass killing and rape.

### RELEVANT FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

Plaintiffs filed the Complaint (Doc. No. 1) on June 24, 2024.  Plaintiffs served Defendants UNRWA, Ellis, and Gunnarsdottir on July 10, 17, and 23, respectively.  Docs. No. 14, 15, & 16.

These defendants have not responded to the Complaint within their time to do so.  As referenced by the United Nations (DOJ Letter at 2), Plaintiffs have provided letters to certain of the overseas Defendants requesting their waiver of service pursuant to Fed. R. Civ. P. 4(d).

The Alien Tort Statute, 28 U.S.C. § 1350, provides this Court with jurisdiction to hear civil actions by aliens for torts committed in violation of the law of nations or a treaty of the United States.  Plaintiffs contend that the Defendants violated the law of nations and treaties of the United States prohibiting aiding and abetting genocide, crimes against humanity, mass killing of civilians, taking of civilian hostages, systematic mass rape, and financing and providing material support for international terrorism.  (Cmplt. ¶¶644-652).  Plaintiffs also contend that the Individual Defendants violated the Torture Victim Protection Act of 1991.  (Cmplt. ¶¶654-659).

The Plaintiffs are non-U.S.-citizen victims of the October 7 Attack, including estates and other survivors of such victims, whose individual stories and injuries are described in detail. (Cmplt. ¶¶15-506).  Defendant UNRWA was first established by a resolution of the UN General Assembly in December 1949.  (Cmplt. ¶507).  UNRWA provides education, health care and other social services to approximately 5 million Palestinians located in Gaza, the West Bank, Jordan, Lebanon and Syria; it employs over 30,000 people.  (Cmplt. ¶540).  The Individual Defendants served as UNRWA Commissioner Generals, UNRWA Deputy Commissioner Generals and the Director of UNRWA's Representative Office in New York.  (Cmplt. ¶514).

Prior to the October 7 Attack, UNRWA systematically and deliberately aided and abetted Hamas by transforming its headquarters, schools and clinics into military storage and deployment bases for Hamas.  (Cmplt. ¶¶545-559).  As a result, UNRWA provided Hamas with a safe haven to prepare and launch mass-casualty, genocidal attacks, including the October 7 Attack, on civilians.  (Cmplt. ¶560).  UNRWA knowingly allowed Hamas to indoctrinate recruits and control

its schools through Hamas teacher guides, Hamas teachers and al Kutla programming; and UNRWA knowingly employed Hamas members on staff and in leadership positions, and regularly met with senior Hamas leaders. (Cmplt. ¶¶ 572-580, 587). UNRWA knowingly caused over one billion in U.S. cash dollars to be funneled to Hamas in Gaza needed by Hamas pay smugglers for weapons, ammunition, explosives and tunnel construction material. (Cmplt. ¶¶581-586). The Defendants set in motion these acts here in New York, through New York bank accounts and New York-based planning, budgeting, solicitation and fundraising. (Cmplt. ¶¶ 617-631).

The United Nations Secretary General, along with other UN agencies, repeatedly warned UNRWA concerning its activities in aid of Hamas and recommended that UNRWA change course, but UNRWA ignored those warnings and recommendations. (Cmplt. ¶¶ 558-559, 563-565, 576, 593). Defendants also knew of Hamas' genocidal intentions given Hamas' prior words and deeds. (Cmplt. ¶¶632, 522-539). UNRWA was able to provide assistance in Gaza to Hamas of a different kind than other outside backers of terrorism because UNRWA could operate openly in Gaza and could exploit its claimed humanitarian status to impede security measures from preventing the October 7 Attack. (Cmplt. ¶535). Its assistance formed a potent pillar of Hamas' plan to undertake the October 7 Attack (Cmplt. ¶¶535, 632). The October 7 Attack, and the revelations in its aftermath, proved a public relations nightmare for UNRWA. (Cmplt. ¶¶635-637). As a result, UNRWA and the United Nations issued statements that any UNRWA employee who "participated or abetted" in the October 7 Attack would be held accountable, terminated and referred for criminal prosecution. (Cmplt. ¶¶639-640).

**ARGUMENT**

## I.    DEFENDANTS BEAR THE BURDEN OF ESTABLISHING THEIR IMMUNITY DEFENSE

Immunity defenses are just that:  affirmative *defenses* that generally must be pleaded and proved by the defendant seeking to avoid litigating the merits.  *See*, *e.g.*, *Pablo Star Ltd. v. Welsh Government*, 961 F.3d 555, 559-60 (2d Cir. 2020) (defendant claiming to be "foreign state" protected by the Foreign Sovereign Immunities Act, 28 U.S.C. §1602 et seq. ("FSIA") "bears the burden of establishing a prima facie case that it is a foreign sovereign"); *Ocean Line Holdings Ltd. v. China National Chartering Corp.*, 578 F.Supp.2d 621, 622-628 (S.D.N.Y. 2008) (rejecting immunity claim because defendant corporation failed to meet its burden to show it was agency or instrumentality of Chinese government); *Mazengo v. Mzengi*, 542 F. Supp.2d 96, 99-100 (D.D.C. 2008) (rejecting diplomatic immunity defense advanced by individual associated with embassy of Tanzania to the U.S. because he failed to demonstrate that he qualified for such immunity "despite his burden to do so"); *A.J. Ruiz Consultatoria Empresarial S.A. v. Banco Bilbao Vizcaya Argentaria, S.A.*, 2024 WL 460482 at *9 (Bankr. S.D.N.Y. Feb. 6, 2024) (International Finance Corporation met its initial burden of entitlement to protection under the IOIA by showing that it had been designated by executive order for IOIA protection).[2]

## II.    UNRWA IS NOT ENTITLED TO IMMUNITY

The Government argues (DOJ Letter at 3) that the "U.N. enjoys immunity from this action" under the CPIUN. This is a non sequitur. Plaintiffs have not sued the UN itself, only UNRWA,

