# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ESTATE OF TAMAR KEDEM SIMAN TOV, BY HEIR-AT-LAW GAD KEDEM, ET AL.,** *Plaintiffs,* | |
| v. | No. 1:24-CV-4765 |
| **UNITED NATIONS RELIEF AND WORKS AGENCY ("UNRWA"), ET AL.,** *Defendants.* | |

**[PROPOSED] BRIEF OF FORMER FOREIGN POLICY OFFICIALS AND INTERNATIONAL LAW EXPERTS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' COMPLAINT**

Jason Torchinsky
Edward M. Wenger
Erielle Davidson
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
2300 N Street NW, Suite 643A
Washington, D.C. 20037
emwenger@holtzmanvogel.com
jtorchinsky@holtzmanvogel.com
edavidson@holtzmanvogel.com
Phone: (202) 737-8808
Fax: (540) 341-8809

Drew Ensign
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
Esplanade Tower IV
2575 East Camelback Rd., Suite 860
Phoenix, AZ 85016
densign@holtzmanvogel.com
Phone: (602) 388-1262

*Attorneys for Amici Curiae*

1

## INTERESTS OF AMICI CURIAE[1]

*Amici* include one former United States Attorney General, one federal judge, several former senior national security officials and diplomats, and international law professors who have deep expertise in questions of diplomatic and functional immunity. Given their expansive backgrounds in international law, government, and diplomacy, they have a professional interest in ensuring that those responsible for subsidizing and supporting the Hamas terror attacks of October 7, 2023, are held properly accountable. While Plaintiffs have consented to the filing of this Brief, the U.S. Government has not responded to *Amici*'s request, sent early morning on October 11, 2024.

*Amici* are the following:

**Michael Mukasey** served from 2007 to 2009 as the 81st Attorney General of the United States and from 1988 to 2006 as a U.S. district judge of the U.S. District Court for the Southern District of New York.

**Gen. Keith Alexander (ret.)** is a retired four-star general of the U.S. Army who previously served as the Director of the National Security Agency (2005-2014), Chief of the Central Security Service (2005-2014), and Commander of the U.S. Cyber Command (2010-2014). From 2003 to 2005, he served as the Deputy Chief of Staff for G-2 Intelligence within the U.S. Army.

---

[1] No counsel for any party authored this brief in whole or in part, and no party, party's counsel, or any person other than Amici Curiae or its counsel contributed money intended to fund preparation or submission of this brief. All parties were given timely notice of Amicus Curiae's intent to file.

**Victoria Coates** is a former national security official who served as Deputy Assistant to the President and Deputy National Security Advisor for the Middle East and North Africa from 2019 to 2020. Before that role, she worked on the National Security Council staff in a variety of capacities from 2017 to 2020. Ms. Coates currently serves as Vice President of the Kathryn and Shelby Cullom Davis Institute for National Security and Foreign Policy at The Heritage Foundation.

**Kevin Roberts** is the current President of the Heritage Foundation, which has been recognized as one of the think tanks with the most significant impact on public policy. He previously served as the Chief Executive Officer of the Texas Public Policy Foundation ("TPPF"), a nonpartisan research institute that became the largest state think tank in the Nation.

**Bonnie Glick** is an American diplomat who served as the Deputy Administrator of the United States Agency for International Development ("USAID") from January 2019 to November 2020 and previously as a Foreign Service Officer for twelve years at the U.S. Department of State. She currently serves as the Director of the Krach Institute for Tech Diplomacy at Purdue University.

**Advancing American Freedom** is a Section 501(c)(4) organization founded by former Vice President Mike Pence that advances conservative principles within both the domestic and foreign-policy space. It frequently submits *amicus curiae* briefs on a range of issues, from the proper application of Title IX to the presence of the anti-Israel Boycott, Divest, Sanction ("BDS") in higher education.

**Mark Goldfeder** is a Senior Lecturer at Emory Law School and the Director of the National Jewish Advocacy Center, where he addresses a variety of legal issues facing the global Jewish community. Much of his litigation work focuses on confronting entities providing material support for terrorist organizations. He previously served as private counsel to President Donald J. Trump.

**Eugene Kontorovich** is Professor of Law and Director of the Center for International Law in the Middle East at George Mason University's Antonin Scalia Law School. He has written over thirty articles on a range of legal subjects, including constitutional law, international law, and legal issues arising from the creation of international organizations.

**Jeremy Rabkin** is a Professor of Law at George Mason University's Antonin Scalia Law School, where he has taught a variety of public law subjects, including international law. Before joining the faculty in June 2007, he was, for over two decades, a professor in the Department of Government at Cornell University.

## INTRODUCTION &
## SUMMARY OF THE ARGUMENT

On October 7, 2023, the world bore witness to the deadliest day for the Jewish people since the Holocaust. Hamas terrorists, including staff members of Defendant UNRWA, invaded Israel and slaughtered 1,200 Israelis—men, women, children, and the elderly—while kidnapping over two hundred more. The slaughter was accompanied by gruesome and barbaric acts of torture. Victims were subjected to gang rape. Some were burned alive while their hands were zip tied together. Others suffocated in their own safe rooms from smoke inhalation after terrorists doused their houses in oil and set them aflame. Small babies were murdered in their cribs; other children watched the execution of their parents.

