# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ESTATE OF TAMAR KEDEM SIMAN TOV, BY HEIR-AT-LAW GAD KEDEM, ET AL.,<br><br>　　　　　　　　Plaintiffs,<br>　　　v.<br><br>UNITED NATIONS RELIEF AND WORKS AGENCY ("UNRWA"), ET AL.,<br><br>　　　　　　　　Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.<br><u>24 Civ. 4765 (AT)</u> |

## PLAINTIFFS' MEMORANDUM OF LAW
## <u>IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

AMINI LLC
Bijan Amini
Avery Samet
John W. Brewer
131 West 35th Street, 12th Floor
New York, New York 10001
Tel. (212) 490-4700

MM~LAW LLC
Gavriel Mairone (admitted to S.D.N.Y. Bar)
Adora Sauer
　(pro hac vice application to be filed)
　Ariel Mairone (N.Y. state bar # 4993259,
　　pro hac vice application to be filed)
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
Tel. (312) 253-7444

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ......................................................................................................................... 5

I.    DEFENDANTS BEAR THE BURDEN OF SHOWING THAT THEY ARE ENTITLED TO THE PROTECTION OF THE CPIUN AND/OR THE IOIA ..................................... 5

II.   UNRWA ITSELF IS NOT IMMUNE UNDER EITHER THE CPIUN OR THE IOIA ... 6

   A.   No Showing Has Been Made that the Treaty and Statutory Immunity Granted to the UN Itself Extends to Immunize UNRWA ..................................................... 6

   B.   Under Well-Established Treaty Interpretation Principles, Any CPIUN Immunity Does Not Apply to Jus Cogens Violations ............................................................ 11

   C.   This Court Is Not Obligated to Subordinate Its Own Judgment on Questions of Treaty Interpretation to the Government ................................................................. 15

   D.   Explicit Statutory Exceptions to IOIA Immunity Would Apply Here ......................... 16

III.  THE INDIVIDUAL DEFENDANTS ARE NOT ENTITED TO "OFFICIAL ACTS" IMMUNITY UNDER EITHER THE CPIUN OR THE IOIA ......................................... 19

   A.   No Showing Has Been Made That Any of the Defendants Qualify for Protection Under Either the CPIUN or IOIA ............................................................................. 19

   B.   Jus Cogens Violations Are By Definition Not Official Acts and Are Thus Unprotected by Official-Acts Immunity ............................................................................. 21

   C.   Any Potential Immunity of the Individual Defendants Has Been Waived .................. 23

IV.   MESSRS. LAZZARINI AND GRANDI ARE NOT ENTITLED TO "DIPLOMATIC" IMMUNITY .................................................................................................................... 25

V.    IN THE ALTERNATIVE, DISCOVERY WOULD BE WARRANTED ON THE ALLEGED FACTUAL GROUNDS FOR THE DEFENDANTS' IMMUNITY ARGUMENTS ................................................................................................................. 27

VI.   DEFENDANTS' OBJECTIONS TO SERVICE OF PROCESS ADD NOTHING, AND THEY HAVE NOW WAIVED ANY PERSONAL JURISDICTION DEFENSE .......... 28

CONCLUSION ..................................................................................................................... 30

i

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*767 Third Ave. Assoc. v. Permanent Mission of Zaire*,
  988 F.2d 295 (2d Cir. 1993) ........................................................................ 16

*BG Group plc v. Republic of Argentina*,
  572 U.S. 25 (2014) ...................................................................................... 15

*Bilalov v. Gref*,
  2022 WL 4225968 (S.D.N.Y. Sept. 13, 2022) ............................................ 19

*Broidy Capital Mgt. LLC v. Benomar*,
  944 F.3d 436 (2d Cir. 2019) .................................................................. 5, 27

*Caltagirone v. Grant*,
  629 F.2d 739 (2d Cir. 1980) ................................................................ 15, 16

*Devi v. Silva*,
  861 F. Supp. 2d 135 (S.D.N.Y. 2012) .................................................. 26, 27

*Does v. Obiano*,
  2024 WL 185642 ........................................................................................ 23

*EM Ltd. v. Republic of Argentina*,
  695 F.3d 201 (2d Cir. 2012) ...................................................................... 17

*Filus v. Lot Polish Airlines*,
  907 F.2d 1328 (2d Cir. 1990) .................................................................... 28

*Flores v. S. Peru Copper Corp.*,
  414 F.3d 233 (2d Cir. 2003) ...................................................................... 14

*Friends of the East Hampton Airport, Inc. v. Town of East Hampton*,
  841 F.3d 133 (2d Cir. 2016) ........................................................................ 9

*Funk v. Belneftekhim*,
  861 F.3d 354 (2d Cir. 2017) .................................................................. 27, 28

*Georges v. United Nations*,
  834 F.3d 88 (2d Cir. 2016) .......................................................................... 9

*Georges v. United Nations*,
  84 F. Supp. 3d 246 (S.D.N.Y. 2015) ........................................................... 9

ii

*In re Terrorist Attacks on Sept. 11*,
   349 F. Supp.2d 765 (S.D.N.Y. 2005) ................................................................ 28

*Jam v. Int'l Finance Corp.*,
   586 U.S. 199 (2019) ............................................................................... 6, 17

*Kadic v. Karadzic*,
   70 F.3d 232 (2d Cir. 1995) ..................................................................... 29, 30

*Kashef v. BNP Paribas, S.A.*,
   925 F.3d 53 (2d Cir. 2019) ...............................................................13, 21-23

*Kashef v. BNP Paribas SA.*,
   316 F.Supp.3d 770 (S.D.N.Y. 2018) ............................................................ 21

*Kolovrat v. Oregon*,
   366 U.S. 187 (1961) ...................................................................................... 15

*Laventure v. United Nations*,
   279 F. Supp.3d 394 (E.D.N.Y) ................................................................ 9, 14

*Laventure v. United Nations*,
   746 F. App'x 80 (2d Cir. 2018) ..................................................................... 9

*Lempert v. Rice*,
   956 F. Supp. 2d 17 (D.D.C. 2013) ................................................................. 9

*Matar v. Dichter*,
   563 F.3d 9 (2d Cir. 2009) ............................................................................. 22

*Medellin v. Texas*,
   552 U.S. 491 (2008) ...................................................................................... 15

*Mora v. New York*,
   524 F.3d 183 (2d Cir. 2008) ......................................................................... 12

*OBB Personenverkehr AG v. Sachs*,
   577 U.S. 27 (2015) ........................................................................................ 18

*Ocean Line Holdings Ltd. v. China National Chartering Corp.*,
   578 F. Supp.2d 621 (S.D.N.Y. 2008) ............................................................. 6

*Pablo Star Ltd. v. Welsh Government*,
   961 F.3d 555 (2d Cir. 2020) ..................................................................... 6, 17

*Rodriguez v. Pan American Health Organization*,
   29 F.4th 706 (D.C. Cir. 2022) ...................................................................... 18

*Rodriguez v. Pan American Health Organization*,
    502 F. Supp. 3d 200 (D.D.C. 2020) ................................................................ 7

*Rosenberg v. Pasha*,
    577 F. App'x 22 (2d Cir. 2014) ..................................................................... 22

*Sadikoglu v. United Nations Development Programme*,
    2011 WL 4953994 (S.D.N.Y. Oct. 14, 2011) ................................................. 9

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ...................................................................................... 16

*Smith v. Socialist People's Libyan Arab Jamahiriya*,
    101 F.3d 239 (2d Cir. 1996) ................................................................... 17, 21

*Sumitomo Shoji America, Inc. v. Avagiano*,
    457 U.S. (1982) ............................................................................................ 16

*Tanzin v. Tanvir*,
    592 U.S. 43 (2020) ....................................................................................... 21

*Turkiye Halk Bankasi A.S. v. United States*,
    598 U.S. 264 (2023) ....................................................................................... 5

*United States v. Bahel*,
    662 F.3d 610 (2d Cir. 2011) ........................................................................ 25

*United States v. Bankasi*,
    120 F.4th 41 (2d Cir. 2024) ......................................................................... 22

*United States v. Norman*,
    935 F.3d 232 (4th Cir. 2019) ......................................................................... 9

*United States v. Turkiye Halk Bankasi*,
    16 F.4th 336 (2d Cir. 2021) ................................................................... 18, 19