---

[2] *See also Varrone v. Bilotti*, 123 F.3d 75, 78 ("[s]ince qualified immunity is an affirmative defense, the defendants bear the burden"); *Young v. Selsky*, 41 F.3d 47, 57 (2d Cir. 1994) (prison-system official who adjudicated appeals from inmate disciplinary hearings had burden of showing he was entitled to absolute immunity like that enjoyed by judges and did not meet that burden); *Shechter v. Comptroller of City of New York*, 79 F.3d 265, 269 (2d Cir. 1996) (when immunity is limited to defendant's official acts, it is defendant's burden to demonstrate that alleged misconduct fell within that protected category).

which is (Cmplt. ¶507) "affiliated with, but distinct from the United Nations." The burden is on the proponent of immunity for UNRWA to show that the immunity granted to "the United Nations" in the CPIUN encompasses UNRWA, and that burden has not been met.

a.    *The CPIUN's Text, Historical Context, and U.S. Ratification History Indicate No Intent to Immunize UNRWA*

The CPIUN was approved by the UN in 1946. Article II of the CPIUN provides that "[t]he United Nations, its property and assets… shall enjoy immunity from every form of legal process except insofar as in any particular case it has expressly waived its immunity." *See* 21 U.S.T. 1418 §2.  However, the CPIUN nowhere states nor implies that such immunity extends to affiliated entities other than the UN itself.  The Preamble refers to "the Organization," and Article I states simply that "the United Nations" itself (in the singular) can contract, acquire property and institute legal proceedings.  Articles IV, V, and VI of the CPIUN separately grant immunity to three additional groups:  "representatives of Members to the principal and subsidiary organs" (§§11-13); certain UN officials (§§17-21); and experts on missions for the UN (§§22-23).  None of these three Articles covers UNRWA; indeed, UNRWA did not even exist until 1949.

In 1947, a year after the UN approved the CPIUN, the General Assembly approved the text of a separate treaty, the Convention on the Privileges and Immunities of the Specialized Agencies ("CPISA"), which was intended to provide immunity to UN-affiliated entities that the UN must have understood the CPIUN did not itself protect – an act that would make no sense if "the United Nations" in Article II of the CPIUN was intended and understood to encompass all affiliated entities.  "But the United States has never ratified the CPISA." *Rodriguez v. Pan American Health Organization*, 29 F.4th 706, 719 (D.C. Cir. 2022) (rejecting multiple immunity defenses raised by

UN-affiliated agency).[3]  Similarly, the 1949 resolution establishing UNRWA (Resolution 302, at ¶17) actually asked the world's governments to grant immunity to UNRWA, suggesting that UNRWA did not have immunity under the CPIUN.

The United States did not ratify the CPIUN until 1970.  Before then, the immunities of the UN were governed by the IOIA, enacted in 1945.  One feature of the IOIA is that it protects only those specific organizations that the President has affirmatively designated.  22 U.S.C § 288.  By executive order dated February 19, 1946, President Truman designated the UN itself, as well as a variety of other UN-affiliated agencies and entities.  Ex. Ord. 9698, F.R. 1809 (Feb. 19, 1946).  Again, this suggests that, at the time, the term "the United Nations" was not intended to encompass all of its affiliated agencies and entities.[4]

When, in 1970, the Nixon Administration finally lobbied the Senate to ratify the CPIUN, the State Department told the Senate that "[w]ith respect to the United Nations itself, there is no significant change [from the IOIA] …. Substantially all the privileges and immunities which are granted by the [CPIUN] are already given by the headquarters agreement of 1947 and the [IOIA]."  Senate Executive Report 91-17, Brewer Decl., Exh. A at 11; *see also id*., at 2 (explaining that while CPIUN Articles IV, V, and VI (discussed above) "change present practice somewhat," Articles I, II, and III "do not change the present situation since the [IOIA] already provides for the same legal capacities, privileges, and immunities"); *see generally id.* at 11-15.   In other words, Article II

---

[3] The text of the CPISA can be found at https://uia.org/archive/legal-status-5-1.

[4] Many other UN-affiliated agencies have been designated since then.  *See*, *e.g*., Ex. Ord. 12628, 53 F.R. 7725 (Mar. 8, 1988) (designating the United Nations Industrial Development Organization as entitled to IOIA immunity).  But UNRWA has never been designated for IOIA protection.  Accordingly, the DOJ Letter does not argue that it is protected by the IOIA.

immunity was intended to have the same meaning as immunity under the IOIA, which, as discussed above, treated UN affiliated agencies separately from the UN itself.

Indeed, the Senators specifically asked the State Department representative who testified before the Foreign Affairs Committee whether the CPIUN would extend to other entities:

> The CHAIRMAN [Senator Fulbright].  Does this convention apply only to the United Nations, or does it also cover the OAS, regional organizations or specialized United Nations agencies?
>
> Mr. STEVENSON:  There is a separate convention on specialized agencies which is not before the Senate.  There is no present intention to bring it before the Senate.

*Id.* at 37.  And on that basis the Foreign Affairs Committee assured the rest of the Senate, on the eve of their vote to ratify the CPIUN, that the immunity it granted would *not* extend to "any international or regional organizations other than the United Nations."  *Id.* at 6.[5]  Nowhere in Mr. Stevenson's testimony or in the legislative record was there any suggestion that "the United Nations" that was granted immunity by the CPIUN would also encompass UNRWA or any other affiliated agency.