This modern-day pogrom was financed substantially and supported materially by Defendants, who now claim various forms of immunity to evade responsibility for their involvement. Specifically, Defendants—including the United Nations Relief and Works Agency ("UNRWA"), as well as individual members of its leadership and staff—are alleged to have continuously funneled U.S. dollars to Hamas for over a decade by injecting over $1 billion U.S. dollars into Gaza and to have enabled the construction of terrorist infrastructure both within and under Defendant UNRWA's facilities, as well as paid various members of Hamas who participated in the October 7 terror attacks. Despite having contributed to the mass atrocities, Defendants UNRWA and Lazzarini have announced not a *single* change to their current mechanism for hiring UNRWA employees, some of whom participated in the October 7 atrocities. Furthermore, Defendants UNRWA and Lazzarini have not indicated any

5

plans to alter their current payment system to local Gazans, which, unlike other UNRWA payment systems, uses U.S. dollars. That might seem innocuous, paying employees in U.S. dollars forces UNRWA employees to use moneychangers whose fees are siphoned off by Hamas—a well-known and longstanding issue that UNRWA has largely ignored. Indeed, if funding Hamas is not the *specific objective* of paying in U.S. dollars, it is difficult to discern what other purpose it might serve.

As an entity established by the United Nations ("U.N.") in 1949, UNRWA's putative mandate is to "provide assistance and protection to Palestinian refugees pending a just and lasting solution to their plight."[2] Knowingly funding Hamas terrorists is clearly outside that mandate—and therefore, the official function—of UNRWA employees. Yet, despite the obviousness of this statement, Defendants assisted Hamas for over a decade—from sharing UNRWA facilities with Hamas, permitting Hamas infrastructure to be built beneath or next UNRWA structures, and employing members of Hamas, to finally instituting a money-laundering operation that would allow foreign aid to land in the pockets of Hamas.

Despite statements to the contrary from the Government, Individual Defendants Phillippe Lazzarini, Filippo Grandi, Pierre Krähenbühl, Leni Stenseth, Sandra Mitchell, Margot Ellis, and Greta Gunnardottir ("Individual Defendants") do not enjoy immunity from suit. *First*, Defendants Lazzarini and Grandi are not privy to diplomatic immunity because the position of UNRWA Commissioner-General has

---

[2] *What is the Mandate of UNRWA?*, United Nations Relief and Works Agency for Palestine Refugees in the Near East, https://www.unrwa.org/what-mandate-unrwa-0 (last visited Oct. 14, 2024).

not been singled out for such treatment by the Convention on the Privileges and Immunities of the United Nations ("U.N. Immunities Convention"). *Second*, even if this Court were to find them eligible for diplomatic immunity, many of the allegations in the Complaint concerning their money-laundering operation to Hamas would not qualify for protection because those allegations fall outside the scope of that immunity. *Third*—even if that the Court decides that these individuals are non-senior U.N. employees—the functional immunity generally afforded to U.N. employees does not cover many of the primary allegations listed in the Complaint. Indeed, when evaluating the application of such functional immunity, the Court should consider the degree to which Individual Defendants' actions in this instance were *ultra vires* in nature and therefore undeserving of immunity.

## ARGUMENT

### I.  Defendants Lazzarini and Grandi Do Not Enjoy Diplomatic Immunity.

The Government claims that Defendants Lazzarini and Grandi enjoy diplomatic immunity as a function of their "rank" as Under-Secretary-General." Government's Letter Concerning Immunity Issues ("DOJ Letter") at 6. In making this argument, the Government relies on the Convention on the Privileges and Immunities of the United Nations (the "U.N. Immunities Convention"), Feb. 13, 1946, *entered into force with the respect to the United States* Apr. 29, 1970, which adorns "the Secretary-General [of the U.N.] and all Assistant Secretaries General . . . the privileges and immunities . . . accorded to diplomatic envoys, in accordance with international law." U.N. Immunities Convention, art. V, § 19. This argument fails,

however, because neither Lazzarini nor Grandi is being sued for actions taken while holding any position for which diplomatic immunity attaches.

To start, Defendant Lazzarini currently serves as the Commissioner-General of UNRWA—not "Under-Secretary General"—while Defendant Grandi serves as the U.N. High Commissioner for Refugees. The Government refers to a letter— submitted by Miguel de Serpa Soares, the Under-Secretary-General for Legal Affairs at the U.N.—to U.S. Ambassador to the U.N. Linda Thomas-Greenfield, which states that both Defendants Lazzarini and Grandi currently hold the "official rank of Under-Secretary General of the United Nations." DOJ Letter at 6.