*Waldman v. PLO*,
    835 F.3d 317 (2d Cir, 2016) ........................................................................ 28

*Yaman v. Yaman*,
    730 F.3d 1 (1st Cir. 2013) ............................................................................ 16

*Yousuf* v. *Samantar*,
    699 F.3d 763 (4th Cir. 2012) .................................................................. 21-23

**Statutes**

22 U.S.C. §288d(b) ........................................................................................................ 19

22 U.S.C. §288e .......................................................................................................... 20

22 U.S.C. §§ 288 ........................................................................................................... 1

28 U.S.C. 1602 ............................................................................................................ 6

28 U.S.C. § 1605(a)(1) ................................................................................................ 17

28 U.S.C. §§ 1350, 1331, and 1367(a) ..................................................................... 1, 5

**Rules**

Fed. R. Civ. P. 4 ........................................................................................................ 29

Fed. R. Civ. P. 4(m) .................................................................................................. 29

Fed. R. Civ. P. 12(h)(1)(A) ....................................................................................... 28

Fed. R. Civ. P. 12(h)(2) .............................................................................................. 1

**Treaties**

Convention on the Privileges and Immunities of the United States,
   Feb. 13, 1946, 21 U.S.T. 1422 .......................................................................... passim

UN Charter,
   59 Stat. 1031 ....................................................................................................... passim

Vienna Convention on Diplomatic Relations,
   Apr. 18, 1961, 23 U.S.T. 3227 ................................................................................. 12

**UN Resolutions**

G.A. Res. 76(I) (Dec. 7, 1946) ............................................................................ 19, 20

International Tribunal for the Prosecution of Persons Responsible for Serious Violations of
   International Humanitarian Law Committed in the Territory of the Former Yugoslavia since
   1991 (September 2009) ........................................................................................... 11

Security Council Resolution 1373,
   S/RES/1373 (2001) .......................................................................................... 14, 25

**Executive Orders**

Exec. Order No. 9698, 11 Fed. Reg. 1809 (Feb. 19, 1946) ........................................... 10

Exec. Order No. 10,864 25 F.R. 1507 (Feb. 18, 1960) ................................................. 10

Exec. Order No. 12628, 53 F.R. 7725 (Mar. 8, 1988) ................................................. 10

**Other Authorities**

Restatement (3d) of Foreign Relations Law of the United States §102 ........................................ 12

S. Rep. No. 102-249 ...................................................................................................... 22

Plaintiffs respectfully submit this Memorandum of Law in opposition to the Defendants' Motion to Dismiss (Doc. No. 49, the "Motion") on immunity grounds.

## PRELIMINARY STATEMENT

The Defendants have conceded for purposes of their Motion that the Plaintiffs' Complaint (Doc. No. 1, the "Cmplt.") sets forth, subject to proof at trial, viable claims against each of them for aiding and abetting the horrific genocidal and terrorist acts of Hamas (the "October 7 Attack," as defined in the Cmplt.) that killed or grievously injured the Plaintiffs and their decedents.[1]  They likewise do not dispute that, absent their claimed immunity defenses, this Court has subject-matter jurisdiction over these claims under 28 U.S.C. §§ 1350, 1331, and 1367(a), and likewise do not dispute that they are all subject to personal jurisdiction in this Court under the New York long-arm statute and consistent with the Fourteenth Amendment.  The Motion argues only that a treaty (the "CPIUN"[2]) and a federal statute (the "IOIA"[3]) override this Court's jurisdiction and thereby put the Defendants completely above the law, permitting them to aid and abet genocide, mass murder, mass rape, and other violations of fundamental human rights with impunity.  They are wrong.

On October 7, 2023, the Plaintiffs were mercilessly hunted, tortured, taken hostage, sexually assaulted and killed by a premeditated and carefully organized attack launched by

---

[1] *See* Doc. No. 50 at 8 n. 1, stating that "this Motion does not challenge the well-pleaded factual allegations of the Complaint" while purporting to reserve the right to challenge whether the Complaint states a cause of action at some unspecified future time.  Fed. R. Civ. P. 12(h)(2) governs when and how Defendants may do so.  Their intermittent rhetorical flourishes attacking the adequacy of the Plaintiffs' pleading are just that – flourishes to be ignored unless and until they are willing to actually make a motion on that issue.

[2] The Convention on the Privileges and Immunities of the United Nations, 21 U.S.T. 1422.

[3] The International Organizations Immunities Act, 22 U.S.C. §§ 288 et seq.

Hamas with genocidal intent and the active participation of UNRWA personnel. By this action, Plaintiffs seek redress from the Defendants for aiding and abetting Hamas in perpetrating those same atrocities, via, among other things, funding Hamas' illicit arms purchases and providing safe harbor for Hamas to use UNRWA headquarters and other property as part of its terror infrastructure. Plaintiffs' Complaint sets forth in great detail how Defendant UNRWA and its current and former senior leadership (the "Individual Defendants") knowingly provided over $1 billion U.S. dollars in cash to Hamas to pay smugglers for the weapons and explosives used in the October 7 Attack; Defendants knowingly provided Hamas with the safe haven of UNRWA's Gaza facilities to plan, command, stage and coordinate the October 7 Attack; Defendants knowingly allowed Hamas to indoctrinate recruits and control its schools through Hamas teacher guides, Hamas teachers and al Kutla programming, knowingly employed and retained Hamas members on staff and in leadership positions, and regularly met with senior Hamas leaders. Cmplt. ¶¶ 545-559, 560, 572-580, 587, 581-586. The Complaint alleges how the Defendants acted and set in motion these acts here in New York, through New York bank accounts and New York-based planning, budgeting, solicitation and fundraising. *Id.* ¶¶ 617-631.

Defendants' actions in aiding and abetting the atrocities committed by Hamas were not only torts and violations of the Torture Victims Protection Act ("TVPA"), they violated well-established "jus cogens" norms. As the Second Circuit has explained, these fundamental international-law norms protecting human rights "may not be violated, irrespective of the consent or practice of a given State," and "enjoy the highest status within international law." Similarly, the United Nations itself maintains that any action or decision of any international organization (including treaties) that conflicts with a jus cogens norm is ineffective. Indeed, the United Nations Security Council has mandated that all states, including the United States, must

"ensure that any person who participates in the financing, planning, preparation or perpetration of terrorist acts … is brought to justice."  Given this context, Defendants' assertions of complete immunity and impunity should be rejected.

Defendants are not advancing their immunity arguments on a blank slate.  The Plaintiffs previously responded to the Government's arguments about immunity (Docs. No. 17 & 38) at length in two filings of our own, showing that immunity is not available here.  Docs. No. 25 ("Pl. Immunity Mem. I") & 42 ("Pl. Immunity Mem. II"), both of which are incorporated herein by reference in their entirety.  Two separate amicus briefs were filed in support of Plaintiffs' position and in opposition to the Government's immunity arguments.  Docs. No. 35 & 37-1, both of which are likewise incorporated herein by reference to the extent relevant to opposing the Motion.

Now that they have filed their own Motion, however, it is clear that Defendants have no new arguments on immunity to offer.  Moreover, despite having had the advantage of having already seen all of the arguments against immunity set out in the prior filings by Plaintiffs and the amici, their brief (Doc. No. 50, the "Def. Mem.") completely ignores many of those arguments, thus (as will be explained below) conceding they have no response to offer to them. To the extent they even acknowledge prior official UN statements that cannot be reconciled with their current litigation position, they pooh-pooh those statements as having been empty PR exercises with no legal significance.  Even more importantly, the Defendants have not accompanied their Motion with any evidence, either in the form of documents or of testimonial declarations, even though they rely on self-serving factual assertions that they would necessarily have easy access to the evidence to support if such evidence actually existed.

Briefly:

- Both the CPIUN and IOIA protect the United Nations itself, but do not extend protection to the entire range of separate UN-affiliated entities such as UNRWA;

- The CPIUN, under standard treaty-interpretation principles endorsed by the UN itself, does not provide protection for jus cogens violations;

- Any IOIA immunity is subject to other specific statutory exceptions;

- Immunity for the Individual Defendants (even if UNRWA employment were considered UN employees) requires preconditions which were not satisfied here and is limited to their "official" acts – but jus cogens violations are by definition not protected as official acts since no nation or international organization can authorize such acts;

- No additional "diplomatic" immunity is available for the two Individual Defendants claiming it due to, among other things, a failure of proof of their alleged status; and

- Any individual immunity has been waived.