> b.  *The Government's Cited Caselaw Does Not Establish that the CPIUN Immunizes UNRWA*

The Government cites no cases involving or mentioning UNRWA.  Another federal court has recently made clear that the immunity protections of the CPIUN do not extend to another UN affiliate organization, in that case the Pan American Health Organization.  *Rodriguez v. Pan*

_____

[5] At the time, prominent senators were aware of UNRWA and concerned about its activities.  The Congressional Record shows Senators of both parties making strongly critical statements about UNRWA on the Senate floor in the same spring 1970 timeframe as the ratification.  *See* "Should United Nations Funds Finance the Training of Arab Terrorists?," Feb. 27, 1970 at 5263-65 (remarks of Sen. Dodd, D. - Conn.); "Education for Hatred - Middle East Tragedy," May 26, 1970 at 17130-31 (remarks of Sen. Scott, R. - Pa.), Brewer Decl. Exhs. B & C.

*American Health Organization,* 502 F. Supp. 3d 200, 227 (D.D.C. 2020), *aff'd* 29 F.4th 706 (D.C. Cir. 2022).[6]

The Government cites *Brzak v. United Nations*, 597 F.3d 107 (2d Cir. 2010), but the UN itself was the only entity sued in *Brzak*, making it irrelevant. The Government then asserts (DOJ Letter at 3) that *Georges v. United Nations*, 834 F.3d 88, 98 (2d Cir. 2016), stands for the proposition that (emphasis added) "the United Nations *and its subsidiary organs* are absolutely immune from suit in domestic courts." But this is not a quotation from that case, which nowhere uses the phrase "subsidiary organ." And the record does not establish that UNRWA would qualify as a "subsidiary organ" in any event.[7] To the contrary, the official organizational chart of the entire "United Nations System" posted on the UN's website specifically lists a number of entities as "subsidiary organs" but does not include UNRWA in that category, instead listing UNRWA in a separate miscellaneous category of "Other Entities." Brewer Decl. Exh. D. And the UN lawyer's letter submitted as an exhibit (Doc. 17-1) to the DOJ Letter does not characterize UNRWA as a "subsidiary organ."

In *Georges*, the plaintiffs had (unlike the present Plaintiffs) sued the UN itself, the Secretary-General and the Security Council's Stabilization Mission to Haiti ("MINUSTAH"). All parties agreed for purposes of that litigation that these defendants constituted the UN itself. For that reason, both the district court and Second Circuit spoke of MINUSTAH having the same

---

[6] The D.C. Circuit, while affirming the district court's denial of immunity, did not address the applicability of the CPIUN or the UN Charter, as the defendant did not press those arguments on appeal.

[7] While "subsidiary organ" may sound like it ought to be a technical term in UN parlance, it appears in practice to be used inconsistently.

immunity as the UN itself; they did not decide the issue.[8] *See, e.g., Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133, 153 (2d Cir. 2016) (a "sub silentio holding" in earlier case on issue not disputed by parties to that case "is not binding precedent" because earlier court "did not independently analyze" its merits) (citations and quotations omitted); *United States v. Norman*, 935 F.3d 232, 241 (4th Cir. 2019) (declining to give weight to statement of law in prior opinion that had not been disputed by parties in that case: "[U]nder our adversarial system of justice, an unchallenged and untested assumption is simply not a holding that binds future courts."). Moreover, the Government has made no showing that UNRWA is similarly situated to MINUSTAH.

As to the other district court cases the Government cites, *Boimah v. United Nations General Assembly,* 664 F. Supp. 69 (E.D.N.Y. 1987), holds that the UN's General Assembly, "as one of the six principal organs" established by the UN's Charter, falls within the immunity protections of the CPIUN. That is irrelevant here because it is undisputed that UNRWA was not established by the Charter and is not one of the "principal organs." *Askir v. Boutros-Ghali,* 993 F. Supp. 368 (S.D.N.Y. 1996) involved only claims against senior officials of the UN itself in their official capacity; no UN-affiliated agencies were named as defendants. *Sadikoglu v. United Nations Development Programme,* No. 11 Civ. 294 (PKC), 2011 WL 4953994 (S.D.N.Y. Oct. 14, 2011) treats the United Nations Development Programme, an entity vaguely characterized as a "subsidiary program" of the UN, as protected by the CPIUN. However, as in *Georges*, the plaintiff

---

[8] As a review of the plaintiffs' briefing in both courts shows, they never challenged the assertion that MINUSTAH was encompassed within the UN's own CPIUN immunity. *See* S.D.N.Y. 13-cv-7146, Docs. 33 & 43; 2d Cir. 15-455-cv, Doc. 40-1. *Laventure v. United Nations*, 279 F. Supp.3d 394 (E.D.N.Y. 2017), *aff'd* 746 Fed. App'x 80 (2d Cir. 2018), also cited in the DOJ Letter, is another case involving MINUSTAH, and the plaintiffs there likewise never argued that MINUSTAH was distinct from the "United Nations" itself for CPIUN immunity purposes. *See* E.D.N.Y. 14-cv-1611, Doc. 21; 2d Cir. 17-2908-cv, Doc. 41.

did not contest that claim, arguing only (unsuccessfully) for a commercial-activities exception to CPIUN immunity.[9]

    c.    *The Government's "Integral Part" Contention is an Unsupported Factual Assertion Contradicted by the Evidence*

The Government asserts (DOJ Letter at 4) that "[a]s an integral part of the United Nations, UNRWA enjoys the privileges and immunities of the United Nations." But even if "integral part" were the proper legal standard for determining the scope of CPIUN immunity, the contention that UNRWA is an "integral part" of the UN is a *factual* assertion and one that is completely unsupported by evidence. Indeed, the authority the Government cites for this factual claim is nothing more than a quotation in essentially the same words from a letter that was written by a UN in-house lawyer after this action had already been filed – an entirely conclusory and self-serving statement made solely for litigation purposes by an interested party, and not even made under penalty of perjury. *See Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009) (an "attorney's unsworn statements in a brief are not evidence").

The only *fact* cited by either the Government or the UN's lawyer in connection with this "integral part" assertion is that UNRWA was established in 1949 by General Assembly Resolution 302. Not only is this an unexplained non sequitur, but the very resolution cited contradicts the

---

[9] See S.D.N.Y. 11-cv-294, Docs. 16 & 45.