As a threshold matter, the term "official rank" is not synonymous with "is." The Government—with the assistance of the U.N. appears to conflate the title of "Under-Secretary General" with "Commissioner-General" with no basis. Indeed, the United Nations cites no authority, either among its own documents, conventions, or resolutions or among the case law of U.S. federal courts, for the proposition that the title of Commissioner-General is actually representative of the "official rank" of Under-Secretary-General of the U.N. To that end, it is not obvious what the term "official rank" means—is it a term used for designating one's salary or retirement benefits internally or does the term genuinely serve a diplomatic function? Again, the U.N. provides no explanation.

Meanwhile, there is no dearth of actual "Under-Secretaries" who are abound within the United Nations; Defendant Lazzarini, however, is *not* one of them. Such positions include, for example, Under-Secretary-General for Policy, Under-Secretary-

General of the U.N. Counter-Terrorism Office, Under-Secretary-General for Legal Affairs and U.N. Legal Counsel, and Under-Secretary-General for Economic and Social Affairs. Indeed, Lazzarini is neither one of the many Under Secretaries nor a member of the United Nations' "Senior Management Group" ("SMG"),which the U.N. defines as "a high-level body, chaired by the Secretary-General, which brings together leaders of United Nations departments, offices, funds and programmes."[3]

Similarly, the Government also cites no authority for the proposition that the position of "Commissioner-General" is equivalent to "Under-Secretary General" because no such authority exists. Not a single court in the United States has ever found as much. That absence of legal precedent makes perfect sense, for not a single official from UNRWA is included in the SMG. This categorization is relevant because "[a]lthough senior executives of the U.N.—including the Secretary General of the United Nations, Under Secretaries-General and Assistant Secretaries-General of the United Nations–enjoy full diplomatic immunity, [U.N. Immunities Convention] art. V, § 19, *other U.N. employees do not.*" *Deng v. United Nations*, No. 22-CV-5539, 2022 WL 3030437, at *3 (S.D.N.Y. July 29, 2022) (emphasis added). Defendant Lazzarini is thus one of those many "other U.N. employees" that do not enjoy full diplomatic immunity. *Id.*

Accordingly, even if the Court were to credit the Government's position that UNRWA employees are, in fact, U.N. employees—an assertion properly contested by

---

[3] *Senior Management Group*, UNITED NATIONS, https://www.un.org/sg/en/content/senior-management-group (last visited Oct. 14, 2024).

Plaintiffs, *see* Plaintiffs' Memorandum of Law in Response to the Government's Letter Concerning Immunity Issues ("MOL"), 7–20—Defendant Lazzarini is being sued for acts committed as a general U.N. employee who typically does not enjoy diplomatic immunity under the U.N. Immunities Convention.

Lastly, Defendant Grandi similarly lacks diplomatic immunity here. Although he currently serves as the U.N. High Commissioner for Refugees—a position that *does* enjoy immunity in the Second Circuit, *see Brzak v. U.N.,* 551 F. Supp. 2d 313, 318–319 (S.D.N.Y. 2008)—he did *not* hold that position when he committed the acts giving rise to the allegations in this suit. Instead, he is being sued for acts he committed as the previous Commissioner-General of UNRWA from 2010 until 2014. Therefore, while Grandi enjoys diplomatic immunity for actions he might take in his current official capacity, he had no such immunity at the time he committed the acts alleged in the Complaint.

Decisions concerning the retroactive application of diplomatic immunity are sparse. Only one time has this Court squarely encountered it, and it determined—rather unusually—that those *currently* enjoying diplomatic immunity should be immune from prosecution concerning acts *committed previously*. *See United States v. Khobragade,* 15 F. Supp. 3d 383, 388 (S.D.N.Y. 2014). While the Second Circuit itself has not opined on this question, *Amici* believe that this Court, in the very least, should not adhere to the position adhered to by the *Khobrogade* court. The Vienna Convention on Diplomatic Relations ("Vienna Convention"), implemented by the

Diplomatic Relations Act in 1972, does not address retroactive diplomatic immunity.[4]

Similarly, from examining the legislative history of the Diplomatic Relations Act, it

is obvious that members of Congress did not anticipate such a strange application of

diplomatic immunity, either.

> Members of Congress might have found a retroactive grant of diplomatic immunity to be absurd because such a grant runs squarely afoul of the Vienna Convention's stated objective: "[T]he purpose of [diplomatic] privileges and immunities is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States[.]" A retroactive grant of immunity serves the individual—not diplomatic functions—because the individual was not a diplomat and therefore had no official functions when the alleged wrongful conduct occurred.[5]

Retroactive diplomatic immunity confounds logic, insofar as former diplomats

themselves are not even eligible for diplomatic immunity *for acts they committed as*

*diplomats*. *See Ravelombonjy v. Zinsou-Fatimabay,* 632 F. Supp. 3d 239 (S.D.N.Y.

2022); *Fontaine v. Permanent Mission of Chile*, No. 7-CV-10086, 2020 U.S. Dist.