Finally, it cannot be ignored the United Nations and the treaties discussed herein were formed in the years immediately following the Second World War as an antidote to the unrestrained trampling of jus cogens norms. In the midst of that era, on September 29, 1947, the U.S. Government opened the Einsatzgruppen Trial by declaring: "If these men be immune, then law has lost its meaning and man must live in fear." It would be a grim irony if the same treaties were now interpreted to give license and absolute immunity to aid and abet genocide, crimes against humanity, torture, mass killing and rape.

# ARGUMENT

## I.    DEFENDANTS BEAR THE BURDEN OF SHOWING THAT THEY ARE ENTITLED TO THE PROTECTION OF THE CPIUN AND/OR THE IOIA

Defendants assert (Def. Mem. at 7-8) that Plaintiffs bear the burden of showing subject-matter jurisdiction exists, but do not deny that 28 U.S.C. §§ 1350, 1331, and 1367(a), properly invoked by the Cmplt.  (¶¶ 10-11), individually and collectively give this Court subject matter jurisdiction unless they are specifically overridden by the CPIUN or the IOIA.  Plaintiffs have thus carried whatever initial burden they may have had regarding subject-matter jurisdiction. The very first case they cite, *Broidy Capital Mgt. LLC v. Benomar*, 944 F.3d 436, 444 (2d Cir. 2019), hurts them rather than helps them, because in that case the Second Circuit expressly held that (*id*. at 440, emphasis added) "*where a defendant has demonstrated diplomatic status, plaintiffs bear the burden of proving by a preponderance of the evidence that an exception to diplomatic immunity applies.*"  In other words, it had been the *defendant's* burden to make the initial showing that he was in fact a diplomat presumptively entitled to the protection of the relevant treaty granting such immunity.  Likewise, whatever cases may hold (Def. Mem. at 19) that a plaintiff must prove that CPIUN immunity has been waived necessarily only impose that burden *after* CPIUN immunity, if disputed, has been shown by the defendant to be applicable unless waived.[4]

---

[4] In any event, earlier Second Circuit decisions that speak of the Defendants' proffered immunity defenses as going to subject matter jurisdiction must be read in light of the Supreme Court's recent emphasis that such immunity doctrines provide "a rule of substantive law governing the exercise of the jurisdiction of the courts, not an exception to a general statutory grant of subject matter jurisdiction."  *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 270-71 (2023) (citation and quotation omitted).

We previously cited (Pl. Immunity Br. I. at 7) *Pablo Star Ltd. v. Welsh Government*, 961 F.3d 555, 559-60 (2d Cir. 2020), which holds that a defendant claiming immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. 1602 et seq., "bears the burden of establishing a prima facie case that it is a foreign sovereign." Indeed, in the FSIA context it is the defendant that bears the ultimate burden of showing the inapplicability of any potentially available exception to immunity.  *Id*. at 560.  *Jam v. Int'l Finance Corp.*, 586 U.S. 199, 207-208 (2019), holds that the IOIA provides "international organizations" as defined therein with the same protection as the FSIA provides foreign sovereigns, necessarily meaning that a defendant claiming to be a protected "international organization" must likewise establish that it in fact is one and likewise prove the inapplicability of any potentially relevant exceptions.  Defendants fail to even acknowledge, much less distinguish, *Pablo Star* or any of the numerous other cases on the initial burden cited in the Pl. Immunity Br. I (at 7), such as *Ocean Line Holdings Ltd. v. China National Chartering Corp.,* 578 F. Supp.2d 621, 622-628 (S.D.N.Y. 2008) (immunity rejected when defendant failed to show that it was agency or instrumentality of foreign government).

## II.    UNRWA ITSELF IS NOT IMMUNE UNDER THE CPIUN OR THE IOIA

### A.  No Showing Has Been Made that the Treaty and Statutory Immunity Granted to the UN Itself Extends to Immunize UNRWA

Section 2 of the CPIUN provides immunity to "[t]he United Nations."  Nothing in its text, much less its history or structure, extends that immunity to any or all affiliated entities such as UNRWA.  Indeed, Defendants do not dispute that section 2 immunity does not extend to all UN-affiliated entities, because they do not dispute (Def. Mem. at 11) that the Pan American Health Organization ("PAHO"), whose immunity defenses were rejected in the *Rodriguez* case, is not protected by the CPIUN.  *See Rodriguez v. Pan American Health Organization*, 502 F.

Supp. 3d 200, 227 (D.D.C. 2020) They likewise do not dispute that PAHO is affiliated with the UN just as UNRWA is.  Their current theory (Def. Mem. at 12-14) appears to be that UNRWA is a "subsidiary organ" within the meaning of Article 22 of the UN Charter while PAHO is a "specialized agency" within the meaning of Article 57 of the Charter, and that the wording "United Nations" as used in section 2 of the CPIUN is somehow broad enough to extend to all subsidiary organs yet not broad enough to extend to any specialized agencies.[5]

Even if it were established that UNRWA is in fact a subsidiary organ (which it has not been), no support or rationale is offered for this distinction other than that it obviously suits UNRWA's immediate tactical litigation needs.  Indeed, the initial June 2024 UN letter seeking the help of the Government in extricating the Defendants from this action nowhere uses the phrase "subsidiary organ," but instead asserts (Doc. No. 17-1 at 2) that UNRWA is covered by section 2 "as an integral part" of the UN.

After the DOJ Letter echoed this "integral part" assertion, Plaintiffs then pointed to very substantial evidence undermining it.  Pl. Immunity Br. I at 14-16 and exhibits cited therein. Defendants have not responded to or disputed this showing, and have thus now silently abandoned *the UN's own argument* that only an "integral part" of it is entitled to CPIUN immunity.  They now contend that (Def. Mem. at 12) "subsidiary argument" status can supposedly be established merely by pointing to the fact that UNRWA was originally created in 1949 by a General Assembly resolution (which nowhere uses the phrase "subsidiary organ"),

---

[5] Defendants also make a pro forma claim (Def. Br. at 7, 9) that the U.N. Charter itself provides immunity, but they cite to zero case law that so holds.  *See*, *e.g.*, *Rodriguez*, 502 F. Supp. 3d at 228 (D.D.C. 2020) (rejecting precisely that claim about the effect of the Charter), *aff'd on other grounds*, 29 F.4th 706, 716-717 (D.C. Cir. 2022) (noting that defendant had not pursued its Charter-based immunity argument on appeal).

thus sidestepping their inability to contradict any of Plaintiffs' evidence showing how UNRWA's actual operations and structure distinguish it from the UN itself.

But as Plaintiffs have already explained (Pl. Immunity Br. I at 13-14), the very same 1949 resolution establishing UNRWA that Defendants point to "[c]alls upon the Governments concerned to accord to [UNRWA] the privileges, immunities, exemptions and facilities *which have been granted to the United Nations Relief for Palestine Refugees*, together with all other privileges, immunities, exemptions and facilities necessary for the fulfilment of its functions." (Doc. No. 24-5, ¶17 (emphasis added)).  This is the very opposite of a statement that UNRWA was to be considered legally indistinguishable *from the UN itself* for treaty-based immunity purposes.  Defendants have nothing to say about this glaring contradiction in their position. While they do not and cannot dispute that General Assembly resolutions sometimes characterize UNRWA as a "subsidiary organ" and other times do not, they claim (Def. Mem. at 13) that this unexplained inconsistency is irrelevant.  But they do not even address the undisputed evidence that the UN's current official organizational chart affirmatively excludes UNRWA from its list of "subsidiary organizations," putting it instead into a miscellaneous category of "Other Entities."  Doc. No. 24-4.  Similarly, a seemingly comprehensive list of "Subsidiary Organs of the General Assembly" found on the UN's official website lists the *Advisory Commission* to UNRWA (not a defendant in this action) as such an organ, but conspicuously omits UNRWA itself.  *See* Exhibit to Supplemental Declaration of John W. Brewer filed herewith.