As to the state court decisions the Government cites, *Shamsee v. Shamsee*, 74 A.D.2d 357 (2d Dep't 1980), held that a divorced wife could not execute against her ex-husband's interest in the United Nations Joint Staff Pension Fund because that fund's assets were property of the UN itself and protected from execution by the CPIUN. The court noted the "intimate connection between the fund and its parent organization," largely because the UN itself had provided the funding for the pension fund, *id.* at 362, whereas here (see below at 14) UNRWA is not funded by the UN but is required to raise its own funding independently. In *Hunter v. United Nations,* 6 Misc.3d 1008(A) (Sup. Ct. N.Y. Cty. 2004),the plaintiff sued the UN and UNICEF for employment discrimination, and the Court dismissed finding that the UN was covered by the CPIUN, and, seemingly, that UNICEF was instead immune not under that treaty but instead as an international organization covered by the IOIA.

Government's current position.  That resolution, in pertinent part, "[c]alls upon the Governments concerned to accord to [UNRWA] the privileges, immunities, exemptions and facilities which have been granted to the United Nations Relief for Palestine Refugees, together with all other privileges, immunities, exemptions and facilities necessary for the fulfilment of its functions." (Brewer Decl. Exh. E, ¶17). This is the very opposite of a statement that UNRWA was to be considered indistinguishable *from the UN itself* for treaty-based immunity purposes. Indeed, by the time of this resolution, the CPIUN had already been drafted and ratified by numerous countries (even though not yet by the U.S.).  Moreover, the "calls upon" language in the resolution is itself the very opposite of a self-executing treaty that could bind U.S. courts without implementing legislation.

There is, contrary to the Government's conclusory assertion, substantial evidence that UNRWA is a separate entity rather than an "integral part" of the UN,[10] such as:

- UNRWA is not funded by the UN's general revenues. Each year it must raise its own money from donor states and private donors through its own efforts.  And when it experiences budget shortfalls or cash-flow crises due to, for example, donors suspending payment, it cannot rely on the UN to bail it out.[11]

---

[10] Much of this evidence also shows that UNRWA is not similarly situated to the various other UN-affiliated entities involved in the prior cases the DOJ Letter cites.

[11] According to UNRWA itself: "Some 91 per cent of UNRWA's core funding is provided on the basis of voluntary contributions and the remaining nine per cent is received from UNRB [UN Regular Budget] (six per cent), and indirect support costs (ISC) and interest earned (three per cent). Despite the generosity of donors, this funding model has led to repeated liquidity crises, an ongoing struggle to reach and maintain service delivery standards and norms, the degradation of Agency installations, including health centres and schools and, in relation to staffing, an increased vacancy rate and reliance on short-term contracts, job creation programme and consultants to fulfil core functions."  Brewer Decl. Exh. F at 1.34.

14

- UNRWA does not take policy direction from the General Assembly or Secretary-General; instead, it relies on input from its own "Advisory Commission" composed of only a fraction of UN members, many of which are donors.  Brewer Decl. Exh. E, ¶8; *id*., Exh. F at 1.2 ("Overall advice and support regarding Agency programming are provided to the Commissioner-General by an Advisory Commission, currently comprised of 29 members and 4 observers, including representatives of UNRWA's major donors and host countries.").

- As already noted above, General Assembly Resolution 302 that created UNRWA did *not* characterize it as entitled to the same privileges and immunities as the UN itself.

- "On 11 December 2009, a Special Agreement was entered into between the Secretary-General of the United Nations and UNRWA's Commissioner-General by which UNRWA accepted the jurisdiction of the [UN] Appeals Tribunal to hear appeals from the judgments of the UNRWA [Dispute Tribunal], pursuant to Article 2(10) of the Appeals Tribunal Statute."  *Nemrawi v. Commissioner-General of UNRWA*, Judgment No. 2018-UNAT-851 at 6 n.3., Brewer Decl. Exh. G.  The need for such an arms-length "Special Agreement" with the UN to confer such appellate jurisdiction would make no sense if UNRWA were an "integral part" of the UN.

- UNRWA's tens of thousands of locally recruited personnel do not participate in the same pay and benefits system as the personnel of the UN itself.  *See* Brewer Decl. Exh. H ("Over the last few days, in several meetings, the Commissioner-General reminded the Agency's major donors that UNRWA area staff salaries are far lower than those of nationally recruited United Nations staff, with a completely different pay scale."); *Tabari v. Commissioner General*, Judgment No. 20-11-UNAT-177 at 6 ("It is clear …

15

that historically the UNRWA area staff members are not part of the United Nations common system of salaries, allowances, or other conditions of service"),  Brewer Decl. Exh. I at 28.

- Functionally, UNRWA's work looks nothing like that of the UN's "principal organs" such as the General Assembly and Security Council.  Those entities set policy and make decisions regarding, among other things, military action – core governmental functions as to which absolute immunity makes perfect sense and is common in U.S. law.  By contrast, UNRWA is running schools and health clinics in Gaza and other locations in the Middle East, as well as other, similar large-scale programs dealing with ordinary people in the real world.  (Cmplt.  ¶¶540-541).  Entities engaged in this sort of activity often can be and are private charities or NGOs, as well as governmental agencies or international organizations.  Especially given the likelihood of tort injuries committed through ordinary negligence when such programs are conducted at large scale, entities engaged in such work essentially never have absolute immunity under US law, state or federal.