LEXIS 149673 (S.D.N.Y. Aug. 18, 2020). Here, the Court would have to determine

that prior acts committed before an individual *ever* was eligible for diplomatic

immunity ought to be granted the protection of diplomatic immunity. Because this

position is untenable, the Court should decline to embrace it.

---

[4] Anna Raphael, Note, *Retroactive Diplomatic Immunity*, 69 DUKE L. J. 1425, 1438; *see generally* Vienna Convention on Diplomatic Relations, Apr. 18, 1961 23 U.S.T. 3227, 500 U.N.T.S. 95.

[5] Raphael, *supra note* 4, at 1438–39.

## II.    Even if Diplomatic Immunity Covered Commissioners-General, the Acts at Issue Are Not Protected.

Even if the Court were to find that Defendants Lazzarini and Grandi enjoyed diplomatic immunity while each served as Commissioner-General of UNRWA, diplomatic immunity, like presidential immunity, does not cover every conceivable act taken by a person who enjoys some immunity by virtue of his position. And here, many of the acts alleged in the Complaint committed by Defendant fall well outside the diplomatic-immunity rubric. Thus, even if Lazzarini and Grandi had diplomatic immunity, the acts at issue in the Complaint are not covered by it.

The Vienna Convention establishes the scope of diplomatic immunity for legal proceedings in the United States. Article 31 provides that a diplomatic agent "shall enjoy immunity from the criminal jurisdiction of the receiving State," as well as "immunity from its civil and administrative jurisdiction." Vienna Convention, art.31(1). The immunity from civil and administrative jurisdiction, however, is not absolute. Instead, the Vienna Convention provides three situations in which diplomatic immunity would not apply, and one of them is when "[a]n action relat[es] to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions." *Id.*, art. 31(1)(c). Ultimately, "[t]he purpose of diplomatic immunity, as stated in the Preamble to the Vienna Convention, 'is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States.'" *Ayekaba v. Ndong Mba*, No. 1:18-CV-12040, 2019 U.S. Dist. LEXIS 206145, *8-9 (S.D.N.Y. Nov. 25, 2019) (quoting the

Vienna Convention, 23 U.S.T. 3227, 500 U.N.T.S. 95, Preamble, cl. 4.). Acts falling outside official functions to not trigger this concern.

The "precise contours" of the phrase "professional or commercial activity . . . outside his official functions" are not defined with exacting certainty and remain "unsettled." *Broidy Capital Mgmt. LLC v. Benomar*, 944 F.3d 436, 445 (2d Cir. 2019). The term itself is not defined in the Vienna Convention. But even though the dividing line between official and unofficial acts itself may remain fuzzy enough to produce hard cases at the margins, this is not one of them. The allegations lodged against the Defendants cannot seriously be considered part of their official duties.

While some courts, including this one, have indicated the unofficial-act exception "broadly" refers to "trade or business activity engaged in for personal profit," *id.*, it remains the case in this Court—and this Circuit, more generally—that most litigants claiming this exception unsuccessfully seek its application in instances of workplace disputes between current or former employees.[6]

In contrast, the allegations here concern a widespread operation, spanning at least a decade, that was both "commercial" and "professional" in nature and far

---

[6] *See, e.g.*, *De Luca v. United Nations Org.*, 841 F. Supp. 531, 534 (S.D.N.Y. 1994) (suing U.N. Secretary-General for, inter alia, failure to reimburse plaintiff for his 1988 taxes, denial of extended medical coverage, and failure to investigate his complaints); *Gomes v. ANGOP*, No. 11-CV-0580, 2012 U.S. Dist. LEXIS 119049, *26 (E.D.N.Y. Aug. 22, 2012) (suing, inter alia, Angola's ambassador for publishing plaintiff's photo and misidentifying him as a drug trafficker on Angola's state media website); *Fontaine v. Permanent Mission of Chile*, No. 7-CV-10086, 2020 U.S. Dist. LEXIS 149673, *14 (S.D.N.Y. Aug. 18, 2020) (suing Chile's Permanent Mission, as well as Chile's various diplomatic representatives, for sexual harassment and discrimination).

outside the "official functions" ostensibly performed by Defendants Lazzarini and Grandi (and Defendant Krähenbühl, for that matter). Namely, Defendants Lazzarini, Grandi, and Krähenbühl, during their respective terms, facilitated the transfer of U.S. dollars from JP Morgan Chase Bank in New York, New York, to members of Hamas. In no conceivable way can these allegations fall under the "official" umbrella.

In particular, Defendant Lazzarini, who served as Commissioner-General in the years before and during the October 7 terror attacks, ensured that those U.S. dollars were used to pay salaries to over a dozen individuals, including members of Hamas, who participated directly in the atrocities of October 7 or provided support to Hamas in the days that followed. Compl. ¶¶ 566–71. All three Defendants, however, were responsible for overseeing an expansive money-laundering operation that ensured a sizeable share of UNRWA's payments to local employees in Gaza landed in the pockets of Hamas. Compl. ¶¶ 581–82. Defendants are, quite literally, accused of directly and knowingly financing a terrorist organization. To state the obvious, terrorism is not diplomacy. And cloaking terrorist financing with the auspices of "diplomacy" contorts the meaning of diplomacy beyond recognition.