The case law Defendants cite (Def. Mem. at 10-11) in which various UN-affiliated entities were held entitled to section 2 immunity, on various rationales generally not explained with any clarity, is overwhelmingly at the district court level rather than binding precedent, but even more importantly, merely *assumed* rather than *decided* a broad interpretation of the treaty

like that UNRWA now claims, as well as never addressing the jus cogens issues discussed

below. As Plaintiffs previously showed (Pl. Immunity Mem. I at 11-13), in case after case relied

on, the claimants did not challenge in their briefing the defendants' contentions that such-and-

such entity was protected by the CPIUN, relying only on other, unsuccessful, arguments that

some exception to immunity applied. Defendants completely ignore that showing because they

cannot dispute it.[6] These decisions thus have no precedential value.[7] And the same is true of the

Defendants' newly-cited case, *Lempert v. Rice*, 956 F. Supp. 2d 17, 24 (D.D.C. 2013), where the

pro se plaintiff never challenged the assertion that the CPIUN covered the United Nations

Development Programme ("UNDP") to the same extent as the UN itself.[8]

   Just as importantly, Defendants completely ignore the ratification history of the CPIUN,

even though they concede (Def. Mem. at 17) that it is only the Senate's belated 1970 ratification

of the 1946-drafted treaty that makes it a source of law enforceable in this Court. We showed

(Pl. Immunity Mem. I at 10) that when the Chairman of the Senate Foreign Relations Committee

asked the State Department's senior lawyer whether the treaty covered entities (including UN

affiliates) beyond the UN itself, he, and thus the entire Senate which then relied on that

---

[6] We previously provided (Pl. Immunity Mem. I at 12 n.8 and 13 n.9) direct citations to the relevant briefing in *Georges v. United Nations*, 834 F.3d 88, 98 (2d Cir. 2016), *Laventure v. United Nations*, 279 F. Supp.3d 394 (E.D.N.Y), *aff'd* 746 Fed. App'x 80 (2d Cir. 2018), and *Sadikoglu v. United Nations Development Programme*, No. 11 Civ. 294 (PKC), 2011 WL 4953994 (S.D.N.Y. Oct. 14, 2011).

[7] *See, e.g., Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133, 153 (2d Cir. 2016) (a "sub silentio holding" in earlier case on issue not disputed by parties to that case "is not binding precedent" because earlier court "did not independently analyze" its merits) (citations and quotations omitted); *United States v. Norman*, 935 F.3d 232, 241 (4th Cir. 2019) (giving no weight to statement of law in prior opinion that had not been disputed by parties in that case: "[U]nder our adversarial system of justice, an unchallenged and untested assumption is simply not a holding that binds future courts.").

[8] *See* D.D.C. No. 1:12-cv-01518 Docs. No. 20 & 29, treating the "UN/UNDP" as an undifferentiated group.

testimony, was told that it did not.  The State Department had every opportunity to advise the

Senate that the treaty did *not* cover "specialized agencies" as defined in Article 57 of the UN

charter but *did* cover "subsidiary organs" as defined by Article 22 of the Charter.  But it did not

do so, and there is no evidence that the State Department or anyone else believed that.  Indeed,

the Senate was affirmatively told (Doc. No. 24-1 at 11) that as to the UN itself, the coverage of

the CPIUN would be essentially identical to that already provided by the IOIA, but Defendants

have pointed to no caselaw or even informal Government statements prior to the Senate's 1970

ratification that had treated President Truman's 1946 designation of the UN itself, as an

"international organization" entitled to IOIA protection, as extending to other UN affiliates such

as UNRWA.  The Senate was thus not even on constructive notice of Defendants' current

interpretation of the treaty it ratified.

And as to the IOIA, the Defendants do not dispute that the IOIA requires (22 U.S.C §

288) specific organization-by-organization presidential designation by Executive Order, they do

not dispute that UNRWA has never been so designated, and they do not dispute that multiple

presidents over the years have specifically designated other UN-affiliated entities, including in

the very 1946 Executive Order in which President Truman designated the UN itself.  Ex. Ord.

9698, 11 F.R. 1809 (Feb. 19, 1946).  *See also*, *e.g*., Ex. Ord. 10,864, 25 F.R. 1507 (Feb. 18,

1960) (designating PAHO); Ex. Ord. 12628, 53 F.R. 7725 (Mar. 8, 1988) (designating UN

Industrial Development Organization).  Plaintiffs have already briefed all of these points (*see*,

*e.g.,* Pl. Immunity Mem. II at 6), and once again Defendants ignore them because they have no

response to offer.  They certainly do not offer any evidence that it was President Truman's

intention in 1946 by designating the "United Nations" for protection to also offer protection to

any and all subsidiary organs as defined in Article 22, including those like UNRWA that did not

yet exist, while not offering protection to any specialized agencies covered by the Charter's Article 57, whether or not already in existence. Indeed, given the IOIA's focus on entity-by-entity designation for protection, they offer no basis to think that the meaning of "United Nations" in President Truman's executive order could conceivably be any broader than its meaning in the CPIUN.

Why would President Truman give the UN General Assembly a blank check to secure IOIA immunity for any number of future "subsidiary organs" not even created or imagined yet, no matter how divergent their missions from the UN's original core mission might prove to be, or how inconsistent with U.S. interests or values they might prove to be? Why would the Senate ratify a treaty that similarly conferred an even more open-ended blank check on the UN General Assembly to do the same thing? There are no good answers to these questions, and Defendants have not even attempted to answer them.

In short, because the CPIUN does not provide any immunity to UNRWA or its employees and no President thus far has chosen to designate UNRWA as eligible for immunity under the IOIA,[9] neither the treaty nor the statute provides any immunity to these Defendants and the Court need not inquire any further before denying their Motion.

B. Under Well-Established Treaty Interpretation Principles, Any CPIUN Immunity Does Not Apply to Jus Cogens Violations[10]

---

[9] To the extent Defendants may claim that the failure to separately and specifically designate UNRWA for IOIA protection was a bureaucratic oversight, any such "oversight" may be corrected by the current President or his successors by a new Executive Order if and when they deem it in the public interest to do so.

[10] Defendants do not dispute that the acts of Hamas alleged in the Complaint constitute jus cogens violations, nor do they dispute (at least not with any authority) that aiding and abetting a jus cogens violation is itself a jus cogens violation. *See*, *e.g*., Art. 7(1) of the Security-Council-approved Statute of the International Criminal Tribunal for the Former Yugoslavia, available online at https://www.icty.org/x/file/Legal%20Library/Statute/statute_sept09_en.pdf: ("A

Defendants' assertion that Plaintiffs are seeking some judge-made jus cogens exception to the superficially absolute language of section 2 of the CPIUN misapprehends the argument. The CPIUN is a treaty, and there is a well-established body of law as to how treaties and their language are to be interpreted and understood.  Specifically, it is a well-established principle of treaty interpretation that a treaty among nations is void and unenforceable if it violates a jus cogens norm, just as an ordinary private contract may be held void for illegality or for violating public policy. *See*, *e.g*., Vienna Convention on the Law of Treaties, arts. 53 & 64;[11] Restatement (3d) of Foreign Relations Law of the United States §102, cmt. j ("an agreement will not supersede a prior rule of customary law that is a peremptory norm of international law [*jus cogens*]; and an agreement will not supersede customary law if the agreement is invalid because it violates such a peremptory norm"). Thus, the CPIUN would be unenforceable to the extent it is interpreted to provide impunity for defendants charged with aiding and abetting genocide and similar jus cogens violations.

The UN's own International Law Commission ("ILC") fully endorses this position, recently advising the General Assembly that international treaties (necessarily including the CPIUN) are void if they conflict with jus cogens norms. *See* Conclusions 10, 11 & 12 in the

---

person who planned, instigated, ordered, committed or otherwise aided and abetted in the planning, preparation or execution of a crime referred to in articles 2 to 5 … shall be individually responsible for the crime.")

Again, defendants have elected not to file a 12(b)(6) motion arguing that the Complaint does not sufficiently plead aiding and abetting liability against each of them, so the immunity analysis must proceed on the assumption that it does.

[11] *See Mora v. New York*, 524 F.3d 183, 196 (2d Cir. 2008) (treating this convention as persuasive authority on customary principles of treaty interpretation even though U.S. has not formally ratified it). The text of this convention is available at https://legal.un.org/ilc/texts/instruments/english/conventions/1_1_1969.pdf.