In sum, whether UNRWA is an "integral part" of the UN, even if that is the proper legal standard for it to receive immunity under the CPIUN, is a disputed threshold fact question on which the party seeking immunity bears the burden of proof but has not met that burden.

     d.    *The CPIUN Does Not and Cannot Apply to Claims for Aiding and Abetting Genocide and Other "Jus Cogens" Violations*

All of the horrific actions of Hamas that the Complaint alleges, with supporting factual detail, that UNRWA aided and abetted were not merely torts.  These atrocities violated what are called in international law "jus cogens norms."  As the Second Circuit explained in *Kashef v. BNP Paribas, S.A.*, 925 F.3d 53, 61 (2d Cir. 2019):

We are prohibited from deeming valid, for purposes of act-of-state deference, atrocities such as genocide, mass rape, and ethnic cleansing, which violate jus cogens norms. "A jus cogens norm, also known as a peremptory norm of international law, is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." *Carpenter v. Republic of Chile*, 610 F.3d 776, 780 n.4 (2d Cir. 2010). "Jus cogens embraces customary laws considered binding on all nations, and is derived from values taken to be fundamental by the international community, rather than from the fortuitous or self-interested choices of nations." *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 715 (9th Cir. 1992). Accordingly, we have previously explained that these norms may not be violated, "irrespective of the consent or practice of a given State." *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 179 (2d Cir. 2009). "Because jus cogens norms do not depend solely on the consent of states for their binding force, they enjoy the highest status within international law." *Siderman*, 965 F.2d at 715.

None of the cases the Government cites hold that the immunity provided by the CPIUN, if it were available to UNRWA, provides impunity for such jus cogens violations. For example, *Brzek* involved allegations of employment discrimination and workplace sexual harassment, and *Georges* involved allegations that UN peacekeepers had negligently caused a public health crisis in Haiti.

Whether the CPIUN provides immunity to "the United Nations" for jus cogens violations thus appears to be a question of first impression. But it is not a difficult question. It is a well-established principle of treaty interpretation that a treaty among nations is void and unenforceable if it violates a jus cogens norm, just as an ordinary contract may be held void for illegality or for violating public policy. *See*, *e.g*., Vienna Convention on the Law of Treaties, arts. 53 & 64;[12]

---

[12] *See Mora v. New York*, 524 F.3d 183, 196 (2d Cir. 2008) (Second Circuit treating this convention as persuasive authority on customary principles of treaty interpretation even though U.S. has not formally ratified it). The text of this convention is available at https://legal.un.org/ilc/texts/instruments/english/conventions/1_1_1969.pdf.

Restatement (3d) of Foreign Relations Law of the United States §102, cmt. j ("an agreement will not supersede a prior rule of customary law that is a peremptory norm of international law [*jus cogens*]; and an agreement will not supersede customary law if the agreement is invalid because it violates such a peremptory norm").  Thus, the CPIUN would be unenforceable to the extent it is interpreted to provide impunity for defendants charged with aiding and abetting genocide and similar jus cogens violations.

The UN's own International Law Commission ("ILC") fully endorses this position, recently advising the General Assembly that international treaties (necessarily including the CPIUN) are void if they conflict with jus cogens norms.  *See* Conclusions 10, 11 & 12 in the ILC's "Draft conclusions on identification and legal consequences of peremptory norms of general international law (jus cogens)." Brewer Decl. Exh. J. Not only is there no basis in the other authorities cited to exempt the UN from this rule of international law, the ILC separately concludes (*id*. at Conclusion 16) that a "resolution, decision or other act of an international organization that would otherwise have binding effect" is ineffective to the extent it conflicts with a jus cogens norm. In Comment 2 to Conclusion 16, the ILC gives the specific example of a Security Council or a General Assembly resolution as the type of decision that cannot override jus cogens norms.

But there is no need to interpret the CPIUN (whether in section 2 or otherwise, see below at 22-24), to provide immunity for defendants alleged to have violated jus cogens norms.  The text of the CPIUN must be interpreted in light of Article 105 of the UN's Charter, which contemplates (emphasis added) that the UN "shall enjoy in the territory of each of its Members such privileges and immunities *as are necessary for the fulfillment of its purposes*."  Indeed, the DOJ Letter (at 3) quotes this language from Article 105, which is recited in the CPIUN's own preamble (in the second "Whereas" clause).  *See Mora*, 524 F.3d at 196 (a treaty's "preamble is not without

18

meaning under international law.  It provides valuable context for understanding the terms of a treaty.").

We are not asking this Court to make its own assessment of whether or not aiding and abetting Hamas' terror and genocide is consistent with the "fulfillment" of the UN's "purposes." The UN itself has already answered that question.  Security Council Resolution 1373, adopted in 2001, authoritatively declares "that acts, methods, and practices of terrorism are contrary to the purposes and principles of the United Nations and that knowingly financing, planning and inciting terrorist acts are also contrary to the purposes and principles of the United Nations." Brewer Decl. Exh. K. It also requires all UN Members, including the U.S., to "[e]nsure that any person who participates in the financing, planning, preparation or perpetration of terrorist acts … is brought to justice."[13]   The Complaint alleges, with voluminous supporting detail, that UNRWA helped finance Hamas' terrorist acts and genocide in the October 7 Attack.

The suggestion that UNRWA may aid and abet genocide and other jus cogens violations and finance terrorist acts with impunity thus undermines and contradicts the very "purposes" of the UN, as authoritatively stated by the Security Council. The CPIUN, which was expressly drafted to further those purposes, cannot and should not be interpreted so as to frustrate them.[14]

Finally, granting UNRWA or any other defendant immunity for jus cogens violations would also contradict the express will of the UN as set forth in the General Assembly's Resolution 60/147

---

[13] When the Security Council acts pursuant to Article VII, as it did in this resolution, the resolution is binding international law rather than merely hortatory.  See *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 261 (2d Cir. 2003) (distinguishing between Security Council resolutions which are binding on all UN member governments and General Assembly resolutions, which are not); Brewer Decl. Exh. L (U.S. ambassador to UN explaining that "only under Chapter 7 is the [Security Council] action mandatory on all UN members").