UNRWA remains the second-largest employer in Gaza, second only to Hamas.[7] UNRWA pays its employees in Lebanon, Syria, Jordan, and the West Bank in their respective local currencies; only in Gaza does UNRWA insist on paying its employees in U.S. dollars, even though the dollar is not a readily negotiable currency in Gaza.

---

[7] *The real problem with the UN's agency for Palestinians*, ECONOMIST (Feb. 25, 2024), https://www.economist.com/middle-east-and-africa/2024/02/15/the-real-problem-with-the-uns-agency-for-palestinians.

Compl. ¶ 581. Instead, the standard currency for transactions in Gaza is New Israeli Shekels. This discrepancy means that local UNRWA staff must then resort to Gaza moneychangers to convert their dollars. And when they do, the moneychangers are required to pay anywhere from 10% to 25% of their fees to Hamas. Compl. ¶ 582. Indeed, in recent years, Hamas has used currency-exchange facilities in Gaza to finance its military activities. Compl. ¶ 582. Between 2018 and 2023, UNRWA injected $20 million USD *in cash* into Gaza *per month*, which amounts to roughly two-thirds of the U.S. dollars that are currently circulating in Gaza, including among Hamas. Compl. ¶¶ 582, 585. Hamas cannot otherwise access U.S. dollars due to anti-money laundering statutes and regulations. Compl. ¶ 585. To put a finer point on it, UNRWA is Hamas's cash cow.

There is no legitimate reason for this scheme. Such injections easily could be avoided if UNRWA paid its Gaza staff in their local currency—as it does in *every single other location* in which it operates. Compl. ¶ 584. It could do so straightforwardly via direct electronic transfer from banks in the West Bank to accounts in Gaza. Compl. ¶ 584. But instead, UNRWA funds for Gaza are transferred to the Bank of Palestine in Ramallah, where the transfers are converted to cash. Compl. ¶ 584. The U.S. dollars are then loaded onto trucks and carried across Israeli territory into Gaza. Compl. ¶ 584. Because each truck contains millions of U.S. dollars, the security risks are staggering. Compl. ¶ 584. Yet, this manifestly absurd and clunky operation continues unabated.

During each of their tenures, Defendants Lazzarini, Grandi, and Krähenbühl oversaw the execution of this seamless mechanism for transferring U.S. dollars in a manner that guaranteed Hamas ultimately would collect millions of dollars in money-changing fees. Compl. ¶¶ 586, 6. Indeed, if the generation of such fees was not the point of paying in U.S. dollars, it is hard to discern what would be. No obvious legitimate motive is apparent. The continued existence of this arrangement exists to support Hamas—which, to this day, UNRWA itself does not recognize as a terrorist organization.

An array of third parties, including auditors, have warned Defendants of the dangers inherent in this arrangement. Compl. ¶ 583. These repeated warnings went ignored for so long and remain so flagrant and otherwise inexplicable that the situation can only suggest that Defendants Lazzarini, Grandi, and Krähenbühl either were seeking personal remuneration from Hamas, thereby rendering their actions in some way "commercial," or were pursuing a political agenda—namely, aiding Hamas—from official U.N. purposes that it amounts to a private "profession," namely financing and promoting terrorism. In fact, because UNRWA exists solely to serve the Palestinian refugee population (indeed, no other refugee population in the world that has its own international organization within the U.N.), UNRWA's leadership has a vested interest in ensuring the refugee population never escapes such status; otherwise, the organization would be become obsolete. This money-laundering operation maintains the status quo of suffering.

In this vein, it would be difficult to imagine a clearer example of international officials engaging in both "professional" and "commercial" activities that fall "outside [the] official functions" of a diplomat. Most bluntly, Diplomats are empowered to engage in diplomacy. Aiding and abetting a terrorist organization through a decade of financial assistance—to the point that the terrorist organization is able to slaughter 1,200 people in a single day—amounts to *ultra vires* actions that should not be afforded diplomatic immunity.

In contrast to earlier cases this Circuit has confronted concerning exceptions to diplomatic immunity, recognizing diplomatic immunity here would be incongruous and create a stark outlier with profoundly negative implications. The specified categories of diplomatic immunity, as described *supra* in Section I, are designed, in part, to prevent the Court from wading into the murky waters of identifying which activities legitimately are considered "professional" or "commercial." For that reason, *Amici* strongly recommend that the Court recognize, as a threshold matter, that there exists no basis for granting Defendants Lazzarini and Grandi diplomatic immunity based on their respective terms as Commissioner-Generals of UNRWA. But should the Court disagree, it should nonetheless conclude that their actions fall outside the scope of diplomatic immunity.