ILC's "Draft conclusions on identification and legal consequences of peremptory norms of general international law (jus cogens)." *See* Doc. No. 24-10. Not only is there no basis in the other authorities cited to exempt the UN from this rule of international law, the ILC separately concludes (*id*. at Conclusion 16) that a "resolution, decision or other act of an international organization that would otherwise have binding effect" is ineffective to the extent it conflicts with a jus cogens norm. In Comment 2 to Conclusion 16, the ILC gives the specific example of a Security Council or a General Assembly resolution as the type of decision that cannot override jus cogens norms.

As the Second Circuit has explained,

A jus cogens norm, also known as a peremptory norm of international law, is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character. Jus cogens embraces customary laws considered binding on all nations, and is derived from values taken to be fundamental by the international community, rather than from the fortuitous or self-interested choices of nations. Accordingly, we have previously explained that these norms may not be violated, irrespective of the consent or practice of a given State. Because jus cogens norms do not depend solely on the consent of states for their binding force, they enjoy the highest status within international law."

*Kashef v. BNP Paribas, S.A*., 925 F.3d 53, 61 (2d Cir. 2019) (citations and quotations omitted).

Separately, it is well established that a treaty's "preamble is not without meaning under international law. It provides valuable context for understanding the terms of a treaty." *Mora*, 524 F.3d at 196. Here, the CPIUN's preamble (in the second "Whereas" clause, emphasis added) quotes the language of the UN Charter's Article 105, contemplating that the UN itself (again, not UNWRA) "shall enjoy in the territory of each of its Members such privileges and immunities *as are necessary for the fulfillment of its purposes*."

Plaintiffs do not ask this Court to make its own determination about whether impunity for jus cogens violations is "necessary for the fulfillment of the UN's purposes." The UN itself has

already definitively answered that question.  Security Council Resolution 1373, adopted in 2001 under Chapter VII of the UN Charter, authoritatively declares "that acts, methods, and practices of terrorism are contrary to the purposes and principles of the United Nations and that knowingly financing, planning and inciting terrorist acts are also contrary to the purposes and principles of the United Nations."[12]  Doc No. 24-11.  That also requires all UN Members, including the U.S., to "[e]nsure that any person who participates in the financing, planning, preparation or perpetration of terrorist acts … is brought to justice."  The Complaint alleges, with voluminous supporting detail, that UNRWA helped finance and otherwise facilitate Hamas' terrorism and genocide in the October 7 Attack.  Cmplt. ¶ 6a-d, 543-616.

Although all of these authorities have already been raised in this Court by Plaintiffs (Pl. Immunity Mem. I at 17-20), Defendants almost completely ignore them and their impact on the proper judicial interpretation of the CPIUN, claiming only (Def. Mem. at 15-16) that Security Council Resolution 1373 should be considered merely a non-binding and aspirational document like those addressed in *Laventure*, which dealt with the establishment of internal UN claims resolutions processes to provide compensation for negligent harm caused by UN peacekeepers but were allegedly not adequately implemented.  We doubt that the Security Council members who voted for Resolution 1373 in the immediate aftermath of the 9/11 attack would find this a persuasive analogy, and there is no basis for this Court to do so.  Put plainly, the Defendants' position is that the entire UN organization is fundamentally hypocritical and all of its statements condemning terrorism and impunity for jus cogens violations and stressing the importance for

---

[12] When the Security Council acts pursuant to Article VII, as it did in this resolution, the resolution is binding international law rather than merely hortatory. *See Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 261 (2d Cir. 2003); Doc. No. 24-12 (U.S. ambassador to UN explaining that "only under Chapter 7 is the [Security Council] action mandatory on all UN members").

remedies for victims of such violations are intended to apply to everyone else in the world while the UN itself together with its affiliates (including any future affiliated entities established by a majority vote of the General Assembly) remains completely above the law.[13]  This Court should reject that position.

### C.  This Court Is Not Obligated to Subordinate Its Own Judgment on Questions of Treaty Interpretation to the Government

Defendants repeatedly assert that this Court ought to abandon its own right and duty to decide questions of law by blindly deferring to whatever position the Government has suggested. Def. Mem. at 2, 11, 20.  But the law is clear that "courts interpret treaties for themselves." *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961). *See also Medellin v. Texas*, 552 U.S. 491, 506 (2008) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text.") The courts in practice do not defer to the Government in treaty interpretation if the Government's position does not persuade them on the merits. *See*, *e.g*., *BG Group plc v. Republic of Argentina*, 572 U.S. 25, 37 (2014) ("We do not accept the Solicitor General's view as applied to the treaty before us.").

The Government is certainly entitled to no deference when its current litigation position contradicts its earlier positions, especially the representations it made to the Senate when the treaty in question was ratified. *See Caltagirone v. Grant*, 629 F.2d 739, 746 n.18 (2d Cir. 1980) (refusing to give weight in interpreting extradition treaty to affidavit from State Department

---

[13] Interpreting the CPIUN to give these Defendants impunity would likewise contravene the UN General Assembly's Resolution 60/147 on "Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law." Doc. No. 24-13.  That resolution and the principles it endorses state (emphasis added) that each member state, including the U.S., is obligated to "[p]rovide those who claim to be victims of a human rights or humanitarian law violation with equal and effective access to justice … *irrespective of who may ultimately be the bearer of responsibility for the violation*" and to "[p]rovide effective remedies to victims."

official that Government had submitted to district court when the affiant appeared to lack familiarity with the drafting of the treaty); *Yaman v. Yaman*, 730 F.3d 1, 14 (1st Cir. 2013) (in interpreting treaties, "the 'weight' of the Executive Branch's position in a particular case depends in part upon 'its consistency with earlier and later pronouncements'") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  Here, of course, the Government's current arguments cannot be reconciled with what the State Department told the Senate at the time it was considering ratification of the CPIUN.

The claim (Def. Mem. at 11, 14) that the Government's position should be entitled to even greater deference because the UN itself agrees with it does not pass the red-face test. The UN, in the context of this case, is a self-interested entity affiliated with each of the defendants and unsurprisingly supportive of their desire for immunity and impunity. This is the polar opposite of *Sumitomo Shoji America, Inc. v. Avagiano*, 457 U.S. 76 (1982).[14]

Finally, the claim (Def. Mem. at 20) that this Court "must" defer to the Government's claims about treaty interpretation because of *767 Third Ave. Assoc. v. Permanent Mission of Zaire*, 988 F.2d 295, 301-302 (2d Cir. 1993) completely miscites that case.  That case held to the contrary that (*id*. at 302, emphasis added) "federal courts must defer *to the language* of Article 22" of the relevant treaty after noting that the Government's interpretative position and historical practice was fully consistent with the Court's own interpretation of the treaty language after a lengthy discussion of prior authorities.

D.  Explicit Statutory Exceptions to IOIA Immunity Would Apply Here

---

[14] In that case, a New York subsidiary of a Japanese company argued it should be treated as a Japanese company under a specific U.S.-Japan treaty. But the Japanese government took the contrary position, which was against the economic interests of the litigant's Japanese owners. As a result, the Court gave weight to the fact that both countries agreed on the treaty's proper interpretation even though they had potentially competing economic interests.

Defendants' discussion of the IOIA largely claims (Def. Mem. at 16-18) that it is irrelevant because CPIUN immunity is broader in scope. Why, then, do Defendants even bother to raise the IOIA? The answer is obvious. It is undisputed that the Second Circuit has held FSIA immunity (and thus, under *Jam*, IOIA immunity) to protect a sovereign-nation defendant even when jus cogens violations are alleged. *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 244-45 (2d Cir. 1996). Defendants are well-aware of their vulnerability given all the reasons why the CPIUN does not provide immunity for jus cogens violations. Accordingly, they hope that the IOIA under *Smith* could immunizes UNRWA where the CPIUN does not. *See* Pl. Immunity Mem. II at 1-2 (noting same obvious motivation for Government's belated invocation of IOIA.)

Contrary to Defendants' mischaracterization, Def. Mem. at 18, Plaintiffs do not dispute that this Court is bound by *Smith* unless and until the Second Circuit revisits it. Rather, the point is that IOIA immunity is subject to *other* explicit FSIA exceptions not available if the CPIUN applies, and those separate exceptions prevent the IOIA from providing immunity here.

Although Plaintiffs previously set out (Pl. Immunity Mem. II at 2-5) the basis for both the implicit waiver and commercial activities FSIA exceptions here, Defendants offer no meaningful response to those arguments, even though the ultimate burden rests on them to disprove the potential availability of any plausibly-raised exception. *Pablo Star*, 961 F.3d at 560.