[14] Or at a minimum, is a prospective immunity waiver for jus cogens violations.

on "Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law." Brewer Decl. Exh. M. That resolution and the principles it endorses state (emphasis added) that each member state, including the U.S., is obligated to "[p]rovide those who claim to be victims of a human rights or humanitarian law violation with equal and effective access to justice … *irrespective of who may ultimately be the bearer of responsibility for the violation*" and to "[p]rovide effective remedies to victims." Both directives set forth in the resolution are inconsistent with the immunity claimed for UNRWA (and the Individual Defendants) here.

## III.    THE INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO ANY OFFICIAL-ACTS IMMUNITY UNDER CPIUN SECTION 18

The DOJ Letter raises (at 7) the possibility that the Individual Defendants all have "official acts" immunity from suit under Section 18 of the CPIUN.  Strikingly, however, the Government does not actually endorse the merits of this position, but simply recites that it "hereby conveys to the Court the position of the United Nations" that Section 18 immunity protects the Individual Defendants.  It cites no authority for the notion that the Court should take any action on the position of a non-party who has not appeared before the Court when the Government is unwilling to vouch for the correctness of that position.

### a.    *No Presumption of Protection Under Either the CPIUN or IOIA Has Been Shown*

First and foremost, the Government notes correctly that Section 18 immunity is limited to "U.N. officials" but makes no attempt to show that any of the Individual Defendants qualify as such, given that, at shown above, UNRWA is not the same entity as the UN itself.  Moreover, Section 17 of the CPIUN requires that the Secretary-General and General Assembly "specify the categories of officials" entitled to Section 18 immunity and make the names of the specific individuals entitled to such immunity "known to the Governments of Members."  There is no

evidence that the UN complied with this requirement with respect to either the "category" of UNRWA employees or the "names" of the Individual Defendants. [15] Beyond these failures of evidence, the Government cites no case law showing that these defendants fall within the scope of the immunity conferred by Section 18.[16]

The Government separately raises the possibility (DOJ Letter at 7) that the Individual Defendants could be entitled to IOIA immunity, even though that possibility was not raised by the UN in the letters attached as exhibits. But the Government completely ignores the explicit statutory prerequisites for any IOIA immunity for individuals. First, the Government ignores the requirement of 22 USC §288d(b) that the individual seeking immunity be or have been employed by an "international organization" as specifically defined for IOIA purposes. As shown above at 9, this requires an affirmative designation by the President that the Government does not claim UNRWA has received, as shown by its decision not to argue that UNRWA itself has any IOIA protection. Second, the Government ignores 22 U.S.C. §288e, which provides, in pertinent part: "No person shall be entitled to the benefits of this subchapter, unless he (1) shall have been duly notified to and accepted by the Secretary of State as a representative, officer, or employee [of the relevant "international organization"]; or (2) shall have been designated by the Secretary of State, prior to formal notification and acceptance, as a prospective representative, officer, or employee." Neither the Government nor the UN even asserts that this basic prerequisite has been satisfied with respect to any of the Individual Defendants. Without satisfying that prerequisite, no IOIA

---

[15] The only General Assembly resolution "specify[ing] the categories of officials" is Resolution 76, which identifies in its title the "Staff of the Secretariat of the United Nations." Brewer Decl. Exh. N. There is no suggestion that UNRWA and/or its staff are part of the Secretariat, and the official UN organizational chart (Brewer Decl. Exh. D) shows that they are not.

[16] There were individual defendants sued in *Brzak*, but it appears that they were held entitled to immunity under section 19 of the CPIUN (addressed below), not section 18. 597 F.3d at 113.

21

immunity can be available. *See also Mazengo*, 542 F. Supp. 2d at 99-100 (claim to diplomatic immunity cannot be sustained without evidence that U.S. State Department followed process for formally recognizing claimant's status as a protected diplomat).

      b.      *Any Individual Immunity That Might Otherwise Be Available Does Not Extend to Jus Cogens Violations*

Section 18 immunity for individuals covered by it is limited to claims arising from (DOJ Letter at 7) "words spoken or written and all acts performed by them in their official capacity." Likewise, IOIA immunity for individuals covered by it is limited to claims "relating to acts performed by them in their official capacity and falling within their functions as such representatives, officers or employees."  22 U.S.C. §288d(b).

But such "official-acts" immunity does not, as a matter of law, extend to *jus cogens* violations like those alleged against the Individual Defendants here for aiding and abetting genocide, crimes against, humanity, mass killing of civilians, torture, weaponized rape, and hostage-taking.  In addition to the inability of the CPIUN, as a treaty, to override such jus cogens norms, as discussed above, case law makes clear that no immunity doctrine, treaty-based or otherwise, could apply here.  *See*, *e.g*., *Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012) (rejecting immunity defense because "under international and domestic law, officials from other countries are not entitled to foreign official immunity for *jus cogens* violations, even if the acts were performed in the defendant's official capacity"). This was hardly a new idea. In its 1947 Resolution 177 (Brewer Decl. Exh. O), the UN General Assembly directed the ILC to formulate for future reference the so-called "Nuremberg principles," which included as Principle III: "The fact that a person who committed an act which constitutes a crime under international law acted as Head of State or responsible Government official does not relieve him from responsibility under

international law." The CPIUN never gave UN personnel more expansive immunity than the immunities available to a "responsible Government official" of an individual nation.