### III.    Defendants' Actions Are Not Covered by "Official Function" Immunity.

In typical belt-and-suspenders fashion, the Government also insists that "official function" immunity, which applies to the U.N. employees, also shields Defendants from answering Plaintiffs' allegations. Notably, not a single Court has

determined that UNRWA is functionally equivalent to the U.N. for immunity purposes. More specifically, for an organization—and in turn, its employees—to receive immunity under the International Organizations Immunity Act ("IOIA"), the President of the United States must explicitly designate that the organization in question receive the "same immunity from suit and every form of judicial process as is enjoyed by foreign governments." 22 U.S.C. §§ 288b(a), 288. No President has decreed such with regard to UNRWA.

To be sure, the U.N., as well as other U.N.-affiliated agencies, have received such protection—but not UNRWA. Rather, such protection is contingent upon a *specific* executive designation that has not occurred here. *See, e.g.*, Ex. Ord. 9698, F.R. 1809 (Feb. 19, 1946).[8] Similarly, when the U.N. Immunities Convention was ratified by Congress in 1970, Congress understood that the U.N. Immunities Convention would *not* apply to "specialized United Nations agencies."[9] *See* MOL at 10.

Even UNRWA has acknowledged that the U.N. immunity does not extend to it without more. In 1967, UNRWA's then-Commissioner-General Lawrence Michelmore agreed to an arrangement with the Israeli government that "the Convention on the Privileges and Immunities of the United Nations [U.N. Immunities Convention] of 13

---

[8] It is worth noting that the U.N. General Assembly resolution establishing UNRWA "calls upon" states—language that is not strictly binding in U.N. practice—to grant UNRWA the same immunity that its predecessor organization, United Nations Relief for Palestine Refugees, enjoyed. Similar to UNRWA, its predecessor was never designated by the U.S. President under the IOIA. *See* G.A. Res. 302(IV), ¶ 17 (Dec. 8, 1949).

[9] UNRWA has been referred to as a "specialized agency" elsewhere, most recently in a bill before the U.S. Senate. *See* S. 3717, 118th Cong. § 2(3). https://www.congress.gov/bill/118th-congress/senate-bill/3717/text.

February 1946,1 to which Israel is a party, shall govern the relations between the Government and UNRWA in all that concerns UNRWA's functions."[10] The provisional agreement raises the question—why would UNRWA *need* to seek the application of the U.N. Immunities Convention for itself if the Convention already applied to UNRWA? The answer: the Convention did not automatically extend to it.

UNRWA's request of Israel was not unusual, for it concluded similar arrangements with the governments of Egypt and Lebanon in order to secure immunity for itself and its leadership. With regard to Egypt, UNRWA eventually was granted diplomatic immunity for its leadership in 1950 pursuant to a formal agreement,[11] while an exchange of notes between the Lebanese Government and UNRWA in 1954 reveals that UNRWA was to be afforded the privileges and immunities outlined in the U.N. Immunities Convention via a formal agreement.[12]

The legislative history of the U.N. Immunities Convention—and even UNRWA's own understanding of its place—squarely refutes the Government's

---

[10] *Exchange of letters constituting a provisional agreement concerning assistance to Palestine Refugees,* JEWISH VIRTUAL LIBRARY, https://www.jewishvirtuallibrary.org/exchange-of-letters-constituting-a-provisional-agreement-concerning-assistance-to-palestine-refugees (last visited Oct. 14, 2024).

[11] *Agreement between the Government of the Kingdom of Egypt and the United Nations Relief and Works Agency for Palestine Refugees in the Near East,* INTERACTIVE ENCYCLOPEDIA OF THE PALESTINE QUESTION, https://www.palquest.org/en/historictext/33966/agreement-between-government-kingdom-egypt-and-united-nations-relief-and-works-agency-palestine (last visited Oct. 14, 2024).

[12] *Exchange of Notes Constituting an Over-All Agreement between Lebanon and UNRWA,* INTERACTIVE ENCYCLOPEDIA OF THE PALESTINE QUESTION, https://www.palquest.org/en/historictext/24747/exchange-notes-between-lebanon-and-unrwa (last visited Oct. 14, 2024).

expansive interpretation of the U.N. Immunities Convention. The U.N. is a large international organization of particular importance and whose immunity is governed by a particular convention. Alongside, and separate from the U.N., are a wide range of other organizations with various degrees of linkage to the U.N., known as the "U.N. family" of agencies.[13] These organizations are not integral parts of the United Nations, but rather distinct legal entities that have varying relationships to the U.N. These organizations do not automatically enjoy the immunity of the U.N., as evidenced by the fact that a number of such organizations have been separately designated by the president under the IOIA –*e.g.*, the United Nations Educational, Scientific, and Cultural Organization ("UNESCO"); the United Nations Industrial Development Organization ("UNIDO"); the World Health Organization ("WHO"); the Food and Agricultural Organization of the United Nations ("FAO"); and the International Civil Aviation Organization ("ICAO"). These designations would make little sense if U.N. affiliates automatically enjoyed the U.N.'s immunity. Given the vast array of U.N. satellite organizations, it would be a tremendous leap for this Court to add UNRWA to the list of organizations enjoying immunity in the absence of any presidential action.