They completely ignore the waiver argument, thus conceding they have no response to it.[15] As to the commercial activities exception, they make a throwaway argument citing only a

---

[15] IOIA/FSIA waiver can be implicit as well as explicit. *See* 28 U.S.C. § 1605(a)(1). No authority is cited for the assertion (Def. Mem. at 16) that the CPIUN does not permit prospective waiver before a specific claimant's cause of action has arisen, and such prospective waivers are routinely enforced in the FSIA context. *See, e.g.*, *EM Ltd. v. Republic of Argentina*, 695 F.3d

single case, *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27 (2015). *OBB*'s facts have nothing

to do with Plaintiffs' claims here. In *OBB*, the American plaintiff was injured in a railway

station in Austria and sued the government-owned Austrian railway system in a U.S. court,

claiming that her injuries resulted from commercial activities in the U.S. because she had bought

a Eurail pass in the U.S. before traveling to Austria. This was obviously sheer happenstance, and

the Austrian railway system obviously derived only a trivial percentage of its revenue from

Eurail pass sales in the U.S. rather than domestic ticket sales. Here, by stark contrast, UNRWA

deliberately comes to New York to do virtually all of its fundraising, that fundraising, and the

subsequent New-York-based collection and disbursement to Gaza of the funds solicited, is

"upstream" from, and causally necessary for, all of the subsequent downstream acts of UNRWA

in Gaza that aided and abetted Hamas' atrocities in the October 7 attack. Cmplt. ¶¶ 617-631.

Moreover, Defendants wrongly assert (Def. Mem. at 18-19) that *OBB*'s "gravamen" rule

means that the commercial activities exception can only apply when a plaintiff's actual injury

occurred in the U.S. That is simply not the law. As Plaintiffs already explained (Pl. Immunity

Mem. II at 4-5, in yet another previously-briefed argument Defendants ignore because they

cannot counter), the D.C. Circuit in *Rodriguez*, 29 F.4th at 716-717, held the commercial-

activities exception applicable to deny IOIA immunity to UN-affiliate PAHO despite the fact

that it was undisputed that the plaintiffs' injuries themselves occurred in Brazil or Cuba. What

mattered (*id*. at 715) was the significance of PAHO's activities in transferring money through the

United States in the causal chain that ultimately led to those plaintiffs' injuries. *Compare United*

*States v. Turkiye Halk Bankasi*, 16 F.4th 336 (2d Cir. 2021), *aff'd in relevant part on alternative*

---

201, 203 n.1 (2d Cir. 2012) (noting broad prospective immunity waiver explicitly made by
Argentina when it initially issued bonds, long before it defaulted on them).

*grounds*, 598 U.S. 349 (2023) (no immunity because foreign bank's dealings with U.S. Treasury Department were commercial activities and key part of alleged wrongdoing), *with Bilalov v. Gref*, 2022 WL 4225968 *5-6 (S.D.N.Y. Sept. 13, 2022) (exception inapplicable because financial transactions via U.S. banks occurred only after plaintiff had already been injured overseas and were thus not in causal chain leading to plaintiff's injury).

## III. THE INDIVIDUAL DEFENDANTS ARE NOT ENTITED TO "OFFICIAL ACTS" IMMUNITY UNDER EITHER THE CPIUN OR THE IOIA

### A. No Showing Has Been Made That Any of the Defendants Qualify for Protection Under Either the CPIUN or IOIA

Section 18 of the CPIUN provides for "official acts" immunity for "Officials of the United Nations." The relevant IOIA provision, 22 U.S.C. §288d(b), provides for "official acts" immunity for officers and employees of "international organizations" as elsewhere defined in the IOIA. But as shown above, UNWRA is not the "United Nations" within the meaning of the CPIUN and UNRWA does not qualify as an "international organization" within the meaning of the IOIA.[16] That by itself disposes of the Individual Defendants' immunity claims.

But both the CPIUN and the IOIA impose additional preconditions before any individual is entitled to protection, and the Defendants have failed to produce any evidence that those requirements have been satisfied. Section 17 of the CPIUN requires that the Secretary-General and General Assembly "specify the categories of officials" entitled to Section 18 immunity and make the names of the specific individuals entitled to such immunity "known to the Governments of Members." As to the first point, Plaintiffs have already pointed out (Pl. Immunity Mem. I at 21 n.15), that the 1946 General Assembly resolution Defendants rely on

---

[16] Defendants have not disputed the Cmplt.'s allegations (at ¶¶508-516) that the Individual Defendants are or were employed by UNRWA, rather than the UN itself.

(Def. Mem. at 28) refers (emphasis added) to the "Staff *of the Secretariat* of the United Nations." They do not dispute this, and they make no claim (nor could they) that UNRWA staff are staff of the Secretariat, which is specifically defined and described in Chapter XV of the U.N. Charter. As to the second point, it is obvious that if the notification requirement had been complied with the Defendants would have access to documentary proof of that.  But not only have they failed to put such proof before the Court, they argue (Def. Mem. at 28-29) that the notification requirement is *not* a prerequisite to immunity, which is not only completely unsupported by the authority they try to invoke, but makes no sense to raise unless Defendants are keenly aware that they failed to comply with the CPIUN's requirements.[17]

That Defendants failed to comply with the notification requirement at the appropriate time is further confirmed by their attempt to rely (Def. Mem. at 29) on the June 2024 letter from a UN in-house lawyer asking the U.S. Ambassador to the UN for assistance with this already-filed lawsuit.  This was a "notification" obviously sent only after the Individual Defendants had already committed the acts giving rise to Plaintiffs' claims and only after six of the eight of them were no longer employed by UNRWA.

As to the IOIA, 22 U.S.C. §288e mandates that no otherwise eligible individual can claim immunity unless (in pertinent part) he or she "shall have been duly notified to and accepted by the Secretary of State as a representative, officer, or employee" of a designated "international organization."  Again, all Defendants point to (Def. Mem. at 29), thus confirming their failure to comply with this statutory requirement, is the June 2024 letter only sent *after* this action had

---

[17] Citing to third-party hearsay reports claiming that the notification requirement has historically been complied with as a general matter (Def. Mem. at 28) likewise makes no sense unless the Defendants cannot show it was complied with with respect to these specific individuals.

already been filed.  Nor do they justify their strained suggestion that the *Justice* Department submitting that letter to this Court somehow constitutes the required "accept[ance] by the Secretary of *State*."  *See Tanzin v. Tanvir*, 592 U.S. 43, 52 (2020) (courts lack authority to provide immunity to individual defendants where Congress has not done so).

### B.  Jus Cogens Violations Are By Definition Not Official Acts and Are Thus Unprotected by Official-Acts Immunity

Defendants spend considerable time (Def. Mem. at 22-24) arguing that the various acts of the Individual Defendants enumerated in the Complaint were all "official" because they were generally conducted within the apparent scope of their UNRWA-related responsibilities.  But they ignore or misstate the key point here.  "[J]us cogens violations are not legitimate official acts and therefore do not merit foreign official immunity."  *Yousuf  v. Samantar*, 699 F.3d 763, 776 (4th Cir. 2012).  The Second Circuit explicitly cited and followed *Yousuf* in *Kashef*, 925 F.3d at 62, holding that because the Government of Sudan could not, as a matter of fundamental international law, validly choose to commit genocide and similar atrocities, it could therefore not validly authorize anyone else to assist it in such atrocities such that they could claim immunity from liability.[18]  As *Yousuf* put it, 669 F.3d at 776, "as a matter of international and domestic law, jus cogens violations are, by definition, acts that are not officially authorized by the Sovereign."  Put another way, because a sovereign nation (and any international organization)

---

[18] The reversed District Court opinion in *Kashef,* 316 F.Supp.3d 770 (S.D.N.Y. 2018), relied on the so-called "act of state" doctrine, holding that the aiding and abetting claims against the defendants could not proceed without an adjudication that the Sudanese government had committed torts as the primary violator, which the court thought the act-of-state doctrine prohibited a U.S. court from considering under the circumstances.  The Second Circuit reversed because the tortious conduct the government was alleged to have committed was not within the range of possibilities that international law permits a sovereign state to consider.  That the Sudanese government itself would, under the Second Circuit's *Smith* precedent, be immune from liability because of the FSIA's lack of a jus cogens exception was neither here nor there.

inherently lacks any capacity to authorize its officials to commit jus cogens violations, if they do commit such violations, those violations are by definition ultra vires and outside the bounds of the official's legitimate official capacity.  Significantly, *Yousuf* also noted the Congressional observation (in the context of the enactment of the TVPA) that "because no state officially condones torture or extrajudicial killings, few such acts, if any, would fall under the rubric of 'official actions' taken in the course of an official's duties."  699 F.3d at 777 (quoting S. Rep. No. 102-249, at 8 (1991)).