*Yousuf* reaffirmed this principle more recently when it followed what it called, with numerous citations, "an increasing trend in international law to abrogate foreign official immunity for individuals who commit acts, otherwise attributable to the State, that violate *jus cogens* norms– i.e. they commit international crimes or human rights violations[.]" 699 F.3d at 776. *Yousuf* also observed that "American courts have generally followed the foregoing trend, concluding that *jus cogens* violations are not legitimate official acts and therefore do not merit foreign official immunity[.]" *Id.*

Even more recently, the Second Circuit cited *Yousuf* approvingly and followed it in the similar fact pattern presented by *Kashef*, 925 F.3d at 62, n. 7. The defendants in that case were private-sector actors alleged to have aided and abetted acts of genocide and terror by the government of Sudan. The Second Circuit rejected their argument that they could not be secondarily liable as aiders and abettors under the theory that the primary torts they had allegedly aided and abetted were "acts of state" by the alleged primary violator. To the contrary, the Second Circuit held that "[t]he act of state doctrine cannot shield this genocide from scrutiny by the courts of the United States because … a universal international consensus prohibit us from deeming genocide an 'official act' of Sudan" and further held that it was "prohibited from deeming valid, for purposes of act-of-state deference, atrocities such as genocide, mass rape, and ethnic cleansing, which violate jus cogens norms." *Id.* at 60, 61. *See also Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1242 (9th Cir. 2007) (defendant could not use act-of-state doctrine to avoid secondary liability for alleged acts of Papua New Guinea government when those alleged acts would violate jus cogens norms). The application of *Yousef* and similar precedents is particularly compelling here where,

as shown above, the authoritative statements of both the Security Council and General Assembly show that recognizing any immunity for the acts the Individual Defendants are alleged to have committed would be contrary to the purposes and interests of the UN itself.

      *c.*     *Any Individual Immunity That Might Otherwise Be Available Has Been Waived*

      Given the failure to establish that any of the Individual Defendants are entitled to any presumptive immunity, and that any such immunity would not shield them from the allegations of *jus cogens* violations advanced here, this Court need not reach the waiver issue. But if it does, the record establishes waiver.

      Section 20 of the CPIUN provides that "[p]rivileges and immunities are granted to officials in the interests of the United Nations and not for the personal benefit of the individuals themselves." Accordingly (emphasis added), the "Secretary-General shall have the right *and the duty* to waive the immunity of any official in any case where, in his opinion, the immunity would impede the course of justice and can be waived without prejudice to the interests of the United Nations." Likewise, 22 U.S.C. §288d(b) provides that the immunity available to qualifying officers and employees of qualifying "international organizations" may be "waived by the … international organization concerned."

      The Second Circuit, in a case involving a former UN employee, has held that such waiver of an individual defendant's immunity, either under the CPIUN or the IOIA, may be either implied or express. *United States v. Bahel*, 662 F.3d 610, 625 (2d Cir. 2011).[17]

      Here, the conclusory statement in one of the UN's lawyer letters (not made under penalty of perjury and not even written to this Court) that no waiver of immunity has been given cannot

---

[17] The *Bahel* court also read the language of an express waiver in that case broadly to make practical sense in context even though some of the charges fell outside its scope if the waiver were read narrowly and literally. 662 F.3d at 624.

be reconciled with the prior public statements of both UNRWA and the Secretary-General himself – statements completely ignored both by that letter and the DOJ Letter even though they are directly quoted in the Complaint (at ¶¶639-40).  Specifically, on January 24, 2024, defendant Lazzarini, in his capacity as the current head of UNRWA, said on UNRWA's behalf that (emphasis added) "*any* UNRWA employee who was involved in acts of terror will be held accountable, including through criminal prosecution."  Brewer Decl. Exh. P.  The same day, a spokesperson for the Secretary-General of the UN confirmed that (emphasis added) the Secretary-General had directed that steps be taken "to ensure that *any* UNRWA employee shown to have participated or *abetted* what transpired on 7 October, or in any other criminal activity, be terminated immediately and referred for potential criminal prosecution."   Brewer Decl. Exh. Q.

These statements were not made casually or lightly.  They were made in the interests of UNRWA's own self-preservation at a time when it was experiencing a financial crisis because many of its major donor countries had suspended their contributions due to worldwide publicity about UNRWA's complicity with Hamas and the October 7 Attack.  *See* Brewer Decl. Exh. R (Jan. 28, 2024 N.Y. Times news article listing donor countries that had suspended funding).  They cannot be reconciled with the current litigation position expressed in the UN's letters that UNRWA management must be free to aid and abet genocide with impunity.  Moreover, Security Council Resolution 1373, discussed above, constitutes either a directive not to construe the CPIUN to provide immunity to the Individual Defendants here or, in the alternative, an express advance waiver of any immunity for the Individual Defendants for allegations of aiding, abetting, and funding terrorism, as they are alleged to have done.

## IV.   DEFENDANTS LAZZARINI AND GRANDI DO NOT HAVE DIPLOMATIC IMMUNITY FOR THE CLAIMS AGAINST THEM

The Government asserts that Messrs. Grandi and Lazzarini currently hold the "rank" of Under-Secretary-General (apparently without actually serving in that capacity functionally) and are thus also separately entitled to immunity under Section 19 of the CPIUN.

But even if that assertion was backed by evidence, Section 19 immunity would provide these two defendants no more benefit than Section 18 immunity would.  Section 19 immunity is broader than Section 18 immunity, primarily because it extends beyond "official acts" to, e.g., tort claims arising from purely private conduct, like an automobile accident unconnected to work.  *See* Brewer Decl. Exh. A at 29 (chart of examples provided by State Department to Senate Foreign Relations Committee).  However, the DOJ Letter (at 6) concedes that Section 19 immunity is not truly "absolute"; rather, it is subject to specified carve-outs, including one for "professional or commercial activities other than official functions."  Here, all of the wrongdoing by Messrs. Grandi and Lazzarini alleged in the Complaint was carried out in their "professional" capacity during their respective tenures directing UNRWA.  Because that wrongdoing, involving jus cogens violations, falls outside the scope of official-acts immunity as set forth above at 22-24, it necessarily falls within the separate category of "professional … activities other than official functions," for which the Government concedes section 19 provides no immunity. Finally, Section 20 of the CPIUN provides that Section 19 immunity, just like Section 18 immunity, is not for the personal benefit of the individual and can and must be waived to the same extent and in the exact same manner as Section 18 immunity. So, any potentially available Section 19 immunity has been waived for the reasons already given above.