If the Court were to make such a fateful determination—that UNRWA is legally indistinguishable from the U.N.— Defendants would still not enjoy immunity for the acts alleged against them in the Complaint. Section 18 of the U.N. Immunities

---

[13] *UN Family of Organizations,* UNITED NATIONS, https://www.un.org/en/model-united-nations/un-family-organizations (last visited Oct. 14, 2024).

Convention provides a baseline degree of immunity for non-senior U.N. employees. They are to "be exempt from legal process in respect of words spoken or written and all acts performed by them in their official capacity." U.N. Immunities Convention, art. V, § 18(a). This provision applies to "all members of the staff of the United Nations, with the exception of those who are recruited locally and are assigned to hourly rates." G.A. Res. 76 (I), U.N. Doc. A/RES/76(I) (Dec. 7, 1946). In conjunction with the U.N. Immunitities Convention, the IOIA affords U.N. officers and employers immunity from suit and legal process "relating to acts performed by them in their official capacity and falling within their functions as [] officers or employees, except insofar as such immunity may be waived by the [U.N.].'" 22 U.S.C.A. § 228d(b)). The U.N. Immunities Convention—and per its language, the IOIA—can be understood to provide "functional immunity" for U.N. employees. *See Nouinou v. Smith,* No. 20-CV-8682, 2021 U.S. Dist. LEXIS 182293, at *9 (S.D.N.Y. Sep. 22, 2021).

The functional immunity afforded to general employees, as opposed to senior leaders of the U.N., is less robust. *See id.* Again, most of the instances in which this type of immunity has successfully shielded defendants in the Second Circuit arise in cases concerning workplace harassment or general disputes between employees.[14] Because the allegations in this Complaint are of an unprecedented magnitude,

---

[14] *See, e.g.*, *Boimah v. United Nations Gen.l Assembly*, 664 F. Supp. 69, 71 (E.D.N.Y. 1987) (concerning, inter alia, an employment discrimination claim); *Tuck v. Pan Am. Health Org. et al.*, (D.C. Cir. 1981) 668 F.2d 547, 550, n 7, 215 U.S. App. D.C. 201 (concerning breach of contract and race discrimination claims); *De Luca v. United Nations Org.*, 841 F. Supp. 531, 534-35 (S.D.N.Y. 1994) (concerning claims of sexual harassment and "indecent battery"); *Brzak v. UN*, 597 F.3d 107, 113 (2d Cir. 2010) (concerning claims of sexual harassment).

spanning a decade and culminating in the deadliest day for the Jewish people since the Holocaust, this functional immunity plainly does not apply.

Defendants Stenseth, Mitchell, and Ellis each served as Deputy Commissioners-General of UNRWA for Defendants Lazzarini, Krähenbühl, and Grandi, respectively. As second-in-command to the Commissioner-General, each assisted in executing the money-laundering scheme described above. Defendant Gunnarsdottir's work as Director of UNRWA's "Representative Office" in New York was in turn overseen and directed by Defendants Lazzarini and (during her UNRWA employment) Stenseth. Defendant Gunnardottir ensured that the U.S. dollars intended for Gaza would be in the JP Morgan Chase bank account in New York. It is not part of the official function of these individuals to funnel millions to a foreign terrorist organization. Indeed, it is ironic for the Government to argue that such behaviors were within the "official functions" of Defendants after the Government cut off aid to UNRWA until 2025 following confirmation of UNRWA's involvement in the October 7 atrocities.

The functional immunity asserted by several of the named Defendants ought to be approached with a critical eye. In fact, to maintain consistency within the Supreme Court's schema of immunity afforded to international entities, this Court should incorporate considerations of *ultra vires* when evaluating the proper application of functional immunity under the IOIA for the Individual Defendants. Just as common law principles of *jus cogens* may govern the immunity of foreign leaders who far exceed their authority, *ultra vires* would provide the appropriate

bulwark against those senior leaders of international organizations who perform actions inconsistent with the authority granted to them. In other words, if an individual is engaging in actions in his or her function, he or she implicitly does not have the authority to do so, which makes his or her actions void as *ultra vires.*

In *Jam v. International Financial Corporation*, the Supreme Court held that the most natural way to interpret the IOIA is to understand immunity for international organizations as being "continuously equivalent" with the immunity awarded to foreign governments, as outlined in the Foreign Sovereign Immunities Act ("FSIA"). 586 U.S. 199, 208 (2019). In *Jam*, the Court emphasized that international organizations should not enjoy greater immunity than sovereign states: "The IOIA should therefore be understood to link the law of international organization immunity to the law of foreign sovereign immunity, so that the one develops in tandem with the other." *Id.* at 210. The term "continuously equivalent" refers to the degree to which holdings within the FSIA arena ought to be reflected within the IOIA space.