Although *Kashef* is cited prominently in the Pl. Immunity Br. I, Defendants do not attempt to address it and simply ignore it, thus conceding that they cannot distinguish it.  Instead, Defendants assert that the Second Circuit has "rejected" *Yousuf*, citing for that proposition a *non-precedential* decision dated five years *earlier* than *Kashef*'s favorable citation of, and reliance on, *Yousuf*.  Def. Mem. at 26, citing *Rosenberg v. Pasha*, 577 Fed. App'x 22, 24 (2d Cir. 2014).  But not only was *Rosenberg* never binding precedent, after *Kashef* it is not even persuasive, at least beyond its specific facts and procedural context.[19]  *Matar v. Dichter*, 563 F.3d 9, 14-15 (2d Cir. 2009), likewise involved common-law immunity and the same deference.  *Matar* thus does not control this case and in light of the Second Circuit's more recent endorsement of *Yousuf*'s logic in *Kashef*, there is no reason to think the Second Circuit would extend *Matar* outside the common-law area.

---

[19] *Rosenberg* involved common-law immunity for former foreign officials, where unlike treaty-based or statute-based immunity the Second Circuit defers almost entirely to the views of the Government.  However, while *Rosenberg* thought the Fourth Circuit gave the Executive too little deference in the common-law immunity context, a much more recent precedential Second Circuit opinion cites *Yousuf*'s discussion of the degree of deference due in that context approvingly.  *See United States v. Bankasi*, 120 F.4th 41, 51-52 (2d Cir. 2024).

The recent Texas district court opinion Defendants seize upon to argue against the application of *Yousuf*, *Does v. Obiano*, No. 4:23-cv-00813, 2024 WL 185642, *5 (S.D. Tex. Jan. 17, 2024), freely acknowledges that whether to follow *Yousuf* was an open question in the Fifth Circuit, and indeed acknowledges some hints in non-binding prior concurrences by Fifth Circuit judges that might be favorably disposed toward *Yousuf*'s reasoning.[20]  *Yousuf*'s reasoning is compelling, endorsed by *Kashef*, and not inconsistent with any controlling Second Circuit precedent. This Cout should adopt its reasoning and reject the Individual Plaintiffs' official-acts immunity claims.

Defendants' attempt to avoid the reasoning of *Yousuf* and *Kashef* is particularly egregious because these decisions are fully consistent with the pronouncements of the UN itself and its International Law Commission, stretching straight back to the immediate aftermath of the Nuremberg Trials.  In its 1947 Resolution 177, the UN General Assembly directed the ILC to formulate for future reference the so-called "Nuremberg principles," which included as Principle III: "The fact that a person who committed an act which constitutes a crime under international law acted as … [a] responsible Government official does not relieve him from responsibility under international law."  *See* Doc. No. 24-15.  Neither the CPIUN nor the IOIA can be construed to give UN-affiliated individuals more expansive immunity than the immunities the UN itself has stated are available to a "responsible Government official" of an individual nation.  Once more, the Defendants' position is apparently that impunity for jus cogens violations is bad for everyone else but good for those associated with the UN.

C.  Any Potential Immunity of the Individual Defendants Has Been Waived

---

[20] Significantly, Defendants do not even try to distinguish *Yousuf*, but are reduced to arguing that it was incorrectly decided (although they cannot explain why) and thus should not be followed.

Faced with undeniable statements on January 26, 2024 by both Defendant Lazzarini and the Secretary-General of the UN pledging that no impunity would be available to any UNRWA employee involved in the October 7 Attack (Docs. No. 24-16 & 24-17), Defendants again try to disavow these statements by claiming they were hypocritical. Lazzarini, they say (Def. Mem. at 25), could not promise to turn over wrongdoers for criminal prosecution because only the Secretary-General could do so – this despite the fact that the Secretary-General's statement issued the very same day explicitly approved of what Lazzarini had announced he was doing and confirmed that the Secretary-General had instructed him to do so. And the Secretary-General's statement, they say (Def. Mem. at 24) was not technically a statement of the Secretary-General, but merely a press release by a spokesperson conveying the Secretary-General's views, which they thereby contend lacks the effect that the waiver provisions of the CPIUN require.

To be blunt, Defendants' apparent argument is that Lazzarini and the Secretary-General were engaged in fraud when they made these statements in late January 2024. These statements now disavowed as mere "press releases" were not made casually or lightly. They were made in the obvious interests of UNRWA's own financial self-preservation at a time when it was experiencing a funding crisis because many of its major donor countries had suspended their contributions due to worldwide adverse publicity about UNRWA's complicity with Hamas and the October 7 Attack. *See* Doc. No. 24-18 (N.Y. Times news article contemporaneous with these statements, listing donor countries that had suspended funding). The obvious intent of Lazzarini and the Secretary-General was to reassure donors by convincing them that there would be accountability instead of impunity for any UNRWA personnel, no matter how senior, complicit with the October 7 Attack. Indeed, the Secretary-General's statement was arguably broader (reaching "any UNRWA employee shown to have participated or abetted in what transpired on 7

October" compared to Lazzarini's "[a]ny UNRWA employee who was involved in acts of terror"). But now the Defendants claim that both statements were illusory and meaningless, to be relied on only by suckers.

Under the CPIUN as authoritatively construed by the Second Circuit, while any waiver of the UN's own immunity must be explicit, waiver of the immunity of a UN official (which, again, these Defendants have not even proven themselves to be) may be implicit. *United States v. Bahel,* 662 F.3d 610, 625 (2d Cir. 2011) (noting analogy to same distinction in text of IOIA, where waiver of an individual's immunity may be implicit but that of the organization must be explicit).[21] These statements by Lazzarini and the Secretary-General, taken at face value rather than conclusively presumed to have been a cynical attempt to defraud and mislead, are more than sufficient to constitute such an implicit waiver. Finally, as noted above at 14, Security Council Resolution 1373 is likewise a prospective implicit waiver with respect to assisting or financing terrorism.

## IV.    MESSRS. LAZZARINI AND GRANDI ARE NOT ENTITLED TO "DIPLOMATIC" IMMUNITY

Defendants assert, with peculiarly exact phrasing, that Messrs. Lazzarini and Grandi "*hold the rank of* " UN Under-Secretary-General) while arguing that section 19 of the "CPIUN" grants diplomatic immunity to all individuals "serving *at the level of* Assistant Secretary-General and above." In other words, they do not contend that either Defendant actually works as an Under Secretary-General of the UN or actually carries out the duties associated with that title of assisting the Secretary-General in the overall administration of the UN.

---

[21] Defendants note (Def. Mem. at 25) that *Bahel* also dealt with an explicit waiver, however the Court found an implicit waiver as to criminal conduct occurring outside of the time range of the explicit waiver. 662 F.3d at 624.