## V.    NO DEFERENCE SHOULD BE ACCORDED TO THE GOVERNMENT'S POSITION ABOUT THE CPIUN'S LEGAL MEANING OR FACTUAL APPLICATION

The Government asks for deference to its views, but the very first case it cites (DOJ Letter at 3) begins its discussion of deference with a clear statement that "courts interpret treaties for themselves." *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961). *See also Medellin v. Texas*, 552 U.S. 491, 506 (2008) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text.")  The courts in practice do not defer to the Government in treaty interpretation when the Government's position does not persuade them. *See*, *e.g.*, *BG Group plc v. Republic of Argentina*, 572 U.S. 25, 37 (2014) ("We do not accept the Solicitor General's view as applied to the treaty before us.").  In any event, whatever the Government's legal position on the meaning of the CPIUN may be, the application of that legal position to this case depends on unsupported *factual* assumptions about UNRWA and the extent to which it is or is not an "integral part" of the UN itself.  But the Government does not assert it is entitled to deference on the application of treaty language to disputed facts, and it is not. *See, e.g., Von Saher v. Norton Simon Museum of Art*, 754 F.3d 712, 724 (9th Cir. 2014) (declining to "give serious weight to the Executive Branch's view" where the Solicitor General's amicus brief went "beyond explaining federal foreign policy and appears to make factual determinations").

Even as to legal rather than factual questions, the Government is entitled to no deference when its current litigation position contradicts its earlier positions, especially the representations it made to the Senate when the treaty in question was ratified.  *See Caltagirone v. Grant*, 629 F.2d 739, 746 n.18 (2d Cir. 1980) (refusing to give weight in interpreting extradition treaty to affidavit from State Department official that Government had submitted to district court when the affiant appeared to lack familiarity with the drafting of the treaty); *Yaman v. Yaman*, 730 F.3d 1, 14 (1st Cir. 2013) (in interpreting treaties, "the 'weight' of the Executive Branch's position in a particular

case depends in part upon 'its consistency with earlier and later pronouncements'") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  Indeed, *Tachiona v. United States*, 386 F.3d 205, 216 (2d Cir. 2004), cited by the Government, gave weight in interpreting the CPIUN to the testimony the State Department's Legal Advisor Mr. Stevenson gave to the Senate Foreign Relations Committee in the ratification context – the very same testimony (see above at 9-10) that the Government ignores and contradicts here.

Finally, the claim (DOJ Letter at 3-4) that the Government's position should be entitled to even greater deference because the UN itself agrees with it does not pass the red-face test.  The UN, in the context of this case, is a self-interested entity affiliated with each of the defendants and unsurprisingly supportive of their desire for immunity and impunity. This is the polar opposite of *Sumitomo Shoji America, Inc. v. Avagiano*, 457 U.S. 76 (1982), the only case the DOJ Letter cites for that proposition.[18]  Moreover, as shown above at 18-20, the UN's own current litigating position in this case cannot be reconciled with the prior authoritative statements of the Security Council and other UN bodies denouncing and disclaiming impunity for jus cogens violations.

## VI.   THE IMMUNITY ARGUMENTS CANNOT BE RESOLVED IN DEFENDANTS' FAVOR WITHOUT EVIDENCE

Since it is the Defendants' burden to prove they are entitled to immunity, and neither they nor the Government as their advocate has carried that burden, that should be the end of it and the case should proceed.  If, however, the Court is inclined to believe that the various unsupported and self-serving factual claims advanced in the unsworn UN lawyer's letter, if true, would conclusively

---

[18] There, a New York subsidiary of a Japanese company argued to be treated as a Japanese company under a specific U.S.-Japan treaty.  But the Japanese government took the contrary position against the interest of the Japanese owners.  As a result, the Court gave weight to the fact that both countries agreed on the treaty's proper interpretation even though they had potentially competing interests.

establish their immunity claims, then, at a minimum, the issue cannot be decided against the Plaintiffs without a full record. In the FSIA context, courts have repeatedly recognized the need for discovery when necessary to test the accuracy of self-serving and conclusory assertions by a party seeking immunity. *See*, *e.g.*, *Funk v. Belneftekhim*, 861 F.3d 354, 358 (2d Cir. 2017) (district court had properly ordered jurisdictional discovery against defendant entities that claimed to be protected by FSIA as agencies or instrumentalities of government of Belarus, and properly sanctioned those entities for failure to provide discovery); *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp.2d 765, 823 (S.D.N.Y. 2005) (ordering jurisdictional discovery against Saudi bank that claimed to be protected by FSIA as agency or instrumentality of Saudi government). *See also Filus v. Lot Polish Airlines*, 907 F.2d 1328 (2d Cir. 1990) (discussing potential need on remand to require Soviet government to respond to interrogatories; no dispute that USSR was a "foreign state" under FSIA but a fuller record might be needed to establish whether a relevant exception to FSIA immunity applied). The same approach would be warranted here. At the very least, the Defendants should be required to present evidence supporting these defenses before the Court rules on an important matter of first impression.

## CONCLUSION

For the foregoing reasons, the Government's suggestion that the Court dismiss this action as against some or all of the defendants on immunity grounds should be denied in its entirety.

Dated: New York, New York
September 13, 2024

AMINI LLC

By ____/s/ Avery Samet_____
    Bijan Amini
    Avery Samet
    John W. Brewer
131 West 35th Street, 12th Floor
New York, New York 10001
Tel. (212) 490-4700
bamini@amnillc.com
asamet@aminillc.com
jbrewer@aminillc.com

MM~LAW LLC

By ____/s/ Gavriel Mairone_____
    Gavriel Mairone (admitted to S.D.N.Y. Bar)
    Adora Sauer
    (pro hac vice application to be filed)
    Ariel Mairone (N.Y. state bar # 4993259,
    pro hac vice application to be filed)
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
Tel. (312) 253-7444

*Attorneys for Plaintiffs*

Of Counsel:
Mark Sunshine, Esq.
Thomas Berner, Esq.

30