To that end, the Supreme Court has held that the FSIA does not apply to foreign-official immunity, meaning that common law principles govern the parameters of the immunity enjoyed by individuals leading sovereign states rather than the FSIA. In *Samantar*, for instance, the Supreme Court considered whether the Prime Minister of Somalia could be sued for overseeing the Somali military forces that killed, tortured, and detained Somalis and members of their families. After the Supreme Court determined the FSIA did not apply and remanded, the Fourth Circuit

concluded on remand that the Somalian Prime Minister's violent acts were *not* protected under foreign-official immunity because, "as a matter of international and domestic law, *jus cogens* violations are, by definition, acts that are not officially authorized by the Sovereign." *Bashe Abdi Yousuf v. Mohamed Ali Samantar*, 699 F.3d 763, 776 (4th Cir. 2012). As the Fourth Circuit explained, "There has been an increasing trend in international law to abrogate foreign official immunity for individuals who commit acts, otherwise attributable to the State, that violate *jus cogens* norms—*i.e.*, they commit international crimes or human rights violations." *Id.* at 777.

While *Amici* understand that the Second Circuit previously has rejected the application of *jus cogens* to questions of immunity abrogation in the FSIA context, *see Matar v. Dichter,* 563 F.3d 9, 15 (2d Cir. 2009), the same cannot be said of the Second Circuit's treatment of the *ultra vires* principle, which governs the scope of the immunity typically enjoyed by government officials who similarly exceed their authority. The *ultra vires* exception strips immunity for actions of officials "beyond the scope of [] their authority." *Avent v. Solfaro,* No. 02-CV-0914, 2003 U.S. Dist. LEXIS 9896, at *12 (S.D.N.Y. June 11, 2003). And while the exception does not apply to "erroneous" behavior, *id.*, the acts at issue here are intentional, systematic, and longstanding. Here, it is clear the United States would never have financed UNRWA's activities if U.S. officials understood its purpose included support for terrorism (indeed, that is precisely *why* U.S. funding for UNRWA has ceased). Hence, such activity must be, by default, *ultra vires.*

Application of the *ultra vires* exception is particularly warranted here. Otherwise, a low-level staff member of an international organization that employs thousands would enjoy considerably *more* immunity than the leader of a sovereign state (in other Circuits), as well as U.S. government officials (in this Circuit). This cannot be right—and ultimately, it would create a legally chaotic immunity regime. It would also contravene the premise of *Jam*, which specifically cautioned against allowing international organizations to enjoy more immunity than sovereign states (and, in turn, presumably the respective officials of each).

While it remains unsettled whether the *ultra vires* principle applies to the immunity afforded to non-senior employees of international organizations, *Amici* respectfully submit that it should. Defendants acted beyond the scope of their UNRWA mandate to provide continuous support to a terrorist organization, as well as execute a massive, decade-long money laundering scheme that directly and knowingly funded a terrorist organization. Thus, even if Defendants otherwise would enjoy immunity generally, their immunity for the acts at issue in the Complaint fall outside of that immunity under the *ultra vires* exception.

## CONCLUSION

This case concerns a decades-long operation of systematic material support to a terrorist organization by an international organization. Even the Government, which now rushes to UNRWA and its employees' defense, suspended aid to UNRWA in the wake of the October 7 terror attacks for the same reasons that Plaintiffs bring suit now.

If such acts of material support were indeed within the "official functions" of UNRWA's employees, one might presume that continuing to fund UNRWA's actions would pose little issue for both Congress and the Executive branch. But it is precisely because UNRWA's operations so clearly contribute to funding Hamas that continued funding of federal dollars is a complete non-starter politically.

But accountability for UNRWA longstanding funding of a terrorist organization is not limited to the political branches. Because the challenged actions at issue went far beyond the scope of the official role of such employees, neither diplomatic immunity nor functional immunity shields individual Defendants from accountability in the Judiciary. The Government's letter contending otherwise lacks merit and should be rejected.

October 14, 2024

On behalf of the following *Amici*:

Michael Mukasey
Gen. Keith Alexander (ret.)
Victoria Coates
Kevin Roberts
Bonnie Glick
Advancing American Freedom
Mark Goldfeder
Eugene Kontorovich
Jeremy Rabkin

Respectfully submitted,

*/s/ Edward M. Wenger*
Edward M. Wenger
Bar No. 4779039
Jason Torchinsky
Erielle Davidson
HOLTZMAN VOGEL BARAN TORCHINSKY &
JOSEFIAK
2300 N Street NW, Suite 643A
Washington, D.C. 20037
emwenger@holtzmanvogel.com
jtorchinsky@holtzmanvogel.com
edavidson@holtzmanvogel.com
Phone: (202) 737-8808
Fax: (540) 341-8809

Drew Ensign
HOLTZMAN VOGEL BARAN TORCHINSKY &
JOSEFIAK
Esplanade Tower IV
2575 East Camelback Rd., Suite 860
Phoenix, Arizona 85016
densign@holtzmanvogel.com
Phone: (602) 388-1262

*Attorneys for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed with the United States District Court, Southern District of New York, on October 14, 2024, and served upon all parties of record via the Court's electronic filing system.

*/s/ Edward M. Wenger*
Edward M. Wenger
No. 4779039