As set forth at length in the amicus brief of multiple distinguished Former Policy Officials and International Law Experts (including former Judge Mukasey of this District), Doc. No. 37-1 at 8-9, there is no basis for the claim that a senior official of a UN affiliate who is treated as an honorary Under Secretary-General for reasons having to do with internal UN protocol or status hierarchy should be entitled to the protection offered by the CPIUN to actual, non-honorary Under Secretaries-General. Defendants offer no argument or authority supporting such a theory, which would be yet another blank check enabling the UN to hand out a higher level of immunity to whoever it wished without limitation. Indeed, during the pre-ratification discussion in the Senate, the granting of this higher level of immunity under Section 19 was of particular concern to the Senate, and the State Department assured them (Doc. No. 24-1 at 3, 17) that it was only going to apply to a very small number of senior officials – a representation completely inconsistent with the apparent subsequent proliferation of "honorary" Under Secretaries-General claiming to possess that "rank" without the corresponding duties. And again, there is no *evidence* that either Lazzarini or Grandi in fact even possesses this honorary rank.[22]

In any event, establishing diplomatic status under Section 19 would not be sufficient to establish immunity. First, the VCDR is a treaty and like all other treaties is subject to the general international law principles set forth above at __ that require it to be interpreted consistently with jus cogens norms and thus not to provide impunity for jus cogens violations. Defendants rely almost entirely on *Devi v. Silva*, 861 F. Supp. 2d 135, 142 (S.D.N.Y. 2012), for the proposition

---

[22] Unsworn lawyers' letters are not evidence. Defendants assert (Def. Mem. at 21) that it is "absurd" to suggest that the claim is unsubstantiated, but once again the real question is why Defendants have refused to provide this Court with evidence that must be at their fingertips if their contention is actually true. The official UN press release announcing Lazzarini's swearing-in as current head of UNRWA conspicuously fails to mention any Under-Secretary-General title. https://www.un.org/unispal/document/unrwa-commissioner-general-sworn-in-at-ceremony-in-new-york-press-release/

that VCDR immunity applies even to jus cogens violations, thereby admitting that it is an open question with no controlling Second Circuit authority. Second, neither *Devi* nor any other case they cite responds to the argument that jus cogens violations, because by definition ultra vires and unauthorized, fall within the admitted carve-out from diplomatic immunity for a diplomat's separate professional or commercial actions. Defendants point to authorities focusing on the motive for private profit in such circumstances (Def Mem. on 20), but the Second Circuit has conceded that the "precise contours" of the exception are "unsettled." *Broidy*, 944 F.3d at 445.The rationale expressed in the authorities for the exception appears to be that any activity for personal profit is by definition outside the diplomat's appropriate and authorized role. But any jus cogens violation is likewise, for the reasons set forth at length above, outside that role. Finally, section 19 immunity can be waived just as section 18 immunity can be, and has been here for the reasons already given.

## V. IN THE ALTERNATIVE, DISCOVERY WOULD BE WARRANTED ON THE ALLEGED FACTUAL GROUNDS FOR THE DEFENDANTS' IMMUNITY ARGUMENTS

On the record now before the Court, the Defendants' various immunity claims all fail for the reasons already given. But if the Court were to think the factual record insufficiently clear and not (as it should) simply treat that as the Defendants' problem for having failed to make a record with evidence that, if it exists, ought to be within their control, limited jurisdictional discovery would be appropriate. In the FSIA context, courts have repeatedly recognized the need for discovery when it is necessary to test the accuracy of self-serving and conclusory assertions by a party seeking immunity. *See*, *e.g.*, *Funk v. Belneftekhim*, 861 F.3d 354, 358 (2d Cir. 2017) (district court had properly ordered jurisdictional discovery against defendant entities

that claimed to be protected by FSIA as agencies or instrumentalities of government of Belarus, and properly sanctioned those entities for failure to provide discovery).[23]

## VI.    DEFENDANTS' OBJECTIONS TO SERVICE OF PROCESS ADD NOTHING, AND THEY HAVE NOW WAIVED ANY PERSONAL JURISDICTION DEFENSE

In addition to Rule 12(b)(1), under which they advance their immunity defenses, Defendants purport (Doc. No. 49) to move to dismiss under Rule 12(b)(2) (lack of personal jurisdiction), (4) (insufficient process), and (5) (insufficient service of process).  All of these are defenses that are waived if not included in an initial 12(b) motion, *see* Fed. R. Civ. P. 12(h)(1)(A), and Defendants have thus waived any personal jurisdiction defense other than one related to the sufficiency of service. [24]

---

[23] *See also In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp.2d 765, 823 (S.D.N.Y. 2005) (ordering jurisdictional discovery against Saudi bank that claimed to be protected by FSIA as agency or instrumentality of Saudi government). *See also Filus v. Lot Polish Airlines*, 907 F.2d 1328 (2d Cir. 1990) (discussing potential need on remand to require Soviet government to respond to interrogatories; no dispute that USSR was a "foreign state" under FSIA but a fuller record might be needed to establish whether a relevant exception to FSIA immunity applied).

[24] The only case they cite, *Waldman v. PLO*, 835 F.3d 317, 327 (2d Cir, 2016), lists adequate service of process as the first of three elements of personal jurisdiction, followed by (ii) a statutory basis for personal jurisdiction; and (iii) no violation of Constitutional restrictions on the exercise of personal jurisdiction.  In *Waldman*, *id.* at 328, there was no dispute that service had been properly made, and the only issue was whether under the circumstances the statutory basis for personal jurisdiction exceeded what the Fifth and Fourteenth Amendments permitted.  Here, by contrast, the Defendants raise no argument that they are not subject to personal jurisdiction in this Court under established New York law relating to general and/or specific jurisdiction and likewise raise no argument that they do not have the minimum contacts with New York necessary to make New York jurisdictional law constitutional as applied in this case.

In any event, UNRWA itself continuously does business in New York via its office here (Cmplt. ¶ 507), defendant Gunnarsdottir works full-time in that New York office (¶ 514), and the other defendants are specifically alleged (¶¶ 622-626) to have travelled to New York and taken actions in New York in order to carry out the wrongful scheme alleged.

As to the service arguments, Defendants do not dispute any of the facts set forth in any of the affidavits of service (Docs. No. 14, 15, 16), nor do they contend that the various modes of service described in those affidavits failed to comply with the requirements (made applicable via Fed. R. Civ. P. 4) of the various jurisdictions in which service was made: New York, Virginia, and the District of Columbia.  Their argument instead is that (Def. Mem. at 29-30) any defendant substantively immune from liability under the CPIUN is likewise automatically immune from service of process by the same provisions of the CPIUN.  Those arguments fail for all of the reasons briefed above, but the equally important point is that this objection to service stands or falls with the CPIUN substantive immunity argument and cannot provide any additional defense once that argument is rejected.  Separately, the Individual Defendants that have not yet been served are currently located outside the United States, so Fed. R. Civ. P. 4(m)'s time limit for service on domestic defendants does not apply to them.[25]

Finally, Defendants claim that a separate CPIUN provision stating that the "premises of the United Nations shall be inviolable" somehow undermines the efficacy of the service made on UNRWA at its office in Washington, D.C.  Doc. No. 14.  Separate and apart from the threshold problem that UNRWA is not protected by the CPIUN in the first place, absolutely no authority is cited for the proposition that this "inviolability" language has anything to do with service of process.  As Defendants know full well but have not informed the Court, a separate bilateral treaty between the U.S. and the U.N. commonly known as the "Headquarters Agreement" governs that issue.  As the Second Circuit explained in *Kadic v. Karadzic*, 70 F.3d 232, 247 (2d Cir. 1995), that separate treaty bars service of process without the Secretary-General's consent

---

[25] We are concurrently filing a premotion letter to move for an order authorizing alternative means of service on those overseas defendants pursuant to Fed. R. Civ. 4(f)(3).

only within the "headquarters district," a specifically defined part of Manhattan containing the UN's headquarters, but does not restrict service on a defendant elsewhere, even on a defendant who was in Manhattan traveling to or from the headquarters district at the time in order to conduct official business with the UN.  No argument is made, or could be made, that UNRWA's Washington, D.C. office, which appears from public records to be rented space in an ordinary commercial office building whose other tenants have no affiliation with the UN, is within the headquarters district as defined in the Headquarters Agreement.

## CONCLUSION

For all of the foregoing reasons as well as those set forth in the prior briefing on immunity issued filed by Plaintiffs and the amici, Defendants' Motion should be denied in its entirety.

Dated: New York, New York
        January 13, 2025

AMINI LLC

By ____*/s/ Avery Samet*_____
     Bijan Amini
     Avery Samet
     John W. Brewer
131 West 35th Street, 12th Floor
New York, New York 10001
Tel. (212) 490-4700
bamini@aminillc.com
asamet@aminillc.com
jbrewer@aminillc.com

MM~Law LLC

By ____/s/ Gavriel Mairone_____
   Gavriel Mairone (admitted to S.D.N.Y. Bar)
   Adora Sauer
   (pro hac vice application to be filed)
   Ariel Mairone (N.Y. state bar # 4993259,
   pro hac vice application to be filed)
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
Tel. (312) 253-7444

*Attorneys for Plaintiffs*

Of Counsel:
Mark Sunshine, Esq.
Thomas Berner, Esq.